IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA
CIVIL DIVISION

**F I L E D**

MAY 2 4 2000

Date $\mathscr{Y}$ : OO-CV-l026-T-25B   Time

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

LOCHMERE DEVELOPMENT
GROUP, INC., a Florida Corporation, and
LOCHMERE REALTY, INC., a Florida
corporation,

        Plaintiffs,

v.

EIGER FUND I, L.P., a Delaware
Limited Partnership; EIGER, INC., a Delaware
Corporation; EIGER PARTNERS, L.P. a Delaware
Limited Partnership; DAVID LANE, an individual;
BARNETT LANE INVESTMENTS, INC., a Texas
corporation; JTL CAPITAL, L.L.C., a Texas
limited liability company; H.D. ASSOCIATES,
L.P., a Delaware Limited Partnership; BANKBOSTON,
N.A., a national association; and PAUL E.
ROWSEY, III, an individual; C. TODD
MILLER, an individual; DAVID M. JACOBS, an
individual; and, WILLIAM S. BUCHANAN,
an individual,

        Defendants.

_____/

( 0  0 **2525**

CASE NO:
Division No:  **DIVISION I**

RECEIPT OF FILING
**APR 0 3 2000**

CLERK OF CIRCUIT COURT

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, LOCHMERE DEVELOPMENT GROUP, INC., a Florida corporation, and

LOCHMERE REALTY, INC., a Florida corporation (collectively "LOCHMERE"), sue

Defendants, EIGER FUND I, L.P., a Delaware Limited Partnership; EIGER, INC., a

Delaware Corporation; EIGER PARTNERS, L.P. a Delaware Limited Partnership; DAVID

LANE, an individual; BARNETT LANE INVESTMENTS, INC., a Texas corporation; JTL

CAPITAL. L.L.C.. a Texas limited liability company; H.D. ASSOCIATES, L.P., a Delaware



limited partnership; BANKBOSTON, N.A., a national banking association; PAUL E. ROWSEY, III, an individual; C. TODD MILLER, an individual; DAVID M. JACOBS, an individual; and WILLIAM S. BUCHANAN, an individual, and allege as follows:

1.    This is a Complaint for damages exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

2.    Robert D. Evans (hereafter "Evans") is the President of Plaintiff, LOCHMERE.

3.    LOCHMERE DEVELOPMENT GROUP, INC. is a Florida corporation with its principal place of business in Hillsborough County, Florida. LOCHMERE REALTY, INC. is a Florida corporation with its principal place of business in Hillsborough County, Florida.

4.    EIGER FUND I, L.P., is a Delaware Limited Partnership which is in the business of making investments in real estate and related transactions.

5.    EIGER, INC., is a Delaware corporation with its principal place of business in Dallas, Texas, and which is in the business of making investments in real estate and related transactions.

6.    EIGER PARTNERS, L.P., is a Delaware Limited Partnership with its principal place of business in Dallas, Texas, and is in the business of making investments in real estate and related transactions. EIGER PARTNERS, L.P., is the General Partner of EIGER FUND I, L.P.

7.    EIGER, INC. controls EIGER PARTNERS, L.P., and substantially all of its stock is owned by the Principals of EIGER FUND I, L.P. (hereafter, EIGER, INC., EIGER PARTNERS, L.P., and EIGER FUND I, L.P., will be collectively referred to as "EIGER").

2

8. BARNETT LANE INVESTMENTS, INC., is a Texas corporation (hereafter "BARNETT LANE").

9. JTL CAPITAL, L.L.C., is a Texas limited liability company (hereafter "JTL CAPITAL"), an affiliate of LANE, and is general partner of H. D. ASSOCIATES, L.P., a Delaware limited partnership (hereafter "H.D. ASSOCIATES").

10. BANKBOSTON, N.A. is a national banking association (hereafter "BANKBOSTON").

11. C. TODD MILLER (hereinafter "MILLER), is an individual with his residence in Texas and is a Principal of EIGER FUND I, L.P. owning substantially all of the stock of EIGER, INC., along with other Principals, David M. Jacobs, Paul E. Rowsey, and William S. Buchanan.

12. DAVID M. JACOBS (hereinafter "JACOBS"), is an individual with his residence in Texas and is a Principal of EIGER FUND I, L.P. owning substantially all of the stock of EIGER, INC., along with other Principals, C. Todd Miller, William S. Buchanan, and Paul E. Rowsey.

13. WILLIAM S. BUCHANAN (hereinafter "BUCHANAN"), is an individual with his residence in Texas and is a Principal of EIGER FUND I, L.P. owning substantially all of the stock of EIGER, INC., along with other Principals, C. Todd Miller, David M. Jacobs, and Paul E. Rowsey.

14. PAUL E. ROWSEY, III (hereafter "ROWSEY"), is an individual with his residence in Texas and is a Principal of EIGER FUND I, L.P. owning substantially all of the

stock of EIGER, INC., along with other Principals, C. Todd Miller, David M. Jacobs, and William S. Buchanan. (hereafter "ROWSEY").

15.    H. D. ASSOCIATES, L.P., is a Delaware limited partnership with its principal place of business in Dallas, Texas. (hereafter "H.D. ASSOCIATES"). H.D. ASSOCIATES' sole limited partner is EIGER FUND I. L.P. and JTL CAPITAL, LLC, an affiliate of LANE, is its general partner.

16.    DAVID LANE (hereafter "LANE") is an individual with his residence in Dallas, Texas and is the President and Director of H.D. ASSOCIATES, L.P.

## JURISDICTION

17.    Jurisdiction in this matter is established under Florida's Long Arm Statute, Fla. Stat. § 48.193(1)(a) because each of the Defendants operated, conducted and engaged in and carried on a business venture within this state with LOCHMERE for the sale and purchase of property located in Florida.

18.    Jurisdiction in this matter is also established under Florida's Long Arm Statute, Fla. Stat. § 48.193(1)(f) because Defendants caused injury to LOCHMERE within Florida arising out of acts and omissions by Defendants residing out of the State while engaged in solicitation and business activities within the state.

## VENUE

19.    Venue is proper in Hillsborough County, Florida for the following reasons:

4

a.    Defendant EIGER, INC., is a foreign corporation doing business in this State.

b.    Defendants LANE, ROWSEY, BUCHANAN, JACOBS, and MILLER are nonresident individuals.

c.    The causes of action accrued in Hillsborough County because the foreign defendants failed to pay for services performed by LOCHMERE and payment for such services was to be made to LOCHMERE at LOCHMERE's resident office located in Tampa, Florida.

d.    Florida Statutes § 47.051 allows venue to be brought against foreign corporations in the county where the cause of action accrued which was Hillsborough County, Florida, the situs of payment.

## ALLEGATIONS COMMON TO ALL COUNTS

20.    LOCHMERE is in the business of developing, marketing, and managing real estate development projects in Florida.

21.    During the fall of 1997, Gene Gorab ("Gorab") of Greenfield Partners, a Connecticut based investment company, informed LOCHMERE of an opportunity to acquire all or portions of the project known as Hammock Dunes, located in Palm Coast, Florida.  Gorab suggested that LOCHMERE visit the site for further investigation. LOCHMERE discovered that the property would cost approximately $35,000,000.00 to purchase.

22.     In November 1997, Evans, as President of LOCHMERE, visited the Hammock Dunes site to obtain information on the Property for potential acquisition and development efforts.

23.     On or about December 12, 1997, in Westport, Connecticut, Evans and Gorab discussed the Hammock Dunes project (hereafter "Project") with Mr. Steve Millham of Farallon Capital Management, L.L.C., of San Francisco, California ("Farallon"), which is also in the business of purchasing and developing real estate.  Evans and Millham discussed arranging a visit in early 1998 to inspect the opportunity as Farallon expressed an interest in pursuing the acquisition of Hammock Dunes in the capacity of a capital investor and needed the involvement of LOCHMERE because of its extensive Florida land development experience.

24.     On or about February 17, 1998, Millham advised LOCHMERE that Defendant, LANE of BARNETT LANE, also in the business of purchasing and developing real estate; was interested in the Project, that Farallon had an existing relationship with LANE, and that LANE had a relationship with Jim Gardner ("Gardner"), President of ITT Community Development Corporation ("ITT"), the owner of Hammock Dunes.

25.     On or about March 3, 1998, Millham contacted Evans and proposed that LOCHMERE evaluate the Project because of its knowledge of Florida land development.

26.     On or about that time, LOCHMERE and LANE and BARNETT LANE agreed to associate for the purpose of forming a partnership and/or joint venture in order to profit from the business of finding a buyer for, and developing, marketing, and managing the Project.

27.    On March 6, 1998, Millham prepared a memorandum to LANE, BARNETT LANE and LOCHMERE detailing the business association and each parties' involvement in the same.  As indicated by the memorandum, LOCHMERE's services were required because of its permitting and development experience in coastal Florida and because LOCHMERE's knowledge of local builders would be an asset to marketing efforts and "sales velocity."  A copy of the memorandum is attached hereto and incorporated herein as Exhibit "A."

28.    Since the inception of LOCHMERE's association with LANE and BARNETT LANE, they knew and agreed that LOCHMERE's continued involvement in due diligence investigations, pursuit of an equity partner and planning development, marketing and management of the Project were conditioned upon LOCHMERE being compensated for all such contributions to the association, specifically to include participation in the profits of the Project.

29.    With that knowledge in hand, LANE and BARNETT LANE continued its partnership with LOCHMERE and the parties continued in cooperative efforts to acquire and develop the Project.

30.    Beginning March 6, 1998 and thereafter, LOCHMERE, at the request of LANE and BARNETT LANE, assumed responsibility for compiling the necessary due diligence information and preparing financial projections and analyses for the Project.

31.    Pursuant to LOCHMERE's agreement with LANE and BARNETT LANE, LOCHMERE assumed a broad role of planning the Project including hiring contractors to

7

engage in due diligence exercises, hiring a law firm to assist in legal matters, hiring a design consultant, engaging the services of an engineering firm, and other tasks.

32.    During April 1998 and May 1998, LOCHMERE met and negotiated with ITT representatives to discuss plans and financial projections for the project and to negotiate major sales agreement issues.

33.    On or about August 6, 1998, BARNETT LANE and ITT executed a purchase and sale agreement for the Project for a purchase price of $32,000,000.00.

34.    On August 21, 1998, LOCHMERE forwarded to LANE and BARNETT LANE and Millham a confirmation letter ("First Partnership Letter") detailing the parties' negotiated structure of marketing, management and development services to be provided by LOCHMERE for the joint venture.    The First Partnership Letter provided that LOCHMERE would provide LANE and Millham "specified managerial services based upon a monthly fee, in addition to all direct expenses related to such services."    Also, "LOCHMERE would receive a Real Estate Brokerage commission, over and above any other brokerage fees paid to Palm Coast Realty, or outside Brokers, as compensation for [LOCHMERE's] supervision and management of the sales efforts" on the Project. The First Partnership Letter provided that the brokerage commission would be paid at the time of the closing of the individual properties sold.  Further, LOCHMERE would "participate in the profit of the venture" based upon a stair stepped hurdle rate.  See Letter dated August 21, 1998 attached hereto and incorporated herein as Exhibit "B."

35.    After receipt of the First Partnership Letter, LANE and BARNETT LANE knew and agreed that LOCHMERE's continued work on the Project was conditioned upon the

8

compensation package outlined in the preceding paragraph.    LANE and BARNETT LANE continued its partnership with LOCHMERE and the parties continued in cooperative efforts to acquire the Project according to the terms of the First Partnership Letter.

36.    On September 2, 1998, LOCHMERE sent LANE and BARNETT LANE a follow up letter ("Second Partnership Letter") to the August 21, 1998 letter detailing, once again, the parties' negotiated structure of marketing, management and development services to be provided by LOCHMERE.  See Letter dated September 2, 1998 attached hereto and incorporated herein as Exhibit "C."

37.    Upon receipt of the Second Partnership Letter, LANE and BARNETT LANE knew and agreed that LOCHMERE's continued work on the Project was conditioned upon receiving the compensation package as set forth in the Second Partnership Letter.  LANE and BARNETT LANE continued its partnership with LOCHMERE and the parties continued in cooperative efforts to complete the Project according to the terms of the Second Partnership Letter.

38.    Between September 2, 1998 and December 15, 1998, in reliance upon LANE and BARNETT LANE's representations and assurances, LOCHMERE continued its work on behalf of LANE and BARNETT LANE and the partnership to plan the development, marketing and management of the Project and to negotiate the acquisition of the Project.

39.    LOCHMERE understood that it would be compensated under the terms of the First Partnership Letter and the Second Partnership Letter.

9

40.    On or about December 15, 1998, Millham and Farallon Capital informed LOCHMERE that Farallon Capital was no longer in a position to proceed with the acquisition of Hammock Dunes.

41.    After Farallon's involvement ceased, LOCHMERE, LANE and BARNETT LANE continued to pursue another equity partner to further their joint partnership interests pursuant to the terms of the First and Second Partnership Letters.    Basic Capital Management, Inc. ("Basic Capital") was identified as a potential equity partner.

42.    LOCHMERE, in furtherance of its role as partner in the Project, was involved in the day to day negotiations with, and education of Basic Capital regarding the Project. See Letter dated March 2, 1999, attached hereto and incorporated herein as Exhibit "E."

43.    However, later that month, Basic Capital decided not to pursue the Project.

44.    After Basic Capital's involvement ceased, LOCHMERE and LANE and BARNETT LANE continued to pursue an equity partner to further their joint partnership interests and pursuant to the terms of the First and Second Partnership Letters.

45.    On March 18, 1999, LANE and BARNETT LANE sent LOCHMERE a memorandum stating "Bob, I had a great meeting today with a potential new partner." See Memorandum dated March 18, 1999 attached hereto and incorporated herein as Exhibit "D." The potential partner was EIGER ("EIGER").

46.    In or about March 1999, LANE left BARNETT LANE and formed Defendant, JTL CAPITAL.

10

47.    In late March, 1999, LANE of JTL CAPITAL, and ROWSEY of EIGER had an initial meeting to discuss their acquisition of Hammock Dunes and to discuss a potential partnership for this purpose.

48.    On March 30, 1999, LOCHMERE, LANE and JTL CAPITAL, Gardner of ITT, ROWSEY and MILLER of EIGER, also met to introduce EIGER to Gardner as a new potential equity partner in the Project. At this meeting, the parties discussed the issue of each parties' involvement in the Project.

49.    As LOCHMERE had done with the two prior potential equity partners, Farallon and Basic Capital, LOCHMERE was primarily responsible for educating EIGER regarding the Project by outlining the results of its due diligence research, its financial projections for the Project, and the business plan LOCHMERE was developing for the Project.

50.    Again, with both Partnership Letters in hand, LANE and JTL CAPITAL knew and agreed that LOCHMERE's continued work on the Project was conditioned upon receiving compensation as set forth in the letters and prior discussions.

51.    On March 31, 1999, EVANS, ROWSEY, MILLER, and representatives of BANKBOSTON, a financial lending institution which had been solicited for financing, visited the Project site, and Evans briefed them on the development opportunity, due diligence efforts to date, and the development strategy for the Project.

52.    On April 14, 1999, LOCHMERE forwarded to LANE another letter ("Third Partnership Letter") to reiterate the continued involvement of LOCHMERE on the Project according to the terms previously agreed to by LOCHMERE and LANE and BARNETT

11

LANE. A copy of the letter is attached hereto and incorporated herein as Exhibit "F." The Third Partnership Letter also included a copy of the proposed Management, Development and Marketing Agreement and a copy of the Listing Agreement between LOCHMERE and LANE and BARNETT LANE (the "Partnership Agreement"). See Partnership Agreement attached hereto and incorporated herein as Exhibit "G."

53.    The Partnership Agreement provided the following compensation schedule for LOCHMERE:

| | |
|---|---|
| Management Fee: | $12,000 |
| Due Diligence Fee: | 1% |
| Real Estate Commission: | 4% |
| Expense Reimbursement: | 100% |
| Profit Participation: | 30% after 12% preferred return to capital and repayment of all capital and debt |

54.    On April 15, 1999, Evans reviewed the April 14, 1999 letter in detail with LANE and JTL CAPITAL at a meeting with ROWSEY and others in Dallas, Texas which was called to discuss the Project and its details.

55.    At that time, Evans confirmed with LANE and JTL CAPITAL that its continued involvement was conditioned upon LANE, JTL CAPITAL, ROWSEY, H.D. ASSOCIATES and EIGER's honoring of the Partnership Agreement and its terms.

56.    On or about this time, H.D. ASSOCIATES was formed for the purpose of purchasing and operating the Project. JTL CAPITAL is H.D. ASSOCIATE's general partner, and EIGER FUND I., L.P. is H.D. ASSOCIATE's sole limited partner. H.D. ASSOCIATES knew of LANE and JTL CAPITAL's Partnership Agreement with LOCHMERE.

12

57.    On April 22, 1999, LANE, JTL CAPITAL, H.D. ASSOCIATES and ROWSEY of EIGER, sent Gardner a letter which stated as follows: "As you know, David A. Lane has secured a new capital source, EIGER FUND I, L.P. (the "Fund") to pursue the purchase of the Project. We have also discussed that H.D. ASSOCIATES, L.P. ("Purchaser"), a limited partnership of which the Fund is the sole limited partner, and JTL Capital, L.L.C., as affiliate of David A. Lane, is a general partner, is prepared to immediately enter into an agreement for the purchase of the Project." The letter was signed by both LANE and ROWSEY and was addressed only to Gardner at ITT. Also discussed in the letter were proposed changes to a proposed Purchase Agreement between LANE, JTL CAPITAL and ITT based upon a previous purchase agreement between BARNETT LANE and Farallon as purchaser, and ITT as seller. See Letter dated April 22, 1999, attached hereto and incorporated herein as Exhibit "H."

58.    On that same date, at the specific request of ROWSEY, LANE, Evans, Steven Samaha (the attorney assisting on the Project), Gardner of ITT, Robert Cuff (attorney for ITT) and Chuck Callia (Chief Financial Officer of ITT), met at Hammock Dunes to present a proposed Purchase Agreement for the Project to ITT. At the meeting, ROWSEY, EIGER, LANE, JTL CAPITAL, and H.D. ASSOCIATES presented LOCHMERE to the ITT representatives as the Developer of the Project and requested LOCHMERE to assist in negotiating the contract.

59.    At all times, LOCHMERE continued its involvement in the Project based upon LANE, JTL CAPITAL, EIGER, and H.D. ASSOCIATES' continued assurances that

13

it would receive compensation as set forth in the Partnership Agreement, and the First, Second, and Third Partnership letters.

60.    Throughout LOCHMERE's involvement with the Project, LOCHMERE had been collecting data from various sources, analyzing such materials, and had been assimilating the data and its analysis into a concise development plan which was ultimately encapsulated within a series of authentic spreadsheets captioned "Master Development Budget" (hereafter the "Lochmere Plan") which set forth detailed, itemized entries as a strategic plan to the Project, and which was over one (1) year in the making.   The Lochmere Plan was created solely by LOCHMERE as a result of its employees work, creativity, inspiration and mental impressions. The Lochmere Plan contained extremely valuable, proprietary information which could not be duplicated by others without LOCHMERE's assistance.

61.    The data, information, and expertise provided by LOCHMERE as compiled in the Lochmere Plan constitute a trade secret inasmuch as the material was secret, had value, was intended for use within the confines of the Project, and it provided an advantage in the land development marketplace over those who did not know of it.

62.    On April 28, 1999, LOCHMERE, LANE, JTL CAPITAL, H.D. ASSOCIATES, EIGER, ROWSEY, and others, including Steve Kennedy of EIGER, met in Dallas, Texas. At the meeting, Evans of LOCHMERE personally presented the attendees with the Lochmere Plan dated April 26, 1999.

63.    EIGER, ROWSEY, LANE, JTL CAPITAL, and H.D. ASSOCIATES knew the document included secret proprietary material and in fact, the document stated, "Please

14

Note: This Document Is The Exclusive Proprietary Property of LOCHMERE Development Group, Inc. Do Not Duplicate Or Disperse Without Prior Written Consent."

64.     The Lochmere Plan contains specific line items entitled "R.E. Commissions," "Management Services," "General & Administrative Cost Estimates--Development Office" and "Due Diligence Coordination" which are directly extracted from the Partnership Agreement by and between LOCHMERE and LANE, JTL CAPITAL, and H.D. ASSOCIATES.     The listed items could not have addressed anything other than compensation to LOCHMERE as described in the Partnership Agreement.

65.     In reviewing the Lochmere Plan with ROWSEY, Evans explained each component, and further explained how each summary item was supported by detailed supporting budgets. Evans also specifically explained to ROWSEY how the line items related to LOCHMERE's Partnership Agreement.

66.     With full knowledge of the Partnership Agreement and compensation requirements of LOCHMERE, EIGER and its principals, LANE, JTL CAPITAL, and H.D. ASSOCIATES continued to request LOCHMERE's assistance and continued to rely on LOCHMERE's expertise and the Lochmere Plan, thereby ratifying the Partnership Agreement and its terms.

67.     Between April 1999 and May 1999, in reliance upon the belief that the terms of the Partnership Agreement would be honored, LOCHMERE continued in its work on the Project on behalf of LANE, JTL CAPITAL, H.D. ASSOCIATES and EIGER.

68.     On May 25, 1999, Samaha (the attorney assisting on the project) sent LOCHMERE, LANE, JTL CAPITAL, H.D. ASSOCIATES, ROWSEY of EIGER and Mark

15

Van Kirk, attorney for EIGER, a memorandum detailing various "deal points" discussed by the parties to formulate a revised Purchase Agreement between EIGER and ITT. Among the items listed was a revised purchase price of $25,400,000.00. See Memorandum attached hereto and incorporated herein as Exhibit "I." LOCHMERE was instrumental in reducing the purchase price.

69.    Based on discussions with, and at the request of EIGER, on June 7, 1999, LOCHMERE forwarded to ROWSEY a revised version of The Lochmere Plan, which contained numerous refinements ("Revised Lochmere Plan") to the original April 26, 1999 version. The Revised Lochmere Plan states on page one: "Please Note: This document is the exclusive proprietary property of Lochmere Development Group, Inc. Do not duplicate or disperse without prior written consent."

70.    On June 8, 1999, ROWSEY sent LOCHMERE a facsimile suggesting that EIGER would hire a Chief Executive Officer to be in charge of the development of Hammock Dunes. The letter represented that EIGER wanted to have LOCHMERE continue with primary responsibility for development but with a lower compensation package and diminished return on profits. This letter was in stark contrast to the terms of the Partnership Agreement and which ROWSEY of EIGER had previously accepted as a condition of LOCHMERE's continued involvement in the Project and the use of LOCHMERE's trade secrets included within the Revised Lochmere Plan. See correspondence attached hereto and incorporated herein as Exhibit "J."

71.    On June 9, 1999, Evans of LOCHMERE telephoned ROWSEY in response to ROWSEY's correspondence of June 8, 1999, and scheduled a meeting with ROWSEY

16

to discuss the merits of the correspondence for the following day at 2:00 p.m. in Dallas, Texas.

72.    On June 10, 1999, at the meeting in Dallas between LOCHMERE and ROWSEY, ROWSEY stated that LANE, JTL CAPITAL, and H.D. ASSOCIATES had never discussed with ROWSEY the Partnership Agreement between LOCHMERE and LANE, BARNETT LANE, and H.D. ASSOCIATES.

73.    In response to ROWSEY's statements, Evans presented ROWSEY with the First, Second and Third Partnership Letters and the Revised Partnership Agreement, a copy of which is attached hereto as Exhibit "K."

74.    At the meeting, Evans and ROWSEY discussed the merits and structure of the compensation program. ROWSEY reaffirmed the need for LOCHMERE's continued involvement in the acquisition and development of Hammock Dunes and represented that the terms appeared reasonable but stated that he and EIGER wanted to review the documents in greater detail to determine if there were any "minor revisions" or comments and would discuss the matter with Evans the following day.

75.    LOCHMERE made it clear to ROWSEY that its involvement in the Project was solely conditioned upon receiving compensation and future profits as delineated within the Partnership Agreement. LOCHMERE made it clear that its efforts would cease if ROWSEY and EIGER failed to honor the Partnership Agreement's terms.

76.    With full knowledge of the terms stated in the Partnership Agreement and that LOCHMERE's involvement was conditioned upon full acceptance of the same,

17

ROWSEY, EIGER, and H.D. ASSOCIATES continued to solicit and use LOCHMERE's information and expertise to further EIGER's involvement in the Project.

77.    Later on June 10, 1999, Evans and ROWSEY were joined by Kennedy to review in greater detail, the changes to the Revised Lochmere Plan.

78.    On June 14, 1999, ROWSEY contacted Evans to request that Evans attend a meeting between EIGER and representatives of BANKBOSTON, in Atlanta, Georgia to discuss BANKBOSTON's participation in the financing of the Project. Solely induced by the belief that the terms of the Partnership Agreement continued to be acceptable, Evans agreed to meet ROWSEY and Kennedy in Atlanta the following morning.

79.    On June 15, 1999, Evans led a meeting at the office of BANKBOSTON in Atlanta, Georgia to discuss financing on the Project. In attendance were Evans, ROWSEY, Kennedy, and representatives from BANKBOSTON.

80.    At the meeting, Evans presented all attendants with the Revised Lochmere Plan prepared by LOCHMERE and spent approximately four (4) hours reviewing the complexity and thoroughness of the Revised Lochmere Plan. The representatives of BANKBOSTON indicated that they were extremely impressed with LOCHMERE's knowledge of the Project and Florida land development in general.

81.    Nick Whiting, one of the representatives from BANKBOSTON, requested that LOCHMERE e-mail the Revised Lochmere Plan to both Kennedy and Bob Avil, another representative of BANKBOSTON.

82.    At the meeting, Evans explained the unique financial structure included in the Revised Lochmere Plan and that he had developed a simplified and innovative

18

structure for financing which was a novel and untapped strategy in the industry. The Revised Lochmere Plan proposed combining the required letters of credit according to the proposed Purchase Agreement and a line of credit to provide the necessary liquid security to satisfy ITT's demands. BANKBOSTON and Kennedy requested LOCHMERE to further edit the Revised Lochmere Plan to incorporate the implementation of this innovative letter of credit/line of credit financing vehicle recommended by LOCHMERE.

83.    As in earlier versions, this revised Lochmere Plan ["Final Lochmere Plan"] contained the following statement:  "Please Note: This document is the exclusive proprietary property of Lochmere Development Group, Inc. Do not duplicate or disperse without prior written consent."

84.    At the meeting, Evans also described the format of the draw package prepared by LOCHMERE which included performance under the Partnership Agreement with LOCHMERE. BANKBOSTON requested LOCHMERE prepare the draw package as discussed and submit for its review and approval.

85.    At the meeting, BANKBOSTON further requested that LOCHMERE coordinate with Joseph Hatzell of Joseph J. Blake and Associates, the company hired to perform an appraisal on the Project. An appraisal was necessary before BANKBOSTON would approve the financing necessary for the Project. BANKBOSTON asked LOCHMERE to provide copies of the due diligence research compiled by and solely in the possession of LOCHMERE and a copy of the Final Lochmere Plan to expedite the appraisal report and to secure financing more quickly.

86.    At the meeting, BANKBOSTON also requested that LOCHMERE coordinate with Tracy Plott, Esq. of Paul Hastings Janofsky & Walker, L.L.P., in supplying copies of the due diligence research compiled by LOCHMERE to expedite Plott's review as well.

87.    At the meeting, ROWSEY reiterated to BANKBOSTON representatives that LOCHMERE would be responsible for the development of Hammock Dunes.

88.    LOCHMERE only continued to work in furtherance of the Project in reliance upon both LANE, JTL CAPITAL, H.D. ASSOCIATES, ROWSEY and EIGER's assurances that the terms of the Partnership Agreement would be honored.

89.    LOCHMERE's involvement was instrumental in EIGER's and the Project's obtaining financing with BANKBOSTON.

90.    On June 17, 1999, LOCHMERE forwarded two complete copies of the draft draw package to Kennedy. One copy was for BANKBOSTON's review. The other copy was for EIGER's review. The draw package detailed LOCHMERE's performance and compensation under the proposed Purchase Agreement.

91.    On June 24, 1999, LOCHMERE compiled and forwarded three (3) volumes of due diligence and the Final Lochmere Plan to Joseph Blake & Associates.

92.    Until that time, LOCHMERE had been the sole custodian of all due diligence records and those records had not been provided to any of the Defendants until that time.

93.    On June 28, 1999, LOCHMERE received a request from Kennedy that he be copied on all due diligence information sent to Joseph Blake & Associates.

94.    Later that same day, obviously after receiving confirmation that the diligence documents had been sent, ROWSEY called Evans and informed LOCHMERE that contrary

20

to prior representations, EIGER would not honor the terms of the Partnership Agreement. Instead, ROWSEY stated that EIGER would consider some form of a diminished role for LOCHMERE, along with a proposed diminished compensation. ROWSEY also informed Evans that he was not certain that EIGER would continue its pursuit of Hammock Dunes if EIGER and LOCHMERE could not reach an understanding about LOCHMERE's diminished role for a diminished compensation.

95.    On July 2, 1999, LOCHMERE requested that ROWSEY describe exactly what EIGER proposed as a diminished role and a diminished compensation for LOCHMERE. ROWSEY's description of LOCHMERE's obligations varied little from the Partnership Agreement but the compensation changed dramatically.    Specifically, ROWSEY proposed the following:

| | |
|---|---|
| Management Fee: | $12,000 per month |
| Due Diligence Fee: | 1% |
| Real Estate Commission: | 0% |
| Expense Reimbursement: | $3,000 per month |
| Profit Participation: | 7.5% after unknown preferred return to capital and repayment of all capital and debt |

96.    During that conversation, ROWSEY's justification for the diminished compensation was that the investors demanded a 75% share of the profits after and in addition to the preferred return. Therefore, there was only 25% to be shared between the rest of the group. ROWSEY stated that EIGER had reached a side agreement with LANE and JTL CAPITAL for a ten percent (10%) carried interest or profit participation after the

21

preferred return. That left fifteen percent (15%) for LOCHMERE and affiliates of H.D. ASSOCIATES.

97.    Prior to that conversation, LOCHMERE had no knowledge that LANE and JTL CAPITAL had separately negotiated a side agreement with EIGER.

98.    LANE and JTL CAPITAL's actions in accepting such a side agreement, favorable to its own interests but completely detrimental to LOCHMERE's interest and in complete derogation of the Partnership Agreement's terms, was a blatant breach of the longstanding partnership and the fiduciary duty owed to LOCHMERE.

99.    EIGER's pursuit of such a side agreement with LANE and JTL CAPITAL was also favorable to its own interests but completely detrimental to LOCHMERE's interest and in complete derogation of the Partnership Agreement's terms. As such, EIGER also breached the Partnership Agreement which it had ratified through its actions and continued use of LOCHMERE's information and expertise to further EIGER's involvement in the Project, and also breached its own fiduciary duty owed to LOCHMERE as a partner in the joint business venture.

100.    On July 12, 1999, LOCHMERE sent correspondence to ROWSEY, Joseph Blake & Associates, LANE and JTL CAPITAL demanding the return of all information provided to EIGER, BANKBOSTON, LANE, JTL CAPITAL, H.D. ASSOCIATES, and Joseph Blake & Associates, and reiterated that all information provided constituted trade secrets under Florida law. See correspondence dated July 12, 1999 attached hereto and incorporated herein as Exhibit "L."

22

101.    ROWSEY responded by letter dated July 13, 1999. In the letter, ROWSEY admitted that EIGER had used and relied upon LOCHMERE's analysis of the Project, i.e., the Lochmere Plans, to conduct due diligence and to investigate the potential investment in the Project. However, contrary to statements and representations made during the negotiations with EIGER, and even though EIGER had been relying solely upon the proprietary information of LOCHMERE for several months in its efforts to arrange a favorable deal for itself on the Project, ROWSEY now informed LOCHMERE that the Lochmere Plans were "fatally flawed." See correspondence dated July 13, 1999 attached hereto and incorporated herein as Exhibit "M."

102.    In the letter, ROWSEY falsely claimed that lower compensation to LOCHMERE was justified because neither LANE nor LOCHMERE was willing to work more than three (3) days a week.

103.    EIGER's July 13, 1999, letter further conflicted with ROWSEY and EIGER's earlier request that LOCHMERE continue in the same role as before but only with a lower compensation.

104.    ROWSEY's July 13, 1999, letter also failed to acknowledge the side agreement established between EIGER and LANE wherein LANE and JTL CAPITAL would receive a ten percent (10%) carried interest or profit participation after the preferred return.

105.    Thereafter, LOCHMERE sent ROWSEY a second letter demanding the return of all Lochmere Plans which LOCHMERE had clearly labeled as secret and proprietary. See correspondence dated July 29, 1999 attached hereto and incorporated herein as Exhibit "N."

23

106. LOCHMERE also sent follow-up letters to Joseph Blake & Associates, LANE, JTL CAPITAL, and BANKBOSTON.

107. The Lochmere Plans were the key to EIGER's ability to secure BANKBOSTON's financing and ability to proceed to purchase the Project "within only a matter of weeks" because those materials, along with LOCHMERE's unique explanations, educated EIGER regarding the development potential and value of the Project. Furthermore, because ITT demanded a non-refundable deposit of $3,000,000 to induce it to sign any proposed purchase contracts, due diligence had to be completed at that time. If not for the analysis of the information gathered by LOCHMERE including the Lochmere Plans, H.D. ASSOCIATES could not have purchased the Project.

108. EIGER, ROWSEY, LANE, JTL CAPITAL, and H.D. ASSOCIATES have yet to return all of the information to LOCHMERE as requested. BANKBOSTON returned the documents only after utilizing the materials included therein.

109. Instead, EIGER, ROWSEY, LANE, JTL CAPITAL, H.D. ASSOCIATES and BANKBOSTON utilized the proprietary and secret Lochmere Plans and other proprietary information to conclude the purchase of the Project.

110. On or about November 30, 1999, H.D. ASSOCIATES, including EIGER, LANE, and JTL CAPITAL closed on the Project.

111. As a result of LOCHMERE's substantial work, creativity and trade secrets, H.D. ASSOCIATES was able to acquire the Project at a price millions of dollars less than the original contract and which will allow H.D. ASSOCIATES and its affiliates to make millions of dollars in profits.

24

112.    As a result of their actions, the Defendants wrongfully deprived LOCHMERE DEVELOPMENT GROUP, INC. and LOCHMERE REALTY, INC. of the ability to acquire or participate in the development of the Project and receive the profits therefrom.

113.    During the course of dealing between LOCHMERE, LANE, JTL CAPITAL, H.D. ASSOCIATES and EIGER and its principals, ROWSEY, BUCHANAN, MILLER and JACOBS, LOCHMERE has received absolutely no compensation for its work spanning over 1 ½ years.

## COUNT I

## VIOLATION OF FLORIDA'S UNIFORM PARTNERSHIP ACT
### · FLA. STAT. § 620 Et. Seq.
### (Wrongful Dissociation and Usurpation of Partnership Opportunity)
### (LANE and BARNETT LANE)

114.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

115.    This is an action for a violation of Florida Statutes § 620, et. seq (Revised Uniform Partnership Act) and related common law exceeding $15,000.00 exclusive of interest, costs, and attorneys fees.

116.    LOCHMERE, LANE, and BARNETT LANE were partners.

117.    LOCHMERE entered into a valid and enforceable Partnership Agreement with LANE and BARNETT LANE.

118.    In furtherance of the partnership and Partnership Agreement, LOCHMERE contributed money to the partnership and invested time and effort on due diligence issues, arranged for the hiring of and contact with third parties who provided services for the

25

furtherance of the partnership including, but not limited to, engineers, attorneys, and appraisers, and also played a very active role in the contract negotiation process with all the parties solicited as potential partners in the Project including Farallon, Basic Capital, and EIGER. Further, LOCHMERE prepared extensive budgetary analyses to be used in the negotiating process, negotiated directly with ITT as part of the acquisition group, negotiated directly with BANKBOSTON as a "borrower" to secure financing for the Project, and was the sole reason that EIGER was able to purchase the Project and the justification for payment of the non-refundable deposit of $3,000,000.

119. LOCHMERE's sole inducement to form a partnership with LANE and BARNETT LANE was that LOCHMERE would receive the compensation described in the Partnership Agreement, including future profits as a result of its work on the Project.

120. LANE and BARNETT LANE had fiduciary duties to LOCHMERE to refrain from conduct adverse to the partnership.

121. LANE and BARNETT LANE had fiduciary duties to LOCHMERE to refrain from engaging in grossly negligent, reckless, intentional misconduct, or a knowing violation of the law.

122. LANE and BARNETT LANE wrongfully dissociated from the partnership.

123. LANE and BARNETT LANE wrongfully usurped the partnership opportunity that they and LOCHMERE had with EIGER and ITT.

124. LANE and BARNETT LANE wrongfully used and allowed EIGER, ROWSEY and others to use the trade secrets to close the purchase of the Project while knowing that they had no intention of honoring the Partnership Agreement with LOCHMERE.

26

125.   As a proximate result of LANE and BARNETT LANE's actions and inaction, LOCHMERE has suffered damages including damage to its reputation in the Florida development community.

126.   All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived.

WHEREFORE, LOCHMERE demands judgment against LANE and BARNETT LANE for damages resulting from their wrongful dissociation from the partnership and usurpation of the parties' partnership opportunity including, but not limited to, lost future profits, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT II

### VIOLATION OF FLORIDA'S UNIFORM PARTNERSHIP ACT
### FLA. STAT. § 620 Et. Seq.
### (Wrongful Dissociation and Usurpation of Partnership Opportunity)
### (LANE AND JTL CAPITAL)

127.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

128.   This is an action for a violation of Florida Statutes § 620, et. seq (Revised Uniform Partnership Act) and related common law exceeding $15,000.00 exclusive of interest, costs, and attorneys fees.

129.   LOCHMERE, LANE and JTL CAPITAL were partners.

130.    LOCHMERE entered into a valid and enforceable Partnership Agreement with LANE and JTL CAPITAL.

131.    In furtherance of the Partnership Agreement, LOCHMERE contributed money to the partnership and invested time and effort on due diligence issues, arranged for the hiring of and contact with third parties who provided services for the furtherance of the partnership including, but not limited to, engineers, attorneys, and appraisers, and also played a very active role in the contract negotiation process with all the parties solicited as potential partners of the Project including Farallon, Basic Capital, and EIGER. Further, LOCHMERE prepared extensive budgetary analyses to be used in the negotiating process, negotiated directly with ITT as part of the acquisition group, negotiated directly with BANKBOSTON as a "borrower" to secure financing for the Project, and was the sole reason that EIGER was able to purchase the Project and the justification for payment of the non-refundable deposit of $3,000,000.

132.    LOCHMERE's sole inducement to form a partnership with LANE and JTL CAPITAL was that LOCHMERE would receive the compensation described in the Partnership Agreement, including future profits as a result of its work on the Project.

133.    LANE and JTL CAPITAL had fiduciary duties to LOCHMERE to refrain from conduct adverse to the partnership.

134.    LANE and JTL CAPITAL had fiduciary duties to LOCHMERE to refrain from engaging in grossly negligent, reckless, intentional misconduct, or a knowing violation of the law.

135.    LANE and JTL CAPITAL wrongfully dissociated from the partnership.

136.   LANE and JTL CAPITAL wrongfully usurped the partnership opportunity that they and LOCHMERE had with EIGER and ITT.

137.   LANE and JTL CAPITAL wrongfully used and allowed EIGER and ROWSEY and others to use the trade secrets to close the purchase of the Project knowing that they had no intention of honoring the Partnership Agreement with LOCHMERE.

138.   As a proximate result of LANE and JTL CAPITAL's actions and inaction, LOCHMERE has suffered damages, including damage to its reputation in the Florida development community.

139.   All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived by LANE and JTL CAPITAL.

WHEREFORE, LOCHMERE demands judgment against LANE and JTL CAPITAL for damages resulting from their wrongful dissociation from the partnership and usurpation of the parties' partnership opportunity including, but not limited to, lost future profits, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT III

### VIOLATION OF FLORIDA'S UNIFORM PARTNERSHIP ACT
### FLA. STAT. § 620 Et. Seq.
### (Wrongful Dissociation and Usurpation of Partnership Opportunity)
### (EIGER & H.D. ASSOCIATES

140.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

141.   This is an action for a violation of Florida Statutes §620, et. seq. (Revised Uniform Partnership Act) and the related common law exceeding $15,000.00 excluding pre and post judgment interest, costs and attorney's fees.

142.   LOCHMERE, EIGER, and H.D. ASSOCIATES were partners.

143.   LOCHMERE entered into a valid and enforceable Partnership Agreement with EIGER and/or H.D. ASSOCIATES.

144.   In furtherance of the partnership and Partnership Agreement, LOCHMERE contributed money to the partnership and invested time and effort on due diligence issues, arranged for the hiring of and contact with third parties who provided services for the furtherance of the partnership including, but not limited to, engineers, attorneys, and appraisers, and also played a very active role in the contract negotiation process with all the parties solicited as potential partners in the Project including Farallon, Basic Capital, and EIGER. Further, LOCHMERE prepared extensive budgetary analyses to be used in the negotiating process, negotiated directly with ITT as part of the acquisition group, negotiated directly with BANKBOSTON as a "borrower" to secure financing for the Project, and was the sole reason that EIGER was able to purchase the Project and the justification for payment of the non-refundable deposit of $3,000,000.

145.   LOCHMERE's sole inducement to form a partnership with EIGER and/or H.D. ASSOCIATES was that LOCHMERE would receive the compensation described in the Partnership Agreement, including future profits as a result of its work on the Project.

146.   EIGER and H.D. ASSOCIATES had a fiduciary duty to LOCHMERE to refrain from conduct adverse to the partnership.

147.    EIGER and H.D. ASSOCIATES had a fiduciary duty to LOCHMERE to refrain from engaging in grossly negligent, reckless, intentional misconduct, or a knowing violation of the law.

148.    EIGER and H.D. ASSOCIATES wrongfully dissociated from the partnership.

149.    EIGER and H.D. ASSOCIATES wrongfully usurped the partnership opportunity that all of the partners had with ITT.

150.    EIGER and H.D. ASSOCIATES wrongfully used and allowed third parties to use trade secrets created by LOCHMERE to close the purchase of the Project while knowing that EIGER had no intention of honoring the Partnership Agreement.

151.    As a proximate result of EIGER's and H.D. ASSOCIATES' actions and inactions, LOCHMERE has suffered damages, including damage to his reputation in the Florida development community as a proximate result of EIGER's and H.D. ASSOCIATES' wrongful dissociation and usurpation of the partnership opportunity they had with ITT.

WHEREFORE, LOCHMERE demands judgment against EIGER and H.D. ASSOCIATES for damages resulting from their wrongful dissociation from the partnership and usurpation of the parties' partnership opportunity including, but not limited to, lost future profits, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

31

## COUNT IV

### VIOLATION OF FLORIDA'S UNIFORM PARTNERSHIP ACT
### FLA. STAT. § 620 Et. Seq.
### (Wrongful Dissociation and Usurpation of Partnership Opportunity)
### (ROWSEY, BUCHANAN, MILLER AND JACOBS)

152.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

153.    This is an action for a violation of Florida Statutes § 620, et. seq (Revised Uniform Partnership Act) and related common law exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

154.    ROWSEY, BUCHANAN, MILLER and JACOBS are the principals of EIGER.

155.    LOCHMERE and ROWSEY, BUCHANAN, MILLER, and JACOBS were partners.

156.    LOCHMERE entered into a valid and enforceable Partnership Agreement with ROWSEY, BUCHANAN, MILLER and JACOBS.

157.    ROWSEY, BUCHANAN, MILLER, and JACOBS had fiduciary duties to LOCHMERE to refrain from conduct adverse to the partnership.

158.    ROWSEY, BUCHANAN, MILLER, and JACOBS had fiduciary duties to LOCHMERE to refrain from engaging in grossly negligent, reckless, intentional misconduct, or a knowing violation of the law.

159.    ROWSEY, BUCHANAN, MILLER, JACOBS wrongfully dissociated from the partnership.

32

160.    ROWSEY, BUCHANAN, MILLER, and JACOBS wrongfully usurped the partnership opportunity that all of the partners had with ITT.

161.    ROWSEY, BUCHANAN, MILLER, and JACOBS wrongfully used and allowed third parties to use the trade secrets created by LOCHMERE to close the purchase of the Project even though they had no intention of honoring the Partnership Agreement.

162.    As a proximate result of ROWSEY, BUCHANAN, MILLER, and JACOBS' inactions, LOCHMERE has suffered damages, including damage to his reputation in the Florida development community.

163.    All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived.

WHEREFORE, LOCHMERE demands judgment against ROWSEY, BUCHANAN, MILLER, and JACOBS for damages resulting from its wrongful dissociation from the partnership and usurpation of the parties' partnership opportunity including lost future profits, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT V

## INTENTIONAL FRAUD (LANE)

164.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

165.    This is an action for intentional fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

33

166. During LANE and LOCHMERE's partnership to develop the Project, LANE made repeated false representations of fact regarding the compensation which LOCHMERE would receive upon closing of the sale, purchase and development of the Project.

167. LANE made these false representations of fact knowing that such statements were false.

168. LANE made these false representations of fact for the purpose of inducing LOCHMERE to continue its work on the Project. At all times relevant to this dispute, LANE knew that he would not honor those representations.

169. LOCHMERE relied to its detriment upon LANE's representations and continued to work to complete the Project.

170. LOCHMERE has been economically damaged as a result of LANE's intentional misrepresentations.

171. All conditions precedent to the bringing of this action have occurred or have been waived by Defendants.

WHEREFORE, LOCHMERE demands judgment against LANE for damages resulting from intentional fraud including compensatory damages, punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

34

## COUNT VI

### INTENTIONAL FRAUD (BARNETT LANE)

172.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

173.   This is an action for intentional fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

174.   During BARNETT LANE and LOCHMERE's partnership to develop the Project, BARNETT LANE made repeated false representations of fact regarding the compensation which LOCHMERE would receive upon closing of the sale, purchase and development of the Project.

175.   BARNETT LANE made these false representations of fact knowing that such statements were false.

176.   BARNETT LANE made these false representations of fact for the purpose of inducing LOCHMERE to continue its work on the Project. At all times relevant to this dispute, BARNETT LANE knew that it would not honor those representations.

177.   LOCHMERE relied to its detriment upon BARNETT LANE's representations and continued to work to complete the Project.

178.   LOCHMERE has been economically damaged as a result of BARNETT LANE's intentional misrepresentations.

179.   All conditions precedent to the bringing of this action have occurred or have been waived by Defendants.

WHEREFORE, LOCHMERE demands judgment against BARNETT LANE for damages resulting from intentional fraud including compensatory damages, punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT VII

### INTENTIONAL FRAUD (JTL CAPITAL)

180.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

181.    This is an action for intentional fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

182.    During JTL CAPITAL and LOCHMERE's partnership to develop the Project, JTL CAPITAL made repeated false representations of fact regarding the compensation which LOCHMERE would receive upon closing of the sale, purchase and development of the Project.

183.    JTL CAPITAL made these false representations of fact knowing that such statements were false.

184.    JTL CAPITAL made these false representations of fact for the purpose of inducing LOCHMERE to continue its work on the Project. At all times relevant to this dispute, JTL CAPITAL knew that it would not honor those representations.

185.    LOCHMERE relied to its detriment upon JTL CAPITAL's representations and continued to work to complete the Project.

186.    LOCHMERE has been economically damaged as a result of JTL CAPITAL's intentional misrepresentations.

187.    All conditions precedent to the bringing of this action have occurred or have been waived by Defendants.

WHEREFORE, LOCHMERE demands judgment against JTL CAPITAL for damages resulting from intentional fraud including compensatory damages, punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT VIII

## INTENTIONAL FRAUD (H.D. ASSOCIATES)

188.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

189.    This is an action for intentional fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

190.    During H. D. ASSOCIATES and LOCHMERE's partnership to develop the Project, H.D. ASSOCIATES made repeated false representations of fact regarding the compensation which LOCHMERE would receive upon closing of the sale, purchase and development of the Project.

191.    H.D. ASSOCIATES made these false representations of fact knowing that such statements were false.

192.    H.D. ASSOCIATES made these false representations of fact for the purpose of inducing LOCHMERE to continue its work on the Project. At all times relevant to this dispute, H.D. ASSOCIATES knew that it would not honor those representations.

193.    LOCHMERE relied to its detriment upon H.D. ASSOCIATES' representations and continued to work to complete the Project.

194.    LOCHMERE has been economically damaged as a result of H.D. ASSOCIATES' intentional misrepresentations.

195.    All conditions precedent to the bringing of this action have occurred or have been waived by Defendants.

WHEREFORE, LOCHMERE demands judgment against H.D. ASSOCIATES for damages resulting from intentional fraud including compensatory damages, punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT IX

### INTENTIONAL FRAUD (EIGER)

196.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

197.    This is an action for intentional fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

198.    EIGER made these false representations of fact for the purpose of inducing LOCHMERE to continue its work on the Project.

38

199. At all times relevant to this dispute, EIGER knew that it would not honor those representations.

200. LOCHMERE relied to his detriment upon EIGER's representations, continued to work on the Project and gave EIGER the Lochmere Plans in sole reliance upon those representations.

201. LOCHMERE has been damaged as a result of EIGER's intentional misrepresentations.

202. All conditions precedent to the bringing of this action have occurred or have been waived by Defendants.

WHEREFORE, LOCHMERE demands judgment against EIGER for damages resulting from intentional fraud including compensatory damages, punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT X

### INTENTIONAL FRAUD (ROWSEY, JACOBS, MILLER AND BUCHANAN)

203. LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

204. This is an action for intentional fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

205. ROWSEY, JACOBS, MILLER and BUCHANAN are principals of EIGER.

206.    ROWSEY, JACOBS, MILLER and BUCHANAN made repeated false representations of fact for the purpose of inducing LOCHMERE to continue its work on the Project.

207.    At all times relevant to this dispute, ROWSEY, JACOBS, MILLER and BUCHANAN knew that they would not honor those representations.

208.    LOCHMERE relied to its detriment upon ROWSEY, JACOBS, MILLER and BUCHANAN's representations, continued to work on the Project, and gave EIGER the Lochmere Plans in sole reliance upon those representations.

209.    LOCHMERE has been damaged as a result of ROWSEY, JACOBS, MILLER and BUCHANAN's intentional misrepresentations.

210.    All conditions precedent to the bringing of this action have occurred or have been waived by Defendants.

WHEREFORE, LOCHMERE demands judgment against ROWSEY, JACOBS, MILLER and BUCHANAN, jointly and severally, for damages resulting from intentional fraud including compensatory damages, punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XI

### CONSTRUCTIVE FRAUD (LANE)

211.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

212. This is an action for constructive fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

213. LOCHMERE and LANE agreed to work together to purchase and develop the Project. During the partnership, LOCHMERE developed confidential information and data for the sole purpose of furthering the goal of obtaining and developing the Project and financially profiting from the deal.

214. LOCHMERE fulfilled all of its duties.

215. LANE owed a fiduciary duty to LOCHMERE to refrain from acting to the detriment of the partnership and to keep secret all confidential information created during the partnership.

216. LANE abused and breached the confidential and fiduciary relationship created by the partnership between LANE and LOCHMERE.

217. LOCHMERE has been economically damaged as a result of LANE's wrongful actions.

218. All conditions precedent to the bringing of this action have occurred or have been waived by LANE.

WHEREFORE, LOCHMERE demands judgment against LANE for damages resulting from constructive fraud including compensatory and punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

41

## COUNT XII

### <u>CONSTRUCTIVE FRAUD (BARNETT LANE)</u>

219.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

220.    This is an action for constructive fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

221.    LOCHMERE and BARNETT LANE agreed to work together to purchase and develop the Project.    During the partnership, LOCHMERE developed confidential information and data for the sole purpose of furthering the goal of obtaining and developing the Project and financially profiting from the deal.

222.    LOCHMERE fulfilled all of its duties.

223.    BARNETT LANE owed a fiduciary duty to LOCHMERE to refrain from acting to the detriment of the partnership and to keep secret all confidential information created during the partnership.

224.    BARNETT LANE abused and breached the confidential and fiduciary relationship created by the partnership between BARNETT LANE and LOCHMERE.

225.    LOCHMERE has been extensively economically damaged as a result of BARNETT LANE's wrongful actions.

226.    All conditions precedent to the bringing of this action have occurred or have been waived by BARNETT LANE.

WHEREFORE, LOCHMERE demands judgment against BARNETT LANE for damages resulting from constructive fraud including compensatory and punitive damages,

costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XIII

## CONSTRUCTIVE FRAUD (JTL CAPITAL)

227.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

228.   This is an action for constructive fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

229.   LOCHMERE and JTL CAPITAL where they agreed to work together to purchase and develop the Project.   During the partnership, LOCHMERE developed confidential information and data for the sole purpose of furthering the goal of obtaining and developing the Project and financially profiting from the deal.

230.   LOCHMERE fulfilled all of its duties required under the Partnership Agreement.

231.   JTL CAPITAL owed a fiduciary duty to LOCHMERE to refrain from acting to the detriment of the partnership and to keep secret all confidential information created during the partnership.

232.   JTL CAPITAL abused and breached the confidential and fiduciary relationship created by the partnership between JTL CAPITAL and LOCHMERE.

233.   LOCHMERE has been extensively economically damaged as a result of JTL CAPITAL's wrongful actions.

43

234.   All conditions precedent to the bringing of this action have occurred or have been waived by JTL CAPITAL.

WHEREFORE, LOCHMERE demands judgment against JTL CAPITAL for damages resulting from constructive fraud including compensatory and punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XIV

### CONSTRUCTIVE FRAUD (H.D. ASSOCIATES)

235.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

236.   This is an action for constructive fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

237.   LOCHMERE and H.D. ASSOCIATES agreed to work together to purchase and develop the Project.   During the partnership, LOCHMERE developed confidential information and data for the sole purpose of furthering the goal of obtaining and developing the Project and financially profiting from the deal.

238.   LOCHMERE fulfilled all of its duties.

239.   H.D. ASSOCIATES owed a fiduciary duty to LOCHMERE to refrain from acting to the detriment of the partnership and to keep secret all confidential information created during the partnership.

44

240.   H.D. ASSOCIATES abused and breached the confidential and fiduciary relationship created by the partnership between H.D. ASSOCIATES and LOCHMERE.

241.   LOCHMERE has been extensively economically damaged as a result of H.D. ASSOCIATES' wrongful actions.

242.   All conditions precedent to the bringing of this action have occurred or have been waived by H.D. ASSOCIATES.

WHEREFORE, LOCHMERE demands judgment against H.D. ASSOCIATES for damages resulting from constructive fraud including compensatory and punitive damages, .costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XV

## CONSTRUCTIVE FRAUD (EIGER)

243.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

244.   This is an action for constructive fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

245.   LOCHMERE and EIGER agreed to work together to purchase and develop the Project.   During the partnership, LOCHMERE developed confidential information and data for the sole purpose of furthering the goal of obtaining and developing the Project.

246.   LOCHMERE fulfilled all of its duties.

45

247.    EIGER owed a fiduciary duty to LOCHMERE to refrain from acting to the detriment of the partnership and to keep secret all confidential information created during the partnership.

248.    EIGER knew that LOCHMERE's continued involvement in the Project was dependent upon the terms of the partnership and Partnership Agreement.

249.    EIGER knew that LOCHMERE was the sole custodian of confidential and proprietary information which was necessary to the Project. EIGER owed a duty to LOCHMERE not to take unconscionable advantage by obtaining LOCHMERE's confidential information for its own financial gain.

250.    EIGER abused and breached the confidential relationship and took improper advantage of its relationship with LOCHMERE.

251.    LOCHMERE has been extensively economically damaged as a result of EIGER's wrongful actions.

252.    All conditions precedent to the bringing of this action have occurred or have been waived by EIGER.

WHEREFORE, LOCHMERE demands judgment against EIGER for damages resulting from constructive fraud including compensatory and punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XVI

### CONSTRUCTIVE FRAUD (ROWSEY, JACOBS, MILLER AND BUCHANAN)

253.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

254.    This is an action for constructive fraud exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

255.    LOCHMERE and ROWSEY, JACOBS, MILLER and BUCHANAN agreed to work together to obtain and develop the Project.   During the partnership, LOCHMERE developed confidential information and data for the sole purpose of furthering the goal of obtaining and developing the Project.

256.    LOCHMERE fulfilled all of its duties required.

257.    ROWSEY, JACOBS, MILLER and BUCHANAN owed a fiduciary duty to LOCHMERE to refrain from acting to the detriment of the partnership and to keep secret all confidential information created during the partnership.

258.    ROWSEY, JACOBS, MILLER and BUCHANAN knew that LOCHMERE's continued involvement in the Project was dependent upon the terms of the partnership and Partnership Agreement.

259.    ROWSEY, JACOBS, MILLER and BUCHANAN knew that LOCHMERE was the sole custodian of confidential and proprietary information which was necessary to the purchase and development of the Project. ROWSEY, JACOBS, MILLER and BUCHANAN owed a duty to LOCHMERE not to take unconscionable advantage by obtaining LOCHMERE's confidential information for their own financial gain.

47

260.   ROWSEY, JACOBS, MILLER and BUCHANAN abused and breached the confidential relationship and took improper advantage of their relationship.

261.   LOCHMERE has been economically damaged as a result of ROWSEY, JACOBS, MILLER and BUCHANAN's wrongful actions.

262.   All conditions precedent to the bringing of this action have occurred or have been waived.

WHEREFORE, LOCHMERE demands judgment against ROWSEY, JACOBS, MILLER and BUCHANAN for damages resulting from constructive fraud including compensatory and punitive damages, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XVII

### UNJUST ENRICHMENT
### QUANTUM MERUIT AND UNJUST ENRICHMENT
### (LANE)

263.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

264.   This is an action for quantum meruit exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

265.   LOCHMERE has conferred a benefit upon LANE by providing to LANE its substantial skills, creativity and proprietary information without compensation.

266.   LANE has been further unjustly enriched because LANE has obtained and is currently using information and data collected by LOCHMERE for use in the Project in

48

violation of Florida's Trade Secret's Act, and is benefitting financially in the marketplace at the financial expense of LOCHMERE.

267.   LANE would be unjustly enriched and it would be inequitable for LANE to retain the benefit conferred upon him by LOCHMERE without paying LOCHMERE.

268.   All conditions precedent to the bringing of this action have occurred or have been waived by Defendants.

WHEREFORE, LOCHMERE demands judgment against LANE for damages resulting from unjust enrichment, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XVIII

### UNJUST ENRICHMENT
### QUANTUM MERUIT AND UNJUST ENRICHMENT
### (BARNETT LANE)

269.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

270.   This is an action for quantum meruit exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

271.   LOCHMERE has conferred a benefit upon BARNETT LANE by providing to BARNETT LANE its substantial skills, creativity and proprietary information without compensation.

49

272. BARNETT LANE would be unjustly enriched and it would be inequitable for BARNETT LANE to retain the benefit conferred upon it by LOCHMERE without paying LOCHMERE.

273. All conditions precedent to the bringing of this action have occurred or have been waived by BARNETT LANE.

WHEREFORE, LOCHMERE demands judgment against BARNETT LANE for damages resulting from unjust enrichment, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XIX

### UNJUST ENRICHMENT
### QUANTUM MERUIT AND UNJUST ENRICHMENT
### (JTL CAPITAL)

274. LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

275. This is an action for quantum meruit exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

276. LOCHMERE has conferred a benefit upon JTL CAPITAL by providing to JTL CAPITAL its substantial skills, creativity and proprietary information without compensation.

277. JTL CAPITAL has been further unjustly enriched because JTL CAPITAL has obtained and is currently using information and data collected by LOCHMERE for use in the Project in violation of Florida's Trade Secret's Act, and is benefitting financially in the marketplace at the financial expense of LOCHMERE.

50

278.    JTL CAPITAL would be unjustly enriched and it would be inequitable for JTL CAPITAL to retain the benefit conferred upon them by LOCHMERE without paying value thereof to LOCHMERE.

279.    All conditions precedent to the bringing of this action have occurred or have been waived by JTL CAPITAL.

WHEREFORE, LOCHMERE demands judgment against JTL CAPITAL for damages resulting from unjust enrichment, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XX

### UNJUST ENRICHMENT
### QUANTUM MERUIT AND UNJUST ENRICHMENT
### (H.D. ASSOCIATES)

280.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

281.    This is an action for quantum meruit exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

282.    LOCHMERE has conferred a benefit upon H.D. ASSOCIATES by providing H.D. ASSOCIATES its substantial skills, creativity and proprietary information without compensation.

283.    H.D. ASSOCIATES has been further unjustly enriched because H.D. ASSOCIATES has obtained and is currently using information and data collected by

51

LOCHMERE for use in the Project in violation of Florida's Trade Secret's Act, and is benefitting financially in the marketplace at the financial expense of LOCHMERE.

284. H.D. ASSOCIATES would be unjustly enriched and it would be inequitable for H.D. ASSOCIATES to retain the benefit conferred upon them by LOCHMERE without paying value thereof to LOCHMERE.

285. All conditions precedent to the bringing of this action have occurred or have been waived by H.D. ASSOCIATES.

WHEREFORE, LOCHMERE demands judgment against H.D. ASSOCIATES for damages resulting from unjust enrichment, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXI

### UNJUST ENRICHMENT
### QUANTUM MERUIT AND UNJUST ENRICHMENT
### (EIGER)

286. LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

287. This is an action for quantum meruit exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

288. LOCHMERE has conferred a benefit upon EIGER by providing to EIGER its substantial skills, creativity and proprietary information without compensation.

289. EIGER has been further unjustly enriched because EIGER has obtained and is currently using information and data collected by LOCHMERE for use in the Project in

52

violation of Florida's Trade Secret's Act, and is benefitting financially in the marketplace at the financial expense of LOCHMERE.

290. EIGER would be unjustly enriched and it would be inequitable for EIGER to retain the benefit conferred upon it by LOCHMERE without paying LOCHMERE.

291. All conditions precedent to the bringing of this action have occurred or have been waived by Defendants.

WHEREFORE, LOCHMERE demands judgment against EIGER for damages resulting from unjust enrichment, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXII

### UNJUST ENRICHMENT
### QUANTUM MERUIT AND UNJUST ENRICHMENT
### (ROWSEY, JACOBS, MILLER AND BUCHANAN)

292. LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

293. This is an action for quantum meruit exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

294. ROWSEY, JACOBS, MILLER and BUCHANAN are principals of EIGER.

295. LOCHMERE has conferred a benefit upon ROWSEY, JACOBS, MILLER and BUCHANAN by providing them with its substantial skills, creativity and proprietary information without compensation.

296.    ROWSEY, JACOBS, MILLER and BUCHANAN have been further unjustly enriched because ROWSEY, JACOBS, MILLER and BUCHANAN have obtained and are currently using information and data collected by LOCHMERE for use in the Project in violation of Florida's Trade Secret's Act, and are benefitting financially in the marketplace at the financial expense of LOCHMERE.

297.    ROWSEY, JACOBS, MILLER and BUCHANAN would be unjustly enriched and it would be inequitable for ROWSEY, JACOBS, MILLER and BUCHANAN to retain the benefit conferred upon them by LOCHMERE without paying LOCHMERE.

298.    All conditions precedent to the bringing of this action have occurred or have been waived by ROWSEY, JACOBS, MILLER and BUCHANAN.

WHEREFORE, LOCHMERE demands judgment against ROWSEY, JACOBS, MILLER and BUCHANAN for damages resulting from unjust enrichment, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXIII

## UNJUST ENRICHMENT
## QUANTUM MERUIT AND UNJUST ENRICHMENT
## (BANKBOSTON)

299.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

300.    This is an action for quantum meruit exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

301. LOCHMERE has conferred a benefit upon BANKBOSTON by providing to BANKBOSTON its substantial skills, creativity and proprietary information without compensation.

302. BANKBOSTON has been further unjustly enriched because BANKBOSTON obtained and used information and data collected by LOCHMERE for use in the Project in violation of Florida's Trade Secret's Act, and is benefitting financially in the marketplace at the financial expense of LOCHMERE.

303. BANKBOSTON would be unjustly enriched and it would be inequitable for BANKBOSTON to retain the benefit conferred upon them by LOCHMERE without paying LOCHMERE.

304. All conditions precedent to the bringing of this action have occurred or have been waived.

WHEREFORE, LOCHMERE demands judgment against BANKBOSTON for damages resulting from unjust enrichment, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXIV

### VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT (LANE)

305. LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

306.    This is an action for violation of Florida's Uniform Trade Secrets Act, Fla. Stat § 688.03, exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

307.    The data, information, and expertise provided by LOCHMERE to LANE including the Lochmere Plans, constitute trade secrets.

308.    LANE knew the material contained trade secrets.

309.    LANE unlawfully misappropriated the items designated as trade secrets to his own use and to gain an economic advantage.

310.    LOCHMERE has been economically damaged by LANE's wrongful use of LOCHMERE's trade secrets.

311.    All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived by LANE.

WHEREFORE, LOCHMERE demands judgment against for damages resulting from Defendant's violation of the Florida Trade Secrets Act, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXV

### VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT (BARNETT LANE)

312.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

313.  This is an action for violation of Florida's Uniform Trade Secrets Act, Fla. Stat § 688.03, exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

314.  The data, information, and expertise provided by LOCHMERE to BARNETT LANE, including the Lochmere Plans, constitute trade secrets.

315.  BARNETT LANE knew the material contained trade secrets.

316.  BARNETT LANE unlawfully misappropriated the items designated as trade secrets to its own use and to gain an economic advantage.

317.  LOCHMERE has been economically damaged by BARNETT LANE's wrongful use of LOCHMERE's trade secrets.

318.  All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived by BARNETT LANE.

WHEREFORE, LOCHMERE demands judgment against for damages resulting from Defendant's violation of the Florida Trade Secrets Act, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXVI

### VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT (JTL CAPITAL)

319.  LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

57

320.    This is an action for violation of Florida's Uniform Trade Secrets Act, Fla. Stat § 688.03, exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

321.    The data, information, and expertise provided by LOCHMERE to JTL CAPITAL, including the Lochmere Plans, constitutes trade secrets.

322.    JTL CAPITAL knew the material contained trade secrets.

323.    JTL CAPITAL unlawfully misappropriated the items designated as trade secrets to its own use and to gain an economic advantage that it would not have had but for use of LOCHMERE's Lochmere Plans.

324.    LOCHMERE has been economically damaged by JTL CAPITAL's wrongful use of LOCHMERE's trade secrets.

325.    All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived by JTL CAPITAL.

WHEREFORE, LOCHMERE demands judgment against JTL CAPITAL for damages resulting from violation of the Florida Trade Secrets Act, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

58

## COUNT XXVII

### VIOLATION OF FLORIDA'S UNIFORM
### TRADE SECRETS ACT (H.D. ASSOCIATES)

326.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

327.   This is an action for violation of Florida's Uniform Trade Secrets Act, Fla. Stat § 688.03, exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

328.   The data, information, and expertise provided by LOCHMERE to H.D. ASSOCIATES, including the Lochmere Plans, constitutes trade secrets.

329.   H.D. ASSOCIATES knew the material contained trade secrets.

330.   H.D. ASSOCIATES unlawfully misappropriated the items designated as trade secrets to its own use and to gain an economic advantage.

331.   LOCHMERE has been economically damaged by H.D. ASSOCIATES' wrongful use of LOCHMERE's trade secrets.

332.   All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived by H.D. ASSOCIATES.

WHEREFORE, LOCHMERE demands judgment against H.D. ASSOCIATES for damages resulting from violation of the Florida Trade Secrets Act, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXVIII

## VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT (EIGER)

333.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

334.    This is an action for violation of Florida's Uniform Trade Secret's Act, Fla. Stat § 688.03, exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

335.    The data, information, and expertise provided by LOCHMERE to EIGER, including the Lochmere Plans, constitutes trade secrets.

336.    EIGER knew the material contained trade secrets.

337.    EIGER unlawfully misappropriated the items designated as trade secrets to its own use and to gain an economic advantage.

338.    LOCHMERE has been economically damaged by EIGER's wrongful use of LOCHMERE's trade secrets.

339.    All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived by EIGER.

WHEREFORE, LOCHMERE demands judgment against EIGER for damages resulting from violation of the Florida Trade Secrets Act, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXIX

### VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT (ROWSEY, JACOBS, MILLER AND BUCHANAN)

340. LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

341. This is an action for violation of Florida's Uniform Trade Secrets Act, Fla. Stat § 688.03, exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

342. The data, information, and expertise provided by LOCHMERE to ROWSEY, JACOBS, MILLER and BUCHANAN, including the Lochmere Plans, constitutes trade secrets.

343. ROWSEY, JACOBS, MILLER and BUCHANAN knew the material contained trade secrets.

344. ROWSEY, JACOBS, MILLER and BUCHANAN unlawfully misappropriated the items designated as trade secrets to their own use and to gain an economic advantage.

345. LOCHMERE has been economically damaged by ROWSEY, JACOBS, MILLER and BUCHANAN's wrongful use of LOCHMERE's trade secrets.

346. All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived.

WHEREFORE, LOCHMERE demands judgment against ROWSEY, JACOBS, MILLER and BUCHANAN, jointly and severally, for damages resulting from violation of the

Florida Trade Secrets Act, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXX

### VIOLATION OF FLORIDA'S UNIFORM TRADE SECRETS ACT (BANKBOSTON)

347.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

348.   This is an action for violation of Florida's Uniform Trade Secrets Act, Fla. Stat § 688.03, exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

349.   The data, information, and expertise provided by LOCHMERE to BANKBOSTON, including the Lochmere Plans, constitutes trade secrets.

350.   BANKBOSTON knew the material contained trade secrets.

351.   BANKBOSTON unlawfully misappropriated the items designated as trade secrets to its own use and to gain an economic advantage.

352.   LOCHMERE has been economically damaged by BANKBOSTON's wrongful use of LOCHMERE's trade secrets.

353.   All conditions precedent to LOCHMERE's right to bring this action have been met or have been waived by BANKBOSTON.

WHEREFORE, LOCHMERE demands judgment against BANKBOSTON for damages resulting from violation of the Florida Trade Secrets Act, costs of this action, a

62

reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXXI

## CONVERSION (LANE)

354. LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

355. This is an action for conversion exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

356. Starting in late 1997, LOCHMERE compiled information and data for the acquisition, development and marketing of the Project.

357. LANE knew that LOCHMERE's information, including the Lochmere Plans, included confidential trade secrets.

358. LANE also knew that LOCHMERE's disclosure of such Lochmere Plans were conditioned upon LANE's acknowledgment that LOCHMERE would be compensated.

359. LANE wrongfully induced LOCHMERE to disclose the trade secrets.

360. LOCHMERE would not have forwarded LANE the information and trade secrets had it known that it would not be compensated therefor.

361. LANE took LOCHMERE's information and trade secrets and used it for its own benefit.

362. LOCHMERE has been economically damaged as result of LANE's actions.

63

363.    All conditions precedent to the bringing of this action have occurred or have been waived by LANE.

WHEREFORE, LOCHMERE demands judgment against LANE for damages resulting from conversion, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXXII

### CONVERSION (BARNETT LANE)

364.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

365.    This is an action for conversion exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

366.    Starting in late 1997, LOCHMERE compiled information and data for the acquisition, development and marketing of the Project.

367.    BARNETT LANE knew that LOCHMERE's information, including the Lochmere Plans, included confidential trade secrets.

368.    BARNETT LANE also knew that LOCHMERE's disclosure of such Lochmere Plans were conditioned upon BARNETT LANE's acknowledgment that LOCHMERE would be compensated.

369.    BARNETT LANE wrongfully induced LOCHMERE to disclose the trade secrets.

64

370.   LOCHMERE would not have forwarded BARNETT LANE the information and trade secrets had it known that it would not be compensated therefor.

371.   BARNETT LANE took LOCHMERE's information and trade secrets and used it for its own benefit.

372.   LOCHMERE has been economically damaged as result of BARNETT LANE's actions.

373.   All conditions precedent to the bringing of this action have occurred or have been waived by BARNETT LANE.

WHEREFORE, LOCHMERE demands judgment against BARNETT LANE for damages resulting from conversion, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.


## COUNT XXXIII

### CONVERSION (JTL CAPITAL)

374.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

375.   This is an action for conversion exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

376.   Starting in late 1997, LOCHMERE had compiled information and data for the acquisition, development and marketing of the Project.

377.   JTL CAPITAL knew that LOCHMERE's information, including the Lochmere Plans, included confidential trade secrets.

65

378.    JTL CAPITAL also knew that LOCHMERE's disclosure of such Lochmere Plans were conditioned upon JTL CAPITAL's acknowledgment that LOCHMERE would be compensated.

379.    JTL CAPITAL wrongfully induced LOCHMERE to disclose the trade secrets.

380.    LOCHMERE would not have forwarded JTL CAPITAL the information and trade secrets had it known that it would not be compensated therefor.

381.    JTL CAPITAL took LOCHMERE's information and trade secrets and used it for its own benefit.

382.    LOCHMERE has been economically damaged as result of JTL CAPITAL's actions.

383.    All conditions precedent to the bringing of this action have occurred or have been waived by JTL CAPITAL.

WHEREFORE, LOCHMERE demands judgment against JTL CAPITAL for damages resulting from conversion, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXXIV

### CONVERSION (H.D. ASSOCIATES)

384.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

385.    This is an action for conversion exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

66

386.   Starting in late 1997, LOCHMERE had compiled information and data for the acquisition, development and marketing of the Project.

387.   H.D. ASSOCIATES knew that LOCHMERE's information, including the Lochmere Plans, included confidential trade secrets.

388.   H.D. ASSOCIATES also knew that LOCHMERE's disclosure of such Lochmere Plans were conditioned upon H.D. ASSOCIATES' acknowledgment that LOCHMERE would be compensated.

389.   H.D. ASSOCIATES wrongfully induced LOCHMERE to disclose the trade secrets.

390.   LOCHMERE would not have forwarded H.D. ASSOCIATES the information and trade secrets had it known that it would not be compensated therefor.

391.   H.D. ASSOCIATES took LOCHMERE's information and trade secrets and used it for its own benefit.

392.   LOCHMERE has been economically damaged as result of H.D. ASSOCIATES' actions.  All conditions precedent to the bringing of this action have occurred or have been waived by H.D. ASSOCIATES.

WHEREFORE, LOCHMERE demands judgment against H.D. ASSOCIATES for damages resulting from conversion, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

67

## COUNT XXXV

### CONVERSION (EIGER)

393.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

394.    This is an action for conversion exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

395.    Starting in late 1997, LOCHMERE had compiled information and data for the acquisition, development and marketing of the Project.

396.    EIGER knew that LOCHMERE's information, including the Lochmere Plans, included confidential trade secrets.

397.    EIGER also knew that LOCHMERE's disclosure of such Lochmere Plans were conditioned upon EIGER's acknowledgment that LOCHMERE would be compensated.

398.    EIGER wrongfully induced LOCHMERE to disclose the trade secrets.

399.    LOCHMERE would not have forwarded EIGER the information and trade secrets had it known that it would not be compensated therefor.

400.    EIGER took LOCHMERE's information and trade secrets and used it for its own benefit.

401.    LOCHMERE has been economically damaged as result of EIGER's actions.

402.    All conditions precedent to the bringing of this action have occurred or have been waived by EIGER.

68

WHEREFORE, LOCHMERE demands judgment against EIGER for damages resulting from conversion, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXXVI

## CONVERSION (ROWSEY, JACOBS, MILLER AND BUCHANAN)

403.    LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

404.    This is an action for conversion exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

405.    Starting in late 1997, LOCHMERE had compiled information and data for the acquisition, development and marketing of the Project.

406.    ROWSEY, JACOBS, MILLER and BUCHANAN knew that LOCHMERE's information, including the Lochmere Plans, included confidential trade secrets.

407.    ROWSEY, JACOBS, MILLER and BUCHANAN also knew that LOCHMERE's disclosure of such Lochmere Plans were conditioned upon ROWSEY, JACOBS, MILLER and BUCHANAN's acknowledgment that LOCHMERE would be compensated.

408.    ROWSEY, JACOBS, MILLER and BUCHANAN wrongfully induced LOCHMERE to disclose the trade secrets.

409.    LOCHMERE would not have forwarded ROWSEY, JACOBS, MILLER and BUCHANAN the information and trade secrets had it known that it would not be compensated therefor.

69

410. ROWSEY, JACOBS, MILLER and BUCHANAN took LOCHMERE's information and trade secrets and used it for its own benefit.

411. LOCHMERE has been economically damaged as result of ROWSEY, JACOBS, MILLER and BUCHANAN's actions.

412. All conditions precedent to the bringing of this action have occurred or have been waived by ROWSEY, JACOBS, MILLER and BUCHANAN.

WHEREFORE, LOCHMERE demands judgment against ROWSEY, JACOBS, MILLER and BUCHANAN for damages resulting from conversion, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXXVII

## CONVERSION (BANKBOSTON)

413. LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

414. This is an action for conversion exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

415. Starting in late 1997, LOCHMERE had compiled information and data for the acquisition, development and marketing of the Project.

416. BANKBOSTON knew that LOCHMERE's information, including the Lochmere Plans, included confidential trade secrets.

417.   BANKBOSTON also knew that LOCHMERE's disclosure of such Lochmere Plans were conditioned upon BANKBOSTON's acknowledgment that LOCHMERE would be compensated.

418.   BANKBOSTON wrongfully induced LOCHMERE to disclose the trade secrets.

419.   LOCHMERE would not have forwarded BANKBOSTON the information and trade secrets had it known that it would not be compensated therefor.

420.   BANKBOSTON took LOCHMERE's information and trade secrets and used it for its own benefit.

421.   LOCHMERE has been economically damaged as result of BANKBOSTON's actions.

422.   All conditions precedent to the bringing of this action have occurred or have been waived by BANKBOSTON.

WHEREFORE, LOCHMERE demands judgment against BANKBOSTON for damages resulting from conversion, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## COUNT XXXVIII

### CIVIL CONSPIRACY (LANE, BARNETT LANE, JTL CAPITAL, H.D. ASSOCIATES, EIGER, ROWSEY, JACOBS, MILLER, BUCHANAN, AND BANKBOSTON)

423.   LOCHMERE re-alleges each and every allegation of Paragraphs 1 through 113 above.

424.    This is an action for civil conspiracy exceeding $15,000.00 excluding pre and post judgment interest, costs, and attorneys fees.

425.    LANE, BARNETT LANE, JTL CAPITAL, H.D. ASSOCIATES, EIGER, ROWSEY, JACOBS, MILLER, BUCHANAN, and BANKBOSTON, or two or more of them, agreed and conspired with each other and committed overt acts in furtherance of such conspiracy in order to usurp the partnership opportunity of the Project. In addition, they conspired to unlawfully misappropriate trade secrets of LOCHMERE, wrongfully induced LOCHMERE to work on the Project, while knowing that they had no intention of compensating LOCHMERE.

426.    LOCHMERE has been economically damaged as result of LANE, BARNETT LANE, JTL CAPITAL, H.D. ASSOCIATES, EIGER, ROWSEY, JACOBS, MILLER, BUCHANAN, and BANKBOSTON's actions.

427.    All conditions precedent to the bringing of this action have occurred or have been waived.

WHEREFORE, LOCHMERE demands judgment against for damages against LANE, BARNETT LANE, JTL CAPITAL, H.D. ASSOCIATES, EIGER, ROWSEY, JACOBS, MILLER, BUCHANAN, and BANKBOSTON, jointly and severally, resulting from civil conspiracy, costs of this action, a reasonable attorneys' fee, together with such further relief as is just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

428.    LOCHMERE demands a jury trial on all issues so triable.

Dated this 3 day of April , 2000.

Jay J. Bartlett,
Florida Bar No. 875163
Gregory J. Orcutt
Florida Bar No. 230855
BRICKLEMYER SMOLKER & BOLVES, P.A.
500 East Kennedy Boulevard, Suite 200
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
Attorneys for LOCHMERE    DEVELOPMENT
GROUP, INC. and LOCHMERE REALTY, INC.

F:\DOCS\DMS\KEITH\LOCHMERE\HILLSBOR.U01
April 3, 2000

73

## · LIST OF EXHIBITS

EXHIBIT "A"        3/6/98 memorandum to LANE, BARNETT LANE and LOCHMERE detailing business association and each parties' involvement in same.

EXHIBIT "B"        8/21/98 confirmation letter (First Partnership Letter) detailing parties' negotiated structure of marketing, management and development services to be provided by LOCHMERE for the joint venture.

EXHIBIT "C"        9/2/98 follow-up letter (Second Partnership Letter) to 8/21/98 confirmation letter from LOCHMERE to LANE and BARNETT LANE, once again detailing parties' negotiated structure of services to be provided by LOCHMERE.

EXHIBIT "D"        3/18/99 memorandum from LANE and BARNETT LANE to LOCHMERE commenting on that day's meeting.

EXHIBIT "E"        3/2/99 letter from LOCHMERE to Basic Capital Management, Inc. outlining due diligence information.

EXHIBIT "F"        4/14/99 letter from LOCHMERE to LANE (Third Partnership Letter) to reiterate the continued involvement of LOCHMERE on the Project.

EXHIBIT "G"        Partnership Agreement between LOCHMERE, LANE and BARNETT LANE.

EXHIBIT "H"        4/22/99 letter from LANE and ROWSEY to Gardner of ITT outlining agreement of purchase of the Project.

EXHIBIT "I"                          5/25/99 memorandum from Samaha to
                                     LOCHMERE, LANE, JTL CAPITAL, H.D.
                                     ASSOCIATES, ROWSEY of EIGER, and Mark
                                     Van Kirk, attorney for EIGER, detailing various
                                     "deal points" discussed by parties to formulate
                                     revised Purchase Agreement between EIGER
                                     and ITT.

EXHIBIT "J"                          6/8/99 facsimile from ROWSEY of EIGER to
                                     LOCHMERE suggesting EIGER hire a CEO in
                                     charge of development of Hammock Dunes.

EXHIBIT "K"                          Revised Partnership Agreement between
                                     LOCHMERE, and H.D. ASSOCIATES.

EXHIBIT "L"                          7/12/99 correspondence from LOCHMERE to
                                     ROWSEY, Joseph Blake & Associates, LANE
                                     and JTL CAPITAL demanding return of all
                                     information provided to EIGER, BANKBOSTON,
                                     LANE, JTL CAPITAL, H.D. ASSOCIATES, and
                                     Joseph Blake & Associates, and reiterating that
                                     all information provided constituted trade secrets
                                     under Florida law.

EXHIBIT "M"                          7/13/99 response letter from ROWSEY to
                                     LOCHMERE's 7/12/99 letter, admitting that
                                     EIGER had used and relied upon LOCHMERE's
                                     analysis of the Project and informing
                                     LOCHMERE that the Lochmere plans were now
                                     "fatally flawed".

EXHIBIT "N"                          7/29/99 letter from LOCHMERE to ROWSEY
                                     demanding return of all Lochmere Plans which
                                     are clearly labeled as "secret and proprietary."

# EXHIBIT NO.

# A

**Farallon Capital Management, LLC**

# Memo

**To:**     David Lane

**From:**   Steve Millham

**CC:**     Bob Evans

**Date:**   March 6, 1998

**Re:**     Hammock Dunes due diligence

---

In that we are hopefully going to contract within a few weeks on this deal, I thought that I would try to create a list of things that I would like to get my arms around in the due diligence process. After re-reading the offering materials for the project and talking to several locals (including Bobby Know-it-all), I have come to the realization that this transaction is very complicated and will require a level of research far beyond that which is employed for a single asset real estate deal. I believe that it is imperative that we get Bob Evans involved as soon as possible in the process (note that he is CC'd on this). While I think Larry and Robert are talented land developers, I am convinced that the permitting and development issues in coastal Florida are far more complex and risky that anything that they have faced in Plano or elsewhere. Moreover, I think that we will need someone who is intimately familiar with the local builders in order to achieve our projected sales velocity. If we are going to write a $32 mm check, I want local knowledge on my side.

I have delineated the issues as follows:

## Entitlements

As indicated by the package, the project is currently entitled for a total of 1,724 units and is governed by a Development Order (officially the Hammock Dunes Development Order or "HDDO") originally secured in 1984 and amended in 1995 with a further amendment currently being sought. Being a dumb Californian, I do not understand the development rights and obligations that we would be getting as a result of the assignment of the HDDO. In addition, it appears as though there are several other jurisdictional agencies that would prevent us from developing the unimproved parcels as of right (this is just an inference from wording in the sales package). It seems as though the St. Johns River Water Management District (SJRWMD) as well as Flagler County have approval rights over development plans (which the cynic in me says they can still stop you for frivolous reasons). Therefore, I'd like to understand the following as it pertains the entitlements:

1.  What exactly is the HDDO? What kind of development rights are vested currently? How could it be jeopardized if we were to fall under attack from opponents to the project?

● Page 1



EXHIBIT "A" to Complaint

2. What are the conditions to/processes for pulling building permits on the undeveloped parcels? How long, generally, does it take to process permits? What are the expenses involved with processing permits? We need to make sure that if there is some subjectivity to obtaining building permits, we underwrite the full estimated costs of do so (land use attorneys, consultants, planners etc.). We have gotten nailed by this before in other sensitive development deals.

3. How much of the building permit process on the unentitled parcels is subjective (requires public hearings, votes of governing bodies such as Flagler County Commissioners etc.) and how much is merely administrative?

4. What are the ramifications of the coastal construction line and does development in these areas require approval of any additional bodies (i.e. the Florida equivalent of the California Coastal Commission)?

5. What is the SJRWMD? What is their role in overseeing the development of our parcels?

6. What are the obligations of the developer per the HDDO that must be completed in order to preserve the entitlements (regardless of permitting/sales activity)? I see from the package that several improvements must be constructed at the developer's expense (the "Public Safety Building" and the "Bon Terra School Site"). What are the trigger dates/events for the construction of these buildings/sites?

7. What is the status of the entitlements for the second golf course parcel? Can we build? If not, what are the steps required to prepare the parcel for development? Has ITT done any planning?

8. How do the unit counts change from parcel to parcel per the 15% allowance? Are there any density limitations or other limiting conditions that would prevent us from maximizing oceanfront unit counts?

9. Who are the organized anti-growth groups in the area? Have they been active in opposing any of the coastal projects, including Hammock Dunes? What is the development climate currently in the Flagler County area?

10. Any threatened or endangered species on the site or in the area or is this even relevant?


## Project Carrying Costs

It seems to me that ITT has obligated itself for quite a few ongoing expenses. I want to make sure that we are fully aware of all costs currently being carried by ITT as well as any future costs which could arise as the development gets built out. I want to make sure that our base case proforma accounts for all carrying costs both contractual and potential. Specifically, I'd like to investigate the following:

1. We need to fully analyze the historical financials (revenues, expenses, cap ex etc) of all of the community associations as well as the master association(s). What are their respective obligations and responsibilities? Have there been any accumulated deficits in the past that we would assume? Are dues sufficient to cover the expenses of each association? Any lawsuits or other liabilities that we would inherit?

2. We should get a club expert to analyze the operations/financials of the club. In that we are assuming the liability for the club deficits, I want to make sure that it is quantified. From experience,

this can become a huge problem because attempting to save money in club operations at the expense of club quality can cause the members to become extremely displeased with the developer, ultimately choking off real estate sales. Conversely, in an attempt to coddle members so that they market the project for you, you can go wildly overboard with club subsidies.

3.  We need to analyze the utility connection fees and how they relate to our lot sales. As I understand it, ITT has to pay fees for all units that haven't been hooked up by 1998. The aggregate annual amount is projected to be established at $194,250 (although this will presumably vary dependent upon how many utility hook-ups occur in 1998 which is dependent on sales). Apparently, every time any additional units hook up to the utilities, the developer would receive a rebate of these subsidies from the utilities. Is this common? How difficult is it to recapture this money? Does this obligation go on until all of the lots are connected?

4.  Real Estate Taxes/Other carrying costs. We need to make sure that the neighborhood associations and the master association fully pay for all necessary property carrying costs (landscaping, guardhouse, insurance etc.) and that there are no hidden costs that ITT is paying to keep the property is such good condition. We've seen deals where the seller will spend extra money to make the property look good for sale while telling us that the associations fully cover maintenance and upkeep.

## Project Development Costs/Future Capital Expenditures

The development proforma assumes very little in the way of future development costs. With the exception of in-tract development expenses (primarily roads and utilities) on the oceanfront parcels, there seems to be very little in the way of capital improvements required for the project. However, I'd like to investigate the following:

1.  The in-tract development costs for parcels 1A/1B, 1D/16B, 16C, 19/20, 14, & the Marina have all been estimated by ITT. We need to investigate these costs particularly in light of the conflicts between the parcel borders and the new/old coastal construction lines. Do the estimates to complete infrastructure take into account special coastal design criteria? Do the in-tracts include the cost of providing community access to the beach? Are there any special development conditions (additional fill, dune reinforcement etc.) required when building this close to the ocean?

2.  Are there additional big ticket infrastructure items to account for as the community gets built-out (i.e. additional sewer capacity)? Have all utilities to the site been sized up-front for full build out or do we have further obligations?

3.  What development cost does the net price ($2,750,000) for the marina assume? The infrastructure burden of the marina seems huge and we should verify the costs to make sure this thing has real net value given its entitlements.

4.  We need to make sure that we are not responsible for any off-sites. The A1A widening issue seems to have been mitigated but I want to make sure that we don't have any other such expenditures.

5.  Do we have to build a clubhouse at the second golf course?

6.  Are the other, non-golf amenities (pools, tennis courts etc) sufficient to support a full build-out of the property? If not, what do we need to do?

● Page 3

## Marketing/Property Sales

The single most important consideration when evaluating this deal is sales velocity and pricing. Clearly, sales velocity under ITT's ownership has been pathetic and if it were to continue, the IRR on our $32 mm purchase price would be terrible. We need to completely re-evaluate the sales effort both on and off-site and come up with a cohesive strategy for selling units on a much more accelerated pace. In my gut, a project that is as beautiful and well done as Hammock Dunes should not sell less than 100 units per year *even in a down market.* There is something wrong and we should investigate the following:

1.  Is Palm Coast a good location for retirees/vacation homes? What are its locational (i.e. not site specific) advantages/disadvantages? How is it viewed by traditional snow birds (mid-westerners and east coast folks)? How much of an issue is the property's distance from major airports?

2.  What is the market perception of what ITT did wrong with sales?

3.  How is our pricing? Is demand price-elastic (i.e. you can generate velocity by lowering price) or our we hampered by other factors (crowded golf course, poor marketing, ITT etc)? What sections are overpriced/under priced?

4   What are the prospects for bringing third-party builders into the development on a large scale? What builders are active in the Palm Coast area? Do they buy in bulk or on a rolling lot basis? What has been the history of third-party builders in Hammock Dunes?

5.  What are the prospects for bringing in third-party condo developers to buy the parcels on either side of the Provence buildings? Has ITT ever tried to do a deal with them?

6.  How have individual lot sales been generated? Inside sales via direct marketing by the sales office or by third party brokers? What kind of sales effort has been undertaken by ITT? Have they been too passive?

7.  What kind of marketing do we need to do? How has Bobby sold so many beach front lots (approx. 30 out of a trailer) when we have only sold 6 in 5 years?

8.  How much is the lack of a second golf course affecting our sales? If we had a plan to build the course on a specified time schedule and demonstrated a funding source (Farallon equity), would it help sales? Would reducing the number of total equity memberships to sell (in conjunction with building the new course) from 1100 to 750-800 help? Can we sell 550 more memberships at $35,000 per membership?

9.  Do we need a signature name to design the golf course?

10. Will lots of construction activity on the oceanfront condo parcels negatively affect the sales of the oceanfront lots?

11. How do we sell the "scattered lots"? Do we try to sell them on a one-off basis or do we form a little home building venture to build houses on them to make them more salable?

12. What kind of impact will the Lowe/PASERS development to the north have on us? Will the resort help or hurt our marketing? Exactly how much competition (ie number of lots) will be coming on-line over the next few years? If Hammock Dunes is the "crown jewel", why didn't they buy it?

13. Does the bridge and toll system cause a marketing problem? Does it hamper drive-in traffic to the sales office?

14. What kind of traffic does the sales center get on a weekly basis?

15. Do we need to spec some houses in Grand Mer to demonstrate its potential? They haven't sold a lot there since 1994 so we would obviously need to do something.

16. Is there a problem with the usage of the clubhouse? I detected from the manager that there has been some grumbling about the operation and usage of the facility.

In general, I think we need to do everything that we can to generate strong word-of-mouth traffic from the existing residents/members. In our other high-end deals, this is the best way to sell high-priced real estate. Conversely, the surest way to kill your velocity and pricing is to piss off your current membership/resident base.

We should try to get on the phone together next week (sorry about the vacation, David) and discuss the steps we take from here. I'm still working on the financial model which should be done next week.

● Page 5

B

# EXHIBIT NO.

# B

# Lochmere

August 21, 1998

**VIA FACSIMILE (214) 692-0274**
Mr. David A. Lane
President
Barnett Lane Investments, Inc.
8235 Douglas Avenue; Suite 200
Dallas, Texas 75225

**VIA FACSIMILE (415) 421-2133**
Mr. Stephen L. Millham
Farallon Capital Management, LLC
One Maritime Plaza; Suite 1325
San Francisco, California 94111

RE:   **MARKETING, MANAGEMENT & DEVELOPMENT**
       **HAMMOCK DUNES**

Gentlemen:

Now that we have had an initial opportunity to evaluate the complexity of the acquisition and future development of Hammock Dunes, we would like to propose the following outline of services to be provided by Lochmere Development Group, Inc.

**INITIAL ACQUISITION REVIEW**

This scope commenced with the initial meeting with David on March 17 and subsequent review of the Offering Memorandum. Our visit to Hammock Dunes on March 31 and April 1 provided us the first opportunity to examine the property and demonstrate to ITT representatives that we have the capabilities to not only purchase Hammock Dunes - Phase I, but to operate and complete the development of their crown jewel in Palm Coast.

**DUE DILIGENCE INVESTIGATION**

This scope commenced with the execution of the Purchase Agreement, effective August 6, 1998. The objective of the due diligence investigation is two fold. The first is to review to the greatest extent possible, within the time frame allowed, the representations made by the Seller within the Offering Memorandum and the existing tangible and intangible characteristics of the property.

**EXHIBIT**
"B" to
Complaint

LOCHMERE DEVELOPMENT GROUP, INC.   2701 NORTH ROCKY POINT DRIVE   SUITE 1070   TAMPA, FL 33607
(813) 286-3001   FAX (813) 636-8035   lochmere@aol.com

August 21, 1998
Mr. David A. Lane
Mr. Stephen L. Millham
Page Two of Three

The second objective is to compare our findings with ITT's Offering Memorandum to identify flaws and omissions by Cushman & Wakefield that would substantially impact the acquisition price. The manner and substance in which we present our findings will dictate how our counter offer is received by ITT. The anticipated difference between the current Purchase Agreement price of $32,000,000 and a more realistic purchase price could be substantial.

As this scope of services are two fold, we propose two components of compensation. The first would be a flat fee to offset time and expenses incurred through the due diligence period. Secondly, a success fee based upon reaching a revised Purchase Agreement with ITT at a lower price than the current $32,000,000 purchase price. Lochmere would receive a percentage of the difference between the current purchase price and the revised purchase price, payment subject to and payable at closing.

## MARKETING, MANAGEMENT & DEVELOPMENT

The short, intermediate and long term objectives of this acquisition will be based in part on the findings from our due diligence investigation. Market depth, realistic absorption, product mix, development objectives, capital requirements, build out time frame, profitability, IRR, market risk, construction of second golf course, restructuring of Club Membership Program, Community Development District, etc. will define the magnitude of involvement required by Lochmere.

In a venture of this caliber, we propose the following structure.

Lochmere Development Group, Inc. would enter into a Marketing, Management & Development Agreement with Barnett Lane Investment, Inc. and Farallon Capital Management, LLC to provide specified managerial services based upon a monthly fee, in addition to all direct expenses related to such services. Lochmere Realty, Inc. would receive a Real Estate Brokerage commission, over and above any other brokerage fees paid to Palm Coast Realty or outside Brokers, as compensation for Lochmere Realty, Inc.'s supervision and management of the sales efforts at Hammock Dunes. This brokerage commission would be paid at the time of closing of the individual properties sold.

Lochmere Development Group, Inc. would participate in the profit of the venture based upon a stair stepped hurdle rate. For example, upon the return of all capital, Lochmere would receive a specified percentage of profit after a 10% IRR; a higher percentage after a 15%, 20% and 25% IRR.

LOCHMERE DEVELOPMENT GROUP, INC. 2701 NORTH ROCKY POINT DRIVE SUITE 1070 TAMPA, FL 33607
(813) 286-3001 FAX (813) 636-8035 lochmere@aol.com

August 21, 1998
Mr. David A. Lane
Mr. Stephen L. Millham
Page Three of Three

Due to our intense and concentrated efforts to reach this point in the proposed acquisition, we have focused on more urgent matters. Although we have not had an opportunity to discuss in depth a compensation program, it should be designed whereby all of the parties' interests are aligned. We welcome your comments and suggestions as we should address this issue as soon as possible.

Should you have any questions, do not hesitate to contact our office at your convenience.

With kindest regards,

Robert D. Evans
President

C

# EXHIBIT NO.

# C

# Lochmere

September 2, 1998

__VIA FACSIMILE (214) 692-0274__
Mr. David A. Lane
President
Barnett Lane Investments, Inc.
8235 Douglas Avenue; Suite 200
Dallas, Texas 75225

__VIA FACSIMILE (415) 421-2133__
Mr. Stephen L. Millham
Farallon Capital Management, LLC
One Maritime Plaza; Suite 1325
San Francisco, California 94111

RE:   __MARKETING, MANAGEMENT & DEVELOPMENT__
      __HAMMOCK DUNES__

Gentlemen:

To follow up on our letter of August 21, we would like to expand upon the justification for a multi-phase method of compensation for Lochmere. Each phase of the services to be provided is unique, yet each contribute substantially to the overall success of the venture. Thus all aspects of the marketing, management and development must be properly administered. The proposed incentive based compensation program is not designed to provide an excessive fee management structure. With this in mind, compensation was distributed from each phase to promote a high level of management individually and collectively. We believe that such a program best aligns the interests of Lochmere Development Group, Inc., Barnett Lane Investments, Inc. and Farallon Capital Management, LLC.

We believe that the following compensation structure is reasonable, market driven and promotes the overall success of the Hammock Dunes venture.



EXHIBIT
"C" to
Complaint

LOCHMERE DEVELOPMENT GROUP, INC   2701 NORTH ROCKY POINT DRIVE  SUITE 1070  TAMPA, FL 33607
(813) 286-2001   FAX (813) 636-8035   lochmere@ool.com

September 2, 1998
Mr. David A. Lane
Mr. Stephen L. Millham
Page Two of Three

## INITIAL ACQUISITION REVIEW

This scope commenced with the initial meeting with David on March 17 and subsequent review of the Offering Memorandum. Our visit to Hammock Dunes on March 31 and April 1 provided us the first opportunity to examine the property and demonstrate to ITT representatives that we have the capabilities to not only purchase Hammock Dunes - Phase I, but to operate and complete the development of their crown jewel in Palm Coast.

## DUE DILIGENCE INVESTIGATION

This scope commenced with the execution of the Purchase Agreement, effective August 6, 1998. The objective of the due diligence investigation is two fold. The first is to review to the greatest extent possible, within the time frame allowed, the representations made by the Seller within the Offering Memorandum and the existing tangible and intangible characteristics of the property.

The second objective is to compare our findings with ITT's Offering Memorandum to identify flaws and omissions by Cushman & Wakefield that would substantially impact the acquisition price. The manner and substance in which we present our findings will dictate how our counter offer is received by ITT. The anticipated difference between the current Purchase Agreement price of $32,000,000 and a more realistic purchase price could be substantial.

Lochmere would receive a lump sum fee of $120,000.00, inclusive of all out-of-pocket expenses, due and payable upon completion of the Price Waterhouse due diligence report. Lochmere would also receive a success fee based upon reaching a revised Purchase Agreement with ITT at a lower price than the current $32,000,000 purchase price. Lochmere would receive five percentage (5%) of the difference between the current purchase price and the revised purchase price, payment subject to and payable at closing.

## MARKETING, MANAGEMENT & DEVELOPMENT

Lochmere Development Group, Inc. would enter into a Marketing, Management & Development Agreement with Barnett Lane Investment, Inc. and Farallon Capital Management, LLC to provide specified managerial services based upon a monthly fee of $12,000.00, in addition to all direct expenses related to such services. Lochmere Realty, Inc. would receive a three percent (3%) Real Estate Brokerage commission, over and above any other brokerage fees paid to Palm Coast Realty or outside Brokers, as compensation for Lochmere Realty, Inc.'s supervision and management of the sales efforts at Hammock Dunes. This brokerage commission would be paid at the time of closing of the individual properties sold.

September 2, 1998
Mr. David A. Lane
Mr. Stephen L. Millham
Page Three of Three

Lochmere Development Group, Inc. would participate in the profit of the venture based upon a stair stepped hurdle rate. For example, upon the return of all capital, Lochmere would receive a specified percentage of profit after a 10% IRR; a higher percentage after a 15%, 20% and 25% IRR. This aspect of the compensation program needs further discussion among all three parties.

There are numerous advantages to a business structure of this nature to all parties. We can discuss these further on Tuesday, September 8 in Tampa after our "half time" meeting with the due diligence team.

Should you have any questions, do not hesitate to contact our office at your convenience.

With kindest regards,

Robert D. Evans
President

D

# EXHIBIT NO.

# D

# JTL CAPITAL, L.L.C.
8235 DOUGLAS AVENUE, SUITE 770
DALLAS, TEXAS 75225

(214) 692-5085
FAX (214) 692-0274

DAVID A. LANE
MANAGING PARTNER

## MEMORANDUM

To:       Mr. Robert E. Evans
          Lochmere Development Group, Inc.

Via Fax:  (813) 636-8035

From:     Mr. David A. Lane  𝒟𝒸𝓁
          JTL Capital, L. L. C.

Date:     March 18, 1999

Re:       FYI/Hammock Dunes

Enclosed please find:

1.   Memo to Gene Phillips
2.   A draft of the reinstatement Contract (I received via Federal Express this morning)
3.   Memo to Jim Gardner

Bob, I had a great meeting today with a potential new partner.



EXHIBIT
"D" to
Complaint

# BARNETT LANE INVESTMENTS, INC.
8235 DOUGLAS AVENUE, SUITE 200
DALLAS, TEXAS 75225

(214) 692-5085
FAX (214) 692-0274

## MEMORANDUM

To:      Mr. Gene E. Phillips
         Basic Capital Management, Inc.

From:    David A. Lane  𝒟𝑎𝐿
         Barnett Lane Investments, Inc.

Date:    Thursday, March 18, 1999

Time:    1:45 p.m.

Re:      Hammock Dunes

---

I understand you have been in Bulgaria this week, I hope things are going well. I heard about your plane mishap in New York, I am glad things turned out okay.

On the other hand, regarding Hammock Dunes, I am completely baffled as to what is going on. I can never get any straight answers from the capital side of this deal.   Gene, there are many other potential partners that have been driving me crazy wanting to discuss this deal. I have continued to honor our potential arrangement, but I am going to protect Barnett Lane Investments, Inc. position.

Lets talk on Monday, I hope you will convince me you are ready to do this deal, and are prepared to go hard with the $3,000,000.00. If that is not the case, I will proceed with someone else. If I do not hear from you on Monday, I will assume you pass.

You are a good friend, and we will get the next deal done together.


cc:     Mr. Richard Blunk

TOWERS, BAILEY, JONES & ...
A PROFESSIONAL ASSOCIATION

ATTORNEYS AT LAW
1301 RIVERPLACE BOULEVARD
SUITE 1500
JACKSONVILLE, FL 32207

TELEPHONE (904) 398-3911
FAX (904) 396-0663

WRITER'S INTERNET ADDRESS:
jo'shields@rtlaw.com

WRITER'S DIRECT DIAL NUMBER:
(904) 346-6607

TALLAHASSEE OFFICE
106 SOUTH MONROE STREET
P.O. BOX 1872
TALLAHASSEE, FLORIDA 32302-1872
(850) 222-7200
FAX (850) 222-7204

ST. AUGUSTINE OFFICE
170 MALAGA STREET, SUITE A
P.O. BOX 3504
ST. AUGUSTINE, FLORIDA 32085-3504
(904) 824-0878
FAX (904) 825-4070

SPECIAL COUNSEL
HOWARD I. KORMAN
ALFRED J. POMERANZ

*Admitted in N.Y. only

PLEASE REPLY TO:
JACKSONVILLE

CHARLES D. TOWERS, JR.
JAMES M. McLEAN
FRED M. RINGEL
DAVID M. FOSTER
C. WILLIAM REINEY
ALLAN T. GEIGER
G. KENNETH NORRIE
DOUGLAS A. WARD
WILLIAM E. SCHEU
PAUL P. SANFORD
IRVIN M. WEINSTEIN
ROBERT T. HYDE, JR.
EDWARD L. KELLY
H. JOSEPH O'SHIELDS
DONALD C. WRIGHT
JOSEPH O. STROUD, JR.
MICHAEL A. WODRICH
CECILE EVANS RIDER
E. ALLEN MEG, JR.
J. KIRBY CHRITTON
T.R. HAINLINE, JR.
CHRISTOPHER C. HAZELIP
SUSAN C. McDONALD
BETSY COX MAHIN
ANTHONY A. ANDERSON
MARCIA PARKER TJOFLAT
ANNE K. BUZBY
KURT H. DUNKLE
RICHARD L. MAGUIRE
JAMES M. RILEY
MARK M. ARNOLD
GEORGE M. McCLURE
JOHN L. WHITEMAN
C. DAVIS ELY
RICK MONTE REZNICSEK

REGINA ALBERINI YOUNG
WILLIAM A. O'LEARY
GREGORY F. LUNNY
JOHN R. IBACH
DAVID A. GARFINKEL
PETER L. DAME
EMILY G. PIERCE
JAMES W. MIDDLETON
CHERYL L. WORMAN
JOHN A. SAPORA
SANDRA J. MATHIS
PATRICIA J. HILL
GILBERT L. FELTEL, JR.
ADRIAN RUST
CINDY L. BARTIN
TROY K. SMITH
LORI S. PATTERSON
STEVEN DIEBENOW
ALEXANDER G. MOODY*
CHRISTOPHER M. HOOGE
RICHARD S. VERMUT
LEIGH S. SCALES
CHARLES R. CURLEY, JR.
CHRISTINE T. ADAMS
F. EUGENE ATWOOD
KATHRYN KNEE
KAREN E. WENDZEL
STEVAN M. JONES
MARGARET IOANNIDES-CORDOBA
THOMAS J. FRASER, JR.
SUSAN B. BLOODWORTH
MARGARET B. WETHERBEE
ARNETTA CAROL GIRARDEAU
CHARLES A. BEARD

March 17, 1999

*BY FEDERAL EXPRESS*

Mr. David A. Lane
Barnett Lane Investments, Inc.
8235 Douglas Avenue, Suite 200
Dallas, Texas 75225

      RE:    ITT COMMUNITY DEVELOPMENT CORPORATION, ET AL., SALE OF LANDS IN HAMMOCK DUNES, PHASE I, FLAGLER COUNTY, FLORIDA TO BARNETT LANE INVESTMENTS, INC. AND FARALLON CAPITAL MANAGEMENT, INC.

Dear Mr. Lane

      At the request of Bob Cuff, I am pleased to enclose herewith the following:

      1.      One clean copy of the proposed Purchase and Sale Agreement which incorporates changes and revisions contemplated by the parties since the expiration of the prior Contract between the parties which was dated on or about August 6, 1998;

      2.      A black-lined copy of the proposed Agreement for Purchase and Sale, marked to show the changes made to the execution version of the prior Contract between the parties; and

      3.      Clean copies of Exhibits K-1, K-2, L, P, Y, Z and CC.

ROGERS, TOWERS, BAILEY, JONES & GAY

March 17, 1999
Page 2

You should receive from Bob Cuff, under separate cover, copies of all of the other Exhibits which are to be attached to the Agreement for Purchase and Sale.

Please contact me or Bob with any comments you may have.

Very truly yours,

H. Joseph O'Shields

HJO/kcw
encls.

**BARNETT LANE INVESTMENTS, INC.**

8235 DOUGLAS AVENUE, SUITE 200
DALLAS, TEXAS 75225

---

(214) 692-5085
FAX (214) 692-0274

## MEMORANDUM

To:         Mr. James E. Gardner, President
            ITT Community Development Corporation

Via Fax:    (904) 445-9539

From:       Mr. David A. Lane, President  $D_\varepsilon L$
            Barnett Lane Investments, Inc.

Date:       March 18, 1999

Re:         Hammock Dunes

---

We are working our butt's off on this deal, we are close to going hard. I received a draft of the reinstatement Contract today. We will turn it around as quickly as possible.

Jim, thank you for your continued support.

E

# EXHIBIT NO.

# E

# Lochmere

March 2, 1999

Michael E. Bogel
Basic Capital Management, Inc.
106670 North Central Expressway
Suite 600
Dallas, Texas 75231

Re:   Hammock Dunes Due Diligence Information
      Palm Coast, Florida

Dear Mr. Bogel:

In order to further assist you with the acquisition of Hammock Dunes, Mr. Evans has asked me to provide you with information that we have involving the due diligence of this proposed acquisition . As you know, we have been involved in the due diligence process for Hammock Dunes for a year now; therefore, our files are quite voluminous. In an effort to assist you in the most efficient and expedient manner we have put together a package of information for you, compiling final reports, engineering studies, and current financial and inventory statuses of the various components of this project. The various consultants that we engaged relied not only on the documentation that we had compiled in our files, but also on outside research and meetings with various entities associated with Hammock Dunes.

The information in this package should provide you with a thorough analysis of this asset. However, should you desire additional information, please do not hesitate to contact our office so that we may provide you with the information or provide you with the appropriate contacts. Please find enclosed the following information:

## Offering Memorandum

This offering memorandum was prepared by Cushman & Wakefield and the Financial Service Group on November 25, 1997 for ITT. We utilized this memorandum as a benchmark for establishing changes in inventory, price fluctuations, and as a basis for comparison with our findings.

## PricewaterhouseCoopers Asset Advisory Report for Hammock Dunes (November 16, 1998)

In July of 1998 we engaged the services of PricewaterhouseCoopers to perform an analysis of Hammock Dunes providing the following information:

1.    Residential market demand/supply and competitive positioning analysis of Hammock Dunes' land, lots and housing product;

2.    Proforma analysis reflecting market-based absorption and pricing assumptions for land,

LOCHMERE DEVELOPMENT GROUP, INC    2701 NORTH   SUITE 1070  TAMPA



Mr. Michael E. Bogel
March 2, 1999
Page 2 of 3

> lots, and housing product; and,

3.  Evaluation of the real property assets contained in the Hammock Dunes Offering
    Memorandum including testing of revenues and operating expenses for Golf Course and
    Club House facilities.

Their analysis was based on information received by Lochmere Development, our engineering
consultants, meetings with key financial, marketing, and sales personnel at ITT, as well as
meetings with surrounding developers. Their Asset Advisory Report is a summary of their
findings and is comprised of the following components:

- Executive Summary
- Cash Flow Assumptions
- Golf Club Analysis
- Addenda (includes site evaluation, area housing market trends, pricing and
  absorption, etc.)
- Cash Flow Output

## Financial and Inventory Information

The following reports and analysis are updates to PricewaterhouseCoopers' November 21, 1998
Asset Advisory Report as well as additional financial information we have recently received:

1.  Pro Forma Additions to Purchase Price (December 31, 1998);

2.  Hammock Dunes Club, Inc. Balance Sheet (December 31, 1998);

3.  Change in Inventory of Platted Units (February 15, 1999); and,

4.  1999 Budget Summary for Hammock Dunes Homeowner Associations.

## Engineering

Though the following information is included, to a limited degree, in the
PricewaterhouseCoopers report, we believe that these reports and findings will enable you to
better determine the potential of Hammock Dunes:

1.  **Second Golf Course.** Canterbury Engineering's services were engaged in order to
    analyze the utilization of the second golf course site and to provide and estimate of
    construction costs. We have enclosed for your review, the Estimate of Probable
    Construction Costs for Second Golf Course prepared by Canterbury Engineering, Inc.,
    dated October 23, 1998 and Canterbury Engineering's summary of tasks to be completed
    pr or to the planning of the second golf course site.

Mr. Michael E. Bogel
March 2, 1999
Page 3 of 3

2.      **Bridge Traffic Analysis Review.**  According to the Hammock Dunes Development
        Order, the developer is required to build an additional Intracoastal Waterway bridge once
        traffic has reached an established level.  In order to determine the potential need of an
        additional bridge we engaged the services of VHB.  Enclosed is a copy of VHB's analysis
        dated September 21, 1998.

3.      **Hammock Dunes Parcels 19 and 20.**  We have enclosed a copy of the Development
        Study prepared by Consultants for Environmental Design ("CED") dated May 29, 1998
        which includes site plans, typical lot cross section, and typical lot site plan.  Additionally,
        we have enclosed the preliminary homesite design prepared by CED. This preliminary
        design is based on the enclosed letter from the Department of Environmental Protection,
        dated May 15, 1998, providing an analysis of the suitable development of parcels 19 and
        20.

4.      **Hammock Dunes Parcel 16C.**  Similar to parcels 19 and 20, we have also enclosed a
        copy of the Development Study prepared by CED, dated May 29, 1998, for parcel 16C
        which includes site plans, typical lot cross section, and typical lot site plan.  Additionally,
        we have enclosed the preliminary homesite design prepared by CED for this parcel.  This
        preliminary design is based on the enclosed letter from the Department of Environmental
        Protection, dated May 15, 1998, providing an analysis of the suitable development of
        parcel 16C.

Steve Samaha will be able to provide you with copies of the following information per your
"Acquisition Due Diligence Checklist":

1.      Title Report and Exception Documents;
2.      Homeowner Association Agreements, By-Laws, and Deed Restrictions;
3.      Development Order responsibilities;
4.      Copies of Leases; and
5.      Existing Utility and other Agreements.

If we can be of any further assistance in your possible acquisition of Hammock Dunes, please do
not hesitate to contact our office.

Sincerely,

Amanda S. Brinegar

cc:     Mr. David Lane (w/out enclosure)
        Steven M. Samaha, Esq. (w/out enclosure)

F

# EXHIBIT NO.

# F

# Lochmere

April 14, 1999

Mr. David A. Lane
Barnett Lane Investments, Inc.
8235 Douglas Avenue; Suite 200
Dallas, Texas 75225

RE:  MANAGEMENT, DEVELOPMENT & MARKETING AGREEMENT
     MARKETING & LISTING AGREEMENT
     HAMMOCK DUNES
     PALM COAST, FLORIDA

Dear David:

Please find enclosed the proposed Management, Development and Marketing Agreement <u>and</u> the Marketing and Listing Agreement by and between Lochmere Development Group, Inc. / Lochmere Realty, Inc. and Barnett Lane Investments, Inc. ("Agreements") detailing the services to be provided by us as it relates to the Hammock Dunes project. The referenced Agreements are in keeping with our correspondence of August 21 and September 2, 1998 regarding the continued participation by Lochmere.

After your review, we would like to finalize the Agreements as soon as possible, especially considering the volume of work needed to conclude this transaction and provide us adequate time to prepare for the closing of this new project.

Should you have any questions, do not hesitate to contact our office at your convenience.

With kindest regards,

Robert D. Evans
President



EXHIBIT
"F" to
Complaint

G

# EXHIBIT NO.

# G

# MANAGEMENT, DEVELOPMENT AND
# MARKETING AGREEMENT

By and Between

## LOCHMERE DEVELOPMENT GROUP, INC.,
a Florida corporation

and

## BARNETT LANE INVESTMENTS, INC.
a Texas corporation

Dated: April _____, 1999



EXHIBIT
"G" to
Complaint

F:\DOCS\ML0\13190\MANAGE.A02
April 14, 1999

## TABLE OF CONTENTS

Page

RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   1.    DUTIES OF MANAGER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
   2.    DUTIES OF OWNER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   3.    MATTERS REQUIRING THE APPROVAL OR DIRECTION OF OWNER. . . 3
   4.    MANAGER'S GENERAL AUTHORITY TO ACT . . . . . . . . . . . . . . . . . . . . 4
   5.    OPERATING ACCOUNT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
   6.    CONSTRUCTION DRAWS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   7.    TAXES AND ASSESSMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
   8.    LIENS AND ENCUMBRANCES. . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
   9.    INSURANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
  10.    MARKETING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
  11.    MANAGER'S OVERHEAD AND OTHER COSTS, FEES AND EXPENSES. 11
  12.    BUDGETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  13.    REPORTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  14.    RIGHT TO INSPECT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  15.    TERM OF AGREEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
  16.    OWNER'S RIGHT TO TERMINATION . . . . . . . . . . . . . . . . . . . . . . . 13
  17.    MANAGER'S RIGHT TO TERMINATE. . . . . . . . . . . . . . . . . . . . . . . 15
  18.    ARBITRATION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  19.    ASSIGNMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
  20.    MISCELLANEOUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Exhibit "A"    Legal Description of the Development
Exhibit "B"    Master Site Plan Showing, Lots and general layout of the Development
Exhibit "C"    Development Budget
Exhibit "D"    Master Development Budget
Exhibit "E"    Profit Participation Agreement

## MANAGEMENT, DEVELOPMENT AND MARKETING AGREEMENT

This Management, Development and Marketing Agreement is made and entered into this _____ day of _____, 1999, by and between **LOCHMERE DEVELOPMENT GROUP, INC.**, a Florida corporation, whose address is 2701 North Rocky Point Drive, Suite 1070, Tampa, Florida 33607 ("Manager"), and **BARNETT LANE INVESTMENTS, INC.**, a Texas corporation, whose address is 8235 Douglas Avenue, Suite 200, Dallas, Texas 75225 ("Owner").

### RECITALS

Whereas, Owner is the owner of that real property more particularly described on **Exhibit "A"** hereto consisting of tracts of approximately _____ acres of undeveloped land and _____ developed lots located in Palm Coast, Florida (the **"Development"**); and

Whereas, Manager has in its employ individuals who are acquainted with the Development who have the expertise and ability to manage, develop and market the Development, Manager is willing to perform such services on certain terms and conditions, and Owner desires to retain the services of Manager to manage, develop and market the Development.

NOW THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto state, covenant and agree as follows:

### AGREEMENT

### 1. DUTIES OF MANAGER.

Subject to directions to be given by Owner from time to time as described herein, Manager agrees to undertake and perform the following services respecting the management, development and marketing of the Development during the term of this Agreement on behalf of Owner:

1.1    Manager shall manage, maintain, administer, supervise and prepare the Development for marketing in accordance with plans and specifications (the "**Plans**") to be approved by Owner prior to the commencement of such work, such approval not to be unreasonably withheld (substantial changes made to the plans and specifications after the issuance of Owners approval shall be resubmitted to Owner for approval, but minor, nonstructural changes which do not affect the value of such Development and can be completed within the budgets approved by Owner and attached as **Exhibit "D"** hereto (collectively, the "**Master Development Budget**") may be approved by Manager as the project manager without resubmittal to Owner).

1.2    Once the Development or a portion of the Development has been sold to third party purchasers, Manager shall enforce applicable contracts to require contractors to perform all warranty work required under the terms of said contracts of the Development. To the extent that Owner has rights against contractors, subcontractors or materialmen who have performed the work or supplied

the materials to which any such warranty relates, Owner assigns those rights to Manager so Manager can enforce.

1.3    Manager shall supervise the completion of the on-site and off-site improvements necessary to complete the Development as fully developed lots, ready for building by Owner or for marketing to third party builders (the "Site Improvements").  Such Site improvements shall be completed in accordance with the Plans.

1.4    Manager shall obtain all permits, licenses and other municipal or governmental approvals from time to time necessary or required in connection with the construction activities described in Paragraphs 1.1 through 1.3 above and any other permits, licenses and other municipal or governmental approvals from time to time necessary or required incident to the management and operation of the Development.

1.5    Manager shall maintain the Development, common areas and streets owned by Owner in the Development from time to time and shall provide security for such areas.  The level of maintenance and security to be provided by Manager with respect to such property shall be determined by Owner in consultation with Manager from time to time and shall be implemented by Manager in accordance with Owners directions.

1.6    Manager shall maintain appropriate insurance coverage with respect to all properties included in the Development in accordance with the insurance requirements set forth in Section 9 below.  The coverages to be supplied shall conform to such insurance requirements and any supplemental instructions received by Manager in writing from time to time from Owner.

1.7    Manager shall monitor and cause to be paid in a timely fashion, prior to the imposition of any penalty or interest, all taxes and assessments from time to time accruing with respect to the properties included in the Development or any part thereof.

1.8    Manager shall maintain books and records respecting the management, development, and marketing of the Development and shall provide Owner with periodic reports respecting same, all as more particularly set forth in Section 13 below.

## 2.    DUTIES OF OWNER.

2.1    Owner agrees to fund amounts as necessary to accomplish the purposes of this Agreement in accordance with its terms, including but not limited to, funding (a) the acquisition of the Development in accordance with the terms, conditions and provisions of that Sale Agreement dated as of April _____, 1999, by and between ITT Community Development Corporation ("Seller") and Barnett Lane Investments, Inc. ("Purchaser"); (b) the Master Development Budget; and (c) the Operating Account (as such term is defined below); and (d) the General Marketing Plan; and the Profits Participation Agreement attached hereto as **Exhibit "E"**.

2.2    Owner agrees to review and approve or to specifically object to all matters requiring its consent and approval in a timely fashion and to otherwise cooperate with and direct Manager with

F:\DOCS\MLB\13190\MANAGE.A02
April 14, 1999

2

respect to the management, development and marketing of the various properties included in the Development as contemplated by this Agreement. For purposes of this Agreement, unless otherwise stated for a particular matter, Owner's timely consent and approval shall mean within five (5) business days after requested in writing by Manager. If Owner does not respond within said period, Owner shall be deemed to have approved Manager's request.

3.    **MATTERS REQUIRING THE APPROVAL OR DIRECTION OF OWNER.**

Owner as the owner of the Development has reserved the right to make decisions and to issue approvals as follows:

3.1    Each contract for services, construction contract or contract for materials or equipment involving a contract price or stated obligation in excess of the lesser of (a) $10,000.00 or (b) the amount specified for such contract in the Budget to be entered into by Manager on behalf of Owner for the benefit of the Development or any part thereof or otherwise pursuant to the performance of Managers duties hereunder shall first be submitted to Owner for its consent and written approval. Additionally, all contracts to be entered into by and between Manager and any Affiliated Entity (as such term is defined below) regardless of the contract price or the stated obligation, must first be disclosed to Owner in a writing which fully sets forth the relationship between Manager and the Affiliated Entity. All such contracts shall be subject to Owner's prior written approval, which approval may be granted or withheld in Owner's sole discretion. For the purposes of this provision, an Affiliated Entity shall mean (i) a person or entity that is controlled by or under common control with Manager or Robert Evans, (ii) a person within the third degree of kindred with Robert Evans, (iii) an entity controlled by one or more of Robert Evans or person(s) within the third degree of kindred with Robert Evans, (iv) any officer, director, employee, shareholder or partner of an entity described in clauses (i) or (iii) above, (v) any entity controlled by a party described in clause (iv) above, and (vi) any entity in which Robert Evans or a person within the third degree of kindred with Robert Evans is an officer, director, employee, shareholder, partner or profit participant.

3.3    Any contract with a contract price or stated obligation in excess of $25,000 or with an Affiliated Entity shall be put out to bid and the results of such bidding be reported to Owner prior to requesting Owners approval. If a contract is put out to bid and Manager recommends the acceptance by Owner of other than the lowest bidder, Manager shall indicate in writing its reasons for such recommendation.

3.4    Manager's submission of contracts for Owner's approval shall be in writing setting forth the services and/or materials and/or equipment to be rendered and/or obtained; the Development, the Unit or area to be benefited by such services, material or equipment; the contract amount, the term of such contract; and any other terms, conditions or provisions of such proposed contract or agreement which would reasonably be material to a determination of Owner respecting same.

3.5    If the contract or agreement is to be in writing, a copy of the proposed form of contract or agreement shall be submitted to Owner together with such request for approval. Owner

shall respond to any such written request for approval of the contract within five (5) business days and shall either consent thereto or state its objections with specificity in writing. Failure to respond to a request for approval .of a contract within the applicable time frame shall (i) be deemed an approval of the recommendation of Manager contained in such request if the contract is for work contemplated by an approved Budget and is within the amount designated for such work in such approved Budget and will not reasonably require more than 180 days within which to complete such work; or (ii) deemed a disapproval if the contract does not fall within the parameters of clause 3.5(i) immediately preceding. If within the approval period Owner requests further information respecting the matter under consideration, Manager shall endeavor to deliver such additional information as quickly as possible and the submittal of additional or further information shall commence the running of an additional approval period of the same duration as the original.

3.6    Sales and marketing decisions shall be made by Owner to the extent reserved to Owner pursuant to the terms, conditions and provisions of Section 10 below.

3.7    Owner shall have the right to review and approve all initial contracts of insurance respecting the Development or any part thereof required pursuant to Section 9 below prior to such contracts being bound. Manager shall submit proposals for such insurance to Owner for its review and approval together with Manager's recommendation respecting same, but Owner shall have the right to accept same or to propose alternative coverage. Manager may renew existing coverage with existing companies without a further approval from Owner but Owner may, at its discretion, require the cancellation of one policy and the substitution of another at any time or from time to time.

3.8    Owner has approved the layout and utilization of the Development reflected on the Master Site Plan set forth as **Exhibit "B"** hereto. Prior to Manager implementing any significant change of the design, layout or utilization contemplated by **Exhibit "B"** hereto or requiring approvals or consents are required from any governmental authority or entity, Manager shall first submit its written proposal for a modification to such design and layout to Owner and shall not proceed with the implementation of same without the written concurrence of Owner, such concurrence to be in Owners sole and absolute discretion. Minor deviations from the approved layout which do not affect the number of lots or the general location, utilization or value thereof shall not require the consent of Owner.

## 4.    MANAGER'S GENERAL AUTHORITY TO ACT

4.1    Subject to the specific matters reserved to Owner in Section 3 above, Owner hereby appoints Manager as its agent for purposes of implementing this Agreement and Manager shall be and is hereby empowered to manage the day to day operations of the Development and marketing of the Development on behalf of and for the benefit of Owner. Manager shall act from time to time hereunder either in its own name or in its name as agent of Owner, as appropriate. To the extent that Manager may require written limited powers-of-attorney or written agency agreements from time to time to satisfy third parties with whom it is dealing, Owner shall supply such documents and instruments as may be reasonably required by Manager to perform its duties and obligations hereunder in a timely manner.

**4.2**    Subject to the constraints set forth in Paragraph 3.8 above, Manager is specifically authorized to obtain building permits, licenses and such other governmental approvals and consents as may be required from time to time to complete the Development, and the Site Improvements. Subject to the budget constraints set forth in Section 6 below and the provisions of Paragraphs 3. 1, Owner hereby authorizes Manager shall enter into contracts for the labor, materials and services required in connection with the completion of the Development and the Site Improvements and the operation, marketing and maintenance of the Development with such contractors and on such terms as Manager deems appropriate.

**4.3**    During the term of this Agreement, Manager has no authority to enter into or bind Owner to enter into any sale or conveyance with respect to all or any portion of the Development unless owner consents in writing to such sale or conveyance.

**4.4**    Nothing contained in this Agreement or in the relationship of Owner and Manager shall be deemed to constitute a partnership, joint venture or any other relationship other than that of contract parties hereunder and, while Owner shall have certain payment obligations to Manger hereunder which are determined by reference to the economic performance of the Property, nothing herein shall constitute Manager as having any equity or partnership interest in the Property, directly, or indirectly. Owner shall be entitled to expense all payments to Manager hereunder and Manager shall not report any such payments as distributions from a partnership or other joint venture. Manager shall not be obligated to make any capital contributions or other out-of-pocket payments to fund any capital expenditures or Negative Cash Flow for the Property.

**4.5**    Except as otherwise specifically stated, nothing herein shall be construed as vesting in Manager any control rights or voting or approval rights whatsoever in or to the operation, financing and disposition of the Property or any portion thereof and all decisions concerning the Property or any portion thereof shall be made solely by Owner or its designee from time to time. Owner may sell, finance or refinance the Property or any part thereof in any manner whatsoever from time to time and shall have the right to mortgage, pledge or otherwise encumber the Property or any portion thereof from time to time in connection with any or all of such financings or refinancings or otherwise. Manager agrees to execute any document reasonably requested by Owner from time to time to confirm the provisions of this paragraph.

## 5.    OPERATING ACCOUNT.

**5.1**    Owner shall establish at _____ ("Bank") an account or line of credit against which Manager will be authorized to write checks to pay all costs, fees, and expenses which Manager is authorized or obligated to incur and pay under the terms of this Agreement with respect to the management, development and marketing of the Development (hereinafter the "Operating Account"). Owner shall initially fund or cause to be funded the Operating Account with an amount of not less than $25,000.00 (the "Operating Balance"). On the ten (10th) day of each month Manager shall notify Owner of the amount which Owner is required to fund into the Operating Account to bring the amount then available to Manager in the Operating Account back up to the Operating Balance, and Owner shall cause such amount to be deposited into the Operating Account within five (5) business days of the receipt of such notice. In the event that Manager from time to

time anticipates the need to write checks that would be in excess of the Operating Balance or the amounts then available in the Operating Account, Manager shall notify Owner and Owner shall by electronic transfer or otherwise cause the amount required to cover such large items checks to be deposited in the Operating Account not later than the business day prior to the date Manager anticipates the need to write such check(s). From time to time when the amount available to Manager in the Operating Account falls below $25,000.00 (the "Minimum Balance") Manager may notify Owner who shall within five (5) business days of the receipt of such notice cause an amount to be deposited in the Operating Account to bring the balance back up to the Operating Balance. Owner in its sole and absolute discretion may adjust the Operating Balance and the Minimum Balance as Owner shall determine reasonable from time to time to accommodate the demands for funds for Manager to perform its duties and obligations hereunder. The Operating Account shall belong to Owner, and Manager shall have no right, title or interest therein except for the ability to write checks thereon as Owner's agent for the purposes hereof. Dual statements on the Operating Account shall be provided monthly to Manager and Owner.

5.2    Checks drawn upon the Operating Account that are in the amount of $10,000.00 or less may be signed by an authorized representative of Manager from time to time without any countersignature from Owner or any other agent of Owner. Any checks drawn upon the Operating Account that are in excess of $10,000.00 (the "Authorized Amount") shall require the prior approval of David A. Lane or such other representative as Owner shall designate to Manager in writing. Any check drawn on the Operating Account for any amount in excess of the Authorized Amount shall require the signature of two parties, one of whom shall be Manager's representative and the other of whom shall be a designated agent of Owner not employed or affiliated with Manager; to implement such control, all checks prepared for the Operating Account shall have printed thereon the following legend: "All checks for amounts in excess of $10,000.00 require two (2) signatures." Owner shall be entitled to increase the Authorized Amount at its sole and absolute discretion from time to time by written notice to Manager and the account officer of Bank handling the Operating Account.

6.    CONSTRUCTION DRAWS.

6.1    "Manager's Certification" as such term is used in Paragraphs 6.1 and 6.2 shall mean a certification signed by an authorized officer or representative of Manager to the effect that: (I) all work for which a draw against the respective budget is requested has been performed and incorporated into the Development as indicated; (ii) all materials which are covered by such draw request have either been incorporated into the improvements being constructed or are suitably stored on the Development; (iii) the amount requested represents the actual amount then due and payable to contractors, subcontractors or materialmen under the terms of their respective contracts or for Manager's supervision in accordance with Paragraph 11.2 below and does not include any amounts which Manager is entitled to hold back from contractors or subcontractors pending completion; (iv) that all amounts previously disbursed by Owner with respect to the Development have been disbursed to the contractors, subcontractors, laborer's and materialmen's to whom such amounts were due and payable and valid lien waivers have been obtained from such parties with respect to all amounts previously drawn by Manager; and (v) to the best of Manager's knowledge, no labor or materialmen's liens have been filed with respect to the work respecting such project which have not been theretofore

fully paid and released.

6.2     Provided Manager has observed the approval process set forth in Paragraph 3.1 above and within the amounts designated for the particular work, materials or equipment in the Budget approved by Owner from time to time, upon receipt of a draw request together with Manager's Certification relating thereto, Owner shall fund the amount requested (or shall give notice to Manager that it may use amounts then on deposit in the Operating Account for such purposes to the extent adequate funds are then held in such account) within five (5) business days of receipt of same against the respective Budget for such work unless Owner desires further information respecting all or some part of the amounts requested or unless Owner desires to verify Manager's Certification by an independent inspection of the work.  If Owner desires to verify Manager's Certification through an independent inspection, Owner shall be entitled to conduct such inspection using its own personnel or through agents hired by Owner at it sole cost and expense.  If an independent inspection is desired, it shall be completed in any event within five (5) business days from Owners receipt of a draw request.  In all events, Owner shall fund the draw request by deposit into the Operating Account of the amount thereof within five (5) business days of receipt of the draw request together with Manager's Certification unless Owner shall have noted a problem with such request and given Manager written notice thereof with an indication of the action required to cure same.  In the event of any discrepancy or problem that Manager is given written notice of, Owner shall fund the amount requested upon Manager's resolution of the discrepancy or problem to the reasonable satisfaction of Owner.  Manager shall make draws against the Master Development Budget which shall be funded by Owner into the Operating Account upon Manager's Certification.

7.     **TAXES AND ASSESSMENTS.**

7.1     Manager shall be the party designated by Owner to receive all notices of real property taxes and assessments and shall notify Owner of such tax liabilities not later than thirty (30) days prior to the delinquency of any such taxes or assessments.  If Manager anticipates that the amounts on deposit in the Operating Account will be insufficient to pay such taxes or assessment as of the date ten (10) business days prior to the date on which any penalty, interest or fine will be imposed on Owner for the non-payment thereof, then Manager shall notify Owner of the amount and date by which additional funds must be deposited in the Operating Account to enable Manager to pay such tax or assessment prior to its delinquency.  If Manager has requested that Owner deposit additional funds in the Operating Account to enable Manager to pay such tax or assessment, then, at least five (5) business days prior to the delinquency of any such taxes and assessments, Owner shall deposit into the Operating Account the amount requested by Manager incident to the payment of such taxes and shall notify Manager in writing to pay such taxes immediately.  Upon receipt of such notice and the deposit of the requested amount, Manager shall pay such taxes or assessments and shall supply Owner with written confirmation of such payments.

7.2     Owner in its sole and absolute discretion shall have the right to contest or challenge (or to direct Manager to contest or challenge at Owner's expense) any tax or assessment or any other lien or imposition which it deems to be inappropriate provided that such contest or challenge is conducted in a manner that does not jeopardize Owner's title to the subject property and does not unreasonably delay or hinder the development or marketing of the Development.  Manager shall

notify Owner of any tax, assessment or valuation that Manager in good faith believes to be inappropriate based upon information available to Manager. Upon direction from Owner, Manager shall contest or challenge the validity or amount of any tax, assessment, charge or encumbrance in the manner provided by law at the cost and expense of Owner. Upon the final determination of any such contest or challenge, Manager shall promptly pay for Owner's account all sums determined to be due as hereinabove provided.

8.    **LIENS AND ENCUMBRANCES.**

**8.1**    Manager shall immediately notify Owner of any labor or materialmen's liens or any other encumbrances which it receives notice of or which it otherwise becomes aware of respecting all or any part of the Development together with Manager's recommendation for resolving such matter. Upon instruction from Owner, Manager shall pursue at Owners cost and expense the course directed by Owner to resolve and remove any such lien at Owner's expense.

**8.2**    Owner in its sole and absolute discretion shall have the right to contest or challenge (or to direct Manager to contest or challenge at Owners expense) any lien, charge, assessment, or other encumbrance which affects all or any part of the Development and Manager, at Owner's expense, shall assist and support Owner in such contest or challenge as Owner may direct from time to time, provided that such contest or challenge is conducted in a manner that does not jeopardize Owner's title to the subject property and does not unreasonably delay or hinder the development or marketing of the Development or any part thereof.

**8.3**    Manager shall promptly notify Owner of any material disputes with contractors, vendors, materialmen or suppliers from time to time and shall exert all reasonable efforts to give such notice in any event prior to the filing of any liens against all or any portion of the property which is the subject of this Agreement. For purposes of the foregoing sentence, a dispute of $10,000.00 or more shall be deemed material.

9.    **INSURANCE.**

**9.1**    Manager shall secure and maintain policies of fire and extended coverage insurance on the insurable improvements from time to time located on the Development owned by Owner in an amount not less than the full insurable value of such improvements, on a replacement-cost basis, and, shall also secure and maintain policies of insurance in amounts required by Owner covering vandalism and malicious mischief, sprinkler leakage, flood damage, and any other risks which Owner directs Manager to cover from time to time with insurance. All such policies shall contain standard beneficiary clauses making losses payable to Owner and/or such additional insured and loss payees as Owner may from time to time direct. Manager shall also secure and maintain comprehensive public liability insurance in amounts required by Owner and containing endorsements naming Owner and Manager as insured, and such additional insured and loss payees as Owner may from time to time direct. All insurance policies shall be with companies (and through insurance agents and/or brokers) from time to time approved by Owner, shall provide that both Manager and Owner are to receive thirty (30) days notice prior to cancellation and shall otherwise be in form and substance satisfactory to Owner and Manager. Original policies of insurance shall be delivered to Manager with certified

copies thereof to Owner; renewal policies shall be delivered to Manager with certified copies thereof to Owner thirty (30) days before the expiration of the then-existing policies with satisfactory proof that the premiums for renewal have been paid. Owner reserves the right to designate all insurers and agents through whom the insurance coverage contemplated hereby is obtained.

9.2    In the event of a loss or casualty on or to the Property, Manager shall give immediate notice to Owner, and Manager shall make proof of loss to the insurer. Each insurance company is hereby authorized and directed to make payment for loss directly to Owner, and Owner may apply all or any part of such insurance proceeds to the restoration or repair of the improvements destroyed or for any other purpose which Owner deems appropriate. Upon the sale of any portion of the Development, Manager shall promptly notify the insurance carrier and cancel any coverages no longer required as a consequence of such sales.

9.3    If the insurance proceeds are at Owner's election to be used for the restoration and repair of the improvements located on the Development which were damaged or destroyed, they shall be held by Owner in an account selected by Owner in its sole and absolute discretion (the "Restoration Account"). Manager, at Owner's expense, shall promptly prepare and submit to Owner all plans and specifications necessary for the restoration and repair of the damaged improvements, together with Managers cost estimate of the required restoration or repair. Upon Owner's direction, Manager shall either enter into a fixed price contract with a reputable builder for such restoration or repair (subject to the limitations on contracts set forth in Paragraph 3.1 above) or shall proceed to hire subcontractors and complete such work with Manager supervising such work as the project manager. If Manager completes the work with subcontractors acting under Manager's direction as the project manager, Manager shall be entitled to compensation in accordance with Paragraph 11.2 below. The plans and specifications and all other aspects of the proposed restoration and repair shall be subject to Owner's approval. In the event the insurance proceeds held in the Restoration Account are insufficient to complete the restoration and repair, Owner shall fund the amount equal to the difference between the amount then held in the Restoration Account and the amount .required to complete the restoration and repair after depletion of the amounts in the Restoration Account. Manager shall commence restoration and repair of the damaged improvements only when authorized in writing by Owner to do so and thereafter shall proceed diligently with the restoration and repair until completed. Disbursements shall be made from the Restoration Account for the restoration and repair in accordance with the same procedure utilized for disbursements for construction of the Development set forth in Paragraphs 6.1 and 6.2 above. In the event the amounts held in the Restoration Account exceed the cost of the restoration and repair of the damaged improvements, including any construction supervision fee paid to Manager or its affiliate, the excess funds shall be disbursed to Owner.

## 10.    MARKETING.

10.1    Manager and Owner shall prepare and agree upon the general marketing plan (such general marketing plan as hereafter amended from time to time being hereinafter referred to as the "General Marketing Plan") and Manager shall proceed with marketing the Development as outlined in the General Marketing Plan. Without excluding other issues which the parties hereto may determine to cover in the General Marketing Plan in effect under the terms hereof from time to time,

it is agreed hereto that the General Marketing Plan shall address the following issues:

(a)    The minimum cash purchase prices to be solicited by Manager with respect to each component of the Development to be offered;

(b)    The advertising and promotional materials that Manager is authorized to develop and utilize pursuant to the Budget;

(c)    The location and design of a sales office/reception center on the Property; and

(d)    The services to be provided by Manager and by Owner's exclusive sales agent for the Property, Lochmere Realty, Inc. ("**Broker**"), and the sales staff to be employed to market the Property. Pursuant to Owner's agreement with Broker, Owner shall not be obligated to pay sales commissions in excess of seven (7) percent of the purchase price for the Property or any portion thereof.

**10.2**    Owner shall have the ability to modify or amend the General Marketing Plan at any time and from time to time, subject to the other terms and conditions of this Agreement and after consultation with Manager, although Manager's approval shall not be required to any such modifications. Upon any such modification or amendment to the General Marketing Plan, Owner shall immediately notify Manager and Manager shall implement such modified or amended General Marketing Plan as Owner's agent. Manager shall recommend to Owner changes from time to time it deems appropriate to the General Marketing Plan and, Owner shall consider same in good faith and respond thereto, although Owner shall retain the ultimate discretion respecting the General Marketing Plan. Manager shall have responsibility and authority to carry out the General Marketing Plan and shall charge all costs, fees and expenses incurred by it in accordance with the Budget and incident to the implementation of the General Marketing Plan to the Operating Account.

**10.3**    Owner shall execute and deliver to Manager a limited power-of-attorney in form and content satisfactory to Manager and the title company and its agent as selected by Manager to close such sales as escrow agent(s) granting Manager the authority, as attorney-in-fact for Owner, to sign all purchase contracts, agreements of sale, and special warranty deeds, affidavits of value, affidavits regarding seller's non-foreign status, and any and all other documents reasonably required to consummate a sale of a portion of the Development. All such sales closed by Manager as attorney-in-fact for Owner shall be consummated on forms of documents previously approved by Owner without substantial modification or deviation from the standard terms set forth therein and any contracts, agreements of sale, deeds, affidavits or other documents containing substantial deviations from the standard forms approved by Owner shall first be submitted to and approved by Owner. Copies of any documents executed by Manager pursuant to the aforesaid power of attorney shall be delivered to Owner promptly following the execution and delivery of same.

**10.4**    Once Owner has determined whether to accept or reject any proposal respecting the sale of all or any part of the properties included in the Development that requires its consent and approval, its decision respecting such proposal shall be communicated to Manager in writing and Manager shall proceed to use its best efforts to conclude the sale in the manner directed by Owner.

Any material deviation from the terms and conditions of any sale proposal approved by Owner shall first be resubmitted to Owner for its concurrence.

10.5    All net sales proceeds from the sale of all or any part of the properties included in the Development shall be forwarded directly by the escrow agent handling any such closing directly to an account designated by Owner; Manager shall have no interest or authority with respect to such account. The escrow agent closing each sale shall be directed by Manager to deliver to Owner a copy of the final escrow accounting and, to the extent that Owner shall have previously authorized same, any and all original documents and instruments representing carry-back financing received in any such sale.

10.6.    The provisions of this Section 10 are subject to the provisions of Section 4.3 above.

## 11. MANAGER'S OVERHEAD AND OTHER COSTS, FEES AND EXPENSES.

11. 1    To the extent not covered by checks drawn on the Operating Account, Owner shall reimburse Manager for all costs, fees and expenses paid by Manager in accordance with the Master Development and other agreements approved by Owner and Budget to third parties in Manager's performance of its various duties and obligations hereunder.

11.2    To compensate Manager for its supervision of operations as required herein to complete the Site Improvements as described in **Exhibit "A"** attached hereto, Owner shall pay to Manager a monthly fee in arrears in an amount equal to $12,000. Additionally, Owner shall reimburse Manager for all direct expenses incurred in connection with the Development and in accordance with the Master Development Budget as may be required from time to time, including but not limited to; employees, insurance , benefits, administrative overhead, travel, lodging and car rental. Such expense categories and amounts shall be pre-approved by Owner, and any such expenses incurred by Manager, which have not been pre-approved by Owner, then such expenses shall not be reimbursed by Owner. Commencement of management and development duties shall be deemed effective as of April _____, 1999. Owner shall pay or fund through the Operating Account all general and administrative expenses incurred in connection with the Development as more fully described in detail in the Master Development Budget (defined in section 12.1 hereto).

11.3    Manager shall pay the costs, fees and expenses contemplated by this Agreement by writing checks on the Operating Account as and when such amounts become due and payable. Manager shall submit not later than the tenth (10th) business day of each month an accounting of all such costs, fees and expenses. If there are any expenditures for which Owner desires further information, it shall be entitled to request such further information and Manager shall endeavor to promptly respond to any such inquires.

11.4    Owner hereby agrees to pay Manager the sum equal to one percent (1%) of the Purchase Price of the Property in consideration for the due diligence investigation and other work performed by Lochmere for the benefit of the Owner in negotiating the purchase agreement and ultimate acquisition of the Property for the period occurring prior to April _____, 1999. Owner shall pay Manager the above referenced sum only if, as and when Owner closes on the purchase of the

Property.

12. **BUDGETS.**

12.1     Attached hereto within **Exhibit** "C are construction budgets setting forth Manager's best estimation of the costs, fees and expenses that will be required (i) to complete the Development (the "**Development Budget**"); and (ii) complete the Site Improvements and prepare the balance of the Lots for marketing (the "**Site Improvements Budget**") (the Development Budget and the Site Improvements Budget being hereinafter individually and collectively referred to as the "**Master Development Budget**"). Owner hereby acknowledges that it has reviewed the proposed Master Development Budget and, subject to its right to review and adjust such Master Development Budget quarterly as set forth in Paragraph 12.2 below, concurs with same, and agrees to fund the costs, fees and expenses anticipated thereby as the construction of such projects progresses as set forth in Section 6 above. In the event that Manager encounters situations or circumstances that will increase the total cost reflected on a particular Budget beyond the amount allocated for such purpose, Manager shall promptly notify Owner of such anticipated cost over-run as soon as it is discovered and shall request in writing that the respective Master Development Budget be adjusted to cover the additional cost. Project cost over-runs of less than five percent (5%) of the total Master Development Budget for the project indicated shall not require approval of Owner and shall be funded by Owner. Manager shall have the ability to adjust line items in the Master Development Budget to offset a cost savings against a cost over-run within such Master Development Budget. In the event of a cost over-run in excess of five percent (5%) or more of the total approved Master Development Budget for a project, Manager shall promptly submit in writing such explanations and other evidence as may be appropriate to explain and justify the additional costs, and Owner shall promptly respond thereto, either approving such modification to the particular Master Development Budget or requesting additional information or directing that Manager take other direction reasonably calculated to avoid the cost overrun. Without limitation on the foregoing, but in addition thereto, in no event shall Manager incur an expense for any particular line item within the Master Development Budget which is greater than 120% of the amount budgeted for such line item, without the prior written consent of Owner.

12.2     Notwithstanding Owner's approval of the Master Development Budget and as set forth above, Owner retains the right to review and modify the Master Development Budget, in its sole discretion, once each calendar quarter. However, prior to Owner modifying the Master Development Budget, it shall first consult with Manager, either in a meeting or by telephone and shall request Managers input with respect to any proposed modification but Owner retains ultimate discretion with respect to such Budgets and shall have the right to modify or amend the Master Development Budget not more often than once each calendar quarter by either increasing or decreasing the amounts thereof in its sole and absolute discretion, except as to fees and categories of funds payable or reimbursable to Manager. Once Owner has given written notice to Manager of the modification or amendment to a particular budget, such budget as amended shall be deemed to be the revised Master Development Budget for all purposes.

13. **REPORTS.**

13.1     Monthly, not later than the tenth day of the following month, Manager shall submit in writing (i) a financial report to Owner setting forth all income, whether from the proceeds of sales, rentals or otherwise, and setting forth all costs, fees and expenses incurred during the previous calendar month; (ii) a marketing report setting forth all contracts entered into, the other party to the contract, the total purchase price, the amount of any down payment or earnest money deposited, and the anticipated date of closing as well as a report of all closings, the name of the party to such closing, the net sales proceeds and enclosing a copy of the final settlement sheet; and (iii) a construction report with respect to each of the construction projects then in progress to report the work completed, the costs incurred and the amount of any anticipated costs to complete.  Upon review of the monthly reports, Owner shall be entitled to request any further information or detail that it requires for its purposes and Manager shall endeavor to promptly supply same.  Owner shall also receive on a monthly basis copies of all bank statements on the Operating Account.

## 14. RIGHT TO INSPECT.

14.1     Owner shall have the right to inspect the Development from time to time and at any time that it may elect subject only to reasonable safety precautions which Manager may impose with respect to inspection of construction projects.  Owner shall also have the right to inspect the books and records of Manager relating to the Development and Manager's performance of the Agreement from time to time.  To the extent that Owner desires to copy books and records or other information in the files of Manager relating to any aspect of the Development or Manager's performance hereunder it may do so during normal business hours.

## 15. TERM OF AGREEMENT.

15.1     This agreement shall be for a four (4) year term unless sooner terminated in accordance with the provisions hereof (the "Initial Term").  At any time on or after that date which is ninety (90) days prior to the expiration of the Initial Term, either Owner or Manager shall have the right, with or without cause, to terminate this Agreement, to be effective upon the expiration of the Initial Term, upon not less than thirty (30) days prior written notice and no termination fee or other penalty or termination payment shall be due or payable in connection with any such termination.

15.2     In the event this Agreement shall not have been terminated at the expiration of the Initial Term pursuant to the preceding sentence or pursuant to any other term or provision of this Agreement, then this Agreement shall be automatically renewed for additional, successive one year terms, subject to termination during each annual extension in the same manner as provided for with regard to the Initial Term.  Thus, if not sooner terminated, this Agreement shall automatically expire upon the final disposition of the entire Development and shall terminate as to each portion of the Development, as the same is sold and conveyed to the purchaser thereof, except that Owner's obligation to pay or reimburse Manager as described herein shall survive any such termination or expiration.

## 16. OWNER'S RIGHT TO TERMINATION

16.1     Owner shall have the right to terminate this Agreement without payment of any

penalty or termination payment immediately upon the final disposition of all lots and/or parcels included within the Development to third party purchasers by the giving of written notice to Manager of such event. Owner shall also have the right to terminate this Agreement without payment of any penalty or termination payment immediately upon Manager's receipt of the initial payment incident to either Manager or Owner exercising its right to require a buy-out of Manager under the terms of the buy-sell provision of the Profits Participation Agreement by the giving of written notice to Manager of such event.

16.2     Owner shall have the right to terminate this Agreement for cause without payment of any penalty or termination payment upon the occurrence of any one or more of the following, except as:

(a)     Failure of Manager to perform any one or more of its duties or obligations under the terms, conditions and provisions of this Agreement which manager fails to cure within thirty (30) days after receipt of written notice from Owner;

(b)     The filing by Manager (or against Manager to which Manager acquiesces or to which Manager does not acquiesce but that is not dismissed within sixty (60) days after the filing thereof of any proceeding under the federal bankruptcy laws now or hereafter existing or any other similar statute now or hereafter in effect; the entry of an order for relief under such laws with respect to Manager; or the appointment of a receiver, trustee, custodian or conservator of all or any part of the assets of Manager.

(c)     The insolvency of Manager; or the execution by Manager of an assignment for the benefit of creditors; or the convening by Manager of a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; or the failure of Manager to pay its debts as they mature; or if Manager is generally not paying its debts as they mature.

(d)     The death or incapacity of Robert Evans unless within forty-five (45) days after such occurrence, Manager retains the services of another person whose background and experience in the management and development of similar types of properties is satisfactory to Owner in Owner's sole and absolute discretion.

(e)     Failure of Robert Evans to personally control the operations of Manager contemplated hereby.

(f)     The commission by Manager of any act constituting fraud, embezzlement or misappropriation of Owner's funds or any act or omission by Manager or by any of its agents or employees constituting gross negligence or willful misconduct.

16.3     At the request of Owner (but subject to Manager's rights to participate in the financing as provided in the Profits Participation Agreement which are not waived or diminished in any fashion by the provisions of this Paragraph 16.3), Manager shall execute and deliver such subordinations and other documents and instruments as may be reasonably required from time to time to subordinate its

rights, title and interest under this Agreement to the rights of any lender making a loan to Owner secured by all or any part of the Development which remains subject to the terms of this Agreement at the time such loan is closed. In addition, upon request of Owner, Manager agrees to execute and deliver such further confirmations, documents and instruments as Owner may request from time to time to evidence termination of this Agreement as to portions of the Development sold or disposed of from time to time.

## 17. MANAGER'S RIGHT TO TERMINATE.

17.1    Manager shall have the right to terminate this Agreement for cause in the event of Owner's failure to perform any of its duties and obligations hereunder, including without limitation, failure to make any one or more of the payments that it is required to make under the terms and provisions of this Agreement. Notwithstanding the foregoing, Manager shall not terminate this Agreement for Owners failure to perform unless Manager shall first have given Owner written notice of the circumstance, condition or default upon which such intended termination is based and ten (10) business days within which to cure such default if it can be cured by the payment of money (a "Monetary Default") and forty-five (45) days within which to cure all defaults other than Monetary Defaults. In the event Owner shall cure any such default within the applicable cure period therefor, then Manager shall have no right to terminate this Agreement by reason of such cured default.

17.2    In the event Manager shall have terminated this Agreement pursuant to paragraph 17.1 above, or otherwise, Manager shall cooperate with the party designated by Owner as the replacement manager for the Development to assist in a smooth transition and shall make all records and information which it has in its possession respecting the Development and the improvements then existing or anticipated available to such substitute manager for copying. No termination of this Agreement by either party shall relieve any party from any of its liabilities or obligations hereunder arising or accruing prior to such termination.

## 18. ARBITRATION

18.1    This Section concerns the resolution of any controversies or claims between Manager and Owner, including, but not limited to, those that arise from:

(a)    This Agreement (including any renewals, extensions or modifications hereof);

(b)    Any document, agreement or procedure related to or delivered in connection with this Agreement (hereinafter the "Related Documents");

(c)    Any violation of this Agreement or any Related Documents;

(d)    Any claims for damages resulting from any business conducted between Manager and Owner, including claims for injury to persons, property or business interests (torts); or

(e)    Any right of either party hereto to terminate this agreement with cause. Notwithstanding the foregoing, however, any disputes with respect to the Master Development

F:\DOCS\MLB\13190\MANAGE.A02
April 14, 1999

15

Budget and any dispute with respect to termination of this Agreement without cause, where cause is not required for such termination, shall not be subject to arbitration unless both parties shall consent in writing thereto, which consent may be granted or withheld by either party in its sole and absolute discretion.

18.2    At the request of either party hereto, any such controversies or claims will be settled by arbitration in accordance with the United States Arbitration Act. The United States Arbitration Act will apply even though this Agreement and the Related Documents provide that they are governed by Florida law.

18.3    Arbitration proceedings will be administered by the American Arbitration Association and will be subject to its commercial rules of arbitration.

18.4    For purposes of the application of the statute of limitations, the filing of an arbitration pursuant to this paragraph is the equivalent of the filing of a lawsuit, and any claim or controversy which may be arbitrated under this paragraph is subject to any applicable statute of limitations. The arbitrators will have the authority to decide whether any such claim or controversy is barred by the statute of limitations and, if so, to dismiss the arbitration on that basis.

18.5    If there is a dispute as to whether an issue is arbitrable, the arbitrators will have the authority to resolve any such dispute.

18.6    The decision that results from an arbitration proceeding may be submitted to any authorized court of law to be confirmed and enforced and shall inure to the benefit of, the parties hereto and their successors and assigns.

18.7    The pursuit of or a successful action for provisional, interim, additional or supplementary remedies, or the filing of a court action, does not constitute a waiver of the right of Manager or Owner, including the suing party, to submit the controversy or claim to arbitration if the other party contests the lawsuit.

## 19. ASSIGNMENT.

19.1    Owner may assign its right, title and interest under this Agreement only upon an assignment of all of Owner's right, title and interest in and to the Development (or the entire portion of the Development then remaining subject to the terms of this Agreement) ,to any entity which it owns or controls (a "Related Party"), and, if not to a Related Party, then only with the consent of Manager, such consent to be in Manger's sole and absolute discretion. Upon a permitted transfer or assignment of Owner's right, title and interest hereunder pursuant to the foregoing sentence and such permitted transferee's assumption of all of Owner's duties and obligations hereunder, Owner shall have no liability hereunder to Manager for obligations and actions accruing or taking place after the date of such assumption.

19.2    Manager shall have no right to assign any right, title or interest it may have hereunder to another party without the prior written consent of Owner, which consent Owner shall be entitled

to withhold in its sole and absolute discretion, except for a proposed assignment to an entity that is owned or controlled by Robert Evans.

20. **MISCELLANEOUS.**

20.1     The provisions hereof shall apply to the parties according to the context thereof and without regard to the number or gender of words or expressions used.

20.2     Time is expressly made of the essence of this Agreement.

20.3     All notices required or permitted to be given hereunder shall be in writing and may be given in person or by United States mail, by delivery service or by electronic transmission. Any notice directed to a party to this Agreement shall become effective upon the earliest of the following: (i) actual receipt by that party; (ii) delivery to the designated address of that party, addressed to that party; or (iii) if given by certified or registered United States mail, seventy-two (72) hours after deposit with the United States Postal Service, postage prepaid, addressed to that party at its designated address. The designated address of a party shall be the address of that party shown at the beginning of this Agreement or such other address as that party, from time to time, may specify by notice to the other parties.

20.4     This Agreement shall be governed by and construed according to the laws of the State of Florida.

20.5     Except as otherwise provided herein, this Agreement shall be binding upon, shall inure to the benefit of, the parties hereto and their successors and assigns.

20.6     The headings or captions of sections in this Agreement are for reference only, do not define or limit the provisions of such sections, and shall not affect the interpretation of this Agreement.

20.7     Any and all costs, fees and expenses incurred and paid by Owner pursuant to the terms, conditions and provisions of this Agreement shall without duplication, be taken into account in determining **"Net Cash Receipts", "Negative Cash Flow", "Net Financing Proceeds"** or **"Net Sale Proceeds"** (as all such terms are defined in the Profits Participation Agreement) and items so taken into account shall be charged, accrued or allocated, as appropriate, in the manner contemplated by said Profits Participation Agreement.

20.8     In the event a party shall breach or fail to perform its obligation under this Agreement, then the prevailing party shall be entitled to recover from the defaulting party the prevailing party's reasonable legal fees and costs in effecting performance by the defaulting party hereunder.

20.9     During the term of this Agreement, and without limitation upon any other term or provision of this Agreement, Manager shall disclose in advance and in writing to Owner all fees and other compensation, and all arrangements therefor, to be received or entered into from time to time by Manager or by any Affiliated Entity (including, but without limitation, Robert Evans) with parties

or persons other than Owner and that relate to the Development or any portion thereof, including, but without limitation, portions of the Development that have been sold, transferred or conveyed by Owner. Manager and its Affiliated Entities shall not be prohibited from entering into such arrangements so long as the compensation therefore is customary and at or below market rates, such arrangements are not competitive with any interests of Owner and such arrangements are not linked to any concessions or other economic detriment as to matters in which Owner has an economic interest.

20.10    Owner's obligations to Manager hereunder shall be without recourse to any partner of Owner and in the event of any claim by Manager hereunder of pursuant hereto, shall look solely to the assets from time to time owned by Owner.

IN WITNESS WHEREOF, these presents are executed as of the date indicated above.

LOCHMERE DEVELOPMENT GROUP, INC.,
a Florida corporation

By: _____.
Name:  Robert D. Evans
Title:  President
**"MANAGER"**

BARNETT LANE INVESTMENTS, INC.,
a Texas corporation

By: _____
Name:  David A. Lane
Title:  President
**"OWNER"**

## LIST OF EXHIBITS

Exhibit "A"    Legal Description of the Development

Exhibit "B"    Master Site Plan Showing, Lots and general layout of the Development

Exhibit "C"    Development Budget

Exhibit "D"    Master Development Budget

Exhibit "E"    Profit Participation Agreement

**Exhibit "E"**

**PROFIT PARTICIPATION AGREEMENT**

1.    **OVERVIEW**

Owner hereby agrees to pay Manager an **"Incentive Participation"** calculated in accordance with and subject to the terms and conditions of this **Exhibit "E".**  No Incentive Participation shall be payable until Owner receives a full return of **"Owner Fundings"** as defined herein and at least a ten percent (10%) simple, cumulative, annual return on **"Owner Capital"** as defined herein.

Once the aforesaid preconditions have been satisfied, Manager's Incentive  Participation will be calculated by multiplying a percentage rate times **"Net Cash Receipts"**, as defined herein.  Said percentage rate increases as the Owner's Priority Return increases as described in Section _____ below.  An example of how these calculations are to be made, subject to all the other terms and conditions of this **Exhibit "E"**, is attached hereto as Schedule 1.

2.    **CERTAIN DEFINITIONS.**  For purposes hereof, the following terms shall have the following meanings:

A.    **"Cash Expenditures"** for the applicable period means cash expenditures made by Owner during such period in the operation of or in connection with the development, operation and management and sale of the Property and the Development, including, but not being limited to, payroll, business taxes and real and personal property taxes and assessments, insurance premiums and capital costs, and all management fees and expenses, but excluding Debt Service Payments and expenditures from Reserve Additions accounts.

B.    **"Cash Income"** for the applicable period means the gross cash receipts from the Property for such period including, but not limited to: (i) Net Financing Proceeds; (ii) Net Sales Proceeds; (iii) rental income; (iv) prepaid rents; (v) prepaid payments; (vi) security deposits; (vii) proceeds from rental income interruption insurance; (viii) releases from reserves previously funded from Cash Income now being included in Cash Income as earned, applied, forfeited or released from reserves; but not including capital contributions by Owner or its Partner.

C.    **"Debt Service Payments"** for the applicable period means all payments of principal and interest and other amounts paid during such period on or in connection with the **"Property Indebtedness"** or any **"Qualified Indebtedness".**

D.    **"Negative Cash Flow"** means for the applicable period the amount, if any, by which (x) the sum of the Cash Expenditures for such period, plus the Debt Service Payments for such period plus the Reserve Additions for such period exceeds (y) the Cash Income for such period.

E.    "Net Cash Receipts" for the applicable period means the amount, if any, by which (x) the "Cash Income" for such period exceeds (y) the sum of (i) the "Cash Expenditures" for such period,  plus (ii) the "Debt Service Payments" for such period, plus (iii) the "Reserve Additions" for such period.

F.    "Net Financing Proceeds" means the net proceeds to Owner from any financing or refinancing of the Property or any part hereof, including the Property Indebtedness, after deductions for: (i) the payment of all expenses related to said financing; (ii) the payment for any capital expenditures from said financing; (iii) the payments for said financing to satisfy any debts on or related to the Property; (iv) payments to reserves from said financing.  Net Financing Proceeds shall include releases from reserves to the extent such released amounts were earlier funded from financing proceeds, together with interest earned on such earlier fundings.

G.    "Net Sale Proceeds" means the net proceeds to Owner from any sale or other disposition, taking or loss of or from the Property, including, but not limited to, proceeds from: (i) land sales; (ii) eminent domain proceedings or conveyances in lieu thereof; and (iii)  casualty insurance other than rental interruption insurance and title insurance, after deductions for payments made from said proceeds for those items described in subsection _____(i) through (iv).  Net Sales Proceeds shall include releases from reserves to the extent such released amounts were earlier funded from sales proceeds, together with interest earned on such earlier fundings.

H.    "Owner Capital" means, individually and collectively, all amounts actually funded by Owner, for or in connection with: (i) the acquisition of the Property, including, but without limitation, the purchase price of the Property, closing costs and brokerage and attorneys' fees; and (ii) the development and construction of improvements on the Property.

I.    "Owner Fundings" means payment made by Owner, other than from Cash Income, Qualified Indebtedness or Reserve Additions accounts, for (i) Owner Capital; and (ii) to fund Negative Cash Flow.

J.    "Property Indebtedness" means the aggregate outstanding principal amount of any indebtedness to Owner secured from time to time by the Property.

K.    "Priority Return" means the money paid Owner from the operation and sale of the Property after the full payment of Owner Capital and all other debts and expenses related to the Property as described herein calculated as a percent per annum cumulative annual return on all Owner Capital through the date of such calculation.

L.    "Qualified Indebtedness" mean indebtedness to a Third Party Lender, both secured and unsecured, which has been incurred to fund "Negative Cash Flow" or capital expenditures for the Property.  Notwithstanding the actual interest rate on any Qualified Indebtedness, said interest rate for purposes of calculations under this Exhibit ____, shall not be deemed to exceed Owner's cost of such borrowing.  As used herein, "Third Party Lender" means a lender which does not control, is not controlled by and is not under common control with Owner.

F:\DOCS\MLB\13190\MANAGE.A02
April 14, 1999

2

M.    "Reserve Additions" for the applicable period means all payments made to reserve accounts for future costs and expenses during such period.

N.    "Term" means the term of this Agreement, which shall commence on the date hereof and shall continue until the date as of which Owner shall no longer own any portion of the Property, except that the Term shall continue solely as to any payments to Lochmere as described herein.

3.    CALCULATION AND PAYMENT OF INCENTIVE PARTICIPATION.

At least annually for the first two (2) years of the Term of the Agreement, and at least quarterly thereafter, Owner shall provide a report to Manager calculating the Priority Return and the Incentive Participation as described herein. Upon the full repayment of Owner Fundings and payments to Owner resulting in at least a ten percent (10%) simple, cumulative annual return to Owner on Owner Capital, Owner agrees to pay Manager an Incentive Participation in accordance with the following schedule:

| Of Owner's Return is: | Then the Percentage rate used to calculate the Incentive Participation shall be: |
|---|---|
| 0 - up to 10% | 0% |
| 10% up to 15% | 10% |
| 15%up to 20% | 15% |
| 20% up to 25% | 20% |
| 25% or greater | 25% |

Upon a determination pursuant to an Owner's Report that an Incentive Participation payment is due, Owner agrees to make said payment within twenty (20) days after the end of the applicable calendar quarter.

4.    REPORTS. Together with each Owner's Report, Owner shall provide Manager with a reasonably detailed itemization and back-up for the calculations therein. Manager and his representatives shall be authorized, at his sole cost and expense and upon reasonable advance written notice, to review and copy Owners' books and records from time to time with respect to the Property and the determination of the Property and Qualified Indebtedness, as well as any other matters relating to the calculation of payments to Manager hereunder; provided, however, that all such materials as are copies or reviewed shall be treated with confidentiality by Manager and his representatives and shall not be used for any purpose other than verifying the obligations to Manager hereunder. Owner shall provide copies to Manager of any quarterly reports which Owner prepare for its investors with respect to the Property.

5.    BUY-SELL.

A.    Owner agrees to pay a "Cancellation Fee" to Manger in the event this Profit Participation Agreement is terminated prior to its automatic termination upon Owner no longer

owning any portion of the Property. Said Cancellation Fee shall be equal to the payment which Manger would have received pursuant to paragraph _____ above if Owner's interest in the Property were to have been sold by Owner on the date of such termination on an all cash basis and at the then fair market value of Owner's interest in the Property, determined as of the date of such termination. In the event that, within thirty (30) days following such a termination, Owner and Manger cannot agree on the fair market value of the Property as of the date of such termination then each shall promptly (and, in any event, within fifteen (15) days subsequent to the end of said thirty-day period) choose an independent appraiser and such appraisers shall choose a neutral independent appraiser. All appraisers shall be experienced in the appraisal of properties similar to the Property and none of the appraisers shall be in the employ of Owner, Manger or their respective affiliates except in connection with appraising the Property. The appraisers shall each make a separate determination of the fair market value of the Owner's interest in the Property as of the date of termination. The two appraisals closest in value shall be averaged and such average shall be deemed to be the fair market value of the Owner's interest in the Property as of the date of termination unless the highest and lowest appraisals amounts are equally distant from the middle appraisal amount, in which event the fair market value shall be the amount of the middle appraisal. Manager shall pay the costs of the appraiser it selects, Owner shall pay the cost of the appraiser it selects and Manager and Owner shall share equally the costs of the third appraiser. Owner shall pay the Cancellation Fee to Manager within fifteen (15) days after the determination of the fair market value of the Owner's interest in the Property; provided, however, that Manager shall have no interest or right in or to any payments based on Net Sale Proceeds or Net Financing Proceeds occurring after the date of termination, but provided further, however, that Manager shall continue to have a right to payments based on Net Cash Receipts for the period from the date of termination through the date the Cancellation Fee is paid.

---

## END

# EXHIBIT NO.

# H



## H. D. ASSOCIATES, L.P.
### Dallas, Texas

April 22, 1999

ITT Community Development Corporation
One Corporate Drive
Palm Coast, Florida 32137
Attention: Mr. James E. Gardner

      Re:    Hammock Dunes, Palm Coast, Florida (the "**Project**")

Gentlemen:

      As you know, David A. Lane has secured a new capital source, Eiger Fund I, L.P. (the "**Fund**"), to pursue the purchase of the Project. We have also discussed that H. D. Associates, L.P. ("**Purchaser**"), a limited partnership of which the Fund is the sole limited partner and JTL Capital, LLC, an affiliate of David A. Lane, is a general partner, is prepared to immediately enter into an agreement for the purchase of the Project. Attached to this letter is an Agreement for Sale and Purchase (the "**Agreement**") executed by Purchaser.

### I. EIGER

      The Fund is a Delaware limited partnership that has been organized for the purpose of making investments in real estate by investing in real estate assets, real estate companies, and real estate debt and equity securities. The Fund was formed by C. Todd Miller, Paul E. Rowsey, III, David M. Jacobs, and William S. Buchanan (the "**Principals**"), Rosewood Property Company ("**RPC**"), and an entity affiliated with and controlled by Sammons Enterprises, Inc. ("**Sammons**"). RPC is a wholly owned subsidiary of The Rosewood Corporation, the holding company for the Caroline Hunt Trust Estate, a multi-generation trust established by H.L. Hunt, the legendary Texas oil man. The Rosewood Corporation is a diversified investment company with holdings, through its subsidiaries, in real estate, oil and gas, ranching, timber, hotels, and venture and growth capital concerns. Sammons is one of the United States' largest privately held companies, with more than 3,100 employees, capital of $1.5 billion, more than $7.0 billion in assets, and annual revenue of more than $1.7 billion. Sammons owns a wide variety of businesses coast to coast, ranging from life insurance to mountain spring water to one of the largest tour companies in America. The Principals and RPC are also the sole owners of Eiger, Inc., an operating entity that serves as the general partner of the Fund and will serve as a general partner of Purchaser.

      Prior to the formation of the Fund, each of the Principals was an executive at RPC, and their combined tenure at affiliates of The Rosewood Corporation exceeds 40 years. The Principals have been investing in real estate related opportunities together at RPC since 1994. In 1996 Sammons began participating with the Principals and RPC in a variety of real estate investments.

**EXHIBIT**
" H " to
Complaint

142781.2

James E. Gardner
April 22, 1999
Page 2

## II. PROPOSED CHANGES TO THE AGREEMENT

For your convenience, the Purchaser has utilized the attached Agreement which is based on the previous form of purchase agreement entered into by an affiliate of David A. Lane and a former capital partner, Farallon Capital Management, Inc. Farallon recently realized that it was over committed in real estate (of its capital base, Farallon is only authorized to invest a fixed percentage in real estate). Farallon was forced to withdraw from the acquisition, and a new partnership of which the Fund is the major capital source has agreed to pursue the acquisition of the Project.

You will note that the new Purchaser has made a number of changes to the previous agreement. The most significant changes to the Agreement are as follows:

1.    Closing Date - We have changed the closing date in the Agreement to June 15, 1999.

2.    The Second Closing - Purchaser desires to eliminate the second closing in order to streamline the acquisition and to facilitate its plan to continue to develop the Project.

3.    Prorations - Generally, Purchaser believes that prorations impacting the purchase price should be made as of the closing date. Specifically, this concept is implemented in the agreement with respect to infrastructure obligations, DRI obligations, utility payment obligations, bridge debt service, and termination of the Coast Guard road agreement.

4.    Purchaser Mortgage - The Purchaser Mortgage will secure only the bridge debt and Purchaser will have the right to substitute reasonably equivalent collateral on a lot by lot basis. The contingent, residual liability related to club obligations and obligations under the Development Order are not secured by the Purchaser Mortgage, but Purchaser has more than ample incentive to ensure that these obligations are fulfilled.

5.    Adjustments to Purchase Price for lots, Viscaya Units, and club memberships sold prior to Closing - The purchase price is reduced by 70% of the net sales proceeds of all lots, Viscaya Units, and club memberships sold by Seller after ~~September 1998:~~ *FEBRUARY 15, 1999*

6.    Second Golf Course - The obligation to build the second golf course will be governed solely by the subscription agreement. The attached contract does not create a separate obligation to upon Purchaser to do so; however in the event Purchaser is obligated to build a second course by the terms of the operative club documents, it will do so. Purchaser is considering obtaining the approval of the club's Advisory Committee to restructuring its membership plan, limiting the number of club memberships and amending the club documents so that the obligation to build the second golf course does not arise.

142781.2

James E. Gardner
April 22, 1999
Page 3

7.    Intercreditor Agreement - This has been eliminated.

8.    Inspection Period - Because Purchaser is new to the transaction and there are still some due diligence documents required of the Seller that are missing, a brief (10-day) inspection period has been added. The escrowed earnest money deposit of $3 million will be non-refundable 10 days after the Seller's delivery of the last of the missing due diligence items.

9.    Hammock Dunes Real Estate Company, Inc. ("HDREC") - HDREC's assets are included in the sale at no additional cost over and above the $22,500,000 purchase price, and language has been added clarifying that the rights to listings of real property in Hammock Dunes are to be included in the assets of HDREC sold to purchaser.

10.   Leased Billboards- The revised contract sent to us in March added a provision whereby the purchase price was increased by $35,000 for leased billboards. We have eliminated this change in the attached contract and restored the original language.

11.   WARN Act Liability- We have added an indemnity to Purchaser from the Seller regarding Warn Act liabilities.

12.   Viscaya Units- Seller will be obligated to complete all Viscaya units under construction at closing.

13.   Pending Contracts- All pending sales contracts will be assigned to the Purchaser.

While we understand that some of the changes may be material, the Purchaser has undertaken an expedited and intensive review of the acquisition and is willing to move quickly to a closing, relying substantially on the due diligence performed by the previous purchaser.

We look forward to working with you to consummate this transaction on an expedited basis.

Very truly yours,

David A. Lane,
President, JTL Capital, LLC

Paul E. Rowsey, III,
President, Eiger, Inc.

142781.2

APR-21-99 WED  5:58 PM          214+744+0231                          P. 4

# EXHIBIT NO.

# I

## ANNIS, MITCHELL, COCKEY, EDWARDS & ROEHN

# MEMORANDUM

CLIENT-MATTER NUMBER
6973-001

**TO:**  Bob Evans     (via fax #636-8035)
David Lane     (via fax #214-692-0274)
Paul Rowsey   (via fax #214-756-6598)
Mark D. Van Kirk (via fax #241-744-0231)

**FROM:**  Steve Samaha

**DATE:**  May 25, 1999

**RE:**  Hammock Dunes – Revised Purchase Contract

---

The following are the highlights of the revised purchase contract:

1. Viscaya units under contract (whether or not constructed) shall be retained by Seller. Seller has a put option to require the Purchaser to acquire any Viscaya unit that is subject to a contract (whether the contract exists before or after closing) that does not close pursuant to its terms. The term of the put option is 15 months after closing and the purchase price is the cost to construct the unit. There is not a definition of Seller's cost or the items to be included in the cost. Bob told me that the understanding is that any Viscaya unit that does not close pursuant to an existing contract will be purchased by the Buyer at Seller's construction cost. We should clarify that the reference to Viscaya units includes only Phase 1 and that we are acquiring all of the Phase 2 Viscaya land. In addition,.

    #25,400,000

2. The purchase price is $26,207,000. We will request a pro forma closing statement.

oK 3. The purchase price is reduced by 75% of the net proceeds (i.e., contract sales price minus closing discounts, sale incentive amounts, and closing costs) to reflect any sales that close after February 15, 1999, and before our closing date..

4. The purchase price is increased by an amount equal to 95% of all receivables due to be paid to the Club for any period prior to closing.

5. The purchase price is increased by an amount equal to 95% of all receivables due to be paid to Hammock Dunes Real Estate Company for any period prior to closing.

ouT 6. Seller retains the right to transfer 10 free or reduced price memberships in connection with the sale of any lot or unit.



EXHIBIT
" I " to
Complaint

·7.     The contract provides that the Seller does not make any representation or warranty that the information contained in or statements made in the documents or materials provided to Purchaser are true and correct. *ITT stands behind info*

o✓ 8.    Purchaser acknowledges that it has obtained an environmental report and Purchaser has no reason to believe Seller's representations regarding environmental matters are inaccurate.

9.      Purchaser must execute a mortgage encumbering identified Island Estates lots as security for the bridge debt service payments. The lots have an agreed upon value of $7,470,000. Substitute collateral in the form of other lots within Island Estates or a letter of credit are acceptable.  Shouldn't we have the right to utilize other land we are acquiring as substitute collateral?  The Purchaser is also required to provide a letter of credit in the amount of $1,259,000 to secure the DRI obligations. Finally, the purchaser is required to provide a mortgage on the second golf course site and a $10,000,000 letter of credit to secure Purchaser's assumption of the obligations of the "Company" pursuant to the Subscription Agreement.  Bob was under the impression that this collateral should be limited to the letter of credit.  The security for the second golf course is not released until the course is constructed, open for play and deeded to the Club, or we provide Seller evidence that the Club has released Seller from any obligation to ever construct a second golf course, "which evidence must include proof of consent to such release ~~by all of the existing Club members~~." *NO* There is no legal requirement for all of the existing Club members to consent to such a release.

There are other legal issues raised by the redraft, but we have not addressed those issues in this memo.  Hopefully, we can work those out directly with Bob Cuff.

With respect to the billboard information, we still have not received the following:

*   9 of the 11 billboard leases.  We are also missing 2 of the land leases.

*   There are a difference of 5 billboards between the exhibit to the contract and the master list of billboards that ITT is reviewing.

*   Surveys and title commitment for the sites to be acquired in fee simple.

*   Estoppel letters from the lessors.

We forwarded to you earlier today a title letter that we are currently reviewing.  There are still a number of open title issues.

We have not received any of the revised surveys, although we received a letter addressing some of the survey issues.

Finally, we are reviewing the employment information we received last Friday.

Please contact us with any questions or comments.


/mp
6973-001-654401 v1

-2-

J

# EXHIBIT NO.

# J



# EIGER

EQUITY INVESTMENTS
IN REAL ESTATE

June 8, 1999

VIA FAX  813/ 636-8035

Mr. Robert D. Evans
President
Lochmere Development Group, Inc.
2701 North Rocky Point Drive
Suite 1070
Tampa, Florida  33607

Dear Bob:

After a tremendous amount of work done by many people, it looks as if the Hammock Dunes deal may actually go to a closing mode. The deal has evolved very quickly in the short time I have been involved in it and even more during your tenure.

I have enjoyed working with you over the past few weeks and am confident we can reach an agreement to continue working together. As you know, as a condition to acquiring Hammock Dunes, my company is convinced that the project will require a full-time, on-site CEO. While I have no doubt that David Lane could have fulfilled this role, David's personal and business commitments in Dallas preclude his relocating to Hammock Dunes. Therefore, we have commenced negotiations with a long-standing strategic partner of ours to take this position. While not finalized, I am confident that this candidate will accept the job. He is not only a qualified real estate professional with extensive experience, but a great guy who is easy to work with. I am confident that you could establish a very good working relationship with him.

We envision that this person would have overall responsibility for the project, overseeing the management of the Club, Hammock Dunes Real Estate Co., the marketing and sales operation, and the planning, development, and disposition of the balance of the project. The project would operate on a team basis, with a team member responsible for each critical function:  development; sales and marketing; brokerage; Club operations, and finance. As an integral part of this overall organization, we would hope that you would continue to have primary responsibility for development. Your understanding of the project and the various land use laws and regulations in Florida are extremely valuable, as are your contacts. You would also be an important team member and contributor to the planning initiatives and the product mix decision-making.

500 Crescent Court

Suite 300

Dallas Texas 75201

Phone 214 756 6550

Fax 214 756 6599



EXHIBIT
"J" to
Complaint

I understand that this effort would consume a significant amount of your time and resources and I want to make sure that you are adequately compensated and have appropriate incentives in such regard. I would expect that you would be paid a monthly fee, plus out-of-pocket expenses, and would have a "profits" interest in the overall transaction, after repayment of debt, return of all invested equity and a preferential return on such equity. I would appreciate it if you would give some thought to this and give me some feedback as soon as possible. I think it would be beneficial if we knew what direction we are heading before we sign a contract with ITT.

Thank you again for your time and consideration.

Very truly yours,

Paul E. Rowsey, III

# EXHIBIT NO.

# K



# MANAGEMENT, DEVELOPMENT AND MARKETING AGREEMENT

By and Between

## LOCHMERE DEVELOPMENT GROUP, INC.,
a Florida corporation

and

## H D ASSOCIATES, L.P.,
a Delaware Limited Partnership

Dated: June _____, 1999



EXHIBIT
" K " to
Complaint

ɔASSOC.WPD
14, 1999

# TABLE OF CONTENTS

Page

RECITALS ........................................................... 1

AGREEMENT ......................................................... 1
1.  DUTIES OF MANAGER. ........................................ 1
2.  DUTIES OF OWNER. .......................................... 2
3.  MATTERS REQUIRING THE APPROVAL OR DIRECTION OF OWNER. ... 3
4.  MANAGER'S GENERAL AUTHORITY TO ACT ....................... 4
5.  OPERATING ACCOUNT. ....................................... 5
6.  CONSTRUCTION DRAWS. ...................................... 6
7.  TAXES AND ASSESSMENTS. ................................... 7
8.  LIENS AND ENCUMBRANCES. .................................. 7
9.  INSURANCE. ............................................... 8
10. MARKETING. ............................................... 9
11. MANAGER'S OVERHEAD AND OTHER COSTS, FEES AND EXPENSES.
    ......................................................... 10
12. BUDGETS. ................................................ 11
13. REPORTS. ................................................ 12
14. RIGHT TO INSPECT. ....................................... 12
15. TERM OF AGREEMENT. ...................................... 12
16. OWNER'S RIGHT TO TERMINATION ........................... 13
17. MANAGER'S RIGHT TO TERMINATE. .......................... 14
19. ASSIGNMENT. ............................................. 16
20. MISCELLANEOUS. .......................................... 16

Exhibit "A"    Legal Description of the Development
Exhibit "B"    Master Site Plan Showing, Lots and general layout of the Development
Exhibit "C"    Master Development Budget
Exhibit "D"    Profit Participation Agreement

A \HDASSOC WPD
June 14, 1999                                    i

# MANAGEMENT, DEVELOPMENT AND MARKETING AGREEMENT

This Management, Development and Marketing Agreement is made and entered into this _____ day of June, 1999, by and between **LOCHMERE DEVELOPMENT GROUP, INC.**, a Florida corporation, whose address is 2701 North Rocky Point Drive, Suite 1070, Tampa, Florida 33607 (**"Manager"**), and **H D ASSOCIATES, L.P.**, a Delaware Limited Partnership, whose address is 8235 Douglas Avenue, Suite 770, Dallas, Texas 75225 (**"Owner"**).

## RECITALS

Whereas, Owner is the owner of that real property more particularly described on **Exhibit "A"** hereto consisting of tracts of approximately _____ acres of undeveloped land and _____ developed lots located in Palm Coast, Florida (the **"Development"**); and

Whereas, Manager has in its employ individuals who are acquainted with the Development who have the expertise and ability to manage, develop and market the Development, Manager is willing to perform such services on certain terms and conditions, and Owner desires to retain the services of Manager to manage, develop and market the Development.

NOW THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto state, covenant and agree as follows:

## AGREEMENT

## 1 . DUTIES OF MANAGER.

Subject to directions to be given by Owner from time to time as described herein, Manager agrees to undertake and perform the following services respecting the management, development and marketing of the Development during the term of this Agreement on behalf of Owner:

1.1     Manager shall manage, maintain, administer, supervise and prepare the Development for marketing in accordance with plans and specifications (the **"Plans"**) to be approved by Owner prior to the commencement of such work, such approval not to be unreasonably withheld (substantial changes made to the plans and specifications after the issuance of Owners approval shall be resubmitted to Owner for approval, but minor, nonstructural changes which do not affect the value of such Development and can be completed within the budgets approved by Owner and attached as **Exhibit "C"** hereto (collectively, the **"Master Development Budget"**) may be approved by Manager as the project manager without resubmittal to Owner).

1.2     Once the Development or a portion of the Development has been sold to third party purchasers, Manager shall enforce applicable contracts to require contractors to perform all warranty work required under the terms of said contracts of the Development. To the extent that Owner has rights against contractors, subcontractors or materialmen who have performed the work or supplied the materials to which any such warranty relates, Owner assigns those rights to Manager so Manager

A WDASSOC WPD
June 14, 1999                                    1

can enforce.

1.3     Manager shall supervise the completion of the on-site and off-site improvements necessary to complete the Development as fully developed lots, ready for building by Owner or for marketing to third party builders (the **"Site Improvements"**).  Such Site improvements shall be completed in accordance with the Plans.

1.4     Manager shall obtain all permits, licenses and other municipal or governmental approvals from time to time necessary or required in connection with the construction activities described in Paragraphs 1.1 through 1.3 above and any other permits, licenses and other municipal or governmental approvals from time to time necessary or required incident to the management and operation of the Development.

1.5     Manager shall maintain the Development, common areas and streets owned by Owner in the Development from time to time and shall provide security for such areas.  The level of maintenance and security to be provided by Manager with respect to such property shall be determined by Owner in consultation with Manager from time to time and shall be implemented by Manager in accordance with Owners directions.

1.6     Manager shall maintain appropriate insurance coverage with respect to all properties included in the Development in accordance with the insurance requirements set forth in Section 9 below.  The coverages to be supplied shall conform to such insurance requirements and any supplemental instructions received by Manager in writing from time to time from Owner.

1.7     Manager shall monitor and cause to be paid in a timely fashion, prior to the imposition of any penalty or interest, all taxes and assessments from time to time accruing with respect to the properties included in the Development or any part thereof.

1.8     Manager shall maintain books and records respecting the management, development, and marketing of the Development and shall provide Owner with periodic reports respecting same, all as more particularly set forth in Section 13 below.

## 2.   DUTIES OF OWNER.

2.1     Owner agrees to fund amounts as necessary to accomplish the purposes of this Agreement in accordance with its terms, including but not limited to, funding (a) the acquisition of the Development in accordance with the terms, conditions and provisions of that Sale Agreement dated as of May _____, 1999, by and between ITT Community Development Corporation ("Seller") and H D Associates, L.P. ("**Purchaser**"); (b) the Master Development Budget; and (c)  the Operating Account (as such term is defined below); and (d) the General Marketing Plan; and the Profits Participation Agreement attached hereto as **Exhibit "D"**.

2.2     Owner agrees to review and approve or to specifically object to all matters requiring its consent and approval in a timely fashion and to otherwise cooperate with and direct Manager with respect to the management, development and marketing of the various properties included in the Development as contemplated by this Agreement.  For purposes of this Agreement, unless otherwise

A \HDASSOC WPD
June 14, 1999                                          2

stated for a particular matter, Owner's timely consent and approval shall mean within five (5) business days after requested in writing by Manager. If Owner does not respond within said period, Owner shall be deemed to have approved Manager's request.

3.   MATTERS REQUIRING THE APPROVAL OR DIRECTION OF OWNER.

Owner as the owner of the Development has reserved the right to make decisions and to issue approvals as follows:

3.1   Each contract for services, construction contract or contract for materials or equipment involving a contract price or stated obligation in excess of the lesser of (a) $25,000.00 or (b) the amount specified for such contract in the Budget to be entered into by Manager on behalf of Owner for the benefit of the Development or any part thereof or otherwise pursuant to the performance of Managers duties hereunder shall first be submitted to Owner for its consent and written approval. Additionally, all contracts to be entered into by and between Manager and any Affiliated Entity (as such term is defined below) regardless of the contract price or the stated obligation, must first be disclosed to Owner in a writing which fully sets forth the relationship between Manager and the Affiliated Entity. All such contracts shall be subject to Owner's prior written approval, which approval may be granted or withheld in Owner's sole discretion. For the purposes of this provision, an Affiliated Entity shall mean (I) a person or entity that is controlled by or under common control with Manager or Robert Evans, (ii) a person within the third degree of kindred with Robert Evans, (iii) an entity controlled by one or more of Robert Evans or person(s) within the third degree of kindred with Robert Evans, (iv) any officer, director, employee, shareholder or partner of an entity described in clauses (I) or (iii) above, (v) any entity controlled by a party described in clause (iv) above, and (vi) any entity in which Robert Evans or a person within the third degree of kindred with Robert Evans is an officer, director, employee, shareholder, partner or profit participant.

3.3   Any contract with a contract price or stated obligation in excess of $25,000 or with an Affiliated Entity shall be put out to bid and the results of such bidding be reported to Owner prior to requesting Owners approval. If a contract is put out to bid and Manager recommends the acceptance by Owner of other than the lowest bidder, Manager shall indicate in writing its reasons for such recommendation.

3.4   Manager's submission of contracts for Owner's approval shall be in writing setting forth the services and/or materials and/or equipment to be rendered and/or obtained; the Development, the Unit or area to be benefited by such services, material or equipment; the contract amount, the term of such contract; and any other terms, conditions or provisions of such proposed contract or agreement which would reasonably be material to a determination of Owner respecting same.

3.5   If the contract or agreement is to be in writing, a copy of the proposed form of contract or agreement shall be submitted to Owner together with such request for approval. Owner shall respond to any such written request for approval of the contract within five (5) business days and shall either consent thereto or state its objections with specificity in writing. Failure to respond to a request for approval of a contract within the applicable time frame shall (I) be deemed an



approval of the recommendation of Manager contained in such request if the contract is for work contemplated by an approved Budget and is within the amount designated for such work in such approved Budget and will not reasonably require more than 180 days within which to complete such work; or (ii) deemed a disapproval if the contract does not fall within the parameters of clause 3.5(I) immediately preceding. If within the approval period Owner requests further information respecting the matter under consideration, Manager shall endeavor to deliver such additional information as quickly as possible and the submittal of additional or further information shall commence the running of an additional approval period of the same duration as the original.

3.6    Sales and marketing decisions shall be made by Owner to the extent reserved to Owner pursuant to the terms, conditions and provisions of Section 10 below.

3.7    Owner shall have the right to review and approve all initial contracts of insurance respecting the Development or any part thereof required pursuant to Section 9 below prior to such contracts being bound. Manager shall submit proposals for such insurance to Owner for its review and approval together with Manager's recommendation respecting same, but Owner shall have the right to accept same or to propose alternative coverage. Manager may renew existing coverage with existing companies without a further approval from Owner but Owner may, at its discretion, require the cancellation of one policy and the substitution of another at any time or from time to time.

3.8    Owner has approved the layout and utilization of the Development reflected on the Master Site Plan set forth as **Exhibit "B"** hereto. Prior to Manager implementing any significant change of the design, layout or utilization contemplated by **Exhibit "B"** hereto or requiring approvals or consents are required from any governmental authority or entity, Manager shall first submit its written proposal for a modification to such design and layout to Owner and shall not proceed with the implementation of same without the written concurrence of Owner, such concurrence to be in Owners sole and absolute discretion. Minor deviations from the approved layout which do not affect the number of lots or the general location, utilization or value thereof shall not require the consent of Owner.

## 4.    MANAGER'S GENERAL AUTHORITY TO ACT

4.1    Subject to the specific matters reserved to Owner in Section 3 above, Owner hereby appoints Manager as its agent for purposes of implementing this Agreement and Manager shall be and is hereby empowered to manage the day to day operations of the Development and marketing of the Development on behalf of and for the benefit of Owner. Manager shall act from time to time hereunder either in its own name or in its name as agent of Owner, as appropriate. To the extent that Manager may require written limited powers-of-attorney or written agency agreements from time to time to satisfy third parties with whom it is dealing, Owner shall supply such documents and instruments as may be reasonably required by Manager to perform its duties and obligations hereunder in a timely manner.

4.2    Subject to the constraints set forth in Paragraph 3.8 above, Manager is specifically authorized to obtain building permits, licenses and such other governmental approvals and consents as may be required from time to time to complete the Development, and the Site Improvements. Subject to the budget constraints set forth in Section 6 below and the provisions of Paragraphs 3. 1,

Owner hereby authorizes Manager to enter into contracts for the labor, materials and services required in connection with the completion of the Development and the Site Improvements and the operation, marketing and maintenance of the Development with such contractors and on such terms as Manager deems appropriate.

4.3    During the term of this Agreement, Manager has no authority to enter into or bind Owner to enter into any sale or conveyance with respect to all or any portion of the Development unless owner consents in writing to such sale or conveyance.

4.4    Nothing contained in this Agreement or in the relationship of Owner and Manager shall be deemed to constitute a partnership, joint venture or any other relationship other than that of contract parties hereunder and, while Owner shall have certain payment obligations to Manger hereunder which are determined by reference to the economic performance of the Property, nothing herein shall constitute Manager as having any equity or partnership interest in the Property, directly, or indirectly. Owner shall be entitled to expense all payments to Manager hereunder and Manager shall not report any such payments as distributions from a partnership or other joint venture. Manager shall not be obligated to make any capital contributions or other out-of-pocket payments to fund any capital expenditures or Negative Cash Flow for the Property.

4.5    Except as otherwise specifically stated, nothing herein shall be construed as vesting in Manager any control rights or voting or approval rights whatsoever in or to the operation, financing and disposition of the Property or any portion thereof and all decisions concerning the Property or any portion thereof shall be made solely by Owner or its designee from time to time. Owner may sell, finance or refinance the Property or any part thereof in any manner whatsoever from time to time and shall have the right to mortgage, pledge or otherwise encumber the Property or any portion thereof from time to time in connection with any or all of such financings or refinancings or otherwise. Manager agrees to execute any document reasonably requested by Owner from time to time to confirm the provisions of this paragraph.

## 5.    OPERATING ACCOUNT.

5.1    Owner shall establish at First Union National Bank ("**Bank**") an account or line of credit against which Manager will be authorized to write checks to pay all costs, fees, and expenses which Manager is authorized or obligated to incur and pay under the terms of this Agreement with respect to the management, development and marketing of the Development (hereinafter the "**Operating Account**"). Owner shall initially fund or cause to be funded the Operating Account with an amount of not less than $25,000.00 (the "**Operating Balance**"). On the ten (10th) day of each month Manager shall notify Owner of the amount which Owner is required to fund into the Operating Account to bring the amount then available to Manager in the Operating Account back up to the Operating Balance, and Owner shall cause such amount to be deposited into the Operating Account within five (5) business days of the receipt of such notice. In the event that Manager from time to time anticipates the need to write checks that would be in excess of the Operating Balance or the amounts then available in the Operating Account, Manager shall notify Owner and Owner shall by electronic transfer or otherwise cause the amount required to cover such large item checks to be deposited in the Operating Account not later than the business day prior to the date Manager anticipates the need to write such check(s). From time to time when the amount available to

Manager in the Operating Account falls below $5,000.00 (the **"Minimum Balance"**) Manager may notify Owner who shall within five (5) business days of the receipt of such notice cause an amount to be deposited in the Operating Account to bring the balance back up to the Operating Balance. Owner in its sole and absolute discretion may adjust the Operating Balance and the Minimum Balance as Owner shall determine reasonable from time to time to accommodate the demands for funds for Manager to perform its duties and obligations hereunder. The Operating Account shall belong to Owner, and Manager shall have no right, title or interest therein except for the ability to write checks thereon as Owner's agent for the purposes hereof. Dual statements on the Operating Account shall be provided monthly to Manager and Owner.

5.2    Checks drawn upon the Operating Account that are in the amount of $10,000.00 or less may be signed by an authorized representative of Manager from time to time without any countersignature from Owner or any other agent of Owner. Any checks drawn upon the Operating Account that are in excess of $10,000.00 (the **"Authorized Amount"**) shall require the prior approval of David A. Lane or such other representative as Owner shall designate to Manager in writing. Any check drawn on the Operating Account for any amount in excess of the Authorized Amount shall require the signature of two parties, one of whom shall be Manager's representative and the other of whom shall be a designated agent of Owner not employed or affiliated with Manager; to implement such control, all checks prepared for the Operating Account shall have printed thereon the following legend: **"All checks for amounts in excess of $10,000.00 require two (2) signatures."** Owner shall be entitled to increase the Authorized Amount at its sole and absolute discretion from time to time by written notice to Manager and the account officer of Bank handling the Operating Account.

6.    <u>CONSTRUCTION DRAWS.</u>

6.1    **"Manager's Certification"** as such term is used in Paragraphs 6.1 and 6.2 shall mean a certification signed by an authorized officer or representative of Manager to the effect that: (I) all work for which a draw against the respective budget is requested has been performed and incorporated into the Development as indicated; (ii) all materials which are covered by such draw request have either been incorporated into the improvements being constructed or are suitably stored on the Development; (iii) the amount requested represents the actual amount then due and payable to contractors, subcontractors or materialmen under the terms of their respective contracts or for Manager's supervision in accordance with Paragraph 11.2 below and does not include any amounts which Manager is entitled to hold back from contractors or subcontractors pending completion; (iv) that all amounts previously disbursed by Owner with respect to the Development have been disbursed to the contractors, subcontractors, laborer's and materialmen's to whom such amounts were due and payable and valid lien waivers have been obtained from such parties with respect to all amounts previously drawn by Manager; and (v) to the best of Manager's knowledge, no labor or materialmen's liens have been filed with respect to the work respecting such project which have not been theretofore fully paid and released.

6.2    Provided Manager has observed the approval process set forth in Paragraph 3.1 above and within the amounts designated for the particular work, materials or equipment in the Budget approved by Owner from time to time, upon receipt of a draw request together with Manager's Certification relating thereto, Owner shall fund the amount requested (or shall give notice to

A \HDASSOC WPD
June 14, 1999                                      6

Manager that it may use amounts then on deposit in the Operating Account for such purposes to the extent adequate funds are then held in such account) within five (5) business days of receipt of same against the respective Budget for such work unless Owner desires further information respecting all or some part of the amounts requested or unless Owner desires to verify Manager's Certification by an independent inspection of the work. If Owner desires to verify Manager's Certification through an independent inspection, Owner shall be entitled to conduct such inspection using its own personnel or through agents hired by Owner at it sole cost and expense. If an independent inspection is desired, it shall be completed in any event within five (5) business days from Owners receipt of a draw request. In all events, Owner shall fund the draw request by deposit into the Operating Account of the amount thereof within five (5) business days of receipt of the draw request together with Manager's Certification unless Owner shall have noted a problem with such request and given Manager written notice thereof with an indication of the action required to cure same. In the event of any discrepancy or problem that Manager is given written notice of, Owner shall fund the amount requested upon Manager's resolution of the discrepancy or problem to the reasonable satisfaction of Owner. Manager shall make draws against the Master Development Budget which shall be funded by Owner into the Operating Account upon Manager's Certification.

7.    **TAXES AND ASSESSMENTS.**

   7.1    Manager shall be the party designated by Owner to receive all notices of real property taxes and assessments and shall notify Owner of such tax liabilities not later than thirty (30) days prior to the delinquency of any such taxes or assessments. If Manager anticipates that the amounts on deposit in the Operating Account will be insufficient to pay such taxes or assessment as of the date ten (10) business days prior to the date on which any penalty, interest or fine will be imposed on Owner for the non-payment thereof, then Manager shall notify Owner of the amount and date by which additional funds must be deposited in the Operating Account to enable Manager to pay such tax or assessment prior to its delinquency. If Manager has requested that Owner deposit additional funds in the Operating Account to enable Manager to pay such tax or assessment, then, at least five (5) business days prior to the delinquency of any such taxes and assessments, Owner shall deposit into the Operating Account the amount requested by Manager incident to the payment of such taxes and shall notify Manager in writing to pay such taxes immediately. Upon receipt of such notice and the deposit of the requested amount, Manager shall pay such taxes or assessments and shall supply Owner with written confirmation of such payments.

   7.2    Owner in its sole and absolute discretion shall have the right to contest or challenge (or to direct Manager to contest or challenge at Owner's expense) any tax or assessment or any other lien or imposition which it deems to be inappropriate provided that such contest or challenge is conducted in a manner that does not jeopardize Owner's title to the subject property and does not unreasonably delay or hinder the development or marketing of the Development. Manager shall notify Owner of any tax, assessment or valuation that Manager in good faith believes to be inappropriate based upon information available to Manager. Upon direction from Owner, Manager shall contest or challenge the validity or amount of any tax, assessment, charge or encumbrance in the manner provided by law at the cost and expense of Owner. Upon the final determination of any such contest or challenge, Manager shall promptly pay for Owner's account all sums determined to be due as hereinabove provided.

## 8. LIENS AND ENCUMBRANCES.

8.1 Manager shall immediately notify Owner of any labor or materialmen's liens or any other encumbrances which it receives notice of or which it otherwise becomes aware of respecting all or any part of the Development together with Manager's recommendation for resolving such matter. Upon instruction from Owner, Manager shall pursue at Owners cost and expense the course directed by Owner to resolve and remove any such lien at Owner's expense.

8.2 Owner in its sole and absolute discretion shall have the right to contest or challenge (or to direct Manager to contest or challenge at Owners expense) any lien, charge, assessment, or other encumbrance which affects all or any part of the Development and Manager, at Owner's expense, shall assist and support Owner in such contest or challenge as Owner may direct from time to time, provided that such contest or challenge is conducted in a manner that does not jeopardize Owner's title to the subject property and does not unreasonably delay or hinder the development or marketing of the Development or any part thereof.

8.3 Manager shall promptly notify Owner of any material disputes with contractors, vendors, materialmen or suppliers from time to time and shall exert all reasonable efforts to give such notice in any event prior to the filing of any liens against all or any portion of the property which is the subject of this Agreement. For purposes of the foregoing sentence, a dispute of $25,000.00 or more shall be deemed material.

## 9. INSURANCE.

9.1 Manager shall secure and maintain policies of fire and extended coverage insurance on the insurable improvements from time to time located on the Development owned by Owner in an amount not less than the full insurable value of such improvements, on a replacement-cost basis, and, shall also secure and maintain policies of insurance in amounts required by Owner covering vandalism and malicious mischief, sprinkler leakage, flood damage, and any other risks which Owner directs Manager to cover from time to time with insurance. All such policies shall contain standard beneficiary clauses making losses payable to Owner and/or such additional insured and loss payees as Owner may from time to time direct. Manager shall also secure and maintain comprehensive public liability insurance in amounts required by Owner and containing endorsements naming Owner and Manager as insured, and such additional insured and loss payees as Owner may from time to time direct. All insurance policies shall be with companies (and through insurance agents and/or brokers) from time to time approved by Owner, shall provide that both Manager and Owner are to receive thirty (30) days notice prior to cancellation and shall otherwise be in form and substance satisfactory to Owner and Manager. Original policies of insurance shall be delivered to Manager with certified copies thereof to Owner; renewal policies shall be delivered to Manager with certified copies thereof to Owner thirty (30) days before the expiration of the then-existing policies with satisfactory proof that the premiums for renewal have been paid. Owner reserves the right to designate all insurers and agents through whom the insurance coverage contemplated hereby is obtained.

9.2 In the event of a loss or casualty on or to the Property, Manager shall give immediate notice to Owner, and Manager shall make proof of loss to the insurer. Each insurance company is

A \HDASSOC WPD
June 14, 1999

8

hereby authorized and directed to make payment for loss directly to Owner, and Owner may apply all or any part of such insurance proceeds to the restoration or repair of the improvements destroyed or for any other purpose which Owner deems appropriate. Upon the sale of any portion of the Development, Manager shall promptly notify the insurance carrier and cancel any coverages no longer required as a consequence of such sales.

9.3     If the insurance proceeds are at Owner's election to be used for the restoration and repair of the improvements located on the Development which were damaged or destroyed, they shall be held by Owner in an account selected by Owner in its sole and absolute discretion (the "Restoration Account"). Manager, at Owner's expense, shall promptly prepare and submit to Owner all plans and specifications necessary for the restoration and repair of the damaged improvements, together with Managers cost estimate of the required restoration or repair. Upon Owner's direction, Manager shall either enter into a fixed price contract with a reputable builder for such restoration or repair (subject to the limitations on contracts set forth in Paragraph 3.1 above) or shall proceed to hire subcontractors and complete such work with Manager supervising such work as the project manager. If Manager completes the work with subcontractors acting under Manager's direction as the project manager, Manager shall be entitled to compensation in accordance with Paragraph 11.2 below. The plans and specifications and all other aspects of the proposed restoration and repair shall be subject to Owner's approval. In the event the insurance proceeds held in the Restoration Account are insufficient to complete the restoration and repair, Owner shall fund the amount equal to the difference between the amount then held in the Restoration Account and the amount .required to complete the restoration and repair after depletion of the amounts in the Restoration Account. Manager shall commence restoration and repair of the damaged improvements only when authorized in writing by Owner to do so and thereafter shall proceed diligently with the restoration and repair until completed. Disbursements shall be made from the Restoration Account for the restoration and repair in accordance with the same procedure utilized for disbursements for construction of the Development set forth in Paragraphs 6.1 and 6.2 above. In the event the amounts held in the Restoration Account exceed the cost of the restoration and repair of the damaged improvements, including any construction supervision fee paid to Manager or its affiliate, the excess funds shall be disbursed to Owner.

## 10.    MARKETING.

10.1    Manager and Owner shall prepare and agree upon the general marketing plan (such general marketing plan as hereafter amended from time to time being hereinafter referred to as the "General Marketing Plan") and Manager shall proceed with marketing the Development as outlined in the General Marketing Plan. Without excluding other issues which the parties hereto may determine to cover in the General Marketing Plan in effect under the terms hereof from time to time, it is agreed hereto that the General Marketing Plan shall address the following issues:

(a)     The minimum cash purchase prices to be solicited by Manager with respect to each component of the Development to be offered;

(b)     The advertising and promotional materials that Manager is authorized to develop and utilize pursuant to the Budget;

A \HDASSOC WPD
June 14, 1999                                    9

(

(c)     The location and design of a sales office/reception center on the Property; and

(d)     The services to be provided by Manager and by Owner's exclusive sales agent for the Property, Lochmere Realty, Inc. ("**Broker**"), and the sales staff to be employed to market the Property. Pursuant to Owner's agreement with Broker, Owner shall not be obligated to pay sales commissions in excess of seven (7) percent of the purchase price for the Property or any portion thereof.

**10.2**    Owner shall have the ability to modify or amend the General Marketing Plan at any time and from time to time, subject to the other terms and conditions of this Agreement and after consultation with Manager, although Manager's approval shall not be required to any such modifications. Upon any such modification or amendment to the General Marketing Plan, Owner shall immediately notify Manager and Manager shall implement such modified or amended General Marketing Plan as Owner's agent. Manager shall recommend to Owner changes from time to time it deems appropriate to the General Marketing Plan and, Owner shall consider same in good faith and respond thereto, although Owner shall retain the ultimate discretion respecting the General Marketing Plan. Manager shall have responsibility and authority to carry out the General Marketing Plan and shall charge all costs, fees and expenses incurred by it in accordance with the Budget and incident to the implementation of the General Marketing Plan to the Operating Account.

**10.3**    Owner shall execute and deliver to Manager a limited power-of-attorney in form and content satisfactory to Manager and the title company and its agent as selected by Manager to close such sales as escrow agent(s) granting Manager the authority, as attorney-in-fact for Owner, to sign all purchase contracts, agreements of sale, and special warranty deeds, affidavits of value, affidavits regarding seller's non-foreign status, and any and all other documents reasonably required to consummate a sale of a portion of the Development. All such sales closed by Manager as attorney-in-fact for Owner shall be consummated on forms of documents previously approved by Owner without substantial modification or deviation from the standard terms set forth therein and any contracts, agreements of sale, deeds, affidavits or other documents containing substantial deviations from the standard forms approved by Owner shall first be submitted to and approved by Owner. Copies of any documents executed by Manager pursuant to the aforesaid power of attorney shall be delivered to Owner promptly following the execution and delivery of same.

**10.4**    Once Owner has determined whether to accept or reject any proposal respecting the sale of all or any part of the properties included in the Development that requires its consent and approval, its decision respecting such proposal shall be communicated to Manager in writing and Manager shall proceed to use its best efforts to conclude the sale in the manner directed by Owner. Any material deviation from the terms and conditions of any sale proposal approved by Owner shall first be resubmitted to Owner for its concurrence.

**10.5**    All net sales proceeds from the sale of all or any part of the properties included in the Development shall be forwarded directly by the escrow agent handling any such closing directly to an account designated by Owner; Manager shall have no interest or authority with respect to such account. The escrow agent closing each sale shall be directed by Manager to deliver to Owner a copy of the final escrow accounting and, to the extent that Owner shall have previously authorized same, any and all original documents and instruments representing carry-back financing received

in any such sale.

10.6.    The provisions of this Section 10 are subject to the provisions of Section 4.3 above.

## 11. MANAGER'S OVERHEAD AND OTHER COSTS, FEES AND EXPENSES.

11. 1    To the extent not covered by checks drawn on the Operating Account, Owner shall reimburse Manager for all costs, fees and expenses paid by Manager in accordance with the Master Development Budget and other agreements approved by Owner and Budget to third parties in Manager's performance of its various duties and obligations hereunder.

11.2    To compensate Manager for its supervision of operations as required herein to complete the Site Improvements as described in **Exhibit "C"** attached hereto, Owner shall pay to Manager a monthly fee, in arrears, in an amount equal to $12,000.00.  Additionally, Owner shall reimburse Manager for all direct expenses incurred in connection with the Development and in accordance with the Master Development Budget as may be required from time to time, including but not limited to; employees, insurance , benefits, administrative overhead, travel, lodging and car rental.   Such expense categories and amounts shall be pre-approved by Owner, and any such expenses incurred by Manager, which have not been pre-approved by Owner, then such expenses shall not be reimbursed by Owner.  Commencement of management and development duties shall be deemed effective as of June _____, 1999. Owner shall pay or fund through the Operating Account all general and administrative expenses incurred in connection with the Development as more fully described in detail in the Master Development Budget (defined in section 12.1 hereto).

11.3    Manager shall pay the costs, fees and expenses contemplated by this Agreement by writing checks on the Operating Account as and when such amounts become due and payable. Manager shall submit not later than the tenth (10th) calendar day of each month an accounting of all such costs, fees and expenses.  If there are any expenditures for which Owner desires further information, it shall be entitled to request such further information and Manager shall endeavor to promptly respond to any such inquires.

11.4    Owner hereby agrees to pay Manager the sum equal to one percent (1%) of the Purchase Price of the Property in consideration for the due diligence investigation and other work performed by Lochmere for the benefit of the Owner in negotiating the purchase agreement and ultimate acquisition of the Property for the period occurring prior to the Closing of the subject Property by Owner.  Owner shall pay Manager the above referenced sum only if, as and when Owner closes on the purchase of the Property.

## 12. BUDGETS.

12.1    Attached hereto within **Exhibit "C** are construction budgets setting forth Manager's best estimation of the costs, fees and expenses that will be required (i) to complete the Development (the **"Development Budget"**); and (ii) complete the Site Improvements and prepare the balance of the Lots for marketing (the **"Site Improvements Budget"**) (the Development Budget and the Site Improvements Budget being hereinafter individually and collectively referred to as the **"Master Development Budget"**).  Owner hereby acknowledges that it has reviewed the proposed Master



A \HDASSOC WFD
June 14, 1999                    11

Development Budget and, subject to its right to review and adjust such Master Development Budget quarterly as set forth in Paragraph 12.2 below, concurs with same, and agrees to fund the costs, fees and expenses anticipated thereby as the construction of such projects progresses as set forth in Section 6 above. In the event that Manager encounters situations or circumstances that will increase the total cost reflected on a particular Budget beyond the amount allocated for such purpose, Manager shall promptly notify Owner of such anticipated cost over-run as soon as it is discovered and shall request in writing that the respective Master Development Budget be adjusted to cover the additional cost. Project cost over-runs of less than five percent (5%) of the total Master Development Budget for the project indicated shall not require approval of Owner and shall be funded by Owner. Manager shall have the ability to adjust line items in the Master Development Budget to offset a cost savings against a cost over-run within such Master Development Budget. In the event of a cost over-run in excess of five percent (5%) or more of the total approved Master Development Budget for a project, Manager shall promptly submit in writing such explanations and other evidence as may be appropriate to explain and justify the additional costs, and Owner shall promptly respond thereto, either approving such modification to the particular Master Development Budget or requesting additional information or directing that Manager take other direction reasonably calculated to avoid the cost overrun. Without limitation on the foregoing, but in addition thereto, in no event shall Manager incur an expense for any particular line item within the Master Development Budget which is greater than 120% of the amount budgeted for such line item, without the prior written consent of Owner.

12.2    Notwithstanding Owner's approval of the Master Development Budget and as set forth above, Owner retains the right to review and modify the Master Development Budget, in its sole discretion, once each calendar quarter. However, prior to Owner modifying the Master Development Budget, it shall first consult with Manager, either in a meeting or by telephone and shall request Managers input with respect to any proposed modification but Owner retains ultimate discretion with respect to such Budgets and shall have the right to modify or amend the Master Development Budget not more often than once each calendar quarter by either increasing or decreasing the amounts thereof in its sole and absolute discretion, except as to fees and categories of funds payable or reimbursable to Manager. Once Owner has given written notice to Manager of the modification or amendment to a particular budget, such budget as amended shall be deemed to be the revised Master Development Budget for all purposes.

13. **REPORTS.**

13.1    Monthly, not later than the tenth day of the following month, Manager shall submit in writing (i) a financial report to Owner setting forth all income, whether from the proceeds of sales, rentals or otherwise, and setting forth all costs, fees and expenses .incurred during the previous calendar month; (ii) a marketing report setting forth all contracts entered into, the other party to the contract, the total purchase price, the amount of any down payment or earnest money deposited, and the anticipated date of closing as well as a report of all closings, the name of the party to such closing, the net sales proceeds and enclosing a copy of the final settlement sheet; and (iii) a construction report with respect to each of the construction projects then in progress to report the work completed, the costs incurred and the amount of any anticipated costs to complete. Upon review of the monthly reports, Owner shall be entitled to request any further information or detail that it requires for its purposes and Manager shall endeavor to promptly supply same. Owner shall

also receive on a monthly basis copies of all bank statements on the Operating Account.

## 14. RIGHT TO INSPECT.

14.1     Owner shall have the right to inspect the Development from time to time and at any time that it may elect subject only to reasonable safety precautions which Manager may impose with respect to inspection of construction projects. Owner shall also have the right to inspect the books and records of Manager relating to the Development and Manager's performance of the Agreement from time to time. To the extent that Owner desires to copy books and records or other information in the files of Manager relating to any aspect of the Development or Manager's performance hereunder it may do so during normal business hours.

## 15. TERM OF AGREEMENT.

15.1     This agreement shall be for a four (4) year term unless sooner terminated in accordance with the provisions hereof (the "Initial Term"). At any time on or after that date which is ninety (90) days prior to the expiration of the Initial Term, either Owner or Manager shall have the right, with or without cause, to terminate this Agreement, to be effective upon the expiration of the Initial Term, upon not less than thirty (30) days prior written notice and no termination fee or other penalty or termination payment shall be due or payable in connection with any such termination.

15.2     In the event this Agreement shall not have been terminated at the expiration of the Initial Term pursuant to the preceding sentence or pursuant to any other term or provision of this Agreement, then this Agreement shall be automatically renewed for additional, successive one year terms, subject to termination during each annual extension in the same manner as provided for with regard to the Initial Term. Thus, if not sooner terminated, this Agreement shall automatically expire upon the final disposition of the entire Development and shall terminate as to each portion of the Development, as the same is sold and conveyed to the purchaser thereof, except that Owner's obligation to pay or reimburse Manager as described herein shall survive any such termination or expiration.

## 16. OWNER'S RIGHT TO TERMINATION

16.1     Owner shall have the right to terminate this Agreement without payment of any penalty or termination payment immediately upon the final disposition of all lots and/or parcels included within the Development to third party purchasers by the giving of written notice to Manager of such event. Owner shall also have the right to terminate this Agreement without payment of any penalty or termination payment immediately upon Manager's receipt of the initial payment incident to either Manager or Owner exercising its right to require a buy-out of Manager under the terms of the buy-sell provision of the Profits Participation Agreement by the giving of written notice to Manager of such event.

16.2     Owner shall have the right to terminate this Agreement for cause without payment of any penalty or termination payment upon the occurrence of any one or more of the following:

(a)      Failure of Manager to perform any one or more of its duties or obligations under the terms, conditions and provisions of this Agreement which manager fails to cure within thirty (30) days after receipt of written notice from Owner;

(b)      The filing by Manager (or against Manager to which Manager acquiesces or to which Manager does not acquiesce but that is not dismissed within sixty (60) days after the filing thereof of any proceeding under the federal bankruptcy laws now or hereafter existing or any other similar statute now or hereafter in effect; the entry of an order for relief under such laws with respect to Manager; or the appointment of a receiver, trustee, custodian or conservator of all or any part of the assets of Manager.

(c)      The insolvency of Manager; or the execution by Manager of an assignment for the benefit of creditors; or the convening by Manager of a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; or the failure of Manager to pay its debts as they mature; or if Manager is generally not paying its debts as they mature.

(d)      The death or incapacity of Robert Evans unless within forty-five (45) days after such occurrence, Manager retains the services of another person whose background and experience in the management and development of similar types of properties is satisfactory to Owner in Owner's sole and absolute discretion.

(e)      Failure of Robert Evans to personally control the operations of Manager contemplated hereby.

(f)      The commission by Manager of any act constituting fraud, embezzlement or misappropriation of Owner's funds or any act or omission by Manager or by any of its agents or employees constituting gross negligence or willful misconduct.

16.3      At the request of Owner (but subject to Manager's rights to participate in the financing as provided in the Profits Participation Agreement which are not waived or diminished in any fashion by the provisions of this Paragraph 16.3), Manager shall execute and deliver such subordinations and other documents and instruments as may be reasonably required from time to time to subordinate its rights, title and interest under this Agreement to the rights of any lender making a loan to Owner secured by all or any part of the Development which remains subject to the terms of this Agreement at the time such loan is closed.  In addition, upon request of Owner, Manager agrees to execute and deliver such further confirmations, documents and instruments as Owner may request from time to time to evidence termination of this Agreement as to portions of the Development sold or disposed of from time to time.

## 17.  MANAGER'S RIGHT TO TERMINATE.

17.1      Manager shall have the right to terminate this Agreement for cause in the event of Owner's failure to perform any of its duties and obligations hereunder, including without limitation, failure to make any one or more of the payments that it is required to make under the terms and provisions of this Agreement.  Notwithstanding the foregoing, Manager shall not terminate this

A \HDASSOC WPD
June 14, 1999                                    14

Agreement for Owners failure to perform unless Manager shall first have given Owner written notice of the circumstance, condition or default upon which such intended termination is based and ten (10) business days within which to cure such default if it can be cured by the payment of money (a "**Monetary Default**") and forty-five (45) days within which to cure all defaults other than Monetary Defaults. In the event Owner shall cure any such default within the applicable cure period therefor, then Manager shall have no right to terminate this Agreement by reason of such cured default.

17.2    In the event Manager shall have terminated this Agreement pursuant to paragraph 17.1 above, or otherwise, Manager shall cooperate with the party designated by Owner as the replacement manager for the Development to assist in a smooth transition and shall make all records and information which it has in its possession respecting the Development and the improvements then existing or anticipated available to such substitute manager for copying. No termination of this Agreement by either party shall relieve any party from any of its liabilities or obligations hereunder arising or accruing prior to such termination.

## 18. ARBITRATION

18.1    This Section concerns the resolution of any controversies or claims between Manager and Owner, including, but not limited to, those that arise from:

(a)    This Agreement (including any renewals, extensions or modifications hereof);

(b)    Any document, agreement or procedure related to or delivered in connection with this Agreement (hereinafter the "**Related Documents**");

(c)    Any violation of this Agreement or any Related Documents;

(d)    Any claims for damages resulting from any business conducted between Manager and Owner, including claims for injury to persons, property or business interests (torts); or

(e)    Any right of either party hereto to terminate this agreement with cause. Notwithstanding the foregoing, however, any disputes with respect to the Master Development Budget and any dispute with respect to termination of this Agreement without cause, where cause is not required for such termination, shall not be subject to arbitration unless both parties shall consent in writing thereto, which consent may be granted or withheld by either party in its sole and absolute discretion.

18.2    At the request of either party hereto, any such controversies or claims will be settled by arbitration in accordance with the United States Arbitration Act. The United States Arbitration Act will apply even though this Agreement and the Related Documents provide that they are governed by Florida law.

18.3    Arbitration proceedings will be administered by the American Arbitration Association and will be subject to its commercial rules of arbitration.

A \HDASSOC WPD
June 14, 1999                    15

18.4     For purposes of the application of the statute of limitations, the filing of an arbitration pursuant to this paragraph is the equivalent of the filing of a lawsuit, and any claim or controversy which may be arbitrated under this paragraph is subject to any applicable statute of limitations. The arbitrators will have the authority to decide whether any such claim or controversy is barred by the statute of limitations and, if so, to dismiss the arbitration on that basis.

18.5     If there is a dispute as to whether an issue is arbitrable, the arbitrators will have the authority to resolve any such dispute.

18.6     The decision that results from an arbitration proceeding may be submitted to any authorized court of law to be confirmed and enforced and shall inure to the benefit of, the parties hereto and their successors and assigns.

18.7     The pursuit of or a successful action for provisional, interim, additional or supplementary remedies, or the filing of a court action, does not constitute a waiver of the right of Manager or Owner, including the suing party, to submit the controversy or claim to arbitration if the other party contests the lawsuit.

## 19. ASSIGNMENT.

19.1     Owner may assign its right, title and interest under this Agreement only upon an assignment of all of Owner's right, title and interest in and to the Development (or the entire portion of the Development then remaining subject to the terms of this Agreement) ,to any entity which it owns or controls (a "Related Party"), and, if not to a Related Party, then only with the consent of Manager, such consent to be in Manger's sole and absolute discretion. Upon a permitted transfer or assignment of Owner's right, title and interest hereunder pursuant to the foregoing sentence and such permitted transferee's assumption of all of Owner's duties and obligations hereunder, Owner shall have no liability hereunder to Manager for obligations and actions accruing or taking place after the date of such assumption.

19.2     Manager shall have no right to assign any right, title or interest it may have hereunder to another party without the prior written consent of Owner, which consent Owner shall be entitled to withhold in its sole and absolute discretion, except for a proposed assignment to an entity that is owned or controlled by Robert Evans.

## 20. MISCELLANEOUS.

20.1     The provisions hereof shall apply to the parties according to the context thereof and without regard to the number or gender of words or expressions used.

20.2     Time is expressly made of the essence of this Agreement.

20.3     All notices required or permitted to be given hereunder shall be in writing and may be given in person or by United States mail, by delivery service or by electronic transmission. Any notice directed to a party to this Agreement shall become effective upon the earliest of the following: (I) actual receipt by that party; (ii) delivery to the designated address of that party, addressed to that



party; or (iii) if given by certified or registered United States mail, seventy-two (72) hours after deposit with the United States Postal Service, postage prepaid, addressed to that party at its designated address. The designated address of a party shall be the address of that party shown at the beginning of this Agreement or such other address as that party, from time to time, may specify by notice to the other parties.

20.4 This Agreement shall be governed by and construed according to the laws of the State of Florida.

20.5 Except as otherwise provided herein, this Agreement shall be binding upon, shall inure to the benefit of, the parties hereto and their successors and assigns.

20.6 The headings or captions of sections in this Agreement are for reference only, do not define or limit the provisions of such sections, and shall not affect the interpretation of this Agreement.

20.7 Any and all costs, fees and expenses incurred and paid by Owner pursuant to the terms, conditions and provisions of this Agreement shall without duplication, be taken into account in determining "Net Cash Receipts", "Negative Cash Flow", "Net Financing Proceeds" or "Net Sale Proceeds" (as all such terms are defined in the Profits Participation Agreement) and items so taken into account shall be charged, accrued or allocated, as appropriate, in the manner contemplated by said Profits Participation Agreement.

20.8 In the event a party shall breach or fail to perform its obligation under this Agreement, then the prevailing party shall be entitled to recover from the defaulting party the prevailing party's reasonable legal fees and costs in effecting performance by the defaulting party hereunder.

20.9 During the term of this Agreement, and without limitation upon any other term or provision of this Agreement, Manager shall disclose in advance and in writing to Owner all fees and other compensation, and all arrangements therefor, to be received or entered into from time to time by Manager or by any Affiliated Entity (including, but without limitation, Robert Evans) with parties or persons other than Owner and that relate to the Development or any portion thereof, including, but without limitation, portions of the Development that have been sold, transferred or conveyed by Owner. Manager and its Affiliated Entities shall not be prohibited from entering into such arrangements so long as the compensation therefore is customary and at or below market rates, such arrangements are not competitive with any interests of Owner and such arrangements are not linked to any concessions or other economic detriment as to matters in which Owner has an economic interest.

20.10 Owner's obligations to Manager hereunder shall be without recourse to any partner of Owner and in the event of any claim by Manager hereunder of pursuant hereto, shall look solely to the assets from time to time owned by Owner.

IN WITNESS WHEREOF, these presents are executed as of the date indicated above.

A \HDASSOC WPD
June 14, 1999                                  17

**LOCHMERE DEVELOPMENT GROUP, INC.,**
a Florida corporation

By: _____.
Name:  Robert D. Evans
Title:  President
**"MANAGER"**

**H D ASSOCIATES, L.P.**
a Delaware Limited Partnership

By its General Partner
JTL Capital, L.L.C.,
a Texas corporation

By: _____
Name: David A. Lane
Title:  President
**"OWNER"**

## LIST OF EXHIBITS

Exhibit "A"    Legal Description of the Development

Exhibit "B"    Master Site Plan Showing, Lots and general layout of the Development

Exhibit "C"    Master Development Budget

Exhibit "D"    Profit Participation Agreement

## Exhibit "D"

## PROFIT PARTICIPATION AGREEMENT

1.    **OVERVIEW**

       Owner hereby agrees to pay Manager an **"Incentive Participation"** calculated in accordance with and subject to the terms and conditions of this **Exhibit "D"**. No Incentive Participation shall be payable until Owner receives a full return of **"Owner Capital"** and  at least a twelve percent (12%) simple, cumulative, annual return on **"Owner Capital"** as defined herein.

       Once the aforesaid preconditions have been satisfied, Manager's Incentive  Participation will be calculated by multiplying a percentage rate times **"Net Cash Receipts"**, as defined herein.  Said percentage rate increases as the Owner's Priority Return increases as described in Section 3 below.

2.    **CERTAIN DEFINITIONS.**  For purposes hereof, the following terms shall have the following meanings:

       A.    **"Cash Expenditures"** for the applicable period means cash expenditures made by Owner during such period in the operation of or in connection with the development, operation and management and sale of the Property and the Development, including, but not being limited to, payroll, business taxes and real and personal property taxes and assessments, insurance premiums and capital costs, and all management fees and expenses, but excluding Debt Service Payments.

       B.    **"Cash Income"** for the applicable period means the gross cash receipts from the Property for such period including, but not limited to: (I) Net Financing Proceeds; (ii) Net Sales Proceeds; (iii) rental income; but not including capital contributions by Owner or its Partner.

       C.    **"Debt Service Payments"** for the applicable period means all payments of principal and interest and other amounts paid during such period on or in connection with the **"Property Indebtedness"** or any **"Qualified Indebtedness"**.

       D.    **"Negative Cash Flow"** means for the applicable period the amount, if any, by which (x) the sum of the Cash Expenditures for such period, plus the Debt Service Payments for such period exceeds (y) the Cash Income for such period.

E.    "Net Cash Receipts" for the applicable period means the amount, if any, by which (x) the "Cash Income" for such period exceeds (y) the sum of (I) the "Cash Expenditures" for such period, plus (ii) the "Debt Service Payments" for such period.

F.    "Net Financing Proceeds" means the net proceeds to Owner from any financing or refinancing of the Property or any part hereof, including the Property Indebtedness, after deductions for: (I) the payment of all expenses related to said financing; (ii) the payment for any capital expenditures from said financing; (iii) the payments for said financing to satisfy any debts on or related to the Property.

G.    "Net Sale Proceeds" means the net proceeds to Owner from any sale or other disposition, taking or loss of or from the Property, including, but not limited to, proceeds from: (I) land sales and (ii) club membership sales.

H.    "Owner Capital" means, individually and collectively, all amounts actually funded by Owner, for or in connection with: (I) the acquisition of the Property, including, but without limitation, the purchase price of the Property, closing costs and brokerage and attorneys' fees; and (ii) the development and construction of improvements on the Property.

I.    "Property Indebtedness" means the aggregate outstanding principal amount of any indebtedness to Owner secured from time to time by the Property.

J.    "Priority Return" means the money paid Owner from the operation and sale of the Property after the full payment of Owner Capital and all other debts and expenses related to the Property as described herein calculated as a percent per annum cumulative annual return on all Owner Capital through the date of such calculation.

K.    "Qualified Indebtedness" mean indebtedness to a Third Party Lender, both secured and unsecured, which has been incurred to fund "Negative Cash Flow" or capital expenditures for the Property. Notwithstanding the actual interest rate on any Qualified Indebtedness, said interest rate for purposes of calculations under this Exhibit "D", shall not be deemed to exceed Owner's cost of such borrowing. As used herein, "Third Party Lender" means a lender which does not control, is not controlled by and is not under common control with Owner.

L.    "Term" means the term of this Agreement, which shall commence on the date hereof and shall continue until the date as of which Owner shall no longer own any portion of the Property, except that the Term shall continue solely as to any payments due Lochmere as described herein.

3.    CALCULATION AND PAYMENT OF INCENTIVE PARTICIPATION.

At least annually for the first two (2) years of the Term of the Agreement, and at least quarterly thereafter, Owner shall provide a report to Manager calculating the Priority Return and the Incentive Participation as described herein. Upon the full repayment of Owner Fundings and payments to Owner resulting in at least a twelve percent (12%) simple, cumulative annual return to Owner on Owner Capital, Owner agrees to pay Manager an Incentive Participation in accordance

A \HDASSOC WPD
June 14, 1999

with the following schedule:

| Of Owner's Return is: | Then the Percentage rate used to calculate the Incentive Participation shall be: |
| --- | --- |
| 0 - up to 12% | 0% |
| 12% up to 22% | 15% |
| 22% or greater | 30% |

Upon a determination pursuant to an Owner's Report that an Incentive Participation payment is due, Owner agrees to make said payment within twenty (20) days after the end of the applicable calendar quarter.

4.   **REPORTS.**  Together with each Owner's Report, Owner shall provide Manager with a reasonably detailed itemization and back-up for the calculations therein.  Manager and his representatives shall be authorized, at his sole cost and expense and upon reasonable advance written notice, to review and copy Owners' books and records from time to time with respect to the Property and the determination of the Property and Qualified Indebtedness, as well as any other matters relating to the calculation of payments to Manager hereunder; provided, however, that all such materials as are copies or reviewed shall be treated with confidentiality by Manager and his representatives and shall not be used for any purpose other than verifying the obligations to Manager hereunder.  Owner shall provide copies to Manager of all quarterly reports which Owner prepares for its investors with respect to the Property.

5.   **BUY-SELL.**

A.      Owner agrees to pay a **"Cancellation Fee"** to Manger in the event this Profit Participation Agreement is terminated prior to its automatic termination upon Owner no longer owning any portion of the Property.  Said Cancellation Fee shall be equal to the payment which Manger would have received pursuant to paragraph 3 above if Owner's interest in the Property were to have been sold by Owner on the date of such termination on an all cash basis and at the then fair market value of Owner's interest in the Property, determined as of the date of such termination.  In the event that, within thirty (30) days following such a termination, Owner and Manger cannot agree on the fair market value of the Property as of the date of such termination then each shall promptly (and, in any event, within fifteen (15) days subsequent to the end of said thirty-day period) choose a licensed independent appraiser and such appraisers shall choose a neutral independent appraiser. All appraisers shall be experienced in the appraisal of properties similar to the Property and none of the appraisers shall be in the employ of Owner, Manger or their respective affiliates except in connection with appraising the Property.  The appraisers shall each make a separate determination of the fair market value of the Owner's interest in the Property as of the date of termination.  The two appraisals closest in value shall be averaged and such average shall be deemed to be the fair market value of the Owner's interest in the Property as of the date of termination unless the highest and lowest appraisals amounts are equally distant from the middle appraisal amount, in which event the fair market value shall be the amount of the middle appraisal.  Manager shall pay the costs of the appraiser it selects, Owner shall pay the cost of the appraiser it selects and Manager and Owner shall

share equally the costs of the third appraiser. Owner shall pay the Cancellation Fee to Manager within fifteen (15) days after the determination of the fair market value of the Owner's interest in the Property; provided, however, that Manager shall have no interest or right in or to any payments based on Net Sale Proceeds or Net Financing Proceeds occurring after the date of termination, but provided further, however, that Manager shall continue to have a right to payments based on Net Cash Receipts for the period from the date of termination through the date the Cancellation Fee is paid.

---

END

# EXHIBIT NO.

# L

# Lochmere

July 12, 1999

<u>**VIA FACSIMILE (214) 756-6598**</u>
Mr. Paul E. Rowsey, III
President
Eiger, Inc.
500 Crescent Court; Suite 300
Dallas, Texas 75201

RE:    **HAMMOCK DUNES**
       **PALM COAST, FLORIDA**

Dear Paul:

Since our initial meeting with you and Mr. Todd Miller on March 30, 1999 at Hammock Dunes in Palm Coast, Lochmere Development Group, Inc. has worked diligently to provide your company with information and assistance you have requested to familiarize you and your lender, BankBoston, with the investment opportunity in Hammock Dunes. Our continued assistance to you in facilitating the purchase and development of Hammock Dunes by H. D. Associates, L.P. was based on your honoring the terms of the Management, Development and Marketing Agreement ( the "Agreement") which I previously negotiated with Mr. David Lane of JTL Capital, L.L.C. (general partner of H.D. Associates, L.P.), and which I reviewed with you in detail during our meeting on June 10, 1999 in Dallas. Based on our agreement to move forward at that meeting, we have provided, at your request, voluminous documentary information and technical and strategic analyses to you, BankBoston, and BankBoston's appraiser, Joseph J. Blake and Associates, Inc. All the information provided constitutes trade secrets.

Based on my telephone conversations with you on June 28 and July 2, 1999, I understand that you will not honor the terms of the Management, Development and Marketing Agreement. Your alternative proposal in no way compensates Lochmere for its investment to date and for the value it has created by virtue of the application to this transaction of its proprietary methods of analysis and documentation, all of which we have repeatedly reviewed and explained to you and your associates.

EXHIBIT
"L" to
Complaint

LOCHMERE DEVELOPMENT GROUP INC.    2701 NO          E 1070    TAMPA, FL 33607

July 12, 1999
Mr. Paul E. Rowsey, III
President
Eiger, Inc.
Page Two of Two


Lochmere hereby demands that you return all information related to Hammock Dunes that Lochmere has provided to you. Also, be advised that any attempt to use Lochmere's trade secrets by Eiger, Inc., H. D. Associates, L.P., or any affiliated individuals or entities without full compensation to Lochmere per the Agreement is not permitted and will be vigorously contested.

By copy of this letter, I am also demanding the return from BankBoston, Joseph J. Blake and Associates, Inc., Mr. David Lane and JTL Capital, L.L.C. of the proprietary information described above.

With kindest regards,

Robert D. Evans
President

LOCHMERE DEVELOPMENT GROUP INC  2701 NORTH ROCKY POINT DRIVE  SUITE 1070  TAMPA, FL 33607
(813) 286-3001  FAX (813) 636-8035  lochmere@aol.com

M

Exhibit



# EIGER


EQUITY INVESTMENTS
IN REAL ESTATE

July 13, 1999

VIA FAX  813/ 636-8035

Mr. Robert D. Evans
President
Lochmere Development Group, Inc.
2701 North Rocky Point Drive
Suite 1070
Tampa, Florida  33607

Re:    Hammock Dunes (the "Property")

Dear Bob:

Having received your letter of July 12, 1999, I have to say that I am both confused and surprised not only by its tone, but also its substance.   When we last spoke you were analyzing your time commitment to the Hammock Dunes transaction and were to contact me to give me your thoughts on how you wanted to be involved, if at all.  To have sent the July 12th letter misstating the facts and making an unfounded allegation regarding "trade secrets" is not only disappointing, but also entirely inconsistent with the manner in which you have conducted yourself in the past.  Unfortunately, this conduct requires me to set the record straight on the evolution of our relationship.

In March of this year,. David Lane contacted me regarding the Hammock Dunes transaction.  He told me that you and he had been working on trying to acquire the Property for the preceding 12-15 months.  In that time period, you had the Property under contract at least once, but it had not been under contract since prior to the end of 1998 (and was not under contract at the time).  Also during this time period you had attempted in vain to find debt and equity financing for the acquisition of the Property, although it was represented that you once had an equity source but it had failed to perform.  Obviously, neither you nor David had the financial strength to buy the Property on your own.  Based on the representations made to us regarding the attributes of the Property, we began to conduct due diligence, relying in large part on the analysis David and you had previously done  We spent hundreds of hours and  thousands of dollars reviewing the Property and your work product.  We took numerous trips to Florida and did independent market research on other East Coast ocean-front communities.

Simultaneously, we undertook negotiations with the seller of the Property.  It became clear to us very early that the contractual approach you and your team had initiated with the seller was not

500 Crescent Court

Suite 300

Dallas Texas 75201

PHONE 214 756 6550

FAX 214 756 6599


EXHIBIT
"M" to
Complaint

Mr. Robert D. Evans
July 13, 1999
Page 2


feasible from a financing standpoint. We therefore took the initiative to restructure the transaction with the seller of the Property and to arrange financing for the acquisition.

Based on our independent research, it became clear to us that your strategic plan for the development, operation and marketing of the Property was fatally flawed. Your plan to amend the Hammock Dunes Club documents and to not build the second golf course would have had significant adverse consequences from both a marketing and financial perspective. Therefore, we completely modified the strategic plan, restructured the deal and worked to finalize a contract with the seller based on this new strategic plan, which you agreed with in all respects.

In late May or early June, it also became obvious to us, and other capital sources, that the team of Lane and Evans could not successfully manage the development, operation and marketing of the Property. You had indicated a willingness to work up to three days a week on the project, commuting from Tampa. David wanted to oversee the project on a part-time basis from Dallas. David admitted that he did not have any experience in managing large scale residential land projects and it was clear that you had little, if any, experience in managing high-end, equity golf club projects. In fact, you admitted this in June. Based on this, in early June, we informed both you and David that a condition to our providing financing for the acquisition of the Property was that we engage a full-time, on-site professional to oversee the project. David readily agreed with this approach. I wrote you in early June and asked that we discuss your continuing role In the project. We were very impressed with your knowledge of Florida land-use issues and the "on-the-ground" development and infrastructure experience you exhibited. What we were uncomfortable with was your operational and marketing skills. Prior to our involvement, you had not begun to understand the operational demands of the project and had not begun to plan for them. In addition, you admitted to having little experience marketing this type of Property.

On June 10th, you came to Dallas to talk about this issue. It was at that time that you disclosed to me that you "had a deal" with David Lane. As you know, David disputes this. In any event, I told you at that meeting that the "deal" you had with David would not work for us. It assumed that you would handle all aspects of the development, operation and marketing of the Property, which you were obviously not capable of handling. At our meeting I explained to you that we envisioned you being responsible for development issues, but not operations or marketing. You indicated that you would need to think about this diminished role and would get back to me with your thoughts. In the meantime, we continued to work in good faith to try and finalize negotiations with the seller of the Property and

Mr. Robert D. Evans
July 13, 1999
Page 3

BankBoston, our lender. You continued to work with us in this respect and have been very helpful. Never once did you indicate to us that your continuing involvement was conditioned upon you receiving the "deal" you claim to have arranged with David Lane. In fact, over the course of the next several weeks we continued to have discussions on what you role would be and our respective thoughts on what a fair compensation package would be. We offered to pay you approximately $225,000 upon the closing of the acquisition. In addition we offered to pay you a $12,000 per month fee for your time, to reimburse a fair portion of your overhead, and to grant to you a 7.5% profits participation in the transaction, after repayment of debt, capital, and cost of funds. This residual participation, by your calculation, would have been worth in excess of $4,000,000, and would have been earned in less than four years. By way of comparison, the package you proposed to us would have amounted to a potential compensation of $12,000,000 to $15,000,0000, or more. This seemed to us to be a little rich for part-time work, considering you did not structure the transaction, did not arrange financing for the transaction, and were not investing any money in the transaction. To now send a letter threatening legal action if we don't capitulate to your multi-million dollar demands, resembles fraud in the inducement insofar as you seemed to have waited to spring this demand until the 11th hour of the transaction.

In your letter you assert that our "proposal in no way compensates Lochmere for its investment to date and for the value it has created by virtue of the application to this transaction of its proprietary methods of analysis and documentation, all of which we have repeatedly reviewed and explained to you and your associates." Based on my conversations with David Lane, I do not believe you have any substantial investment in the transaction. David Lane has informed me that he has paid for virtually all costs and expenses you incurred in connection with evaluating the Property up until March of 1999. I believe we have made all of the substantial investments since that date, and, in fact, paid a significant past due legal bill you had incurred prior to our involvement.

With respect to value created, your "proprietary methods of analysis" led to the conclusion that the second golf course should not be built and that the golf memberships should be limited to 400. This plan would have resulted in failure as you have subsequently conceded. I am not sure what you think are "trade secrets." You have given us little information that was not prepared by third parties and paid for by others. The information you personally have prepared and provided constitutes computer generated financial models based on information gathered from public records and from third parties. Some of the assumptions contained in these financial models are based on information we generated, some of which was generated by David Lane, and some of which is based on your opinions. Your computer

Mr. Robert D. Evans
July 13, 1999
Page 4

model is generated on commercially available software and is a simple roll up of information, none of which appears to be proprietary. Never were we asked to sign a confidentiality agreement or otherwise warned not to utilize this program. Nevertheless, we are happy to cease using the program and to remove it from all of our computer hard drives. Additionally, we will send you any disks that contain the software or destroy them at you option. If there is any other specific information that you think is proprietary or contains "trade secrets," please let us know.

I am truly sorry you have chosen to threaten legal action in an attempt to derail the acquisition of the Property in hopes of forcing us to accept your proposed compensation package. I really believe that the transaction, as restructured, could have been successful and that all of us could have been rewarded for our contributions. It has occurred to us that you may be trying to use these tactics to discourage us from pursuing the acquisition of the Property so you can attempt to put together your own sources (again) to acquire it for your own account. If this is so, I wish you good luck.

In the meantime, please be advised that in the event we suffer any adverse consequences as a result of your threats and/or your sending your libelous letter to BankBoston in connection with this matter, we will hold you fully accountable.

Very truly yours,

Paul E. Rowsey, III

# EIGER, INC.
500 Crescent Court
Suite 300
Dallas, Texas 75201-0495



## FAX COVER SHEET

| | | | |
|---|---|---|---|
| **DATE:** | July 13, 1999 | **TIME:** | 3:31 PM |
| **TO:** | Robert D. Evans | **PHONE:** | 813/ 286-3001 |
| | | **FAX:** | 813/ 636-8035 |
| **FROM:** | Paul Rowsey | **PHONE:** | 214/ 756-8552 |
| | Eiger, Inc. | **FAX:** | 214/ 756-8598 |
| | | **E-mail:** | paul_rowsey@eigerpartners.com |
| **RE:** | Hammock Dunes | | |

Number of pages including cover sheet: 5

## *Message:*

Please see attached letter.

UNLESS OTHERWISE INDICATED OR OBVIOUS FROM THE ACCORD OF THE TRANSMITTAL, THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO EIGER, INC. AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE AT OUR EXPENSE. THANK YOU.

N

Case 8:00-cv-01026-JDW    Document 2    Filed 05/24/00    Page 183 of 186 PageID 192

# EXHIBIT NO.

# N

# BRICKLEMYER SMOLKER & BOLVES, P.A.

## ATTORNEYS & COUNSELORS AT LAW

JAY J BARTLETT
BRIAN A BOLVES
KEITH W BRICKLEMYER
R. MICHAEL BROOKS
DAVID M CORRY
GREGORY J. ORCUTT

DOUGLAS C ROLAND
RICHARD A SCHLOSSER
DEBORAH M SCHMITT
DAVID SMOLKER
OF COUNSEL
*J A JURGENS, P.A
Longwood, Florida

July 29, 1999

**VIA FACSIMILE (214) 756-6598**
Mr. Paul Rowsey, III
President
Eiger, Inc.
500 Crescent Court, Suite 300
Dallas, Texas 75201

Re:    **Hammock Dunes**
       **Palm Coast, Florida**

Dear Mr. Rowsey:

This firm has been retained as Florida counsel by Lochmere Development Group, Inc. regarding the above-referenced matter.  We have retained Texas counsel who will respond to your July 23. 1999, letter and the lawsuit you have filed in Texas.

I have also received a copy of your letter to Robert D. Evans, President of Lochmere, dated July 13, 1999.  Rather than debate your revisionist version of history, and without attempting to harmonize your curious conclusion that Mr. Evans fraudulently induced you into an agreement you simultaneously disclaim, let me simply clarify several important points.

1.    The information and analysis provided by Lochmere which it developed over an 18-month period were accurately characterized in Mr. Evans' letter to you dated July 12, 1999 as trade secrets.  Since you appear to be unfamiliar with this term of art, I commend to your reading the legend on the proforma provided to you and BankBoston, and Section 688.003, Florida Statutes, and the cases thereunder.

2.    Lochmere would not have provided this information to BankBoston and to its appraiser, nor assisted them with their evaluation of this project on your behalf, but for your commitment to honor the economics of Lochmere's Management, Development and Marketing Agreement.

Reply to:
500 East Kennedy Boulevard
Suite 200 F\DOCS\AL\913\ROWSEY.L02
Tampa, Florida 33602-4825
Telephone (813) 223-3888
In 407 Area Code 831-4551
Facsimile (813) 228-6422
e-mail: keh@hshorooartvlaw.com



*505 Wekiva Springs Road
Suite 800
Longwood, Florida 32779
Telephone (407) 772-2277
Facsimile (407) 772-2278
e-mail: jajenv@magicnet.net

Mr. Paul Rowsey, III
President
Eiger, Inc.
July 29, 1999
Page 2

3.      But for the trade secrets and continued assistance provided by Lochmere, you would have been unable to determine in only a matter of weeks that you should attempt to purchase this project with a $3,000,000.00 non-refundable deposit.

4.      But for the trade secrets and continued assistance provided by Lochmere, BankBoston would not have considered participating in financing such a transaction on the expedited schedule that was followed.

Finally, let me reiterate Mr. Evans' demands to you, David Lane, Joseph J. Blake and Associates, Inc., and BankBoston in his letter dated July 12, 1999:

1.      Return and cause to be returned to Lochmere all information related to Hammock Dunes that Lochmere provided to you or to others on your behalf.

2.      Neither Eiger nor any affiliated individuals or entities are authorized to use Lochmere's trade secrets without full compensation to Lochmere. Any unauthorized use is grounds for injunctive action.

Please govern yourself accordingly.

Yours truly,

BRICKLEMYER SMOLKER & BOLVES, P.A.

By:     Keith W. Bricklemyer

KWB/mlb

P:\DOCS\MLB\I)I\ROWLOWTEY L\r1