UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**F I L E D**

Date 7-5-0/                    Time

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

LOCHMERE DEVELOPMENT
GROUP, INC. and
LOCHMERE REALTY, INC.

        Plaintiffs,

v.                                                    Case No.: 8:00-cv-1026-T-27B

EIGER FUND I, L.P., et al.

        Defendants.

_____/

## AFFIDAVIT OF PAUL E. ROWSEY, III
## IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

STATE OF TEXAS
COUNTY OF DALLAS

        BEFORE ME, the undersigned authority, personally appeared Paul E. Rowsey, III, who was duly sworn and says:

        1.     I am the President of Eiger, Inc. ("Eiger"), a Dallas, Texas based investment management company. I have served in that position since its incorporation on January 11, 1999. I am over twenty-one year of age and am competent to testify to the maters addressed in the affidavit. These matters are based on my personal knowledge.

        2.     I am a defendant in the above referenced lawsuit. The other individual defendants also are officers of Eiger. C. Todd Miller is the Chief Executive Officer, David M. Jacobs is an Executive Vice President, and William S. Buchanan is also an Executive Vice President.

        3.     Eiger and 2M Dunes, L.L.C., a Texas limited liability company, are the general partners of Dunes Operating Company, L.P., a Delaware limited partnership. Dunes Operating Company, L.P., in turn, is the sole general partner of H. D. Associates, L.P., a Delaware limited

82

partnership. Eiger also is the sole general partner of Eiger Partners, L.P., a Delaware limited partnership, and Eiger Partners, L.P. is the sole general partner of Eiger Fund 1, L.P., a Delaware limited partnership. All of these entities are hereinafter referred to herein as the "Eiger Entities."

4.   In late March 1999, I was contacted by David Lane, a Dallas-based real estate Developer, who inquired whether Eiger would have an interest in investing in the acquisition of Hammock Dunes, a multi-million dollar high end real estate development project in Palm Coast, Florida. Lane advised me that he and various companies with which he was affiliated had been involved for over a year in unsuccessful efforts to purchase Hammock Dunes. Lane described the location of the property, the proposed assets to be acquired, his previous efforts to finance and acquire the property, and his relationship with the current owner of the property.

5.   On March 30, 1999, Todd Miller and I visited the Hammock Dunes property where we first met Robert Dale Evans ("Evans"). Evans informed me that he was the principal of Lochmere Development Group, Inc., a Florida real estate development company and the he had been working with Lane in performing due diligence on the property. During this trip to the property, we met the president of the owner of the property, toured the property, met with a resident of the Hammock Dunes community, talked about the range of values for the property, and explored the terms upon which the property could be acquired.

6.   During the next two and one-half months, I met with Evans on several occasions of Eigers' offices in Dallas, at Hammock Dunes, and on one occasion in Boca Raton, Florida to discuss issues relating to the Eiger Entities' possible purchase of Hammock Dunes.

7.   On June 8, 1999, I faxed Evans a letter, a copy of which is attached hereto as Exhibit A, which advised Evans that the Eiger Entities intended to hire a full-time CEO to work on-site at Hammock Dunes and which contained a proposal regarding the future involvement and

compensation of Lochmere Development Company if we were successful in acquiring the property.

8.      The next day, Evans telephoned me to ask if he could meet with me at Eigers' offices in Dallas to discuss the letter.  I agreed to meet with him the following day, June 10th.

9.      At the June 10, 1999 meeting, Evans gave me two proposed contracts—one entitled "Management, Development, and Marketing Agreement" and the other entitled "Marketing and listing Agreement."  A copy of the proposed Management, Development and Marketing is attached hereto as Exhibit B, and a copy of the proposed Marketing and Listing Agreement is attached hereto as Exhibit C.

10.      I explained to Evans the different role that the Eiger Entities envisioned Lochmere Development would play in the Hammock Dunes project and the forms of compensation it could receive as outlined in my letter of June 8th.  At no time during this meeting or at any other time did I agree to or accept either of the proposed contracts that Evans had presented to me at the meeting on June 10, 1999, nor did I ever agree to pay Evans or his companies the compensation called for under those documents.  In fact, I specifically advised Evans that the compensation structure that these document called for would not have been financially feasible and that the Eiger Entities did not believe that his companies had the experience to perform the management and marketing of the project.  At the conclusion of the meeting, Evans told me that he wanted to think about it and perform some analysis of the numbers and that he would get back to me with a response to my proposal.

11.      On or about June 12, 1999, I arranged a meeting in Atlanta with representatives of BankBoston, N.A. (the "Bank") for the purpose of discussing the Bank possibly providing debt financing for the acquisition of the property.  Believing that Evans had in principle accepted our

3

proposal relating to his participation and compensation in the Hammock Dunes project, I invited Evans to attend the meeting with me, Steve Kennedy, a Vice President of Eiger, and representatives of the Bank. This meeting took place in Atlanta on or about June 15, 1999. At the meeting, Kennedy and Evans reviewed with the Bank representatives a budget relating to the Hammock Dunes project. Evans brought multiple copies of the budget and gave the Bank representatives copies of it to keep.

12. At this meeting, Evans also presented a "draw package," a copy of which is attached hereto as Exhibit D, which consisted of a set of blank financial forms. The draw request was not tailored for any specific loan structure and neither the Eiger Entities or the Bank used it for any purpose.

13. At the meeting with the Bank I discussed in Evans' presence the various roles we anticipated that individuals would fill in connection with the property if we were successful in acquiring it, including, among others, the CEO role which was to be filled by Terry Pendleton, a sales and marketing role which would be potentially be filled by and individual we were interviewing, and the land planning and development role I had discussed with Evans in Dallas. We did not further discuss any issues relating to Evans' future involvement with the project or the compensation that he or his companies would receive if they elected to continue with the project at the meeting in Atlanta; however, at the Atlanta airport before departing I told Evans that we still needed to resolve the details of his compensation. He did not contact me thereafter to discuss these issues. Therefore, I telephoned Evans on or about June 28, 1999, and submitted a comprehensive compensation package to him, which outlined the role he would play, the duties he would perform and the various methods by which he would be compensated. Evans told me he appreciated the offer and would need time to think about it.

14.     The next conversation I had with Evans was on or about July 2, 1999.  In this conversation, I asked Evans if he had any questions about our offer and he told me that he still had not had enough time to fully evaluate the proposal and that he was having an associate in his office perform an analysis of the time and cost associated with the role Evans was to perform.  I told Evans that I wanted to get this issue resolved as the seller of the property was anxiously expecting us to submit a contract the purchase the property and that I wanted all parties' roles and compensation to be determined before I submitted an offer and deposited $3,000,000 of forfeitable earnest money.  Evans asked me how much flexibility I had in the structure of our proposal and I told him that we had some flexibility, but that we really needed to get things finalized quickly if we were going to make an offer to purchase the property.  Evans responded that he would get back in touch with me as soon as he could.

15.     Although I called Evans at least once between July 2, 1999 and July 12, 1999, I did not hear from Evans again until July 12, 1999 when I received a letter from Evans, a copy of which is attached hereto as Exhibit E.   I responded by letter July 13, 1999, a copy of which is attached hereto as Exhibit F.

16.     On or about July 23, 1999, I learned from the seller that Evans had submitted an offer to purchase the Hammock Dunes project on behalf of himself and Starwood Financial Group.  Thereafter, Eiger made an offer to purchase the property, and on July 29, 1999, one of the Eiger Entities, Dunes Operation Company, L.P. entered into a contract with ITT Community Development Corporation, Admiral Corporation, Corprop A&F, Inc. and ITT Land Corporation (collectively ITT) to purchase Hammock Dunes.

17.     On November 30, 1999, H. D. Associates, L.P. and Dunes Operating Company, L.P. closed on the acquisition of Hammock Dunes.

18.    Neither Lochmere Development or Lochmere Realty ever submitted any bills to the Eiger Entities for payment of any time, costs or expenses, nor did either of them ever request reimbursement of any time, costs, or expenses, in connection with the Hammock Dunes project.

19.    I never made any misrepresentation or false statements at any time to Evans or any representatives of Lochmere Development or Lochmere Realty with regard to any compensation they would be paid or work they would perform with respect to Hammock Dunes, or with regard to any other matter.

_____
PAUL E. ROWSEY, III

SWORN TO AND SUBSCRIBED before me, this _2nd_ day of ~~June~~ July, 2001, by Paul E.

Rowsey, III, who is personally know to me .



(Print Name) _____
NOTARY PUBLIC, State of Texas

ALICE ASHLEY
NOTARY PUBLIC
State of Texas
Comm. Expires 05-07-2005

My Commission expires _____05-07-2005_____

C:\Document\PaulRowseyAffidavit.doc

6

# Exhibit
# A



# EIGER

EQUITY INVESTMENTS
IN REAL ESTATE

June 8, 1999

VIA FAX 813/ 636-8035

Mr. Robert D. Evans
President
Lochmere Development Group, Inc.
2701 North Rocky Point Drive
Suite 1070
Tampa, Florida 33607

Dear Bob:

After a tremendous amount of work done by many people, it looks as if the Hammock Dunes deal may actually go to a closing mode. The deal has evolved very quickly in the short time I have been involved in it and even more during your tenure.

I have enjoyed working with you over the past few weeks and am confident we can reach an agreement to continue working together. As you know, as a condition to acquiring Hammock Dunes, my company is convinced that the project will require a full-time, on-site CEO. While I have no doubt that David Lane could have fulfilled this role, David's personal and business commitments in Dallas preclude his relocating to Hammock Dunes. Therefore, we have commenced negotiations with a long-standing strategic partner of ours to take this position. While not finalized, I am confident that this candidate will accept the job. He is not only a qualified real estate professional with extensive experience, but a great guy who is easy to work with. I am confident that you could establish a very good working relationship with him.

We envision that this person would have overall responsibility for the project, overseeing the management of the Club, Hammock Dunes Real Estate Co., the marketing and sales operation, and the planning, development, and disposition of the balance of the project. The project would operate on a team basis, with a team member responsible for each critical function: development; sales and marketing; brokerage; Club operations, and finance. As an integral part of this overall organization, we would hope that you would continue to have primary responsibility for development. Your understanding of the project and the various land use laws and regulations in Florida are extremely valuable, as are your contacts. You would also be an important team member and contributor to the planning initiatives and the product mix decision-making.

300 Crescent Court
Suite 300
Dallas, Texas 75201
Phone 214 756 6550
Fax 214 756 6599

EVANS

EXHIBIT NO. 12
3-28-00
F. FABRICIUS

EVANS 05154

I understand that this effort would consume a significant amount of your time and resources and I want to make sure that you are adequately compensated and have appropriate incentives in such regard. I would expect that you would be paid a monthly fee, plus out-of-pocket expenses, and would have a "profits" interest in the overall transaction, after repayment of debt, return of all invested equity and a preferential return on such equity. I would appreciate it if you would give some thought to this and give me some feedback as soon as possible. I think it would be beneficial if we knew what direction we are heading before we sign a contract with ITT.

Thank you again for your time and consideration.

Very truly yours,

Paul E. Rowsey, III

EVANS 05155

# Exhibit
# B

# MANAGEMENT, DEVELOPMENT AND MARKETING AGREEMENT

By and Between

## LOCHMERE DEVELOPMENT GROUP, INC.,
a Florida corporation

and

## H D ASSOCIATES, L.P.,
a Delaware Limited Partnership

Dated: June _____, 1999

A:\HOASSOC.WPD
June 1, 1999



DEPOSITION EXHIBIT
7

EC0396

## TABLE OF CONTENTS

Page

RECITALS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
1.  DUTIES OF MANAGER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
2.  DUTIES OF OWNER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
3.  MATTERS REQUIRING THE APPROVAL OR DIRECTION OF OWNER. . . 3
4.  MANAGER'S GENERAL AUTHORITY TO ACT . . . . . . . . . . . . . . . . . . . . . 4
5.  OPERATING ACCOUNT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
6.  CONSTRUCTION DRAWS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
7.  TAXES AND ASSESSMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
8.  LIENS AND ENCUMBRANCES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
9.  INSURANCE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
10.  MARKETING. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
11.  MANAGER'S OVERHEAD AND OTHER COSTS, FEES AND EXPENSES.
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
12.  BUDGETS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
13.  REPORTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
14.  RIGHT TO INSPECT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
15.  TERM OF AGREEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16.  OWNER'S RIGHT TO TERMINATION . . . . . . . . . . . . . . . . . . . . . . . . . . 13
17.  MANAGER'S RIGHT TO TERMINATE. . . . . . . . . . . . . . . . . . . . . . . . . . . 14
19.  ASSIGNMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
20.  MISCELLANEOUS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Exhibit "A"   Legal Description of the Development
Exhibit "B"   Master Site Plan Showing, Lots and general layout of the Development
Exhibit "C"   Master Development Budget
Exhibit "D"   Profit Participation Agreement

A \HDASSOC WPD
June 1 1999

i

E00397

# MANAGEMENT, DEVELOPMENT AND MARKETING AGREEMENT

This Management, Development and Marketing Agreement is made and entered into this _____ day of June, 1999, by and between **LOCHMERE DEVELOPMENT GROUP, INC.,** a Florida corporation, whose address is 2701 North Rocky Point Drive, Suite 1070, Tampa, Florida 33607 ("**Manager**"), and **H D ASSOCIATES, L.P.,** a Delaware Limited Partnership, whose address is 8235 Douglas Avenue, Suite 770, Dallas, Texas 75225 ("**Owner**").

## RECITALS

Whereas, Owner is the owner of that real property more particularly described on **Exhibit "A"** hereto consisting of tracts of approximately _____ acres of undeveloped land and _____ developed lots located in Palm Coast, Florida (the "**Development**"); and

Whereas, Manager has in its employ individuals who are acquainted with the Development who have the expertise and ability to manage, develop and market the Development, Manager is willing to perform such services on certain terms and conditions, and Owner desires to retain the services of Manager to manage, develop and market the Development.

NOW THEREFORE, in consideration of the mutual covenants set forth herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto state, covenant and agree as follows:

## AGREEMENT

## 1 . DUTIES OF MANAGER.

Subject to directions to be given by Owner from time to time as described herein, Manager agrees to undertake and perform the following services respecting the management, development and marketing of the Development during the term of this Agreement on behalf of Owner:

**1.1**     Manager shall manage, maintain, administer, supervise and prepare the Development for marketing in accordance with plans and specifications (the "**Plans**") to be approved by Owner prior to the commencement of such work, such approval not to be unreasonably withheld (substantial changes made to the plans and specifications after the issuance of Owners approval shall be resubmitted to Owner for approval, but minor, nonstructural changes which do not affect the value of such Development and can be completed within the budgets approved by Owner and attached as **Exhibit "C"** hereto (collectively, the "**Master Development Budget**") may be approved by Manager as the project manager without resubmittal to Owner).

**1.2**     Once the Development or a portion of the Development has been sold to third party purchasers, Manager shall enforce applicable contracts to require contractors to perform all warranty work required under the terms of said contracts of the Development. To the extent that Owner has rights against contractors, subcontractors or materialmen who have performed the work or supplied

A \HDASSOC WPD
June 1 1999

1

E00398

the materials to which any such warranty relates, Owner assigns those rights to Manager so Manager can enforce.

1.3    Manager shall supervise the completion of the on-site and off-site improvements necessary to complete the Development as fully developed lots, ready for building by Owner or for marketing to third party builders (the "Site Improvements"). Such Site improvements shall be completed in accordance with the Plans.

1.4    Manager shall obtain all permits, licenses and other municipal or governmental approvals from time to time necessary or required in connection with the construction activities described in Paragraphs 1.1 through 1.3 above and any other permits, licenses and other municipal or governmental approvals from time to time necessary or required incident to the management and operation of the Development.

1.5    Manager shall maintain the Development, common areas and streets owned by Owner in the Development from time to time and shall provide security for such areas. The level of maintenance and security to be provided by Manager with respect to such property shall be determined by Owner in consultation with Manager from time to time and shall be implemented by Manager in accordance with Owners directions.

1.6    Manager shall maintain appropriate insurance coverage with respect to all properties included in the Development in accordance with the insurance requirements set forth in Section 9 below. The coverages to be supplied shall conform to such insurance requirements and any supplemental instructions received by Manager in writing from time to time from Owner.

1.7    Manager shall monitor and cause to be paid in a timely fashion, prior to the imposition of any penalty or interest, all taxes and assessments from time to time accruing with respect to the properties included in the Development or any part thereof.

1.8    Manager shall maintain books and records respecting the management, development, and marketing of the Development and shall provide Owner with periodic reports respecting same, all as more particularly set forth in Section 13 below.

## 2.    DUTIES OF OWNER.

2.1    Owner agrees to fund amounts as necessary to accomplish the purposes of this Agreement in accordance with its terms, including but not limited to, funding (a) the acquisition of the Development in accordance with the terms, conditions and provisions of that Sale Agreement dated as of May _____, 1999, by and between ITT Community Development Corporation ("Seller") and H D Associates, L.P. ("Purchaser"); (b) the Master Development Budget; and (c) the Operating Account (as such term is defined below); and (d) the General Marketing Plan; and the Profits Participation Agreement attached hereto as Exhibit "D".

2.2    Owner agrees to review and approve or to specifically object to all matters requiring its consent and approval in a timely fashion and to otherwise cooperate with and direct Manager with

A \HDASSOC WPD
June 1 1999                                2

E00300

respect to the management, development and marketing of the various properties included in the Development as contemplated by this Agreement. For purposes of this Agreement, unless otherwise stated for a particular matter, Owner's timely consent and approval shall mean within five (5) business days after requested in writing by Manager. If Owner does not respond within said period, Owner shall be deemed to have approved Manager's request.

3.    MATTERS REQUIRING THE APPROVAL OR DIRECTION OF OWNER.

Owner as the owner of the Development has reserved the right to make decisions and to issue approvals as follows:

3.1    Each contract for services, construction contract or contract for materials or equipment involving a contract price or stated obligation in excess of the lesser of (a) $25,000.00 or (b) the amount specified for such contract in the Budget to be entered into by Manager on behalf of Owner for the benefit of the Development or any part thereof or otherwise pursuant to the performance of Managers duties hereunder shall first be submitted to Owner for its consent and written approval. Additionally, all contracts to be entered into by and between Manager and any Affiliated Entity (as such term is defined below) regardless of the contract price or the stated obligation, must first be disclosed to Owner in a writing which fully sets forth the relationship between Manager and the Affiliated Entity. All such contracts shall be subject to Owner's prior written approval, which approval may be granted or withheld in Owner's sole discretion. For the purposes of this provision, an Affiliated Entity shall mean (I) a person or entity that is controlled by or under common control with Manager or Robert Evans, (ii) a person within the third degree of kindred with Robert Evans, (iii) an entity controlled by one or more of Robert Evans or person(s) within the third degree of kindred with Robert Evans, (iv) any officer, director, employee, shareholder or partner of an entity described in clauses (I) or (iii) above, (v) any entity controlled by a party described in clause (iv) above, and (vi) any entity in which Robert Evans or a person within the third degree of kindred with Robert Evans is an officer, director, employee, shareholder, partner or profit participant.

3.3    Any contract with a contract price or stated obligation in excess of $25,000 or with an Affiliated Entity shall be put out to bid and the results of such bidding be reported to Owner prior to requesting Owners approval. If a contract is put out to bid and Manager recommends the acceptance by Owner of other than the lowest bidder, Manager shall indicate in writing its reasons for such recommendation.

3.4    Manager's submission of contracts for Owner's approval shall be in writing setting forth the services and/or materials and/or equipment to be rendered and/or obtained; the Development, the Unit or area to be benefited by such services, material or equipment; the contract amount, the term of such contract; and any other terms, conditions or provisions of such proposed contract or agreement which would reasonably be material to a determination of Owner respecting same.

3.5    If the contract or agreement is to be in writing, a copy of the proposed form of contract or agreement shall be submitted to Owner together with such request for approval. Owner

E00400

shall respond to any such written request for approval of the contract within five (5) business days and shall either consent thereto or state its objections with specificity in writing. Failure to respond to a request for approval .of a contract within the applicable time frame shall (I) be deemed an approval of the recommendation of Manager contained in such request if the contract is for work contemplated by an approved Budget and is within the amount designated for such work in such approved Budget and will not reasonably require more than 180 days within which to complete such work; or (ii) deemed a disapproval if the contract does not fall within the parameters of clause 3.5(1) immediately preceding. If within the approval period Owner requests further information respecting the matter under consideration, Manager shall endeavor to deliver such additional information as quickly as possible and the submittal of additional or further information shall commence the running of an additional approval period of the same duration as the original.

3.6    Sales and marketing decisions shall be made by Owner to the extent reserved to Owner pursuant to the terms, conditions and provisions of Section 10 below.

3.7    Owner shall have the right to review and approve all initial contracts of insurance respecting the Development or any part thereof required pursuant to Section 9 below prior to such contracts being bound. Manager shall submit proposals for such insurance to Owner for its review and approval together with Manager's recommendation respecting same, but Owner shall have the right to accept same or to propose alternative coverage. Manager may renew existing coverage with existing companies without a further approval from Owner but Owner may, at its discretion, require the cancellation of one policy and the substitution of another at any time or from time to time.

3.8    Owner has approved the layout and utilization of the Development reflected on the Master Site Plan set forth as **Exhibit "B"** hereto. Prior to Manager implementing any significant change of the design, layout or utilization contemplated by **Exhibit "B"** hereto or requiring approvals or consents are required from any governmental authority or entity, Manager shall first submit its written proposal for a modification to such design and layout to Owner and shall not proceed with the implementation of same without the written concurrence of Owner, such concurrence to be in Owners sole and absolute discretion. Minor deviations from the approved layout which do not affect the number of lots or the general location, utilization or value thereof shall not require the consent of Owner.

## 4.    MANAGER'S GENERAL AUTHORITY TO ACT

4.1    Subject to the specific matters reserved to Owner in Section 3 above, Owner hereby appoints Manager as its agent for purposes of implementing this Agreement and Manager shall be and is hereby empowered to manage the day to day operations of the Development and marketing of the Development on behalf of and for the benefit of Owner. Manager shall act from time to time hereunder either in its own name or in its name as agent of Owner, as appropriate. To the extent that Manager may require written limited powers-of-attorney or written agency agreements from time to time to satisfy third parties with whom it is dealing, Owner shall supply such documents and instruments as may be reasonably required by Manager to perform its duties and obligations hereunder in a timely manner.

E00401

4.2     Subject to the constraints set forth in Paragraph 3.8 above. Manager is specifically authorized to obtain building permits. licenses and such other governmental approvals and consents as may be required from time to time to complete the Development, and the Site Improvements. Subject to the budget constraints set forth in Section 6 below and the provisions of Paragraphs 3. 1, Owner hereby authorizes Manager to enter into contracts for the labor, materials and services required in connection with the completion of the Development and the Site Improvements and the operation, marketing and maintenance of the Development with such contractors and on such terms as Manager deems appropriate.

4.3     During the term of this Agreement. Manager has no authority to enter into or bind Owner to enter into any sale or conveyance with respect to all or any portion of the Development unless owner consents in writing to such sale or conveyance.

4.4     Nothing contained in this Agreement or in the relationship of Owner and Manager shall be deemed to constitute a partnership, joint venture or any other relationship other than that of contract parties hereunder and, while Owner shall have certain payment obligations to Manger hereunder which are determined by reference to the economic performance of the Property, nothing herein shall constitute Manager as having any equity or partnership interest in the Property, directly, or indirectly. Owner shall be entitled to expense all payments to Manager hereunder and Manager shall not report any such payments as distributions from a partnership or other joint venture. Manager shall not be obligated to make any capital contributions or other out-of-pocket payments to fund any capital expenditures or Negative Cash Flow for the Property.

4.5     Except as otherwise specifically stated, nothing herein shall be construed as vesting in Manager any control rights or voting or approval rights whatsoever in or to the operation, financing and disposition of the Property or any portion thereof and all decisions concerning the Property or any portion thereof shall be made solely by Owner or its designee from time to time. Owner may sell, finance or refinance the Property or any part thereof in any manner whatsoever from time to time and shall have the right to mortgage, pledge or otherwise encumber the Property or any portion thereof from time to time in connection with any or all of such financings or refinancings or otherwise. Manager agrees to execute any document reasonably requested by Owner from time to time to confirm the provisions of this paragraph.

## 5.     OPERATING ACCOUNT.

5.1     Owner shall establish at First Union National Bank ("Bank") an account or line of credit against which Manager will be authorized to write checks to pay all costs, fees, and expenses which Manager is authorized or obligated to incur and pay under the terms of this Agreement with respect to the management, development and marketing of the Development (hereinafter the "Operating Account"). Owner shall initially fund or cause to be funded the Operating Account with an amount of not less than $25,000.00 (the "Operating Balance"). On the ten (10th) day of each month Manager shall notify Owner of the amount which Owner is required to fund into the Operating Account to bring the amount then available to Manager in the Operating Account back up to the Operating Balance. and Owner shall cause such amount to be deposited into the Operating Account within five (5) business days of the receipt of such notice. In the event that Manager from

E00-02

time to time anticipates the need to write checks that would be in excess of the Operating Balance or the amounts then available in the Operating Account, Manager shall notify Owner and Owner shall by electronic transfer or otherwise cause the amount required to cover such large item checks to be deposited in the Operating Account not later than the business day prior to the date Manager anticipates the need to write such check(s). From time to time when the amount available to Manager in the Operating Account falls below $5,000.00 (the "**Minimum Balance**") Manager may notify Owner who shall within five (5) business days of the receipt of such notice cause an amount to be deposited in the Operating Account to bring the balance back up to the Operating Balance. Owner in its sole and absolute discretion may adjust the Operating Balance and the Minimum Balance as Owner shall determine reasonable from time to time to accommodate the demands for funds for Manager to perform its duties and obligations hereunder. The Operating Account shall belong to Owner, and Manager shall have no right, title or interest therein except for the ability to write checks thereon as Owner's agent for the purposes hereof. Dual statements on the Operating Account shall be provided monthly to Manager and Owner.

     **5.2** Checks drawn upon the Operating Account that are in the amount of $10,000.00 or less may be signed by an authorized representative of Manager from time to time without any countersignature from Owner or any other agent of Owner. Any checks drawn upon the Operating Account that are in excess of $10,000.00 (the "**Authorized Amount**") shall require the prior approval of David A. Lane or such other representative as Owner shall designate to Manager in writing. Any check drawn on the Operating Account for any amount in excess of the Authorized Amount shall require the signature of two parties, one of whom shall be Manager's representative and the other of whom shall be a designated agent of Owner not employed or affiliated with Manager; to implement such control, all checks prepared for the Operating Account shall have printed thereon the following legend: "**All checks for amounts in excess of $10,000.00 require two (2) signatures.**" Owner shall be entitled to increase the Authorized Amount at its sole and absolute discretion from time to time by written notice to Manager and the account officer of Bank handling the Operating Account.

## 6.    <u>CONSTRUCTION DRAWS.</u>

     **6.1** "**Manager's Certification**" as such term is used in Paragraphs 6.1 and 6.2 shall mean a certification signed by an authorized officer or representative of Manager to the effect that: (I) all work for which a draw against the respective budget is requested has been performed and incorporated into the Development as indicated; (ii) all materials which are covered by such draw request have either been incorporated into the improvements being constructed or are suitably stored on the Development; (iii) the amount requested represents the actual amount then due and payable to contractors, subcontractors or materialmen under the terms of their respective contracts or for Manager's supervision in accordance with Paragraph 11.2 below and does not include any amounts which Manager is entitled to hold back from contractors or subcontractors pending completion; (iv) that all amounts previously disbursed by Owner with respect to the Development have been disbursed to the contractors, subcontractors, laborer's and materialmen's to whom such amounts were due and payable and valid lien waivers have been obtained from such parties with respect to all amounts previously drawn by Manager; and (v) to the best of Manager's knowledge, no labor or materialmen's liens have been filed with respect to the work respecting such project which have not

A \HDASSOC WPD
June 1 1999

E00403

been theretofore fully paid and released.

6.2    Provided Manager has observed the approval process set forth in Paragraph 3.1 above and within the amounts designated for the particular work, materials or equipment in the Budget approved by Owner from time to time. upon receipt of a draw request together with Manager's Certification relating thereto. Owner shall fund the amount requested (or shall give notice to Manager that it may use amounts then on deposit in the Operating Account for such purposes to the extent adequate funds are then held in such account) within five (5) business days of receipt of same against the respective Budget for such work unless Owner desires further information respecting all or some part of the amounts requested or unless Owner desires to verify Manager's Certification by an independent inspection of the work. If Owner desires to verify Manager's Certification through an independent inspection, Owner shall be entitled to conduct such inspection using its own personnel or through agents hired by Owner at it sole cost and expense. If an independent inspection is desired, it shall be completed in any event within five (5) business days from Owners receipt of a draw request. In all events, Owner shall fund the draw request by deposit into the Operating Account of the amount thereof within five (5) business days of receipt of the draw request together with Manager's Certification unless Owner shall have noted a problem with such request and given Manager written notice thereof with an indication of the action required to cure same. In the event of any discrepancy or problem that Manager is given written notice of, Owner shall fund the amount requested upon Manager's resolution of the discrepancy or problem to the reasonable satisfaction of Owner. Manager shall make draws against the Master Development Budget which shall be funded by Owner into the Operating Account upon Manager's Certification.

7.    TAXES AND ASSESSMENTS.

7.1    Manager shall be the party designated by Owner to receive all notices of real property taxes and assessments and shall notify Owner of such tax liabilities not later than thirty (30) days prior to the delinquency of any such taxes or assessments. If Manager anticipates that the amounts on deposit in the Operating Account will be insufficient to pay such taxes or assessment as of the date ten (10) business days prior to the date on which any penalty, interest or fine will be imposed on Owner for the non-payment thereof, then Manager shall notify Owner of the amount and date by which additional funds must be deposited in the Operating Account to enable Manager to pay such tax or assessment prior to its delinquency. If Manager has requested that Owner deposit additional funds in the Operating Account to enable Manager to pay such tax or assessment, then, at least five (5) business days prior to the delinquency of any such taxes and assessments, Owner shall deposit into the Operating Account the amount requested by Manager incident to the payment of such taxes and shall notify Manager in writing to pay such taxes immediately. Upon receipt of such notice and the deposit of the requested amount. Manager shall pay such taxes or assessments and shall supply Owner with written confirmation of such payments.

7.2    Owner in its sole and absolute discretion shall have the right to contest or challenge (or to direct Manager to contest or challenge at Owner's expense) any tax or assessment or any other lien or imposition which it deems to be inappropriate provided that such contest or challenge is conducted in a manner that does not jeopardize Owner's title to the subject property and does not unreasonably delay or hinder the development or marketing of the Development. Manager shall

notify Owner of any tax, assessment or valuation that Manager in good faith believes to be inappropriate based upon information available to Manager. Upon direction from Owner. Manager shall contest or challenge the validity or amount of any tax, assessment, charge or encumbrance in the manner provided by law at the cost and expense of Owner. Upon the final determination of any such contest or challenge, Manager shall promptly pay for Owner's account all sums determined to be due as hereinabove provided.

8.    **LIENS AND ENCUMBRANCES.**

    **8.1**    Manager shall immediately notify Owner of any labor or materialmen's liens or any other encumbrances which it receives notice of or which it otherwise becomes aware of respecting all or any part of the Development together with Manager's recommendation for resolving such matter. Upon instruction from Owner, Manager shall pursue at Owners cost and expense the course directed by Owner to resolve and remove any such lien at Owner's expense.

    **8.2**    Owner in its sole and absolute discretion shall have the right to contest or challenge (or to direct Manager to contest or challenge at Owners expense) any lien, charge, assessment, or other encumbrance which affects all or any part of the Development and Manager, at Owner's expense, shall assist and support Owner in such contest or challenge as Owner may direct from time to time, provided that such contest or challenge is conducted in a manner that does not jeopardize Owner's title to the subject property and does not unreasonably delay or hinder the development or marketing of the Development or any part thereof.

    **8.3**    Manager shall promptly notify Owner of any material disputes with contractors, vendors, materialmen or suppliers from time to time and shall exert all reasonable efforts to give such notice in any event prior to the filing of any liens against all or any portion of the property which is the subject of this Agreement. For purposes of the foregoing sentence, a dispute of $25,000.00 or more shall be deemed material.

9.    **INSURANCE.**

    **9.1**    Manager shall secure and maintain policies of fire and extended coverage insurance on the insurable improvements from time to time located on the Development owned by Owner in an amount not less than the full insurable value of such improvements, on a replacement-cost basis. and, shall also secure and maintain policies of insurance in amounts required by Owner covering vandalism and malicious mischief, sprinkler leakage, flood damage, and any other risks which Owner directs Manager to cover from time to time with insurance. All such policies shall contain standard beneficiary clauses making losses payable to Owner and/or such additional insured and loss payees as Owner may from time to time direct. Manager shall also secure and maintain comprehensive public liability insurance in amounts required by Owner and containing endorsements naming Owner and Manager as insured, and such additional insured and loss payees as Owner may from time to time direct. All insurance policies shall be with companies (and through insurance agents and/or brokers) from time to time approved by Owner, shall provide that both Manager and Owner are to receive thirty (30) days notice prior to cancellation and shall otherwise be in form and substance satisfactory to Owner and Manager. Original policies of insurance shall be delivered to

A.\HOASSOC.WPD
June 1 1999

8

E00405

Manager with certified copies thereof to Owner; renewal policies shall be delivered to Manager with certified copies thereof to Owner thirty (30) days before the expiration of the then-existing policies with satisfactory proof that the premiums for renewal have been paid. Owner reserves the right to designate all insurers and agents through whom the insurance coverage contemplated hereby is obtained.

9.2     In the event of a loss or casualty on or to the Property, Manager shall give immediate notice to Owner, and Manager shall make proof of loss to the insurer. Each insurance company is hereby authorized and directed to make payment for loss directly to Owner, and Owner may apply all or any part of such insurance proceeds to the restoration or repair of the improvements destroyed or for any other purpose which Owner deems appropriate. Upon the sale of any portion of the Development, Manager shall promptly notify the insurance carrier and cancel any coverages no longer required as a consequence of such sales.

9.3     If the insurance proceeds are at Owner's election to be used for the restoration and repair of the improvements located on the Development which were damaged or destroyed, they shall be held by Owner in an account selected by Owner in its sole and absolute discretion (the "Restoration Account"). Manager, at Owner's expense, shall promptly prepare and submit to Owner all plans and specifications necessary for the restoration and repair of the damaged improvements, together with Managers cost estimate of the required restoration or repair. Upon Owner's direction, Manager shall either enter into a fixed price contract with a reputable builder for such restoration or repair (subject to the limitations on contracts set forth in Paragraph 3.1 above) or shall proceed to hire subcontractors and complete such work with Manager supervising such work as the project manager. If Manager completes the work with subcontractors acting under Manager's direction as the project manager, Manager shall be entitled to compensation in accordance with Paragraph 11.2 below. The plans and specifications and all other aspects of the proposed restoration and repair shall be subject to Owner's approval. In the event the insurance proceeds held in the Restoration Account are insufficient to complete the restoration and repair, Owner shall fund the amount equal to the difference between the amount then held in the Restoration Account and the amount .required to complete the restoration and repair after depletion of the amounts in the Restoration Account. Manager shall commence restoration and repair of the damaged improvements only when authorized in writing by Owner to do so and thereafter shall proceed diligently with the restoration and repair until completed. Disbursements shall be made from the Restoration Account for the restoration and repair in accordance with the same procedure utilized for disbursements for construction of the Development set forth in Paragraphs 6.1 and 6.2 above. In the event the amounts held in the Restoration Account exceed the cost of the restoration and repair of the damaged improvements, including any construction supervision fee paid to Manager or its affiliate, the excess funds shall be disbursed to Owner.

## 10.   MARKETING.

10.1    Manager and Owner shall prepare and agree upon the general marketing plan (such general marketing plan as hereafter amended from time to time being hereinafter referred to as the "General Marketing Plan") and Manager shall proceed with marketing the Development as outlined in the General Marketing Plan. Without excluding other issues which the parties hereto

E00406

may determine to cover in the General Marketing Plan in effect under the terms hereof from time to time, it is agreed hereto that the General Marketing Plan shall address the following issues:

(a)    The minimum cash purchase prices to be solicited by Manager with respect to each component of the Development to be offered;

(b)    The advertising and promotional materials that Manager is authorized to develop and utilize pursuant to the Budget;

(c)    The location and design of a sales office/reception center on the Property; and

(d)    The services to be provided by Manager and by Owner's exclusive sales agent for the Property, Lochmere Realty, Inc. ("**Broker**"), and the sales staff to be employed to market the Property. Pursuant to Owner's agreement with Broker, Owner shall not be obligated to pay sales commissions in excess of seven (7) percent of the purchase price for the Property or any portion thereof.

10.2    Owner shall have the ability to modify or amend the General Marketing Plan at any time and from time to time, subject to the other terms and conditions of this Agreement and after consultation with Manager, although Manager's approval shall not be required to any such modifications. Upon any such modification or amendment to the General Marketing Plan, Owner shall immediately notify Manager and Manager shall implement such modified or amended General Marketing Plan as Owner's agent. Manager shall recommend to Owner changes from time to time it deems appropriate to the General Marketing Plan and, Owner shall consider same in good faith and respond thereto, although Owner shall retain the ultimate discretion respecting the General Marketing Plan. Manager shall have responsibility and authority to carry out the General Marketing Plan and shall charge all costs, fees and expenses incurred by it in accordance with the Budget and incident to the implementation of the General Marketing Plan to the Operating Account.

10.3    Owner shall execute and deliver to Manager a limited power-of-attorney in form and content satisfactory to Manager and the title company and its agent as selected by Manager to close such sales as escrow agent(s) granting Manager the authority, as attorney-in-fact for Owner, to sign all purchase contracts, agreements of sale, and special warranty deeds, affidavits of value, affidavits regarding seller's non-foreign status, and any and all other documents reasonably required to consummate a sale of a portion of the Development. All such sales closed by Manager as attorney-in-fact for Owner shall be consummated on forms of documents previously approved by Owner without substantial modification or deviation from the standard terms set forth therein and any contracts, agreements of sale, deeds, affidavits or other documents containing substantial deviations from the standard forms approved by Owner shall first be submitted to and approved by Owner. Copies of any documents executed by Manager pursuant to the aforesaid power of attorney shall be delivered to Owner promptly following the execution and delivery of same.

10.4    Once Owner has determined whether to accept or reject any proposal respecting the sale of all or any part of the properties included in the Development that requires its consent and approval, its decision respecting such proposal shall be communicated to Manager in writing and

E00407

Manager shall proceed to use its best efforts to conclude the sale in the manner directed by Owner. Any material deviation from the terms and conditions of any sale proposal approved by Owner shall first be resubmitted to Owner for its concurrence.

10.5     All net sales proceeds from the sale of all or any part of the properties included in the Development shall be forwarded directly by the escrow agent handling any such closing directly to an account designated by Owner; Manager shall have no interest or authority with respect to such account.  The escrow agent closing each sale shall be directed by Manager to deliver to Owner a copy of the final escrow accounting and, to the extent that Owner shall have previously authorized same, any and all original documents and instruments representing carry-back financing received in any such sale.

10.6.     The provisions of this Section 10 are subject to the provisions of Section 4.3 above.

## 11. MANAGER'S OVERHEAD AND OTHER COSTS, FEES AND EXPENSES.

11. 1     To the extent not covered by checks drawn on the Operating Account, Owner shall reimburse Manager for all costs, fees and expenses paid by Manager in accordance with the Master Development Budget and other agreements approved by Owner and Budget to third parties in Manager's performance of its various duties and obligations hereunder.

11.2     To compensate Manager for its supervision of operations as required herein to complete the Site Improvements as described in **Exhibit "C"** attached hereto, Owner shall pay to Manager a monthly fee, in arrears, in an amount equal to $12,000.00.  Additionally, Owner shall reimburse Manager for all direct expenses incurred in connection with the Development and in accordance with the Master Development Budget as may be required from time to time, including but not limited to; employees, insurance , benefits, administrative overhead, travel, lodging and car rental.   Such expense categories and amounts shall be pre-approved by Owner, and any such expenses incurred by Manager, which have not been pre-approved by Owner, then such expenses shall not be reimbursed by Owner.  Commencement of management and development duties shall be deemed effective as of June _____, 1999. Owner shall pay or fund through the Operating Account all general and administrative expenses incurred in connection with the Development as more fully described in detail in the Master Development Budget (defined in section 12.1 hereto).

11.3     Manager shall pay the costs, fees and expenses contemplated by this Agreement by writing checks on the Operating Account as and when such amounts become due and payable. Manager shall submit not later than the tenth (10th) calendar day of each month an accounting of all such costs, fees and expenses.  If there are any expenditures for which Owner desires further information, it shall be entitled to request such further information and Manager shall endeavor to promptly respond to any such inquires.

11.4     Owner hereby agrees to pay Manager the sum equal to one percent (1%) of the Purchase Price of the Property in consideration for the due diligence investigation and other work performed by Lochmere for the benefit of the Owner in negotiating the purchase agreement and ultimate acquisition of the Property for the period occurring prior to the Closing of the subject

A \HDASSOC WPD
June 1, 1999                             11

E0C408

Property by Owner. Owner shall pay Manager the above referenced sum only if, as and when Owner closes on the purchase of the Property.

## 12. BUDGETS.

**12.1** Attached hereto within **Exhibit "C** are construction budgets setting forth Manager's best estimation of the costs, fees and expenses that will be required (i) to complete the Development (the **"Development Budget"**); and (ii) complete the Site Improvements and prepare the balance of the Lots for marketing (the **"Site Improvements Budget"**) (the Development Budget and the Site Improvements Budget being hereinafter individually and collectively referred to as the **"Master Development Budget"**). Owner hereby acknowledges that it has reviewed the proposed Master Development Budget and, subject to its right to review and adjust such Master Development Budget quarterly as set forth in Paragraph 12.2 below, concurs with same, and agrees to fund the costs, fees and expenses anticipated thereby as the construction of such projects progresses as set forth in Section 6 above. In the event that Manager encounters situations or circumstances that will increase the total cost reflected on a particular Budget beyond the amount allocated for such purpose, Manager shall promptly notify Owner of such anticipated cost over-run as soon as it is discovered and shall request in writing that the respective Master Development Budget be adjusted to cover the additional cost. Project cost over-runs of less than five percent (5%) of the total Master Development Budget for the project indicated shall not require approval of Owner and shall be funded by Owner. Manager shall have the ability to adjust line items in the Master Development Budget to offset a cost savings against a cost over-run within such Master Development Budget. In the event of a cost over-run in excess of five percent (5%) or more of the total approved Master Development Budget for a project, Manager shall promptly submit in writing such explanations and other evidence as may be appropriate to explain and justify the additional costs, and Owner shall promptly respond thereto, either approving such modification to the particular Master Development Budget or requesting additional information or directing that Manager take other direction reasonably calculated to avoid the cost overrun. Without limitation on the foregoing, but in addition thereto, in no event shall Manager incur an expense for any particular line item within the Master Development Budget which is greater than 120% of the amount budgeted for such line item, without the prior written consent of Owner.

**12.2** Notwithstanding Owner's approval of the Master Development Budget and as set forth above, Owner retains the right to review and modify the Master Development Budget, in its sole discretion, once each calendar quarter. However, prior to Owner modifying the Master Development Budget, it shall first consult with Manager, either in a meeting or by telephone and shall request Managers input with respect to any proposed modification but Owner retains ultimate discretion with respect to such Budgets and shall have the right to modify or amend the Master Development Budget not more often than once each calendar quarter by either increasing or decreasing the amounts thereof in its sole and absolute discretion, except as to fees and categories of funds payable or reimbursable to Manager. Once Owner has given written notice to Manager of the modification or amendment to a particular budget, such budget as amended shall be deemed to be the revised Master Development Budget for all purposes.

## 13. REPORTS.

A \HDASSOC WPD
June 1, 1999                                            12

E0040⁰

13.1     Monthly, not later than the tenth day of the following month, Manager shall submit in writing (i) a financial report to Owner setting forth all income, whether from the proceeds of sales, rentals or otherwise, and setting forth all costs, fees and expenses incurred during the previous calendar month; (ii) a marketing report setting forth all contracts entered into, the other party to the contract, the total purchase price, the amount of any down payment or earnest money deposited, and the anticipated date of closing as well as a report of all closings, the name of the party to such closing, the net-sales proceeds and enclosing a copy of the final settlement sheet; and (iii) a construction report with respect to each of the construction projects then in progress to report the work completed, the costs incurred and the amount of any anticipated costs to complete. Upon review of the monthly reports, Owner shall be entitled to request any further information or detail that it requires for its purposes and Manager shall endeavor to promptly supply same. Owner shall also receive on a monthly basis copies of all bank statements on the Operating Account.

## 14. RIGHT TO INSPECT.

14.1     Owner shall have the right to inspect the Development from time to time and at any time that it may elect subject only to reasonable safety precautions which Manager may impose with respect to inspection of construction projects. Owner shall also have the right to inspect the books and records of Manager relating to the Development and Manager's performance of the Agreement from time to time. To the extent that Owner desires to copy books and records or other information in the files of Manager relating to any aspect of the Development or Manager's performance hereunder it may do so during normal business hours.

## 15. TERM OF AGREEMENT.

15.1     This agreement shall be for a four (4) year term unless sooner terminated in accordance with the provisions hereof (the "Initial Term"). At any time on or after that date which is ninety (90) days prior to the expiration of the Initial Term, either Owner or Manager shall have the right, with or without cause, to terminate this Agreement, to be effective upon the expiration of the Initial Term, upon not less than thirty (30) days prior written notice and no termination fee or other penalty or termination payment shall be due or payable in connection with any such termination.

15.2     In the event this Agreement shall not have been terminated at the expiration of the Initial Term pursuant to the preceding sentence or pursuant to any other term or provision of this Agreement, then this Agreement shall be automatically renewed for additional, successive one year terms, subject to termination during each annual extension in the same manner as provided for with regard to the Initial Term. Thus, if not sooner terminated, this Agreement shall automatically expire upon the final disposition of the entire Development and shall terminate as to each portion of the Development, as the same is sold and conveyed to the purchaser thereof, except that Owner's obligation to pay or reimburse Manager as described herein shall survive any such termination or expiration.

## 16. OWNER'S RIGHT TO TERMINATION

E00410

**16.1**    Owner shall have the right to terminate this Agreement without payment of any penalty or termination payment immediately upon the final disposition of all lots and/or parcels included within the Development to third party purchasers by the giving of written notice to Manager of such event.  Owner shall also have the right to terminate this Agreement without payment of any penalty or termination payment immediately upon Manager's receipt of the initial payment incident to either Manager or Owner exercising its right to require a buy-out of Manager under the terms of the buy-sell provision of the Profits Participation Agreement by the giving of written notice to Manager of such event.

**16.2**    Owner shall have the right to terminate this Agreement for cause without payment of any penalty or termination payment upon the occurrence of any one or more of the following:

(a)    Failure of Manager to perform any one or more of its duties or obligations under the terms, conditions and provisions of this Agreement which manager fails to cure within thirty (30) days after receipt of written notice from Owner;

(b)    The filing by Manager (or against Manager to which Manager acquiesces or to which Manager does not acquiesce but that is not dismissed within sixty (60) days after the filing thereof of any proceeding under the federal bankruptcy laws now or hereafter existing or any other similar statute now or hereafter in effect; the entry of an order for relief under such laws with respect to Manager; or the appointment of a receiver, trustee, custodian or conservator of all or any part of the assets of Manager.

(c)    The insolvency of Manager; or the execution by Manager of an assignment for the benefit of creditors; or the convening by Manager of a meeting of its creditors, or any class thereof, for purposes of effecting a moratorium upon or extension or composition of its debts; or the failure of Manager to pay its debts as they mature; or if Manager is generally not paying its debts as they mature.

(d)    The death or incapacity of Robert Evans unless within forty-five (45) days after such occurrence, Manager retains the services of another person whose background and experience in the management and development of similar types of properties is satisfactory to Owner in Owner's sole and absolute discretion.

(e)    Failure of Robert Evans to personally control the operations of Manager contemplated hereby.

(f)    The commission by Manager of any act constituting fraud, embezzlement or misappropriation of Owner's funds or any act or omission by Manager or by any of its agents or employees constituting gross negligence or willful misconduct.

**16.3**    At the request of Owner (but subject to Manager's rights to participate in the financing as provided in the Profits Participation Agreement which are not waived or diminished in any fashion by the provisions of this Paragraph 16.3), Manager shall execute and deliver such subordinations and other documents and instruments as may be reasonably required from time to

E00411

time to subordinate its rights. title and interest under this Agreement to the rights of any lender making a loan to Owner secured by all or any part of the Development which remains subject to the terms of this Agreement at the time such loan is closed. In addition, upon request of Owner, Manager agrees to execute and deliver such further confirmations, documents and instruments as Owner may request from time to time to evidence termination of this Agreement as to portions of the Development sold or disposed of from time to time.

## 17. MANAGER'S RIGHT TO TERMINATE.

**17.1**    Manager shall have the right to terminate this Agreement for cause in the event of Owner's failure to perform any of its duties and obligations hereunder, including without limitation, failure to make any one or more of the payments that it is required to make under the terms and provisions of this Agreement. Notwithstanding the foregoing, Manager shall not terminate this Agreement for Owners failure to perform unless Manager shall first have given Owner written notice of the circumstance, condition or default upon which such intended termination is based and ten (10) business days within which to cure such default if it can be cured by the payment of money (a "**Monetary Default**") and forty-five (45) days within which to cure all defaults other than Monetary Defaults. In the event Owner shall cure any such default within the applicable cure period therefor, then Manager shall have no right to terminate this Agreement by reason of such cured default.   ·

**17.2**    In the event Manager shall have terminated this Agreement pursuant to paragraph 17.1 above. or otherwise, Manager shall cooperate with the party designated by Owner as the replacement manager for the Development to assist in a smooth transition and shall make all records and information which it has in its possession respecting the Development and the improvements then existing or anticipated available to such substitute manager for copying. No termination of this Agreement by either party shall relieve any party from any of its liabilities or obligations hereunder arising or accruing prior to such termination.

## 18. ARBITRATION

**18.1**    This Section concerns the resolution of any controversies or claims between Manager and Owner, including, but not limited to, those that arise from:

**(a)**    This Agreement (including any renewals, extensions or modifications hereof);

**(b)**    Any document, agreement or procedure related to or delivered in connection with this Agreement (hereinafter the "**Related Documents**");

**(c)**    Any violation of this Agreement or any Related Documents;

**(d)**    Any claims for damages resulting from any business conducted between Manager and Owner, including claims for injury to persons, property or business interests (torts); or

**(e)**    Any right of either party hereto to terminate this agreement with cause.

A \HOASSOC WPD
June 1 1999                                          15                                            ·· ·

E00412

Notwithstanding the foregoing, however, any disputes with respect to the Master Development Budget and any dispute with respect to termination of this Agreement without cause, where cause is not required for such termination, shall not be subject to arbitration unless both parties shall consent in writing thereto, which consent may be granted or withheld by either party in its sole and absolute discretion.

18.2    At the request of either party hereto, any such controversies or claims will be settled by arbitration in accordance with the United States Arbitration Act. The United States Arbitration Act will apply even though this Agreement and the Related Documents provide that they are governed by Florida law.

18.3    Arbitration proceedings will be administered by the American Arbitration Association and will be subject to its commercial rules of arbitration.

18.4    For purposes of the application of the statute of limitations, the filing of an arbitration pursuant to this paragraph is the equivalent of the filing of a lawsuit, and any claim or controversy which may be arbitrated under this paragraph is subject to any applicable statute of limitations. The arbitrators will have the authority to decide whether any such claim or controversy is barred by the statute of limitations and, if so, to dismiss the arbitration on that basis.

18.5    If there is a dispute as to whether an issue is arbitrable, the arbitrators will have the authority to resolve any such dispute.

18.6    The decision that results from an arbitration proceeding may be submitted to any authorized court of law to be confirmed and enforced and shall inure to the benefit of, the parties hereto and their successors and assigns.

18.7    The pursuit of or a successful action for provisional, interim, additional or supplementary remedies, or the filing of a court action, does not constitute a waiver of the right of Manager or Owner, including the suing party, to submit the controversy or claim to arbitration if the other party contests the lawsuit.

## 19. ASSIGNMENT.

19.1    Owner may assign its right, title and interest under this Agreement only upon an assignment of all of Owner's right, title and interest in and to the Development (or the entire portion of the Development then remaining subject to the terms of this Agreement) ,to any entity which it owns or controls (a "Related Party"), and, if not to a Related Party, then only with the consent of Manager, such consent to be in Manger's sole and absolute discretion. Upon a permitted transfer or assignment of Owner's right, title and interest hereunder pursuant to the foregoing sentence and such permitted transferee's assumption of all of Owner's duties and obligations hereunder, Owner shall have no liability hereunder to Manager for obligations and actions accruing or taking place after the date of such assumption.

19.2    Manager shall have no right to assign any right, title or interest it may have hereunder

A \HDASSOC WPD
June 1 1999                                        16

E00413

to another party without the prior written consent of Owner, which consent Owner shall be entitled to withhold in its sole and absolute discretion, except for a proposed assignment to an entity that is owned or controlled by Robert Evans.

20. MISCELLANEOUS.

20.1    The provisions hereof shall apply to the parties according to the context thereof and without regard to the number or gender of words or expressions used.

20.2    Time is expressly made of the essence of this Agreement.

20.3    All notices required or permitted to be given hereunder shall be in writing and may be given in person or by United States mail, by delivery service or by electronic transmission. Any notice directed to a party to this Agreement shall become effective upon the earliest of the following: (I) actual receipt by that party; (ii) delivery to the designated address of that party, addressed to that party; or (iii) if given by certified or registered United States mail, seventy-two (72) hours after deposit with the United States Postal Service, postage prepaid, addressed to that party at its designated address. The designated address of a party shall be the address of that party shown at the beginning of this Agreement or such other address as that party, from time to time, may specify by notice to the other parties.

20.4    This Agreement shall be governed by and construed according to the laws of the State of Florida.

20.5    Except as otherwise provided herein, this Agreement shall be binding upon, shall inure to the benefit of, the parties hereto and their successors and assigns.

20.6    The headings or captions of sections in this Agreement are for reference only, do not define or limit the provisions of such sections, and shall not affect the interpretation of this Agreement.

20.7    Any and all costs, fees and expenses incurred and paid by Owner pursuant to the terms, conditions and provisions of this Agreement shall without duplication, be taken into account in determining "Net Cash Receipts", "Negative Cash Flow", "Net Financing Proceeds" or "Net Sale Proceeds" (as all such terms are defined in the Profits Participation Agreement) and items so taken into account shall be charged, accrued or allocated, as appropriate, in the manner contemplated by said Profits Participation Agreement.

20.8    In the event a party shall breach or fail to perform its obligation under this Agreement, then the prevailing party shall be entitled to recover from the defaulting party the prevailing party's reasonable legal fees and costs in effecting performance by the defaulting party hereunder.

20.9    During the term of this Agreement, and without limitation upon any other term or provision of this Agreement, Manager shall disclose in advance and in writing to Owner all fees and other compensation, and all arrangements therefor, to be received or entered into from time to time

E00414

by Manager or by any Affiliated Entity (including, but without limitation, Robert Evans) with parties or persons other than Owner and that relate to the Development or any portion thereof, including, but without limitation, portions of the Development that have been sold, transferred or conveyed by Owner. Manager and its Affiliated Entities shall not be prohibited from entering into such arrangements so long as the compensation therefore is customary and at or below market rates, such arrangements are not competitive with any interests of Owner and such arrangements are not linked to any concessions or other economic detriment as to matters in which Owner has an economic interest.

20.10    Owner's obligations to Manager hereunder shall be without recourse to any partner of Owner and in the event of any claim by Manager hereunder of pursuant hereto, shall look solely to the assets from time to time owned by Owner.

IN WITNESS WHEREOF, these presents are executed as of the date indicated above.

LOCHMERE DEVELOPMENT GROUP, INC.,
a Florida corporation

By: _____.
Name:  Robert D. Evans
Title:  President
"MANAGER"

H D ASSOCIATES, L.P.
a Delaware Limited Partnership

By its General Partner
JTL Capital, L.L.C.,
a Texas corporation

By: _____
Name:  David A. Lane
Title:   President
"OWNER"

A \HDASSOC WPD
June 1, 1999

18

## LIST OF EXHIBITS

Exhibit "A"    Legal Description of the Development

Exhibit "B"    Master Site Plan Showing, Lots and general layout of the Development

Exhibit "C"    Master Development Budget

Exhibit "D"    Profit Participation Agreement

A \HDASSOC WPD
June 1 1999

E00416

Exhibit "D"

## PROFIT PARTICIPATION AGREEMENT

### 1.    OVERVIEW

Owner hereby agrees to pay Manager an "Incentive Participation" calculated in accordance with and subject to the terms and conditions of this Exhibit "D". No Incentive Participation shall be payable until Owner receives a full return of "Owner Capital" and at least a twelve percent (12%) simple, cumulative, annual return on "Owner Capital" as defined herein.

Once the aforesaid preconditions have been satisfied, Manager's Incentive Participation will be calculated by multiplying a percentage rate times "Net Cash Receipts", as defined herein. Said percentage rate increases as the Owner's Priority Return increases as described in Section 3 below.

2.    **CERTAIN DEFINITIONS.** For purposes hereof, the following terms shall have the following meanings:

A.    "Cash Expenditures" for the applicable period means cash expenditures made by Owner during such period in the operation of or in connection with the development, operation and management and sale of the Property and the Development, including, but not being limited to, payroll, business taxes and real and personal property taxes and assessments, insurance premiums and capital costs, and all management fees and expenses, but excluding Debt Service Payments.

B.    "Cash Income" for the applicable period means the gross cash receipts from the Property for such period including, but not limited to: (I) Net Financing Proceeds; (ii) Net Sales Proceeds; (iii) rental income; but not including capital contributions by Owner or its Partner.

C.    **"Debt Service Payments"** for the applicable period means all payments of principal and interest and other amounts paid during such period on or in connection with the "Property Indebtedness" or any "Qualified Indebtedness".

D.    "Negative Cash Flow" means for the applicable period the amount, if any, by which (x) the sum of the Cash Expenditures for such period, plus the Debt Service Payments for such period exceeds (y) the Cash Income for such period.

EC0417

E.    "Net Cash Receipts" for the applicable period means the amount, if any, by which (x) the "Cash Income" for such period exceeds (y) the sum of (I) the "Cash Expenditures" for such period, plus (ii) the "Debt Service Payments" for such period.

F.    "Net Financing Proceeds" means the net proceeds to Owner from any financing or refinancing of the Property or any part hereof, including the Property Indebtedness, after deductions for: (I) the payment of all expenses related to said financing; (ii) the payment for any capital expenditures from said financing; (iii) the payments for said financing to satisfy any debts on or related to the Property.

G.    "Net Sale Proceeds" means the net proceeds to Owner from any sale or other disposition, taking or loss of or from the Property, including, but not limited to, proceeds from: (I) land sales and (ii) club membership sales.

H.    "Owner Capital" means, individually and collectively, all amounts actually funded by Owner, for or in connection with: (I) the acquisition of the Property, including, but without limitation, the purchase price of the Property, closing costs and brokerage and attorneys' fees; and (ii) the development and construction of improvements on the Property.

I.    "Property Indebtedness" means the aggregate outstanding principal amount of any indebtedness to Owner secured from time to time by the Property.

J.    "Priority Return" means the money paid Owner from the operation and sale of the Property after the full payment of Owner Capital and all other debts and expenses related to the Property as described herein calculated as a percent per annum cumulative annual return on all Owner Capital through the date of such calculation.

K.    "Qualified Indebtedness" mean indebtedness to a Third Party Lender, both secured and unsecured, which has been incurred to fund "Negative Cash Flow" or capital expenditures for the Property.  Notwithstanding the actual interest rate on any Qualified Indebtedness, said interest rate for purposes of calculations under this Exhibit "D", shall not be deemed to exceed Owner's cost of such borrowing.  As used herein, "Third Party Lender" means a lender which does not control, is not controlled by and is not under common control with Owner.

L.    "Term" means the term of this Agreement, which shall commence on the date hereof and shall continue until the date as of which Owner shall no longer own any portion of the Property, except that the Term shall continue solely as to any payments due Lochmere as described herein.

3.    <u>CALCULATION AND PAYMENT OF INCENTIVE PARTICIPATION</u>.

At least annually for the first two (2) years of the Term of the Agreement, and at least quarterly thereafter, Owner shall provide a report to Manager calculating the Priority Return and the Incentive Participation as described herein.  Upon the full repayment of Owner Fundings and payments to Owner resulting in at least a twelve percent (12%) simple, cumulative annual return to

E00418

Owner on Owner Capital, Owner agrees to pay Manager an Incentive Participation in accordance with the following schedule:

| Of Owner's Return is: | Then the Percentage rate used to calculate the Incentive Participation shall be: |
|---|---|
| 0 - up to 12% | 0% |
| 12% up to 22% | 15% |
| 22% or greater | 30% |

Upon a determination pursuant to an Owner's Report that an Incentive Participation payment is due, Owner agrees to make said payment within twenty (20) days after the end of the applicable calendar quarter.

4.    REPORTS.  Together with each Owner's Report, Owner shall provide Manager with a reasonably detailed itemization and back-up for the calculations therein.  Manager and his representatives shall be authorized, at his sole cost and expense and upon reasonable advance written notice, to review and copy Owners' books and records from time to time with respect to the Property and the determination of the Property and Qualified Indebtedness, as well as any other matters relating to the calculation of payments to Manager hereunder; provided, however, that all such materials as are copies or reviewed shall be treated with confidentiality by Manager and his representatives and shall not be used for any purpose other than verifying the obligations to Manager hereunder.  Owner shall provide copies to Manager of all quarterly reports which Owner prepares for its investors with respect to the Property.

5.    BUY-SELL.

A.    Owner agrees to pay a "Cancellation Fee" to Manger in the event this Profit Participation Agreement is terminated prior to its automatic termination upon Owner no longer owning any portion of the Property.  Said Cancellation Fee shall be equal to the payment which Manger would have received pursuant to paragraph 3 above if Owner's interest in the Property were to have been sold by Owner on the date of such termination on an all cash basis and at the then fair market value of Owner's interest in the Property, determined as of the date of such termination.  In the event that, within thirty (30) days following such a termination, Owner and Manger cannot agree on the fair market value of the Property as of the date of such termination then each shall promptly (and, in any event, within fifteen (15) days subsequent to the end of said thirty-day period) choose a licensed independent appraiser and such appraisers shall choose a neutral independent appraiser. All appraisers shall be experienced in the appraisal of properties similar to the Property and none of the appraisers shall be in the employ of Owner, Manger or their respective affiliates except in connection with appraising the Property.  The appraisers shall each make a separate determination of the fair market value of the Owner's interest in the Property as of the date of termination.  The two appraisals closest in value shall be averaged and such average shall be deemed to be the fair market value of the Owner's interest in the Property as of the date of termination unless the highest and lowest appraisals amounts are equally distant from the middle appraisal amount, in which event the

A:\HDASSOC WPD
June 1 1999

E00419

fair market value shall be the amount of the middle appraisal. Manager shall pay the costs of the appraiser it selects, Owner shall pay the cost of the appraiser it selects and Manager and Owner shall share equally the costs of the third appraiser. Owner shall pay the Cancellation Fee to Manager within fifteen (15) days after the determination of the fair market value of the Owner's interest in the Property; provided, however, that Manager shall have no interest or right in or to any payments based on Net Sale Proceeds or Net Financing Proceeds occurring after the date of termination, but provided further, however, that Manager shall continue to have a right to payments based on Net Cash Receipts for the period from the date of termination through the date the Cancellation Fee is paid.

---

## END

A\HOASSOC WPD

# MARKETING AND LISTING AGREEMENT

This Agreement is made and entered into this _____ day of June, 1999 by and between **H D ASSOCIATES, L.P.**, a Delaware limited partnership ("**Owner**"), whose address is 8235 Douglas Avenue, Suite 770, Dallas, Texas 75225 and **LOCHMERE REALTY, INC.**, a Florida corporation ("**Broker**"), whose address is 2701 North Rocky Point Drive, Suite 1070, Tampa, Florida 33607.

## WITNESSETH

Owner is the owner of that real property more particularly described on **Exhibit "A"** hereto consisting of tracts of approximately _____ acres of undeveloped land and _____ developed lots located in Palm Coast, Flagler County, Florida ("**Property**") known as Hammock Dunes Phase One. The term "**Property**" as used herein shall also include a portion thereof. In consideration of the services of Broker as described in this Agreement, Owner hereby appoints Broker as its exclusive agent and grants Broker the exclusive right to sell the Property subject to the following terms and conditions:

1.    **TERM**

Owner hereby grants Broker the sole and exclusive right and authority to market the Property on the Owner's behalf in order to find a purchaser or purchasers for the Property, in whole or in part, at the price, terms and conditions established by Owner. This Agreement shall commence on the date first written above and shall continue until the date as of which Owner no longer owns any portion of the Property.

2.    **SINGLE AGENT NOTICE**

**FLORIDA LAW REQUIRES THAT REAL ESTATE LICENSEES OPERATING AS SINGLE AGENTS DISCLOSE TO BUYERS AND SELLERS THEIR DUTIES.**

As a single agent, Broker owes to you the following duties:

1.    Dealing honestly and fairly;
2.    Loyalty;
3.    Confidentiality;
4.    Obedience;
5.    Full disclosure;
6.    Accounting for all funds; and
7.    Skill, care and diligence in the transaction.

A\LISTAGRM
June 1, 1999

1

E00421

During the term of this Agreement, Owner expressly agrees to refer to Broker all inquiries made to Owner pertaining to the Property. Broker agrees to act as Owner's agent in any sale or purchase negotiations and not as a transaction broker.

## 3. OFFERS

Broker will submit to Owner each written offer Broker receives within three (3) business days of receipt by Broker. Broker has no authority to accept any offer on behalf of Owner in regard to the Property and all such authority is retained by Owner. Broker agrees to require prospective purchasers to submit all offers to purchase the Property in the form of a Letter of Intent or Purchase and Sale Agreement. and further agrees to advise prospective purchasers and their brokers that any Letter of Intent or Purchase and Sale Agreement is subject to and contingent upon written acceptance by the Owner, in its sole discretion and upon Owner entering into a Purchase and Sale Agreement duly executed by all applicable parties.

## 4. MARKETING

Owner has entered a contract (the "Management Agreement") with Lochmere Development Group, Inc. ("Manager") to provide management, development and marketing services for the Property. Owner agrees, at its expense, to provide or cause to be provided to Broker all materials and information called for in the General Marketing Plan as defined in the Management Agreement, to facilitate Broker's efforts to market the Property pursuant to this Agreement.

## 5. REAL ESTATE COMMISSION

If Owner executes a contract for the purchase and sale of the Property or a portion thereof, then, if, as and when the sale of the Property is closed with such purchaser, Owner shall pay to Broker a commission equal to: (i) four (4) percent of the purchase price paid to Owner by the purchaser if no sales person affiliated with Broker assists with the sale and no cooperating broker procures the purchaser; (ii) an additional one (1) percent if a sales person affiliated with Broker assists with the sale; and (iii) an additional two (2) percent if a cooperating broker procures the purchaser. In no event shall Owner be required to pay commissions in excess of seven (7) percent.

In the event Owner sells the Property after the expiration or termination of this Agreement to any party procured by Broker during the term of this Agreement, Owner shall be required to pay the commissions as described above. This provision shall survive the expiration or termination of this Agreement.

## 6. ENTIRE AGREEMENT

This Agreement constitutes the entire agreement of the parties with respect to the subject matter of this Agreement and there are no oral agreements or understandings of the parties. No modifications of this Agreement shall be made except by written agreement signed by the parties hereto.

E00422

7.     NOTICES

All notices required under this Agreement shall be deemed properly given if given in writing and mailed, postage prepared, return receipt requested, or if delivered by Federal Express or other recognized international courier service that gives written confirmation of delivery. Notice shall be given to the parties at the following addresses:

If to Owner:          David A. Lane, President
                      H D Associates, L.P.
                      8235 Douglas Avenue - Suite 770
                      Dallas, Texas 75225

And to:               _____
                      _____
                      _____
                      _____

If to Broker:         Robert D. Evans, President
                      Lochmere Realty, Inc.
                      2701 North Rocky Point Drive - Suite 1070
                      Tampa, Florida 33607

And to:               Keith W. Bricklemyer, Esq.
                      Bricklemyer Smolker & Bolves, P.A.
                      500 E. Kennedy Boulevard - Suite 200
                      Tampa, FL 33602

Notices shall be deemed given on the date of receipt by the last party to whom addressed, or if delivery is attempted, but refused or not effected, then the notice shall be deemed given on the date of first attempted delivery thereof to the last party required to receive notice. A notice from only one of the Owners shall be deemed to apply only to that Owner's interest in the Property.

8.     **BINDING EFFECT**

The provisions of this Agreement shall be binding upon, and shall enure to the benefit of Owner and Owner's successors and assigns, and Broker and Broker's permitted successors and assigns.

9.     **ATTORNEYS' FEES** If either party to this Agreement shall be forced to employ legal counsel to enforce its rights under this Agreement, the prevailing party in any litigation arising out of this Agreement shall be entitled to recover all reasonable attorneys' fees and costs incurred in connection with such proceedings, including paralegal and attorneys' fees incurred in the trial courts, in appellate proceedings and in bankruptcy and administration proceedings.

A\ILISTAGRM
June 1 1999

3

E00423

10. **TIME OF ESSENCE**  Time is of the essence for the performance of all obligations under this Agreement.

12. **GOVERNING LAW**  This Agreement shall be governed by the laws of the State of Florida.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date indicated above.

**Owner**
H D ASSOCIATES, L.P.
a Delaware limited partnership

By:_____
Name: _____
Title: _____

**Broker**

LOCHMERE REALTY, INC.
a Florida corporation

BY:_____
Name: Robert D. Evans
        President / Broker
        Broker License No. BK 0431885
        Corporate License No. CQ 0273119

A \LISTAGRM
June 1 1999

4

E00424

# Exhibit
# C

# MARKETING AND LISTING AGREEMENT

This Agreement is made and entered into this _____ day of June, 1999 by and between **H D ASSOCIATES, L.P.**, a Delaware limited partnership ("**Owner**"), whose address is 8235 Douglas Avenue, Suite 770, Dallas, Texas 75225 and **LOCHMERE REALTY, INC.**, a Florida corporation ("**Broker**"), whose address is 2701 North Rocky Point Drive, Suite 1070, Tampa, Florida 33607.

## WITNESSETH

Owner is the owner of that real property more particularly described on Exhibit "A" hereto consisting of tracts of approximately _____ acres of undeveloped land and _____ developed lots located in Palm Coast, Flagler County, Florida ("**Property**") known as Hammock Dunes Phase One. The term "**Property**" as used herein shall also include a portion thereof. In consideration of the services of Broker as described in this Agreement, Owner hereby appoints Broker as its exclusive agent and grants Broker the exclusive right to sell the Property subject to the following terms and conditions:

1.    **TERM**

Owner hereby grants Broker the sole and exclusive right and authority to market the Property on the Owner's behalf in order to find a purchaser or purchasers for the Property, in whole or in part, at the price, terms and conditions established by Owner. This Agreement shall commence on the date first written above and shall continue until the date as of which Owner no longer owns any portion of the Property.

2.    **SINGLE AGENT NOTICE**

**FLORIDA LAW REQUIRES THAT REAL ESTATE LICENSEES OPERATING AS SINGLE AGENTS DISCLOSE TO BUYERS AND SELLERS THEIR DUTIES.**

As a single agent, Broker owes to you the following duties:

1.    Dealing honestly and fairly;
2.    Loyalty;
3.    Confidentiality;
4.    Obedience;
5.    Full disclosure;
6.    Accounting for all funds; and
7.    Skill, care and diligence in the transaction.

ALISTACRM
June 1 1999

1

EXHIBIT
48
4-26-01

CONFIDENTIAL

E00421

During the term of this Agreement, Owner expressly agrees to refer to Broker all inquiries made to Owner pertaining to the Property. Broker agrees to act as Owner's agent in any sale or purchase negotiations and not as a transaction broker

### 3.    OFFERS

Broker will submit to Owner each written offer Broker receives within three (3) business days of receipt by Broker. Broker has no authority to accept any offer on behalf of Owner in regard to the Property and all such authority is retained by Owner. Broker agrees to require prospective purchasers to submit all offers to purchase the Property in the form of a Letter of Intent or Purchase and Sale Agreement, and further agrees to advise prospective purchasers and their brokers that any Letter of Intent or Purchase and Sale Agreement is subject to and contingent upon written acceptance by the Owner, in its sole discretion and upon Owner entering into a Purchase and Sale Agreement duly executed by all applicable parties.

### 4.    MARKETING

Owner has entered a contract (the "Management Agreement") with Lochmere Development Group, Inc. ("Manager") to provide management, development and marketing services for the Property. Owner agrees, at its expense, to provide or cause to be provided to Broker all materials and information called for in the General Marketing Plan as defined in the Management Agreement, to facilitate Broker's efforts to market the Property pursuant to this Agreement.

### 5.    REAL ESTATE COMMISSION

If Owner executes a contract for the purchase and sale of the Property or a portion thereof, then, if, as and when the sale of the Property is closed with such purchaser, Owner shall pay to Broker a commission equal to: (i) four (4) percent of the purchase price paid to Owner by the purchaser if no sales person affiliated with Broker assists with the sale and no cooperating broker procures the purchaser; (ii) an additional one (1) percent if a sales person affiliated with Broker assists with the sale; and (iii) an additional two (2) percent if a cooperating broker procures the purchaser. In no event shall Owner be required to pay commissions in excess of seven (7) percent.

In the event Owner sells the Property after the expiration or termination of this Agreement to any party procured by Broker during the term of this Agreement, Owner shall be required to pay the commissions as described above. This provision shall survive the expiration or termination of this Agreement.

### 6.    ENTIRE AGREEMENT

This Agreement constitutes the entire agreement of the parties with respect to the subject matter of this Agreement and there are no oral agreements or understandings of the parties. No modifications of this Agreement shall be made except by written agreement signed by the parties hereto.

a \LISTACRM
June 1 1999

2

CONFIDENTIAL

E00422

7    NOTICES

All notices required under this Agreement shall be deemed properly given if given in writing and mailed, postage prepared, return receipt requested, or if delivered by Federal Express or other recognized international courier service that gives written confirmation of delivery. Notice shall be given to the parties at the following addresses:

If to Owner:  David A. Lane, President
      H D Associates, L.P.
      8235 Douglas Avenue - Suite 770
      Dallas, Texas 75225

And to:   _____
      _____
      _____
      _____

If to Broker:  Robert D. Evans, President
      Lochmere Realty, Inc.
      2701 North Rocky Point Drive - Suite 1070
      Tampa, Florida 33607

And to:   Keith W. Bricklemyer, Esq.
      Bricklemyer Smolker & Bolves, P.A.
      500 E. Kennedy Boulevard - Suite 200
      Tampa, FL 33602

Notices shall be deemed given on the date of receipt by the last party to whom addressed, or if delivery is attempted, but refused or not effected, then the notice shall be deemed given on the date of first attempted delivery thereof to the last party required to receive notice. A notice from only one of the Owners shall be deemed to apply only to that Owner's interest in the Property.

8.    BINDING EFFECT

The provisions of this Agreement shall be binding upon, and shall enure to the benefit of Owner and Owner's successors and assigns, and Broker and Broker's permitted successors and assigns.

9.    ATTORNEYS' FEES If either party to this Agreement shall be forced to employ legal counsel to enforce its rights under this Agreement, the prevailing party in any litigation arising out of this Agreement shall be entitled to recover all reasonable attorneys' fees and costs incurred in connection with such proceedings, including paralegal and attorneys' fees incurred in the trial courts, in appellate proceedings and in bankruptcy and administration proceedings.

A LISTACRM
LM 1 1999          3

CONFIDENTIAL

E00423

10.    **TIME OF ESSENCE**  Time is of the essence for the performance of all obligations under this Agreement.

12.    **GOVERNING LAW**  This Agreement shall be governed by the laws of the State of Florida.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date indicated above.

**Owner**
H D ASSOCIATES, L.P.
a Delaware limited partnership

By:_____
Name: _____
Title:  _____

**Broker**

LOCHMERE REALTY, INC.
a Florida corporation

BY:_____
Name: Robert D. Evans
       President / Broker
       Broker License No. BK 0431885
       Corporate License No. CQ 0273119

A LISTACRM
May 1 1997

4

CONFIDENTIAL

E00424

# Exhibit
# D

# Lochmere

July 12, 1999

VIA FACSIMILE (214) 756-6598
Mr. Paul E. Rowsey, III
President
Eiger, Inc.
500 Crescent Court; Suite 300
Dallas, Texas 75201

RE:   HAMMOCK DUNES
      PALM COAST, FLORIDA



EXHIBIT NO. 31
3-2 F-00
F. FABRICIUS

Dear Paul:

Since our initial meeting with you and Mr. Todd Miller on March 30, 1999 at Hammock Dunes in Palm Coast, Lochmere Development Group, Inc. has worked diligently to provide your company with information and assistance you have requested to familiarize you and your lender, BankBoston, with the investment opportunity in Hammock Dunes.  Our continued assistance to you in facilitating the purchase and development of Hammock Dunes by H. D. Associates, L.P. was based on your honoring the terms of the Management, Development and Marketing Agreement ( the "Agreement") which I previously negotiated with Mr. David Lane of JTL Capital, L.L.C. (general partner of H.D. Associates, L.P.), and which I reviewed with you in detail during our meeting on June 10, 1999 in Dallas.  Based on our agreement to move forward at that meeting, we have provided, at your request, voluminous documentary information and technical and strategic analyses to you, BankBoston, and BankBoston's appraiser, Joseph J. Blake and Associates, Inc.  All the information provided constitutes trade secrets.

Based on my telephone conversations with you on June 28 and July 2, 1999, I understand that you will not honor the terms of the Management, Development and Marketing Agreement.  Your alternative proposal in no way compensates Lochmere for its investment to date and for the value it has created by virtue of the application to this transaction of its proprietary methods of analysis and documentation, all of which we have repeatedly reviewed and explained to you and your associates.



EVANS 04479

July 12, 1999
Mr. Paul E. Rowsey, III
President
Eiger, Inc.
Page Two of Two

Lochmere hereby demands that you return all information related to Hammock Dunes that Lochmere has provided to you. Also, be advised that any attempt to use Lochmere's trade secrets by Eiger, Inc., H. D. Associates, L.P., or any affiliated individuals or entities without full compensation to Lochmere per the Agreement is not permitted and will be vigorously contested

By copy of this letter, I am also demanding the return from BankBoston, Joseph J. Blake and Associates, Inc., Mr. David Lane and JTL Capital, L.L.C. of the proprietary information described above.

With kindest regards,

Robert D. Evans
President

EVANS 04480

# Exhibit
# E

Sent By: Rosewood Property Company;



# EIGER

EQUITY INVESTMENTS
IN REAL ESTATE

July 13, 1999

VIA FAX  813/ 636-8035

Mr. Robert D. Evans
President
Lochmere Development Group, Inc.
2701 North Rocky Point Drive
Suite 1070
Tampa, Florida  33607

Re:    Hammock Dunes (the "Property")

Dear Bob:

Having received your letter of July 12, 1999, I have to say that I am both confused and surprised not only by its tone, but also its substance.  When we last spoke you were analyzing your time commitment to the Hammock Dunes transaction and were to contact me to give me your thoughts on how you wanted to be involved, if at all.  To have sent the July 12th letter misstating the facts and making an unfounded allegation regarding "trade secrets" is not only disappointing, but also entirely inconsistent with the manner in which you have conducted yourself in the past.  Unfortunately, this conduct requires me to set the record straight on the evolution of our relationship.

In March of this year, David Lane contacted me regarding the Hammock Dunes transaction.  He told me that you and he had been working on trying to acquire the Property for the preceding 12-15 months.  In that time period, you had the Property under contract at least once, but it had not been under contract since prior to the end of 1998 (and was not under contract at the time).  Also during this time period you had attempted in vain to find debt and equity financing for the acquisition of the Property, although it was represented that you once had an equity source but it had failed to perform.  Obviously, neither you nor David had the financial strength to buy the Property on your own.  Based on the representations made to us regarding the attributes of the Property, we began to conduct due diligence, relying in large part on the analysis David and you had previously done  We spent hundreds of hours and  thousands of dollars reviewing the Property and your work product.  We took numerous trips to Florida and did independent market research on other East Coast ocean-front communities.

Simultaneously, we undertook negotiations with the seller of the Property.  It became clear to us very early that the contractual approach you and your team had initiated with the seller was not

500 Crescent Court

Suite 300

Dallas, Texas 75201

PHONE 214 756 6550

, 214 756 6599



EXHIBIT
"M"  to
Complaint

Mr. Robert D. Evans
July 13, 1999
Page 2

feasible from a financing standpoint. We therefore took the initiative
to restructure the transaction with the seller of the Property and to
arrange financing for the acquisition.

Based on our independent research, it became clear to us that your
strategic plan for the development, operation and marketing of the
Property was fatally flawed. Your plan to amend the Hammock Dunes
Club documents and to not build the second golf course would have
had significant adverse consequences from both a marketing and
financial perspective. Therefore, we completely modified the strategic
plan, restructured the deal and worked to finalize a contract with the
seller based on this new strategic plan, which you agreed with in all
respects.

In late May or early June, it also became obvious to us, and other
capital sources, that the team of Lane and Evans could not
successfully manage the development, operation and marketing of the
Property. You had indicated a willingness to work up to three days a
week on the project, commuting from Tampa. David wanted to
oversee the project on a part-time basis from Dallas. David admitted
that he did not have any experience in managing large scale
residential land projects and it was clear that you had little, if any,
experience in managing high-end, equity golf club projects. In fact,
you admitted this in June. Based on this, in early June, we informed
both you and David that a condition to our providing financing for the
acquisition of the Property was that we engage a full-time, on-site
professional to oversee the project. David readily agreed with this
approach. I wrote you in early June and asked that we discuss your
continuing role in the project. We were very impressed with your
knowledge of Florida land-use issues and the "on-the-ground"
development and infrastructure experience you exhibited. What we
were uncomfortable with was your operational and marketing skills.
Prior to our involvement, you had not begun to understand the
operational demands of the project and had not begun to plan for
them. In addition, you admitted to having little experience marketing
this type of Property.

On June 10th, you came to Dallas to talk about this issue. It was at
that time that you disclosed to me that you "had a deal" with David
Lane. As you know, David disputes this. In any event, I told you at
that meeting that the "deal" you had with David would not work for us.
It assumed that you would handle all aspects of the development,
operation and marketing of the Property, which you were obviously
not capable of handling. At our meeting I explained to you that we
envisioned you being responsible for development issues, but not
operations or marketing. You indicated that you would need to think
about this diminished role and would get back to me with your
thoughts. In the meantime, we continued to work in good faith to try
and finalize negotiations with the seller of the Property and

Mr. Robert D. Evans
July 13, 1999
Page 3

BankBoston, our lender. You continued to work with us in this respect and have been very helpful. Never once did you indicate to us that your continuing involvement was conditioned upon you receiving the "deal" you claim to have arranged with David Lane. In fact, over the course of the next several weeks we continued to have discussions on what you role would be and our respective thoughts on what a fair compensation package would be. We offered to pay you approximately $225,000 upon the closing of the acquisition In addition we offered to pay you a $12,000 per month fee for your time, to reimburse a fair portion of your overhead, and to grant to you a 7.5% profits participation in the transaction, after repayment of debt, capital, and cost of funds. This residual participation, by your calculation, would have been worth in excess of $4,000,000, and would have been earned in less than four years. By way of comparison, the package you proposed to us would have amounted to a potential compensation of $12,000,000 to $15,000,0000, or more. This seemed to us to be a little rich for part-time work, considering you did not structure the transaction, did not arrange financing for the transaction, and were not investing any money in the transaction. To now send a letter threatening legal action if we don't capitulate to your multi-million dollar demands, resembles fraud in the inducement insofar as you seemed to have waited to spring this demand until the 11th hour of the transaction.

In your letter you assert that our "proposal in no way compensates Lochmere for its investment to date and for the value it has created by virtue of the application to this transaction of its proprietary methods of analysis and documentation, all of which we have repeatedly reviewed and explained to you and your associates." Based on my conversations with David Lane, I do not believe you have any substantial investment in the transaction. David Lane has informed me that he has paid for virtually all costs and expenses you incurred in connection with evaluating the Property up until March of 1999. I believe we have made all of the substantial investments since that date, and, in fact, paid a significant past due legal bill you had incurred prior to our involvement.

With respect to value created, your "proprietary methods of analysis" led to the conclusion that the second golf course should not be built and that the golf memberships should be limited to 400. This plan would have resulted in failure as you have subsequently conceded. I am not sure what you think are "trade secrets." You have given us little information that was not prepared by third parties and paid for by others. The information you personally have prepared and provided constitutes computer generated financial models based on information gathered from public records and from third parties. Some of the assumptions contained in these financial models are based on information we generated, some of which was generated by David Lane, and some of which is based on your opinions. Your computer

Mr. Robert D. Evans
July 13, 1999
Page 4

model is generated on commercially available software and is a simple roll up of information, none of which appears to be proprietary. Never were we asked to sign a confidentiality agreement or otherwise warned not to utilize this program. Nevertheless, we are happy to cease using the program and to remove it from all of our computer hard drives. Additionally, we will send you any disks that contain the software or destroy them at you option. If there is any other specific information that you think is proprietary or contains "trade secrets," please let us know.

I am truly sorry you have chosen to threaten legal action in an attempt to derail the acquisition of the Property in hopes of forcing us to accept your proposed compensation package. I really believe that the transaction, as restructured, could have been successful and that all of us could have been rewarded for our contributions. It has occurred to us that you may be trying to use these tactics to discourage us from pursuing the acquisition of the Property so you can attempt to put together your own sources (again) to acquire it for your own account. If this is so, I wish you good luck.

In the meantime, please be advised that in the event we suffer any adverse consequences as a result of your threats and/or your sending your libelous letter to BankBoston in connection with this matter, we will hold you fully accountable.

Very truly yours,

Paul E. Rowsey, III

# EIGER, INC.
500 Crescent Court
Suite 300
Dallas, Texas 75201-0495

## FAX COVER SHEET

DATE:   July 13, 1999          TIME:    3:31 PM

TO:     Robert D. Evans        PHONE:   813/ 286-3001
                               FAX:     813/ 836-8035

FROM:   Paul Rowsey           PHONE:   214/ 756-6552
        Eiger, Inc.           FAX:     214/ 756-6598
                              E-mail:  paul_rowsey@eigerpartners.com

RE:     Hammock Dunes

Number of pages including cover sheet: 5

---

## Message:

Please see attached letter

CONFIDENTIALITY NOTICE: UNLESS OTHERWISE INDICATED OR OBVIOUS FROM THE NATURE OF THE TRANSMITTAL, THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND CONFIDENTIAL INFORMATION INTENDED FOR THE USE OF THE INDIVIDUAL OR ENTITY NAMED ABOVE. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE TO DELIVER IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF THIS COMMUNICATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE IMMEDIATELY NOTIFY THE SENDER BY TELEPHONE AND RETURN THE ORIGINAL MESSAGE TO US AT THE ABOVE ADDRESS VIA THE U.S. POSTAL SERVICE OR BY EXPRESS. THANK YOU.

N

# BRICKLEMYER SMOLKER & BOLVES, P.A.

### ATTORNEYS & COUNSELORS AT LAW

JAY J. BARTLETT
BRIAN A. BOLVES
KEITH W BRICKLEMYER
R. MICHAEL BROOKS
DAVID M CORRY
GREGORY J. ORCUTT

DOUGLAS C ROLAND
RICHARD A SCHLOSSER
DEBORAH M. SCHMOTT
DAVID SMOLKER
OF COUNSEL:
•J A. JURGENS, PA
Longwood, Florida

July 29, 1999

VIA FACSIMILE (214) 755-6598
Mr. Paul Rowsey, III
President
Eiger, Inc.
500 Crescent Court, Suite 300
Dallas, Texas 75201

Re:    **Hammock Dunes**
       **Palm Coast, Florida**

Dear Mr. Rowsey:

This firm has been retained as Florida counsel by Lochmere Development Group, Inc. regarding the above-referenced matter. We have retained Texas counsel who will respond to your July 23, 1999, letter and the lawsuit you have filed in Texas.

I have also received a copy of your letter to Robert D. Evans, President of Lochmere, dated July 13, 1999. Rather than debate your revisionist version of history, and without attempting to harmonize your curious conclusion that Mr. Evans fraudulently induced you into an agreement you simultaneously disclaim, let me simply clarify several important points.

1.    The information and analysis provided by Lochmere which it developed over an 18-month period were accurately characterized in Mr. Evans' letter to you dated July 12, 1999 as trade secrets. Since you appear to be unfamiliar with this term of art, I commend to your reading the legend on the proforma provided to you and BankBoston, and Section 688.003, Florida Statutes, and the cases thereunder.

2.    Lochmere would not have provided this information to BankBoston and to its appraiser, nor assisted them with their evaluation of this project on your behalf, but for your commitment to honor the economics of Lochmere's Management, Development and Marketing Agreement.

Reply to:
500 East Kennedy Boulevard
Suite 200 [illegible]
Tampa, Florida 33602-4825
Telephone (813) 223-3888
In 407 Area Code 831-4551
Facsimile (813) 228-6422
e-mail: [illegible]@shorecourtvlaw.com

505 Wekiva Springs Road
Suite 800
Longwood, Florida 32779
Telephone (407) 772-2277
Facsimile (407) 772-2278
e-mail: jajens@magicnet.net



EXHIBIT
"N" to
Complaint

Mr. Paul Rowsey, III
President
Eiger, Inc.
July 29, 1999
Page 2

3.    But for the trade secrets and continued assistance provided by Lochmere, you would have been unable to determine in only a matter of weeks that you should attempt to purchase this project with a $3,000,000.00 non-refundable deposit.

4.    But for the trade secrets and continued assistance provided by Lochmere, BankBoston would not have considered participating in financing such a transaction on the expedited schedule that was followed.

Finally, let me reiterate Mr. Evans' demands to you, David Lane, Joseph J. Blake and Associates, Inc., and BankBoston in his letter dated July 12, 1999:

1.    Return and cause to be returned to Lochmere all information related to Hammock Dunes that Lochmere provided to you or to others on your behalf.

2.    Neither Eiger nor any affiliated individuals or entities are authorized to use Lochmere's trade secrets without full compensation to Lochmere. Any unauthorized use is grounds for injunctive action.

Please govern yourself accordingly.

Yours truly,

BRICKLEMYER SMOLKER & BOLVES, P.A.

By:    Keith W. Bricklemyer

KWB/mlb

P:\DOCS\MLB\1)IROLO\TEY.Ltr