

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LOCHMERE DEVELOPMENT
GROUP, INC., et al.

       Plaintiffs,

v.                            Case No.: 8:00-cv-1026-T-27B

EIGER FUND I, L.P., et al.

       Defendants.

_____/

## MEMORANDUM OF LAW IN SUPPORT
## OF EIGER ENTITIES' MOTION FOR SUMMARY JUDGMENT

### I.    STATEMENT OF FACTS

The Eiger Entities[1] are affiliated business entities based in Dallas, Texas, which are

engaged in investment management and real estate investment businesses. (First Am. Comp.

¶¶ 4- 10; Rowsey Dep. at 10-14). In November 1999, two of the Eiger Entities, H.D.

Associates, L.P. ("H. D. Associates") and Dunes Operating Company, L.P. ("Dunes

Operating"), purchased an upscale real estate development known as Hammock Dunes in

Palm Coast, Florida.   (First Am. Comp. ¶ 4; Rowsey Aff. ¶ 17).

---

[1]Eiger, Inc. and Defendant 2M Dunes, L.L.C., a Texas limited liability company, are the general partners of Defendant Dunes Operating Company, L.P., a Delaware limited partnership. Dunes Operating Company, L.P., in turn, is the sole general partner of Defendant H. D. Associates, L.P., a Delaware limited partnership. Eiger also is the sole general partner of Defendant Eiger Partners, L.P., a Delaware limited partnership, and Defendant Eiger Partners, L.P. is the sole general partner of Defendant Eiger Fund 1, L.P., a Delaware limited partnership. (Rowsey Aff. ¶ 3; Rowsey Dep. at 11-18 ). References to deposition transcripts on file with this Court are denoted by the name of the deponent followed by a reference to the relevant pages of the transcript. Robert Dale Evans has been deposed three times -- twice in the related lawsuit in Texas and once in this case. References to the transcripts of these depositions are denoted as "Evans I" for his deposition on March 28, 2000, in the Texas case, "Evans II" for his deposition on May 22, 2000, in the Texas case, and "Evans III" for his deposition on April 26, 2001, in this case.

5361.1



Representatives of Eiger, Inc. ("Eiger") were first introduced to Hammock Dunes in late March 1999 by David Lane ("Lane"), a real estate investor who had been involved in a prior unsuccessful attempt to purchase the property. (Rowsey Aff. ¶ 4; Rowsey Dep. at 19; Evans Dep. I at 73-74). On March 30, 1999, Paul Edward Rowsey ("Rowsey") and Todd Miller, the President and C.E.O., respectively, of Eiger, visited Hammock Dunes where they met Robert Dale Evans ("Evans"). (Rowsey Aff. ¶ 5; Rowsey Dep. at 19-22, 32; Evans Dep. III at 67-70). Evans was the sole officer, director, and shareholder of Lochmere Development Group, Inc. ("Lochmere Development"), a real estate development company, and Lochmere Realty, Inc. ("Lochmere Realty") a real estate brokerage company. (Evans Dep. I at 17-18; Evans Dep. III at 15, 21).

Over the next two and one-half months, Rowsey and Evans met several times at Eiger's office in Dallas, at Hammock Dunes, and in Boca Raton, Florida, to discuss issues relating to the Eiger Entities' possible purchase of the property. (Rowsey Aff. ¶ 6; Evans I at 79-81, 84, 86-87; Evans III at 80-84).

On June 8, 1999, Rowsey faxed a letter advising Evans that the Eiger Entities intended to hire a full-time CEO to work on-site at the project and making a proposal regarding the future involvement and compensation of Lochmere Development. (Rowsey Aff. ¶ 7; Am. Comp. Ex. "J").

Upon receipt of this letter, Evans telephoned Rowsey to schedule a meeting in Dallas for June 10. (Rowsey Aff. ¶ 8, Ex. A; Am. Compl. ¶ 73; Evans Dep. I at 96-98, 159-161;

5361.1                                    -2-

Evans Dep. III at 145-146; Rowsey Dep. at 43-44). At that meeting, Evans gave Rowsey a proposed "Management, Development and Marketing Agreement" (the "Management Agreement") which contemplated an extensive role for Lochmere Development in the management, as well as site development and sales activities, and a proposed "Marketing and Listing Agreement", (the "Marketing Agreement") which contemplated that Lochmere Realty would receive commissions from sale of lots in the development, if H.D. Associates were successful in acquiring Hammock Dunes. (Rowsey Aff. ¶ 9; Evans Dep. III at 146; Am. Compl. Ex. K). According to Rowsey, he told Evans that he felt the role which the proposed Management Contract envisioned for Lochmere Development was beyond its experience and expertise and that the proposed compensation would not have been feasible. (Rowsey Aff. ¶ 10; Rowsey Dep. at 57-60, 63-64). Rowsey then further explained to Evans the alternative structure contemplated by his June 8th letter. (Rowsey Aff. ¶ 10; Rowsey Dep. at 60-62). Evans responded that he wanted to think about it and perform some analysis of the numbers Rowsey was proposing, and he would get back to Rowsey with a response. (Rowsey Aff. ¶ 10; Rowsey Dep. at 60).

Evans, however, testified that, after he explained the proposed Management Agreement to Rowsey, Rowsey told him that he (Rowsey) wanted to look over it and would get back to Evans about any adjustments or changes. (Evans Dep. I at 136). Regardless, however, Evans conceded that no one on behalf of the Eiger Entities ever told him that they would sign, and no one ever did sign, the proposed Management Agreement. (Evans Dep. I

5361.1                                    -3-

at 167-168; Evans Dep. III at 150-151, 210-211, Rowsey Aff. Exs. B and C).[2] Evans also testified that, from his perspective, he was willing to discuss modifications to his proposed Management Agreement "as long as the economics were in keeping with the original agreement." (Evans Dep. I at 136-137).

A few days later, Evans attended a meeting in Atlanta with a prospective lender, Bank Boston, N.A. (now Fleet National Bank, N.A.) ("the Bank"). (Rowsey Aff. ¶ 11; Evans Dep. I at 186-187). Evans reviewed the Master Development Budget with representatives of the Bank (Rowsey Aff. ¶ 11; Evans Dep. III at 93-96, 98-103) and was asked to provide documents relating to the project to the Bank's appraiser and to their legal counsel. (Evans Dep. III at 103-105). Evans did not discuss his compensation with Rowsey at the Atlanta meeting; however, at the airport prior to departing from Atlanta, Rowsey advised Evans that they still needed to resolve the details relating to his compensation. (Rowsey Aff. ¶ 13).

Having not heard further from Evans about the issue, on June 28, 1999, Rowsey telephoned him and reviewed with him a comprehensive compensation package which more fully outlined, from Eiger's perspective, the role that Evans would play, the duties he would perform and the various methods by which he would be compensated. Evans again stated that he would need more time to think about the proposal. (Rowsey Aff. ¶ 13).

On July 12, 1999, Rowsey received a letter from Evans rejecting Rowsey's "alternative proposal" and demanding that he return the documentation that Evans provided

---

[2]Rowsey likewise testified that there were never any written or oral agreements between the Eiger Entities and Lochmere Development or Lochmere Realty. (Rowsey Dep. at 26, 69-70).

5361.1                                    -4-

to him and the Bank. (Rowsey Aff. ¶ 15)  Rowsey responded in a detailed letter to Evans the next day. (Id.)

A few days later, Evans approached Starwood Capital Group ("Starwood"), a Wall Street capital management firm to inquire whether it was interested in pursuing the acquisition and development of Hammock Dunes. (Rowsey Aff. ¶ 16; Evans Dep. III at 41-42, 295-297).  Evans gave Starwood a copy of the Master Development Budget and discussed the project with them. (Evans Dep. III at 298-299). On about July 23, 1999, Starwood made an offer to the owners of Hammock Dunes, ITT, to purchase the property. (Evans Dep. III at 300-302).

ITT, however, rejected Starwood's offer and, after being told by ITT that Evans had submitted a contract proposal with another entity, on July 29, 1999, Dunes Operating entered into a contract with ITT to purchase Hammock Dunes. (Rowsey Aff. ¶ 16; Rowsey Dep. at 94-95, Ex. 10[3]). On November 30, 1999, Dunes Operating and HD Associates closed on the purchase. (Rowsey Aff. ¶ 17).

## II.    ARGUMENT

### A.    Introduction

The Eiger Entities adopt and incorporate the text setting forth the applicable standard to guide the Court's consideration of these motions for summary judgment in the Memorandum of Law in Support of Motion for Summary Judgment filed by Defendants Paul

---

[3] The reference in the transcript of the date of the contract as "June 28, 1999" is erroneous.  As reflected on Exhibit 10 accompanying the transcript, the actual date of the contract was July 28, 1999.

5361.1                                          -5-

E. Rowsey, III, C. Todd Miller, David M. Jacobs, and William S. Buchanan.

### B.     Count III Is Legally Insufficient

#### 1.     The Proposed Management Agreement Negates the Existence of a Partnership

Plaintiffs' claim for violation of the Florida Uniform Partnership Act in Count III must fail because the undisputed facts demonstrate that, as a matter of law, no partnership was formed between Plaintiffs and the Eiger Entities.

Evans testified that the only contract that "Lochmere" had with any of the Eiger Entities was the unexecuted Management Agreement, and that it contained all of the terms of the parties' alleged agreement. (Evans Dep. I at 56-58, 68-72). Section 4.4 of this document, however, expressly states:

> 4.4     Nothing contained in this Agreement or in the relationship of Owner and Manager shall be deemed to constitute a partnership, joint venture or any other relationship other than that contract parties hereunder and, while Owner shall have certain payment obligations to Manager hereunder which are determined by reference to the economic performance of the Property, nothing therein shall constitute Manager as having any equity or partnership interest in the Property, directly or indirectly. . . .

(Am. Comp. Ex. "K") (emphasis added).

Courts have repeatedly held that such a provision precludes a finding of a partnership or joint venture. Florida Municipal Power Agency, 714 So.2d 660, 661 (Fla. 5th DCA 1998); Schweitzer v. Seaman, 383 So.2d 1175, 1177-1178 (Fla. 4th DCA 1980); Savers Fed. Sav. &

5361.1                                        -6-

Loan Ass'n v. Amberley Huntsville, Ltd., 934 F.2d 1201, 1207-1208 (11th Cir. 1991).[4]

Thus, even if the proposed Management Agreement were accepted and signed by the parties (which it was not), it would form no basis for a partnership. See also Resolution Trust Corp. v. Jet Stream, Ltd., 790 F. Supp. 1130, 1136 (M.D. Fla. 1992) (granting summary judgment against borrower based on defense alleging oral joint venture in light of express provision to the contrary in loan documents).

### 2.   The Proposed Marketing Agreement Does Not Create a Partnership

Plaintiffs also apparently base their claim of an alleged partnership on the proposed Marketing Agreement that Evans also presented to Rowsey at the June 10, 1999, meeting. (Evans Dep. III at 193-194, 209-211, Ex. 48). A partnership, however, is only established when both parties contribute equally to the capital or labor of the business, have a mutuality of interest in both profits and losses, and agree to share in the assets of the business. Dreyfuss v. Dreyfuss, 701 So.2d 437, 439 (Fla. 3d DCA 1997). "To establish a partnership, there must be a 'community of interest in performance of a common purpose, joint control or right of control, joint propriety of interest in the subject matter, right to share in the profits, and duty to share in any losses which may be sustained.'" Id. (quoting Austin v. Duval Co. School Bd., 657 So.2d 945 (Fla. 1st DCA 1995)); see also Rigal v. State, 780 So.2d 256, 258 (Fla. 3d DCA 2001). The absence of even one of these requirements precludes finding a

---

[4] The language in Section 4.4 is even especially compelling because Lochmere Development and its lawyers drafted the document. (Evans Dep. I at 129 -130).

-7-

partnership. <u>Dreyfus</u>, <u>supra</u>, at 439.

In this instance, the proposed Marketing Agreement never states or implies that Lochmere is, or will be, a partner with H. D. Associates or with any of the Eiger Entities and does not give Plaintiffs any right of control or ownership interest, or provide that they will share in any losses, relating to Hammock Dunes.[5] Indeed, during his deposition, Evans confirmed that his companies were <u>not</u> going to contribute any money to the project and would <u>not</u> have to share in any losses. (Evans Dep. III at 320).

Moreover, the undisputed evidence demonstrates that H. D. Associates and the Eiger Entities clearly did <u>not</u> agree to either the proposed Marketing Agreement or to the proposed Management Agreement. Indeed, not only does Rowsey deny that any agreement was reached (Rowsey Dep. at 26, 70), but Evans himself admitted that no representative of the Eiger Entities ever told him that they would sign these documents or made any commitment to pay the compensation provided by the documents. (Evans Dep. I at 136-137, 166-167; Evans Dep. III at 150-151, 188-189, 191-192, 210-211). Of course, a binding and enforceable contract requires "mutual assent to certain and definite contractual terms; without a meeting of the minds on all of the essential terms, no enforceable contract arises." <u>University Creek Assoc. II, Ltd. v. Boston Am. Financial Group, Inc.</u>, 100 F.Supp.2d 1337, 1340 (S.D. Fla. 1998). Thus, even if the documents provided for the establishment of a partnership, no partnership was created because the parties did not reach a mutual assent

---

[5] The proposed Management Agreement that Evans presented also did not provide that Evans or Lochmere Development would have any right of control over, or ownership interest in, Hammock Dunes or provide that Evans or Lochmere Development would share in any losses of the project. (Am. Compl. Ex. "K").

regarding all of the essential terms.

### 3.    Evans Admitted There Was No Partnership

Finally, if there were any lingering doubt, during his deposition Evans admitted that

even he does not consider that a partnership was created between his companies and the Eiger

Entities.  Evans testified:

> **Q:** (BY MS FARQUHAR)  In your capacity as president of Lochmere
> Development Group, Inc., <u>are you claiming that Lochmere Development Group, Inc.
> is now or has ever been a partner</u> with Eiger Fund I, L.P., Eiger, Inc., Eiger Partners,
> L.P., HD Associates L.P., Paul E. Rowsey, III, C. Todd Miller, David M. Jacobs or
> William S. Buchanan?
> **MS. LUEBKER**: Objection, form.
> **A:**      <u>Not that I'm aware of.</u>
> **Q:** (BY MS. FARQUHAR) In your capacity as president and corporate
> representative of Lochmere Realty, Inc., <u>is Lochmere Realty, Inc. claiming that is
> now or has ever been a partner</u> with Eiger Fund I, L.P., Eiger, Inc., Eiger Partners,
> L.P., HD Associates, L.P., Paul Rowsey, III, C. Todd Miller, David Jacobs or
> William Buchanan?
> **MS. LUEBKER**: Objection to form.
> **A:** <u>Based on my understanding of the definition of "partnership," no.</u>
> * * *
> **Q:** (BY MS. FARQUHAR) Okay.  Relying on your definition of
> "partnership" and your understanding of partnership, <u>has Lochmere Development
> Group, Inc., to your knowledge, ever entered into an agreement, whether it's written
> or oral, to form a partnership</u> with any of the plaintiffs in this lawsuit?
> **A:** <u>Not that I recall at this time.</u>
> **Q:** And relying on your understanding of partnerships, <u>has Lochmere
> Development Group, Inc. ever entered into an agreement whether it's written or oral
> to enter into a partnership</u> with any of the plaintiffs in this lawsuit?
> **A:** <u>Not that I recall.</u>

(Evans Dep. II at 12-13, 16) (emphasis added).

The Court therefore should enter summary judgment in favor of the Eiger Defendants

as to Count III.

**C.    The Court Should Enter Summary Judgment As to Counts VIII and IX**

**1.    The Eiger Entities Did Not Fraudulently Misrepresent that they Would Pay Plaintiffs**

In their Amended Complaint, Plaintiffs assert that the Eiger Entities "made repeated and false representations of fact regarding the compensation which LOCHMERE would receive upon closing of the sale, purchase and development of the project ... for the purpose of inducing LOCHMERE to continue to work on the Project." (Am. Compl. ¶¶ 192, 194, 200). In his depositions, however, Evans, admitted that no representative of the Eiger Entities ever told him that they would sign these agreements or made any commitment to pay the compensation called for in those agreements. (Evans Dep. I at 136-137, 166-167; Evans Dep. III at 150-151, 188-189, 191-192, 210-211).

To prevail on a claim for fraudulent misrepresentation, it is fundamental that a plaintiff demonstrate, among other things, that defendant knowingly made a false statement. See State Farm Mut. Automobile Ins. Co. v. Novotny, 657 So.2d 1210, 1213 (Fla. 5th DCA 1995). In this instance, by the admission of Plaintiffs' own corporate representative, the Eiger Entities in fact made no false statements that Plaintiffs would be paid the compensation they were seeking. Therefore, Plaintiffs cannot establish any of the requisite elements for fraudulent misrepresentation.

**D.    Plaintiffs' Fraud Claim Is Barred by the Economic Loss Rule**

Furthermore, as distinguished from claims for fraud in the inducement which under some circumstances can constitute an independent tort, Florida courts have consistently held

5361.1                                              -10-

that claims for economic damages arising from promises or assurances in connection with the performance of a contract, either express or implied, are precluded by the economic loss rule. See, e.g., Pressman v. Wolf, 732 So.2d 356, 361 (Fla. 3d DCA 1999); Straub Capital Corp. v. L. Frank Chopin, 724 So.2d 577, 579 (Fla. 4th DCA 1998); Interstate Securities Corp. v. Hayes, 920 F.2d 769 (11th Cir. 1991). The Court therefore should enter summary judgment in favor of the Eiger Defendants as to Counts VIII and IX.

**E.      The Court Should Enter Summary Judgment As to Counts XIV and XV**

**1.      There is No Confidential or Fiduciary Relationship**

Plaintiffs assert that the Eiger Entities committed "constructive fraud" by acting to the detriment of the alleged partnership and by not keeping secret all confidential information created during the partnership. (Am. Compl. ¶¶ 239 - 242, 247 - 249). Constructive fraud exists where a party abuses a confidential or fiduciary relationship. Saglio v. Chrysler First Commercial Corp., 839 F. Supp. 830, 833 (M.D. Fla. 1993); Rogers v. Mitzi, 584 So.2d 1092, 1094 (Fla. 5th DCA 1991). As demonstrated above, as a matter of law, no partnership was formed between the parties. Therefore, no confidential or fiduciary relationship can be premised on that basis.

In addition to negating the existence of a partnership between the parties, the proposed Management Agreement also states that it will not be deemed to constitute "any other relationship other than that of contract parties hereunder . . . ." (Am. Compl. Ex. "K", § 4.4). The language of this section not only precludes any finding of a partnership, but also clearly indicates that the parties were dealing at arm's length rather than in any *confidential*

5361.1                                    -11-

or fiduciary relationship. See Amoco Oil Co. v. Gomez, 125 F. Supp.2d 492, 508 (S.D. Fla. 2000) (similar language precluded gas station operator's claim for breach of fiduciary duty).

### 2. Plaintiffs' Constructive Fraud Claims Are Preempted by the Florida Uniform Trade Secrets Act

Furthermore, to the extent that Plaintiffs' constructive fraud claims are predicated upon the alleged disclosure of any purported trade secrets (see Am. Compl. ¶¶ 239-242, 247-252), they are preempted or displaced by the Florida Uniform Trade Secret Act. Section 688.008(1), Fla. Stat., provides "[e]xcept as otherwise provided in subsection (2), ss. 688.001-688.009 (the Florida Uniform Trade Secret Act) displace conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret."

Courts have repeatedly held that common law tort remedies involving trade secret misappropriation are preempted by the Uniform Trade Secret Act and can no longer be asserted as separate claims apart from the statutory remedy. Del Monte Fresh Produce Co. v. Dole Food Co., 136 F. Supp. 1271, 1291 (S. D. Fla. 2001); All Sports Camp, Inc. v. Walt Disney Co., 727 So.2d 363, 367 (Fla. 5th DCA 1999). Accordingly, to the extent that Plaintiffs are seeking to recover damages for misuse or misappropriation of their alleged trade secrets based upon a tort theory of constructive fraud, their claims are displaced by the Act. See S&S Computers & Design, Inc., No. Civ. A 500CV00058, 2001 WL 515260, at 3 (W.D. Va. Apr. 5, 2001); Composite Marine Propellers, Inc. v. Van Der Woude, 962 F.2d 1263, 1265 (7th Cir. 1992); Venango River Corp. v. NIPSCO Industries, Inc., No. 92 C 2412, 1994 WL 702759 at *8 (N.D. Ill. 1994).

**3.    Plaintiffs' Constructive Fraud Claim Are Barred by the Economic Loss Rule**

To the extent that Plaintiffs' claims for constructive fraud are grounded upon the Eiger Defendants' alleged failure to perform under the proposed contract (Evans Dep. III at 292-293), they also are barred by the economic loss rule.  See Clayton v. State Farm Mut. Auto. Ins. Co., 729 So.2d 1012, 1013 (Fla. 3d DCA 1999); McCutcheon v. Kidder, Peabody & Co., 938 F. Supp. 820, 823 (S.D. Fla. 1996); Interstate Securities, supra, 920 F.2d at 776-777.

**F.    The Court Should Enter Summary Judgment on Counts XX and XXI.**

**1.    A Claim for Unjust Enrichment is Preempted by the Florida Uniform Trade Secrets Act**

As with respect to the Plaintiffs' claims for constructive fraud, Plaintiffs' claims for unjust enrichment, to the extent that they are based on any alleged use or disclosure of Plaintiffs' alleged trade secrets, are preempted by the Florida Uniform Trade Secrets Act. Section 688.008(1), Fla. Stat., provides that the Act also displaces restitutory laws as well as common law tort and other conflicting laws concerning misappropriation of trade secrets. See Del Monte, supra, 136 F. Supp. 1271.

Unjust enrichment clearly is a restitutory remedy.  See Yates v. Bernard's Carpet and Draperies, Inc., 481 So.2d 515, 516 (Fla. 4th DCA 1985); Restatement of Restitution § 1.  In asserting these claims, Plaintiffs seek to be compensated for any benefits derived from the Eiger Entities' alleged use or disclosure of its purported trade secrets.  (Am. Compl. ¶¶ 284, 285, 290, 291).  These claims therefore are preempted by the Uniform Trade Secrets Act. See

5361.1                                          -13-

GlassTech, Inc. v. TGL Tempering Systems, Inc., 50 F.Supp. 722, 730 (N.D. Ohio 1999); Hutchinson v. KFC Corp., 809 F. Supp. 68, 71 (N.D. Ill. 1995); Web Communications Group, Inc. v. Gateway 2000, 889 F.Supp. 316, 321 (N.D. Ill. 1995).

### 2.  The Expectation of a Potential Future Business Opportunity Cannot Form the Basis for a Claim for Unjust Enrichment

It is well-settled law that no recovery can be had for preliminary services which are provided with a view toward obtaining business through a hoped-for contract, and the expectation of a future business opportunity cannot form the basis for a quantum meruit or unjust enrichment claim.  See Cherokee Oil Co. v. Union Oil Co. of California, 706 F. Supp. 826, 830 (M.D. Fla. 1989); Peko Oil USA v. Evans, 800 S.W. 2d 572, 576-577(Tex. App. – Dallas 1990); North Am. Financial Group, Inc. v. S.M.R. Enter., Inc., 583 F. Supp. 691 (N.D. Ill. 1984); Maple Island Farm, Inc. v. Bitterling, 209 F.2d 867, 871-872 (8th Cir. 1954); Restatement of Restitution § 57 (1937).

Plaintiffs approached the Eiger Entities with a business opportunity to purchase Hammock Dunes.  Plaintiffs did so in the hopes of entering into the Management and Marketing Agreements. Plaintiffs never kept any records with respect to the time that they spent on the Hammock Dunes project (Evans Dep. III at 32) and never submitted any bills to the Eiger Entities for any services. (Rowsey Aff. ¶ 18).  As in Cherokee Oil Co., this case likewise "simply involves a business deal that was never consummated." See 706 F.Supp. at 830.  Accordingly, Plaintiffs have no claim for unjust enrichment or quantum meruit.

### G.  The Court Should Enter Summary Judgment As to Counts XXVII and XXVIII

5361.1                                -14-

### 1. Plaintiffs Failed to Demonstrate a Trade Secret

A trade secret is defined by the Florida Uniform Trade Secret Act, Section 688.002(a), Fla. Stat., as follows:

> . . . information, including a formula, pattern, compilation, program, device, method, technique or process that:
>
> (a) Derives independent economic value, actual or potential, from not being generally known to, and not be readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
>
> (b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

To establish a claim, the plaintiff bears the burden of demonstrating both that specific information it seeks to protect is secret and that it has taken reasonable steps to protect this secrecy. American Red Cross v. Palm Beach Blood Bank, Inc., 143 F.3d 1407 (11th Cir. 1998) (citing Lee v. Cercoa, 433 So.2d 1, 2 (Fla. 4th DCA 1983)).

Plaintiffs contend that the purported "trade secrets" they gave to the Eiger Defendants consisted primarily of a "Master Development Budget" which they prepared for the Hammock Dunes project. (Evans Dep. III at 225-226). The Master Development Budget was a computer-generated spread sheet of rows and columns containing various income and expense items projected for the Hammock Dunes Project. (Evans Dep. II Ex. 36; Evans Dep. III, Exs. 38, 46-50) (filed under seal). The budget was inputted on "Lotus" or "Excel" software -- common off-the-shelf computer programs which are commercially available to anyone who wants to purchase them. (Evans Dep. III at 161, 162).

The information in the budget was assembled from the seller, ITT, from consultants

whom Lane had hired and whose fees were ultimately paid by the Eiger Entities (and not by Lochmere Development), and from publicly available documents. (Evans Dep. III at 166, 170-171, 256). The information was not secret or confidential, but was available to the prior prospective purchaser or to the Eiger Entities as well as to Lochmere Development. (Evans Dep. III at 178-179, 242). Evans conceded that Defendants could have put together their own budget given adequate time. (Evans Dep. III at 227).

In Public Systems, Inc. v. Towry, 587 So. 2d 969, 971-972 (Ala. 1991), the Supreme Court of Alabama held that the plaintiff's "spreadsheet software data program" did not meet the definition of a trade secret because the spreadsheet program was an "off-the-shelf computer program" that was "available to anybody who wants to go down to the software store and buy it," and the information in the spreadsheet data program–a map, population figures, and other figures gleaned from public documents–was "readily available to the public" Id.

In this instance, the Master Development Budget likewise started with an off-the-shelf computer spreadsheet program. All of the information contained in the spreadsheet program was either not assembled by Plaintiffs or was available to the public. Under these facts, this Court should find, as the court held in Public Systems, that Plaintiffs have failed to establish a trade secret.

2.      **Plaintiffs Failed to Preserve or Waived Any Claim of Trade Secrets by Disclosing The Alleged Trade Secret To a Third Party.**

In attempting to interest Starwood in Hammock Dunes after Eiger refused to agree to

his proposed Management Agreement, Evans gave Starwood representatives a copy of the Master Development Budget which Starwood evaluated and used in making its own offer to purchase the property. (Evans Dep. III at 298, 302-305). Moreover, Evans disclosed this information to Starwood without any confidentiality agreement and without any contract for his or Lochmere Development's services. (Evans Dep. III at 313, 324).

The United States Supreme Court has held that "[i]f an individual discloses his trade secret to others who are under no obligation to protect the confidentiality of the information, or otherwise publicly discloses the secret, his property right is extinguished." Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1002 (1984). Thus, Lochmere's disclosure of the Master Development Budget to Starwood without adequate confidentiality arrangements extinguishes Lochmere's property rights in the document and precludes the claim for misappropriation of trade secrets.

### 3. The Eiger Entities' Use of the Information Was Not Improper.

The Eiger Entities' alleged use of the Master Development Budget was not improper because Lochmere's purpose in providing the information to the Eiger Entities was to assist the Eiger Entities in evaluating whether to make an offer to purchase Hammock Dunes.(Evans Dep. IV at 457)[6] The Eiger Entities' use of the information in that very manner cannot be held to be an improper misappropriation because that use was not adverse

---

[6] Evans also alluded to a "draw package" that Lochmere Development provided to the Eiger Entities as alleged "trade secrets." (Evans Dep. III at 226). These documents consisted of a set of blank financial forms which the borrower was supposed to submit to the project lender to receive disbursements of a loan contemplated for the project. (Rowsey Aff. ¶ 12). It is undisputed, however, that the Eiger Entities never used these documents for any purpose. (Id.).

5361.1                                    -17-

to the purpose for which the information was disclosed. In <u>Vernango River Corp. v. NIPSCO</u>

<u>Industries, Inc.</u>, 1994 WL 702759, at *10  (N.D. Ill. December 15, 1994), the Court held:

> What is absent in this case is an improper use of the information. <u>See</u> <u>Omnitech Int'l</u>
> <u>Inc.</u>, 11 F.3d at 1324-26 (no improper use where alleged trade secrets revealed during
> negotiations with plaintiff simply made defendant "smarter" about investigating
> similar business deal). Plaintiffs were acting on the South Shore's behalf when they
> disclosed the information, and their objective was to facilitate the economic stability
> of the South Shore. Even if the Court assumes, arguendo, that NIPSCO used the
> information to formulate its bid to buy the South Shore, such a use was not adverse to
> the purpose for which the information was disclosed.

Consequently, the Eiger Entities are entitled to Summary Judgment on Plaintiffs'

claim for misappropriation of trade secrets.

### H.    Plaintiffs' Conversion Claims in Counts XXXIV and XXXV Are Likewise Preempted by the Uniform Trade Secret Act

Plaintiffs seek to recover damages for disclosure or use of its alleged trade secrets

based upon a common law conversion theory.  (Am. Compl. ¶¶ 388-393, 397-402).  As noted

above, the Florida Uniform Trade Secret Act, Section 688.008, clearly displaces and

preempts common law tort remedies involving trade secret misappropriation.  <u>Del Monte,</u>

<u>supra,</u> 136 F. Supp. at 1271; <u>All Sports Camp, supra,</u> 727 So.2d at 367.   In light of the

statutory preemption, numerous courts have granted summary judgments as to claims for

common law conversion when the subjects of the claimed conversions are alleged to be trade

secrets.  <u>See</u> <u>Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.</u>, 132 F. Supp. 643, 647-648

(N. D. Ill. 2001); <u>Thomas & Betts Corp. v. Panduit Corp.</u>, 108 F.Supp. 968, 973 (N. D. Ill.

2000); <u>see</u> <u>also</u> <u>Garrido v. Burger King Corp.</u>, 558 So.2d 79 (Fla. 3d DCA 1990) (company's

conversion and theft claims were preempted by the Copyright Act).   Thus, Plaintiffs' claims

5361.1                                               -18-

for "conversion" of their alleged trade secrets are precluded as a matter of law, and summary judgment should be entered in favor of the Eiger Defendants as to these claims.

**I.     Plaintiffs' Claim for Civil Conspiracy in Count XXXVIII Must Fail Because Plaintiffs Have No Viable Underlying Tort Claim**

The elements of a claim for civil conspiracy are (a) a conspiracy between two or more parties; (b) to do an unlawful act or to do a lawful act by unlawful means; (c) the doing of some overt act in pursuance of the conspiracy; and (d) damage to the plaintiff as a result of acts done under the conspiracy. Primerica Financial Serv., Inc. v. Mitchell, 48 F.Supp. 1363, 1369 (S. D. Fla. 1999); Florida Fern Growers Ass'n, Inc. v. Concerned Citizens of Putnam Co., 616 So.2d 562, 565 (Fla. 5th DCA 1993). The gist of an action for civil conspiracy is not the conspiracy itself, which furnishes no independent cause of action, but the alleged wrong committed by the conspirators. Id. Wright v. Yurko, 446 So.2d 1162, 1165 (Fla. 5th DCA 1984). Thus, where the underlying tort claims are legally insufficient, summary judgment also is appropriate with respect to a claim for civil conspiracy. Griese-Traylor Corp. v. First Nat'l Bank of Birmingham, 572 So.2d 1039, 1045-1046 (5th Cir. 1978).

In this instance, Plaintiffs allege that Defendants conspired to "usurp the partnership opportunity of the Project," to "unlawfully misappropriate trade secrets of LOCHMERE" and "wrongfully induce LOCHMERE to work on the Project, while knowing that they had no intention of compensating LOCHMERE." (Am. Compl. ¶ 427). As demonstrated above, the claims underlying the purported conspiracy -- breach of the Florida Uniform Partnership Act, conversion or misappropriation of trade secrets, and actual or constructive fraud -- are legally

5361.1                                                -19-

insufficient. Accordingly, summary judgment must be entered in the Eiger Defendants' favor as Plaintiffs' claim for civil conspiracy is predicated upon those underlying claims.

## III.   CONCLUSION

For all of these reasons, the Eiger Entities respectfully request that the Court enter summary judgment in their favor as to Counts III, VIII , IX, XIV, XXVII, XXVIII, XXXIV, XXXV, and XXXVIII of Plaintiffs' Amended Complaint and that the Court grant said them costs, expenses, and reasonable attorney's fees.

Respectfully submitted,

Daniel F. Molony (FBN 271330)
James B. Murphy, Jr. (FBN 287598)
SHOOK, HARDY & BACON L.L.P.
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
(813) 202-7100 / (813) 221-8837 - Facsimile
                and
Alan S. Loewinsohn
Carol E. Farquhar
Pezzulli & Loewinsohn, L.L.P.
18383 Preston Road, Suite 110
Dallas, Texas 75252
(972) 713-1300 / (972) 713-1313 - Facsimile
Attorneys for The Eiger Entities

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by facsimile transmission and by United States Mail to Gregory J. Orcutt, Esq., Bricklemyer, Smolker & Bolves, P.A., 500 E. Kennedy Blvd., Suite 200, Tampa, FL 33602 and Alan B. Gerlach, 390 N. Orange Avenue, Suite 1100, Orlando, FL 32801 this 5 day of July, 2001.

5361.1                                                -20-