UNITED STATES DISTRICT COURT
Middle District of Florida

**FILED**

CA

Date 7-5-01       Time _____

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

LOCHMERE DEVELOPMENT GROUP, INC.,
and LOCHMERE REALTY, INC.,

         Plaintiffs,

vs.                    Case No.:      8:00-CV-1026-T-278
                       State Court No.: 00-02525/Div. I

H.D. ASSOCIATES, L.P., a Delaware Limited
Partnership by and through its general partners
DUNES OPERATING COMPANY, L.P., a
Delaware limited partnership and EIGER, INC.,
a Delaware corporation, 2M DUNES, L.L.C.,
a Texas limited liability company; DAVID LANE,
an individual; BARNETT LANE INVESTMENTS, INC.,
a Texas corporation; JTL CAPITAL, L.L.C.,
a Texas limited liability company; FLEET NATIONAL
BANK, N.A., a national banking association;
PAUL E. ROWSEY, III, an individual; C. TODD
MILLER, an individual, DAVID M. JACOBS, an
individual; and WILLIAM S. BUCHANAN, an
individual,

         Defendants.
_____/

| | |
|---|---|
| **DEPOSITION OF:** | **NICHOLAS WHITING** |
| TAKEN: | Pursuant to Notice |
| DATE: | June 15, 2001 |
| TIME: | 9:50 a.m. - 12:30 p.m. |
| PLACE: | Shook, Hardy & Bacon<br>100 North Tampa Street<br>Suite 2900<br>Tampa, Florida  33602 |
| BEFORE: | SHARLENE R. FARMER<br>Notary Public<br>State of Florida |

**COPY**



**BAY AREA REPORTING, INC.**

SUNTRUST FINANCIAL CENTRE  •  TAMPA, FLORIDA 33602
401 EAST JACKSON STREET    •    (813) 229-7207
SUITE 2320                              FAX (813) 229-8498

94

Page 1

UNITED STATES DISTRICT COURT
Middle District of Florida

LOCHMERE DEVELOPMENT GROUP, INC.,
and LOCHMERE REALTY, INC.,

                    Plaintiffs,

vs.                    Case No.:    8:00-CV-1026-T-278
                       State Court No.: 00-02525/Div. I

H.D. ASSOCIATES, L.P., a Delaware Limited
Partnership by and through its general partners
DUNES OPERATING COMPANY, L.P., a
Delaware limited partnership and EIGER, INC.,
a Delaware corporation, 2M DUNES, L.L.C.,
a Texas limited liability company; DAVID LANE,
an individual; BARNETT LANE INVESTMENTS, INC.,
a Texas corporation; JTL CAPITAL, L.L.C.,
a Texas limited liability company; FLEET NATIONAL
BANK, N.A., a national banking association;
PAUL E. ROWSEY, III, an individual; C. TODD
MILLER, an individual, DAVID M. JACOBS, an
individual; and WILLIAM S. BUCHANAN, an
individual,

                    Defendants.
_____/

DEPOSITION OF:      NICHOLAS WHITING

TAKEN:              Pursuant to Notice

DATE:               June 15, 2001

TIME:               9:50 a.m. - 12:30 p.m.

PLACE:              Shook, Hardy & Bacon
                    100 North Tampa Street
                    Suite 2900
                    Tampa, Florida  33602

BEFORE:             SHARLENE R. FARMER
                    Notary Public
                    State of Florida

Page 2

APPEARANCES:

          GREGORY J. ORCUTT, ESQUIRE
          Bricklemyer, Smolker & Bolves, P.A.
          500 East Kennedy Boulevard
          Suite 200
          Tampa, Florida  33602
                 Attorney for Plaintiff

          CAROL E. FARQUHAR, ESQUIRE
          Pezzulli & Loewinsohn, L.L.P.
          18383 Preston Road
          Suite 110
          Dallas, Texas  75252
                 Attorney for Defendant; H.D.
          Associates, L.P. Dunes Operating
          Company, L.P., Eiger, Inc., 2M Dunes,
          L.L.C., Eiger Fund 1 L.P., Eiger
          Partners, L.P., L.P., Paul E. Rowsey,
          III, C. Todd Miller, David M. Jacobs,
          William S. Buchanan and Fleet National
          Bank f/k/a BankBoston, N.A.

          DORA KAUFMAN, ESQUIRE
          Halley, Sinagra & Perez
          100 S.E. 3rd Avenue
          Suite 1900
          Fort Lauderdale, Florida  33394
                 Attorney and Co-Counsel for
          Defendant; Fleet National Bank f/k/a
          BankBoston, N.A.

          ALAN M. GERLACH, ESQUIRE
          Broad and Cassel
          390 North Orange Avenue
          Suite 1100
          Orlando, Florida  32801
                 Attorney for Defendant; David
          Lane, Barnett Lane Investments, Inc.,
          and JTL Capital, L.L.C.

Page 3

C O N T E N T S

                    PAGE

DIRECT EXAMINATION BY MR. ORCUTT         05
CROSS-EXAMINATION BY MR. GERLACH         101
CROSS-EXAMINATION BY MS. FARQUHAR        104
STIPULATIONS                             105
CERTIFICATE OF OATH-REPORTER'S CERTIFICATE 106-107
ERRATA                     108-          109

E X H I B I T S

PLAINTIFF'S EXHIBIT NO. 1                 15
   (Memo dated June 3, 1999)
PLAINTIFF'S EXHIBIT NO. 2                 27
   (Memo dated May 3, 1999)
PLAINTIFF'S EXHIBIT NO. 3                 29
   (Letter dated March 30, 1999)
PLAINTIFF'S EXHIBIT NO. 4                 33
   (Funding Summary Bate Stamp BB 4808)
PLAINTIFF'S EXHIBIT NO. 5                 40
   (Hammock Dunes - Conservative Case)
PLAINTIFF'S EXHIBIT NO. 6                 43
   (Cash Flow Projections)
PLAINTIFF'S EXHIBIT NO. 7                 58
   (Letter dated June 17, 1999)
PLAINTIFF'S EXHIBIT NO. 8                 63
   (Fax dated June 17, 1999)

Page 4

E X H I B I T S

                    PAGE

PLAINTIFF'S EXHIBIT NO. 9                 64
   (Letter dated June 24, 1999)
PLAINTIFF'S EXHIBIT NO. 10                69
   (Fax dated June 16, 1999)
PLAINTIFF'S EXHIBIT NO. 11                74
   (Hammock Dunes Investment Proforma)
PLAINTIFF'S EXHIBIT NO. 12                76
   (Exhibits to Senior Secured Credit Agreement)
PLAINTIFF'S EXHIBIT NO. 13                89
   (Indemnity Agreement)
PLAINTIFF'S EXHIBIT NO. 14                94
   (Letter dated July 12, 1999)

CondenseIt!™

Page 5

NICHOLAS WHITING, the deponent herein, after first being duly sworn on oath, was examined and deposed as follows:

DIRECT EXAMINATION

BY MR. ORCUTT:

Q. Please state your name, for the record.

A. Nicholas Whiting.

Q. And what's your occupation, Mr. Whiting?

A. I'm now in farming.

Q. Okay. And where is that?

A. Osteen, Florida.

Q. Where is that?

A. That is east of Sanford.

Q. Okay. How long --

A. Volusia County.

Q. Volusia County. Do you have an address?

A. The farm does have an address. 1411 Osteen-Maytown.

Q. Spell that.

A. O-S-T-E-E-N --

Q. Okay.

A. -- hypen Maytown, M-A-Y-T-O-W-N, Road. Osteen, 32764, I believe.

Q. And is there a phone number there?

A. At the farm? There is a number,

Page 6

407-328-4444.

Q. And how about your home address?

A. Home address is 1091 New Castle Lane.

Q. Two words?

A. Yes.

Q. Or three words?

A. Three words, sorry. New Castle Lane, Ovidvo, O-V-I-D-V-O, Florida, 32765.

Q. And do you have a phone number there?

A. Sure. 407-977-4666.

Q. And I won't be calling you, but I just -- I wanted to have it, for the record, just in case somehow we needed to get a hold of you.

A. Sure.

Q. You say your occupation now is a farmer?

A. Correct.

Q. Tell me just generally about that business and how -- how you got into it.

A. We are a sod producer. We started this farm about a year ago, 18 months. It was started on my family property, which is an old cattle ranching family in the area. I started that when I left the bank in November of '99.

Q. Okay. And you say "we". Is it a group of you that are in this business?

Page 7

A. I have investors.

Q. Okay. How did you come about the idea of becoming a sod farmer?

A. Yeah. I -- one of my early jobs out of college was with the Federal Land Bank and Credit Association and we worked in Belle Glades, which was a fairly large sod farming area. And so I became aware of the industry.

Q. Okay. Give me just generally your educational background and work experience. I don't need to have every job, but give me --

A. Sure.

Q. -- a couple seconds on -- on it.

A. That's all it takes. I've got -- I graduated from the University of Florida in '77. Majoring in agriculture economics with a minor in business administration.

Q. Okay. And then what did you do --

A. After -- after graduation?

Q. Just general -- yeah.

A. First job spent roughly six months with the Department of Plant Industry, which is a State Agency in the agriculture world. After that I went to work for the Federal Land Bank and Credit Association, with them for four years. After that

Page 8

spent the next four years with a nursery grower and landscape contractor in West Palm Beach. After that a -- approximately a year and-a-half with the Community Bank in Gainesville.

Q. So that was your first entry into the banking industry or other than with the --

A. Land Bank, yeah, this -- in residential and commercial banking would have been that.

Q. Okay.

A. Yes, prior to it would be strictly agriculture.

Q. Okay. Go ahead.

A. And then from -- from the Community Bank in Gainesville I went to work for the Bank -- for BankBoston. Started out in Boca Raton and then our office was closed and relocated to Atlanta. I was up there for approximately ten years.

Q. And then you left, as you said, I think in November of '99?

A. Correct, November 1.

Q. Was that your choice --

A. Sure.

Q. -- to leave banking?

A. Yes.

Page 9

Q. Okay. What -- what was your first knowledge of the Hammock Dunes -- what I'll call the Hammock Dunes project? Is that -- can I call it that?

A. Sure.

Q. What was your first knowledge of that project?

A. My first knowledge of it was being -- living in Volusia County was being in -- generally aware of the project being up there.

Q. Meaning -- was your family still on this property or did you maintain a home there or were you commuting or what --

A. You mean the property where our ranch is?

Q. Yes.

A. No. I -- at that point I was -- the family is still in the area, but when you grow up in the area 50 miles away you're aware of projects that go on. So that's where I first became aware of it. So that would have been years ago.

I think in context of your question as far as it relates to BankBoston and this transaction, I presume is what you're asking.

Q. Well, I was first asking as you just pointed out that you had a general familiarity

Page 10

with it having grown up near that area.

A. Yes.

Q. Now, go to BankBoston and how in your capacity at BankBoston you first became aware of it.

A. I -- I was contacted -- I'm not sure. It would have been either by Bob Avil or Mark Basham informally, purely on an oral basis, just giving a -- in the hall sort of meeting that, oh, by the way, we may be looking at a project or a borrower may be looking at a project in Florida called Hammock Dunes.

Q. Okay. And did you -- what did you say in response to that, if anything?

A. Yes.

Q. Did you say, I'm familiar with it. I grew up near -- did you say anything like that or --

A. No.

Q. -- or just, yes?

A. No. They were probably aware of it -- aware that I was -- that they were certainly aware that I was from Florida and probably assumed that I knew of the project. Not that -- that was germane.

Q. Although at least was helpful to the

Page 11

extent that you knew about it and you knew the area?

A. I guess. I mean -- but that's true.

Q. Had some knowledge of Florida real estate?

A. Yes.

Q. How many years did you say you were with BankBoston?

A. Ten.

Q. And you were a vice-president when you left; is that correct?

A. Correct. Correct.

Q. How -- where is a vice-president in the hierarchy of the Atlanta -- as it's been explained to me -- of the Atlanta Branch or Division or Department of the -- of BankBoston?

A. Um-hum. (Indicating affirmatively.) From the lending prospective?

Q. Yes, sir.

A. There are -- when I entered the bank, I believe the title was something called a mortgage loan officer. There were several progressions between that and vice-president. I think they called them loan specialists. And you have different grades from that. Then you make -- you make vice-president. There may be grades of

Page 12

vice-president.

Q. Is director above vice-president? Is that the next step?

A. Yes, a director would be considered above a vice-president. Actually, they are really more -- the difference is a corporate title versus a -- or a corporate position versus a functional. But I would -- I would submit that the director would typically be considered a higher position than just the vice-president.

Q. What was the department within BankBoston in Atlanta that -- that handled this loan?

A. Real estate.

Q. Okay. And you and Mr. Avil were assigned to this project?

A. Yes.

Q. And Mr. Basham was both of your superior -- he was your superior?

A. Yes.

Q. Then above him was Mr. --

A. Bill Hill.

Q. Okay. And as I have been told at that time final authority for a loan of that size was approved -- ultimately approved in Boston. Is that your understanding?

Page 13

A. Correct. Yes, it is.

MR. ORCUTT: Took a lot less time answering those questions. Off the record.

MS. FARQUHAR: No, let's not go off the record.

MR. ORCUTT: All right. Then I won't break up for any levity whatsoever and we'll just go forward.

BY MR. ORCUTT: (resuming.)

Q. The -- after the -- after the meeting in the hallway where you were told to, I guess work on this project -- or what happened after the conversation in the hall where you were told about the project?

A. Well, the -- with the passage of time I'm not sure what -- what that would have been, maybe a few weeks, we were contacted again and indicated that the project was moving forward and that we would need to submit a -- a memo to marketing committee --

Q. Okay.

A. -- that basically outlines the deal.

Q. What now -- was Eiger identified as the potential borrower or who was?

A. Yes, Eiger.

Page 14

Q. And what do you know or did you know about Eiger at that time?

A. I knew that they were a previous bank customer and that's roughly it.

Q. In what form?

MS. FARQUHAR: Objection, ambiguous.

BY MR. ORCUTT: (resuming.)

Q. Is it Eiger, Inc.? Eiger Fund? Eiger Partners? Was there a distinction? Did you know?

A. I don't know.

Q. You just knew the name Eiger?

A. I knew the name Eiger.

Q. Do you know what that previous banking relationship was?

A. I know that the principals of Eiger had previously worked for another bank customer named Rosewood Properties.

Q. Okay. What -- anything else?

A. (Indicating.)

Q. Did you know the specifics of what the banking relationship was?

A. I had never dealt with Rosewood or Eiger prior to.

Q. Okay. You talk about this memo and I'm going to get to that.

Page 15

A. Okay.

Q. Let me hand you that which I'll mark as Exhibit 1 to your deposition and ask if you can identify this document.

(Whereupon, Exhibit No. 1 was so marked by the court reporter.)

MR. ORCUTT: Do you want them, again?

MS. FARQUHAR: Yes.

MR. GERLACH: Yeah, I don't have them.

MR. ORCUTT: And you don't have it all and I brought an extra copy this time for you.

MS. KAUFMAN: I appreciate it. Thank you.

MR. GERLACH: P-1.

THE WITNESS: This looks familiar.

BY MR. ORCUTT: (resuming.)

Q. Okay. Your name is on it as an author, is it not?

A. It is as an author, correct.

Q. How did this memo come to be prepared and what was the source of the information that's contained within the memo?

Page 16

MS. FARQUHAR: Objection, compound.

MR. GERLACH: Compound.

MR. ORCUTT: Compound.

BY MR. ORCUTT: (resuming.)

Q. I'm sorry. Go ahead and answer the question. How did the memo come to be prepared? We'll ask that first.

A. The -- there are two authors that you note, myself and Bob Avil. As I recall each of us obtained pieces of information with respect to the different categories of the underwriting points being made. We obtained that generally through discussions with Mark Basham and/or Paul Rowsey and it was a collusive effort --

Q. Effort.

A. -- then to put the memo together.

Q. Was it Basham that -- that had the most previous knowledge of Eiger and Rowsey and the -- and the background within the bank?

A. To the best of my knowledge.

Q. Who actually prepared this document? Was it -- was it you or Mr. Avil or someone else?

A. As I say, it was a collusive effort between Bob and myself.

Q. If you recall, did you have more input

Page 17

into the preparation of this document than Mr. Avil?

A. I can't say.

Q. Let's -- let's talk about it and I know you probably haven't seen this for a long time, but at the -- do you remember how much money BankBoston was being asked to loan?

A. No, I do not at that point without reading this document.

Q. And I'm not going to ask you to read it in detail. I'm just going to probably refer you to sections of it.

Do you remember there's -- the last line in the first paragraph that reads, To secure this obligation Eiger slash -- and I assume BKB is BankBoston -- will provide a ten million dollar Standby by Letter of Credit to ITT. Do you read that?

A. Yes, I see that.

Q. Do you remember what that meant?

A. I would have to take a second to read the context that this was written. The -- at the time this memo was prepared the deal structure was -- was just being formulated. And so I can't be certain of -- of which iteration we're talking

Page 18

about here, but I can read and a --

Q. Although it's dated 6-3-99 and the -- and the closing occurred -- you probably don't remember the specific date or do you?

A. The closing occurred after I left so I don't know.

Q. So it was after November of '99 or could it have been right around that time, if you recall?

A. No, it would have been -- it had not closed when I left the bank.

Q. Okay. So do you remember what the -- the Letter of Credit reference was or what it evolved to be?

A. One second. Just let me read the --

Q. All right.

A. -- read the paragraph. Yes. In the context of -- of this memo and under the development order that ITT held there was a contingent obligation for them to construct a second golf course. They believed -- "they" being Eiger and ITT -- that that exposure represented approximately ten million dollars.

And that this -- if they were -- if they, ITT, were to sell the property that that

Page 19

obligation survived any transfer of the property. And that hence to mitigate that exposure they wanted some sort of indemnification. And in this case in the form of a Letter of Credit.

Q. Okay. At the bottom of that page right before the bold word, Commitment, there's a sentence that reads, "Our confidence in the principals is further highlighted by BankBoston's ten million dollar direct investment in the fund." Do you read that?

A. I'm sorry. I didn't see where you were.

Q. It's right above the word, Commitment. Right near the bottom. It's the last sentence of the previous paragraph.

A. Oh, I see now, yes. Yes. Okay. I see the sentence.

Q. What is your understanding or recollection of what that means?

A. Vaguely that BankBoston had independently invested dollars in the Eiger fund -- one Eiger fund, which one I don't know, if there were more than one --

Q. Right.

A. -- I was not aware.

Q. It wasn't in this project -- it wasn't

Page 20

BankBoston -- your knowledge was not that BankBoston was investing ten million dollars in this specific venture --

A. That's correct.

Q. -- just that it had previously invested ten million dollars in the fund?

A. In the fund, correct.

Q. And what that means is the Eiger fund?

A. Correct.

Q. By the way at this point in time as of 6-3-1999 had any of the input or data that you had received to prepare this memorandum -- had the source of that been a Robert Evans?

A. To the best of my knowledge, we had not received anything from Evans at --

Q. At that point in time?

A. -- at this point, correct.

Q. Let's go to page two of that document. Now, I'm going -- that's Friday.

Let's go to page three. Under the amortization paragraph I'm -- does TBD mean to be determined?

A. Yes.

Q. Subject to completion of due diligence and approval of final business plan. I imagine that's

CondenseIt!™

Page 21

a fairly standard provision in a -- in a loan of any size let alone this size; is that correct?

A. I'm sorry?

Q. I'm asking you -- it says, That the stepdown/amortization is subject to completion of due diligence and approval of final business plan; is that correct? Was that your -- is that what that sentence says? I'm not trying to be unclear.

A. Yes. No -- no. I'm just -- yes, in other words, our -- our amortization schedule because this was very early obviously in the -- in the due diligence and review period, the deal structure had not been arranged and so the -- the repayment of capital or repayment of the entire capital structure was to be determined.

Q. And it was subject to the due diligence again and a final submission of a final business plan was my only -- only question. I think you've said the same thing.

A. Of a final business plan that we accepted, correct.

Q. Right.

A. I mean it is our due diligence, correct.

Q. Is there -- I know every -- every real

Page 22

estate loan is -- is different, but is there a -- is there a rule of thumb as far as the length of time from the bank's prospective it takes to evaluate a -- a loan application such as this?

A. I don't know that I could say there's a -- a rule of thumb since they're depending on the nature of the transaction. Some of them may be more complex involving more contingencies, involving more parties. Obviously something like that might take a little longer than a straight forward project acquisition loan.

I would say on average for the plain vanilla acquisition I would submit to you that we -- we would like to think that we would have an approval within a few weeks.

Q. Was this a plain vanilla transaction?

A. It was -- I would say maybe a vanilla with a few chocolate swirls in there.

Q. Okay. Was there -- is there a rule of thumb or a typical or an estimate you could give me as to the BankBoston review period for a loan of vanilla with a few -- whatever you said -- chunks of chocolate?

A. Yeah, I would -- it's probably getting a little -- little nebulous here. I would have a

Page 23

hard time saying what's -- what's an average.

Q. How does the -- and digressing for a moment. How does the review process generally work within BankBoston at that time in your experience?

A. The review process of?

Q. Of approving a loan in the 20 million dollar range for real estate.

A. Actually, the process is -- is pretty much the same regardless of the size. If it -- if it is such a size that warrants approval of our senior credit committee, the process is typically that our borrower, typically the developer, comes in, has provided his financial information. Provides a summary of the project and maybe begin -- the beginnings of what due diligence he has done.

After that preliminary meeting -- and presumably there would have been telephone conversations prior to -- to even get to that point. If we get to that point and it's still looking favorable that it might be something we would be interested in, in getting involved in, then they would -- "they" being a director or the marketing person that's -- that is spearheading

Page 24

the interaction with the customer, would involve somebody such as myself or one of the -- another lending officer to help begin the review and analysis of the project and the underwriting.

Q. And is -- this type of a memo is the next step in that process?

A. That would be correct. This -- this memo then is prepared to -- to submit to our marketing committee, which is comprised of -- of groups out of Boston and many other areas of the real estate department. So that many sets of eyes get a chance to look at it and perhaps say grace over or raise objections to issues that they see.

Q. Then what happens?

A. From that point on if assuming the marketing committee likes what they see, then -- then we continue and really begin in more -- more -- an earnest due diligence effort; that is, we the bank typically.

Q. And that's when the -- your appraiser and your lawyers get involved as far as -- as the due diligence on the loan?

A. Yes. Yes.

Q. How long -- again, I know this either from memory or -- or whatever, is there -- is there a

Page 25

typical period of time that it takes to canvass this marketing committee to get a consensus on a loan such as this?

A. I can't answer that. I don't know since I've -- I've rarely called the meetings. It's -- it involves a correlation of the senior management. So I don't -- I can't answer how long it takes.

Q. The -- you said depending on how much due diligence the developer had submitted to you. How detailed does the bank -- how much detail does the bank require of its own due diligence before it can approve a loan such as this?

A. The detail once -- once we begin our due diligence it is basically comprehensive. In other words, the -- whatever the borrower provides is a starting point. Our charge is to -- we ultimately have responsibility to review and identify all elements of risk and exposure to the credit. So it involves a soup to nuts as far as evaluating the project and the risks. And we do that in -- on an independent basis.

Q. Okay. Again, since it's Friday we'll move on. And, again, I asked you previously, but you were not -- you had no knowledge of any specific

Page 26

previous loans made to Eiger or any -- any of its components?

A. No. No, I did not.

Q. You wouldn't know whether BankBoston had made any acquisition in development loans to Eiger in the past?

A. Not -- not personally, no.

Q. And you don't have any specific knowledge of the terms and conditions of the BankBoston investment in the Eiger fund?

A. No, I don't.

Q. By the time that you prepared Exhibit 1 on or about June 3rd, 1999, would you have seen some budget -- budgetary information from -- from the developer?

A. I don't believe that -- that I -- when we prepared this I don't recall ever having received any information --

Q. Would --

A. -- written information.

Q. Would a cursory and review -- and I don't want you to read this in detail. And maybe you can answer it without reviewing the memo. But would a cursory review of this memo reveal that you probably or probably did not have any specific

Page 27

line item budgetary --

A. I'm sorry. Review of this memo?

Q. Yes, sir. And you may have already done it and can answer the question.

A. Yeah, I don't -- I don't believe that we had received anything at this point.

Q. Okay. Let me hand you that which I'll mark as Exhibit 2 to your deposition.

A. Okay.

Q. And ask if you would take a quick look at that and see if you can identify it.

(Whereupon, Exhibit No. 2 was so marked by the court reporter.)

THE WITNESS: I'm sorry. The question was could I identify this?

BY MR. ORCUTT: (resuming.)

Q. Yes. Can you identify that document?

A. No.

Q. I know your name is not on it, but again being on the team you may or may not have seen this document. You don't remember?

A. I don't recall seeing this.

Q. Do you remember what is called the Hammock Dunes Conservative Case? And I'll get to it later because I'll show you the actual document.

Page 28

A. Um-hum. (Indicating affirmatively.)

Q. Do you remember such a document?

A. I don't recall something called a Conservative Case. Now, maybe I should ask the question again. That -- what's in -- what's in parenthesis (Hammock Dunes Conservative Case) is referencing a set of spreadsheets. Is that what we're saying?

Q. Right.

A. I can't say that I've seen that.

Q. And, again, this is dated May 3rd and your memo Exhibit 1 was dated June 3rd.

A. Um-hum. (Indicating affirmatively.)

Q. Does this memo refresh your memory as to whether any budgetary information had been submitted by the developer prior to the preparation of Exhibit Number 1?

A. If it had I never saw it.

Q. Okay. That's a good -- that's fair. And, if you will, just keep those in a stack that will be fine.

A. Sure.

Q. Let me hand you that which I'll mark as 3. And ask if you can take a look at it and I'll ask you if you can identify it.

Condenselt!™

Page 29

A. No. I've not -- I don't recall seeing this either.

(Whereupon, Exhibit No. 3 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. It appears to be a -- at least from its cover, a document from Eiger, Inc., dated March 30, 1999. Again, sent to Basham not you.

A. Right.

Q. So you don't believe you've seen this before?

A. I don't recall seeing that, no.

Q. Just take a -- it encloses a -- what is called a -- a Hammock Dunes three year proforma and seven year proforma. Take a quick look at that, if you would.

A. Um-hum. (Indicating affirmatively.)

Q. And, again, you don't believe you've ever seen that document --

A. I don't believe so.

Q. -- before?

A. No.

Q. Does this document appear to be the type of preliminary information a developer would send to a bank seeking a loan?

Page 30

A. This would be what I would expect to have received in the -- in the very early formative stages that says, here's a summary of the deal and would you like -- can we talk about it?

Q. Does there appear to be any backup and support to any of the information that is -- that is listed on this memo?

MS. FARQUHAR: Objection, best evidence.

BY MR. ORCUTT: (resuming.)

Q. Go ahead and answer, please.

A. I'm sorry. I didn't understand.

Q. Does there appear to be any backup material to support these numbers?

MS. FARQUHAR: Objection, best evidence.

THE WITNESS: Not that I can see except the -- this may be evidence, but it would be hard to tell from the copy. There's a copy of a -- of the plan -- the sketch of the plan --

BY MR. ORCUTT: (resuming.)

Q. Okay.

A. -- which I suppose is referencing these numbers.

Page 31

Q. And, again, you talked earlier about the comprehensive due diligence that the bank would ultimately have performed on its own behalf.

A. Right.

Q. Any comprehensive due diligence would include the backup, whatever, to support the numbers on a -- on a proforma such as this, would it not?

A. Sure. Absolutely.

Q. Does this proforma -- proforma show any -- any timing of events such as take downs, construction?

MS. FARQUHAR: Objection, ambiguous. And objection, best evidence.

MR. GERLACH: I'm going to agree with the objection so as far it says it's vague.

THE WITNESS: I don't see anything that references time, other than the -- the labeling of the proforma being three and the separate proforma being seven years.

BY MR. ORCUTT: (resuming.)

Q. And, again, in the bank's comprehensive due diligence that type of information would be important, would it not?

A. It would be more detailed is what we would

Page 32

require.

Q. Same answer for monthly cash or funding requirements?

A. Correct.

Q. And there is no reference on that document to monthly cash or funding requirements, is there?

MS. FARQUHAR: Objection, best evidence.

THE WITNESS: Not that I see.

BY MR. ORCUTT: (resuming.)

Q. Or even the timing of the repayment of the debt. Is there any reference to that on this document?

A. I don't see that.

MS. FARQUHAR: Objection, best evidence.

BY MR. ORCUTT: (resuming.)

Q. And that again would be something that would be included in the -- after the bank had conducted its due diligence, correct?

A. Yes. Yes.

Q. Moving right along. Let me hand you which that I will mark as -- is that 3?

A. This was 3, right.

Q. Excuse me. I'm missing 4. There it is.

Page 33

Let me hand you that which I have marked as Deposition Exhibit 4 and ask if you can identify that.

A. I can't identify it, per se.

(Whereupon, Exhibit No. 4 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. I understand you've seen -- you've seen a document or like document in the course of --

A. I've seen similar formats to this.

Q. This is titled, Funding Summary, is it not?

A. Yes, it is.

Q. And at the bottom of that does it appear to have a date on it anywhere?

A. I don't see that.

Q. Okay. At the bottom there is a note however that reads, "That the figures for Gross Sales Revenue and Closing Costs are collected from page one of the Hammock Dunes Cash Flow Projections/Master Development Budget Prepared by Lochmere Development Group, Inc.," does it not?

A. It does.

Q. When in the process -- and, again, I think

Page 34

you said as of the June 3rd memo, which was Exhibit Number 1, that none of that data you believed had been submitted from either Bob Evans and I didn't say it at the time, but his company called Lochmere. Are you familiar with Evans and Lochmere --

A. Yes, I am.

Q. -- the name? When would you say you first heard of Evans or Lochmere in the context of this loan?

A. Shortly before. And I would anticipate that would have been somewhere between the time that we submitted the marketing committee meeting and a subsequent meeting in Atlanta, I believe is when I first heard the name David Lane and Lochmere and Bob Evans.

Q. And Evans. And we're going to get to that eventually. And that meeting we believe occurred on the 15th of June. So what you're saying is sometime between the 3rd of June and the 15th of June is when you heard of Lane, Evans and Lochmere?

MS. FARQUHAR: Objection, misstates his testimony.

MR. GERLACH: I agree with that.

Page 35

BY MR. ORCUTT: (resuming.)

Q. You tell me. I'm not trying to confuse anything.

A. When I say, first heard of them, we -- and maybe I misunderstood the question. I guess I was looking for what -- were you asking for whether I heard of them or whether I received something from them?

Q. I think I asked you about heard of.

A. Heard of. Then I misspoke. I heard of them prior to our meeting and the preparation of our marketing committee meeting.

Q. All right. Is that prior to the preparation of that June 3rd memo?

A. Yes.

Q. By how much, approximately?

A. I -- I'm not the sure. The preparation of the memo, as I recall, probably took place over the course of a week as information was filtered in. Not to me directly. I had not received anything in writing before that. And I'm sorry what was the --

Q. So the question was: When do you believe you did hear of Lane, Evans, Lochmere, their involvement?

Page 36

A. Yeah, it may have been at the -- at that initial -- at my first notice of the project coming on -- coming down the pike.

Q. Okay.

A. I can't say exactly when.

Q. And, again, we've shown here with subsequent exhibits that at least -- at least in the record going back to March, which was Exhibit Number 2 the bank -- excuse me -- 3, the bank had at least received some correspondence from Eiger as late as March -- as early as March 30th?

A. Yes. Okay. Right.

Q. When would you say -- from that June 3rd memo how much earlier than that would you approximate that you were involved in the -- in the process?

A. I can only speculate, but I would suspect that maybe the period of two weeks --

Q. Okay.

A. -- might have passed.

Q. And then you said it took -- what did you say, a couple of weeks to put this memo -- that memo, Exhibit 1, together?

MS. FARQUHAR: Objection, misstates his testimony.

Page 37

BY MR. ORCUTT: (resuming.)

Q. Just tell me. I'm not trying to misstate your testimony.

A. The -- the memo, to put that together, I don't -- I don't recall how long that took. It may have taken a week, maybe two. I don't recall.

Q. Okay. But didn't -- hadn't you told me earlier that you thought it took several weeks? I thought that's what I heard you say. And, again, I don't want to mischaracterize your testimony --

A. Yeah.

Q. -- but --

MS. FARQUHAR: Objection, misstates his testimony.

THE WITNESS: I guess -- I guess it's the -- the differentiation being here the preparation of the menu -- memo versus the gathering of information. I think maybe that's what I had said was maybe taking several weeks.

BY MR. ORCUTT: (resuming.)

Q. Culminating in the memo?

A. Culminating in the memo.

Q. That's fine. And what -- when you did hear about Lane and Lochmere or Evans, what do you

Page 38

recall having been told their involvement was?

A. At that -- at that very first juncture -- and, again, I shouldn't say that I don't know if it was the first conversation or perhaps the second, we had very few, keep in mind. I'm the due diligence guy. So I'm not involved in the business dealings with the borrower, but I believe that I was informed that -- that David Lane -- that the way that Eiger -- that the way the property had been introduced to Eiger was through David Lane.

Q. Okay. And who was David Lane?

A. David Lane I was informed was just a -- was an investigator out of Texas.

Q. Okay. And what about Lochmere and Robert Evans?

A. I don't know that I heard that -- of Lochmere and Evans at that point. If I did or whether it was subsequent to it, it was in the context that David Lane had worked with Bob Evans and Lochmere or he had worked with David Lane to -- on the due diligence of the project.

Q. But no specific role or at least at that point -- and, again, I'm working up to that 6-15 meeting.

Page 39

A. Right.

Q. At that point you -- you did not know the specific role of either Lane or Evans in the project?

A. With respect to Eiger, no.

Q. You say this Funding Summary you've seen -- you can't say you've seen this specific one, but you've seen other -- others?

A. I've seen things that look similar to this, yes.

Q. Would you have seen items similar to this prior to that meeting on the 15th of June?

A. No.

Q. So you believe it was at June 15th, which was the first time you received a document like Exhibit 4?

A. I don't --

MS. FARQUHAR: Assumes facts not in evidence.

THE WITNESS: Yeah, I don't know the date that we met, but the first time I recall receiving any information from Bob Evans was at the Atlanta meeting when he provided a packet of information; spreadsheets, etc., that were similar to this.

Page 40

BY MR. ORCUTT: (resuming.)

Q. Do you recall receiving any spreadsheets or other budgetary documentation from Eiger or anyone else prior to that meeting in Atlanta?

A. I had not.

Q. And, again -- tell me again, but I believe your testimony was that your primary responsibilities were the due diligence in the project -- in the loan, not the --

A. Essentially.

Q. Okay. All right. Let me hand you that which I'll mark as 5 and ask if you can identify that.

A. My answer would be similar. I've seen similar formatted information, but whether or not this is something I've seen, I don't know.

(Whereupon, Exhibit No. 5 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. Okay. It appears to be dated in the lower right hand corner as 6-24-99, does it not?

A. Yes, it does.

Q. And it references in the upper left hand corner reference, Lochmere Development, model dated 6-22-99. Do you read that?

CondenseIt!™

Page 41

A. I see that.

Q. And although -- and we had this problem in Atlanta. It looks like there's a -- a box at the bottom of the document with some language.

A. Um-hum. (Indicating affirmatively.)

Q. You've seen -- you've seen documents with that type language on it before?

A. Actually, I don't recall this -- this language in the lower left box that you're speaking of. It may have been on other documents, but I just don't recall that.

Q. Okay. Just a sec. Would this document as well as Exhibit 3 and again not -- excuse me -- 4, not necessarily this specific document, but similar documents, would that have been reviewed by the bank and by yourself when they were received?

A. At that meeting?

Q. Either at that meeting and, again, I'm -- I'm taking you at -- you -- strike that.

Your position is you didn't receive anything like this until on or after that meeting, which -- which I'm representing occurred on the 15th of June?

A. That's my recollection.

Page 42

Q. But when you did review -- receive and review this -- when you did receive this information, did you review it?

A. Yes.

Q. Did it formulate the -- a process of that -- the budgetary evolution of a development budget for this loan and project?

MS. FARQUHAR: Objection, ambiguous.

THE WITNESS: This would have been what I would have expected as a natural --

BY MR. ORCUTT: (resuming.)

Q. Progression?

A. -- progression from the earlier numbers that would have been prepared.

Q. Okay. And did the bank rely upon these types of numbers as developed in this progression in its due diligence and decision-making process regarding the granting of this loan?

A. What do you mean "rely upon"?

Q. Well, the numbers in a category here such as land income --

A. Right.

Q. -- subject to confirmation, I assume, would you utilize that number as a -- as a -- in part as a basis for approving the loan?

Page 43

A. I guess I would have to answer it this way and say, no, we would not have relied on that because we -- that's my job is to independently verify numbers that are -- that are presented to us.

Q. And what I said is subject to confirmation by you.

A. Okay.

Q. And if so confirmed you would do so, would you not?

A. We would use them in our formulation. Whether or not we changed or modified the numbers is a very could possibility.

Q. Okay. But at least it was in the process of progression to the final budget and approval of this loan?

A. I would agree with that.

Q. Okay. All right. I'm going to hand you that which I'll mark as Exhibit 6 and ask you to take a quick look at that, please.

A. Okay.

(Whereupon, Exhibit No. 6 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. Do you recognize that document? And,

Page 44

again, it's dated 6-11-99 in the upper right hand corner.

A. Right.

Q. Was this or a -- was this or a -- was this document the Master Development Budget that was reviewed at that meeting in Atlanta with -- that Mr. Evans was present at?

MS. FARQUHAR: Objection, assumes facts not in evidence.

THE WITNESS: Should I answer? I cannot confirm that. It would been something similar.

BY MR. ORCUTT: (resuming.)

Q. Okay. Tell me about that meeting, if you would.

A. The meeting was on whatever date and I don't know when it was. I was not responsible for setting the meeting. Again, who set the meeting I'm not sure. I'm assuming that Avil or Basham with Eiger and Rowsey set the meeting. And I was informed that they would be bringing more information to give more color and proper underwriting information that we would be able to have further discussions about the review of the project.

Page 45

At the meeting I remember Bob Avil and I were there pretty much the whole -- throughout the course of the meeting. From Eiger I recall Paul Rowsey and Steven Kennedy. Whether or not there was anybody else there I don't recall from Eiger. And Bob Evans was there.

Q. And that's the first time you had met Mr. Evans?

A. That's the first time I met Bob Evans.

Q. What happened? What transpired at the meeting?

A. The meeting was basically led by Paul who gave prefatory remarks bringing everybody up to date on, if you will, the background of -- of where the project was, the circumstances under which there may be a possibility to acquire the project. I think at that point he had -- he had also mentioned that -- some role with Lane. That Lane had had -- he might have said that Lane previously had introduced him to the project. That may have been how they were aware of it.

And I think he had also said at that point that may have been how he introduced Bob as being a -- a figure that David Lane had used and had worked with David Lane extensively in

Page 46

conducting their due diligence on the project there before.

Q. Had there been reference to the fact that Lane and Evans had been working on this project for some period of time?

A. Yes.

Q. Was it -- did it approximate a year or do you remember how long?

A. I don't recall.

MR. GERLACH: Object to the form of the question, leading.

THE WITNESS: I don't recall.

BY MR. ORCUTT: (resuming.)

Q. Okay. Was -- Mr. Lane was not at this meeting, was he not?

A. I don't recall him being there.

Q. Was Mr. -- was Mr. Evans identified as a developer or was his -- his role in the project discussed at that meeting?

A. Only to the extent that he had worked with David Lane in conducting their due diligence and review of the project.

Q. Okay. After the prefatory comments by Mr. Rowsey, what happened next at the meeting?

A. The discussion then moved to current

Page 47

circumstances and issues to be addressed, which were numerous. I mean from contingent obligations that ITT had to build the golf course. The contingent obligations to guarantee the bond debt for the bridge. All fiscally-related items.

Q. Did Mr. Evans take a more active role in this aspect of the meeting?

A. No, I say it was led by Rowsey. Bob added color and perhaps some detail and specifics about -- for example, a time line on amortization of bonds or when bond payments were due or something like that. But it was clearly led by -- by Paul.

Q. But did it from your appearance -- from your appearance was Evans providing the detail or the color, as you -- as you phrased it, for the -- for the various issues that were discussed at that meeting? And I'm saying just detail versus big picture. The detail versus the scope and general --

A. Yeah. That -- I would say that's -- that's probably true. I mean he provided more of the factual detailed information as opposed to Paul who characterized what the issues might be. And -- and then, like I say, Evans would -- would

Page 48

support that by -- by perhaps giving actual numbers and time lines and that sort of thing.

Q. But there was no discussion during that meeting in what Mr. Evans' role was to be in the project?

A. Not specifically.

Q. Did you have an impression or did you leave that meeting with -- with a -- an indication of what his role was going to be?

A. My impression was that he would continue to work with Eiger in some form or fashion in the development of the project.

Q. Were you told that -- were you told that anyone other than Mr. Evans was going to be the developer end of the -- of the -- I guess the developer cog in that wheel?

MS. FARQUHAR: Objection, form. Objection, assumes facts not in evidence.

THE WITNESS: There were other people referenced that would be involved with the project. What -- their specific roles was not identified.

BY MR. ORCUTT: (resuming.)

Q. Do you recall who those other people were?

A. I don't remember names. I know in through

Page 49

the Eiger organization they have several -- and networking obviously. They're well established in the development community. They may have mentioned one or two names or more. There were people that I didn't recognize, and to be quite honest, didn't pay a lot of attention to.

Q. Was there reference to Mr. Evans in the -- in the -- reference to Mr. Evans as having Florida land development experience?

A. Yes, there was.

Q. And the Eiger folks, of course, were Texas people, were they not?

A. Yes.

Q. Was there anyone identified other than Mr. Evans at that meeting as having Florida land development experience?

A. Other individuals that -- that Eiger has in their -- has access to and had considered whether or not they had Florida experience, I don't know.

Q. But you don't remember any names or --

A. No, I don't.

Q. -- or any specifics?

A. No.

Q. Did Mr. Evans -- did -- go through this

Page 50

budget -- this Master Development Budget by category during the course of that meeting?

A. What do you mean by "category"?

Q. Well, by -- say the cash receipts -- I assume what this -- this first page of Exhibit 6 is a -- is a summary and then it gets into the detail on the subsequent pages. And I guess my question is: Did -- was this budget discussed in detail at that meeting by Mr. Evans?

MS. FARQUHAR: Objection, assumes facts not in evidence.

THE WITNESS: It was discussed. I wouldn't characterize it in detail. Obviously it's a fairly extensive piece of work here. And so I think we went over kind of a format of -- of how he had put it together. How it was modeled, if you will.

BY MR. ORCUTT: (resuming.)

Q. Were you -- what was your reaction -- well -- well, strike that.

Was this a fairly detailed budget in your estimation?

A. Yes.

Q. When you say it wasn't discussed -- and I'm not trying to mischaracterize your testimony,

Page 51

but it was discussed, but not necessarily line item by line item. Is that an accurate --

A. That would be accurate.

Q. Did you -- did you discuss -- for instance, on the first page under expenses, did you discuss or do you recall discussing real estate commissions at seven percent?

A. Oh, I don't have -- no recollection of that -- that level of detail.

Q. Due diligence coordination, which is about the fifth line down from -- on the land cost section of this budget.

A. Right. I have no recollection of that. The -- I don't recall going into that level of detail. My impression was -- and the way I think I subsequently used the data was this was a -- this was the first piece of -- of a more comprehensive formatted cash flow for us to begin to look at and in some detail and begin our due diligence. But that's all done -- we typically do not do that in a meeting.

Q. Right. You do it later. You use this as a starting point and --

A. Right.

Q. Was your impression from that meeting that

Page 52

the Eiger participants were knowledgeable of the project in a Florida land development?

MR. GERLACH: Object to the form of the question. I'm sorry.

THE WITNESS: My impression, absolutely.

BY MR. ORCUTT: (resuming.)

Q. Do you know note the box in the upper center of this document that states, "That this document is the exclusive proprietary property of Lochmere Development Group, Inc. Do not duplicate or disperse without prior written consent"? Had you seen that language --

A. I've seen --

Q. -- on a budget --

A. It may have been there. I don't recall. It may have been there. I can't recall specifically.

Q. Do you remember seeing language to that effect before?

A. At least some of it. I just didn't remember the -- I'm not sure if it was this or whether it's a confidentiality stamp, but I remember there being some notation.

Q. And you get to -- even starting on the

Page 53

second page there's -- on each page there's a -- in the lower right hand corner there appears to be prepared by Lochmere Development Group, does it not?

MS. FARQUHAR: Objection, best evidence.

THE WITNESS: Yes, on the lower right hand corner?

BY MR. ORCUTT: (resuming.)

Q. Right.

A. Yes, I see that. Uh-huh. (Indicating affirmatively.)

Q. Would you have then used -- and, again, I'm going to go to what happened next, but --

A. Sure.

Q. Would this -- and, again, I don't want to mischaracterize your testimony. Would this have been the starting point for the -- at least from the developer's prospective of what they projected the numbers to be and was this document used as a -- as the starting point for completion of the ultimate budget for the -- for the loan?

MS. FARQUHAR: Objection, compound.

THE WITNESS: That I can't say because the -- at this point in time I don't

Page 54

believe that they had agreed upon the structure of the deal with Eiger, with ITT. And so any -- any budgetary information we had received would have been prefatory I mean until the other -- a conclusive deal then it's kind of difficult to model it.

BY MR. ORCUTT: (resuming.)

Q. But was this document or a similar document used by the bank as -- again, in that progress -- progressing -- progression --

A. Yes.

Q. -- to ultimately get to the -- the final budget for the -- for the loan?

A. This probably would have been the starting point which -- from which we received subsequent data and updated schedules from Eiger.

Q. This document does show the timing of events, does it not?

MS. FARQUHAR: Objection, best evidence.

THE WITNESS: Meaning a quarterly cash flow?

BY MR. ORCUTT: (resuming.)

Q. Right.

A. It does show -- show timing, yes.

Page 55

Q. And it shows monthly cash and funding requirements at least quarterly, I guess?

A. I think it is quarterly, correct.

Q. Would you say in your experience and what -- and, again, did you -- you had how many years of experience in real estate loans?

A. Well, I had been with BankBoston exclusively in real estate for ten years. And then approximately two -- just short of two, maybe 18 months, with a commercial bank. And -- where we did both commercial and residential loans.

Q. In your experience how -- how detailed is this budget compared to other budgets you've seen in your experience?

A. On a scale of one to ten, I would give this a good eight. Ten being a very nice budget. I thought it was nicely detailed. I've seen others that may be a little better. I've certainly seen others worse.

Q. Did -- did a budget of this detail shorten the amount of time it took for you to complete the comprehensive due diligence that the bank had to perform?

A. Possibly, but I would have a hard time answering that because typically what it would

Page 56

come down to is the factual sort of information that we're looking for to come out of the -- the review of the Master Development Plan approved by the County and the State, etc., acreages, units, obligation under bonds, all that sort of thing, we would -- we would generally like there to be a legal review of those items.

Q. And we'll get to that, but I'm just saying does a more detailed Master Development Budget assist in the process and make that process easier and shorter in time?

A. I would assume so for the attorney, but since I'm relying on their review I can't say.

Q. What about from your prospective as -- as it relates to the numbers? And, again, it's subject to confirmation from whatever source.

A. It's organized very well.

Q. Do you recall how long that meeting lasted?

MS. FARQUHAR: Objection, ambiguous.

THE WITNESS: As I recall, I think we probably started mid morning, be it the 10:30, 11:00 o'clock range. I think we stopped for lunch and I think people had planes to catch in the 4:00 o'clock range. So I think it probably

Page 57

broke up in the 3:00 o'clock range, 2:00 to 3:00.

BY MR. ORCUTT: (resuming.)

Q. But you don't recall specific discussions of, for instance, the line item I referenced, which was the real estate commission at seven percent?

A. I don't -- I don't recall any discussion about that.

Q. Do you recall any discussion about a -- about a sales marketing and advertising budget?

A. No, I'm sorry. I don't recall.

Q. Okay.

MS. FARQUHAR: Is this a convenient stopping point?

MR. ORCUTT: That would be fine.

MR. GERLACH: We're off the record.

(Whereupon, an off-the-record discussion was had.)

MR. ORCUTT: We're now back on.

BY MR. ORCUTT: (resuming.)

Q. Let me hand you that which I'll mark as Exhibit 7 and you may not have seen this letter before, but have you?

A. I don't recall. I don't believe I've seen

Page 58

it.

(Whereupon, Exhibit No. 7 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. It references in the first sentence a draw request package. Do you know or recall what -- and, again, it references the meeting in Atlanta, which --

A. Um-hum. (Indicating affirmatively.)

Q. -- is the meeting we've been talking about.

A. Um-hum. (Indicating affirmatively.)

Q. Do you recall or know what the reference to a draw request package is in this letter?

A. In the meeting we would have spoken about draw requests. How -- how moneys would be funded. And the bank has a prescribed format -- certain information that we're going to want to see, not necessarily a format. And I think Bob offered at that point that he had one that he was going to submit to see if it met with our approval.

Q. And did he ultimately do that?

A. I believe I received it from Steve Kennedy.

Page 59

Q. And the letter references that in the last sentence of the first paragraph, does it not?

A. Correct. Correct.

Q. Okay. And then it references in the first sentence of the last paragraph, "That the latest revised Master Development Budget was e-mailed to Mr. Whiting on the 16th of June"; is that correct?

A. I don't know about the date, but I do recall receiving an e-mail of a -- of a budget.

Q. Was that in part sent to you by e-mail so that it could be revised and worked on by BankBoston?

A. Perhaps. It was also from an expeditious element. Just a time element to get it to us.

Q. But you could or -- and, again, I don't know who would have done the revisions to it. I imagine that's secretarial personnel. It may have even been you. Tell me.

A. That would have made revisions to a budget?

Q. Right.

A. No, that would have been one of my functions as a loan officer and due diligence.

Q. Do you remember using that budget or a budget furnished by Lochmere as the -- and we've

Page 60

talked about this already -- starting as the progression of the -- of the ultimate budget that was approved for this project?

A. It provided a starting point. As I recall, I think we've used our own -- we did our own modeling.

Q. Okay. So you were not using the spreadsheets as provided by Lochmere for purposes of that modeling -- or explain to me how that occurred.

MS. FARQUHAR: Objection, compound.

THE WITNESS: Just as he has his own structure and format and formulas for arriving at his cash flow, we in context of our due diligence applying our own assumptions come up with our own model.

BY MR. ORCUTT: (resuming.)

Q. Didn't the categories and -- generally stay the same on this -- on the progression of this Master Development Budget as it -- as it evolved?

A. I would suppose in certain -- in certain context. I would have to go -- to be quite honest, go back and look at our model compared to his. The model of the -- the

Page 61

detail of the individual projects would not have changed.

Q. I'm sorry. Does that mean, yes, that the categories were --

A. Well -- well, categories meaning if we have a given pod that calls for -- it's a 20 acre tract and it's permitted for 35 units that would not have changed. What would have changed is the category -- in other words, just the factual detail about what the asset was.

As far as the structure of -- of how the model works, how capitalization was fed in, how amortization occurred, that may have been different.

Q. Okay.

A. That would have been our model.

Q. Had there also been discussion at this Atlanta meeting a mechanism -- we talked about earlier this Line of Credit, Letter of Credit procedure. Was that discussed at the Atlanta meeting?

MS. FARQUHAR: Objection, ambiguous.

THE WITNESS: A procedure? I don't -- I'm not sure what the procedure -- what you mean by "procedure"?

Page 62

BY MR. ORCUTT: (resuming.)

Q. Let me ask it this way: Did -- did BankBoston and/or Mr. Kennedy request evidence to prepare a schedule detailing the implementation of the Letter of Credit, Line of Credit, financing vehicle, that had been discussed at the Atlanta meeting?

A. Oh, I don't recall that.

Q. Do you remember anything about the implementation of the Letter of Credit, Line of Credit financing at the -- during the Atlanta meeting?

A. I think what we're saying is, was there -- let me ask the question. Are you saying was there a revision? Because what we're speaking to -- I think what you're speaking to is the cash flows, which are dictated or related to the Line of Credit and Letter of Credit.

Q. Right.

A. You're asking did we ask Bob Evans to prepare that or revise that?

Q. Or to prepare a schedule of that.

A. Schedule? Schedule? I'm not sure. Our schedule -- I'm not sure. I'm not sure what a schedule would have been. We typically focus on

Page 63

cash flows, which I guess could be construed as a schedule.

Q. And, again, without belaboring the point, it was discussed in some context Letter of Credit, Line of Credit at this meeting, but you don't recall specifically what, if anything, Bob Evans was asked to --

A. Correct.

Q. -- prepare?

A. Correct.

Q. Okay. At that meeting in Atlanta was Mr. Evans requested to coordinate with the -- your appraisers, Mr. Joseph Hatzell or Joseph J. Blake, by providing copies of the due diligence research compiled by Lochmere?

A. I don't know if it was at that meeting or subsequently, but at some point we would have asked the due diligence information to be provided.

Q. Let me hand you that which I'll mark as Exhibit 8. And ask if you can take a quick look at that and then identify it.

A. I don't recognize this.

(Whereupon, Exhibit No. 8 was so marked by the court reporter.)

Page 64

BY MR. ORCUTT: (resuming.)

Q. Do you recall Mr. Hatzell or Blake Appraisals as being the appraisers you used on this project?

A. Yes.

Q. Are you familiar generally with the items that Mr. Hatzell is asking or requesting in this letter be furnished by Mr. Evans?

A. This would have been consistent with any appraisal request that we had made.

Q. And these -- this data is -- is important for BankBoston's use in -- in considering and approving a loan such as this?

A. To the extent that it is a factor in the -- in the -- that the appraiser uses in arriving as a value, certainly.

Q. Right.

A. Factual information.

Q. Let me hand you 9. And ask if you would take a quick look at that. You're showed as having received a copy of this letter. Do recall having seen this letter before?

A. I don't recall.

(Whereupon, Exhibit No. 9 was so marked by the court reporter.)

Page 65

BY MR. ORCUTT: (resuming.)

Q. Do you believe you did receive it or not?

A. It's possible. I just don't recall seeing it.

Q. Number -- do you remember there being a three volume set of binders that were sent to Mr. Hatzell or did you see such --

A. Oh, I never saw --

Q. Okay.

A. -- saw that.

Q. Okay. Under Volume One of this letter it referenced a site evaluation prepared by Price, Waterhouse, Coopers. Do you know anything about a site evaluation that had been performed by Price Waterhouse, Coopers on this project?

A. I knew that they had done that. I'm not sure in what capacity or for who they had done that.

Q. Did you know -- or whether or not the -- the result of the site evaluation by Price, Waterhouse, Coopers -- the result of that evaluation was a -- a lower recommended sales price or purchase price --

A. Oh --

Q. -- for that property?

Page 66

A. -- I don't know.

MS. FARQUHAR: Objection, assumes facts not in evidence.

BY MR. ORCUTT: (resuming.)

Q. Were you are aware of a Cushman -- and that's also referenced -- a Cushman, Wakefield offering memorandum dated 10-25-97?

A. I was aware of that, yes.

Q. Were you aware of the general price range within which Cushman, Wakefield had valued the property?

A. I don't recall that.

Q. Do you recall that that price range was in the mid 30 million dollar range?

A. I don't -- I don't recall.

Q. Do you recall that ITT was originally pricing that project in the range of 30 million dollars?

MR. GERLACH: Object to the form of the question, leading.

THE WITNESS: I don't recall.

BY MR. ORCUTT: (resuming.)

Q. Do you recall whether this -- whether the Cushman, Wakefield offering memorandum valued the Hammock Dunes project as an -- as an ongoing

Page 67

business? And I'll define that in a moment. Ongoing meaning a purchase not just of the land, but a purchase of the construction entities, golf club, management, etc.?

A. I don't recall.

Q. Do you recall whether or not the Price, Waterhouse site evaluation evaluated the Hammock Dunes project merely as a purchase of real estate?

A. I don't recall.

Q. Okay. So none of the questions I've asked has refreshed your memory as to any aspects of those two reports?

A. No.

Q. What was your knowledge, and you may have already answered this, of the Price, Waterhouse report? Do you have any recollection of it?

A. Just that it had been prepared. Again, I can't even recall what -- what the usage was at that point. We tend to -- as we rely on our own due diligence, other people's due diligence is -- we don't tend to put a whole lot of emphasis on that.

Q. All right. I just wanted to know what you did recall and you've told me.

Number Four under Volume One talks

Page 68

about a copy of the Master Development Budget prepared by Lochmere Development Group dated 6-24-99. Again, the one we looked at earlier was dated 6-11-99.

A. Okay. Um-hum. (Indicating affirmatively.)

Q. Do you remember seeing, again to use your words, a progression of that budget as -- as -- after the meeting in Atlanta?

A. There were -- we received, how many I'm not sure, at least one after the meeting in Atlanta.

Q. Would it be accurate to say that you know that various due diligence data was transmitted to your appraiser for use in his appraisal, that you didn't physically or personally see all of that or any of that?

A. It's my understanding that he did receive it.

Q. Okay.

A. And what he received I cannot say.

Q. But it was all part of his appraisal process and information he needed to perform the appraisal?

A. Correct.

Page 69

Q. And you needed his appraisal for purposes of your comprehensive due diligence to approve the loan?

A. Correct.

Q. Let you hand you that which I'll mark as 10. And take a quick look at that, please. Have you seen this document before? It's dated June 15th. It appears to be from your lawyers.

A. It looks like one that we would have used.

(Whereupon, Exhibit No. 10 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. And you appear to be a recipient of this document.

A. Right.

Q. And, again, Page Two lists you as well as Mr. Evans, does it not?

A. Yes, it does.

Q. If references a 20 million, five hundred thousand term credit facility?

A. Um-hum. (Indicating affirmatively.)

Q. Then on Page Three it references this Tracy Plott, P-L-O-T-T, as well as other lawyers and staff for the lender, does it not?

Page 70

A. Yes.

Q. And then starting on Page Five it appears to show an agenda of -- you tell me, but it appears to me to be due diligence requirements and the responsibility for who was to do what.

A. Correct.

Q. Is that --

MS. FARQUHAR: Objection. I'm not sure what you mean. Where's Page Five? I don't see a Page Five.

MR. ORCUTT: Well, I'm using the -- starting with the cover -- I guess it's Four. Excuse me. The page that starts with the word, Agenda.

BY MR. ORCUTT: (resuming.)

Q. And was it your statement that this appears to be the -- a format that BankBoston used at that time or this law firm used at that time?

A. This is similar to what they normally do, yes.

Q. And when it references the borrower, that would have been the borrower who was providing that particular document. BankBoston is again BKB. This law firm was the Paul, Hastings firm. So that would be the PHJW?

Page 71

A. Um-hum. (Indicating affirmatively.)

Q. Who's BC?

A. I'm assuming that's borrowers counsel.

Q. Okay. And, again, starting on Page Five all of this information starting with purchase and sale agreement, plat, at least down through items 12, were to be furnished by the borrower; is that correct?

A. I must be on the wrong page here because --

Q. It's, three, due diligence documents. It shows as Page Five with a Bate stamp number of 18803.

A. Oh, on the fax page -- the fax page?

Q. Yes, sir.

A. Okay. I'm sorry. I was looking at the page number.

Q. I understand.

A. Page Number Two. So on the -- under the due diligence heading?

Q. Yes, sir.

A. Yeah. And I'm sorry that, yes, these items would have been prepared by the borrower -- supplied by the borrower.

Q. And to the extent they hadn't been

Page 72

completed or were not completed the loan could not be -- could not be approved until they were; is that correct?

A. It may -- it wouldn't necessarily have precluded the approval, but also depending on what the item was it possibly could preclude closing.

Q. Right. And I believe the -- the legal compliance with laws and the -- and there's some reference on Page Seven to corporate due diligence of the general partner and of the borrower.

Is it your understanding that all of the requirements of -- of this exhibit were complied with in the course of the closing of this loan transaction at least to the point when you were still with the bank?

A. Yeah, I don't -- I can't answer that since I don't know when -- since it closed after I left.

Q. And what would your role have been in coordinating or otherwise knowing about the status of this due diligence as it occurred?

A. Yeah. It would -- part of my role would have been to have followed up to see what items were still missing. That in conjunction with our counsel.

Q. Or with the borrower? Would you have

Page 73

direct contact with the borrower also during --

A. Yes, it would -- but that would typically be handled -- counsel would generally coordinate these items.

Q. Do you remember there being a counsel, and you may not, by the name of Steve Samaha who was representing the borrower?

A. I remember the name. I'm not sure who he was representing.

Q. Do you remember any due diligence that was provided by him in the course of this project?

A. Not -- not directly.

Q. But you do know his name --

A. Certainly.

Q. -- or heard his name?

A. Certainly.

Q. Do you know whether Bob Evans was coordinating the production of any of this due diligence on behalf of the borrower?

A. I would not know.

Q. Okay. These are bigger, but we'll go through them all.

A. (Witness indicating.) Okay.

Q. Let me hand you that which I'll mark as Exhibit 11. Okay. This is titled, Investment

Page 74

Proforma. And with a date of 1-23-01. And, again, you left the bank before this so you wouldn't have any knowledge at all of this document, would you?

A. I would suspect not.

(Whereupon, Exhibit No. 11 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. Was there any type of document -- well, is this -- is this a document that would be provided by the borrower or is this the -- or is this a document that would be prepared or this type of a document one that would be prepared by the bank?

MS. FARQUHAR: Objection, vague as to time. It calls for speculation.

MR. GERLACH: I agree with the objection.

BY MR. ORCUTT: (resuming.)

Q. I'm just trying to identify whether this is a model that the bank prepared or if you know and you may not know.

A. Right. Our model would typically not be this detailed.

Q. But, again, you have no knowledge of it because you weren't even at the bank?

Page 75

A. Correct.

Q. You do know that the loan closed?

A. Yes.

Q. Do you still -- what knowledge do you have, as we sit here today, of the -- of the project and its progress?

A. Virtually none.

Q. You live in the area again. Are you -- of the Hammock Dunes area again.

A. We're two hours away. But -- in other words, are you asking about do I know how the project is doing economically?

Q. No. Just what progress is being made on the development or the funding of this loan or --

A. Don't -- don't know.

MR. ORCUTT: That saves a lot of time.

BY MR. ORCUTT: (resuming.)

Q. By the time you had left the bank in November of 1999 had any document in this format or titled, Investment Proforma, been submitted by the borrower to the bank?

A. Well, to the extent this looks similar to the spreadsheets that Bob Evans handed out at our meeting in Atlanta and provided subsequent copies,

Page 76

it's very similar.

Q. Well, let me do it this way. Let me hand you the next exhibit which I'll mark as 12 and ask you to take a quick look at that.

A. Okay.

(Whereupon, Exhibit No. 12 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. Have you seen this document before?

A. I don't recall seeing this.

Q. Is this in a format -- it's called, Approved Budget, is it not? Or at least the Exhibit -- the Exhibit A to this document, which I've provided to you is represented as being the Approved Budget?

A. Exhibit A is -- if this is Exhibit A then, yes, it is.

Q. Is this a format that the bank typically used at that time for a budget for a project such as this?

A. It would be similar in terms of showing cash flows.

Q. And, again, I think you said the bank has its own models for laying out a budget such as this.

Page 77

A. Every -- every deal that loan officer has the discretion and the ability and the expectation to present a -- the data in a manner that makes greatest sense for -- in comprehension for our senior committee.

Q. So are you saying that the actual budget itself may vary in form from project to project? Is that what you're saying?

A. Yes. Yes.

Q. And, again, this is a progression?

A. Yes.

Q. What is the role of approved budget in a BankBoston at that time loan?

A. Well, I'm not sure what "approved" means. If it means it's approved that was -- the budget that was used in presentation and loan committee, I would presume that it means approved by loan committee. But I don't -- I don't know.

Q. Is the approved budget a step in the -- is it a step in the approval process or is it -- what is the role? Again, I'm repeating myself, but --

A. I've -- I'm not familiar with the term approved budget in context of the bank. It -- our packages -- our loan packages that are presented to committee have a -- a budget that the -- the

Page 78

denotation of an approved budget. I don't know what that implied.

Q. Again, would that be something within the discretion of the loan officer?

A. Possibly.

Q. So there's no requirement that there be an approved budget, as far as you know, for the closing of -- on a loan such as this?

A. Well, again, I'm not sure how we're defining approved. If there -- if there had been multiple iterations of a cash flow budget, which often times there were, perhaps the loan officer chose to use the word "approved" to indicate this was final.

Q. Right.

A. I don't know.

Q. But it's not something that's a requirement of the bank, to your knowledge, to have a "approved budget"?

A. I don't -- I don't recall that as being a formal term that we used.

Q. What is the budgetary -- in your experience, what is the budgetary process at that time at BankBoston, as far as the -- the approval of the loan and then the funding of a loan?

Page 79

MS. FARQUHAR: Objection, ambiguous. Vague.

THE WITNESS: I'm sorry. Yeah. Could you rephrase?

BY MR. ORCUTT: (resuming.)

Q. Let's talk about the approval of a loan first. We have the progression of these spreadsheets, budgets. We talked a moment ago about the investment proforma and now an approved budget.

Was there a procedure at the time with BankBoston during the approval process for the development of a budget?

MS. FARQUHAR: I'm going to object. I think that your question mischaracterizes the testimony and the exhibits because you've included a document that was prepared in 2001 as part of the progression to approval.

BY MR. ORCUTT: (resuming.)

Q. I'm -- I'm trying to rephrase the question to ask you what role, if any, was in the BankBoston procedure at the time of your involvement with the bank for the development of a budget in the approval process of a loan such as this?

Page 80

A. I would not say there's a formal procedure. As you noted earlier all transactions can be different. So we would certainly have the flexibility to -- but to -- to utilize whatever process seems most expeditious to get to the end result, which we're seeking. And that is a final budget -- approved budget, if you will, that we would use -- that we would opine to -- to submit to our senior committee for review.

Q. And, again, I may not -- I may not know the procedures of BankBoston, but it appeared from my review of Exhibit 12 that it appeared that an approved budget was an actual exhibit to the Senior Secured Credit Agreement, which is the -- which it shows on Page One of -- of this document. Was that the practice and procedure of BankBoston, to your knowledge, at that time?

MS. FARQUHAR: Objection, assumes facts not in evidence.

THE WITNESS: I'm sorry. Are you asking does -- does the attachment of an approved budget is that part of the approval documents?

BY MR. ORCUTT: (resuming.)

Q. Yes.

Page 81

A. That is -- that would be correct.

Q. And I believe you're telling me that -- the format of that budget could vary, but -- and, again, I'm not trying to mischaracterize your testimony. But to get to the final number or whatever your wording was, that budget would be that vehicle, correct?

A. Yes. Yes.

Q. And that's a requirement of BankBoston for the approval process of a loan?

A. Yes.

Q. And that budget would, in one form or the other, cover the categories -- and, again, loans differ in scope and -- and what they're -- what they're involving, but the various aspects of the development, sale, and whatever other components there are of a particular transaction?

A. Yes.

MS. FARQUHAR: Objection, form. Objection, vague.

BY MR. ORCUTT: (resuming.)

Q. Do they include a -- a factor for a proposed or a projected internal rate of return? Would that be a factor or a component of a budget?

A. I wouldn't say that would be a

Page 82

requirement.

Q. Would you know that number or that percentage in the course of your due diligence on a loan?

A. For this project?

Q. Yes.

A. I don't recall that.

Q. For a project?

A. I'm sorry?

Q. Does the phrase internal rate of return is that a component that you as a banker would review or know or ask for --

MR. ORCUTT: Objection, compound.

BY MR. ORCUTT: (resuming.)

Q. -- in the course of a loan approval process?

A. Maybe.

MS. FARQUHAR: I join in the objection.

THE WITNESS: Maybe, maybe not. It would not be a requirement.

BY MR. ORCUTT: (resuming.)

Q. Okay. But that's -- that's usually important for the developer, is it not?

A. It's more on the developer's side.

Page 83

Q. Now, on the funding side of the use of a budget, how is that budget approved or final budget used in the funding? And what word do you want to use? The progression? What -- what word do you use for the -- the actual funding and development and draw request process?

MS. FARQUHAR: Objection, compound.

THE WITNESS: Well, once we -- once we get to a final budget that would -- that we are basing our approval on, then that budget would include a schedule -- a projected schedule for take downs or of dollars representing work to be completed. And then conversely revenues to come in, all tying together obviously.

BY MR. ORCUTT: (resuming.)

Q. Again, is it a -- a starting point subject to change as the actual funding or progression of the project occurs?

A. That is the -- could the budget change? It's possible based on -- on unforeseen events.

Q. What would happen in the sense where a final budget stated that certain development would occur in a quarter of say the year 2000 --

A. Um-hum. (Indicating affirmatively.)

Page 84

Q. -- but it didn't?

MS. FARQUHAR: Objection, calls for speculation. Assumes facts not in --

MR. GERLACH: I --

MS. FARQUHAR: And assumes facts not in evidence.

THE COURT REPORTER: I didn't hear yours. I'm sorry.

MR. GERLACH: I joined in the objection.

THE COURT REPORTER: Thank you.

MR. GERLACH: It calls for speculation.

BY MR. ORCUTT: (resuming.)

Q. Go ahead.

A. You still need the answer?

Q. Yeah.

A. Depending on the nature or the cause of that lack of funding would prompt a review to -- to ascertain whether that -- the causes for that being off plan. And whether or not it's simply a slippage of time for some reason. May be a weather-related reason. Construction didn't occur or whether there's something more meaningful such that a budget item was miss -- misestimated.

Page 85

Q. But generally speaking is it accurate to say that this final approved budget is supposed to be the working plan for --

A. That's the goal.

Q. Okay. And what role, if any, would an investment proforma that -- such as Exhibit 11, which is dated 1-23-01, have in that game plan?

A. I'm sorry. Without reviewing this -- having not seen it before, I'm not sure what this proforma is including or what it's doing.

Q. And, again, take a minute and look at it. And, again, I know that you weren't even there when it was prepared, but I'm just trying get a general feel for how this budgetary process works.

MS. FARQUHAR: Are you asking him to review Exhibit 11?

MR. ORCUTT: I'm asking him to take a quick look at Exhibit No. 11, yes.

THE WITNESS: Oh, 11? I'm sorry. I thought you were talking about 12. Investment proforma. Okay.

MS. FARQUHAR: Are you asking him to look at the entirety of it?

MR. ORCUTT: No, just to skim it --

Page 86

MS. KAUFMAN: It's about 53 pages.

MR. ORCUTT: -- so that he can at least see what it is and see how it may differ or not from the -- from the budget, which is Exhibit 12.

MS. FARQUHAR: You're asking him to compare Exhibit 11 to Exhibit 12?

MR. ORCUTT: I'm asking him to look at Exhibit No. 11.

MR. GERLACH: Off the record.

(Whereupon, an off-the-record discussion was had.)

MR. ORCUTT: Can I ask the questions while you're gone?

MR. GERLACH: Sure.

THE WITNESS: Um-hum. (Indicating affirmatively.)

MS. FARQUHAR: Would you repeat the question, please?

MR. ORCUTT: I don't think there was a question. I asked him to review the --

THE WITNESS: Okay.

BY MR. ORCUTT: (resuming.)

Q. From your review of Exhibit 11 and comparing it just generally to Exhibit 12, is

Page 87

there any indication of what 11 is?

MS. FARQUHAR: Objection, best evidence. Objection, calls for speculation of a -- review of a document he says he's never seen and didn't even occur -- that wasn't even drafted until after he had left the bank.

THE WITNESS: Without a -- a substantive review, I would have a very hard time telling you what Exhibit 11 is.

BY MR. ORCUTT: (resuming.)

Q. In the -- in the procedures and policies of the bank while you were there --

A. Um-hum. (Indicating affirmatively.)

Q. -- was there -- was there such a vehicle or document as an investment proforma that was produced after the closing?

A. It closed after I left so --

Q. In any loan. In any other type loan?

A. Oh.

Q. Real estate loan you were involved with. I don't know. I'm just trying to ask you --

A. Yeah.

Q. I'm just trying to find out what -- if you know what this type of a document is because I don't.

Page 88

A. Similar to the -- to the earlier answer though -- what I think you had asked though was: Are there occasions where the budget can change after closing? And what I think I said or meant to say was that under certain circumstances the budget could change. Whether or not it's material in terms of a monetary context or simply a change in terms of timing would -- would be matters to be ascertained. And depending on what that was might evoke different responses.

Q. And do you have any experience in loan transactions where the budget did change and the developer was requested to submit revisions to the budget that had been approved or was final?

A. Let me -- I would have to think about that for a minute. Ten years is a long time. I can't name one off the top of my head, but I -- if I went back through the files I suspect I would find something where a budget might have been changed.

Q. But this Exhibit 11 appears to be a document prepared by Eiger, not the bank, does it not? It says at least at the bottom of the first page it has --

MS. FARQUHAR: Objection --

BY MR. ORCUTT: (resuming.)

Page 89

Q. -- a box with the reference to the Eiger fund in it.

MS. FARQUHAR: Objection, calls --

BY MR. ORCUTT: (resuming.)

Q. Again, I know you didn't see this document.

A. Right.

MS. FARQUHAR: Objection, calls for speculation. Best evidence.

MR. ORCUTT: That's fine.

BY MR. ORCUTT: (resuming.)

Q. Did -- let me hand you 12.

MS. FARQUHAR: We've already done 12.

MR. KAUFMAN: We've already done 12.

MR. ORCUTT: Then we'll do 13.

BY MR. ORCUTT: (resuming.)

Q. And you may again not have seen this document, but I'll show it to you any way.

A. Okay.

(Whereupon, Exhibit No. 13 was so marked by the court reporter.)

Q. Have you seen this letter before?

A. No, I haven't.

Q. It's actually an -- this exhibit before? Were you aware of any dispute -- I'll use that

Page 90

word "dispute" -- that arose between Eiger on the one hand and Evans and Lochmere on the other hand after the meeting in June in Atlanta?

A. No, I was not.

Q. Were you aware that at a certain point in time Evans had no further involvement in the project?

A. Not formally.

Q. How did you -- what did you know?

MS. FARQUHAR: And I'm going to object to the extent that if your answer calls for you to disclose anything you've learned from counsel and instruct you that -- you may answer the question except for any knowledge you learned from counsel.

BY MR. ORCUTT: (resuming.)

Q. Any statements made to you by counsel. You can tell the conclusion -- the result, but without saying what counsel told you.

MS. FARQUHAR: No. I disagree. He cannot -- conclusion, no. If you learned information from an attorney you are not to disclose that information. You may answer to the extent that your knowledge came from other sources.

Page 91

THE WITNESS: And would you repeat the question?

MR. ORCUTT: Why don't you read it back, please.

(Whereupon, the record was read as requested.)

MS. FARQUHAR: Same objection. Same instruction.

THE WITNESS: No.

BY MR. ORCUTT: (resuming.)

Q. What is your current understanding of the dispute or the issues as they relate to Evans and Lochmere and Eiger, Lane and BankBoston? Again, except as admonished by your counsel or by Eiger's counsel and not to include attorney/client disclosures.

MR. ORCUTT: And, again, let me ask this: Are you representing him for purposes of -- of this deposition?

MS. FARQUHAR: Yes.

MR. ORCUTT: Okay.

MS. KAUFMAN: We are also, Halley, Sinagra & Perez.

MS. FARQUHAR: And Mr. Whiting, I will give you the same instruction that I did

Page 92

to the previous question. To the extent that your knowledge of the disputes in this case come from your -- come from counsel then you are not to answer.

THE WITNESS: Oh.

MS. FARQUHAR: If you have knowledge, other than communications and information from counsel you may answer.

THE WITNESS: Then the extent of my knowledge would be that there -- some claim is being made. The nature of it, I don't know.

BY MR. ORCUTT: (resuming.)

Q. Were you aware of the fact that -- that -- let me ask it this way -- you said you were not aware of this Indemnity Agreement --

A. No.

Q. -- which is Exhibit 13.

A. I had not seen the Indemnity Agreement, right.

Q. Were you aware of a request or requirement by BankBoston that the Eiger entities indemnify BankBoston against -- and, again, I'm reading on Page One -- well, let me give you the specific language. It's about the fifth whereas down on the first page. "Whereas Evans has alleged that

Page 93

either he, it or some related entity has some type of claim in and to either Hammock Dunes or our proposed investment therein". It's on Page EO2271.

MS. FARQUHAR: And Mr. Whiting, I'm going to tell you --

THE WITNESS: Whiting.

MS. FARQUHAR: I'm sorry.

THE WITNESS: That's okay.

MS. FARQUHAR: I'm going to instruct you that to the extent that any knowledge you have came from counsel you are not to disclose that, but you may answer to the extent that you have knowledge, other than what comes from counsel.

THE WITNESS: Right. And I'm sorry the question then?

BY MR. ORCUTT: (resuming.)

Q. The question was: What knowledge do you have of any -- of not just this agreement, but the reasons for? I guess it was a request or a requirement for BankBoston that Eiger indemnify BankBoston from the paragraph I just referenced you to.

A. Right.

Page 94

MS. FARQUHAR: Same objection. Same instruction.

THE WITNESS: My knowledge was pursuant to the filing of an action and this is very vague so I may not have this correct, but some action in Texas that BankBoston would require an indemnity from Eiger.

BY MR. ORCUTT: (resuming.)

Q. Okay. And at that point do you know approximately when you learned that?

A. I do not -- I do not know.

Q. But it was prior to November of 1999?

A. Yes. Prior to my leaving the bank.

Q. Let me hand you that which I'll mark as 14 and ask if you've seen that before. I'm referencing the top page of that --

A. Top -- the letter addressed to me?

Q. Right.

A. And, yes, I believe I've seen this.

(Whereupon, Exhibit No. 14 was so marked by the court reporter.)

BY MR. ORCUTT: (resuming.)

Q. And the accompanying letter dated July 12, 1999 to Mr. Rowsey from Mr. Evans?

(Whereupon, a brief recess was taken

Page 95

for the court reporter to change paper.)

BY MR. ORCUTT: (resuming.)

Q. Okay. Go ahead.

A. This -- I remember the letter coming -- addressed to me from Bob Evans. I believe that the letter -- that attached -- the references attached to Paul Rowsey may be the same, but I obviously couldn't say absolutely without comparing the original.

Q. Okay. It does reference though a July 12th letter.

A. Yes.

Q. This references a letter to Paul Rowsey --

A. Yes.

Q. -- dated today, which would be July 12th.

A. Yes.

Q. To your knowledge, did you or BankBoston return to Mr. Evans any information provided to you and BankBoston by Lochmere Development Group related to the Hammock Dunes project?

A. Yes, we did.

Q. What do you recall having returned to Mr. Evans or Lochmere Development?

A. To the best of my knowledge, we returned everything that we had received.

Page 96

Q. Do you know in general what that was?

A. Well, certainly the -- whatever drafts of the spreadsheets. That -- the budgets that we had received. I believe that we had received a copy of his draw proposal, I think that would have been in there. I don't know that we received anything else.

Q. Was there a cover letter enclosing this documentation that you returned to Mr. Evans?

A. I don't know. I would have to go back to the files to search for that.

Q. Do you know whether or not any of the content of the documents that had been sent to you by Mr. Evans were included in either the approval process of that loan? I'll limit it to that for the time being. The due diligence and approval process of the loan.

MS. FARQUHAR: Objection, vague.

THE WITNESS: The contents?

BY MR. ORCUTT: (resuming.)

Q. And, again, I'm getting -- I'm getting rather abstract here.

A. Yeah.

Q. For instance, if the -- if an item of due diligence -- let's find one. And I'm not going to

Page 97

belabor this point. If you'll go back to Exhibit 8. I'm just going to pick -- pick an item. That's the letter -- the Hatzell letter --

A. Right.

Q. -- and Evans.

A. Right.

Q. At the second -- I'm just using this illustratively. The second to bottom line item on the first page where it says, HOH fees involved with each unit.

A. Um-hum. (Indicating affirmatively.)

Q. If that -- if those numbers had been provided by Mr. Evans, and again I understand this is to Hatzell not to the bank -- and again I'm using in this illustratively -- how -- or how could the bank or did the bank return that work product to Mr. Evans? And, again, I'm not using -- I'm using it hypothetically. I'm not saying it was the bank. I'm just using that as a -- as an example of -- of data that may have been --

A. Well --

Q. -- produced.

A. Sorry.

Q. Go ahead. And he can --

Page 98

MS. FARQUHAR: Objection, compound. Objection, calls for speculation. Objection, assumes facts not in evidence.

THE WITNESS: We ready?

BY MR. ORCUTT: (resuming.)

Q. Yes.

A. We certainly return all the information that we had received from -- or I believe we had returned all the information that we received from Bob Evans. We received subsequent information from Eiger. So if Eiger had gleaned information from and it happened to be the same or not, I don't know, but we're relying on information subsequently that was provided by Eiger.

Q. Right. But the due process -- due diligence process certainly didn't start over. And I'm not asking you to make a legal conclusion or otherwise comment on the effect of Mr. Evans' request or -- or the scope of -- of the required response from the bank. But the due diligence process didn't start --

A. No.

Q. -- from scratch?

A. No, it would have been a continuation of the due diligence. And whether that due diligence

Page 99

as a result of -- of our independent review typically through our counsel, as I mentioned, whether it modified any of those numbers, I don't know.

Q. Okay. I'm almost done. Were you aware -- well, let me ask it this way: Were you aware of the -- of the fees being collected by BankBoston on this loan by the time you left the bank?

MS. FARQUHAR: Objection, vague.

THE WITNESS: Our approval would have referenced what our fee structure was so the answer is, yes.

BY MR. ORCUTT: (resuming.)

Q. Do you know -- was there a typical fee or is it negotiable or --

A. It's negotiable.

Q. What were the components of a fee in this type of a transaction, to your recollection, at that time?

A. In other words, what type of fees would be charged? Or there may be -- it would generally be an origination fee. There may be some sort of underwriting fee if we're stepping up and funding dollars. I mean I don't recall the various

Page 100

components here.

Q. Was there any recollection on your part whether or not those fees were high, low or don't you have any recollection of -- of them?

A. The magnitude of the fees relative, I would -- I would consider them market rate.

Q. Were there any real estate commissions payable on the closing of the loan?

A. I was not aware of any realtor being involved.

Q. Were you aware of a entity called, Monarch Partners out of Deluth, Georgia? It was specifically a man by the name of Penn Hodge, P-E, double "N", H-O-D-G-E.

A. No.

Q. How about a Green Side Realty Corp. --

A. No.

Q. -- in Texas -- in San Antonio?

A. No.

Q. A man by the name of Audie, A-U-D-I-E, looks like Long, L-O-N-G?

A. No.

Q. You're not aware of a $500,000 real estate commission that was paid by Eiger, they are actually H.D. Associates, in conjunction with the

Page 101

acquisition of this property?

A. No.

MR. ORCUTT: That's all I have.

MS. FARQUHAR: Do you have some questions?

MR. GERLACH: Yes, I do.

MS. FARQUHAR: Can we take just a quick break?

MR. GERLACH: I only have maybe one question, but that's fine.

MR. ORCUTT: Do you want to take the one question?

MR. GERLACH: I only have one question.

MS. FARQUHAR: Let's take a break.

(Whereupon, a brief recess was taken.)

MR. GERLACH: Back on the record.

CROSS-EXAMINATION

BY MR. GERLACH:

Q. Mr. Whiting, you were -- you were asked questions about a meeting in Atlanta that the counsel for the Plaintiff represented occurred on June 15, 1999. Do you recall that?

Page 102

A. Yes.

Q. Is it correct that the meeting began mid morning?

A. That's my recollection.

Q. Okay. Did you mean by that 10:00, 10:30 in the morning?

A. 10:00, 11:00 o'clock range.

Q. Okay. And you said that there was a break for lunch?

A. As I recall, I don't -- we have a pretty regular constitution at the bank, we normally break for lunch. I'm just guessing, but we probably broke for lunch.

Q. Okay. Do you recall whether this was a working lunch, sandwiches were brought in or whether people went to a restaurant?

A. You know, I don't recall that.

Q. Did you all have lunch together?

A. We would have, yes.

Q. And you testified that people had flights departing Atlanta around 4:00 o'clock in the afternoon.

A. That was my recollection.

Q. So it is fair to say that the meeting broke up between 2:00 and 3:00 o'clock?

Page 103

A. I would think so.

MR. ORCUTT: Object to the form of the question.

BY MR. GERLACH: (resuming.)

Q. Where in the Atlanta area is your office located?

A. We're in the perimeter area. North side -- north of the 285.

Q. How long does it take to get from the perimeter to the Atlanta Airport mid afternoon on a weekday afternoon?

A. Depending on whether you're driving or taking the Marta, anywhere from 45 minutes to an hour and-a-half.

Q. In view of all those factors can you estimate for me how long the meeting you referenced actually lasted?

A. I'm guessing perhaps three to four hours.

Q. Okay. Are you including lunch in that?

A. Yes.

MR. GERLACH: No further questions.

MS. FARQUHAR: I have just a few questions. And I will note, for the record,

Page 104

Mr. Gerlach asked more than one question.

CROSS-EXAMINATION

BY MS. FARQUHAR:

Q. Mr. Whiting, at the meeting in Atlanta when Mr. Evans passed out the spreadsheets, did he inform you at that time that he or Lochmere expected BankBoston to pay for the information it was receiving in the spreadsheets?

A. No.

Q. Did he or Lochmere ever inform you that he or Lochmere expected payment for the information?

A. No.

Q. In your experience as a loan officer at a bank, and in particular in connection with commercial real estate lending, have you ever been aware of a bank paying for the information it receives from a potential borrower?

A. No.

Q. At the meeting in Atlanta was there any discussion of any payments to the Lochmere entities?

A. No.

Q. Were you ever told by anyone of any payments or financial compensation that was to be received by the Lochmere entities?

**Condenselt!™**

Page 105

A. No.

MS. FARQUHAR: No further questions.

(WHEREUPON, the taking of the deposition was concluded at 12:30 p.m.)

S T I P U L A T I O N S

It was agreed by counsel and the deponent reading and signing of the deposition would not be waived.

Page 106

CERTIFICATE OF OATH

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, the undersigned authority, certify that NICHOLAS WHITING personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 18th day of June, 2001

_____

SHARLENE R. FARMER

Notary Public, State of Florida

Commission No. CC 544105

Expires: April 17, 2004

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA

COUNTY OF HILLSBOROUGH

I, SHARLENE R. FARMER, certify that I was authorized to and did stenographically report the foregoing deposition of NICHOLAS WHITING; that a review of the transcript was not requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of

Page 107

the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action

DATED THIS June 18th, 2001.

_____

Sharlene R. Farmer

Sharlene R Farmer
My Commission CC928628
Expires April 17, 2004

Page 108

I HAVE READ THE FOREGOING TRANSCRIPTION OF MY DEPOSITION AND EXCEPT FOR ANY CORRECTIONS AND/OR AMENDMENTS APPENDED HERETO, I HEREBY SUBSCRIBE TO THE TRANSCRIPT AS AN ACCURATE RECORD OF THE TESTIMONY GIVEN BY ME.

_____

NICHOLAS WHITING

WITNESS my hand and seal, this _____ day of _____, 2001

_____
Notary Public,
State of Florida at Large

My commission expires:

RE: Lochmere Development Group vs. H.D. Associates, et al.
REPORTER BY: SHARLENE RENEE FARMER

Condenselt!™

Page 109

CORRECTIONS AND/OR AMENDMENTS

PAGE    LINE

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____

_____  _____  _____