

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LOCHMERE DEVELOPMENT
GROUP, INC. and
LOCHMERE REALTY, INC.,

    Plaintiffs,

                Case No.: 8:00-cv-1026-T-27B

v.

EIGER FUND I, L.P., et al.

    Defendants.

_____/

## NOTICE OF FILING EXHIBIT #10 TO DEPOSITION OF PAUL E. ROWSEY, III, IN SUPPORT OF DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Defendants Eiger Fund I, L.P., Eiger, Inc., Eiger Partners, L.P., H.D. Associates, L.P., Dunes Operating Company, L.P. and 2M Dunes, L.L.C. ("the Eiger Entities"), and Defendants Paul E. Rowsey, III, C. Todd Miller, David M. Jacobs, and William S. Buchanan ( "the Eiger Individuals"), provide this Notice of Filing Exhibit No. 10 to the deposition of Paul E. Rowsey, III dated May 22, 2000, in Support of Defendants' Motions for Summary Judgment against Plaintiffs Lochmere Development Group, Inc. ("Lochmere Development") and Lochmere Realty, Inc. ("Lochmere Realty").

Respectfully submitted,

Daniel F. Molony    FBN 71330
James B. Murphy, Jr.   FBN 287598
SHOOK, HARDY & BACON L.L.P.
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
(813) 202-7100
(813) 221-8837 - Facsimile

6341.1

- and -

Alan S. Loewinsohn
Carol E. Farquhar
PEZZULLI & LOEWINSOHN, L.L.P.
18383 Preston Road, Suite 110
Dallas, Texas 75252
(972) 713-1300
(972) 713-1313 - Facsimile

Attorneys for Eiger Fund I, L.P., Eiger, Inc.,
Eiger Partners, L.P., H.D. Associates, L.P.,
Dunes Operating Company, L.P.,
2M Dunes, L.L.C. and Fleet National Bank
N.A., f/k/a BankBoston, N.A.

- and -

Dora Kaufman
Florida Bar No. 771244
HALLEY, SINAGRA & PEREZ
100 S.E. 3rd Avenue, Suite 1900
Fort Lauderdale, FL 33394
(954) 467-1300
(954) 467-1372  - Facsimile

Co-Counsel for Fleet National Bank, N.A.,
f/k/a BankBoston, N.A.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

~~facsimile transmission and~~ by United States Mail to Gregory J. Orcutt, Esq., Bricklemyer, Smolker

& Bolves, P.A., 500 E. Kennedy Blvd., Suite 200, Tampa, FL 33602 and Alan B. Gerlach, 390 N.

Orange Avenue, Suite 1100, Orlando, FL 32801 this 5th day of July, 2001.

ATTORNEY

6341.1

## AGREEMENT FOR SALE AND PURCHASE

By and Between

### ITT COMMUNITY DEVELOPMENT CORPORATION,

### ADMIRAL CORPORATION, CORPROP A&F, INC.

and

### ITT LAND CORPORATION

as Seller

and

### DUNES OPERATING COMPANY, L.P.

as Purchaser

**Hammock Dunes**
**Palm Coast, Florida**

**Dated: as of July 29, 1999**

ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE DEVELOPER. FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS CONTRACT AND THE DOCUMENTS REQUIRED BY SECTION 718.503, FLORIDA STATUTES, TO BE FURNISHED BY A DEVELOPER TO A BUYER OR LESSEE.



DEPOSITION EXHIBIT
10

E01203

## TABLE OF CONTENTS

Page No.

1.   Purchase and Sale; Closing. ................................................................................................ 1

2.   Study of Property. .............................................................................................................. 10

3.   Purchase Price. ................................................................................................................... 11

4.   Deposit. ............................................................................................................................... 16

5.   Terms of Payment. ............................................................................................................. 16

6.   Continued Operation of Property ................................................................................ .. 17

7.   Closing. ............................................................................................................................... 20

8.   Title and Survey. ................................................................................................................ 25

9.   Copies of Contracts, Licenses, Real Estate Tax Information and Plans. .............................. 27

10.  Seller's Representations. .................................................................................................... 29

11.  Purchaser's Representations. ............................................................................................. 39

12.  Hammock Dunes Development of Regional Impact (DRI) Development Order. ................. 41

13.  Prohibition Regarding Logo/Name - No Partnership or Joint Venture. ............................... 41

14.  Commission to Brokers. ...................................................................................................... 43

15.  Dunes Community Development District. ............................................................................ 44

16.  Hammock Dunes Equity Club; The Second Golf Course ..................................................... 45

17.  Construction. ...................................................................................................................... 50

18.  Default Provisions. .............................................................................................................. 50

19.  Prorations. ........................................................................................................................... 51

20.  Improvement Liens. ............................................................................................................ 54

21.  Closing Costs. ...................................................................................................................... 54

22.  Assignability. ....................................................................................................................... 55

23.  Notices. ................................................................................................................................ 55

i

E01204

24. Risk of Loss. .................................................................................................... 56

25. Indemnification. .............................................................................................. 57

26. Employees. ..................................................................................................... 61

27. Security for Purchaser's Performance. ............................................................... 67

28. Agreement Regarding Specific Homeowner's Association Litigation. .................. 75

29. ITT Industries, Inc. Guaranty. ........................................................................ 75

30. Miscellaneous. ................................................................................................ 75

31. Entire Agreement. .......................................................................................... 77

32. Seller's Obligations. ........................................................................................ 78

E01205

## List of Exhibits

Exhibit "A"           Sketch of Hammock Dunes Tract I
Exhibit "A-1"         Description of Development Parcels
Exhibit "A-2"         Description of Sales Center
Exhibit "A-3"         Description of Commercial Parcel
Exhibit "A-4"         Description of Common Area Parcels
Exhibit "B"           Description of Marina Parcel
Exhibit "C"           Description of Second Golf Course Site
Exhibit "D"           Inventory of Developed Lots or Units in Hammock Dunes Tract I
Exhibit "E"           Association and Club Documents
Exhibit "F"           Inventory of Club Property
Exhibit "G"           Billboards
Exhibit "H-1"         Illustration of "Hammock Dunes" and "Palm Coast" Logos
Exhibit "H-2"         Illustration of "Hammock Dunes Private Community" Logo
Exhibit "I"           Consents Required
Exhibit "J"           HDREC Commissions Receivable and Payable
Exhibit "K"           Form of Special Warranty Deed to be used in the conveyance of
                      the Real Property
Exhibit "L"           Form of Assignment of Leases, Licenses, Permits, Contracts, Etc.
                      to be executed at the Closing
Exhibit "M"           Schedule of Contracts
Exhibit "N"           List of Pending Litigation Affecting the Property
Exhibit "O"           Inventory of Property Used in Sales Center (to be attached prior to
                      Closing Date)
Exhibit "P"           Allocation of Development Order Agreement Obligations
Exhibit "Q"           Utility Connection Guarantee and Bridge Debt Service Payment
Exhibit "R"           List of Tangible and Intangible Personal Property Not Included in
                      Closing
Exhibit "S"           Seller's Retained Confidential Information
Exhibit "T"           Schedule of Licenses
Exhibit "U"           Commissions and Overrides
Exhibit "V"           List of Sold Units and Pending Signed Contracts
Exhibit "W"           Title Exception Matters
Exhibit "X"           Survey Matters
Exhibit "Y"           Mortgage and Security Agreement for Second Golf Course
Exhibit "Z"           ITT Industries, Inc. Guaranty

Note:  Any reference in the Exhibits to "HD Associates, L.P." shall be deemed to refer to
          Purchaser.

E01206

## AGREEMENT FOR SALE AND PURCHASE

THIS AGREEMENT FOR SALE AND PURCHASE (this "Agreement") is made and entered into as of this 29th day of July, 1999 (the "Effective Date"), by and among ITT COMMUNITY DEVELOPMENT CORPORATION, a Delaware corporation authorized to do business in the State of Florida, ADMIRAL CORPORATION, a Florida corporation, CORPROP A&F, INC., a Delaware corporation, authorized to do business in the State of Florida, and ITT LAND CORPORATION, a Delaware corporation authorized to do business in the State of Florida, (collectively, "Seller"), and DUNES OPERATING COMPANY, L.P., a Delaware limited partnership, and their permitted assigns, ("Purchaser").

NOW, THEREFORE, IN CONSIDERATION of the "Deposit" (as defined in Paragraph 4 below) and the mutual covenants and promises hereinafter set forth, the parties hereto hereby agree as follows:

1. **Purchase and Sale; Closing.**

(a) Seller agrees to sell to Purchaser, and Purchaser agrees to purchase from Seller, upon the Closing Date (as defined in Paragraph 7.a below) and subject to the terms and conditions hereinafter set forth, the following:

(i)    Real Property.  The following parcels of real property located in Flagler County, Florida (collectively, the "Real Property"):

(1) *Realty.*   The parcels of real property (collectively, the "Realty"), located in Tract I of the community commonly known as the "Hammock Dunes Development of Regional Impact" (the "Hammock Dunes DRI") depicted in Exhibit "A" attached hereto and made a part hereof by this reference, consisting of:

E01207

(a) All unsold developed lots, dwelling units, including Unit 2801 at LaGrande Provence Condominium, and future development parcels, except for the Viscaya Units (as that term is defined hereafter), and all of Seller's right, title and interest, if any, in and to all common property, common areas, common elements and other common ownership parcels benefiting such lots, units or parcels, all as generally described in Exhibit "A-1" attached hereto and made a part hereof by this reference (collectively, the "Development Parcels"). The number of existing developed lots and units included in the Realty is as set forth in Exhibit "D" and made a part hereof by this reference, subject to sales or reacquisitions by Seller in the ordinary course of business as set forth in Paragraphs 3.b.i and 3.b.ii(5) below. Any dwelling units within Viscaya which are under contract to be sold by Seller to third parties (the "Viscaya Units"), whether under construction or not, prior to Closing, shall be retained by Seller at Closing. Any dwelling units within LaGrande Provence which are then under contract to be sold by Seller to third parties (the "LaGrande Units") shall be retained by Seller at Closing. Purchaser shall grant to Seller an easement on mutually acceptable terms to enter upon the Property after Closing to the extent necessary to complete the construction and sales of the Viscaya Units.

(b) That certain tract of the Realty and the building constructed thereon consisting of approximately 5,700 square feet currently used by Seller as a sales and marketing center for the Realty, as

2

E01208

generally described in **Exhibit** "A-2" attached hereto and made a part hereof by this reference (the "**Sales Center**"), and any office equipment, furniture, fixtures, equipment, goods, wares, supplies and other personal property used as of the date of closing in connection with the operation of the Sales Center, including without limitation all marketing materials, graphics, proofs, logos, videotapes, brochures, marketing leads, customer lists including names, addresses and phone numbers, and sales activity reports used in connection with the marketing of the Realty but only to the extent such items are assignable. Seller may retain a nominal supply of such items. Seller has furnished to Purchaser an inventory list of fixed assets used in connection with the operation of the Sales Center which is attached as **Exhibit "O"** and made a part of this Agreement. At Buyer's option, upon prior notice to Seller prior to the Closing Date, Seller will cooperate in conducting an inventory of all of the equipment, furniture, fixtures, goods, wares, supplies and other personal property then used by Seller in connection with the operation of the Sales Center, and the list prepared as a result of such inventory shall replace Exhibit "O" provided, however, that the parties agree that conducting such inventory shall not be cause for extension of the Closing Date. Prior to the Closing Date Seller shall permit no waste, sale, transfer or conveyance of such items other than use by Seller or substitutions thereof of like kind and quality in the ordinary course of Seller's business.

E01209

3

(c) That certain tract of the Realty consisting of approximately 7.7 acres approved for commercial development in accordance with the Development Order (as defined in Paragraph 12 below the "**Development Order**"), as generally described in **Exhibit "A-3"** attached hereto and made a part hereof by this reference (the "**Commercial Parcel**").

(d) Notwithstanding the foregoing, the Real Property does not include any lands conveyed by Seller prior to the Effective Date to the various owners' associations and the Dunes Community Development District as generally described in **Exhibit "A-4"** attached hereto (the "**Common Area Parcels**").

(2) *Marina Parcel* That certain tract of real property consisting of approximately 91.6 acres approved for development of up to 339 residential units and use as a marina in accordance with the Development Order, as generally described in **Exhibit "B"** attached hereto and made a part hereof by this reference (the "**Marina Parcel**").

(3) *Second Golf Course Site.* That certain tract of real property not located within the Hammock Dunes DRI consisting of approximately 674 acres designated as the "**Second Golf Course Site**", as described in **Exhibit "C"** attached hereto and made a part hereof by this reference.

(ii)    Development Rights. The right to develop upon the Development Parcels, pursuant to the Development Order, a number of approved residential units equal to the maximum of 1385 units as allowed by the Development Order, less the 713 units

4

EO1210

developed as of February 15, 1999, as shown on **Exhibit "D"** attached hereto and by this reference made a part hereof, as adjusted at Closing pursuant to Paragraph 3.b.i of this Agreement (an inventory of the approved units sold by Seller as of February 15, 1999, is set forth in **Exhibit "D"**), and the right to develop up to 339 residential units and a marina upon the Marina Parcel as allowed by the Development Order (collectively, the **"Development Rights"**).

(iii)   Developer's Rights.  All of Seller's right, title and interest (but not obligations, all of ʋ ˮ ɔbligations shall be retained by Seller except as assumed by Purchaser as provided in this Agreement) with respect to the Real Property (i) as Declarant, Developer, Owner, Member or otherwise, under and pursuant to any covenants, conditions, restrictions, agreements and club documents benefiting the Real Property, including without limitation those certain declarations of covenants and restrictions and club documents identified in **Exhibit "E"** attached hereto and made a part hereof (collectively, the **"Association and Club Documents"**), subject, however, to the terms of this Agreement regarding Purchaser's assumption of certain obligations under the Development Order, Purchaser's assumption of the Seller's obligations in accordance with the Subscription Agreement dated March 20, 1990 (the **"Subscription Agreement"**) between Hammock Dunes Club, Inc. and ITT Community Development Corporation; (ii) as Developer, Applicant, Owner or otherwise in and to the Hammock Dunes Community Development District (the **"District"**) to the extent attributable to the Real Property to be conveyed to Purchaser pursuant to this Agreement; and (iv) in and to any bank accounts containing any assessments, fees or charges collected prior to Closing (as defined in Sub-paragraph 7.a below) pursuant to or in connection with any of the

5                                                    E01211

Association and Club Documents or containing any assessments, fees or charges collected prior to Closing by, or any other funds of, the District (collectively, the "Developer's Rights").

(iv)    The Club. Seller's right, title and interest in and to the 1,116 unsold equity memberships in The Hammock Dunes Club, a Florida not-for-profit corporation (the "Club"), pursuant to the Membership Plan of the Club dated March 20, 1990, owned by Seller as of February 15, 1999 subject to sales or reacquisitions by Seller in the ordinary course of busine · · ·ℸ forth in Paragraphs 3(b)(i) and 3(b)(ii)(5) below. Seller shall also convey to Purchaser all of its right, title and interest, if any, in and to the assets of the Club, including without limitation a clubhouse building of approximately 32,000 square feet, maintenance facilities, an 18 hole championship golf course with driving range and practice areas, croquet lawn, tennis courts, landscaping improvements, man-made lakes and water retention ponds, irrigation system including the sprinklers, pipes, fittings, lake liners, pumps and flood control works, cart paths, paving, walkways, parking facilities, Seller's interest as lessee in golf cart fleet, if assignable, maintenance equipment and vehicles, office equipment, receivables, furniture, fixtures, kitchen equipment, licenses, permits, contracts, leases, subleases and concession agreements, goods, wares, supplies, pro shop and other inventory, warranties, guaranties, architectural plans, engineering plans, construction plans, landscape plans and if available, as-built plans pertaining to any of the foregoing, and all other assets and property, tangible and intangible, used in connection with the operation and maintenance of the Club (collectively, the "Club Property"). An accounting and inventory of the foregoing items used in connection with the Club is attached as **Exhibit "F"** and made a part of this

E01212

Agreement. The value of the tangible personal property included in the inventory as described in Paragraph 3(b)(ii)(3) will be payable to Seller in addition to the Purchase Price.

(v)    Improvements.    All existing buildings, improvements and structures in or upon any of the Real Property and all of Seller's right, title and interest in all furniture, fixtures and equipment attached to or used in connection therewith (the "Improvements").

(vi)    Billboards. All of S        ·ght, title and interest, if any, in and to those billboards identified in Exhibit "G" attached hereto and made a part hereof by this reference, for the purpose of promoting the Real Property and the Club (collectively, the "Billboards"), and all of Seller's right, title and interest in and to the real property underlying such Billboards, whether in fee simple, leasehold, by license or otherwise, provided however, that Seller shall sell or assign all billboards identified in Exhibit "G" according to the provisions set forth in Exhibit "G".

(vii)    Appurtenant Property.    All of Seller's right, title and interest, if any, in and to all strips and gores of land lying adjacent to any of the Real Property, together with all tenements, hereditaments, easements, privileges, rights-of-way, riparian and other water rights, mineral rights, lands underlying any adjacent streets or roads, and appurtenances pertaining to or accruing to the benefit of the Real Property, but less and except therefrom the Connector Road to Tracts II and III as described in Exhibit "A-1".

(viii)    Tangible and Intangible Personal Property.    The following tangible and intangible personal property, if any, but only to the extent owned by Seller and used at or in connection with the Real Property, the Club, the Club Property, the

7

E01213

Improvements or the Billboards and only to the extent transferable, but specifically excluding all of the tangible and intangible personal property described in **Exhibit "R"** attached hereto and by this reference made a part hereof:

(1) all licenses, permits, authorizations, approvals, zoning rights, environmental rights and approvals, vested rights, prepaid fees, credits against fees, subdivision rights, water and sewer rights, development rights, applications, plans, specifications, studies, surveys and reports relating to the Real Property, the Club, the Club Property, the Improvements or th ᵒrds;

(2) all contracts, contract rights, agreements, commitments and equipment, real estate and other leases including leaseback of models (which Purchaser shall assume) in which Seller has any present or future right or interest on the Closing Date, except for any such rights with respect to the Viscaya Units and the LaGrande Units, together with Seller's right to be paid for certain utility connections made hereafter to the District's water and wastewater utility system, including any contracts for the sale of any lot or units to retail customers in the ordinary course of Seller's business, and which relate, directly or indirectly, to the ownership, construction, management or operation of the Real Property, the Club, the Club Property, the Improvements or the Billboards. Seller has attached hereto as **Exhibit "M"** a schedule of the Contracts (as defined herein) that require annual payments in excess of $5,000.00 per year and that may not be terminated upon 30 days or less notice (the **"Major Contracts"**). All Contracts which are not Major Contracts shall be assumed by Purchaser at Closing. Purchaser shall notify Seller within ten (10) days of the Effective Date of any Major Contracts

8

E01214

that it will not assume at Closing. If no such Notice is received Purchaser shall be deemed to agree to assume the Major Contracts at Closing.

(3) the non-exclusive license to use the service marks "Palm Coast", and "Hammock Dunes", and related designs and logos for both service marks, in accordance with the License Agreement attached hereto as Exhibit "H-1" and made a part hereof by reference, and the exclusive Assignment of the trade name "Hammock Dunes Private Community" including all logos, trademarks, and other rights in connection therewith, in ʲance with the Assignment attached hereto as Exhibit "H-2" and made a part hereof by this reference and as specified in Paragraph 13 below;

(4) other tangible and intangible assets and general intangible rights to the extent owned by Seller, pertaining to the ownership, construction, management or operation of the Real Property, the Club, or Club Property, the Improvements or the Billboards as of the Closing Date, including, without limitation, all books and records, customer and supplier lists, accounts, provider agreements, approvals, permits, contracts, plans, warranties, guaranties, surveys, office supplies, forms, lessee's interest in sales vehicles, if assignable, lessee's interest in security vehicles, if assignable, and maintenance vehicles and equipment relating thereto; provided, however, Seller shall not be required to deliver to Purchaser Seller's records pertaining to the matters specified in Exhibit "S" attached hereto and made a part hereof by this reference, which shall remain the confidential and proprietary information of Seller. Seller shall also be

9

EO1215

permitted to retain copies of any such records or other material delivered to Purchaser, subject to the confidentiality provisions hereof.

(ix) <u>Hammock Dunes Real Estate Company</u>. All of the assets of Hammock Dunes Real Estate Company, Inc. ("HDREC") that are described in **Exhibit "J"** attached hereto and by this reference made a part hereof, provided however, that Purchaser shall assume all of the obligations related to such assets of HDREC as described in **Exhibit "J"**.

The Real Property, the Development Rights, the Developer's Rights, th ⁀ ⁼⁼ ⁼'s interest in the Club and the Club Property described herein above, the Improvements, the Billboards, the Appurtenant Property described herein above, the Tangible and Intangible Personal property described hereinabove and the assets of HDREC are hereinafter collectively called the "Closing Property".

2. **Study of Property.** During any time when Purchaser is not in default hereunder prior to the Closing Date Seller shall permit representatives, agents, employees, lenders, contractors, appraisers, architects and engineers designated by Purchaser access to, and entry upon, the Property and access to Seller's books and sales records regarding the Property (except as set forth in **Exhibit "S"** attached hereto) at reasonable times and in a reasonable manner to examine, inspect, measure, and test the Property for the purposes set forth in this paragraph. Purchaser agrees to hold Seller harmless from all damages, costs or expenses arising from claims for personal injury or property damage incurred by Seller as a result of Purchaser's exercise of its rights to inspect, survey or otherwise test the Property. Purchaser shall repair any damage to the Property caused by Purchaser's inspections, surveys or tests. Purchaser acknowledges and agrees that Purchaser's decision to proceed with this transaction shall be based solely on its independent

10

E01016

review and evaluation of the Property and the representations made by Seller in Paragraph 10 hereof. Seller agrees that it will make a good faith effort to comply with Purchaser's reasonable requests for information about the Property, which is in Seller's possession or control. Purchaser acknowledges and agrees that the furnishing of such information by Seller shall not be or be deemed to be a representation or warranty by the Seller as to the accuracy, completeness or current nature of such information; the only representations or warranties made by Seller with regard to the Property are these expressly made in Paragraph 10 hereof.

3. **Purchase Price.**

(a) Purchase Price. The purchase price to be paid by Purchaser to Seller for the Property (the **"Purchase Price"**), shall be Twenty Six Million, Three Hundred Eighty-Seven Thousand And No/100 Dollars ($26,387,000.00), (as the same may be adjusted pursuant to Section 5 of this Agreement) plus the assumption by Purchaser of all of the obligations described in Paragraphs 1, 12, 15 and 16 herein, but subject to adjustments and prorations provided for herein.

(b) Adjustments to Purchase Price. The Purchase Price shall be adjusted as follows:

(i) ***Reductions to Purchase Price.*** The Purchase Price shall be reduced to reflect any sales by Seller of the lots or units for which the closing and transfer of title occurred after February 15, 1999, and before the Closing Date, which sales are described on **Exhibit "V"** by on amount equal to 75% of the net proceeds (i.e., contract sales price minus closing discounts and sales incentive amounts and closing costs) received by Seller in connection with such sale, provided however, that no reduction in Purchase Price shall be made for any of the Viscaya Units. For purposes of this

11

E01217

Paragraph, a lot or unit shall be deemed sold by Seller (each a "Sold Unit") at the time the adjustment is made if Seller has conveyed fee simple title to such lot or unit to a third party. The Purchase Price shall also be reduced by the full amount of the net sales proceeds anticipated to be received by Seller upon the closing of the LaGrande Units. Seller shall not sell Unit 2801 at LaGrande Provence Condominium. The adjustment required by the immediately preceding sentence and with respect to sold memberships as described below in this subparagraph, shall be made as of the Closing Date (the "Sold Unit Adjustment Date") and shall be final. Except for contracts to sell Viscaya Units, any contracts entered into by Seller but not closed by the Closing Date shall not result in an adjustment and, except for contracts to sell Viscaya Units and LaGrande Units, Seller shall assign any such contracts to Purchaser (and Purchaser shall be responsible for payment of all sales costs including customary brokerage commissions and overrides to Seller's employees including reimbursement to Seller of commissions prepaid by Seller under such contracts provided such commissions and overrides do not exceed those listed in **Exhibit "U"** on such contracts) and transfer such lots and units to Purchaser. Any sales by Seller after February 15, 1999, and prior to Closing of memberships in the Club described in Subparagraph 1 (iv) above, in connection with a contract for a lot or unit, shall reduce the inventory of Club memberships transferred to Purchaser at Closing, and shall result in a reduction of the Purchase Price by an amount equal to 75% of the actual purchase price of such Club membership. Any such memberships shall be considered "**Sold Memberships**" for purposes of this Agreement.

12

E01218

Set forth in **Exhibit "V"** attached hereto and made a part hereof by this reference is a list of Sold Units and Sold Memberships, which **Exhibit "V"** will be updated as of the Closing Date to reflect sales of lots, units and memberships between the Effective Date and the Closing Date.

(ii)    *Additions to Purchase Price.*    The Purchase Price shall be increased by the following:

(1) The Purchase Price shall be increased by $35,000 per permitted billboard on real estate owned by Seller and at the Closing Date conveyed to Purchaser, including any billboard sites which are part of the Real Property, but there shall be no payment to the Seller for any nonpermitted boards or for any leased billboards which leases are assumed by Purchaser.  For purposes of this sub-paragraph, a "permitted billboard" is one which is permitted to exist by the Florida Department of Transportation or other applicable governmental authority and is listed in **Exhibit "G"** as a billboard for which a permit will be assigned by Seller at Closing.

(2) The Purchase Price shall be increased to reflect additional lots or units to be conveyed to Purchaser which were previously sold, but which have been reacquired by Seller prior to Closing and which were therefore not included in the "Available" column of **Exhibit "D"**, by an amount equal to 75% of the total sales price that was paid by Seller to reacquire such lot or unit.

(3) The value of the inventory of supplies, merchandise, and food and beverage items included in **Exhibit "F"** which are part of the Club Property shall be computed as described in Paragraph 1.a.iv, at the cost basis to Seller therefore and the Purchase Price shall be increased by such cost basis amount.

13

501219

(4) In the event that Seller requests that Purchaser acquire any one or more of the Viscaya Units prior to the Closing Date, then the Purchase Price will be increased by the amount the Seller paid to Seller's Contractor to construct the vertical improvements for such Viscaya Units(s) (the "out of pocket construction costs"). Additionally, if, at any time after the Closing Date, any person who has a contract to purchase any of the Viscaya Units from Seller elects not to purchase any such Viscaya Unit for any reason, then Seller shall give notice of such circumstances to Purchaser who shall, within 30 days of receiving such notice from Seller, close on and acquire such Viscaya Unit(s) for Seller's out of pocket construction costs for such Viscaya Unit(s). The provisions of this subparagraph 3(b)(ii)(4) shall survive the Closing.

(5) If, after Closing, the LaGrande Units are sold by Seller to the persons with whom Seller had a contract to sell such units at Closing, then Seller shall retain the net sales proceeds from such closings. If, however, either or both of the persons with whom Seller had a contract to sell the LaGrande Units fail to close on their contracts, then Seller shall give notice of such failure to close to Purchaser who shall, within 30 days of receiving such notice from Seller, close on and acquire such LaGrande Unit(s) for the reduction in the Purchase Price made at Closing pursuant to paragraph 3(b)(i) hereof.

(6) The Purchase Price shall be increased by an amount equal to ninety-five percent (95%) of all receivables due to be paid to the Club for any period prior to the Closing Date, where the amount of such receivables is computed by Seller and agreed to by Purchaser on the Closing Date. The

14

E01220

Purchaser shall thereafter retain all right, title and interest to all such Club receivables. The Purchaser shall receive an assignment of all such receivables due to the Club, but Purchaser shall not pay for any receivables that are more than 90 days old as of the Closing Date.

(7) The Purchase Price shall be increased by an amount equal to ninety-five percent (95%) of all receivables due to be paid to HDREC for any period prior to the Closing Date, where the amount of such receivables is computed by Seller and agreed to by Purchaser on the Closing Date, and shall thereafter be reduced by an amount equal to ninety-five percent (95%) of all expenses and commissions payable in connection with such receivables, all as shown on **Exhibit "J"**. Such receivables consist primarily of commissions due or to be due to HDREC for custom homes to be built by builders participating in the Hammock Dunes builders programs. The Purchaser shall thereafter retain all right, title and interest to all such HDREC receivables and shall be responsible for payment of all customary brokerage commissions and overrides to Seller's sales representatives in accordance with **Exhibit "U"**. If, after Closing, additional receivables other than those shown on **Exhibit "J"** become known to either Seller or Purchaser, then Seller shall therefore assign such receivables, for an amount equal to ninety-five percent (95%) of the stated value thereof, subject to a reduction in amount equal to ninety-five percent (95%) of the expenses and commissions related thereto.

15

E01221

(c) <u>Additional Consideration</u>. The consideration for Seller's sale of the Property includes the payment by Purchaser of the Purchase Price and the compliance by Purchaser with all of the terms and conditions hereof.

4. **Deposit.** Within two (2) business days after execution of this Agreement by Seller and Purchaser and receipt of a fully executed copy hereof by Purchaser, Purchaser shall deposit with Palm Coast Abstract and Title Company ("**Escrow Agent**"), the sum of Three Million and no/100 Dollars ($3,000,000.00) (together with interest earned thereon, the "**Deposit**"), to be held in escrow, su    ·· clearance, to secure the performance by Purchaser of its obligations under this Agreement. The Deposit shall be nonrefundable except as expressly provided in this Agreement. The Deposit shall be deposited by Escrow Agent in an interest bearing account. The Deposit shall be credited to Purchaser against the Purchase Price due at the Closing.

5. **Terms of Payment.**

The Purchase Price for the Property shall be paid to Seller as follows:

| | |
|---|---|
| $3,000,000.00 | being the total principal amount of the Deposit referred to in Paragraph 4 of this Agreement, which sum shall be paid to Seller at the Closing; and |
| $23,387,000.00 | approximately, in current funds to be paid to Seller at the Closing, subject to prorations and adjustments as herein provided, (including an increase in an amount equal to the amount of increase in the Total Purchase Price as described below) by wire transfer of Federal Funds to the title insurance company insuring Purchaser's title to the Real Property as provided in Paragraph 8 below. |
| $26,387,000.00 | Total Purchase Price. (The Total Purchase Price shall increase by $20,000.00 per day for each day commencing July 30, 1999 through and including the Closing Date.) |

E01222

At the Closing, the Total Purchase Price, as described above, shall be paid over to Seller simultaneously with the delivery by Purchaser and Seller of the Closing Documents. Purchaser and Seller shall also make the appropriate prorations and adjustments as set forth in this Agreement.

### 6. Continued Operation of Property

(a) Maintenance of Property. At all times prior to the Closing, Seller shall maintain the Property generally in the condition as it exists as of the date of this Agreement, without waste or other :      ent of value. Without limiting the generality of the foregoing, Seller shall continue participation in ITT Industries, Inc.'s pool for self-insurance with respect to the Property against loss or damage due to fire or other casualty or from claims for personal injury or property damage. Seller shall also continue to perform such periodic, scheduled, ordinary or extraordinary maintenance on the Property, if any, as customarily performed in Seller's ordinary course of business, and shall not defer or postpone any such maintenance in anticipation of the execution of this Agreement or the Closing.

(b) Marketing of Development Parcels. Seller shall not transfer any portion of the Real Property or the other Property, which is the subject of this Agreement in any bulk sale or to any affiliated or related entity of Seller, unless such affiliated or related entity specifically assumes Seller's obligations under this Agreement. Notwithstanding the foregoing, from and after the Effective Date, Seller shall continue its retail residential marketing and sales program for the Development Parcels in a manner consistent with past practices, and Seller may sell individual lots included within the Development Parcels to third party, bona fide purchasers in the normal course of Seller's business. Seller shall not reduce its current asking price for any such lot, or accept a sales price for a lot which is more than ten percent (10%) below Seller's

17

EO1223

current asking price therefor, or institute sales incentives with value in excess of 10% of Seller's current asking price, without Purchaser's prior written approval. A listing of Seller's current asking prices for all of the lots and units comprising the Realty is attached hereto as **Exhibit "D"** and made a part hereof by this reference.

(c) <u>Club.</u> From and after the Effective Date of this Agreement until the Closing, Seller shall cause the Club to continue to be operated, in a manner consistent with its past practices considering the time of year and projected business of the Club. Seller shall cause the Club to continue to (i) maintain app    levels of inventory and supplies for the continued efficient operation of the Club; (ii) maintain a policy or policies of insurance similar to that presently in effect with Zurich Services Corp., and (iii) perform such periodic, scheduled, ordinary or extraordinary maintenance on the Club Property and the improvements thereon as customarily performed in Seller's ordinary course of business and Seller shall not permit the Club to defer or postpone any such maintenance of the Club Property in anticipation of the execution of this Agreement or the Closing. Seller shall not permit the Club to dispose of or encumber any of the Club Property except in the ordinary course of its business. Seller shall be responsible for all payables and other obligations of the Club accrued as of the Closing Date and Seller shall cause all reserves to be funded as of the Closing Date to the extent the same are scheduled to be funded under the applicable governing documents establishing such reserves. After the Effective Date, Seller shall not reduce the current membership price for the existing unsold memberships in the Club, or accept a price for such a membership which is below the current membership price, except for pending contracts/commitments for sale of equity memberships as shown on Exhibit "V".

18

E01224

(d) <u>Payment of Expenses</u>.  All amounts owed for labor, materials supplied, services rendered and/or any other bills or amounts related to Seller or the Club and Seller's or the Club's ownership and/or operation of the Property or the Club Property shall be prorated as of the date of Closing.  Without limiting the generality of the foregoing, Seller and Purchaser hereby agree that:

(i)   All sales tax liabilities, employment taxes, personal and real property taxes, income taxes and all other taxes applicable to the Property, the Club and the Club Property, shall be prorated as ~  ~te of.Closing, and all such taxes which should have been paid as of the Closing, or that will be due after the Closing with respect to periods prior to the Closing, by Seller or the Club shall be paid by Seller as of Closing, and Seller and Club shall provide evidence of such payment to Purchaser after Closing promptly after such payments are made.  Seller shall thereafter cause prompt payment of any other such tax liabilities subsequently arising but with respect to transactions occurring before the Closing.

(ii)   All payments which should have been made as of the Closing, or that will be due after the Closing with respect to periods prior to the Closing, by Seller or the Club under any employee benefit plans or insurance programs shall be paid by Seller as of Closing.  Any such payments that will be due after the Closing and which relate solely to the period after the Closing, shall be the responsibility of Purchaser, who shall ensure that such payments are timely made.

(e) <u>Accrued Assessments</u>.  Prior to the Closing, Seller shall fund or discharge all assessments, fees, dues, reserve accounts and other charges which are at that time accrued and

19

E01225

payable by Seller to the Club, to any homeowners', condominium or other property owners' association having jurisdiction over the Property, or to the District, with respect to the Property.

(f) <u>Cooperation</u>. Prior to the Closing, and for a period of twenty-four (24) months after Closing, Seller shall cooperate with and assist Purchaser in connection with the transactions contemplated by this Agreement, including, but not limited to, delivering such information, and executing and filing such documents, applications and petitions as Purchaser may reasonably deem necessary. Seller shall also cooperate with and assist Purchaser in working with existing homeowners of property within the      ck Dunes DRI and existing members of the Club, including without limitation, Seller shall assist Purchaser, at Purchaser's request, in calling and arranging for meetings with the existing homeowners and Club members but subject to Seller's right to be present at such meetings and, prior to Closing, Seller's approval of the agenda for such meetings.

(g) The provisions of this Paragraph 6 shall survive the Closing pursuant to this Agreement.

7. **Closing.**

(a) The closing on the sale and purchase of the Closing Property (the "Closing") shall be held at the offices of Seller at One Corporate Drive, Palm Coast, Florida 32151-0001, on a date selected by Purchaser not less than five (5) days after written notice thereof to Seller, but in no event later than August 31, 1999, unless extended by mutual agreement of Seller and Purchaser (the **"Closing Date"**).

(b) At the Closing, Seller shall execute and deliver to Purchaser, or cause to be executed and delivered to Purchaser, and Purchaser shall execute and deliver to Seller, where appropriate, the following closing documents in respect of the Closing Property or portions

E01126

thereof or interests therein being conveyed to Purchaser in connection with the Closing, in each case in form and substance reasonably satisfactory to both parties (collectively, the "Closing Documents"):

(i)     a Special Warranty Deed executed by Seller, substantially in the form attached hereto as **Exhibit "K"**, conveying marketable, fee simple title to the Real Property subject only to the Permitted Exceptions (defined below), executed by Seller, provided however that the terms and conditions of said deed shall conform to the provisions of this Agreement;

(ii)    [intentionally left blank];

(iii)   an appropriate mechanic's lien affidavit, executed by Seller;

(iv)    an affidavit of exclusive possession, executed by Seller;

(v)     a non-foreign affidavit or certificate pursuant to Sub-paragraph 10.f hereof, executed by Seller;

(vi)    appropriate assignments of all leases, licenses, easements, rights-of-way, contract rights, guarantees and warranties, Development Rights, Developer's Rights, Seller's rights in the assets, properties and receivables of the Club, permits, approvals, tangible and intangible personal property and general intangible rights and all other property and rights included in this transaction, substantially in the form attached hereto as **Exhibit "L"**, executed by Seller;

(vii)   appropriate assignments of all of Seller's right, title and interest to the unsold memberships in the Club owned by Seller, excluding the Sold Memberships, executed by Seller;

21

E01227

(viii)   an appropriate "gap" affidavit and/or indemnity as required by the title insurance company, executed by Seller;

(ix)   a non-exclusive license to use the service marks **"Palm Coast"**, and **"Hammock Dunes"**, and related designs and logos, and an exclusive assignment of the name **"Hammock Dunes Private Community"**, and all logos, trademarks and other rights in connection with such name in the forms attached hereto as **Exhibits "H-1" and "H-2"**, executed by Seller;

(x)   a Developer Order Allocation and Indemnification Ag·   ·: (the "DRI Agreement"), in the form attached hereto as **Exhibit "P"**; ·

(xi)   appropriate documents conveying the Billboards and all other right, title and interest of Seller in and to or in connection with the Billboards and the real property underlying the Billboards, whether in fee simple, leasehold, by license or otherwise, executed by Seller and Purchaser as required, together with an affidavit from Seller certifying that the payments under the Billboard leases are current and, to the extent the same are received prior to Closing, estoppel certificates from the lessors of any Billboards which are leased by Seller;

(xii)   certificates confirming the continuing truth and accuracy of the representations and warranties of Seller and Purchaser contained herein as of the Closing Date, executed by Seller and Purchaser, respectively;

(xiii)   resignations of all directors and officers of the Club appointed by Seller, executed by such directors and officers;

22

E01228

(xiv)   resignations of all directors and officers of all homeowners, condominium and property owners' associations appointed by Seller, executed by such directors and officers;

(xv)   estoppel certificates from all homeowners', condominium and property owners' associations having jurisdiction over any portion of the Property certifying that all assessments, dues, fees and other charges due with respect to the Closing Property are current and the date to which the same have been paid, certifying the current annual, semi-annual, quarterly or monthly, as the case may be, amounts of such assessments, dues, fees and other charges, and containing any necessary approvals or waivers of rights of first refusal with respect to the transfer of the Closing Property to Purchaser, executed by appropriate officers of such associations;

(xvi)   an estoppel certificate from the District certifying that all debt service payments, assessments, dues, fees and other charges due to the District with respect to the Closing Property are current and the date to which the same have been paid, certifying the current annual, semi-annual, quarterly or monthly, as the case may be, amounts of such debt service payments, assessments, dues, fees and other charges, and containing any necessary approvals or waivers of rights of first refusal with respect to the transfer of the Closing Property to Purchaser, executed by an appropriate officer or official of the District;

(xvii)   an estoppel certificate from the Club certifying that all payments, assessments, dues, fees and other charges due to the Club from Seller with respect to the Closing Property are current and the date to which the same have been paid, certifying the current annual, semi-annual, quarterly or monthly, as the case may be, amounts of

23

E01229

such payments, assessments, dues, fees and other charges, and containing any necessary approvals or waivers of rights of first refusal with respect to the transfer of the Closing Property to Purchaser, executed by an appropriate officer or official of the Club;

(xviii) a corporate resolution and/or such other evidence of authority and good standing with respect to Seller as may be reasonably required by the title insurance company issuing title to Purchaser.

(xix)  all governmental and other third party consents to the transfer of the Property to Purchaser and the consummation of the transactions contemplated in this Agreement, listed in **Exhibit "I"** attached hereto and made a part hereof;

(xx)  termination  of  any  management  agreement  and  all  other agreements, contracts and obligations of the Club relating to the Closing Property, executed between the Club and Seller;

(xxi)  an Owner's policy of title insurance issued pursuant to the title insurance commitment contemplated by Paragraph 8 hereof, subject to the provisions of such policy and subject to the "Permitted Exceptions"; and

(xxii)  such other documents as may be reasonably requested by Seller or Purchaser.

(c) At the Closing, Purchaser shall execute and deliver, or cause to be executed and delivered to Seller, in addition to instruments identified and required in other parts of Paragraph 7, the following (the **"Purchaser's Closing Documents"**);

(i)  payment of the Total Purchase Price, in accordance with the requirements of Paragraph 5 hereof;

24

E01230

(ii)     acceptance, consent and joinder, to each and every of the Closing Documents;

(iii)     such documents and instruments as are necessary to evidence the assumption of and agreement to pay the bridge debt service payments to the District and the utility connection guarantees to the District pursuant to this Agreement;

(iv)     an easement or easements sufficient to allow Seller continued access to the Viscaya Units;

(v)     the Mortgage and Security Agreement in substantially the form set forth in **Exhibit "Y"**, provided however, that the terms and conditions of said Mortgage shall conform to the provisions of this Agreement;

(vi)     the Paragraph 27(a) Letter of Credit; and

(vii)     the Paragraph 27(b) Letter of Credit;

(viii)    the Paragraph 27(d) Letter of Credit.

At Closing, Seller and Purchaser shall each execute counterpart closing statements and such other documents as are reasonably necessary to consummate this transaction.

**8. Title and Survey.**

(a) Title Commitment. Seller has delivered to Purchaser, at Seller's sole cost and expense, a title insurance commitment (LTIC Commitment No. 980572), as revised and endorsed through the Effective Date (the **"Commitment"**) issued by Palm Coast Abstract and Title Company, as agent for Lawyers Title Insurance Company (together with photocopies of all matters shown as exceptions thereon), agreeing to issue to Purchaser and the Club, upon recording of the deed to Purchaser, an owner's policy of title insurance in the full amount of the Purchase Price insuring: (i) Purchaser's title to the Real Property (other than Common Area

25

E01231

Parcels); (ii) Purchaser's title to the parcels of real property underlying the Billboards conveyed in fee simple to Purchaser; (iii) Purchaser's interest in any easements benefiting or necessary for the use and enjoyment of the Real Property, the Second Golf Course Site or the Club Property; and (iv) the Club's title to the Club Property, all subject only to the Permitted Exceptions, and containing such endorsements as Purchaser may require; provided, however, that Purchaser may not require any special endorsements or coverages which are not legally available under Florida law or Florida Insurance Department regulations, and provided further that any such endorsements shall be at the cost and expense of Purchaser.

(b) Permitted Exceptions. The term "Permitted Exceptions" shall mean (1) the standard exceptions in the Commitment (other than the standard exceptions for mechanics' lien and parties in possession and the standard exceptions for, easements not of record and survey matters as to the Real Property [other than the Common Areas] and the real property underlying the Billboards, it being specifically agreed that the standard exceptions for easements not of record and survey matters will remain in any policy issued pursuant to the Commitment as to the Connector Road Access Parcel described as Parcel 25 in the Commitment, the access easement to the Second Golf Course described in instrument recorded in Official Records Book 640, page 331, and the Club Property); and (2) all other specific exceptions shown in the Commitment or contemplated by this Agreement except that Seller shall cause the title company to handle the specific exceptions set forth in Exhibit "W" as described in Exhibit "W".

(c) No Actions Affecting Title. From and after the Effective Date of this Agreement, Seller shall take no action which would impair or otherwise affect title to any portion of the Property, other than sales of individual lots included within the Development Parcels or memberships in the Club in the ordinary course of Seller's business and as provided for in this

26

E01232

Agreement, to third party, bona fide purchasers in arms-length transactions in accordance with the provisions hereof, and otherwise shall not record or permit recordation of any documents in the public records which would affect title to the Property, without the prior written consent of Purchaser.

(d) Closing. Title Policy. Seller shall execute appropriate documents as required for "gap coverage" by the title insurance company.

(e) Survey. Seller, at its sole cost and expense, has obtained and delivered 'ary surveys (the "Survey") of all of the Real Property (except for the Common Area Parcel), and all of the parcels of real property underlying the Billboards, to be conveyed to Purchaser pursuant to this Agreement, prepared by either Tomoka Engineering or Stephenson Surveying, Inc. Seller shall also cause such additional surveying work or updates to be completed prior to the Closing as specifically provided in **Exhibit "X"** attached hereto and by this reference made a part hereof and as may be required to permit the title insurance company to delete the standard survey exception from the title insurance Commitment at the Closing; provided however, that Seller shall not be required to take any other action (except as provided above) to remove or provide documentation for any of the matters shown on the surveys as of the date hereof.

9. **Copies of Contracts, Licenses, Real Estate Tax Information and Plans.** Seller has made available for Purchaser's review, originals or copies of such of the documents and materials listed below which are in Seller's possession or control, or which are in the Club's possession or control, as requested by Purchaser. If Purchaser does not close this transaction, all such materials will be returned to Seller. Seller agrees that Purchaser may continue to have

27

E01233

access to all of the following after the Effective Date hereof until either the Closing has occurred or the Purchaser's rights hereunder have expired:

(a) A schedule of (attached hereto as **Exhibit "M"**) and copies of all contracts, leases, subleases, warranties, guaranties, licenses, concessions, easements, service arrangements, brokerage agreements, lot or unit sales agreements pursuant to Paragraph 6.b, and any and all other contracts or agreements, either recorded or unrecorded, affecting the Property or the Club Property, or any portion thereof, or the use thereof (collectively, the **"Contracts"**), and relevant informatior    .ing any oral Contracts, provided however, that contracts, service agreements and the like that require annual payments of less than $5,000.00 and that may be terminated upon 30 days notice or less are not required to be listed on **Exhibit "M"**;

(b) Copies of all permits, licenses, development of regional impact applications for development approval, development orders and amendments thereto, development of regional impact annual reports, authorizations or approvals (other than those which are no longer in effect), issued by any governmental body or agency having jurisdiction over the Property or the Club Property, or any portion thereof, related to the ownership, development and/or operation thereof (collectively, the **"Licenses"**). A schedule of the Licenses shall be attached hereto as **Exhibit "T"** and by this reference made a part hereof;

(c) Real estate tax bills and assessments records for the three (3) years prior to the Closing Date, and any subsequently issued notices pertaining to real estate taxes or assessments applicable to the Property or the Club Property, or any portion thereof;

(d) All engineering and architectural plans and specifications, construction plans, site plans, landscape plans, as-built plans, if available, drawings and surveys, soil reports, drainage assessments and plans, water and sewer plans, vehicular and pedestrian access plans,

E01234

environmental reports, wetlands determinations and other such documents and materials relating to the Property or the Club Property, or any portion thereof (collectively, the "Plans"); and

(e) An income and expense schedule for the Property and the Club Property for the three (3) years prior to the date hereof.

Seller does not make any representation or warranty that the information contained in or statements made in the documents or materials provided to Purchaser as the Contracts, Licenses, Plans or other information provided by Seller to Purchaser are true and correct, provided however, Seller does r    ·. any actual knowledge that such documents or materials contain any materially untrue information. For purposes of this Agreement, information provided to HD Associates, LP, Barnett Lane Investments, Farallon Capital Management, Inc., Lochmere Development Group, Inc., Donohoe, Jameson & Carroll, P.C. and/or Annis, Mitchell, Cockey, Edwards & Roehn, P.A. shall be deemed to be information provided to Purchaser. The only matters as to which Seller shall be deemed to have made a representation or warranty are those matters expressly set forth in Paragraph 10 herein.

10. **Seller's Representations.** To induce Purchaser to execute this Agreement, Seller represents and warrants to Purchaser and agrees with Purchaser with respect to the Property as follows:

(a) No Other Agreements. To the best of Seller's knowledge, neither Seller nor the Club has entered into any Contracts, Licenses, Plans, or other agreements, either recorded or unrecorded, written or oral, affecting the Property, the Club or the Club Property, or any portion thereof or the use thereof, other than sales agreements pursuant to Paragraph 3.b.i, the Contracts, Licenses, the Plans and the Permitted Exceptions; there are no leases or other occupancy agreements, either written or oral, which affect the Property or the Club Property, or any portion

29

EO1235

thereof, and Seller and the Club have exclusive possession of the Property and the Club Property, respectively other than as set forth in such sales agreement, Contracts, Licenses, Plans and Permitted Exceptions.

(b) Pending Actions. Except as set forth on Exhibit "N" attached hereto and made a part hereof by this reference, to the best of Seller's knowledge, neither Seller nor the Club has notice or knowledge of: (i) any pending or proposed public improvement liens or assessments to be made by any governmental authority with respect to the Property or the Club Property; (ii) any violations of zon'  .  '.'nances or other governmental regulations with respect to the Property or the Club Property; (iii) any pending or threatened actions, suits, proceedings, orders or investigations with respect to Seller, the Property, the Club or the Club Property; or (iv) any pending or threatened condemnation proceedings with respect to the Property or the Club Property. After the initial preparation of Exhibit "N", Seller shall notify Purchaser of any additional matters received by Seller or of which Seller obtains knowledge up to the Closing Date.

(c) No Moratoria. To the best of Seller's knowledge, there are no pending or threatened moratoria which would have the effect of limiting the development, operation or uses of, or the availability of water, sanitary sewer, drainage, effluent, electricity, telephone and other utility facilities with sufficient capacity as required by law or necessary for, the development, operation and use of the Property or the Club Property as permitted under the Development Order, or the availability of transportation facilities as are necessary for the development, operation and use of the Property or the Club Property as permitted under the Development Order. To the best of Seller's knowledge the agreements regarding the provision of water, sewer

30

and effluent between Florida Water Company and the District, and the District and Seller, are in effect.

(d) <u>Title</u>. At all times during the term of this Agreement and prior to the Closing Date, no portion of the Property or the Club Property owned by Seller or any interest therein shall be alienated, encumbered, conditioned, conveyed or otherwise transferred, or subjected to any agreement for the conveyance, pledge, encumbrance, or transfer, by Seller or the Club (other than as specifically provided for in this Agreement); provided, however, that Seller or the Club may continue to sell memberships in the Club     at Seller may continue to make sales under its retail residential marketing effort in accordance with the terms of Paragraph 6.b hereof, and Seller may transfer the Property, or any portion or portions thereof to any affiliated or related entity or entities if such transfer is made in connection with a corporate restructuring or to address federal income tax concerns, but only so long as any such transfer is expressly made subject to the terms of this Agreement and such transferee(s) agrees in writing to be bound by the terms hereof. Seller shall not be relieved of its obligations and liabilities hereunder in the event of any such permitted transfer.

(e) <u>Authority</u>. Each of the Sellers is a corporation duly incorporated, validly existing and in good standing under the laws of the state of its incorporation and is qualified to do business in the State of Florida, if necessary, and the Club is a corporation duly incorporated, validly existing and in good standing under the laws of the State of Florida. The execution, delivery and performance of this Agreement by Seller have been duly authorized and approved by all necessary action on the part of Seller. This Agreement and each and every agreement, document and instrument to be executed, delivered and performed by Seller in connection herewith constitute or will, when executed and delivered, constitute the valid and legally binding

E01237

obligations of Seller enforceable against it in accordance with their terms. The person or persons executing this Agreement on behalf of Seller have been or will be duly authorized to execute this Agreement, the Closing Documents and all other documents and instruments reasonably necessary to carry out the transactions contemplated by this Agreement. The execution, delivery and performance of this Agreement by Seller and the Club do not require the consent of any third party, and neither conflicts with, results in a breach of, or constitutes a default under any applicable law, judgment, order, injunction, decree, rule, regulation, or ruling of any court or governmental instrumentality, or the organizational or in:          ʳernance documents of Seller, nor does it conflict with, constitute grounds for termination of, result in an event of acceleration or a breach of, or constitute a default under, any agreement, instrument, license or permit to which Seller is a party or by which the Property or the Club Property is bound, or violate any restrictions to which Seller, the Club, the Property or the Club Property is subject.

(f) FIRPTA. Seller is not a "foreign person" within the meaning of the United States tax laws and to which reference is made in Internal Revenue Code Section 1445(b)(2). At the Closing, Seller shall deliver to Purchaser an affidavit to such effect, and also stating Seller's employer identification number and the state within the United States under which Seller was organized and exists. Seller acknowledges and agrees that Purchaser shall be entitled to fully comply with Internal Revenue Code Section 1445 and all related sections and regulations, as same may be modified and amended from time to time, and Seller shall act in accordance with all reasonable requirements of Purchaser to effect such full compliance by Purchaser.

(g) Development Order Obligations. To the best of Seller's knowledge, all obligations of the "Developer" to be performed under the Development Order, other than site specific obligations of a development nature or ongoing obligations throughout the development

32

EU1238

period that have not accrued as of the Closing, have been substantially performed, and Seller's performance of the obligations under the Development Order as set forth in the latest Annual Report of the Hammock Dunes Community Development District dated July 31, 1998 had not been objected to by Flagler County authorities or any other Federal, State or local authority having jurisdiction thereover, and the obligations enumerated in **Exhibit "P"** are the only obligations of the Developer remaining to be performed under the Development Order.

(h) Bridge Debt Service Payments to the District. The payment obligations under the Debt Service Payment Agreement for the two existing Revenue  ting bonds of the District to be assumed by Purchaser pursuant to Paragraph 3.b.ii. (1) of this Agreement shall remain fixed at the yearly levels set forth in the "Bridge Debt Service" item in **Exhibit "Q"** and Seller will cooperate with Purchaser to obtain an estoppel certificate from the District certifying that there has been no change in such Bridge Debt Service.

(i) Solvency. There are no bankruptcy or insolvency proceedings, voluntary or involuntary, pending, or to best of Seller's knowledge, threatened against Seller or the Club, or to the best of Seller's knowledge pending or threatened against the District. Purchaser acknowledges that the Auditor General of Florida initially identified the District as being in a state of "financial emergency" but retracted this allegation in a letter from the Auditor General on January 3, 1997. Purchaser acknowledges that Seller has disclosed that Seller understands that the Auditor General continues to express general concerns about local government accounting practices.

(j) Environmental Matters.

(i)     *Definitions.* For purposes hereof:

E01239

(1) the term **"Environmental Matter"** shall be defined as any matter or circumstances related in any manner whatsoever to (I) the use, storage, treatment, production, disposal or release of solid, liquid or gaseous substances into the environment, or (II) the use, production, treatment, storage, disposal or other handling of any Hazardous Substance, as defined below, or (III) the release or placement of structures or materials into surface or ground waters of the United States, or (IV) the presence of any Hazardous Substance, including, but not limited to, asbestos, in any building, structure or workplace, or in, o:        'er any portion of the Real Property, the Second Golf Course Site, or the Club Property; and

(2) the term **"Hazardous Substance"** shall refer to any hazardous or toxic substance or waste as those terms are defined by any applicable federal or state law or regulation, (including without limitation Chapter 403, Florida Statutes, the Comprehensive Environmental Recovery, Compensation and Liability Act, 42 U.S.C. 9601 et seq. ("CERCLA") and the Resource Conversation and Recovery Act, 42 U.S.C. 6901 et seq. ("RCRA") and petroleum, petroleum products and oil.

(ii)    Representations and Warranties.

(1) Except as may be used by the Club in normal day to day maintenance and operational activities related to its golf course, golf course maintenance building, clubhouse and related facilities, to the best of Seller's knowledge, neither Seller nor the Club has generated, used, recycled, reused, released, sold, stored, handled, transported and/or disposed of any Hazardous

E01240

Substance on, under or in the vicinity of, the Property or the Club Property, provided however that Seller and the Club may have done such actions with respect to a Hazardous Substance in substantial compliance with applicable environmental laws, statutes, regulations, rules and orders; and Seller has no actual knowledge of any present or past generation, use, recycling, reuse, release, sale, storage, handling, transport and/or disposal of any Hazardous Substance on, under or in the vicinity of the Property or the Club Property, except where any such generation, use, recycling, reuse, release, sale, storage, handling, transp and/or disposal of any Hazardous Substance was done in substantial compliance with applicable environmental laws, statutes, regulations, rules and orders;

(2) there are no actions or suits, or, to Seller's actual knowledge, any proceedings or investigations related to Environmental Matters pending in any court or before or by any federal, state or other governmental agency, private person or entity, or private arbitration tribunal or to Seller's knowledge, threatened against Seller or with respect to any Environmental Matter regarding the Property or the Club Property; and

(3) no written communication from any court, governmental agency, governmental official or instrumentality or private person or entity, of any alleged violation of, or liability or potential liability under, any ordinance, law, decree, order, code, or governmental rule or regulation relating to Environmental Matters has been filed or communicated in writing to Seller or the Club.

35

E01341

(iii)   Purchaser acknowledges and agrees that it has obtained such audits and reports relating to Environmental Matters as it deems appropriate (the **"Environmental Report"**) and agrees that such audits and reports disclose to Purchaser no reason to believe that the Seller representations in this Paragraph 10(j) are untrue, incorrect or misleading in any way.

(k) Unfulfilled Obligations.   Except as specifically set forth in Paragraph 12 hereof, to the best of Seller's knowledge, neither Seller nor the Club have in reference to the Property or the Club Property, nor is the Property or the Club Property subject to, any unfulfilled obligations or responsibilities to any municipality or other governmental or quasi-governmental entity, pursuant to any governmental approval, code, ordinance or rule, or a written agreement executed by Seller, otherwise assumed by Seller in writing, or which Seller is aware of, and which would not be disclosed in the title insurance Commitment described in Paragraph 8 hereof, to construct any buildings or any on-site or off-site infrastructure or improvements or to operate or maintain any buildings, improvements or amenities in, on, or under the Property, the Club Property or any other real property or to pay for or to share in the payment of any costs in connection with any such construction, maintenance or operation or to dedicate or grant any property or facility to such municipality or entity, or to perform any other work, which would in any way be binding upon Purchaser, the Club, the Property or the Club Property, or any portion thereof, after Closing.

(l) Employee Benefit Plans.   With respect to the 401(k) retirement savings plan, the United Health Care Choices Plus Plan, the Guardian Dental Plan, the Guardian Short Term Disability Plan, and the Guardian Life Insurance Plan (collectively the **"Plans"**).

E01242

(i)    That the Plans listed above are all of the employee benefit plans applicable to the Club.

(ii)    That each of the Plans has been operated and funded in compliance with applicable laws (including all disclosure requirements) and in accordance with the terms of such employee benefit plan.

(iii)    That there are no assessments, complaints, investigations, audits or proceedings (either pending or threatened) against any of the Plans.

(iv)    That there are no unfunded, accrued liabilities associated with any of the Plans other than any accrued liabilities for the month of Closing (which will be prorated at Closing).

(v)    To the best of Seller's knowledge, that all required plan documentation and information for each of the Plans has been distributed to employees, as required by applicable law.

(m)Reservation of Capacity. Seller, or Seller's affiliate, has reserved for the benefit of Tract I of the Hammock Dunes DRI 250,000 gallons per day of the capacity presently available at the existing wastewater treatment plant owned and operated by the District.

(n) Investigation By Purchaser.  No investigation by or on behalf of Purchaser shall constitute a waiver as to enforcement of any representation of warranty contained herein, or a waiver as to any right of indemnification hereunder, unless Purchaser, through its investigation, prior to Closing, received written information of the facts underlying or giving rise to such a breach by Seller of its representations and warranties, fails to notify Seller in writing of such breach prior to Closing and Seller is not aware of such facts.  If Purchaser obtains actual knowledge of any such breach through its investigation, Purchaser agrees to give notice of the

37

E01243

knowledge it has obtained to Seller, and Seller shall have the obligation to use its best efforts to cure such breach. If Seller is unable to cure such breach prior to Closing after written notice thereof, then Purchaser's remedies shall be as set forth in Paragraph 18 below. If Purchaser does not obtain knowledge of such breach until after the Closing, then Purchaser's remedy shall be as set forth in Paragraph 25 herein below, provided however, that any such claim must be brought and remedy sought no later than three (3) years from the Closing Date.

As used in Paragraphs 9 and 10, "knowledge" of the Seller shall mean that whenever there is any reference to a matter being to the "knowledge" or the "best of knowledge" of the Seller, the term shall refer solely to those matters that are in the records of or actually known to the following officers and employees of Seller and the Club: James E. Gardner, Charles J. Callea, John V. Kelly, Robert Cuff, or Tom Kelley. Except as aforesaid, the terms "knowledge" or "best of knowledge" shall not mean, imply or include constructive notice or knowledge of any matter or information or the duty to obtain such knowledge. Whenever reference in this Paragraph 10 is made to "knowledge" of violations or noncompliance with requirements of law, the same shall be deemed to refer to knowledge that the facts or circumstances involved constitute a violation or noncompliance with the requirements of a particular law or regulation and not merely that such facts or circumstances exist. Each of the representations and warranties of Seller and the Club in this Paragraph 10 shall survive the Closing or the earlier termination of this Agreement for a period of three (3) years, and each shall be true and correct in all material respects as of the date hereof and on the Closing Date except if any such material change does occur between the date hereof and Closing, Seller promptly shall notify Purchaser. Said representations and warranties shall be deemed to be restated and affirmed by Seller as of the Closing Date, and Seller shall execute a certificate to such effect at the Closing.

38

E01244

**11. Purchaser's Representations.** Purchaser, acknowledging that Seller is relying on the following representations and warranties in entering into this Agreement, represents and warrants to Seller as follows:

(a) <u>Organization and Standing</u>. Purchaser is a limited partnership duly organized, validly existing, and in good standing under the laws of the State of Delaware. Purchaser or its assignee will be duly qualified as a foreign limited partnership in the State of Florida on the Closing Date or shall be such other entity reasonably acceptable to Seller.

(b) <u>Authorization</u>. Purchaser has the full power and authority to execute and deliver this Agreement, to perform hereunder, and to consummate the transactions contemplated hereby without the necessity of any act or consent of any other person whomsoever. The execution, delivery and performance by Purchaser of this Agreement and each and every agreement, document and instrument provided for herein have been duly authorized and approved by all necessary action on the part of Purchaser. This Agreement and each and every agreement, document and instrument to be executed, delivered and performed by the Purchaser in connection herewith constitute or will, when executed and delivered, constitute the valid and legally binding obligations of the Purchaser enforceable against it in accordance with its terms.

(c) <u>Absence of Conflicting Agreements or Required Consents</u>. The execution, delivery, and performance of this Agreement by Purchaser does not require the consent of any third party and neither conflicts with, results in a breach of, or constitutes a default under any applicable law, judgment, order, injunction, decree, rule, regulation, or ruling of any court or governmental instrumentality, or the organizational or internal governance documents of Purchaser, nor does it conflict with, constitute grounds for termination of, result in an event of

39

E01245

acceleration or a breach of, or constitute a default under, any agreement, instrument, license or permit to which Purchaser is now subject.

(d) Arm's Length Negotiations. Purchaser expressly represents and warrants to Seller that (a) before executing this Agreement, Purchaser has fully informed itself of the terms, contents, conditions and effects of this Agreement; (b) Purchaser has relied solely and completely upon its own judgment in executing this Agreement; (c) Purchaser has had the opportunity to seek and has obtained the advice of counsel before executing this Agreement; (d) Purchas · acted voluntarily and of its own free will in executing this Agreement; (e) Purchaser is not acting under duress, whether economic or physical, in executing this Agreement; and (f) this Agreement is the result of arm's length negotiations conducted by and among the parties and their respective counsel.

(e) Water, Wastewater and Irrigation Water. Purchaser acknowledges and represents that it is aware that:

(i)     The existing sewage treatment plant owned and operated by the District does not have sufficient capacity to meet sewage requirements for the full development, operation and use of the Property and the Club as set forth and allowed by the Development Order without expansion of the existing plant, or construction of a new sewage treatment plant to meet such requirements.

(ii)     Seller has made no representations or guarantees that effluent will be available for irrigating the Real Property, the Marina Parcel or the Second Golf Course, other than as may be available pursuant to any agreement to be assigned to Purchaser as part of the Property.

40

E01246

(f) Purchaser's Knowledge. Purchaser has not received written information (whether during the course of its due diligence or otherwise) that any of the representations and warranties of Seller contained in this Agreement is untrue or inaccurate in any material respect that is not known to Seller.

**12. Hammock Dunes Development of Regional Impact (DRI) Development Order.**

(a) The DRI Agreement shall be in substantially the form attached hereto as Exhibit **"P"**.

(b) T ' ' risions of this Paragraph 12 shall survive the Closing pursuant to this Agreement.

(c) The Purchaser's obligations set forth and described in this Paragraph 12 shall be secured as set forth in Paragraph 27 hereto.

**13. Prohibition Regarding Logo/Name - No Partnership or Joint Venture.**

(a) Purchaser acknowledges that the names "ITT" and "ITT Community Development Corporation" and their distinctive designs and logos have become identified by the public with ITT Corporation, ITT Industries, Inc. and ITT Community Development Corporation, respectively, and that such identifications are the result of substantial expenditures over a long period of time and that any unauthorized use of the names "ITT" or "ITT Community Development Corporation" or unpermitted variations thereof or their respective distinctive logos would cause great and irreparable harm to ITT Corporation, ITT Industries, Inc. and ITT Community Development Corporation. Therefore, Purchaser shall not engage in any capacity in any business or activity which utilizes the words, "ITT" or "ITT Community Development Corporation" or unpermitted variations thereof or a logo or symbol identical or similar to the logo of ITT Community Development Corporation or ITT Corporation. In the

41

EO1247

event of a breach of this Paragraph by Purchaser, Seller may apply to any court of competent jurisdiction for an injunction or for damages or for both.  Notwithstanding the foregoing, Purchaser shall be granted a non-exclusive license to use the names "Palm Coast" and "Hammock Dunes", and related designs and logos in common with Seller, other licensees, or any buyer(s) of any portion of Tracts II and III of the Hammock Dunes DRI, and the exclusive assignment of the trade name "Hammock Dunes Private Community", along with all logos, trademarks, service marks (including the associated goodwill, the right to sue for and recover such damages and such other rei        .ight be granted by a court of competent jurisdiction for past, present, or future infringement thereof), if any, and other rights in connection with such names, all as shown on **Exhibits "H-1" and "H-2"** attached hereto, and may also use the words "Palm Coast", along with all logos, trademarks and other rights in connection therewith, on a non-exclusive license basis when used in the address, or to identify the geographical location, of the Property.  Seller may continue to use the name "Hammock Dunes Private Community" or variations thereof (including the term "Hammock Dunes" or the word "Hammock" used in connection with another word) or its associated distinctive logos, but only in connection with the sale, and marketing of any of the Property which it ever hereafter acquires.

(b) Nothing contained in this Agreement or the activities contemplated hereby shall be construed to create the relationship of principal and agent, partnership, joint venture, trust, tenants in common or any other relationship between the parties hereto other than separate and distinct entities dealing at arm's length as Seller and Purchaser respectively for their own separate interests and benefits.  Without limiting the foregoing, but in supplementation thereof, Purchaser and Seller each acknowledge and agree that the other is not a co-venturer or partner of such party in connection with such party's business or affairs, and that such party bears and shall

42

E01248

bear no liability whatsoever resulting from or arising out of the other's ownership and development of, construction upon, sales or leasing activity related to, or resale of the Property, the Club or the Club Property, either prior to the Closing in the case of Seller, or subsequent to the Closing in the case of Purchaser.

(c) The provisions of this Paragraph 13 shall survive the Closing and any earlier termination of this Agreement.

**14. Commission to Brokers.**

(a) Seller and Purchaser recognize T. Avery Ny ·    ·· nmaron Associates, Inc. and Cushman & Wakefield of Florida, Inc. as **"Brokers"** and agree that Brokers will be paid a commission by Seller according to the terms of separate Broker Agreements. Seller shall indemnify, defend (with counsel approved by Purchaser, which approval shall not be unreasonably withheld) and hold Purchaser and Purchaser's partners, shareholders, directors, officers, employees, agents, independent contractors, successors and assigns, and each of them, harmless from and against payment of such commissions to Brokers. The Brokers' commissions shall be deemed earned and owing only if the sale contemplated by this Agreement actually closes.

(b) Except as provided above, Seller and Purchaser each shall indemnify, defend (with counsel approved by the indemnified party which approval shall not be unreasonably withheld) and hold the other, and each of their partners, shareholders, directors, officers, employees, agents, independent contractors, successors and assigns, and each of them, harmless from the claims of any other broker or finder (including anyone claiming to be a broker or finder) on account of any services claimed to have been rendered at the request of the indemnifying party in connection with the transactions contemplated by this Agreement. Each

43

E01249

Broker hereby agrees to indemnify, defend (with counsel approved by Seller or Purchaser, as applicable) and hold harmless Seller and Purchaser, and each of their partners, shareholders, directors, officers, employees, agents, independent contractors, successors and assigns, and each of them, from and against any and all claims, losses, damages, costs or expenses of any kind or character arising out of or resulting from any agreement, arrangement or understanding alleged to have been made by such Broker or on such Broker's behalf with any broker, finder, salesperson or agent in connection with this Agreement or the transactions contemplated hereby. Each Broker is executing the joinder to this Agreement to evidence its agr⁀     ˙ to the matters contained in this Paragraph and is not otherwise a party to this Agreement.

(c) Each Broker agrees to indemnify the Seller and hold it harmless from any claims made to the Seller by a member of the Seller's sales staff with whom either Broker has direct contact or from whom either Broker requests services for any commissions alleged to be due to such sales staff as a result of either Broker's contact with the sales staff. If such a claim is asserted, the Seller shall notify each Broker and may withhold the amount of any such claimed commission from any amount otherwise due to the Brokers pursuant to this Agreement.

(d) The provisions of this Paragraph 14 shall survive the Closing, and any earlier termination of this Agreement.

15. **Dunes Community Development District.**

(a) Purchaser understands and acknowledges that the Property is a part of the Dunes Community Development District (defined herein as the "**District**").

(b) Seller's parent corporation shall continue to guarantee the District's Revenue Refunding Bonds, Series 1992 (Water and Sewer Project) and its Revenue Refunding bonds, Series 1993 (Intracoastal Waterway Bridge Project) (the "**Bridge Project**") until such bonds are

44

E01250

paid in full or defeased, but Purchaser shall assume the fixed yearly payment obligations under the Debt Service Payment Agreement dated as of June 1, 1993 for the Bridge Bonds, as provided in Paragraph 10.h above and Purchaser shall assume, as of the Closing Date, the obligations under the Connection and Standby Charge Agreement between Seller and the District dated as of August 1, 1992.

(c) Seller acknowledges that the District has deficits in certain of its accounts, as measured in accordance with generally accepted accounting principles. Seller and Purchaser further acknowledge and agree that it is not the intent of this Agreement to impor ·pon Purchaser or Seller any obligation to fund or be liable for the Developer's portion (as specified in the Development Order or the documents creating the District) any of such accrued deficits.

(d) The Purchaser's obligations set forth and described in this Paragraph 15 shall be secured as set forth in Paragraph 27 hereof.

(e) The provisions of this Paragraph 15 shall survive the Closing and under this Agreement.

### 16. Hammock Dunes Equity Club; The Second Golf Course

(a) To the extent that the Club's employees are still employed by the Club as of the Closing, these employees will continue to be employees of the Club after the Closing. After Closing, Purchaser will have the right to adjust employment levels, and compensation to the extent it deems necessary, in accordance with the Subscription Agreement between ITT Community Development Corporation and the Club, but agrees that it will, after Closing, continue the benefits program presently offered to employees of the Club for at least twelve (12) months after the Closing Date for employees who worked for the Club immediately prior to Closing. If, within six (6) months after the Closing, Purchaser terminates any such employee of

45

E01251

the Club who was employed by the Club on the Closing Date (for any reason other than for cause), Seller shall provide severance pay to such employee in the amount that such employee would have been entitled to under the severance pay policy established for Club employees applicable immediately prior to the Closing.  The Purchaser shall recognize each Club employee's service with the Club, the Seller, its or their affiliates and predecessors thereof for purposes of determining (i) eligibility for vacation benefits, short term disability or weekly accident and sickness benefits, and severance benefits, and (ii) eligibility and vesting under all other employee benefit plans and policies of the Purchaser applicable to the Club's employees, to the extent such service was recognized by the Seller for such purposes.

(b) The Seller and Purchaser agree as follows with regard to the benefits for the Club's employees:

(i)      The Seller shall be responsible for payment of any premiums for the Club's benefits program relating to periods prior to the Closing Date and for any liability for all claims, expenses and treatments, including administrative expenses related thereto, which are in fact covered and payable under the terms of the benefits program and incurred prior to the Closing Date, irrespective of whether any such claim is filed or submitted after the Closing Date.

(ii)      The Purchaser shall be responsible for payment of any premiums relating to periods from and subsequent to the Closing Date for the Club's benefits program and for any liability for all claims, expenses and treatments, including administrative expenses related thereto, which are in fact covered and payable under the terms of the benefits program, as such terms may exist from time to time, and incurred from and subsequent to the Closing Date.

EO1252

(iii) With respect to the Purchaser's benefits program for the Club, the Purchaser agrees to waive for the Club's employees still employed by the Club as of the Closing, and their eligible dependents (i) any eligibility waiting periods and (ii) any pre-existing conditions and actively-at-work exclusions; except that the Purchaser may require any of the Club's employees or eligible dependents thereof, who, as of the Closing Date, are then in the process of satisfying any similar exclusion or waiting period under the Club's benefits program to fully satisfy the balance of the applicable time period for such exclusion or waiting period under the Purchaser's benefits program.

(iv) With respect to the calendar year in which the Closing Date occurs, all medical and dental expenses incurred with respect to any of the Club's employees still employed by the Club as of the closing, and/or eligible dependents thereof in the portion of such calendar year preceding the Closing Date shall be taken into account for purposes of satisfying any deductible under the medical and dental coverage of the Purchaser's benefits program for the Club for such calendar year, provided any such expenses were qualified to be taken into account for purposes of satisfying any deductible under the Club's benefits program.

(v) For the remainder of the calendar year in which the Closing Date occurs, the Purchaser agrees to make available to any of the Club's employees, and any dependents thereof, any managed care plans in effect as of the Closing Date, including without limitation, any health maintenance organization plans, any dental maintenance organization plans, any preferred provider organization plans or any point-of-service plans.

47

E01253

(vi)    With respect to any benefits to which any of the Club's employees or their spouses, former spouses, or other qualifying beneficiaries may be entitled under COBRA by reason of qualifying events occurring on or prior to the date immediately preceding the Closing Date: (1) the Seller shall provide such benefits to any of the Club's employees who are no longer employed by the Club as of the Closing Date, and their spouses, former spouses and other qualifying beneficiaries from and after the Closing Date through the remaining period of required coverage, and (2) the Purchaser shall provide such benefits to any of the Club's employees still employed by the Club at the Closing Date, their spouses, former spouses and other qualifying beneficiaries from and after the Closing Date through the remaining period of required coverage.

(c) The Purchaser shall provide all notices and certifications required under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") for any of the Club's employees and dependents thereof with respect to any terminations of health coverage governed by HIPAA occurring from and after the Closing Date. Such notices and certifications shall provide information regarding all periods of health coverage prior to and from and after, the effective benefits time under health plans of the Seller and the Purchaser. In the event the Purchaser shall require information regarding health coverage not otherwise available in the records of the Seller transferred to the Purchaser in connection with the transactions contemplated herein, the Seller shall cooperate with the Purchaser in providing health coverage information available in the Seller's records.

(d) The Seller and Purchaser agree as follows regarding the Hammock Dunes Club, Inc. Employees Retirement and Savings Plan (the "**Retirement/Savings Plan**") for the Club's employees:

48

EO1254

(i) As of the Closing Date, the Purchaser will assume all the Seller's obligations and succeed to all the Seller's rights under the Retirement/Savings Plan with respect to any of the Club's employees by adopting, as of the Closing Date, the Retirement/Savings Plan, and by establishing a trust therefor.

(ii) Participation in the Retirement/Savings Plan, as adopted by the Purchaser, by the Club's employees shall not be deemed terminated nor shall their employment be deemed otherwise interrupted for purposes of the Retirement/Savings Plan, as adopted by the Purchaser, by reason of the transactions contemplated under this Agreement.

(iii) The Purchaser will establish a trust for the Retirement/Savings Plan with such trustee as the Purchaser may designate (the **"Purchaser's Trust"**). The Purchaser shall take such action as shall be necessary to qualify the Retirement/Savings Plan as adopted by the Purchaser and to qualify the Purchaser's Trust under the Internal Revenue Code and shall take such other actions in connection therewith as may be required by ERISA.

(iv) As soon as practicable and upon receipt by the Seller and Northern Trust ("Seller's Trustee") of copies of an opinion of the Purchaser's tax counsel satisfactory to the Seller and Seller's Trustee confirming the qualification of such Purchaser's Trust, or favorable determination letters from the IRS with respect to the Retirement/Savings Plan as adopted by the Purchaser and the Purchaser's Trust, and upon satisfaction by the Purchaser of the reasonable and customary requirements of Seller's Trustee, the Seller will, unless otherwise prohibited by applicable law, cause Seller's Trustee to transfer as cash all such assets then held in the Club's presently existing

49

E01255

Retirement/Savings Plan account to the Purchaser's Trust, less any adjustments by Seller's Trustee as of the date of transfer for usual and ordinary fees and expenses, including any charges for trustees fees and benefit payments, with respect to the Club's Retirement/Savings Plan.

(e) From and after the Closing, Purchaser shall discharge all of the obligations of the "Company" (as that term is defined in the Subscription Agreement) required by the Subscription Agreement and other applicable Club Documents. The Purchaser's obligations set fo:    ·  .: described in this paragraph shall be secured as set forth in Paragraph 27 hereof.

(f) The provisions of this Paragraph 16 shall survive the Closing and any earlier termination provided for in this Agreement.

17. **Construction.** Except as otherwise set forth in Paragraph 12 of this Agreement, Purchaser agrees that with respect to its intended development, operation and use of the Property, Purchaser shall bear the expense of and responsibility for construction of any infrastructure or improvements serving the Property as may be required by law including the Development Order obligations with respect to Phase I and the Harbor Village site as allocated to Purchaser in **Exhibit "P"** attached hereto, and that Purchaser's construction activities on or with respect to the Property will not unreasonably interfere with the access to or use of any neighboring property or public or private road rights-of-way. Purchaser further agrees that it will restore any damage caused to any public or private rights-of-way by Purchaser's construction activities.

18. **Default Provisions.**

(a) In the event of the failure or refusal of the Purchaser to close this transaction, without fault on Seller's part and without failure of title or any conditions precedent to Purchaser's obligations hereunder, Seller shall receive the Deposit, together with all interest

50

E01256

earned thereon, as agreed and liquidated damages for said breach, and as Seller's sole and exclusive remedy for the default of Purchaser, it being agreed that the Deposit, together with all interest earned thereon, is the best estimate of the actual damages that will be suffered by Seller in the event of Purchaser's nonperformance, such actual damages would by extremely difficult, inconvenient and uncertain to ascertain. Upon the receipt by Seller of the Deposit, together with all interest earned thereon, the parties shall be relieved of all further obligations hereunder, except for such obligations which expressly survive the termination of this Agreement.

Except as Purchaser's remedies may be altered under the circumstances as set forth in Paragraph 24 hereof, in the event that Seller is for any reason unwilling or unable to convey title to the Realty as contemplated by the Commitment and in compliance with the provisions of **Exhibits "W"** and **"X"**, Purchaser may, as its sole and exclusive remedy, either (i) obtain a return of the Deposit, or (ii) seek specific performance of Seller's obligations hereunder. In the event of any default, other than as specified in the preceding sentence, by Seller hereunder, Purchaser, as its sole and exclusive remedy, may seek specific performance of Seller's obligations hereunder. If specific performance is not available to Purchaser, Purchaser shall be entitled to receive damages against Seller.

(c) Notwithstanding the foregoing, in the event of a default by either party of any obligations which specifically survive the Closing, then the non-defaulting party shall be entitled to the remedies provided for in Paragraph 25 hereof. The provisions of this Paragraph 18 shall survive the Closing, or any earlier termination of this Agreement.

**19. Prorations.**

(a) Real estate and personal property taxes, assessments, dues, fees and charges levied by the District and any homeowners', condominium or other property owners' association

E01257

having jurisdiction over the Property, and all other proratable items, including all expenses, payables or obligations related to the Closing Property, shall be prorated as of the date of the Closing. In the event the taxes for the year of Closing or any of the other foregoing amounts are unknown as of the Closing Date, the proration will be based upon the relevant amounts for the prior year, and at the request of either party, the amounts for the year of the applicable closing shall be reprorated and adjusted when the actual amounts of such items for such year are known.

(b) The revenue and expenses of the Club shall be prorated as of the Closing. The calculation of this proratic ¬ ·.·h respect to any item of revenue or expense for which an exact dollar amount is not available as of the Closing shall take place within ninety (90) days following the Closing and the Seller and Purchaser agree that any net amount due from one party to the other party as a result of this calculation shall be paid by the responsible party within ten (10) days after the amount is so determined. Seller shall be entitled to revenue or receivables of any kind attributable to any period prior to the Closing, except for the receivables of the Club and HDREC which shall be assigned to Purchaser as contemplated herein. Purchaser shall be entitled to all revenue or receivables of any kind attributable to any period on or after the Closing. Revenues and expenses or reimbursements collected prior to the Closing and attributable to both Seller's and Purchaser's period of ownership shall be prorated as of the Closing (provided that for any such proration to occur, Seller or the Club must have taken actual physical possession of such sums). As set out in Paragraph 3.b.ii, the Purchase Price payable to Seller shall be increased to reflect the value of certain items of personal property owned by the Club, namely by an amount equal to cash in bank, as well as utility and liquor deposits, and for items of Club inventory held for retail sale as of the day of Closing. Seller shall be required to fund any operating deficits and reserve requirements of the Club with respect to periods prior to

52

EU1258

the Closing Date as required in the Subscription Agreement between the Club and ITT Community Development Corporation, and such amounts that will be due after the Closing but with respect to periods prior to the Closing shall be paid by Seller as of the Closing. Purchaser shall assume the requirements to fund such operating deficits and reserve requirements with respect to periods after the Closing Date.

        (c) <u>Allocation of Purchase Price</u>.

        (i)      Within sixty (60) days after the Closing Date, Seller and Purchaser agree to allocate the aggregate . ·unt of the Purchase Price among the purchased assets in proportion to the fair market value as of the Closing Date in a manner that is mutually agreeable.

        (ii)      Seller and Purchaser agree to file any and all applicable tax returns and other required tax related schedules and documents in accordance with such allocations and will not adopt or otherwise assert tax positions inconsistent therewith. Within ninety (90) days of the Closing Date, unless extended by mutual agreement of the parties, Purchaser shall provide Seller with a completed copy of IRS Form 8594 reflecting the information and allocations required to be reported pursuant to Internal Revenue Code Section 1060.

E01259

20. **Improvement Liens.** Except as set forth in Paragraph 19 above, certified, confirmed or ratified liens for governmental improvements as of the Closing Date, if any, shall be paid in full by Seller, and pending liens for governmental improvements as of the date of Closing Date shall be assumed by the Purchaser, provided that where the improvement has been substantially completed as of the Closing Date, such pending lien shall be considered certified.

21. **Closing Costs.** At the Closing, the parties shall bear the following costs:

(a) Purchaser shall be responsible for payment of the following: (i) the cost of recording the deed of conveyance and the other C     ? Documents required to be recorded at the Closing, as applicable; (ii) all documentary stamp taxes and intangible personal property taxes and other costs and expenses associated with any financing obtained by Purchaser with respect to the Property; (iii) all costs, expenses and premiums with respect to any title insurance commitment and policy if obtained by Purchaser from a title agent other than Palm Coast Abstract and Title Company; and (iv) such costs as otherwise specifically set forth herein.

(b) Seller shall be responsible for payment of the following: (i) documentary stamp taxes and any surtax or surcharge due on any of the deeds of conveyance; (ii) all costs, expenses and premiums with respect to the title insurance commitment and title insurance policy issued pursuant hereto, unless Purchaser has obtained a title commitment from a title agent other than Palm Coast Abstract and Title Company; (iii) all costs and expenses with respect to the Survey of the Real Property and the Second Golf Course Site; (iv) the recording costs on all corrective instruments required to be recorded to clear title at the Closing or ; and (v) such costs as otherwise specifically set forth herein.

(c) Except as otherwise set forth herein, each party shall pay its own legal fees in connection with this Agreement and the Closing.

54

E01260

(d) Seller agrees to pay the cost of a contiguity endorsement as to Parcels 18-21 and 23 as described in the Commitment. Seller shall also pay for the cost of the following endorsements: _____None_____. The cost of any other endorsements shall be paid by the Purchaser.

22. **Assignability.** Purchaser shall be entitled to assign its rights hereunder to any entity owned, controlled by, under common control with Purchaser, or otherwise as approved by Seller, such approval not to be unreasonably withheld, provided however that, in the event of any such assignment which is permitted pursuant to this Paragraph, Γ shall not be released from liability hereunder. As used in this Agreement, the term **"Purchaser"** shall mean and include Purchaser and its successors and assigns.

23. **Notices.** Any notices required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been given if delivered by hand, sent by telecopy, sent by recognized overnight courier (such as Federal Express), or mailed by certified or registered mail, return receipt requested, in a postage prepaid envelope, and addressed as follows:

If to Purchaser at:

Dunes Operating Company, L.P.
c/o Paul E. Rowsey, III
Eiger, Inc.
500 Crescent Court, Suite 300
Dallas, TX 25201
Phone: (214) 756-6550
Fax: (214) 756-6599

With a copy to:

Mark D. Van Kirk, Esq.
Donohoe, Jameson & Carroll, P.C.
3400 Renaissance Tower
1201 Elm Street
Dallas, Texas 75270-2120
Phone: (214) 747-5700
Fax: (214) 744-0231

55

E01261

| | |
|---|---|
| If to Seller at: | ITT Community Development Corporation<br>One Corporate Drive<br>Palm Coast, Florida 32137<br>Attn: Mr. James E. Gardner<br>Phone: (904) 445-2642<br>Fax: (904) 445-9539 |
| With a copy to: | Robert G. Cuff, Esquire<br>ITT Community Development Corporation<br>One Corporate Drive<br>Palm Coast, Florida 32137<br>Phone: (904) 445-2677<br>Fax: (904) 446-6318 |
| and: | H. Joseph O'Shields, Esquir<br>Rogers Towers Bailey Jones :  _ :y<br>1300 Riverplace Tower, Suite 1500<br>Jacksonville, Florida 32207<br>Phone: (904) 398-3911<br>Fax: (904) 396-0663 |

Notices personally delivered or sent by overnight courier shall be deemed given on the date of delivery; notices sent by telecopy shall be deemed given upon transmittal (provided that the sender can prove that the telecopy was properly sent to the persons to whom notice was to be given); and notices mailed in accordance with the foregoing shall be deemed given upon the date of delivery, or the date delivery is refused or the notice is deemed undeliverable by the postal authorities.

**24. Risk of Loss.** The Property shall be conveyed to Purchaser in the same condition as on the date of this Agreement, ordinary wear and tear excepted, free of all tenancies or occupancies except the Permitted Exceptions. In the event that (a) all of the Property or any material portion thereof is taken by eminent domain prior to Closing or (b) all of the Property or any material portion thereof is damaged by fire or other casualty, Purchaser shall have the option of either: (i) canceling this Agreement and receiving a refund of the Deposit and all interest earned thereon, whereupon both parties shall be relieved of all other obligations under this

56

Agreement, except for such obligations which specifically survive termination of this Agreement, or (ii) Purchaser may proceed with the Closing, in which case Purchaser shall be entitled to all condemnation awards, insurance proceeds and settlements to be received by Seller with respect to such condemnation or casualty, as applicable, and at the Closing Seller shall specifically assign to Purchaser all such condemnation awards, insurance proceeds and settlements, and Seller's right to receive same, and Purchaser shall receive a credit against the Purchaser Price for any deductible which it will be required to pay on account of any such award or proceeds.

### 25. Indemnification.

(a) Seller's Indemnity. Seller shall indemnify, defend (with counsel reasonably acceptable to by Purchaser) and hold Purchaser and Purchaser's partners, shareholders, directors, officers, employees, agents, independent contractors, representatives successors and assigns, and each of them (the **"Purchaser Indemnities"**), harmless from and against any and all losses, damages, costs, including, without limitation, attorneys' fees and costs (at trial and all appellate levels), claims, demands, actions and causes of action, direct or indirect, contingent or otherwise, relating to or in connection with all or any of the obligations, responsibilities, covenants, agreements, representations and warranties of Seller and the Club set forth herein and in any of the Closing Documents, specifically including, without limitation, each and every one of Seller's representations and warranties set forth in Paragraph 10 hereof and the obligations of Seller set forth in Paragraph 12 hereof. Seller shall also indemnify, defend (with counsel reasonably acceptable to by Purchaser) and hold the Purchaser Indemnities harmless from and against any and all losses, costs, including, without limitation, attorneys' fees and costs (at trial and all appellate levels), claims, demands, actions and causes of action, direct or indirect, contingent or

57

E01263

otherwise, relating to or in connection with any claims by third parties, including, without limitation, claims by property owners within Hammock Dunes, members of the Club, and government agencies, arising out of Seller's prior ownership, use, operation, maintenance or improvement of the Closing Property or the Club or any property within Hammock Dunes Phase I prior to Closing, or out of any transfer of the Property or any interest in the Club to Purchaser, or out of the ownership, use, operation, maintenance or improvement or any transfer, of any portion of Tracts II and III of the Hammock Dunes DRI by Seller, including without limitation, claims regarding alleged misrepresentations, fraudulent representations, breach of warranties, breach of construction warranties, and construction defects, except for any such claims, demands or causes of action arising solely out of the acts or omissions of Purchaser. For purposes of this paragraph 25, a claim shall including the withholding of any permit, permission or approval by any governmental authority by reason of any failure by Seller to perform any of its obligations in accordance with Seller's representations in Paragraph 10 hereof.

(b) Purchaser's Indemnity. Purchaser shall indemnify, defend (with counsel reasonably acceptable to by Seller) and hold Seller and Seller's parent corporation, shareholders, directors, officers, employees, agents, independent contractors, representatives successors and assigns, and each of them (the "Seller Indemnities"), harmless from and against any and all losses, damages, costs, including, without limitation, attorneys' fees and costs (at trial and all appellate levels), claims, demands, actions and causes of action, direct or indirect, contingent or otherwise, relating to or in connection with all or any of the obligations, responsibilities, covenants and agreements of Purchaser set forth herein and in any of the Closing Documents, specifically including, without limitation, each and every one of Purchaser's representations and warranties set forth in Paragraph 11 hereof and the obligations of Purchaser set forth in

58

E01264

Paragraphs 12, 15 and 16 hereof. From and after the Closing, Purchaser shall also indemnify, defend (with counsel reasonably acceptable to by Seller) and hold the Seller Indemnities harmless from and against any and all losses, costs, including, without limitation, attorneys' fees and costs (at trial and all appellate levels), claims, demands, actions and causes of action, direct or indirect, contingent or otherwise, relating to or in connection with any claims by third-parties, arising out of (i) Purchaser's ownership, use, operation, maintenance or improvement of the Property after Closing, except for any such claims, demands, actions or causes of action arising solely out of Seller's transfer of any portion of the Hammock Dunes DRI or arising solely out of Seller's acts or omissions; and/or (ii) actions of Purchaser in causing or attempting to cause the Subscription Agreement to be amended to alter the current membership plan or structure of the Club. Notwithstanding any provision of this Agreement to the contrary, any claim made by Robert Evans, Lochmere Realty, Inc., or any party controlled by either of them, related to this transaction, excluding any claim resulting solely from Seller's relationship with any of them, shall be the sole responsibility of Purchaser.

(c) <u>Limitations on Seller's Indemnification Obligations.</u> Purchaser's right of indemnification under Paragraph 25 above is hereby limited as follows:

(i)    Purchaser will be entitled to obtain damages under Paragraph 25 above only if:

(1) the aggregate amount of damages (whether one or more causes of action) which Purchaser would recover under said Paragraph exceeds $50,000.00;

(2) Purchaser has asserted a claim by written notice specifying the details of the alleged misrepresentation or breach of warranty, and such written

59

E01265

notice has been delivered to Seller on or prior to the second annual anniversary of the Closing Date;

(3) the aggregate amount of the damages paid by Seller pursuant to said Section does not exceed $10,000,000.00;

(4) with respect to any misrepresentation or breach of a warranty or covenant by or of Seller, Purchaser shall have instituted litigation regarding any such alleged misrepresentation or breach of warranty or covenant no later than three (3) years after the Closing Date.

(ii)    The Purchaser's right of indemnification shall not apply to any claim or matter otherwise covered by the provisions of Paragraph 25(a) to the extent that the subject matter of the claim or matter is covered by a title insurance policy that insures Purchaser and to the extent of the amount paid by the title insurance company on account of any such title insurance policy to cover the damages arising with respect to such claim or matter.

(iii)    The Purchaser's right of indemnification shall not apply to any claim by or liability to any employee employed by Purchaser arising as a result of the termination of the employee's employment with Purchaser or any other action by Purchaser on or after the Closing Date (except for any claims that are the obligation of Seller pursuant to Paragraphs 16 or 26 of this Agreement)

(iv)    The Purchaser's right of indemnification shall not apply to any claim or matter otherwise covered by the provisions of Paragraph 25(a) to the extent that the subject of the claim or matter is a misrepresentation or breach of a warranty or covenant by or of Seller, if at or before Closing, Purchaser had received written

60

E01266

information (and not merely constructive knowledge) of all of the specific facts giving rise to or relating to such of the misrepresentation or breach of such warranty or covenant and Purchaser did not, prior to Closing, give notice to Seller of such facts.

(d) Indemnification as Purchaser's Exclusive Remedy. From and after the Closing Date, indemnification by Seller pursuant to the provisions of this Paragraph 25 shall be the exclusive remedy of the Purchaser for any misrepresentation or breach of any warranty by Seller contained in this Agreement or in any closing document executed and delivered pursuant to the provisions hereof.

(e) The provisions of this Paragraph 25 will survive the Closing or earlier termination of this Agreement.

26. Employees.

(a) Seller's Employees. Prior to the Closing Date, Purchaser shall notify Seller of all employees of Seller associated with Hammock Dunes whom Purchaser intends to hire as of the Closing. As of the Closing, Seller will be solely responsible for the cost to terminate any employees then employed at Hammock Dunes not hired by Purchaser and will satisfy any and all legal or contractual obligations owed to such terminated employees arising from their employment with Seller. Seller will indemnify Purchaser and hold Purchaser harmless from any liabilities, damages, fines, penalties, costs and expenses (including reasonable attorneys' fees), and defend Purchaser (with counsel reasonably acceptable to Purchaser) against any action, suit, charge, proceeding or claim brought by a terminated employee (or any beneficiary thereof), arising out of or relating to such terminated employee's employment with, or termination by, Seller, including, but not limited to, any claim for wrongful discharge, discrimination, severance payment, contributions and claims under Seller's employee benefit plans, including any retiree or

61

E01267

active employee medical, disability, life insurance, pension, 401(k), profit sharing, deferred compensation, bonus, vacation and sick pay plans; and any workers' compensation benefits arising out of events occurring prior to such termination.

(b) Purchaser's Employees. Any employee of Hammock Dunes transitioned from Seller and hired by Purchaser (a "**Transitioned Employee**") following the date of Closing, whether or not a prior employee of Seller, will be eligible for the better of (a) the same employee benefits as Purchaser offers to its other employees, such as vacation, sick leave, 401(k) plan, "_al insurance, and long-term disability benefits or, (b) employee benefits substantially equivalent to the employee benefits enjoyed by Club's employees immediately prior to the Closing Date. The Purchaser shall recognize each Transitioned Employee's service with Seller, its affiliates and predecessors thereof for purposes of determining (i) eligibility for vacation benefits, short term disability or weekly accident and sickness benefits, and severance benefits, and (ii) eligibility and vesting under all other employee benefit plans and policies of the purchaser applicable to Transitioned Employees, to the extent such service was recognized by the Seller for such purposes. Transitioned Employees shall receive full credit for all accrued and unused, as of the date immediately preceding the Closing Date, vacation benefits to the extent such accrued and unused vacation benefits are reflected on the Closing Balance Sheet. If, within six (6) months after the Closing, Purchaser terminates any Transitioned Employee (for any reason other than for cause), Seller shall provide severance pay to such Transitioned Employee in the amount that such Transitioned Employee would have been entitled to under the Seller's severance pay policy applicable to such Transitioned Employee immediately prior to the Closing.

E01268

62

(c) The Seller and Purchaser agree as follows with regard to the benefits for the Seller's employees:

(i)   The Seller shall be responsible for payment of any premiums for the benefits program relating to periods prior to the Closing Date and for any liability for all claims, expenses and treatments, including administrative expenses related thereto, which are in fact covered and payable under the terms of the benefits program and incurred prior to the Closing Date, irrespective of whether any such claim is filed or sub_ ' after the Closing Date.

(ii)   The Purchaser shall be responsible for payment of any premiums relating to periods from and subsequent to the Closing Date for the benefits program and for any liability for all claims, expenses · and treatments, including administrative expenses related thereto, which are in fact covered and payable under the terms of the benefits program, as such terms may exist from time to time, and incurred from and subsequent to the Closing Date.

(iii)   With respect to the Purchaser's benefits program, the Purchaser agrees to waive for Transitioned Employees and their eligible dependents (i) any eligibility waiting periods and (ii) any pre-existing conditions and actively-at-work exclusions; except that the Purchaser may require any Transitioned Employee or eligible dependent thereof, who, as of the Closing Date, are then in the process of satisfying any similar exclusion or waiting period under the Seller's benefits program to fully satisfy the balance of the applicable time period for such exclusion or waiting period under the Purchaser's benefits program.

63

E01269

(iv)     With respect to the calendar year in which the Closing Date occurs, all medical and dental expenses incurred with respect to any Transitioned Employee and/or eligible dependents thereof in the portion of such calendar year preceding the Closing Date shall be taken into account for purposes of satisfying any deductible under the medical and dental coverage of the Purchaser's benefits program for such calendar year, provided any such expenses were qualified to be taken into account for purposes of satisfying any deductible under the Seller's benefits program.

(v)     For the remainder of the calendar year in which the Closing Date occurs, the Purchaser agrees to make available to any Transitioned Employee, and any dependents thereof, any managed care plans in effect as of the Closing Date, including without limitation, any health maintenance organization plans, any dental maintenance organization plans, any preferred provider organization plans or any point-of-service plans.

(vi)     With respect to any benefits to which any employees or their spouses, former spouses, or other qualifying beneficiaries may be entitle under COBRA by reason of qualifying events occurring on or prior to the date immediately preceding the Closing Date: (1) the Seller shall provide such benefits to any of Seller's employees who are no longer employed by the Seller as of the Closing Date, and their spouses, former spouses and other qualifying beneficiaries from and after the Closing Date through the remaining period of required coverage, and (2) the Purchaser shall provide such benefits to any of the Transitioned Employees, their spouses, former spouses and other qualifying beneficiaries from and after the Closing Date through the remaining period of required coverage.

E01270

(d) <u>Savings Plan</u>. Effective as of the Closing, any of the Transitioned Employees who were participants in the ITT Industries Investment and Savings Plan for Salaried Employees (the "Savings Plan"), and who are hired by Purchaser, shall no longer accrue benefits under the Savings Plan and Seller shall take all such action prior to the Closing as may be required to achieve this result. Seller retains the right to terminate the Savings Plan as of Closing. Purchaser agrees that it will maintain a tax qualified 401(k) defined contribution plan ("Purchaser's Savings Plan"). The Savings Plan provides that a distribution from the Savings Plan may be made on account of a ˙ ˙ fide distribution event as set forth in Internal Revenue Code Section 401(k)10, that salaried Transitioned Employees participating in the Savings Plan shall have the option to retain their account balance in the Savings Plan or to make an elective transfer of their full account balance in accordance with Treasury Regulation 1.411(d) - 4, Q&A 3(b) to Purchasers Savings Plan and that such elective transfers shall include the transfer of notes representing plan loans to participants. Purchaser shall cause Purchaser's Savings Plan to provide for acceptance of elective transfers from the Savings Plan by salaried Transitioned Employees under Treasury Regulation 1.411(d) - 4, Q&A 3(b), including provision for acceptance of the elective transfer of notes representing plan loans to participants.

(e) <u>Long Term Disability Benefits</u>. Seller shall continue, on or after the Closing, to be solely responsible for all obligations arising under the ITT Industries Long Term Disability Plan for Salaried Employees (the "LTD Plan") with respect to Seller's former employees at Hammock Dunes who participated in such plan prior to the Closing, were terminated prior to the Closing, and who became disabled and met the six month eligibility requirements of the LTD Plan prior to the Closing or, in the case of an employee who was on short-term disability as of the Closing, met the six month eligibility requirements of the LTD Plan on or after the Closing.

E01271

Seller represents and agrees that Purchaser shall have no obligation with respect to any benefits provided under the LTD Plan. Seller reserves the right to terminate the LTD Plan as of Closing.

(f) Notices. The Purchaser shall provide all notices and certifications required under the Health Insurance Portability and Accountability Act of 1996 for any Transitioned Employees and dependents thereof with respect to any terminations of health coverage governed by HIPAA occurring from and after the Closing Date. Such notices and certifications shall provide information regarding all periods of health coverage prior to, and from and after, the effective benefits time under health plans of        'ler and the Purchaser. In the event the Purchaser shall require information regarding health coverage not otherwise available in the records of the Seller transferred to the Purchaser in connection with the transactions contemplated herein, the Seller shall cooperate with the Purchaser in providing health coverage information available in the Seller's records.

(g) WARN Act. Purchaser and Seller agree that for purposes of the Work Adjustment and Retraining Notification Act (the "WARN Act"), the Closing shall be the "effective date" as such term is used in the WARN Act. Purchaser acknowledges and represents that it has no present intent to engage in a "mass layoff" or "plant closing" with respect to Purchaser as defined in the WARN Act. Each party hereto agrees that it shall be responsible for any notification required under the WARN Act with respect to it, and shall indemnify the other parties and hold the other parties harmless from and against all fines and other payments which may become, due under the WARN Act with respect to the indemnifying party.

(h) Cooperation. The Seller and the Purchaser agree to cooperate fully with respect to the actions necessary to effect the transactions regarding personnel issues

66

E01272

contemplated in Paragraph 16 and 26 hereof including, without limitation, the provision of records and information as each may reasonably request from the other.

27. **Security for Purchaser's Performance.** (a)  At the Closing, the Purchaser shall cause to be delivered to Seller the Paragraph 27(a) Letter of Credit to secure the Purchaser's obligations under Paragraph 12 hereof.

The Paragraph 27(a) Letter of Credit, when initially executed and delivered at Closing, shall be in an amount equal to the gross value of the Development Order obligations assumed by Purchaser as set forth in **Exhibit "P"** hereto, · ˙ ˙ ⁊ parties hereto estimate to be in the amount of $1,259,000.00.

The **"Paragraph 27(a) Letter of Credit"** shall be an irrevocable letter of credit (i) issued for the benefit of ITT Industries, Inc. and Seller by either (a) a national banking association or a bank chartered by one of the states of the United States of America or the District of Columbia having a long term rating on its senior debt of at least Aa or AA by Moody's Investors Service or Standard and Poors Rating Services, a division of the McGraw-Hill Companies, Inc., respectively, and having a rating on its commercial paper of at least P-1 or A-1 by such respective rating agencies or which banking institution is approved by ITT Industries, Inc., or (b) BankBoston, N.A; and (ii) which is issued in an initial amount equal to $1,259,000.00; and (iii) which may be drawn upon (a) by delivery of an affidavit of an executive officer of ITT Industries, Inc., stating that the beneficiary of the Paragraph 27(a) Letter of Credit is entitled to draw upon the Letter of Credit because Purchaser has defaulted in its obligations pursuant to the DRI Agreement and failed to cure such default within forty-five (45) days after receipt of written notice of such default or (b) if the beneficiary receives at least thirty (30) days written notice that (x) the issuing bank intends to terminate the letter of credit, or (y) said letter

E01273

of credit will expire and will not be renewed 30 days or more after the receipt of such notice by the beneficiary; and (iv) which shall have an initial term of at least three (3) years and which shall be renewed one or more times so that the aggregate term of such Letter of Credit corresponds with the term of the Development Order as the same may be modified from time to time and shall provide that it shall not expire, nor may it be terminated unless ITT Industries, Inc. is provided thirty (30) days prior written notice of any expiration or termination thereof; and (v) shall be renewed for the full aggregate term described in (iv) above; and (vi) which has such other terms and conditions as are reasonably acceptable to Seller.        ess than three (3) business days prior to Closing Date, Purchaser shall provide to Seller a specimen form of the Paragraph 27(a) Letter of Credit for review.

On each anniversary date of the Paragraph 27(a) Letter of Credit, the Purchaser and Seller shall determine the cost of performing the various obligations described in **Exhibit "P"** which are still to be performed and paid by Purchaser, provided that for purposes of such adjustments, the cost of each of the Development Order obligations assumed by Purchaser shall remain fixed. Once the parties have agreed on the adjusted amount of the Paragraph 27(a) Letter of Credit, then the Purchaser may cause to be issued to Seller an endorsement to the Paragraph 27(a) Letter of Credit to reflect that such Letter of Credit is then outstanding in such lower amount.

(b) At the Closing, the Purchaser shall cause to be delivered to Seller the Paragraph 27(b) Letter of Credit to secure the Purchaser's obligations under Paragraph 15(b) hereof.

The Paragraph 27(b) Letter of Credit, when initially executed and delivered at Closing, shall be in an amount equal to the net present value, calculated using a 5% per annum

68

E01274

discount rate, of the Purchaser's obligations under the Debt Service Payment Agreement as described in Paragraph 15.b hereof, which the parties hereto agree is, at Closing, in the amount of $7,470,000.00.

The "Paragraph 27(b) Letter of Credit" means an irrevocable letter of credit (i) in the amount of $7,470,000; (ii) issued for the benefit of ITT Industries, Inc. and Seller by either (a) a national banking association or a bank chartered by one of the states of the United States of America or the District of Columbia having a long term rating on its senior debt of at least Aa or AA by Moody's Investors Service or Standard and Poors Rating Services, a d· ·· ∴ of the McGraw-Hill Companies, Inc., respectively, and having a rating on its commercial paper of at least P-1 or A-1 by such respective rating agencies or which banking institution is approved by ITT Industries, Inc., or (b) BankBoston, N.A.; (iii) which may be drawn upon (a) by delivery of an affidavit of an executive officer of ITT Industries, Inc. stating that Purchaser has defaulted in its obligations pursuant to the Debt Service Payment Agreement as described in paragraph 15.b. of this Agreement, or (b) if the beneficiary receives at least thirty (30) days written notice that (x) the issuing bank intends to terminate the letter of credit or (y) said letter of credit will expire and will not be renewed 30 days or more after the receipt of such notice by the beneficiary; and (iv) which shall have an initial term of at least three (3) years and which shall be renewed one or more times so that the aggregate term of such Letter of Credit shall expire no earlier than January 1, 2008; and (v) shall be renewed for the full aggregate term described in (iv) above; and (vi) with such other terms and in such form as are reasonably acceptable to the Seller. Not less than three (3) business days prior to Closing Date, Purchaser shall provide to Seller a specimen form of the Paragraph 27(b) Letter of Credit for review.

E01275

On each anniversary date of the Paragraph 27(b) Letter of Credit, the Purchaser and Seller shall determine the net present value of the remaining amounts due pursuant to the Bridge Debt Service Payment Agreement, calculated using a 5% per annum discount rate.  Once the parties have agreed on the adjusted amount of the Paragraph 27(b) Letter of Credit, then the Purchaser shall cause to be delivered to Seller an endorsement to the Paragraph 27(b) Letter of Credit to reflect that such Letter of Credit is then outstanding in such adjusted amount.

(c) At the Closing, the Purchaser shall execute and deliver to Seller the Mortgage and Security Agreement for Second Golf Course in the form attached hereto as **Exhibit "Y"** as partial security for the Purchaser's obligation to perform and pay the obligations of the "Company" with respect to the second golf course pursuant to the Subscription Agreement as specified in Paragraph 16 hereof.  The Purchaser's Mortgage shall be a first priority mortgage lien on a portion of the Property identified in **Exhibit "C"**, and shall, among other things, provide that the said mortgage shall be subordinated to a mortgage that secures the repayment of funds that are utilized for construction of the second golf course, which contains covenants requiring Purchaser to complete the second golf course and convey it to the Club pursuant to the Subscription Agreement (the **"Golf Construction Mortgage"**).  The Mortgage and Security Agreement shall provide that Purchaser is entitled to a partial release of (1) all property not necessary for the construction of the second golf course and related facilities including any necessary storm water drainage or retention areas necessary to accommodate the second golf course and any parcels of real property upon which a club house or maintenance facilities will be constructed and (2) all property required to be conveyed or subjected to an easement as a condition to the issuance of a permit or approval for the development of the second golf course, without the payment of any consideration.  Any such partial release shall be delivered within 30

70

E01276

days of the date Purchaser delivers to the Seller the legal description of the property upon which the second golf course including the related facilities described above, will be constructed; a copy of complete plans and specifications for construction of the second golf course; the construction contract for construction of the second golf course; copies of the permits necessary for the construction of the second golf course; and a certification from the Engineer who designed the second golf course that the second golf course can be constructed in accordance with the plans and specifications within the land included in the legal description provided, that all permits or other approvals for the construction of the second golf course have been obtained and that construction can proceed immediately; or in the case of subparagraph (2) above, within the time required to satisfy the requirements of the government agency imposing the requirement.

(d) At the Closing, the Purchaser shall cause to be delivered to Seller a Paragraph 27(d) Letter of Credit to provide additional security to Seller for Purchaser's obligations to perform and pay the obligations of the "Company" with respect to the second golf course pursuant to the Subscription Agreement as specified in Paragraph 16 hereof.

The **"Paragraph 27(d) Letter of Credit"**, when initially executed and delivered, shall be in the amount of $10,000,000.00.

The Paragraph 27(d) Letter of Credit shall be an irrevocable letter of credit (i) issued for the benefit of ITT Industries, Inc. and Seller by either (a) a national banking association or a bank chartered by one of the states of the United States of America or the District of Columbia having a long term rating on its senior debt of at least Aa or AA by Moody's Investors Service or Standard and Poors Rating Services, a division of the McGraw-Hill Companies, Inc., respectively, and having a rating on its commercial paper of at least P-1 or

71

E01277

A-1 by such respective rating agencies or which banking institution is approved by ITT Industries, Inc., or (b) BankBoston, N.A.; (ii) which is issued in an initial amount equal to $10,000,000.00, and (iii) which may be drawn upon (a) by delivery of an affidavit of an executive officer of ITT Industries, Inc., stating that the beneficiary of paragraph 27(d) Letter of Credit is entitled to draw upon the Letter of Credit because Purchaser has defaulted in its obligations to perform and pay the obligations of the "Company" with respect to the second golf course pursuant to the Subscription Agreement as specified in paragraph 16 hereof, and failed to cure such default within one hundred twenty (120) days after receipt of written notice of such default, or (b) if the beneficiary receives at least thirty (30) days written notice that (x) the issuing bank intends to terminate the letter of credit or (y) said letter of credit will expire and will not be renewed 30 days or more after the receipt of such notice by the beneficiary; and (iv) which shall have an initial term of three (3) years, and which shall be renewable one or more times so that the aggregate term of such Letter of Credit extends until the obligation secured by the Paragraph 27(d) Letter of Credit is satisfied in full; and (v) shall be renewable for the full aggregate term described in (iv) above; and (vi) which has such other terms and conditions and is in such form as are reasonably acceptable to Seller. Not less than three (3) business days prior to Closing Date, Purchaser shall provide to Seller a specimen form of the Paragraph 27(d) Letter of Credit for review.

The Purchaser shall be entitled to the release of the Paragraph 27(d) Letter of Credit and the satisfaction of the Mortgage Deed and Security Agreement, at such time as the Purchaser either (i) completes construction of the Second Golf Course, opens the Second Golf Course for play by members of the Club, and deeds the Second Golf Course to the Club, or (ii) provides Seller evidence that the Club has released Seller from any obligation to ever construct

72

E01278

the Second Golf Course; which evidence must include proof of consent to such release by all of the existing Club members. The Purchaser shall also be entitled to, from time to time, reduce the amount of the Paragraph 27(d) Letter of Credit at such time or times as Purchaser has presented to Seller proof reasonably acceptable to Seller that the cost of completing the Second Golf Course is then less than $10,000,000.00; the amount of the Paragraph 27(d) Letter of Credit may be reduced to an amount at least equal to the then certified cost of completing the Second Golf Course, but in no event less than $1,000,000 until the events entitling Purchaser to a full release of the Paragraph 27(d) Letter of Credit and the Purchaser's Mortgage encumbering the lands described in **Exhibit "C"** have occurred.

At Closing, Seller shall deliver to Escrow Agent an executed Subordination Agreement that confirms the subordination of the Mortgage and Security Agreement to the Golf Construction Mortgage; an executed partial release of the Mortgage and Security Agreement as described in paragraph 27(c) above (to which the legal description shall be attached once delivered by Purchaser pursuant to paragraph 27(c)) and an executed Satisfaction of Mortgage. The Subordination shall be completed by the Escrow Agent and recorded upon delivery of a copy of the Golf Construction Mortgage to Escrow Agent. Escrow Agent shall record the partial release of the Mortgage Deed and Security Agreement upon delivery of evidence of satisfaction of the requirements for such a partial release as described in paragraph 27(c) above. Escrow Agent shall record the Satisfaction of Mortgage upon delivery of evidence of the satisfaction of the requirements set forth in paragraph 27(d) above.

To the extent the Seller draws upon any of the Letters of Credit described in this paragraph 27, Seller shall apply the proceeds of any such draw upon any of such Letters of Credit, in the sole discretion of Seller, either (i) toward the satisfaction of the obligations of

73

E01279

Purchaser secured by any such Letter of Credit, or (ii) toward the obtaining of a release of Seller's obligation to perform any of the obligations that may be owed by either Seller or Purchaser from any party or parties to whom any performance is owed. Seller shall provide documentation reasonably satisfactory to Purchaser confirming that all such proceeds are so utilized.

74

E01280

**28. Agreement Regarding Specific Homeowner's Association Litigation.** With respect to pending suit by and between Environmental Care, Inc. ("**ECI**") and Hammock Dunes Owners Association, Inc., et al. ("**HOA**") (the "**Landscape Suit**") as described in Item C of Exhibit "N", Seller confirms and agrees to indemnify, defend and hold Purchaser, Purchaser's partners, shareholders, directors, officers, employees, agents, independent contractors, representatives, successors and assigns harmless from any and all losses, damages, costs, including, without limitation, attorney's fees and costs (at trial and appellate levels), claims, demands, .ns, causes of action, direct or indirect, contingent or otherwise, relating to or in connection with the foregoing. In consideration the indemnification described above, Purchaser agrees, notwithstanding the fact that the Purchaser will be in control of the Boards of Directors of such homeowners associations, that (i) it will not bind the homeowners associations to any settlement of the Landscape Suit without the consent of Seller, and (ii) it shall cause the Boards of Directors to approve any settlement proposed by Seller so long as any settlement provides for the complete relief of such homeowners association.

**29. ITT Industries, Inc. Guaranty.** At the Closing, ITT Industries, Inc. shall execute a guaranty, in the form attached hereto as **Exhibit "Z"** and made a part hereof by this reference, but ITT Industries, Inc. is not otherwise a party to this Agreement.

**30. Miscellaneous.**

(a) This Agreement shall be construed and governed in accordance with the laws of the State of Florida. All of the parties to this Agreement have participated fully in the negotiation and preparation hereof, and, accordingly, this Agreement shall not be more strictly construed against any one of the parties hereto. Venue for any litigation shall be Flagler County, Florida.

E01281

(b) In the event any term or provision of this Agreement be determined by appropriate judicial authority to be illegal or otherwise invalid, such provision shall be given its nearest legal meaning or be construed as deleted as such authority determines, and the remainder of this Agreement shall be construed to be in full force and effect.

(c) In the event of any litigation between the parties under this Agreement, the prevailing party shall be entitled to reasonable attorney's fees and court costs at all trial and appellate levels.

(d) In   .  . ng this Agreement, the singular shall be held to include the plural, the plural shall include the singular, the use of any gender shall include every other and all genders, and captions and paragraph headings shall be disregarded.

(e) All of the exhibits attached to this Agreement are incorporated in, and made a part of, this Agreement.

(f) Time shall be of the essence for each and every provision hereof.

(g) Seller and Purchaser mutually agree that they waive all rights to a trial by jury in the event of any dispute or court action arising from, growing out of, or related to, this Agreement.  The parties acknowledge that this waiver is a significant consideration to and a material inducement for Seller and Purchaser to enter into this Agreement.

(h) Purchaser understands and acknowledges that the Realty, Hammock Dunes, is within a hurricane hazard area, in which property is subject to damage and residents may be subject to an evacuation order in the event of any hurricane (and falling within 50 miles of Hammock Dunes).

(i) The provisions of this Paragraph 30 shall survive the Closing or earlier termination of this Agreement.

76

E01282

(j) Purchaser agrees that any information obtained by it during its review of this transaction, whether before or after the execution of this Agreement, shall be confidential and that, prior to closing, Purchaser will not disclose any such information (Proprietary Information), except to Purchaser's accountants, attorneys, engineers, contractors, lenders, equity partners, consultants, directors, officers, employees and pension fund client(s), or other professionals if such disclosure is required as part of Purchaser's review. Proprietary Information shall mean all information received by Purchaser as part of this transaction, including, but not limited to, any and all papers, documents and . :s, and any copies made thereof relating in any manner whatsoever to the Property, except for any information or document which is already a matter of public record. If the parties do not close the sale of the Property, all Proprietary Information shall remain the property of Seller and be returned to Seller by Purchaser at Seller's request. If there is an actual or threatened disclosure of Proprietary Information by Purchaser in violation of this confidentiality agreement, Seller may apply for an immediate injunction to restrain such disclosure and may pursue any and all other remedies which may be available to it by reason of such violation, including recover from Purchaser of all damages sustained by Seller, including, but not limited to, all costs and attorneys' fees incurred by Seller in connection with pursuing such remedies. Seller and Purchaser agree not to issue any press releases or other public announcements of the terms of this transaction without the prior approval of the other party.

31. **Entire Agreement.** This Agreement constitutes the entire agreement between the parties and supersedes all other negotiations and understandings between the parties. There are no other agreements, representations or warranties other than as set forth herein. This Agreement may not be changed, altered or modified except by an instrument in writing signed by the party against whom enforcement of such change would be sought. This Agreement shall be

77

E01283

binding upon the parties hereto and their respective successors and assigns. Purchaser may assign its rights and obligations pursuant to this Agreement to an affiliated entity. Purchaser shall provide Seller notice of such assignment and upon such assignment the assignee shall be, and Purchaser shall not be, responsible for the obligations pursuant to this Agreement.

32. **Seller's Obligations.** Purchaser shall not have any liability to satisfy any obligations or liabilities of Seller relating to the Closing Property except as expressly assumed by Purchaser pursuant to this Agreement.

The following paragraph regarding t · : ability of the Agreement relates ONLY to Unit 2801, LaGrande Provence Condominium, the LaGrande Units and the Viscaya Units (collectively, the **"Condominium Units"**). If Purchaser elects to cancel the Agreement as to the Condominium Units, the Purchaser and Seller agree that the Agreement will nevertheless remain in full force and effect as to all of the then Property and the Purchase Price shall remain as described in Paragraph 3 hereof.

THIS AGREEMENT IS VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF EXECUTION OF THIS AGREEMENT BY THE BUYER, AND RECEIPT BY BUYER OF ALL OF THE ITEMS REQUIRED TO BE DELIVERED TO HIM OR HER BY THE DEVELOPER UNDER SECTION 718.503, FLORIDA STATUTES. THIS AGREEMENT IS ALSO VOIDABLE BY BUYER BY DELIVERING WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 15 DAYS AFTER THE DATE OF RECEIPT FROM THE DEVELOPER OF ANY AMENDMENT WHICH MATERIALLY ALTERS OR MODIFIES THE OFFERING IN A MANNER THAT IS ADVERSE TO THE BUYER. ANY PURPORTED WAIVER OF THESE VOIDABILITY RIGHTS SHALL BE OF

78

E01284

NO EFFECT. BUYER MAY EXTEND THE TIME FOR CLOSING FOR A PERIOD OF NOT MORE THAN 15 DAYS AFTER THE BUYER HAS RECEIVED ALL OF THE ITEMS REQUIRED. BUYER'S RIGHT TO VOID THIS AGREEMENT SHALL TERMINATE AT CLOSING.

THE DUNES COMMUNITY DEVELOPMENT DISTRICT IMPOSES TAXES OR ASSESSMENTS, OR BOTH TAXES AND ASSESSMENTS, ON THIS PROPERTY THROUGH A SPECIAL TAXING DISTRICT. THESE TAXES AND ASSESSMENTS PAY THE CONSTRUCTION, OPERATION, AND MAI  NCE COSTS OF CERTAIN PUBLIC FACILITIES OF THE DISTRICT AND ARE SET ANNUALLY BY THE GOVERNING BOARD OF THE DISTRICT. THESE TAXES AND ASSESSMENTS ARE IN ADDITION TO COUNTY AND ALL OTHER TAXES AND ASSESSMENTS PROVIDED BY LAW.

E01285

**EXECUTED** as of the date first above written in several counterparts, each of which shall be deemed an original, but all constituting only one agreement.

Signed in the presence of:

SELLER:

*Victoria P. Gard*

*INa*

(As to Seller)

**ITT COMMUNITY DEVELOPMENT CORPORATION**

By: _Charles J. Collea_
Name: _Charles J. Collea_
Title: _Vice President_

(CORPORATE SEAL)

*Victoria P. Gard*

*INC*

(As to Seller)

**ADMIRAL CORPORA.**

By: _Charles J. Collea_
Name: _Charles J. Collea_
Title: _Vice President_

(CORPORATE SEAL)

*Victoria P. Gard*

*INC*

(As to Seller)

**ITT LAND CORPORATION**

By: _Charles J. Collea_
Name: _Charles J. Collea_
Title: _Vice President_

(CORPORATE SEAL)

*Victoria P. Gard*

*INC*

(As to Seller)

**CORPROP A&F, INC.**

By: _Charles J. Collea_
Name: _Charles J. Collea_
Title: _Vice President_

(CORPORATE SEAL)

80

E01286

PURCHASER:

DUNES OPERATING COMPANY, L.P.

By:    EIGER, INC., its general partner

By: _____

Name: PAUL E. ROWSEY, III

Title: PRESIDENT

(As to Purchaser)

(CORPORATE SEAL)

81

E01287

## JOINDER BY CLUB

The undersigned Club hereby joins in execution of this Agreement for the sole purpose of making the representations and warranties of the Club set forth in Paragraph 10 of this Agreement, but the Club is not otherwise a party to this Agreement.

HAMMOCK DUNES CLUB, INC.

By: _____

Name: _____

Title: _____

82

## JOINDER BY ESCROW AGENT

The Escrow Agent hereby joins in the execution of this Agreement for the purposes of acknowledging receipt of a copy hereof and of agreeing to perform all of the duties of the Escrow Agent, subject to all of the provisions of the Agreement.

PALM COAST ABSTRACT & TITLE CO.

By: _Laurel Leonardo Pres._

Name: _Laura A. Leonardo_

Title: _President_

83

E01289

## JOINDER BY BROKER

Each of the undersigned Brokers hereby joins in execution of this Agreement for the purpose of representing and warranting to Seller and Purchaser that it (i) is a duly licensed real estate broker under Florida law and applicable regulations, (ii) is duly authorized to earn and receive a commission in connection with the transaction evidenced by this Agreement, and (iii) acknowledges and agrees to the terms and provisions of Paragraph 14 hereof. Each Broker shall indemnify, defend (with counsel approved by Seller or Purchaser, as applicable) and hold Seller and Purchaser, and each of their partners, shareholders, directors, officers, employees, agents, independent contractors, successors and assigns, and each of them, harmless from any loss, liability, damage, cost or expense (including reasonable attorneys' fees and court costs at trial and at all appellate levels and in all post-judgment or bankruptcy proceedings) resulting by reason of a breach of the representations and warranties made by it in Paragraph 14 and in this Joinder by Broker. This indemnity shall survive the Closing or earlier termination of this Agreement.

CIMMARON ASSOCIATES, INC.

By:_____
Name: T. Avery Nye Jr.
Title:_____

CUSHMAN & WAKEFIELD OF FLORIDA, INC.

By:_____
Name:_____
Title:_____

84

E01290

## JOINDER BY BROKER

Each of the undersigned Brokers hereby joins in execution of this Agreement for the purpose of representing and warranting to Seller and Purchaser that it (i) is a duly licensed real estate broker under Florida law and applicable regulations, (ii) is duly authorized to earn and receive a commission in connection with the transaction evidenced by this Agreement, and (iii) acknowledges and agrees to the terms and provisions of Paragraph 14 hereof. Each Broker shall indemnify, defend (with counsel approved by Seller or Purchaser, as applicable) and hold Seller and Purchaser, and each of their partners, shareholders, directors, officers, employees, agents, independent contractors, successors and assigns, and each of them, harmless from any loss, liability, damage, cost or expense (including reasonable attorneys' fees and court costs at trial and at all appellate levels and in all post-judgment or bankruptcy proceedings) resulting by reason of a breach of the representations and warranties made by it in Paragraph 14 and in this Joinder by Broker. This indemnity shall survive the Closing or earlier termination of this Agreement.

CIMMARON ASSOCIATES, INC.

By:_____
Name: T. Avery Nye, Jr.
Title:_____

CUSHMAN & WAKEFIELD OF FLORIDA, INC.

By:_____
Name:_____David S. Pepe_____
Title:_____Director, Financial Services___

84

E01291

## JOINDER BY ITT INDUSTRIES, INC.

The undersigned ITT Industries, Inc. hereby joins in execution of this Agreement for the sole purpose of agreeing to the provisions of Paragraph 29 of this Agreement, and agreeing to execute at the Closing the guaranty of certain of Seller's obligations under the Development Order, as modified by the Development Order Modification, is substantially the form attached as Exhibit "Z" to this Agreement.

ITT INDUSTRIES, INC.

By: _____

Name: Wilberto Montes de Oca

Title: Vice President

1999726.doc

85

E01292