UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LOCHMERE DEVELOPMENT
GROUP, INC. and
LOCHMERE REALTY, INC.,

        Plaintiffs,

                                  Case No.: 8:00-cv-1026-T-27B

v.

EIGER FUND I, L.P., et al.

        Defendants.

                           /

## THE EIGER DEFENDANTS' AND FLEET BANK, N. A.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND COMPLAINT

Defendants Eiger Fund I, L.P., Eiger, Inc., Eiger Partners, L.P., H.D. Associates, L.P., Dunes Operating Company, L.P. and 2M Dunes, L.L.C., Paul E. Rowsey, III, C. Todd Miller, David M. Jacobs, and William S. Buchanan (collectively the "Eiger Defendants") and Fleet National Bank, N.A. (the "Bank"), a national banking association, submit this Memorandum of Law in Opposition to the Motion for Leave to Amend Complaint filed by Plaintiffs Lochmere Development Group, Inc. ("Lochmere Development") and Lochmere Realty, Inc. ("Lochmere Realty") (together "Plaintiffs").

## I.    INTRODUCTION

Plaintiffs filed this lawsuit on April 3, 2000, in the Hillsborough County Circuit Court. Plaintiffs' original complaint contained thirty-seven counts and 428 numbered paragraphs. In it, Plaintiffs asserted claims for violation of Florida's Uniform Partnership Act, intentional fraud,

6298.1

constructive fraud, quantum meruit and unjust enrichment, violation of Florida's Uniform Trade Secrets Act, conversion, and civil conspiracy.

Following a removal of the case to this Court, on July 27, 2000, this Court entered a Case Management and Scheduling Order. The Case Management Order established May 3, 2001, as the discovery cut-off date and June 4, 2001, as the deadline for filing dispositive motions.[1] (The Court later granted a motion by Plaintiffs to extend the discovery cut-off date to July 4, 2001, and granted a motion by the Lane Defendants to extend the deadline for filing dispositive motions to July 5, 2001. See Order dated April 5, 2001; Order dated June 1, 2001.) Paragraph 3 of the Case Management Order stated as follows:

> 3.      Motions to amend any pleading or a motion for a continuance of any pretrial conference, hearing, or trial filed after the issuance of this Case Management and Scheduling Order are disfavored. (See Local Rule 3.05(c)(2) (E) and Local Rule 3.05(c)(3)(D).[2]

On April 27, 2001, Plaintiffs filed an Amended Complaint, pursuant to a stipulation by the parties, which added two additional defendants to the case, Dunes Operating Company, L.P. and 2 M Dunes, Inc., L.L.C. The additional defendants were affiliated entities of the Eiger Entities who already were named as defendants in the lawsuit.[3] The Amended Complaint did not

---

1.      These deadlines were consistent with the time periods which had been agreed upon by the parties in the Case Management Report they had filed with the Court. See Case Mgt. Report, ¶¶ 3d, 4d, and 7.

2.      Local Rule 3.05(c)(2)(E), to which the Case Management Order refers and which applies here since this is a "Track Two" case, in fact, provides an even stricter standard. It states that motions to amend pleadings filed after the Case Management Order has been entered are "distinctly disfavored."

3.      2M Dunes, L.L.C. and Eiger, Inc. are the general partners of Dunes Operating Company, L.P., a Delaware limited partnership, which, in turn, is the sole general partner of H.D.

(continued...)

6298.1                                          - 2 -

add any new causes of action or substantive allegations and, consequently, the parties stipulated, and the Court ordered, that the answers and defenses previously filed would serve as the answers and defenses of these two new defendants. Stip. to Amend Compl dated April 27, 2001; Order on Stip. to Amend Compl. dated May 7, 2001.

On June 21, 2001, less than two weeks before the discovery completion date and the deadline for filing disposition motions, Plaintiffs filed another motion for leave to amend their complaint. In this motion, Plaintiffs seek permission to file a Second Amended Complaint which adds two completely new causes of action -- promissory estoppel and tortious interference with contractual or business relationships -- as Counts XXXIX and XL. Plaintiffs have not shown any good cause for their untimely attempt to further amend their complaint to add these additional claims. Furthermore, allowing such an "Eleventh Hour" amendment would severely prejudice Defendants and inevitably disrupt the schedule which this Court has established for pretrial proceedings. Plaintiffs' motion therefore should be denied out of hand.

## II.    ARGUMENT

### A.    Plaintiffs Have Not Shown "Good Cause" for their Delay in Seeking to Add the Additional Claims

While timely motions for leave to amend are held to a liberal standard, motions to amend filed after the district court's deadline in its scheduling order should be denied unless the party seeking amendment can show "good cause" as to why the court should not follow the scheduling

---

3.    (...continued)
Associates, L.P., a Delaware limited partnership. Eiger, Inc. along with related Eiger entities Eiger Partners, L.P. and Eiger Fund I, L.P., were named as defendants in the original complaint.

6298.1                                    - 3 -

order deadlines. <u>Sosa v. Airprint Systems, Inc.</u>, 133 F.3d 1417, 1419 (11th Cir. 1998); <u>Senger Bros. Nursery, Inc. v. E. I. Dupont de Nemours & Co.</u>, 184 F.R.D. 674, 678 (M. D. Fla. 1999). Rule 16(b)(1) of the Federal Rules of Civil Procedure provides that a district court "shall, after receiving the report from the parties under Rule 16(f) or after consulting with the attorneys for the parties. . . enter a scheduling order that limits the time . . . to amend the pleadings." The Case Management and Scheduling Order which the Court entered in this case specifically stated that motions to amend pleadings are "disfavored," and it referenced the local rule providing that such motions are "distinctly disfavored, " when filed after the Case Management Order has been entered.

Notwithstanding the Court's admonition, Plaintiffs delayed in filing their motion to amend until nearly eleven months after the Case Management and Scheduling Order was entered. In their motion and supporting memorandum, Plaintiffs do not even attempt to explain or to justify their delay in seeking to assert these additional claims. Under similar circumstances, motions to amend pleadings have been routinely denied by judges of this Court. <u>See</u> <u>Tampa Bay Storm, Inc. v. Arena Football League, Inc.</u>, 1998 WL 182418, at *1 (M.D. Fla. Mar. 19, 1998) (denying leave to amend pleading where the proposed amendment was sought a little more than one year after scheduling order which provided that amendment of pleadings after that date were disfavored); <u>Thorn v. Blue Cross and Blue Shield of Fla., Inc.</u>, 192 F.R.D. 308 (M.D. Fla. 2000) (denying motion to amend filed one year after Case Management and Scheduling Order and ten months after party learned of information forming basis for proposed amendment).

Moreover, Plaintiffs point to absolutely no new information upon which the proposed new claims is based which was not known or available to them at the time the lawsuit was filed

6298.1                                    - 4 -

fifteen months ago. Where, as here, a party bases its amendment on information which was known to the party long before the amendment was sought, there is no "good cause" and the motion to amend should be denied. See Sosa, 133 F.3d at 1418 (quoting Johnson v. Mammoth Recreations, Inc., 975 F.2d 604, 609 (9th Cir. 1992) ("[i]f a party was not diligent, the good cause inquiry should end") ; Tampa Bay Storm, 1998 WL 182418 at *2 (concluding that no good cause was shown because if the movant had exercised reasonable diligence, it could have easily amended its pleading before the scheduling order's deadline).

Furthermore, if the Court were to grant Plaintiffs' motion, discovery would have to be reopened so that the Eiger Defendants and the Bank would have an opportunity to pursue evidence relating to Plaintiffs' additional claims, and a further extension of the dispositive motion deadline would be needed so that, once Defendants had an adequate opportunity to take this discovery, they could move for summary judgment on these claims. These extensions, in turn, would almost certainly require a continuance of the trial date.[4]

---

4.    Defendants' recent motions to amend their answers to add the statute of frauds as an additional affirmative defense (which Plaintiffs did not oppose and the Court granted) are entirely distinguishable from the amendment sought by Plaintiffs. As noted in Defendant Lane's Memorandum of Law in Support of their Motion to Amend Answer and Defenses, which the Eiger Defendants and the Bank adopted, the impetus for Defendants' request to amend their answers to assert a statute of frauds defense was the testimony of Plaintiffs' sole officer, director and shareholder, Robert D. Evans, at his deposition on April 26, 2001, relating to the alleged contractual arrangements that he or his companies had with Defendants. Defs' Mem. of Law in Supp. of Mot. to Amend, at 2. The statute of frauds also presents a purely legal defense which would not result in any need for additional discovery and or cause any delay in the pre-trial schedule. Furthermore, at the time of the filing of the Lane Defendants' motion to amend on May 31, 2001 -- which was substantially identical to the Eiger Defendants' and the Bank's motion -- Plaintiffs had not yet taken any depositions, so that, even if discovery were needed, Plaintiffs could have taken it before the discovery completion date.

6298.1                                    - 5 -

This disruption to the pretrial schedule established by the Court need not occur. Plaintiffs' motion is untimely and their failure to make any showing of "good cause" to disregard the strictures of the Case Management Order and the local rules warrants denial of their motion on its face. See Payne v. Ryder System, Inc. Long Term Disability Plan, 173 F.R.D. 537, 540 (M.D. Fla. 1997).

### C. Plaintiffs' Undue Delay in Filing the Motion to Amend Complaint Severely Prejudices Defendants

Even if the Court were to apply Rule 15(a) to the Plaintiffs' motion to amend, the motion should clearly be denied under these facts. Although under Rule 15(a) "'[l]eave to amend shall be freely given when justice so requires,' "a motion to amend may be denied on 'numerous grounds' such as 'undue delay, undue prejudice to the defendants, and futility of the amendment.'" Brewer-Gorgio v. Producers Video, Inc., 216 F.3d 1281, 1284 (11th Cir. 2000) (quoting Abramson v. Gonzalez, 949 F.2d 1567, 1581 (11th Cir. 1992).

In this instance, Plaintiffs waited until thirteen days before the discovery completion date – and eleven months after the Case Management Order was entered – to file their motion to amend. At that time, it was too late for Defendants to serve any document requests or interrogatories directed to the two new causes of action in Counts XXXIX and XL of the proposed Second Amended Complaint since the response date for any discovery requests would have fallen after the July 4, 2001, discovery completion date. In light of the very limited remaining time, it also would not have been possible to take additional depositions addressing these claims. Moreover, although a continuation of the deposition of Robert D. Evans, the Plaintiffs' sole officer, director and shareholder, had previously been scheduled for June 26,

6298.1                                        - 6 -

2001, after the Plaintiffs filed their motion to amend, Plaintiffs' counsel refused to allow counsel for the Eiger Defendants and the Bank to ask any questions which he believed were outside the scope of the questions asked by counsel for the Lane Defendants[5], which necessarily included any questions relating to the proposed additional two causes of action, and he then terminated the deposition. A copy of the portion of the transcript of the Evans' deposition containing the examination by counsel for the Eiger Defendants and the Bank is attached hereto as Exhibit A.

Plaintiffs characterize the new causes of action they seek to assert as "variations on theories of recovery previously asserted based on facts already alleged in the complaint," and they assert that allowing them to add these claims, even at this late date, would not unduly prejudice the Defendants or subject them to severe hardship. (Mem. of Law in Supp. of Pl's Mot. to Amend Compl. at 5). This is clearly not the case as to the Eiger Defendants and the Bank.

To date, Plaintiffs' claims against the Eiger Defendants and the Bank have been directed solely to these Defendants' conduct and dealings with Plaintiffs. Therefore, counsel for the Eiger Defendants and the Bank have had no need to focus their discovery on Plaintiffs' prior dealings and relationships with the Lane Defendants. The introduction of Plaintiffs' proposed claim for tortious interference, however, would interject the entire factual circumstances and legal status of the Plaintiffs' relationship with the Lane Defendants into the Plaintiffs' claims against the Eiger Defendants and the Bank. Furthermore, unless these defendants were entitled to take discovery on these issues – including pursuing additional document requests and interrogatories and taking

---

5.      David Lane, Barrett Lane Investments, Inc., and JTL Capital, L.L.C.

6298.1                                     - 7 -

or re-taking depositions directed to these issues – they would be severely prejudiced in their ability to defend against these new allegations.

Allowing Plaintiffs' proposed new promissory estoppel claim to be filed would place Defendants in a similar untenable position. A cause of action for promissory estoppel requires proof that a party relied to his detriment on an affirmative representation made by the promissor as to his or her future actions. See Crown Life Ins. Co. v. McBride, 517 So.2d 660, 661-662 (Fla. 1987). In their proposed Second Amended Complaint, Plaintiffs allege that Defendants "individually, or collectively, induced and encouraged LOCHMERE to expend substantial time and money to formulate a unique financing, development, marketing, and management plan for the Hammock Dunes project, and to conduct extensive due diligence research, in reasonable reliance on their promise to employ and compensate Lochmere in accordance with the Partnership Agreement" and "individually or collectively, through their statements, affirmative acts, or acquiescence, induced and encouraged Lochmere to change its position to its detriment." (Proposed Second Am. Compl. ¶¶ 432, 433).

Plaintiffs' allegation in their proposed Second Amended that the Eiger Defendants and the Bank had "promised" or represented that they would employ and compensation Lochmere in accordance with the "Partnership Agreement" presents a substantial change in the position Plaintiffs have taken in the lawsuit. Plaintiffs never previously alleged that the Bank made any promise or representation that it would compensate Plaintiffs. (See Am. Compl. ¶¶ 53, 81-92, 102, 108-111, 301-302, 349-355, 415-424, 425-429). Moreover, Plaintiffs' allegation about promises or representations concerning compensation is directly at odds with the sworn testimony of Evans during his deposition that no representative of the Eiger Defendants ever

6298.1                                    - 8 -

told him or promised that they would sign the so-called Partnership Agreement or made any commitment to compensate Plaintiffs. (Evans Dep. I at 136-137, 166-167; Evans Dep. III at 150-151, 188-189, 191-192, 210-211).[6]  In their proposed Second Amended Complaint, Plaintiffs do not identify any of the "statements" or "affirmative acts" which form the basis of their claim of promissory estoppel. Thus, to defend against this new claim, Defendants likewise will have to take additional discovery to, among other things, ascertain the precise statements or affirmative acts to which Plaintiffs refer, identify which Defendant or Defendants allegedly made each statement or performed each act, find out the factual contexts in which each such statement or act took place, and learn about the manner and reasonableness of Plaintiffs' reliance on each such statement or act.

---

6.    Copies of the portions of the transcripts of Evans' depositions containing this testimony is attached hereto as Exhibit B. Evans has been deposed on several occasions -- two sessions in the related lawsuit in Texas and two sessions in this case. References to the transcripts of these depositions are denoted as "Evans I" for his deposition on March 28, 2000, in the Texas case, "Evans II" for his deposition on May 22, 2000, in the Texas case, and "Evans III" for his deposition on April 26, 2001, and "Evans IV" for his deposition taken on June 26, 2001, in this case. Plaintiffs previously contended  that Defendants acquiesced in Plaintiffs' continuing to work on the Hammock Dunes project and their proposed Second Amended Complaint also refers to alleged "acquiescence" by Defendants. A mere failure to act or silence on the party of a party, however,  will not support a claim for promissory estoppel. See Travelers Indemnity Co. v. Billue, 763 So. 2d 1204, 1204 (Fla. 1st DCA 2000) (holding that promissory estoppel cannot apply where one party has made an assumption based upon the other party's failure to act); Wolters Village Management Co. v. Merchants, 223 F.2d 793, 800 (5th Cir. 1955) (holding that the mere inaction of a party is not the equivalent of an affirmative assurance). Thus, to the extent that the Plaintiffs promissory estoppel claim relies on the alleged acquiescence of any of the Defendants, Plaintiffs' claim would clearly be legally insufficient, and the proposed amendment to add it should also be denied on the basis of futility. See Galindo v. ARI Mutual Ins. Co., 203 F.3d 771, 777, n. 10 (11th Cir. 2000); Senger Bros. Nursery, 184 F.R.D. at 680.

6298.1                                                    - 9 -

When a proposed amendment brings new and separate claims and would require expensive and time consuming new discovery, the opposing party is prejudiced and the amendment should be denied. See Van Harlingen v. City of Dunedin, 1992 WL 80954, at *1 (M.D. Fla. Apr. 8, 1992). Furthermore, when a party has unduly delayed bring a motion to amend before the court, the motion should be denied. The delay especially becomes "undue" when the information that serves as the basis for the amendment was available previously to the party seeking it. Id.. As the Court stated in Senger Bros. Nursery, 184 F.R.D. at 678: "when a plaintiff chooses to wait an artificially delayed period, which enables him to benefit from discovery of issues, or a lack thereof, the defendant is being 'sandbagged.'"

It is incumbent upon Plaintiffs in this instance to show that the information upon which the claims for tortious interference and promissory estoppel are based were unknown or unavailable to them prior to filing the motion. Van Harlington, supra, 1992 WL 80954, at *1. Plaintiffs have not made any such showing and cannot do so. By waiting to file their motion until the eve of the discovery cut-off -- so that Defendants would not have time to take discovery to challenge these claims and prepare their defense -- Plaintiffs have sought to "sandbag" Defendants. Even under the more liberal standard of Rule 15(a), Plaintiffs' motion to amend therefore should be denied.

## III.    CONCLUSION

For the foregoing reasons, the Eiger Defendants and the Bank respectfully request the Court to deny Plaintiffs' Motion for Leave to Amend Complaint.

6298.1                                    - 10 -

Respectfully submitted,

Daniel F. Molony
Florida Bar No. 271330
James B. Murphy
Florida Bar No. 287598
SHOOK, HARDY & BACON L.L.P.
100 N. Tampa Street, Suite 2900
Tampa, FL 33602
(813) 202-7100
(813) 221-8837 - Facsimile

Alan S. Loewinsohn
Carol E. Farquhar.
Pezzulli & Loewinsohn, L.L.P.
18383 Preston Road
Suite 110
Dallas, Texas 75252
(972) 713-1300
(972) 713-1313 - Facsimile

Attorneys for Eiger Fund I, L.P., Eiger, Inc.,
Eiger Partners, L.P., H.D. Associates, L.P.,
Dunes Operating Company, L.P.,
and 2M Dunes, L.L.C. and Fleet National Bank,
NA., f/k/a BankBoston, N.A.

and

Dora Kaufman
Florida Bar No. 771244
HALLEY, SINAGRA & PEREZ
100 S.E. 3rd Avenue, Suite 1900
Fort Lauderdale, FL 33394
(954) 467-1300
(954) 467-1372 - Facsimile

Co-Counsel for Fleet National Bank, N.A. f/k/a
 BankBoston, N.A.

6298.1                        - 11 -

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

United States Mail to Gregory J. Orcutt, Esq., Bricklemyer, Smolker & Bolves, P.A., 500 E.

Kennedy Blvd., Suite 200, Tampa, FL 33602 and Alan B. Gerlach, 390 N. Orange Avenue, Suite

1100, Orlando, FL 32801 this __6th__ day of July, 2001.

ATTORNEY

6298.1                                     - 12 -

# Exhibit
# A

UNITED STATES DISTRICT COURT

Middle District of Florida

Tampa Division

LOCHMERE DEVELOPMENT
GROUP, INC., and
LOCHMERE REALTY, INC.
    Plaintiffs,

vs.                              CASE NO.: 8:00-CV-1026-T-27B
                                 State Court No.: 00-02525/Div.1

H.D. ASSOCIATES, L.P. a
Delaware limited
partnership by and through
its general partner DUNES
OPERATING COMPANY, L.P., a
Delaware limited partnership
by and through its general
partners, EIGER, INC., a
Delaware corporation and 2M
DUNES, L.L.C., a Texas limited
liability company; EIGER FUND 1,
L.P., a Delaware limited
partnership; EIGER PARTNERS,
L.P., a Delaware limited
partnership; DAVID LANE, an
individual; BARNETT LANE
INVESTMENTS, INC., a Texas
corporation; JTL CAPITAL, L.L.C.,
a Texas limited liability company;
FLEET NATIONAL BANK, N.A., a
national banking association;
PAUL E. ROWSEY, III, an
individual; C. TODD MILLER, an
individual; DAVID M. JACOBS, an
individual; and, WILLIAM S.
BUCHANAN, an individual,
    Defendants.
----------------------------------------------------------

COPY

ORAL AND VIDEOTAPED DEPOSITION OF
ROBERT D. EVANS
VOLUME 2
June 26, 2001
----------------------------------------------------------

Job No. 0106256GJC

ORAL DEPOSITION OF ROBERT D. EVANS, produced as a witness at the instance of the Defendants David Lane, an individual and Barnett Lane Investments, Inc., a Texas corporation, and JTL Capital, L.L.C., a Texas Limited Liability Company, and duly sworn, was taken in the above-styled and numbered cause on June 26, 2001, from 9:34 a.m. to 2:01 p.m., before Gloria Carlin, CSR No. 498 in and for the State of Texas, reported by Stenographic method, at the offices of Hill Gilstrap, 1400 West Abram Street, Arlington, Texas, pursuant to the Federal Rules of Civil Procedure, agreement and the provisions stated on the record.

A P P E A R A N C E S

FOR THE PLAINTIFFS:

    Gregory J. Orcutt, Esq.
    BRICKLEMEYER, SMOLKER & BOLVES, P.A.
    500 E. Kennedy Boulevard, Suite 200
    Tampa, Florida  33602

FOR THE DEFENDANTS DAVID LANE, INDIVIDUALLY, AND
BARNETT LANE INVESTMENTS, INC., A TEXAS CORPORATION AND
JTL CAPITAL, L.L.C., A TEXAS LIMITED LIABILITY COMPANY:

    John Greene, Esq.
    HILL GILSTRAP
    1400 West Abram Street
    Arlington, Texas  76013

APPEARANCES CONTINUED

FOR H.D. ASSOCIATES, L.P., DUNES OPERATING COMPANY, L.P., EIGER, INC., 2M DUNES, L.L.C., EIGER FUND 1 L.P., EIGER PARTNERS, L.P., PAUL E. ROWSEY, III, C. TODD MILLER, DAVID M. JACOBS, WILLIAM S. BUCHANAN AND FLEET NATIONAL BANK F/K/A BANKBOSTON, N.A.:

        Carol E. Farquhar, Esq.
        PEZZULLI & LOEWINSOHN, L.L.P.
        18383 Preston Road, Suite 110
        Dallas, Texas   75252

FOR FLEET NATIONAL BANK F/K/A BANKBOSTON, N.A.:

        Dora Kaufman, Esq.
        HALLEY, SINAGRA & PEREZ
        100 S.E. 3rd Avenue, Suite 1900
        Fort Lauderdale, Florida   33394

ALSO PRESENT:

        Tim Bruner, Videographer
        Accurate Evidence Legal Video
        David Lane (Present for a portion)

THE REPORTER: Are we off?

MS. FARQUHAR: We can go off.

MR. ORCUTT: Can we go off now?

THE VIDEOGRAPHER: Going off the record at 12:37.

(Recess from 12:37 to 1:46 p.m.)

THE VIDEOGRAPHER: We're back on record at 1:45.

EXAMINATION

BY MS. FARQUHAR:

Q.    Mr. Evans, my name is Carol Farquhar, and I'm sure, as you recall, I represent the Eiger entities. I have some questions of you today, and if you'll remember, in your deposition a month or two ago with Mr. Loewinsohn, he used certain definitions, and if I refer to the Eiger entities, would you understand that to be the same definition as that was used at your deposition about two months ago?

A.    If I recall that definition.

Q.    Well --

MR. ORCUTT: If you've got questions -- on the record, if you've got questions relating to the questions that Mr. Greene asked, I'm going to allow it. I'm not going to allow you to take additional time for independent questions of your own. The deposition of

Mr. Evans occurred in a period of over eight hours in Tampa without a break for lunch.  The local rule prescribes a seven-hour period for depositions.  I agreed off the record, or perhaps it was on the record before lunch, that I would allow certain questions relating to the areas that were referenced by Mr. Greene, but I'll terminate this deposition if we get beyond that, and you can take that up with the Judge.

Q.    (BY MS. FARQUHAR)   Mr. Evans, that definition was -- of Eiger entities -- was any combination of Eiger, Inc., Eiger Fund, Eiger Partners, H.D. Associates, 2M Dunes, Dunes Operating and then the four individual persons you've sued that are affiliated with either Mr. Rowsey, Mr. Buchanan, Mr. Jacobs and Mr. Miller; does that refresh your recollection?

A.    I'm not sure I understand the question.

Q.    I had asked you if you remember that as being the definition of the Eiger entities, if I refer to the Eiger entities in my question, would you understand that that's what I'm referring to?

A.    Okay.

Q.    Okay.  You testified that at this initial meeting you had in March of 1998 at Hammock Dunes with the representative from Farallon and Mr. Lane and with

various people from ITT that there was a tremendous amount of information that you obtained; is that correct?

A.    There was a tremendous amount of information that we addressed that I requested information on.  As I stated earlier, I requested information or clarifications on a tremendous array of different subject matter during that time frame from the seller.

Q.    Did you take notes during that meeting?

A.    Very, very limited notes, if at all.  I don't recall.  Going into the meeting I asked Mr. Somaha to take notes, because he's very good at taking those notes, because I wanted to focus on maintaining the flow of the conversation and the questions and the subject matter.  That was the arrangements that I had with Mr. Somaha going into that, so I don't recall whether I took notes, you know, during that meeting.  I know that Mr. Somaha took very detailed notes.

Q.    Okay.  If you took notes would they be in Lochmere's files relating to Hammock Dunes?

A.    If I took those notes they would have been produced.

Q.    Do you think that you've ever discarded, thrown away or otherwise disposed of any notes that you took from that meeting?

A.   I have no idea.

Q.   And if you have notes, do you believe they've been produced in this case?

A.   Yes, ma'am.

Q.   You've used the words that Mr. Lane, in your understanding, was to be the purchaser in connection with the contract with Farallon and ITT.  What did you mean when you described Mr. Lane as being the purchaser?

A.   Just that, he was going to be the purchaser of that -- that asset, of that property, in conjunction with Farallon was going to be the equity contributor.

Q.   Was it your understanding that Mr. Lane was going to put in money of his own?

A.   I don't know whether we discussed whether Mr. Lane was going to put in money of his own.  I know that he was going to -- as I discussed earlier -- he was going to pay for the third party consultants to the point and then Farallon was going to reimburse him at a later date for that.

Q.   When the -- when you learned that Farallon was not going to go forward, are you aware of whether or not Mr. Lane ever asked Farallon to be reimbursed for the costs he had expended?

A.   I don't know.

Q.   Did you ever ask Farallon to be reimbursed for the time you had spent?

A.   No.

Q.   Why not?

A.   I didn't.

Q.   And are you seeking then in this lawsuit to be reimbursed for time you spent on the Hammock Dunes project prior to the time that Farallon ceased its involvement?

A.   I don't know that I requested to be reimbursed for time in that concept.  I'm not billing anything by the hour, ma'am.

Q.   Are you seeking in this lawsuit to be awarded any money for the time that you've spent on the Hammock Dunes project?

A.   In my sense of the effort, be it time, resources, commitment, expertise that in the creation of the Master Development Budget and what I brought to the table that allowed Eiger to -- you know, and H.D. to go forward and acquire that project.

MS. FARQUHAR:  Motion to strike as nonresponsive.

Q.   (BY MS. FARQUHAR)   Are you seeking in this lawsuit to be reimbursed or to be paid or awarded damages for the time you spent in connection with the

Hammock Dunes project?

A.    Ma'am, as I stated, I expect to be compensated for my work.

Q.    And how do you expect -- on what basis, at what rate do you expect to be compensated?

A.    I don't have a rate, ma'am.  I expect -- I expected for my agreements to be honored.

Q.    And what part of the agreement that you expect to be honored, if any, relates to the time you expended on the Hammock Dunes project prior to it was -- it was supposed to close?

MR. ORCUTT:  I object to the form of the question.

A.    I don't really understand the question.  What I expect to be compensated for, ma'am, was what I brought to the table, irrespective of when I gained knowledge, and how I got, you know -- I presented it at that time that was embodied in the Master Development Budget as, you know, tied to the agreements.

Q.    (BY MS. FARQUHAR)  Well, the fee for due diligence coordination, is that what you're talking about as being in the Master Development Budget?

A.    It was a component part.  It did not stand alone.  It was a components part of the overall compensation package.

Q.   What does that line represent in the Master Development Budget to your understanding?

A.   What does it represent?  A component part of the compensation package.

Q.   And what particular part of the component?

A.   It's just a component part of the compensation.  It's a fee.

Q.   A fee for what?

A.   A fee for part of my, you know, involvement with this project, in conjunction with all the other component parts.

Q.   And which particular part of your involvement was that a fee for?

A.   It's -- it's not segregated.  For my involvement in help putting this project together and to go forward it was a component part of the Master Development Budget as well as the -- the agreements, so it's not saying that fee was for one specific scope of work.  It wasn't.  It was part of an overall compensation that was part of my compensation, or Lochmere's compensation.

Q.   Does that fee include repayment to Mr. Lane for the monies he paid to these third party vendors such as Steve Somaha?

A.   No, ma'am.

Q.   Where in the Master Development Budget, if at all, is -- do we find repayment to Mr. Lane for those fees?

A.   I don't recall.  I'd have to go back and look and see the various categories if it was addressed.

Q.   And as we sit here today you don't know?

A.   No.  I'm just saying I don't recall right off.

Q.   Well --

MR. ORCUTT:  We're not going to allow any additional exhibits to be offered into evidence. It's not your deposition.  If you're going to continue to do so we're going to terminate the deposition; okay?

Q.   (BY MS. FARQUHAR)   I believe you have before you from this morning Exhibit 46?

A.   Yes, ma'am.

Q.   If you would take a look at that, and can you tell me where in there, if at all, is a place for the reimbursement to Mr. Lane of the third party fees he paid?

A.   It has no numbers in this exhibit, ma'am.

Q.   But can you tell me if there's a category?

A.   There are multiple categories that it may be inclusive in, but it has no numbers in this cat -- in this budget.

Q.   I'm sorry, would you repeat that?

A.   I said this budget does not have any numbers in there to tie that to.

MR. ORCUTT:  Is there a category for Lane's reimbursement that you know of?

A.   You had legal fees and also miscellaneous -- miscellaneous expenses, you also had closing costs, costs that may have been incurred, that could have been attributed to closing costs, so there were multiple -- there were at least a couple of areas that it could be charged against to the -- to Mr. Lane's reimbursement.

Q.   (BY MS. FARQUHAR)   Let me hand you what's been -- what's been marked as Exhibit 50 to your deposition.

MR. ORCUTT:  We're going to terminate the deposition --

MS. FARQUHAR:  Mr. Orcutt --

MR. ORCUTT:  -- at your -- at your risk.

MS. FARQUHAR:  Mr. --

MR. ORCUTT:  MR. -- I'm speaking. Mr. Evans agreed at y'all's convenience to appear in Texas for the continuation of his deposition by Mr. Greene.  We're happy to accommodate him.  We -- your client has had ample time, has had in excess of seven hours deposing this witness, and we agreed or I

agreed that I would give you some latitude. You've already had 15 minutes. If you want to continue and finish this thing without the introduction of issues that were not raised in Mr. Greene's deposition and exhibits that were not raised in Mr. Greene's deposition, I'll give you some latitude, but I'm not going to allow you another opportunity to depose Mr. Evans, period. You may now respond.

MS. FARQUHAR: Mr. Orcutt, as you're well aware, Mr. Evans testified this morning about payments by Mr. Evans -- I'm sorry -- by Mr. Lane for third party fees, and it is a follow-up question to inquire -- he also testified about the creation of the Master Development Budget, and it's a proper follow-up to ask whether or not in the Master Development Budget, which your client claims he created, whether or not he provided for repayment to Mr. Lane of these fees. Now, if you want to terminate the deposition, you're going to do what you're going to do, but I'm entitled to ask follow-up questions, and I'm going to continue with that right.

MR. ORCUTT: All right. The deposition is terminated.

MS. FARQUHAR: That's fine. We'll see what the Judge has to say.

MR. ORCUTT:  Well, and let's -- do you want to go off the record and discuss our deposition scheduling or do you want to leave that on the record? She wants it off the record (referring to the Reporter).

MS. FARQUHAR:  That's fine.

MR. ORCUTT:  We're off.

THE VIDEOGRAPHER:  Okay.  We're going off record at 2:00.

(Deposition adjourned at 2:01 p.m.)

# Exhibit
# B

CAUSE NO.   99-05629-K

| | |
|---|---|
| EIGER, INC., and<br>H.D. ASSOCIATES, L.P., | ) IN THE DISTRICT COURT<br>)<br>) |
| Plaintiffs, | )<br>) |
| vs. | ) DALLAS COUNTY, TEXAS<br>) |
| ROBERT D. EVANS,<br>LOCHMERE DEVELOPMENT<br>GROUP, INC., DAVID LANE<br>and JTL CAPITAL,<br>L.L.C., | )<br>)<br>)<br>)<br>) |
| Defendants. | ) 192ND JUDICIAL DISTRICT |

VIDEOTAPE DEPOSITION OF ROBERT DALE EVANS

Tuesday, March 28, 2000
9:14 a.m. - 2:19 p.m.

Bricklemyer, Smolker & Bolves, P.A.
500 East Kennedy Boulevard
Suite 200
Tampa, Florida

REPORTED BY:

Felita J. Fabricius, CSR, RPR-CP
Notary Public, State of Florida

DISK
ENCLOSED

**2**

APPEARANCES:

ALAN S. LOEWINSOHN, ESQUIRE
CAROL E. FARQUHAR, ESQUIRE
Pezzulli & Loewinsohn, L.L.P.
18383 Preston Road
Suite 110
Dallas, Texas 75252-5476
972/713-1300
 Attorneys for Plaintiffs
MONICA L. LUEBKER, ESQUIRE
Figari & Davenport
4800 NationsBank Plaza
901 Main Street, LB 125
Dallas, Texas 75202
214/939-2000
 and
JAY J. BARTLETT, ESQUIRE
Brickemyer, Smolker & Bolves, P.A.
500 East Kennedy Boulevard
Suite 200
Tampa, Florida 33602
813/223-3888
 Attorneys for Defendants
 Robert D. Evans and Lochmere Development
 Group, Inc.
JOHN W. GREENE, ESQUIRE
Hill Gilstrap
1400 West Abram
Arlington, Texas 76013
817/261-2222
 Attorney for Defendants
 David Lane and JTL Capital, L.L.C.

ALSO PRESENT:

Mark Kindig, Videographer
Paul E. Rowsey, III

**4**

EXHIBITS (Continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 11 | 6-10-99 letter from Robert D. Evans to Paul E. Rowsey, III | 143 |
| 12 | 6-8-99 letter from Paul E. Rowsey, III, to Robert D. Evans | 158 |
| 13 | 5-14-99 letter from Robert D. Evans to David A. Lane | 196 |
| 14 | 3-224-98 letter from Robert D. Evans to David A. Lane | 197 |
| 15 | 6-28-98 letter from Amanda S. Brinegar to David Lane | 197 |
| 16 | 10-6-98 letter from Robert D. Evans to David A. Lane and Stephen L. Millham | 199 |
| 17 | 11-1-98 letter from Robert D. Evans to David A. Lane | 199 |
| 18 | 11-2-98 fax cover sheet from Robert Evans to David Lane | 199 |
| 19 | 11-2-98 fax cover sheet from Robert Evans to David Lane | 200 |
| 20 | 11-2-98 letter from Robert D. Evans to David A. Lane and Stephen L. Millham | 200 |
| 21 | 11-2-98 letter from Robert D. Evans to David A. Lane and Stephen L. Millham | 200 |
| 22 | 12-11-98 fax from Robert Evans to David Lane | 201 |
| 23 | 1-6-99 fax from Robert Evans to Barnett Lane | 201 |
| 24 | 6-30-98 letter from Amanda S. Brinegar to Paula Farris, and attachment | 201 |
| 25 | 3-24-99 fax from Paul E. Rowsey, III, to Robert Evans | 202 |

**3**

INDEX

| | PAGE |
|---|---|
| Examination by Mr. Loewinsohn | 7 |
| Changes and Signature Sheet | 234 |
| Certificate of Reporter | 235 |
| Rule 203 TRCP Certificate | 237 |

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 1 | Second Amended Notice of Deposition of Robert D. Evans | 6 |
| 2 | Second Amended Notice of Deposition of Corporate Representative of Lochmere Development Group, Inc. | 6 |
| 3 | Telephone records | 20 |
| 4 | Notice of Filing Affidavit | 39 |
| 5 | Copy of Robert Evans' calendar for March of 1998 through July of 1999 | 61 |
| 6 | Defendant Lochmere Development Group, Inc.'s, Objections and Supplemental Answers to Plaintiff Eiger, Inc.'s, First Set of Interrogatories | 67 |
| 7 | Management, Development and Marketing Agreement between Lochmere Development Group, Inc., and H.D. Associates, L.P. | 68 |
| 8 | Credit card receipts | 81 |
| 9 | Master development budget for Hammock Dunes | 89 |
| 10 | Management, Development and Marketing Agreement between Lochmere Development Group, Inc., and Barnett Lane Investments, Inc. | 127 |

**5**

EXHIBITS (Continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 26 | 8-21-98 letter from Robert D. Evans to David A. Lane and Stephen L. Millham | 207 |
| 27 | 9-2-98 letter from Robert D. Evans to David A. Lane and Stephen L. Millham | 208 |
| 28 | 4-14-99 letter from Robert D. Evans to David A. Lane | 208 |
| 29 | 5-3-99 letter from Robert D. Evans to Steven E. Kennedy, and attachments | 209 |
| 30 | 6-7-99 letter from Robert D. Evans to Steven E. Kennedy | 211 |
| 31 | 7-12-99 letter from Robert D. Evans to Paul E. Rowsey, III | 212 |

134

Q  By subject matter, anything else?

A  We discussed communications or dialogue between Paul Rowsey and David Lane.

Q  Anything else by subject matter?

A  In general, I think that would cover the fundamental parts of the meeting.

Q  Other than whatever your recollection in your head is, do you know of any way to further refresh your recollection about anything that was said by anyone at the June 10th meeting?

A  Well, we've covered the agreement. We've covered the –

Q  No.

A  I'm trying to – just trying to recap.

Q  Okay.

A  We talked about the agreement, the management, development and marketing agreement. We talked about the master development budget. We talked about the project as a whole, you know.
We talked about conversations that Mr. Rowsey had had with Mr. Lane in regards to our involvement. The bulk of the conversations revolved around Hammock Dunes.

MR. LOEWINSOHN: Motion to strike. Nonresponsive. Please read my question back,

135

Ms. Reporter.

(Page 134, Lines 7 through 10 were read by the reporter.)

A  Not at this time.

Q  For instance, do you have any notes of anything that was said at that meeting?

A  Not that I recall.

Q  Was there any recordings of any type made of anything that was said at that meeting?

A  No, sir.

Q  Now, I take it you don't remember everything that was said by you or Mr. Rowsey during that four hours, as you sit here today. Would that be fair?

A  I could not repeat every word that was said at that meeting, no, sir.

Q  Okay. Because of the passage of time. Correct?

A  Yes, sir.

Q  All right. Now, other than what may be specifically stated in Exhibit 7, is there anything that you can recall today that was said by either you or Mr. Rowsey or anyone on behalf of Eiger or H.D. at the June 10th meeting on the subject – your first subject of an in-depth discussion of the

136

management agreement?

A  Could you review that one more time?

Q  Yes, sir. Other than what may be specifically said – in other words, you could read me a paragraph and say, we used those words – is there something you remember today that was said by you or anyone on behalf of Eiger and H.D. at the June 10th meeting about the management agreement?

A  About the management agreement?

Q  Yes, sir.

A  Mr. Rowsey and I reviewed it in – all the component parts of it that were also incorporated into the master development budget.
Mr. Rowsey said that he wanted to look over it and see if there were any other – any issues that he had or any adjustments or changes he may want to make and he would get back to me.

Q  Do you remember –

A  My response was as was attached to the cover letter that went with this agreement, which I'm sure you have.

Q  Go ahead.

A  It's self-explanatory. And part of that dialogue was that, you know, this is the basis of our involvement, and if our involvement is going to

137

continue as long – you know, we were willing to discuss modifications to the agreement as long as economics are in keeping with the original agreement.

Q  Anything else that was said by either you or Mr. Rowsey or anyone else on behalf of Eiger or H.D. at the June 10th meeting, that you can recall today, on the subject of the management agreement that's not specifically stated in the document?

A  Mr. Rowsey said he had not seen this agreement before, as provided by Mr. Lane.

Q  Anything else?

A  And that prompted us to go through it in great detail.

Q  Okay. Anything else you can recall that was said by anyone on that subject at the June 10th meeting?

A  There was a substantial amount of dialogue that – I mean, the conversation that I had with Mr. Rowsey lasted probably a couple of hours.

Q  Yes, sir. And I understand that, and we've already established that because of the passage of time, you can't remember everything. The purpose of today is to find out what you can

35 (Pages 134 to 137)

166

project –

Q   I understand that.

A   – on a full-time basis.

Q   But you did have a discussion with Mr. Rowsey on the June – during the June 10th meeting about the fact that you would not be on site full-time?

A   I don't recall if it was on the June 10th. I know that we did have a conversation along that after the June 10th meeting.

Q   If Mr. Rowsey recalls it was the June 10th meeting, you're not denying it; you're saying you don't recall?

A   I recall the conversation being after the June 10th more so than I remember it being on the June 10th.

Q   Understood.

A   Okay.

Q   But you're not denying that you had some such discussion at the June 10th meeting on that subject; you're simply saying you don't recall having such?

A   I don't – I do not recall.

Q   And we can agree that no agreement of any type with H.D. or Eiger was ever – and Lochmere

167

was ever signed. Correct?

A   That's – yes, sir.

Q   And we can agree specifically that Exhibit 7 was never signed by anyone or any party, including H.D. Correct?

A   Yes, sir.

Q   And Mr. Rowsey did tell you at the conclusion of the June 10th meeting that he would get back to you about Exhibit 7. Correct?

A   Yes, sir. If there were any changes that he wanted to make to it.

Q   And neither Mr. Rowsey nor any representative of H.D. never – ever affirmatively told you they would, in fact, sign Exhibit 7, did they?

A   We didn't discuss on the signing of Exhibit 7. They said, let's get to work.

Q   Okay.

A   Let's go.

MR. LOEWINSOHN: Motion to strike, nonresponsive.

BY MR. LOEWINSOHN:

Q   Would you just answer my question, which is, no one on behalf of H.D. or Eiger ever said affirmatively that a representative of H.D. would,

168

in fact, sign Exhibit 7 or a version thereof –

A   They –

Q   – correct?

A   They didn't say they would or would not sign it.

Q   All right.

A   He was just going to, you know, look over it to see if he had any questions.

Q   Okay.

A   And he would get back to me.

Q   Now, looking at Exhibit 7, there were things that obviously Lochmere was going to do to perform under this type of agreement. Correct?

A   Yes, sir.

Q   There were things that H.D. was going to do to perform under this type of agreement. Correct?

A   Yes, sir.

Q   For instance, under 2.1, H.D. was going to fund money to acquire the development. Correct?

A   You're reading the document –

Q   Well –

A   – sir. I assume that, yes, sir.

Q   And did you have any understanding where those moneys would come from H.D.?

169

A   The funds for the project – to develop the project were going to come from two sources. One was institutional financing from the Bank of Boston, and the other was going to come through, as I understood it, other sources to H.D. Associates, which could be derived from high net worth individuals as investors and through Eiger, and then Eiger would invest in – or pass it on to H.D. Associates.

Q   Now, when you left the June 10th meeting, it had not been decided whether or not if you-all went forward, H.D. would, in fact, have an on-site representative at all times, had it?

A   It had not been finalized at that time.

Q   Okay. There were various things in this agreement, Exhibit 7, that would have required submission of written materials to H.D. for their review and approval. Correct?

A   Yes, sir.

Q   And as long as H.D. continued to maintain an office in Dallas, Texas, you would have expected those materials to be sent to them in Texas. Correct?

MS. LUEBKER: Objection. Form.

A   Unless the officer or the representative

43 (Pages 166 to 169)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
CASE NO. 8:00-cv-1026-T27GW

LOCHMERE DEVELOPMENT
GROUP, INC., a Florida
Corporation, and LOCHMERE
REALTY, INC., a Florida
Corporation,

        Plaintiffs,

    vs.

EIGER FUND I, L.P., a Delaware
Limited Partnership; EIGER,
INC., a Delaware Corporation;
EIGER PARTNERS, L.P., a
Delaware Limited Partnership;
DAVID LANE, an individual;
BARNETT LANE INVESTMENTS, INC.,
a Texas Corporation; JTL CAPITAL,
L.L.C., a Texas limited liability
company; H.D. ASSOCIATES, L.P.,
a Delaware Limited Partnership;
BANKBOSTON N.A., a national
association; PAUL E. ROWSEY,
III, an individual; C. TODD
MILLER, an individual; DAVID
M. JACOBS, an individual; and
WILLIAM S. BUCHANAN, an individual,

        Defendants.

                /

DEPOSITION OF ROBERT D. EVANS
Thursday, April 26, 2001
9:07 a.m. - 5:09 p.m.
Bricklemyer, Smolker & Bolves, P.A.
500 E. Kennedy Boulevard, Suite 200
Tampa, Florida 33602

REPORTED BY:
MICHELLE OLSEN BADEN, RPR
Notary Public
State of Florida at Large

012f8040-448f-11d5-8bca-000255a63be2

Page 2

APPEARANCES:

GREGORY J. ORCUTT, ESQUIRE
DAVID MERCER, ESQUIRE
BRICKLEMYER, SMOLKER & BOLVES, P A.
500 East Kennedy Boulevard, Suite 200
Tampa, Florida 33602
(813) 223-3888

Attorney for Plaintiffs

JOHN W. GREENE, ESQUIRE
HILL GILSTRAP
1400 West Abram
Arlington, Texas 76013
(817) 261-2222
    Attorney for Defendant, David Lane

ALAN M GERLACH, ESQUIRE
BROAD and CASSEL
390 North Orange Avenue, Suite 1100
Orlando, Florida 32801
(407) 839-4200
    Attorney for Defendant, David Lane

ALAN S. LOEWINSOHN, ESQUIRE
CAROL R. FARQUHAR, ESQUIRE
PEZZULLI & LOEWINSOHN
18383 Preston Road, Suite 110
Dallas, Texas 75252
(972) 713-1300

Attorney for Defendants, Eiger Fund I,
L.P ; Eiger, Inc.; Eiger Partners, L.P.;
H D Associates, L.P ; BankBoston N.A.;
Paul E. Rowsey, III; C. Todd Miller;
David M Jacobs; and William S. Buchanan

Page 3

APPEARANCES: (Continued)

DORA F. KAUFMAN, ESQUIRE
HALEY, SINAGRA & PEREZ
100 SE 3rd Avenue, Suite 1900
Fort Lauderdale, Texas 33394
(954) 467-1300

Attorney for Defendant, Fleet National
Bank Fund formerly BankBoston, N.A.

ALSO PRESENT:
    ALICE ASHLEY
    PAUL R. ROWSEY, III

INDEX

| | PAGE |
|---|---|
| Examination by Mr. Loewinsohn | 7 |
| Certificate of Oath | 333 |
| Certificate of Reporter | 334 |

Page 4

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 40 | First Request for Production sent to Lochmere Development Group | 25 |
| 41 | Eiger, Inc.'s First Request for Production to Lochmere Realty, Inc. | 26 |
| 42 | Lochmere Development Group and Lochmere Realty's response to requests for production | 29 |
| 43 | June the 15th BankBoston notes | 138 |
| 44 | Complaint filed on behalf of Lochmere in Florida case | 141 |
| 45 | Travel charges incurred in connection with Hammock Dunes | 153 |
| 46 | April 14th master development budget for Hammock Dunes created by Lochmere | 160 |
| 47 | Master development budget revised | 177 |
| 48 | Marketing and listing agreement with Lochmere Realty | 209 |
| 49 | Document referred to as the Hammock Dunes conservative case | 200 |
| 50 | June 22nd version of the master development budget prepared by Lochmere | 201 |
| 51 | Letter to the Canterbury Engineering firm from Mr. Evans, dated August 18th, '99 | 257 |
| 52 | Agreement for sale and purchase | 304 |
| 53 | Fax cover sheet from Lochmere to David Lane with attached newspaper article | 317 |
| 54 | Letter to Kevin Partel at Costal Consultant from Mr Evans, dated April 17th, 1998 | 322 |

Page 5

EXHIBITS (continued)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 55 | Summary of personnel | 325 |
| 56 | Document from Mr. David Lane to Mr. Rowsey dated March 29th, '99 | 327 |
| 57 | Correspondence from Mr. Steve Samaha to Richard Blunk of Basic Capital | 329 |

012f8040-448f-11d5-8bca-000255a63be2

Page 150

topics, but I also want you to tell me, if you haven't already, about what was said on a topic, generally or specifically? Do you understand that?

A   Yes, sir.

Q   Do I need to repeat the question, then, to you?

A   No, sir.

Q   Do you have any -- what is your answer, then, to my question, whether or not you have told us everything?

A   I believe I have told you all that I recall at the moment.

Q   Did you take any notes during any portion of the June meeting?

A   I don't believe that I did.

Q   June Dallas meeting.

A   I don't believe that I did.

Q   Do you know of any way to refresh your recollection any further from any of the meetings that occurred in Dallas in June?

A   Not right at the moment, sir.

Q   Mr. Rowsey -- strike that.

No one on behalf of any of the entities we called the Eiger defendants ever said to you we will sign what we called in your first deposition the

Page 151

claimed H.D. agreement, did they?

A   No, sir.

Q   I think we've covered this, but I want to be absolutely certain. At any time, do you recall anything else that you specifically said to any representative of BankBoston, their employees, personnel or counsel or their appraiser, or that any of those persons said to you at any time on any subject, other than what you have testified to here today?

A   Could you repeat the question?

MR. ORCUTT: Same question as he asked you about Eiger. Anything else?

THE WITNESS: I don't recall anything else.

BY MR. LOEWINSOHN:

Q   Do you need me to repeat the question?

A   No, sir.

Q   What I want you to now list for me, Mr. Evans, is everything that you personally, if anything, and everything that either of the two Lochmere entities, if anything, physically paid out-of-pocket having anything to do with the Hammock Dunes project.

A   Lochmere covered all of its own expenses involved with the evaluation of the Hammock Dunes project, travel, staff, office supplies, telephone,

Page 152

Fed Ex, lodging. All expenses incurred directly by Lochmere were paid by Lochmere.

Q   Anything else?

A   No, sir, not that I recall.

Q   With respect to -- let's go through each of these categories under expenses involved in its evaluation. First, travel. This is travel to where?

A   By an airline travel to Dallas, Atlanta, Boca Raton and then on up to Jacksonville and back. I had several airline trips --

Q   Anywhere else?

A   -- that I flew. Those are the ones that I flew. I drove over to Hammock Dunes on numerous occasions.

Q   Anywhere else you drove?

A   No, sir, not that I recall.

Q   How much did you spend total on these various airline trips?

A   Those receipts have been provided to you. I don't recall.

Q   Have you provided all the receipts regarding the airline trips?

A   To the best of my knowledge.

Q   Let me show you what has been marked as Exhibit 45, and ask you if you can confirm that

Page 153

contained within that exhibit represent all travel charges that you say were incurred in connection with anything to do with Hammock Dunes, incurred or paid by you, Lochmere Development or Lochmere Realty, and specifically the circled items on the exhibit.

(Plaintiffs' Exhibit 45 was marked.)

THE WITNESS: Yes, sir, I believe so.

BY MR. LOEWINSOHN:

Q   The next category you gave was driving. Did you keep track of your mileage?

A   No, sir.

Q   Do you have any way to calculate what your mileage was?

A   No, sir.

Q   Next you said staff. Now, that is general overhead, correct?

A   Yes, sir.

Q   Did you incur any specific expenses for your staff relating -- strike that.

Will you understand in this series of questions if I ask "did you incur," when we're talking about expenses, by the "you" I mean you individually or either Lochmere Development or Lochmere Realty for shorthand?

A   Yes, sir.

012f8040-448f-11d5-8bca-000255a63be2

Page 186

coordination. He wanted to know who that was going to, and I explained to him what that was for.

Q    Anything else?

A    I think some of the other questions that he asked me in regards to the budget. I went over how the budget worked, because he asked me how did this roll up. And I walked him through all the different stages of the documents, and how they would roll up into the top sheet, the format being on Lotus, and I believe he said he was more familiar with -- what was the other spreadsheet?

Q    Excel?

A    Excel. That they used Excel. We went through the different categories. I explained to him that we used -- in the construction cost categories, there were items that did not have any numbers in there, but we used the same site development categories for all of them to make sure that we addressed those specific categories, whether they were needed or not.

Because as you go through the master development, he asked me -- he said did we forget to put the numbers in some of these blank categories. And I explained to him, I said, "No, we didn't." I said, "What we did is we made this part a general category, and if, for example, Grand Mer didn't have any wetland

Page 187

protection categories, we didn't have a number in there, but we left the category.

Also explained to him that we left the pages in here for certain residential parcels that didn't have any numbers, because at that point in time we did not envision any future development to it. We explained to him that -- that for the marina, that we had incorporated the cost of the marina for discussion purposes, and we did not -- we had the pro forma for the budget, but we did not incorporate that going forward in the budget; so it would not be reflected in the actual cash flow portion of the project.

That the commercial retail parcel, which was identified there, we didn't have any numbers on that because we didn't know if it would just be sold outright, but in the event that for future use years down the road, if we wanted to come back and do improvements, we could include it in there. And we had the budget for the second golf course to be able to evaluate the impact in the event we wanted to include that in the project going forward.

Q    Anything else?

A    We went over the GNA budget for the development office, as to what was included in that, and how we came up with the various numbers and the

Page 188

personnel and the number and type and profile of the staff.

We talked about the office staff and sales staff for the site sales office categories. We talked about those specifically. We went down to individual items on that budget to understand the assumptions that were made. We talked about where the sales office would be. We talked about other capital expenditures for new equipment, once we were in the sales office.

We talked about the CDD assessments and the fees and how -- how we projected those and what we relied upon, because there is footnotes on our budget. The master homeowner association subsidies were estimated based on our projection of the total unit count of the density that would actually be developed. We talked about the development order responsibilities, as far as what we envision those costs would be to complete those. And club subsidy operations.

Q    Anything else, generally or specifically, that you said to or Mr. Kennedy said at any time in the meetings held in late April, early May in Dallas, that you recall today?

A    That is all I recall at this moment, sir.

Q    Was Mr. Rowsey present when you were going through what you just said on the master development

Page 189

budget with Mr. Kennedy?

A    I don't believe so.

Q    Mr. Kennedy never committed that Lochmere would receive any or all of those sums on behalf of any of the Eiger defendants during those conversations, did he?

A    He never made comment one way or another to it.

Q    So the answer to my question is, I'm correct; he never made a commitment to you, because he never made a comment one way or the other, correct?

A    Yes, sir. We just discussed it, and we went on to the next subject matter.

Q    Okay. Now, do you remember anything that Poppey said, generally or specifically, during any of the meetings that were held in late April, early May on this occasion in Dallas, as you sit here today?

A    Not that I recall other -- she was sitting in a meeting at the same time as Mr. Kennedy going over the aspects of the budget as well to see how they worked; so to answer your question, from a general assistant point, but I don't remember any specific questions that she asked.

Q    Questions or statements?

A    I don't recall right now.

Page 190

Q    As you sit here today, other than what you already told me, do you remember anything generally or specifically that you said to either Mr. Rowsey, Mr. Kennedy or Poppey?

A    Other than the things that I have already described, nothing beyond that, that I recall at this time.

Q    And we're talking about the meeting that was held in either late April or early May '99, correct?

A    Yes, sir. I believe it was the 28th.

Q    Now, I take it that, based on your testimony today, you have no specific recollection, as you sit here today, of any statements made by any representative of any of the entities we call the Eiger defendants, including Paul Rowsey, at the two-day meeting process in March of '99 in Florida; the May meeting that started out in Boca Raton; or the less than ten, approximately, two to five meetings at Hammock Dunes, specifically on the subject of whether or not or to what extent Lochmere Development or Lochmere Realty would be compensated or might be compensated in connection with this project, correct?

A    What were the -- you made the definition the Eiger defendants, correct?

Page 191

Q    Yes, sir. Do you need that back?

A    Within the Eiger defendants, is the definition of H.D. Associates?

Q    Yes.

A    Is my understanding that when the -- well, I'm trying to get the dates right because -- when I met with Lane, that was April 14th. H.D. had not been formed yet, but yet he was eventually one of the owners. I'm just trying to get your question.

Q    I'll read it back to you.

(Record read by counsel as follows:

"Q I take it, based on your testimony today, you have no specific recollection, as you sit here today, of any statements made by any representative of any of the entities we call the Eiger defendants, at the two-day meeting process in March of '99 in Florida or the May meeting that started out in Boca Raton and went to Hammock Dunes or the less than ten, approximately two to five meetings at Hammock Dunes, specifically on the subject of whether or not or to what extent Lochmere Development or Lochmere Realty would be compensated or might be

Page 192

compensated in connection with the Hammock Dunes property, correct?")

THE WITNESS: Other than what I have already testified to.

BY MR. LOEWINSOHN:

Q    Putting aside whether or not you have testified to anything, anything else?

A    Not that I recall.

Q    Same question for the April meeting, the first one you had in Dallas and then the late April, May meeting, same answer?

A    Yes, sir.

MR. ORCUTT: Glad you didn't have to read that all again.

MR. LOEWINSOHN: We're making some progress.

Q    Lochmere said in what we've called Rule 26 Disclosures, which is a form of written discovery in the federal case, that it has been damaged in the amount of $18,461,969. How is that calculated?

A    Based on the marketing management and development agreement, was factored into the last cash flow, being that master development budget of June 22nd; that if that cash flow -- based on those projections, that would be the impact of it.

Q    All right.

Page 193

(Discussion off the record.)

BY MR. LOEWINSOHN:

Q    You recall at your first deposition at the -- in the Texas case there was a document that was marked as Evans Exhibit 7, and we refer to that just by shorthand -- and I'm trying to keep consistency between depositions -- as the claimed H.D. agreement. Do you remember us using that definition?

A    Yes, sir.

Q    And so when you say it was based -- the calculation is based on the marketing management development agreement, you are referring to the claimed H.D. agreement, Evans Exhibit 7, correct?

A    Right. There is two parts to this, and you don't have the second part.

Q    What is the second part?

A    The second part is the marketing and listing agreement with Lochmere Realty.

Q    Was it attached as an exhibit to the management development and marketing agreement, which was not signed, and has been mark the Evans Exhibit 7?

A    No, sir. It accompanied this document. If you go back -- and when I was asked about this document in my last deposition and you asked me if this was the entire document as exhibit -- it was used as

012f8040-448f-11d5-8bca-000255a63be2

Page 210

part of Exhibit 7?

A    Yes, sir. This was --

Q    Let me reconfigure the exhibit so we don't double mark here. What we have now reconfigured and marked, maybe --

A    You already have that as Exhibit 7.

Q    Right. What we now reconfigured and marked as Exhibit 48, Bates stamps E 421 through 424, is the second part along with Evans Exhibit 7 of what you are claiming is the -- what we've called in your first deposition the "claimed H.D. agreement," correct?

A    Yes, sir.

Q    And Exhibit 48, you claim, was presented to Paul Rowsey at the June Dallas meeting, correct, for the first time?

A    Yes, sir.

Q    And that Exhibit 48 document titled, "Marketing Listing Agreement," was never signed by anyone on behalf of H.D. Associates, L.P., or any of what we're calling the Eiger defendants, correct?

A    Yes, sir.

Q    And no one on behalf of H.D. Associates, L.P., or any of what we're calling Eiger defendants ever promised they would sign Exhibit 48, correct?

A    They didn't promise that they wouldn't,

Page 211

but there was --

Q    But they never promised that they would, correct?

A    That's correct.

Q    Now, if you would go to -- strike that. Let me just be clear. Which of the various versions of the master -- strike that. Do you claim the second version of the master -- strike that. It is my understanding you are claiming that the second version, third version, fourth version and fifth version of the master development budget were at various times provided to one or more of the entities we're calling the Eiger defendants, correct?

A    Yes, sir.

Q    Along with the original version, correct?

A    Yes, sir.

Q    All right. Would you get before you Exhibit 38?

A    What is Exhibit 38?

Q    It, after the first page, attaches what we call the second version of the master development budget.

A    The May 26 version?

Q    Yes, sir.

Page 212

A    Yes, sir.

Q    No. The April 26 version?

A    Excuse me. April 26.

Q    You see the first item "Develop multifamily, 1.4 million"?

A    Yes, sir.

Q    How did you derive that?

A    There was a conversation that I had had with Mr. Lane, that I'm trying to determine -- this was a penthouse. This was just one unit.

Q    And where did you come up with your number?

A    Dave and I discussed it, and I said, "I think that is about what it is worth."

Q    Who first came up with the number?

A    I believe I did.

Q    Are you sure?

A    I know that we discussed it, and I believe I came up with that number.

Q    Well, did you pull the number out of the air?

A    No.

Q    Where did you get the number?

A    I went and looked at the unit. I went and looked at the unit, some of the asking prices, and we

Page 213

were trying to determine what was a fair value for that unit.

Q    Where did you get the asking prices from?

A    From the sales department. It was presently for sale. I don't remember what the asking price was.

Q    So this is information from the seller ITT?

A    Not necessarily. It may have been information that was derived from information from the seller.

Q    Do you have notes of any documents that you used to come up with these numbers in the second version of the master development budget?

A    There were a series of notes that I made as far as various values for all the different product, that had been produced.

Q    They have been produced?

A    Yes, sir. I think they were around April 15th or 16th.

Q    And they are handwritten notes of yours?

A    Yes, sir.

Q    The next one, "Undeveloped multifamily," how did you come up with that number -- strike that. By the way, the information on asking