UNITED STATES DISTRICT COURT
Middle District of Florida

LOCHMERE DEVELOPMENT GROUP, INC.,
and LOCHMERE REALTY, INC.,

        Plaintiffs,

vs.

CASE NO.: 8:00-CV-1026-T-27B
State Court No.: 00-02525/Div. I

H.D. ASSOCIATES, L.P. a Delaware limited
partnership by and through its general partner
DUNES OPERATING COMPANY, L.P., a
Delaware limited partnership by and through
its general partners, EIGER, INC., a Delaware
corporation and 2M DUNES, L.L.C.,
a Texas limited liability company; EIGER
FUND 1, L.P., a Delaware limited partnership;
EIGER PARTNERS, L.P., a Delaware limited
partnership;  DAVID LANE, an individual;
BARNETT LANE INVESTMENTS, INC., a
Texas corporation; JTL CAPITAL, L.L.C., a
Texas limited liability company; FLEET NATIONAL
BANK, N.A., a national banking association;
PAUL E. ROWSEY, III, an individual; C. TODD MILLER,
an individual; DAVID M. JACOBS, an individual;
and, WILLIAM S. BUCHANAN, an individual,

        Defendants.

_____/

## LOCHMERE'S MEMORANDUM OF LAW IN OPPOSITION TO MOTIONS FOR SUMMARY JUDGMENT
### (Violation of Florida's Uniform Partnership Act)
### (Quantum Meruit and Unjust Enrichment)

Plaintiffs, LOCHMERE DEVELOPMENT GROUP, INC. and LOCHMERE

REALTY, INC. ("Lochmere"), submit this memorandum of law in response to the

motions for summary judgment filed by the Defendants with respect to Lochmere's

claims for violations of the Florida Uniform Partnership Act (Counts I, II, and III) and for

*118*

unjust enrichment or quantum meruit (Counts XVII, XVIII, XIX, XX, and XXI).[1] Lochmere adopts its discussion of the standards to be applied in ruling on motions for summary judgment from Lochmere's Memorandum Of Law In Opposition To Motions For Summary Judgment (Intentional and Constructive Fraud; Conversion), filed simultaneously herewith and the discussions of the facts in its other Memorandum of Law in Opposition to Defendants' Motions for Summary Judgment.

## I. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON LOCHMERE'S CLAIMS FOR VIOLATION OF THE FLORIDA UNIFORM PARTNERSHIP ACT

The Defendants' motions for summary judgment on Lochmere's claims alleging violations of Florida's Uniform Partnership Act rest on the premise that, as a matter of law, no enforceable partnership or joint venture agreement can be found to exist because: (a) the undisputed facts show no oral or written agreement whereby Lochmere became a "co-owner" of the business by making a monetary contribution to the business, acquiring a right of control and an interest in the assets, and agreeing to share in any losses; (b) a provision in the proposed Marketing, Development and Management Agreement ("the Development Agreement") expressly negates the existence of a partnership or joint venture; and (c) Evans admitted in his deposition testimony there was no partnership.

Lochmere submits that the Defendants have failed to demonstrate they are entitled to summary judgment because (a) there are disputed issues of material fact which, if resolved in Lochmere's favor, would support the finding of a joint venture relationship under Florida law, in that Lochmere would contribute its expertise and

---

[1] Lochmere has elected to voluntarily dismiss its claims against the Eiger Individuals and Fleet Bank for

2

labor, would exercise control over aspects of the business for which it was responsible, would be entitled to share in the profits, and would be obliged to share in the losses to the extent of the skill and labor it invested; **(b)** the express provision in the Development Agreement is not dispositive, because the Defendants have repudiated the validity of that agreement, and in any event Florida courts, while recognizing that such provisions have a bearing on the issue, require consideration of the parties' intent as reflected in the actual functioning of the relationship; and (c) Evans' admission in deposition testimony that there was no "partnership" as he understood the term does not preclude a finding that a joint venture existed.

Before addressing the Defendants' arguments, however, it must be noted that the business relationship at issue in this case should properly characterized as a joint venture rather than a partnership. The Florida Supreme Court has held that a joint venture "is a partnership of limited scope," and that "both relationships are governed by the same rules of law." Kislak v. Kreedian, 95 So.2d 510, 514 (Fla. 1957). Significantly, it is settled that Florida's Uniform Partnership Act also governs joint ventures. Hayes v. H.J.S.B.B. Joint Venture, 595 So.2d 1000, 1002 (Fla. 4th DCA 1992).

The business relations of partnership and joint venture have been described and distinguished by Florida courts as follows:

> A partnership is usually defined as a voluntary contractual relationship between two or more competent persons to place their money, effects, labor and/or skill in lawful commerce or business, with the understanding that there shall be a communion of profits between them.
>
> A joint venture, although a less formal relationship, partakes of many of the characteristics of a partnership. A joint venture has been defined as a special combination of

violations of the Florida Uniform Partnership Act and for quantum meruit or unjust enrichment.

> two or more persons, who, in some specific venture, seek a profit jointly without the existence between them of any actual partnership, corporation, or other business entity. It is an association of persons to carry out a single business enterprise for profit.

Florida Tomato Packers, Inc. v. Wilson, 296 So.2d 536, 539 (Fla. 3d DCA 1974), cert. denied, 327 So.2d 32 (Fla. 1976).

The Florida Supreme Court has explained that "because of the limited scope of the relationship between joint adventurers, it is generally more informal than the relationship between partners, and some of the incidents of partnership do not, or at least may not, attach thereto." Kislak, 95 So.2d at 514-15. Although the joint venture relation "must arise out of a contract, express or implied," an informal agreement may suffice:

> The contract need not...be expressed or be embodied in a formal agreement, or particularly specify or define the rights and duties of the parties. It may be inferred from the conduct of the parties or from facts and circumstances which make it appear that a joint enterprise was in fact entered into. The consideration...may be a promise, express or implied, to contribute capital or labor to the enterprise.

Kislak, 95 So.2d at 515. See also Florida Tomato Packers, 296 So.2d at 539. Because the relationship between Lochmere and the Defendants was for a single business enterprise—i.e., the development of Hammock Dunes—it constituted a joint venture under Florida law.

Finally, with respect to the standards governing summary judgment, Florida law is settled that "the existence of a joint venture is a question to be determined by the trier of facts." Florida Rock & Sand Co. v. Cox, 344 So.2d 1296, 1298 (Fla. 3d DCA 1977); see also, e.g., Knepper v. Genstar Corp., 537 So.2d 619, 622 (Fla. 3d DCA

1988), rev. denied, 545 So.2d 1367 (Fla. 1989). Consequently, if the evidence raises any issue of material fact or would permit differing inferences as to the existence of a joint venture, summary judgment should be denied and the question should be submitted to the jury. Giardina v. Bowe, 680 So.2d 1071, 1071 (Fla. 3d DCA 1996), reaffirmed, 719 So.2d 941, 942 (Fla. 3d DCA 1998), rev. denied, 729 So.2d 389 (Fla. 1999).

### (a) There Are Disputed Issues Of Material Fact That Would Support The Finding Of A Joint Venture Satisfying The Requirements Of Florida Law

The Lane Defendants argue that there could be no violation of the Uniform Partnership Act  because "there was not an association to carry on as co-owners a business for profit," which is how the Act defines "partnership." They urge that Lochmere's own testimony shows "there was never an intent that Lochmere and the Lane Defendants would be 'co-owners,'" or that "there would be a sharing of any losses," each of which, they contend, "is a necessary element for creation of a partnership." [Lane Motion at 5-8.] The Eiger Defendants contend that to establish a partnership, Florida law requires proof that the parties "contribute equally to the capital or labor of the business, have a  mutuality of interest in both profits and losses, and agree to share in the assets of the business." They maintain that Lochmere's claim must fail because they never reached any "mutual assent" with Lochmere as to the "essential terms" of the relationship, and because "the proposed Management Agreement never states or implies that Lochmere is, or will be, a partner with...any of the Eiger Entities and does not give Plaintiffs any right of control or ownership interest, or provide that they will share in any losses." They further posit that Evans admitted

5

Lochmere was "not going to contribute any money to the project and would not have to share in any losses." [Eiger Entities' Motion at 7-8.]

Analysis reveals that the Defendants' arguments are predicated on misconceptions concerning the elements required to establish a partnership or joint venture relationship under Florida law. Specifically, the notions that each party must contribute money to the business, must have a right of control over all aspects of the venture, must have an ownership interest in the assets, and must share the losses in a direct pecuniary sense, are not supported by the pertinent Florida decisions. In addition, although vague and indefinite agreements will not be enforced, Florida courts have allowed the trier of fact considerably more latitude in discerning the exact terms of an agreement than the Defendants suggest.

To establish a partnership or joint venture in Florida, "there must be (1) a community of interest in the performance of the common purpose; (2) joint control or right of control; (3) a joint proprietary interest in the subject matter; (4) a right to share in the profits and (5) a duty to share in any losses which may be sustained." Kislak, 95 So.2d at 515. The party alleging the partnership or joint venture has the burden of proving all elements essential to the relationship. Id. Gratuitous statements that those requirements must be "strictly construed," however, are not borne out by the decisions.

The Florida Supreme Court long ago recognized that a partnership may exist based on an oral agreement whereby one party provides the necessary capital and is the sole owner of all the assets, while the other party furnishes the labor and expertise and is entitled only to share in the profits. In Uhrig v. Redding, 8 So.2d 4 (Fla. 1942), the parties orally agreed to enter into a venture for raising livestock, contemplating that

6

Redding would supply the funding, Uhrig would devote his labor and skill to managing the business, and they would share the profits. When Redding later denied Uhrig's partnership interest, Uhrig filed suit asserting a half-interest in the assets. The trial court ruled that there was no partnership, but only an agreement to share in the profits, and thus rejected Uhrig's claim to a half-interest in the assets; but the Florida Supreme Court reversed, finding the facts sufficient to establish a partnership even though all the capital was invested by Redding:

> It seems beyond question that there was intended and in existence a partnership between the parties. Appellant supplied the labor, experience and skill, appellee the necessary capital. Any profit was to be shared equally. *Losses would also be shared, for in the event of loss, appellant would have exercised his skill and effort in vain, and appellee would have to suffer diminishment of his capital investment.*

8 So.2d at 6 (emphasis added). Significantly, however, the Court concluded that Uhrig's right to share in the profits did not entitle him to any interest in the assets, declaring: "Upon dissolution of a partnership formed by one supplying all the capital, and another supplying only his labor and skill, the capital is returned to the partner supplying it unless the agreement is otherwise." Id. See also Lindberg v. Creative Construction of Palm Beach, Inc., 522 So.2d 467, 468-69 (Fla. 4th DCA 1988).

The Uhrig principle was applied by the Florida Supreme Court to a land development joint venture in Russell v. Thielen, 82 So.2d 143 (Fla. 1955). The Russells entered into an oral agreement with Theilen and Thierry, who were "developers with the 'know-how' to sell and develop land," for the purpose of purchasing and developing an abandoned subdivision. When sales declined, the Russells reneged on the agreement,

7

and Thielen and Thierry sued for a declaration that a joint venture existed. The trial judge and the Florida Supreme Court agreed.

At the outset, the Court declared that a joint venture relationship "is quite similar to that of partnership and is governed by the principles which constitute and control the law of partnership," with the "principal difference" being that "the joint venture is usually limited to a single enterprise." 82 So.2d at 145. Like a partnership, "[a] joint venture is founded entirely on contract which *may be either express or implied in whole or in part from the acts and conduct of the parties* or the construction which the parties give to the contract between them." Id. (emphasis added). Finding that the two developers "did in fact have a sufficient investment in the lands...to establish a joint venture, in that they invested a considerable sum in preparation to placing the lots on the market" by having devoted "more than two years of time and energy in promotion, advertising and development," the Court concluded:

> We have held that *a partnership existed where one party supplied the labor, experience and skill and the other party supplied the necessary capital*, if the intention of the parties were otherwise sufficiently manifested. *Losses under such circumstances would be shared, for in the event of a loss the party supplying the "know-how" would have exercised his skill in vain and the party supplying the capital investment would have suffered diminishment.*

82 So.2d at 146 (emphasis added).

The Russell Court's interpretation of the "investment of labor" and "sharing in losses" elements was again applied to a joint venture relationship in Florida Tomato Packers, Inc. v. Wilson, supra, which involved a tomato farming operation where one party provided all the funds, the other grew the tomatoes, and they divided the profits. In affirming the trial court's conclusion that those facts were sufficient to warrant

8

submitting the question of whether a joint venture agreement existed to the jury, the court declared:

> In Florida *a duty to share in losses actually and impliedly exists as a matter of law in a situation where one party supplies the labor, experience and skill, and the other the necessary capital* since *in the event of a loss, the party supplying the know-how would have exercised his skill in vain* and the party supplying the capital would have suffered a diminishment thereof.

296 So.2d at 539 (emphasis added).

Significantly, the foregoing principles have been applied to hold that where a joint venture for land development failed, the parties that furnished only time and skill were not liable for a share of the deficiency, because the loss was already "shared" in the sense that "the party contributing capital forfeits his financial contribution, and the venturer[s] contributing services ... lost the value of their services." <u>Viking Realty, Inc. v. Balzebre</u>, 535 So.2d 687, 688-89 (Fla. 3d DCA 1988). These authorities refute the contentions of the Defendants here that there can be no partnership or joint venture unless each party makes a monetary contribution, acquires an ownership interest in the assets, and is liable in a direct pecuniary sense for the losses.

Equally fallacious is the Defendants' interpretation of the requirement that each partner or joint venturer must have "control or the right of control" over the business. The "joint control" element does not require that each party must have the right to control all aspects of the venture, but only that each party have the right to exercise control over the particular aspect of the business for which it is responsible. In <u>Arango v. Reyka</u>, 507 So.2d 1211 (Fla. 4th DCA 1987), anesthesiologists contracted with a hospital to serve as their billing agency. The hospital contended that this agreement did

9

not create a partnership or joint venture because it had no control over the doctors' activities, but the court rejected that argument because the hospital exercised control over billings and collections:

> Here there was evidence of a common purpose, where each party needed the other, *as in any partnership in which each partner brings to the enterprise capital, skills, labor, licensing, resources, or knowledge not possessed by the other.* In this arrangement, there was evidence of shared control, which was split or divided by mutual agreement between the defendants. *Each had control over some aspect of providing anesthesiology services; neither had exclusive control.*

507 So.2d at 1213. See also <u>Julian Consolidated, Inc. v. Conrad</u>, 553 So.2d 784 (Fla. 1st DCA 1989).

The Defendants' contention that "no partnership was created because the parties did not reach a mutual assent regarding all of the essential terms" is likewise unfounded. In the case cited as authority for the application of that rule here, <u>University Creek Associates II, Ltd. v. Boston American Financial Group, Inc.</u>, 100 F.Supp.2d 1337 (S.D. Fla. 1998), the court refused to enforce an alleged loan commitment letter based on its finding that "[a] breach of contract claim predicated on an instrument that fails to specify the amount of interest, terms of repayment, or funding does not state a cause of action under Florida law." <u>Id</u>. at 1338-40. The terms of the Development Agreement at issue here are specific.

In Florida, the question of whether an agreement creates a joint venture depends upon the parties' intent, which is to be determined in accordance with the ordinary rules of contract interpretation. <u>Kislak</u>, 95 So.2d at 516. See also <u>Florida Municipal Power Agency v. Ohio Casualty Ins. Co.</u>, 714 So.2d 660, 661 (Fla. 5th DCA

1998). The rule that "[c]ourts are reluctant to hold contracts unenforceable on grounds of uncertainty, especially where...one party has received the benefit of the other party's performance," is applicable where a joint venture agreement is alleged. <u>Bowe v. Giardina</u>, 719 So.2d at 942. In such cases, "[w]hen the existence of a contract is clear, the jury may properly determine the exact terms of an oral contract,...which often depend on the credibility of witnesses." <u>Id</u>.

The record in this case reflects ample facts from which a jury could find that the parties entered into a valid joint venture agreement, under which Lochmere was to provide its skills, experience, and labor in return for a share of the profits from the Hammock Dunes development. (See, eg Appendix, Ex. "G" and "K".) The fact that Lochmere did not keep a record of the time it expended or submit a bill for its services—and that the Defendants never requested Lochmere to do so—bolsters the conclusion that the parties contemplated Lochmere was not to be compensated as an ordinary employee or independent contractor, but would participate in the profits of the enterprise (or suffer the loss of its work if the venture failed). (Evans Dep. III p.31, 154, 464-465, 448-451.) To hold otherwise would mean that the parties intended to treat Lochmere's contributions to the enterprise as gratuitous, which is a manifestly absurd and unreasonable result.

Although the Defendants deny any agreement based on their refusal to sign the proposed Development Agreement, a jury could infer assent to Lochmere's participation from the fact that both Lane and Rowsey, after being made aware of the Development Agreement, encouraged or knowingly acquiesced in Lochmere's continued efforts in furtherance of the enterprise. Indeed, a jury could conclude that

11

Rowsey's correspondence with Lochmere, acknowledging an offer of reduced compensation, constituted a ratification of Lochmere's status as a joint venturer. (Appendix, Ex. "M".) As discussed above, once the existence of a contractual relation is established, "the jury may properly determine the exact terms of an oral contract,...which often depend on the credibility of witnesses." Bowe, supra.

Given the existence of facts sufficient to support the finding that an agreement was reached, the circumstances here clearly qualify the relationship as a joint venture under Florida law. First, the "community of interest in the performance of the common purpose"—the development of Hammock Dunes—is indisputable. Second, there was "joint control" within the meaning of Arango, because the agreement gave Lochmere authority over those aspects of the Hammock Dunes project for which it was responsible; indeed, the Development Agreement empowered Lochmere to bind the enterprise for amounts up to $25,000 without the approval of the other participants. Third, Lochmere had a "joint proprietary interest in the subject matter," at least to the same degree as other joint venturers who provide skill and labor, by virtue of having contributed its expertise and confidential information it had developed. Fourth, Lochmere clearly had "a right to share in the profits," although Rowsey attempted to negotiate a lower percentage. Finally, Lochmere had a "duty to share in the losses," in that Evans "would have exercised his skill in vain" if the venture failed. Thus, there are sufficient facts to preclude the entry of summary judgment on the ground that no joint venture agreement could be established.

The cases cited by the Defendants do not mandate a judgment as a matter of law on this issue. Defendants' reliance on Austin v. Duval County School Board, 657

12

So.2d 945 (Fla. 1st DCA 1995) is plainly misplaced. In that case, not only did neither party have any control over, or proprietary rights in, the resources of the other, but the claimant conceded on appeal that the elements of a joint venture were not proven. Id. at 948-49. Equally unavailing is Dreyfuss v. Dreyfuss, 701 So.2d 437 (Fla. 3d DCA 1997), where a son asserted that a oral partnership agreement had been created based on a "car conversation" with his father. The Third District ruled that the alleged agreement was too indefinite to be enforceable, because the son "failed to identify such essential terms as the parties to the contract, or the contract's duration," and "failed to define the parties' corresponding rights and duties," including "the financial specifics of the alleged partnership." Id. at 438-40.

Finally, Rigal v. State, 780 So.2d 256 (Fla. 3d DCA 2001), is so readily distinguishable as to have no relevance here. Rigal, who was employed as an associate in a law firm, was convicted of various theft offenses for having deposited fees belonging to the firm into his personal account. On appeal, he contended that he could not be guilty of theft because he was a partner, and thus a joint owner of the partnership assets. The court rejected that defense, finding that although he was given the title of partner, he was merely an employee, as evidenced by the fact that he had no partnership agreement with the firm, was not a shareholder, had made no investment in the firm, had no control over the firm's trust account, and, most important, did not share in the profits and losses of the firm. Id. at 257-58. Under those circumstances, the claim of partnership status was utterly frivolous.

In this case, unlike those on which the Defendants rely, the pertinent documents and deposition testimony of the parties present ample facts from which a jury could find

that Lochmere, the Lane Defendants, and the Eiger Entities entered into an oral agreement creating a joint venture relationship that satisfied the requirements of Florida law. Consequently, the Defendants' contention that they are entitled to judgment as a matter of law based on the absence of a valid joint venture agreement should be rejected.

**(b) The Express Provision In The Development Agreement
Does Not Preclude A Finding That A Joint Venture Existed In Fact**

Assuming for the sake of argument that the Defendants can repudiate the Development Agreement yet still rely on its language as a basis for denying the existence of an oral agreement, their argument that express provisions of the Development Agreement negate any joint venture relationship is groundless. (Appendix, Ex. "G" and "K".) Florida courts have acknowledged that while the manner in which a written contract characterizes the relationship between the parties "has some bearing in assessing its nature,...[t]he ultimate determination...turns upon the intent of the parties." Florida Trading & Investment Co. v. River Construction Services, Inc., 537 So.2d 600, 602 (Fla. 2d DCA 1988), rev. denied, 544 So.2d 200 (Fla. 1989). Thus, in cases where a party has claimed that the existence of a partnership or joint venture is negated by an express provision in the written contract declaring that the agreement does not create any such relationship, Florida courts have not relied solely on the contractual disclaimer; rather, they have looked beyond that language to ascertain whether the relationship actually created meets the legal requirements of a partnership or joint venture. The two Florida appellate court decisions cited by the Defendants here bear out that point.

14

Florida Municipal Power Agency v. Ohio Casualty Ins. Co., 714 So.2d 660 (Fla. 5th DCA 1998), involved a "Participation Agreement" between two utility companies, under which they would share the cost of producing electricity but would each be solely responsible for their respective profits or losses. In ruling that a joint venture did not exist, the court acknowledged that the agreement "expressly provided that no joint venture was intended," but proceeded to add: "Further, the contract was carefully drafted in such a way that it is apparent that the parties did not want a joint venture implied from its terms," because it clearly negated "an intention to share losses as well as profits." Id. at 661. Likewise, in Schweitzer v. Seaman, 383 So.2d 1175 (Fla. 4th DCA 1980), the court found that an office-sharing agreement did not create a partnership, not only because the contract specifically declared one party to be an independent contractor, but because it also prescribed separate liability, which was contrary to Florida partnership law. Id. at 1177-78.

As additional authority to support their position that the provision in the unexecuted Development negates the existence of a partnership, the Defendants rely on the Eleventh Circuit's decision in Savers Federal Savings & Loan Assoc. v. Amberly Huntsville, Ltd., 934 F.2d 1201 (11th Cir. 1991), and on this Court's decision in Resolution Trust Corp. v. Jet Stream, Ltd., 790 F.Supp. 1130 (M.D. Fla. 1992). Like the Florida courts in Florida Municipal Power Agency and Schweitzer, however, neither the Eleventh Circuit nor this Court relied solely on the contract provision as grounds for concluding that no partnership or joint venture had been established.

Savers Federal was an action brought by the RTC as conservator for Savers Federal to recover on two promissory notes executed by a land development joint

15

venture ("the borrowers"). The borrowers asserted in defense that a provision in the notes, which required them to pay Savers "additional interest" amounting to 15% of the net sales proceeds, made Savers a participant in the profits, and thereby created a partnership. In rejecting that theory, the Eleventh Circuit initially observed that one note contained "an express disclaimer of any 'partnership, joint venture or association' between Savers and [the borrowers]," 934 F.2d at 1208; but like Florida courts faced with the same issue, the Eleventh Circuit proceeded to identify additional reasons for finding that no partnership existed—most notably, that the "additional interest" could not under Alabama law be equated with a share of the profits, and that neither note imposed upon Savers any obligation to share in the losses. Id.

This Court confronted a similar situation in Jet Stream, where the RTC sued to recover on a promissory note against developers who failed to make any payments. The developers asserted that the loan transaction was actually part an oral joint venture with the bank to develop the property, but this Court ruled that the developers' claim based on a "secret" oral agreement was barred by the D'Oench doctrine. Id. at 1133-37. Having disposed of the argument on that ground, this Court also observed that the promissory note expressly provided the bank should not be deemed a partner or joint venturer, and that the relationship did not qualify as a joint venture because it did not provide for a sharing of profits and losses or any joint right of control. Id. at 1137.

Based on the approach consistently employed by the courts, the provision in the Development Agreement  expressly declaring that Lochmere is not to be deemed a partner or joint venturer cannot, in itself, be regarded as dispositive. To determine

whether a joint venture relationship existed, the Court and the trier of fact must look to the intent of the parties manifested in the actual functioning of the enterprise. As previously demonstrated, the circumstances of this case adequately establish the existence in fact of a joint venture for the development of Hammock Dunes. Accordingly, the Defendants are not entitled to summary judgment based solely on the cited provision of the Development Agreement.

### (c) Evans' Statements On Deposition In The Texas Case That There Was No "Partnership" As He Understood The Term Do Not Constitute An Admission Or Preclude A Finding That A Joint Venture Existed

As their final ground for summary judgment on Lochmere's claims for violations of the Partnership Act, the Eiger Defendants contend that "during his deposition Evans admitted that even he does not consider that a partnership was created between his companies and the Eiger Entities." [Eiger Entities' Memorandum at 9.] This purported "admission" by Evans is predicated on selected excerpts from his deposition in the Texas litigation, where Evans stated that he was not aware of or could not recall becoming a partner with the Defendants "[b]ased on my understanding of the definition of 'partnership.'" When viewed in context, however, it is clear that Evans' statements do not constitute an "admission" as portrayed by the Eiger Defendants.

The testimony in its entirety shows that Evans was confused about the meaning of "partnership" as that term was being used by opposing counsel—a fact vividly illustrated by the next few lines of testimony, which were omitted from the Eiger Entities' Memorandum:

> **Q:** (BY MS. FARQUHAR) What is your understanding of the definition of "partnership"?

17

> **A:** [Mr. Evans] You asked whether it was a general or limited partner that was incorporated in the state of either Florida or Texas or created in the State of Florida or Texas. I would say no.
>
> **Q:** When you said that it was a partnership, what were you referring to by "it"?
>
> **A:** I'm not sure I understand.

[Evans Dep. II at 13.] Evans then expressed concern that opposing counsel's inquiry as to whether there was a partnership might pose "a legal question that could pertain to far more reaching areas of this case that [sic] I'm capable of answering," and added:

> **A:** Yeah. That's where, you know, I'm trying to understand. Because there may be a definition between legal counsel that takes a different view of a partnership than what I'm [sic] may construe as a partnership. So I don't know that I can take an affirmative position on that without consulting with counsel.

[Evans Dep. II at 14.] When asked again to explain his understanding, Evans elaborated in terms that refute any finding of an "admission" as asserted by the Defendants:

> **A:** It could be—a partnership could be all different types of partnerships. You know, if it—you're talking in regards to a legal partnership *or a partnership to pursue ventures*, whatever that case may be. You know, to me it appears more of a legal question that I may not be qualified to answer at this time.
>
> * * *
>
> **A:** Well, my understanding of a partnership, as you've described, where we've entered into an agreement would be an agreement that was drafted and fully executed by both parties, which may not necessarily be a partnership agreement in works by—you know, effectuated by your actions. So it's for that reason I'm trying to better understand the definition of the question I'm being asked.

[Evans Dep. II at 14-19 (emphasis added).] Evans proceeded to testify that he had an oral partnership agreement with David Lane, which he described:

> **A:** *In our partnership arrangement we were pursuing a venture.* Once we were beginning to put the venture together, once we analyzed something and it started coming together, we would go ahead and convert that into a program like the marketing management development agreement....

18

[Evans Dep. II at 26 (emphasis added).]

Considered in its entirety, Evans' deposition testimony does not constitute an "admission" that there was no partnership relationship, but only an acknowledgment of a business relationship that may not, strictly speaking, have met the legal definition of "partnership" as he understood the term was being used by opposing counsel. In effect, it conveys a lay person's understanding of the distinction between a formal partnership and a joint venture, which, as previously discussed, "is generally more informal than the relationship between partners." Kislak, 95 So.2d at 514-15.

In any event, Evans' deposition testimony in the Texas case cannot be deemed a binding "judicial admission" that warrants summary judgment. A statement made in a party's testimony will not be regarded a judicial admission unless it is a statement of fact rather than opinion, and is "deliberate, clear, and unambiguous." McDonald v. General Motors Corp., 110 F.3d 337, 340-41 (6th Cir. 1997); see also, e.g., Heritage Bank v. Redcom Laboratories, Inc., 250 F.3d 319, 329 (5th Cir. 2001). Moreover, where a party testifying in a separate but related case "states a legal conclusion and...not the admission of a fact that could be dispositive," that statement "is not even competent evidence." Kohler v. Leslie Hindman, Inc., 80 F.3d 1181, 1185 (7th Cir. 1996).

As demonstrated above, Evans' deposition testimony in the Texas case cannot be characterized as the kind of deliberate, clear, and unequivocal statement of fact that qualifies as an "admission." The Eiger Defendants' attempt to transform Evans' confusion into a fatal admission calls to mind the following observation of a federal appellate court in a similar context: "To hold that such a semantic misstep from a witness untrained in the law effectively ends his case would only bring back the

sporting theory of justice and open the door to sharp practices by counsel." Videon Chevrolet, Inc. v. General Motors Corp., 992 F.2d 482, 488 (3d Cir. 1993). The motions for summary judgment should be denied.

## II. THE DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON LOCHMERE'S CLAIMS FOR QUANTUM MERUIT AND UNJUST ENRICHMENT

Before addressing the Defendants' arguments on Lochmere's quantum meruit and unjust enrichment claims, it is essential to understand the nature and relationship of those distinct theories of recovery. Claims for quantum meruit and unjust enrichment are typically asserted as "inconsistent alternative pleading[s]"—i.e., as grounds for relief in the event that the principal claim based on an express contract fails. See W.R. Townsend Contracting, Inc. v. Jensen Civil Construction, Inc., 728 So.2d 297, 303, 305 (Fla. lst DCA 1999); see also Tooltrend, Inc. v. CMT Utensili, SRL, 198 F.3d 802, 806 n.5 (11th Cir. 1999). Generally, where an express contract is established, a party has no need to seek recovery based on quantum meruit or unjust enrichment. Quantum meruit rests on a contract implied in fact, however, and is regarded as a "true contract" that "differs from other contracts only in that it has not been committed to writing or stated orally in express terms." Bloomgarden v. Coyer, 479 F.2d 201, 208 (D.C. Cir. 1973). Finally, unjust enrichment is based on "quasi contract," which "is not really a contract, but a legal obligation closely akin to a duty to make restitution," and thus there is "no need to resort to it when the evidence sustains the existence of a true contract, either express or implied in fact." Id. at 210

"*Quantum meruit* is the name for the legal doctrine which, in the absence of an express agreement, imposes legal liability on a contract that the law implies from facts

where one receives goods or services from another under circumstances where in the normal course of common affairs a reasonable person receiving such benefit would ordinarily expect to pay for it." Osteen v. Morris, 481 So.2d 1287, 1289-90 (Fla. 5th DCA 1986). As the Florida Supreme Court observed long ago:

> It is well settled that where services are rendered by one person for another which are knowingly and voluntarily accepted, without more, the law presumes that such services are given and received in the expectation of being paid for, and will imply a promise to pay what they are reasonably worth.

Yeats v. Moody, 128 Fla. 658, 175 So. 719, 720 (1937).

A contract implied in fact may be found where "services were performed under circumstances fairly raising a presumption that the parties understood and intended that compensation was to be paid." Tipper v. Great Lakes Chemical Co., 281 So.2d 10, 13 (Fla. 1973). Florida courts have specifically held that where a party contributed services in pursuance of a proposed venture for the acquisition and development of a real estate project, but the venture fell through and no agreement was ever executed, the party contributing services may recover the reasonable value of its services in an action for quantum meruit. Carter v. Suggs, 190 So.2d 784, 786-88 (Fla. 1st DCA 1966).

A claim for unjust enrichment, by contrast, depends on whether the party against whom relief is sought received a benefit and knowingly accepted it under circumstances where it would be "in violation of good conscience and fundamental principles of justice or equity" to retain the benefits without paying for the value of those services. Challenge Air Transport, Inc. v. Transportes Aereos Nacionales, S.A., 520 So.2d 323, 324-25 (Fla. 3d DCA 1988). The elements of an unjust enrichment claim in Florida are:

21

> a benefit conferred upon the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention of such benefit by the defendant under circumstances that it would be inequitable for him to retain it without paying the value thereof.

Challenge Air Transport, Inc. v. Transportes Aereos Nacionales, S.A., 520 So.2d 323, 324 (Fla. 3d DCA 1988).

The Defendants suggest that Florida courts "treat unjust enrichment and quantum meruit synonymously," citing Commerce Partnership 8098 Limited Partnership v. Equity Contracting Co., 695 So.2d 383, 386 (Fla. 4th DCA 1997)(En Banc). Although the court in Commerce Partnership acknowledged that there had been such "confusion," it refuted any notion that unjust enrichment and quantum meruit are identical claims by analyzing the material distinctions between the two theories. Dealing first with quantum meruit, the court observed that "[a] contract implied in fact is one form of an enforceable contract," which "is based on a tacit promise...inferred in whole or in part from the parties' conduct, not solely from their words." 695 So.2d at 385. Unlike express contracts, "[a] contract implied in fact is not put into promissory words with sufficient clarity, so a finder of fact must examine and interpret the parties' conduct to give definition to their unspoken agreement"; but they are nonetheless enforceable agreements that "rest upon the assent of the parties."

> Common examples of contracts implied in fact are where a person performs services at another's request, or "where services are rendered by one person for another without his expressed request, but with his knowledge, and under circumstances" fairly raising the presumption that the parties understood and intended that compensation was to be paid. ...In these circumstances, the law implies a duty to pay a reasonable amount for the services.

Id. at 386 (quoting from Lewis v. Meginnis, 30 Fla. 419, 12 So. 19, 21 (1892)).

Turning to unjust enrichment, the court in <u>Commerce Partnership</u> recognized that "[a] contract implied in law, or quasi contract, is not based upon the finding...of an agreement between the parties"; rather, it "is a legal fiction, an obligation created by the law without regard to the parties' expression of assent by their words or conduct...to provide a remedy where one party was unjustly enriched" by having "received a benefit under circumstances that made it unjust to retain it without giving compensation." 695 So.2d at 386. See also <u>Rite-Way Painting & Plastering, Inc. v. Tetor</u>, 582 So.2d 15, 17 (Fla. 2d DCA 1991)("While contracts implied in fact, such as an action in quantum meruit, require the assent of the parties, contracts implied in law do not require such assent.")[2]

The <u>Commerce Partnership</u> court concluded its comparative analysis of quantum meruit and unjust enrichment by observing that the "blurring of the distinction...has been exacerbated by the potential for both theories to apply to the same factual setting."

> For example, a common form of contract implied in fact is where one party has performed services at the request of another <u>without discussion of compensation</u>. These circumstances justify the inference of a promise to pay a reasonable amount for the service. The enforceability of this obligation turns on the implied promise, not on whether the defendant has received something of value. A

---

[2] Thus, unlike express oral or written contracts, or contracts implied in fact that give rise to quantum meruit claims, a quasi contract action for unjust enrichment may lie against a third party who had no agreement or direct dealing with the claimant. "Because the basis for recovery does not turn on the finding of an enforceable agreement, there may be recovery under a contract implied in law <u>even where the parties had no dealings at all with each other.</u>" 695 So.2d at 386 (emphasis added). Under Florida law, a third party who benefits from the claimant's work will be liable for unjust enrichment, even though the work was performed under a contract with another, where the claimant has not otherwise been compensated, and the third party has accepted the work but never paid anyone for the benefits it received. E.g., <u>Hillman Construction Co. v. Wainer</u>, 636 So.2d 576, 577 (Fla. 4th DCA 1994); <u>Zaleznik v. Gulf Coast Roofing Co.</u>, 576 So.2d 776 (Fla. 2d DCA 1991); <u>Variety Children's Hospital, Inc. v. Vigliotti</u>, 385 So.2d 1052 (Fla. 3d DCA 1980).

> contract implied in fact can be enforced <u>even where the</u>
> <u>defendant has received nothing of value</u>.
> However, where there is no enforceable express or
> implied in fact contract but <u>where the defendant *has*</u>
> <u>received something of value, or has otherwise benefited</u>
> <u>from the service supplied</u>, recovery under a quasi
> contractual theory may be appropriate.

<u>Commerce Partnership</u>, 695 So.2d at 387 (emphasis added). The Eleventh Circuit has adopted the analysis of <u>Commerce Partnership</u> as a correct application of Florida law regarding the distinction between quantum meruit claims based on "real" contracts implied in fact and unjust enrichment claims derived from "quasi-contract". <u>Tooltrend, Inc. v. CMT Utensili, SRL</u>, 198 F.3d 802, 805-06 (11th Cir. 1999).

Any doubt as to whether unjust enrichment and quantum meruit are distinct causes of action is dispelled by the fact that there are cases in which both claims have been alleged, and one has succeeded while the other has failed. See <u>W.R. Townsend Contracting</u>, 728 So.2d at 304-06 (Fla. lst DCA 1999). See also <u>Media Services Group, Inc. v. Bay Cities Communications, Inc.</u>, 237 F.3d 1326 (11th Cir. 2001). Indeed, those two cases are instructive with respect to the unjust enrichment claims presented here.

In <u>W.R. Townsend Contracting</u>, Jensen wanted to submit the lowest bid on a state road project. Because Townsend was one of only four subcontractors in a position to supply the fill material required by the project at the lowest cost, Jensen solicited Townsend to provide a contract price for the fill that Jensen could use in its bid. Townsend agreed and provided a bid price to Jensen, which enabled Jensen to submit the lowest bid. After being awarded the project, however, Jensen refused to purchase the fill from Townsend, who sued for breach of oral contract, promissory estoppel, quantum meruit, and unjust enrichment. 728 So.2d at 299-300. Reversing an order of

24

dismissal, the First District concluded with respect to the unjust enrichment claim that Jensen's "winning the F.D.O.T. contract for more than $21 million, while paying nothing to [Townsend] in return, would lead to an inequitable result." Id. at 304.

Likewise in the present case, there is evidence from which the jury could find that Lochmere was requested by the Defendants to furnish certain services that were essential to the realization of the Hammock Dunes deal—services that Lochmere was particularly qualified to provide. Based on the understanding that it would be compensated for its work and would participate in the profits if the deal was closed, Lochmere expended substantial time, effort, and skill to provide the services. The Defendants accepted Lochmere's work, used it to consummate the deal, and reaped the benefits therefrom when the Hammock Dunes project succeeded; but they have refused to compensate Lochmere for its contribution, without which the transaction could not have been concluded so quickly and on such favorable terms. Under these circumstances, as in Townsend, allowing the Defendants to retain the benefits conferred by Lochmere's contributions while paying nothing is manifestly inequitable.

In Media Services Group, the Eleventh Circuit affirmed a judgment awarding damages for unjust enrichment to one who furnished financial information in facilitating a sale of property. The plaintiff, who specialized in the sale of media properties, entered into an agreement to market defendant's radio station. After the defendant terminated the agreement, the plaintiff continued its efforts to market the property with the knowledge and encouragement of the defendant. Among other things, the plaintiff provided financial information and arranged a tour of the facilities for a prospective purchaser, Root. Root elected not to purchase the station at that time; but later, the

defendant independently contacted Root and secured a contract for sale. When the defendant excluded him from the negotiations and refused to pay any commission, the plaintiff sued and was awarded damages for unjust enrichment. In affirming that judgment, the Eleventh Circuit emphasized that "Defendant was well aware of the Plaintiff's efforts to sell the station to Root, and even encouraged these efforts by providing Plaintiff with updated financial data...to send to Root." 237 F.3d at 1331.

Similarly, the Defendants here were not only aware of Lochmere's continued efforts to facilitate the purchase and development of Hammock Dunes, but continued to encourage and assist those efforts after having been presented with Lochmere's proposed plan of compensation. (Appendix, Ex. "G" and "K".)  Once they obtained the services from Lochmere that were essential to consummation of the Hammock Dunes deal, however, the Defendants jettisoned Lochmere at the eleventh hour, thereby excluding Lochmere from the final negotiations and from participation in the profits of the venture. (Appendix, Ex. "M".)  Under these circumstances, the trier of fact could certainly find that the Defendants accepted the benefit conferred upon it by Lochmere, and were unjustly enriched as a result.

### (a) The Lane Defendants Are Not Entitled To Summary Judgment With Respect To The Claims For Quantum Meruit and Unjust Enrichment On The Ground That Lochmere Cannot Establish The Fair Value Of The Services It Performed

The Lane Defendants, relying on excerpts from Evans' deposition, argue that "[t]he nebulous claim by [Lochmere] that services were performed" for which it "want[s] to be compensated by the 'honoring' of an unsubstantiated 'agreement' does not provide a legal basis for [Lochmere] to prevail under a theory of unjust enrichment." From that premise, they contend that because Lochmere "cannot establish the fair

26

value of the services which were performed," it "cannot prevail as a matter of law under a theory of unjust enrichment." [Lane Defendants' Memorandum at 13.]

The Lane Defendants cite no authority to support the premise that a plaintiff claiming quantum meruit or unjust enrichment must prove the value of its services in order to avoid summary judgment. The proper amount of damages recoverable on a quantum meruit claim is "the reasonable worth of the services at the time measured by the rate for like work prevailing in the particular community," which would "embody overhead and profit." Timbercraft Enterprises, Inc. v. Adams, 563 So.2d 1090, 1092 (Fla. 4th DCA 1990). Where a party seeks to recover for the reasonable value of services based on quantum meruit, the fact that the claimant does not allege any agreement as to the specific amount due or the method for computing compensation is not fatal. Miller v. Bill Rivers Trailers, Inc., 450 So.2d 334, 334-35 (Fla. 1st DCA 1984).

The proper measure of damages on a claim for unjust enrichment is the amount by which the defendant was unjustly enriched as a result of the plaintiff's services, which may also include profits. See Dethmers Manufacturing Co. v. Automatic Equipment Manufacturing Co., 73 F.Supp.2d 997, 1011 (N.D. Iowa 1999). In measuring unjust enrichment, the value of the benefit conferred is not necessarily limited to what the claimant spent. Bennett v. Artus, 20 P.3d 560, 564 (Alaska 2001). Thus, Evans' testimony that he has not documented his work on the project in terms of some specified quantity of time at some set hourly rate does not conclusively demonstrate that he cannot establish the fair value of the services he performed.

Ordinarily, the determination of what constitutes the "reasonable worth of services," and to what extent (if at all) a defendant has been "unjustly enriched," are

27

questions to be resolved by the trier of fact based on the evidence presented at trial. To establish the reasonable worth of its services and the amount by which the Defendants were unjustly enriched, Lochmere intends to rely on evidence including: (a) the terms of Lochmere's compensation set forth in the Development Agreement, as reviewed by Evans during the deposition testimony that the Lane Defendants have quoted in their Memorandum (Appendix, Ex. "G" and "K"); (b) the modified compensation plan offered by Rowsey, as recounted in his July 13, 1999 letter to Lochmere, which the trier of fact could regard as evidence of the Defendants' own assessment of the reasonable worth of Lochmere's services (Appendix, Ex. "M"); and (c) the testimony of an expert witnesses:  Robert L. Brown and Roger Whitley, recently deposed by the Defendants, regarding the reasonable value of services provided by Lochmere on the Hammock Dunes project, the benefits realized by Defendants as a result of Lochmere's contributions to the venture, and what it would have cost the Defendants to obtain the services from another provider with Lochmere's expertise.  (Copies of their summaries have been filed with the court as Appendix Ex. "S" and "T".)  Thus, any contention that summary judgment is warranted because Lochmere "cannot establish the fair value of the services which were performed" is without merit, and should be rejected.

### (b) The Defendants Are Not Entitled To Summary Judgment  On The Ground That Lochmere's Claims For Quantum Meruit and Unjust Enrichment Are Preempted By The Florida Uniform Trade Secrets Act

The Eiger Defendants and Fleet contend that Lochmere's claims for quantum meruit and unjust enrichment, to the extent that they are based on any alleged use or

disclosure of alleged trade secrets, are preempted by the Florida Uniform Trade Secrets Act ("FUTSA"). Specifically, they rely on section 688.008(1), Florida Statutes:

> (1) Except as provided in subsection (2), ss. 688.001-688.009 displace conflicting tort, restitutory, and other law of this state providing civil remedies for misappropriation of a trade secret.

Collectively, they cite four decisions as authority: Glasstech, Inc. v. TGL Tempering Systems, Inc., 50 F.Supp.2d 722 (N.D. Ohio 1999); Web Communications Group, Inc. v. Gateway 2000, Inc., 889 F.Supp. 316 (N.D. Ill. 1995); Hutchison v. KFC Corp., 809 F.Supp 68 (D. Nev. 1992); and Frantz v. Johnson, 999 P.2d 351 (Nev. 2000).

The Defendants' argument based on preemption by the FUTSA should be rejected for two reasons, both of which arise from the statutory exceptions to the preemption provision set forth in section 688.008(2):

> (2) This act does not affect:
> (a) Contractual remedies, whether or not based upon misappropriation of a trade secret;
> (b) Other civil remedies that are not based upon misappropriation of a trade secret; or
> (c) Criminal remedies, whether or not based upon misappropriation of a trade secret.

As the court in Hutchison declared with respect to the identical preemption provisions of Nevada's Act, "[c]ontractual remedies, whether or not they are based on misappropriation, and other civil remedies which are not based upon misappropriation of a trade secret are excluded." 809 F.Supp. at 71.

These provisions of the Florida Act have been specifically construed to preclude only those common law claims that are based *solely* on a theory of misappropriation of trade secrets. The court in Coulter Corp. v. Leinert, 869 F.Supp. 732 (E.D. Mo. 1994), applying Florida law, held that when determining whether a particular claim is

preempted under the FUTSA, "the issue becomes whether allegations of trade secret misappropriation *alone* comprise the underlying wrong; if so, the cause of action is barred by §688.008." Id. at 734 (emphasis added). See also Smithfield Ham & Products Co. v. Portion Pac, Inc., 905 F.Supp. 346, 348 (E.D. Va. 1995). Thus, because the Act "only preempts common law claims that 'conflict' with its provisions,...a plaintiff may also bring claims that, although involving a trade secret misappropriation issue, include additional elements not necessary for a misappropriation claim under the UTSA." Powell Products, Inc. v. Marks, 948 F.Supp. 1469, 1474 (D. Colo. 1996).

Lochmere's claims for quantum meruit and unjust enrichment are not premised solely on the misappropriation of trade secrets. Rather, each count alleges first that "Lochmere has conferred a benefit...by providing...its substantial skills, creativity and proprietary information without compensation," and then alleges that each defendant "has further been unjustly enriched because [it] has obtained and is currently using information and data collected by Lochmere for use in the Project in violation of Florida's Trade Secrets Act." Thus, while Lochmere's claims for quantum meruit and unjust enrichment include allegations related to the misappropriation of trade secrets, the Defendants are not entitled to summary judgment because each count also seeks recovery on independent grounds for other services that were provided and produced benefits, but were not compensated. See Powell Products, 948 F.Supp. at 1474-75; Smithfield Ham, 905 F.Supp. at 350.

Moreover, while the preemption provision may apply to claims for unjust enrichment, a quantum meruit claim is not precluded because it constitutes a "contractual remedy" within the exception of section 688.008(2). In three of the four

cases cited by Defendants—<u>Hutchison</u>, <u>Web Communications</u>, and <u>Frantz</u>—the courts held that claims for unjust enrichment were preempted. None of those decisions, however, addressed a claim for quantum meruit. Only <u>Glasstech</u> presented a claim for quantum meruit, which the confused court characterized as "quasi-contract/quantum meruit," and wrongly declared (relying on a Louisiana case) to be "an equitable or restitutory remedy rather than a contractual remedy." 50 F.Supp.2d at 730-31.

Courts have consistently recognized that, unlike quasi-contracts from which unjust enrichment claims are derived, a contract implied in fact—the basis of a quantum meruit claim—is a "true contract":

> An implied-in-fact contract is a true contract, containing all necessary elements of a binding agreement; it differs from other contracts only in that it has not been committed to writing or stated orally in express terms, but rather is inferred from the conduct of the parties in the milieu in which they dealt. A quasi-contract, on the other hand, is not a contract at all, but a duty thrust under certain conditions upon one party to requite another in order to avoid the former's unjust enrichment.

<u>Bloomgarden v. Coyer</u>, 479 F.2d 201, 208 (D.C. Cir. 1973). See also, e.g., <u>Iowa Waste Systems, Inc. v. Buchanan County</u>, 617 N.W.2d 23, 29 (Iowa App. 2000)("[W]ith the advent of modern contract law,...*quantum meruit became grounded in the realm of pure contract,* whereas unjust enrichment was placed in the equitable sphere of quasi contract. ...Recovery, therefore, on a claim of quantum meruit is guided by all present notions of contract law. ...*Unjust enrichment on the other hand is not grounded in contract law but rather is a remedy of restitution.*")(emphasis added).

Consistent with that treatment of quantum meruit claims as contractual in nature, Florida courts hold that "[a] contract implied in fact is one form of an enforceable

contract." Commerce Partnership, 695 So.2d at 385. It follows that, for purposes of applying Florida's version of the UTSA, a quantum meruit claim ought to be regarded as a contractual remedy that is excepted from preemption by section 688.008(2)(a). Thus, the Defendants have failed to show that they are entitled to summary judgment on the basis that Lochmere's quantum meruit claims are preempted by the FUTSA.

### (c) The Eiger Entities and Fleet Are Not Entitled To Summary Judgment On The Ground That Lochmere Cannot Recover For Quantum Meruit and Unjust Enrichment Because It Merely Provided Preliminary Services In The Hopes Of Obtaining A Potential Future Business Opportunity, With No Expectation Of Compensation

The Eiger Entities and Fleet contend that Lochmere's claims for quantum meruit or unjust enrichment are barred as a matter of law based on the principle that "no recovery can be had for preliminary services which are provided with a view toward obtaining business through a hoped-for contract, and the expectation of a future business opportunity cannot form the basis for a quantum meruit or unjust enrichment claim." As legal authority for that argument, they rely principally on this Court's decision in Cherokee Oil Co. v. Union Oil Co., 706 F.Supp. 826 (M.D. Fla. 1989), aff'd, 901 F.2d 1114 (11th Cir. 1990), and on three cases applying the law of other jurisdictions. Peko Oil USA v. Evans, 800 S.W.2d 572 (Tex. App. 1990); North American Financial Group, Ltd. V. S.M.R. Enterprises, Inc., 583 F.Supp. 691 (N.D. Ill. 1984; Maple Island Farm, Inc. v. Bitterling, 209 F.2d 867 (8th Cir.), cert. denied, 348 U.S. 882 (1954). As evidence to support this premise, they assert that Lochmere "never kept any records with respect to the time that they spent on the Hammock Dunes project and never submitted any bills to the Eiger Entities for any services."

32

The fundamental flaw in the Defendants' reliance on <u>Cherokee Oil</u> and the other cited cases is that each involved a critical fact that render them inapposite here—i.e., the ***plaintiff admitted that it did not expect to be compensated*** for its services. In <u>Cherokee Oil</u>, a local oil company, Cherokee, had negotiated with Unocal in hopes of becoming the exclusive agent for the sale of Unocal's "liquefier" product in Tampa. No contract was ever signed, and the proposed deal eventually fell through when regulatory permits could not be procured. 706 F.Supp. at 827-29. Cherokee sued Unocal, asserting a quantum meruit claim for expert and consultation services. In granting summary judgment against Cherokee, this Court held that "[a]s to the expert and consultant services provided by Plaintiff, [Cherokee's president] testified that at the outset he did not intend to seek compensation for his services, instead choosing to pursue the expectation of future profit"; and when Unocal suggested he submit vouchers for payment, Cherokee's president "refused to do so, hoping to recover his expenses from the on-going agency relationship." Thus, the Court found that Cherokee's quantum meruit claim failed as a matter of law because it was admitted that the services were *not* "performed under circumstances in which the parties understood and intended that compensation was to be paid." <u>Id</u>. at 830.

Similarly, in <u>Peko Oil</u>, because the plaintiff "concede[d] that it did not want a fee or commission," and the evidence showed that it was merely "seeking a future business opportunity, not compensation," 800 S.W.2d at 575-76, the court rejected the quantum meruit claim on the rationale that it had been "conclusively established as a matter of law that any alleged services...were performed without thought of direct cash compensation." <u>Id</u>. at 578. To the same effect is <u>North American Financial Group</u>,

33

where the court dismissed a claim for the reasonable value of financial consulting services provided in negotiations over a proposed franchising deal that was never consummated, finding that the plaintiff had "advised the defendants gratuitously...in the hope of garnering favor and securing the franchise." 583 F.Supp. at 700. Finally, in Maple Island the plaintiff had never mentioned expecting a commission for his services, and he "admit[ted] that he would not be asserting it now except for other circumstances which caused him to bring this suit." Id. at 873. Moreover, the evidence showed he had in fact been "adequately compensate[d]...for the services he rendered." Id. at 880-81.

These cases cited by Defendants stand for the unsurprising proposition that where a plaintiff has provided services for the *sole* reason of promoting its own business, and manifested *no expectation of compensation* from the defendant at the time the services were being provided, the fact that the defendant received some "incidental enrichment" to its business is insufficient as a matter of law to support a claim for unjust enrichment. Tooltrend, Inc. v. CMT Utensili, SRL, 198 F.3d 802, 807-08 (11th Cir. 1999). See also, e.g., Dunnaville v. McCormick & Co., 21 F.Supp.2d 527, 535-36 (D. Md. 1998). Moreover, where a plaintiff *admits* that he did not expect compensation at the time the services were provided to the defendant, but only decided to seek payment later, a quantum meruit claim fails as a matter of law. Bloomgarden v. Coyer, 479 F.2d 201, 207-08 (D.C. Cir. 1973); see also, e.g., Sabin v. Regardie, Regardie & Bartow, 770 F.Supp 5, 11 (D.D.C. 1991).

Notably, the general principle that one who renders services in the expectation of gaining a future business advantage ordinarily cannot recover the value of those services in quantum meruit is subject to two exceptions: if the claimant "manifested an

expectation that the recipient would pay for her services, or if she rendered services in reliance on the recipient's promise to enter a contract, or to negotiate in good faith to form one, and the recipient then broke that promise." Brady v. State, 965 P.2d 1, 14 (Alaska 1998), cert. denied, 526 U.S. 1026 (1999). In this case, there is ample evidence in the deposition testimony and the documentary record of the transactions between Lochmere and the Defendants from which both exceptions could be found applicable.

Lochmere has never admitted that it did not expect to be compensated for the services it provided in facilitating the Hammock Dunes venture during the time when the work was being performed. To the contrary, it is undisputed that Evans presented the Development Agreement containing specific provisions for Lochmere's compensation to the Defendants, and reviewed those provisions during the course of their meetings and discussions while proceeding on the project. In addition, there were exchanges of correspondence regarding Lochmere's proposed compensation for its services, beginning at the time when Farrallon was still expected to be the funding source, and concluding with the letters to and from Rowsey, which precipitated this dispute. (Appendix, Ex. "B", "C", "F", "G", "J", "K", "L" and "M".)

The only evidence offered by the Defendants to support their theory that Lochmere had no expectation of compensation is the fact that Lochmere "never kept any records with respect to the time that they spent on the Hammock Dunes project and never submitted any bills to the Eiger Entities for any services." Undoubtedly, the fact that a party claiming unjust enrichment declined to submit bills for any services when given the opportunity to do so may, in some circumstances, be evidence that the party

35

intended to provide the services gratuitously. <u>Cherokee Oil</u>; see also <u>Bennett v. Artus</u>, 20 P.3d 560, 567 (Alaska 2001). A more plausible explanation in this case, however, is that Lochmere did not keep time records or submit bills for its services because Lochmere was a *participant* in the venture with a stake in the profits, *not* an *employee or independent contractor* to be compensated at some hourly rate. Indeed, Evans confirmed that understanding in his deposition testimony:

> Q. [By Ms. Farquhar] And are you seeking in this lawsuit to be reimbursed for time you spent on the Hammock Dunes project prior to the time that Farallon ceased its involvement?
> A. I don't know that I requested to be reimbursed for time in that concept. I'm not billing anything by the hour, ma'am.

* * *

> Q. Are you seeking in this lawsuit to be reimbursed or to be paid or awarded damages for the time you spent in connection with the Hammock Dunes project?
> A. Ma'am, as I stated, I expect to be compensated for my work.
> Q. And how do you expect—on what basis, at what rate do you expect to be compensated?
> A. I don't have a rate, ma'am. I expect—I expected for my agreements to be honored.

[See Appendix 5 to Lane Defendants' Memorandum, at 463-65.]

On the other hand, there are two significant factual circumstances that merit consideration in determining the expectations of the parties here: (a) the absence of any evidence to show that the Defendants ever requested or suggested that Lochmere submit a bill for its services; and (b) the fact that Rowsey admitted he had made an offer of compensation to Lochmere (albeit in a reduced amount) while the parties were still proceeding with the venture. (Appendix, Ex. "M", p.3.)  The fact that a defendant offered some compensation to the plaintiff for its services in providing financial information that facilitated a business opportunity for the defendant constitutes "strong

36

evidence [that the defendant] expected to pay some compensation." Mass Cash Register, Inc. v. Comtrex Systems Corp., 901 F.Supp. 404, 424 (D. Mass. 1995)(denying summary judgment on quantum meruit claim).

Finally, although certain limited aspects of the compensation provided for Lochmere in the Development Agreement might arguably be characterized as a "future business opportunity" that Lochmere hoped to realize if the venture came to fruition, that fact alone does not defeat Lochmere's claims for quantum meruit and unjust enrichment. While acknowledging the principle that "compensation under quasi-contract is not mandated where services were rendered in the expectation of a hoped-for contract or simply to gain a business advantage," one court has held that where an agreement provides that some services will be compensated and others will not, the question of whether the specific services rendered fall within those provisions contemplating payment presents "a question of fact to be determined by the trier of fact." Temeron, Inc. v. Ferraro Energy Corp., 861 P.2d 319, 324 (Okl. App. 1993). Consequently, the Defendants are not entitled to summary judgment.

37

I HEREBY CERTIFY that a true and correct copy of the foregoing has been provided by U.S. Mail to all parties on the attached Service List this _23_ day of August, 2001.

Respectfully submitted,

BRICKLEMYER SMOLKER & BOLVES, P.A.

By: _____

Jay J. Bartlett
Florida Bar No. 875163
Gregory J. Orcutt
Florida Bar No. 230855
BRICKLEMYER SMOLKER & BOLVES, P.A.
500 E. Kennedy Boulevard, Suite 200
Tampa, Florida 33602
Telephone: (813) 223-3888
Facsimile: (813) 228-6422
Attorneys for LOCHMERE
DEVELOPMENT GROUP, INC. and
LOCHMERE REALTY, INC.

38

## SERVICE LIST

Daniel F. Molony, Esq.
Shook, Hardy & Bacon, L.L.P.
100 North Tampa Street, Suite 3900
Tampa, FL  33602

Alan S. Loewinsohn, Esq.
Carol E. Farquhar, Esq.
Jo E. Hartwick, Esq.
Pezzulli & Loewinsohn, L.L.P.
18383 Preston Road, Suite 110
Dallas, TX  75252

(Attys. for H.D. ASSOCIATES, L.P. DUNES
OPERATING COMPANY, L.P., EIGER, INC.,
2M DUNES, L.L.C., EIGER FUND 1 L.P.,
EIGER PARTNERS, L.P., PAUL E. ROWSEY, III,
C. TODD MILLER, DAVID M. JACOBS,
WILLIAM S. BUCHANAN and FLEET NATIONAL
BANK f/k/a BANKBOSTON, N.A.)

Dora Kaufman, Esq.
Halley, Sinagra & Perez
100 S.E. 3rd Avenue, Suite 1900
Fort Lauderdale, FL 33394

Co-Counsel: FLEET NATIONAL BANK f/k/a BANKBOSTON,N.A.

Alan M. Gerlach, Esq.
Broad & Cassel
390 North Orange Ave.
Suite 1100
Orlando, FL 32801

John W. Greene, Esq.
Hill Gilstrap, P.C.
1400 West Abram Street
Arlington, TX 76013

(Attys. for DAVID LANE, BARNETT LANE
INVESTMENTS, INC. AND JTL CAPITAL, L.L.C.)

39