F I L E D

Date 11-27-01    3:54    Time

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| LOCHMERE DEVELOPMENT GROUP, INC., and LOCHMERE REALTY, INC., §§§§§ | |
| Plaintiffs § | |
| v. §§ | CASE NO. 8:00-CV-1026-T-27B |
| H.D. ASSOCIATES, L.P., a Delaware §§ | STATE COURT NO. 00-02525/Div. 1 |

LOCHMERE DEVELOPMENT
GROUP, INC., and LOCHMERE
REALTY, INC.,

     Plaintiffs

v.

H.D. ASSOCIATES, L.P., a Delaware
Limited Partnership by and through
its general partners DUNES
OPERATING COMPANY, L.P., a
Delaware Limited Partnership and
EIGER, INC., a Delaware Corporation
2M DUNES, L.L.C., a Texas Limited
Liability Company, DAVID LANE, an
Individual; BARNETT LANE
INVESTMENTS, INC., a Texas
Corporation; JTL CAPITAL, L.L.C.,
A Texas Limited Liability Company;
FLEET NATIONAL BANK, N.A., a
National Banking Association; PAUL E.
ROWSEY, III, an Individual; C. TODD
MILLER, an Individual; DAVID M.
JACOBS, an Individual; and, WILLIAM
S. BUCHANAN, an Individual,

     Defendants

§
§
§
§
§
§
§
§
§

CASE NO.
8:00-CV-1026-T-27B

STATE COURT NO.
00-02525/Div. 1

## MEMORANDUM IN SUPPORT OF DEFENDANTS DAVID LANE, INDIVIDUALLY, BARNETT LANE INVESTMENTS, INC. AND JTL CAPITAL, L.L.C.'S MOTION TO STRIKE EXPERT TESTIMONY OF RICHARD C. BROWN

### STATEMENT OF FACTS

1.    Plaintiffs Lochmere Development Group, Inc. ("Lochmere Development") and Lochmere Realty, Inc. ("Lochmere Realty") (collectively, "Lochmere") served an expert report for Richard L. Brown ("Brown"). Brown's deposition was taken on or about August 3, 2001. Defendants seek to strike Brown's opinions on the basis that Brown is not qualified to render expert opinions in

the areas at issue in this case. Furthermore, Brown's unreliable and baseless opinions are inadmissible under <u>Daubert v. Merrell Dow Pharm, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786 (1993).

<strong>ARGUMENT</strong>

**A.     Brown's Testimony Should Be Stricken Because If Fails to Satisfy the <u>Daubert</u> Factors of Reliability.**

### 1.     Standards for Admission of Expert Testimony under <u>Daubert</u>

The admissibility of expert testimony is governed by a series of recent United States Supreme Court opinions that articulate a new set of admissibility criteria for expert testimony. The first, and most well known, of these opinions is <u>Daubert v. Merrell Dow Pharm, Inc.</u>, 509 U.S. 579, 113 S.Ct. 2786 (1993). <u>Daubert</u> provides a set of admissibility criteria for federal court expert testimony and installs the trial judge as a gatekeeper, charged with evaluating all proffered expert testimony and admitting only that which is found to be both relevant and reliable. The <u>Daubert</u> Court established the following four factors for evaluating the admissibility of expert testimony: (1) whether the methods upon which the testimony is based have been tested; (2) the known or potential rate of error associated with the testing; (3) whether the method has been subject to peer review; and (4) whether the method is generally accepted in the relevant scientific community.

In <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Supreme Court, reversing the Eleventh Circuit, extended <u>Daubert</u> to govern all expert testimony proffered in federal courts. The Court stated that "<u>Daubert</u>'s general holding ...applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." Id. at 141. Under <u>Kumho</u>, <u>Daubert</u>'s general principles are to be applied flexibly to the evaluation of all expert testimony proffered in federal courts and the

four-part test for admissibility of expert testimony may be applied by the trial court to screen any type of expert testimony.

### a.   Rule 104: Preliminary Questions

Daubert notes that Fed.R.Evid. 104(a) provides the "[p]reliminary questions concerning the ...admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b) [pertaining to conditional admissions]. In making its determination it is not bound by the rules of evidence except those with respect to privileges." Daubert, 509 U.S. at 579. It is Rule 104 that establishes the gatekeeper role of the trial court. Daubert states:

> Faced with a proffer of expert scientific testimony under Rule 702, the trial judge, pursuant to Rule 104(a), must make a preliminary assessment of whether the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue. Many considerations may apply.

### b.   Rule 402: Relevance

Daubert cites to Fed.R.Evid. 402 as the baseline for admissibility of expert testimony, quoting from the rule that "[a]ll relevant evidence is admissible, except as otherwise provided ....evidence which is not relevant is not admissible." In elaborating on the rule, the Court noted that "the Rule's basic standard of relevance ...is a liberal one," because relevancy is satisfied by any evidence that "has any tendency to make the existence of any fact that is of consequence ...more...or less probably than it would be without the evidence." Id. at 587.

### c.   Rule 403: Reliability

The Daubert Court noted that "[r]ule 403 permits the exclusion of relevant evidence" if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Id. at 595.

**d.    Rule 702: Evidentiary Reliability and Doctrine of Judge as Gatekeeper**

The Daubert Court begins its explanation of the criteria that the trial courts should use to screen "purportedly scientific evidence" by analyzing Fed.R.Evid. 702, which provides:

> If *scientific, technical, or other specialized knowledge will* assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise. (emphasis added).

The Court explained that "[t]he adjective `scientific' implies a grounding in the methods and procedures of science. Similarly, the word `knowledge' connotes more than subjective belief or unsupported speculation." Id. at 590.

The Court stated that "[t]he subject of an expert's testimony must be `scientific...knowledge,'" because it is "the requirement that an expert's testimony pertain to `scientific knowledge'" that establishes a standard of evidentiary reliability" Id. at 590. Daubert further requires that "to qualify as `scientific knowledge,' an inference or assertion must be derived by the scientific method." Id. The Court stated that:

> Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested. "Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry." (emphasis added)

**2.    Brown's Report and Testimony Should Be Stricken Because His Work Does Not Satisfy the Factors Set Forth in Daubert.**

**a.    Brown's Inexperience in the Real Estate Industry Renders Him Unqualified as an Expert.**

Pursuant to Rule 702, experts may testify on a particular subject if the trial court determines that such *specialized opinion is* necessary to aid the jury in a full understanding of the issues involved. Steward v. Atlantic Refining Co., 240 F.2d 715 (3rd Cir. 1957) (emphasis

added). The subject matter of the expert testimony must be closely related to a particular profession, business or science and not within the common knowledge of the average layman. Faircloth v. Lamb-Grays Harbor Co., Inc., 467 F.2d 685 (5th Cir. 1972). Witnesses of *proved experience in a trade or business* are ordinarily considered qualified to testify as to such opinions. U.S. v. Wysocki, 457 F.2d 1155 (5th Cir. 1972) (emphasis added), *cert denied,* 93 S.Ct. 145, 409 U.S. 859, 34 L.Ed.2d 105. Expert witnesses must have experience in transactions as similar as possible to the transaction upon which they are being asked to comment. Havenfield Corp. v. H & R Block, Inc., 509 F.2d 1263 (8th Cir. 1975), *cert. denied,* 95 S.Ct. 2395, 421 U.S. 999, 44 L.Ed.2d 665. Several courts have excluded expert testimony where the expert did not possess the requisite experience to apply analysis to the facts of the case. Delmer v. Cincinnati Sub-Zero Prod., 58 F.3d 341, 345 (7th Cir. 1995); Wintz v. Northrop Corp., 110 F.3d 508, 514 (7th Cir. 1996) (exclusion of testimony of toxicologist due to lack of experience with bromide and birth defects in general); Nilssen v. Motorola, Inc., 1998 WL 513090 at * 12 (N.D. Ill. 1998) (excluding a damages expert's testimony because the expert had never before formed an opinion like the one at issue in the case); Sittig v. Louisville Ladder Group, LLC, 136 F. Supp.2d 610, 619 (W.D. La. 2001) (experts' lack of experience and training in ladder design, rendered experts' opinions unreliable).

Brown's report (Ex. A) provides several opinions, none of which are based on any experience or specialized knowledge of the real estate industry.

Brown's report and testimony should be stricken because his opinions are not based on any experience or specialized knowledge similar to the real estate development transaction that allegedly took place between Lochmere and Defendants. Brown is not a real estate developer, nor has he ever worked as one. (Brown Dep. at 140, 173). Rather, Brown has been a certified

public accountant ("CPA") for the last 32 years. (Brown Dep. at 12). For the past 5 years, Brown has devoted less than 5 percent (5%) of his practice to the real estate industry. (Brown Dep. at 20-21). Brown has never performed all of the due diligence in a real estate project, only the accounting part. (Brown Dep. at 173). In fact, Brown testified that he is not familiar with what is customary in the industry with regard to how such due diligence is performed. (Brown Dep. at 174).

Brown further testified that he has not previously prepared budget spreadsheets such as the ones he testified about. (Brown Dep. at 140). In fact, Brown's only experience with real estate spreadsheets was a result of his auditing work with real estate clients. (Brown Dep. at 140-41). In sum, Brown's accounting experience does not qualify him to render an expert opinion in this case. In fact, Brown did not perform any accounting functions, including an accounting audit, in forming his opinions. (Brown Dep. at 157-58). Rather, Brown testified that he was engaged by Lochmere to prepare a schedule showing the original agreement and the "re-trade." (Brown Dep. At 158-59). Brown admitted during his deposition that he did not prepare any spreadsheets or pro formas in this case (Brown Dep. At 104). Accordingly, Brown's report and testimony should be stricken.

**b.    Brown's Report and Testimony Should be Stricken Because His Opinions are Baseless and Unreliable.**

A cornerstone of the <u>Daubert</u> analysis to determine reliability is whether the purported theory or technique can be (and has been tested). <u>Daubert</u>, 509 U.S at 590. Brown admitted during his deposition that he did not do any work to independently verify the figures contained in the report. (Brown Dep. at 109). Brown's opinions and testimony should be stricken because his opinions are untested and therefore unreliable. For example, the opinions and calculations referenced in item numbers 5 and 6 above on page 7 are ones in which Brown is clearly

speculating and offers no evidence that he has tested any such opinions and/or verified any such opinions, and/or that he is qualified to do so.

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court strike the opinions of Richard L. Brown.

Respectfully submitted,

HILL GILSTRAP

By: _____
John W. Greene
State Bar No. 08391520

1400 West Abram
Arlington, Texas 76013
(817) 261-2222
(817) 277-3249 FAX

and

Alan M. Gerlach
State Bar No. 199184
BROAD AND CASSEL
390 N. Orange Avenue
Suite 1100
Orlando, FL 32801
Phone: 407/ 839-4200
Via Facsimile: 407/425-8377

ATTORNEYS FOR DEFENDANTS
DAVID LANE, BARNETT LANE
INVESTMENTS, INC. and
JTL CAPITAL, L L.C.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent via _TELEFAX_ on _Nov. 27_, 2001, to all counsel of record.

_____
John W. Greene

# RICHARD L. BROWN & COMPANY, P.A.

### CERTIFIED PUBLIC ACCOUNTANTS

Traci J Anderson, C.P.A.
Richard L. Brown, C.P.A.
Stephen R. Hartmann, C.P.A

1810 South MacDill Avenue, Suite 3
Post Office Box 18545 (zip 33679)
Tampa, Florida 33620

Phone (813) 258-0338
FAX (813) 258-1773
E-Mail: richardlbrown@juno.com

June 1, 2001

Mr. Greg Orcutt, Esquire
Bricklemyer, Smolker & Bolves
500 East Kennedy Boulevard
Tampa, FL 33602

> Re: Lochmere Development Group, Inc. et al(Lochmere) vs. H. D. Associates, LP
> et al(H. D. Associates)

Dear Mr. Orcutt:

You have requested that we assist you in the investigation and analysis of the Lochmere's claim and lawsuit against H. D. Associates and provide expert witness testimony about our findings. The following report is the result of our interviews with Lochmere's principle owner, reading of certain depositions and an analysis of documents produced in discovery. Included are our opinions and the information that helped us in forming these conclusions.

1. Lochmere uses a proprietary analytical tool called the Master Development Budget developed over a number of years in the real estate development business. This analytical tool is based on Lotus Spreadsheets, designed to "roll-up" all detail information to summaries and is interactive to the extent that a change in a detail number automatically changes and updates all relevant schedules.

The information developed using this analytical tool traces a project from its formative stage through completion and sell-out. It has the capability to capture cash flow information including funds borrowed and related repayments. It also calculates rates of return based on a variety of financial assumptions.

## Conclusion

Lochmere owns a proprietary tool that is a complete analytical tool in developing a business plan for a project. We have seen a number of these plans in our audits of real estate developer clients as this information in an integral part of the estimated costs to complete a project. These planning tools vary widely in level of detail and complexity. Lochmere's Budget process is one of the best we have seen.



EXHIBIT

A

2

**2.** Lochmere developed the detailed Master Development Budget for Hammock Dunes using information obtained from the owner of the property, studies prepared by Lochmere's consulting engineers and offering information prepared by Cushman Wakefield, the seller's real estate broker. Utilizing this data, Robert Evans experience in the real estate development business and assumptions on financing, a preliminary Master Development Budget was completed, without amounts, and provided to H. D. Associates in order to identify the complex funding issues unique to Hammock Dunes. This document was dated April 14, 1999 and provided to H. D. Associates on April 15, 1999.

Subsequently, the Budget was prepared with estimated revenues and costs and provided to H. D. Associates. This Budget was dated April 26, 1999. H. D. Associates transmitted this Budget to BankBoston with a one page "conservative case" summary. This Budget was clearly marked as the proprietary property of Lochmere and H. D. Associates acknowledged that it had obtained this information from Lochmere.

The April 26, 1999, Budget was later updated by Lochmere as of May 26, 1999, to include the costs associated with building a second golf course. Golf membership revenue was also adjusted to reflect the second golf course and land sales revenue reduced for what had been a planned sale of the site. The revised Budget was transmitted to H. D. Associates on June 7, 1999.

A final Budget dated June 22, 1999, was prepared by Lochmere which included the costs associated with the financing and a calculation of an Internal Rate of Return(IRR). This Budget became H. D. Associates' Exhibit A to the Senior Secured Credit Agreement. The Exhibit A Budget is identical to Lochmere's June 22, 1999 Budget, including the calculation of IRR of 67.85%.

H. D. Associates subsequently submitted a "final" Exhibit A Budget which was prepared using the June 22, 1999 Budget prepared by Lochmere. Lochmere had provided H. D. Associates with a diskette copy of its analytical tool converted from Lotus Spreadsheet to Microsoft Excel. All significant amounts remained the same. Several descriptive titles changed, but not the amounts. H. D. Associates included the financing costs in this version, though not exact, these costs tracked those prepared by Lochmere.

## Conclusion

H. D. Associates used Lochmere's proprietary information to obtain the financing for this project. This development model is very detailed and extensive and it is a very remote possibility that H. D. Associates could build a modeling system that would accomplish its planning in the short period of time available, not to mention, coming to exactly the same amounts that Lochmere had prepared. H. D. Associates found it necessary to continue using Lochmere's information because of the short time frame necessary to fund this deal. After attempting to "re-trade" Lochmere's compensation arrangement in early July, 1999, a few weeks

3

later, H. D. Associates signed a contract to purchase Hammock Dunes which included a $3,000,000 non-refundable deposit. See Section 3. below.

**3.** Lochmere and David Lane were the original joint venture partners attempting to purchase and develop Hammock Dunes. Lochmere had responsibility for purchase of the property, development and sales. HD had responsibility for bringing a financial partner into the deal. They were operating under a "Management, Development and Marketing Agreement" which, among other things, states the amount and type of compensation the Lochmere organization was to receive for carrying out its assigned responsibility.

Robert Evans received a phone call on June 28, 1999 from H. D. Associates' representative informing him that it was necessary to "re-trade" the terms and conditions of Lochmere's compensation arrangement. Following is a summary of Lochmere's agreement with H. D. Associates and the comparison of Eiger's proposed changes:

| | Lochmere/Lane Agreement | | Eiger's "Re-trade" | |
|---|---|---|---|---|
| Monthly Management Fee ($12,000 per month) | | $ 576,000 | | $ 576,000 |
| Due Diligence Fee (1% of purchase price of property) | | $ 225,000 | | $ 225,000 |
| 4% Real Estate Commission | | $ 4,428,600 | | -0- |
| Reimbursement of operating expenses($48,750 per month) | | $ 2,340,000 | | $ 144,000 |
| Profit participation after 12% preferred return to capital partner | 30% | $17,466,118 | 7.5% | $4,366,529 |

**Conclusion**
As can be seen from the above comparison, there is a significant difference between the two methods of compensation. In fact, under H. D. Associates' "Re-trade" because Lochmere would be responsible for its own operating expenses, Lochmere would be required to invest over one million dollars into this project before any reimbursement which was scheduled to occur at approximately the mid-point of the planned development. As noted above, the capital partner receives his investment back, plus a 12% preferred return. Lochmere would be required to look to its 7.5% profit participation to be reimbursed for its out of pocket expenses throughout the project. This effectively lowers Lochmere's profit participation to less than 4%.

4

As a result of these issues, Lochmere elected not to proceed with Eiger on the "Re-trade" basis.

**Overall Conclusion**

H. D. Associates consistently used information provided by Lochmere to obtain financing for the project. After H. D. Associates attempted to "Re-trade" Lochmere's compensation and Lochmere declined to accept this proposal, H. D. Associates confirmed by letter on July 13, 1999, that it would not use Lochmere's proprietary Budget format. Yet on July 29, 1999, H. D. Associates signed a contract to acquire Hammock Dunes and agreed to make a $3,000,000 non-refundable deposit. It is difficult to believe that H. D. Associates could have gone through the process of preparing detailed budgets necessary to support the feasibility of this project in the two weeks between the issuance of the July 13, 1999, letter and the commitment of $3,000,000 non-refundable deposit to this transaction. It is even more unbelievable that H. D. Associates would discard Lochmere's Budget, prepare its own budgets and come to the same sales and cost estimates as Lochmere's Budget, including the Internal Rate of Return.

Attached to this report letter is a copy of my current resume and a summary of cases in which I have been involved for the last four years. I charge $175.00 per hour for litigation support services. I have been a CPA involved in public practice since 1967. I have not published any articles or books on this or any other subject.

Very truly yours,

Richard L. Brown

Richard L. Brown

**Richard L. Brown, CPA**
**1810 South MacDill Avenue, Suite 3**
**Tampa, Florida 33629**

Education

B.A. in Accounting - University of South Florida

Attends seminars and conferences sponsored by the Florida and American Institute of Certified Public Accountants

Career Experience

Richard L. Brown & Company, P.A.- Shareholder, Tampa, Florida
Coopers & Lybrand, Managing Partner, Austin, Texas
Coopers & Lybrand, General Practice Partner, Tampa, Florida
Grant Thornton, Managing Partner, Tampa, Florida

Industry expertise includes:

| | |
|---|---|
| . Construction | . Manufacturing |
| . Financial Institutions | . Non-Profit Organizations |
| . Governmental | . Real Estate |
| . Litigation support | . Utilities |

Professional and Civic Organizations

University of South Florida Foundation Board of Directors
    . President - 1997-1998, 1998-1999
    . Treasurer - 1996-1997
    . Assistant Treasurer - 1995-1996, 1999-2000
    . Executive Committee
    . Finance Committee, Chairman
    . Audit Committee, Chairman
    . Investment Subcommittee, Chairman
    . Capital Projects Committee, Chairman

University of South Florida Alumni Association - President 1987-1988
Florida Institute of Certified Public Accountants - Member
Bar Grievance Committee - 1993-1996
Bar Fee Arbitration Committee - 1996-1999
University of South Florida Alumni Association Service Award - 1998
University of South Florida Alumni Association Distinguished Alumnus Award - 2000

## Richard L. Brown
## Summary of Cases Retained

| | |
|---|---|
| 9/26/96 | Eilene Henry vs. Dennis Pupello, M.D., et al |
| 9/26/96 | Maryann Stevens vs. City of Venice |
| 2/4/97 | Lewin vs. Kampsen |
| 2/10/97 | Culverhouse vs. Culverhouse Trust |
| 3/4/97 | Angel vs. Gilman & Ciocia |
| 3/4/97 | Lam vs. Win |
| 7/22/97 | Mitchell W. Kurzner, M.D. vs. Connecticut General Life Insurance Company |
| 10/20/97 | Campbell vs. Marie Osmond, et al |
| 1/7/98 | Nancy Beatty and Jacob Beatty, a minor vs. Jeffrey M. Barrett, M.D. and Watson Clinic |
| 5/6-11/98 | Danile vs. Jacobson |
| 7/20/98 | Carmenga Barrego vs. Douglas J. Weiland, M.D., Paul J. Zab, M.D. and Florida Spine Institute |
| 7/20/98 | Reitz vs. Tyson, M.D. |
| 7/20/98 | Michael T. Howell vs. Tom Hutman |
| 8/26/98 | Carlisle vs. Kayan |
| 8/26/98 | Ernest Sucarichi, Deceased vs. Alan M. Weintraub, M. D. and John Q. Stouffer, M.D., P.A. |
| 9/9/98 | Russell vs. Minnesota Mining & Materials, Inc. |
| 10/5/98 | Special Care vs. MediFin/Healthcare Financial |
| 2/9/99 | Independent Reporting, Inc. vs. George Leach, CPA |
| 2/19/99 | Lula McDuffy, Deceased vs. Watson Clinic, LLP |

| | |
|---|---|
| 3/3/99 | Marcy Derfus as Guardan of Daniel Derfus vs. Bernard Tortorice, M.D. and Bayfront Anesthesia Services, P.A. |
| 5/19/99 | Alan Greenstein vs. Jeffrey L. Sager, M.D.. Steven D. Turker, M. D. and Diagnostic Clinic |
| 5/19/99 | Robert A. Lee, Deceased vs Ronald A. Ford, M.D. and Gessler Clinic, P.A. |
| 6/9/99 | Paige Berry vs. Craig Newman, D.C. |
| 6/17/99 | Jack W. Kentish vs. Cellar Door Concerts |
| 6/21/99 | Freddie Parsons vs. Seminole Tribe of Florida |
| 8/9/99 | Diehr vs. Diehr |
| 9/25/99 | Clara Surprise vs. Mark L. Greenberg, M.D. and Watson Clinic |
| 10/1/99 | Magalian vs. Magalian |
| 10/22/99 | Golden Adams vs. Alfonso H. Saa, M.D. |
| 11/29/99 | David J. Burke vs. Abbott Laboratories and John M. Cox |
| 11/29/99 | Warren O. Carlson vs. Robert G. Davies, M.D. and Gessler Clinic, P.A. |
| 11/29/99 | Robert B. Smith, Deceased vs. M. Linton Herbert, M.D., David E. Longacre, M.D. and Diagnostic Clinic |
| 12/1/99 | Healthcare Financial vs. Outpatient Pain & Treatment Center, Inc. |
| 12/10/99 | West vs. West |
| 3/7/00 | Financial Valuation Group vs. Stephen G. Blume |
| 3/30/00 | Kopelovich vs. Kopelovich |
| 6/7/00 | Suncoast Hospital, Inc. vs. Principal Life Insurance Company |
| 6/22/00 | Patricia Esper vs. Minnesota Mining and Manufacturing Company |
| 6/27/00 | Grasso vs. Zuerndorfer, M.D. and Diagnostic Clinic |
| 7/20/00 | Pentaglobe Management vs. Medstar Medical, Inc. |

| | |
|---|---|
| 7/25/00 | Barbara Pope vs. Diagnostic Clinic and Lawrence Friedman, M.D. |
| 8/3/00 | Capital Asset Engineering, Inc. and Frank Masyada vs. Tuthill Corporation |
| 8/15/00 | Lochmere Development Group, Inc. |
| 2/19/00 | Hoskinson vs. Anderson |
| 1/1/01 | Quesada vs. Raymond James, et al |
| 3/1/01 | Pentaglobe Management vs. MedStar Medical, Inc. |