JAMES GARDNER

## Page 1

UNITED STATES DISTRICT COURT
Middle District of Florida

LOCHMERE DEVELOPMENT GROUP, INC.,
and LOCHMERE REALTY, INC.,

     Plaintiffs,

vs.

H.D. ASSOCIATES, L.P. a Delaware Limited Partnership by and through its general partners DUNES OPERATING COMPANY, L.P., a Delaware limited partnership and EIGER, INC., a Delaware corporation; 2M DUNES, L.L.C., a Texas limited liability company; DAVID LANE, an individual; BARNETT LANE INVESTMENTS, INC., a Texas corporation; JTL CAPITAL, L.L.C., a Texas limited liability company; FLEET NATIONAL BANK, N.A., a national banking association; PAUL E. ROWSEY, III, an individual; C. TODD MILLER, an individual; DAVID M. JACOBS, an individual; and, WILLIAM S. BUCHANAN, an individual,

     Defendants.

• • • • • • • • • • • • • • • • • • • • • • • • • • •

DEPOSITION OF:     JAMES E. GARDNER

DATE TAKEN:     Tuesday, June 19, 2001

TIME:     9:39 A.M. to 12:19 P.M.

PLACE:     Rogers, Towers, Bailey, Jones, & Gay
170 Malaga Street, Suite A
St. Augustine, FL 32084

REPORTED BY:     JANET M. BEASON, RPR-CP, RMR, CRR
and Notary Public

• • • • • • • • • • • • • • • • • • • • • • • • • •

ST. AUGUSTINE COURT REPORTERS
1510 N. Ponce de Leon Blvd., Suite A
St. Augustine, FL 32084
(904) 825-0570

## Page 2

APPEARANCES:

GREGORY J. ORCUTT, Esquire
Bricklemyer Smolker & Bolves, P.A.
500 East Kennedy Boulevard, Suite 200
Tampa, Florida 33602
Attorneys for Plaintiffs.

CAROL E. FARQUHAR, Esquire
Pezzulli & Loewinsohn, L.L.P.
18383 Preston Road, Suite 110
Dallas, Texas 75252
Attorneys for HD Associates, Dunes Operating Company, Eiger, Inc., 2M Dunes, Eiger Fund, Eiger Partners, Paul E. Rowsey, III; C. Todd Miller, David M. Jacobs, William S. Buchanan and Fleet National Bank, f/k/a BankBoston, N.A.

ALAN M. GERLACH, Esquire
Broad & Cassel
390 North Orange Avenue
Suite 1100
Orlando, Florida 32801
Attorneys for David Lane, Barnett Lane Investments, Inc., and JTL Capital.

JAMES MIDDLETON, Esquire
Rogers, Towers, Bailey, Jones & Gay
170 Malaga Street
St. Augustine, Florida 32084
Attorney for James E. Gardner

ALSO PRESENT:

Chris Hand, Clerk, Rogers, Towers

**FILED**
12/17/01
**IN OPEN COURT**

## Page 3

### I N D E X

| WITNESS | PAGE |
|---|---|
| JAMES E. GARDNER | |
| Direct Examination by Mr. Orcutt | 4 |
| Cross-Examination by Ms. Farquhar | 70 |
| Cross-Examination by Mr. Gerlach | 87 |
| Redirect Examination by Mr. Orcutt | 90 |

- - - - -

| | |
|---|---|
| Certificate of Reporter | 91 |
| Certificate of Oath | 92 |
| Subscription of Deponent | 93 |

- - - - -

### E X H I B I T S

| | |
|---|---|
| Plaintiffs' Exhibit 1 for Identification | 22 |
| Plaintiffs' Exhibit 2 for Identification | 23 |
| Plaintiffs' Exhibit 3 for Identification | 44 |
| Plaintiffs' Exhibit 4 for Identification | 45 |
| Plaintiffs' Exhibit 5 for Identification | 50 |
| Plaintiffs' Exhibit 6 for Identification | 52 |
| Plaintiffs' Exhibit 7 for Identification | 54 |
| Plaintiffs' Exhibit 8 for Identification | 57 |
| Plaintiffs' Exhibit 9 for Identification | 67 |
| Plaintiffs' Exhibit 10 for Identification | 69 |
| Defendant's Exhibit 11 for Identification | 76 |
| Defendant's Exhibit 12 for Identification | 77 |
| Defendant's Exhibit 13 for Identification | 79 |
| Defendant's Exhibit 14 for Identification | 82 |

- - - - -

### S T I P U L A T I O N S

It is hereby agreed and so stipulated by and between the parties hereto, through their respective counsel, that the reading and signing of the transcript are expressly reserved by the Deponent.

## Page 4

THEREUPON,

     JAMES E. GARDNER,

having been first duly sworn, was examined and testified upon his oath as follows:

     DIRECT EXAMINATION

BY MR. ORCUTT:

Q     Please state your name for the record.

A     James E. Gardner.

Q     And what's your occupation, Mr. Gardner?

A     I've been in management for a number of years. My educational background is engineering.

Q     Have you had your deposition taken before?

A     Yes.

Q     If there's anything I ask that you don't understand or if you need me to ask it again or -- just do so and we'll try to get through this as quickly as we can.

     I represent Bob Evans and his companies, Lochmere Development and Lochmere Realty. Mr. Gerlach represents David Lane and his companies. And Ms. Farquhar represents the Eiger defendants, Mr. Rowsey and his principals, HD Associates, and the other companies on that side of the -- of the coin.

     MS. FARQUHAR: As well as BankBoston.

     MR. ORCUTT: As well as BankBoston. Thank

219

**JAMES GARDNER**

Page 5

you.

MR. MIDDLETON: Then I represent the witness, third-party witness who's been subpoenaed here today and has been cross-noticed by the other two parties present with counsel. And with me is Chris Hand, a summer clerk from our law firm visiting us from the University of Florida law school.

One thing I did want to bring to your attention is that I think I've had conversations with representatives from each group about the fact that y'all have I think litigation here in Florida and litigation in Texas, and that to the extent that you all will agree to stipulate that you will ask whatever questions need to be asked without waiver or prejudice of any party's rights in either of the litigation so that he will only have to testify one time. And I received positive responses to each of y'all in response to — in my request for that. Is that —

MR. ORCUTT: That's fine.

MS. FARQUHAR: That's fine.

MR. MIDDLETON: Thanks.

BY MR. ORCUTT:

Q    Give me a brief background of your

Page 6

education, sir.

A    My Bachelor of Science degree is from Mississippi State University.

Q    I was there last year for the Florida-Mississippi State —

A    That was not a good game.

Q    For us, right. But I enjoyed the campus, and it was the first time I had been there.

A    Yes.

Q    Any other educational degrees or —

A    Yeah. I'm — actually in Mississippi, I attended a community college there, East Central Junior College, got an associate's degree there. And high school, Marion Institute, Marion, Alabama.

Q    And you are an engineer?

A    Yes.

Q    What type of engineer?

A    Civil engineer.

Q    And what licenses do you hold?

A    Well, I never got licensed in Florida. I was licensed in Mississippi, but the job that I had didn't require that, so I never went through with it.

Q    And again, just give me a brief background of your occupational history, just — just leading up to — generally up to your employment with ITT.

Page 7

A    After finishing college, I spent a year in pilot training with the Mississippi Air National Guard, actually was the Air Force, and came back as an assistant city engineer for the City of Meridian, Mississippi. Flew with the Guard and worked with that job for about four years.

Moved from there to the city of Fort Myers, where I was city engineer, public works director, again, about four years. Went to work for Lehigh (phonetic) Corporation as vice-president of operations, there again, about four, four and a half years. Came to work for ITT in Palm Coast as vice-president, director of operations.

Q    And what year was that?

A    In 1978. In — in 1965 (sic), I was promoted to president and CEO of ITT Community Development Corporation, and that's the position I was in when I retired.

Q    Did you say '85? I think you said '65. Did you say —

A    I said '85.

Q    '85? Okay.

A    I'm sorry. '78 to '85.

Q    I understand. I — I just misheard you.

Just give me a brief background, if you

Page 8

would, on the — on ITT and their — their real estate division and its ownership of the Hammock Dunes — can I call it the Hammock Dunes project?

A    That's — yeah, that's correct. ITT, under Harold Geanine (phonetic), back in the '60s, they were diversifying into different types of companies in the U.S. They were purchasing various types of companies.

The idea that they could develop a community that would involve a lot of these companies was something that I think got them going, and they — they were looking at other similar developments. Rayonier at that time owned a tremendous amount of land along the eastern seaboard.

The land in Flagler County was really the southern terminus of that. They decided to put together a development there. They actually took the land that Rayonier owned and they bought a good bit more. And they did this in the late '60s, actually started building houses there in about 1970, something like that, '71.

They ran into some problems in that the state passed Chapter 380 in about 1972 or in that area somewhere. They wound up having to replan and restart the community. That plan produced a 68,000-acre development area, would eventually have some 225,000

JAMES GARDNER

**Page 9**

people living in it. And of course the development of that was really what the ITT Community Development Corporation was all about. That was what we did.

Q And when was it — was it purchased over time, or was it purchased at one time, or is it the 68,000-acre development that it evolved into that we should concern ourselves with?

A Well, they started out with Rayonier owning a good bit of land. They purchased additional tracts of land from a number of people. I don't have any idea how many or even what the total acreage of it was. The 68,000 acres is what the project evolved into. There was additional land that was outside of that that was not considered part of the development.

Q And when was the 68,000-acre development joined or — or come together?

A When the project first started, they — the landholdings that ITT had was larger than the 68,000 acres. It was probably in the neighborhood of a hundred thousand acres.

What they did was brought in a group of planners and looked at what kind of a community they wanted to have, what the land could support. They wound up with a plan that called for 68,000 acres as being the development area.

**Page 10**

The — the location of the various types of housing and land use and what have you was scattered throughout that 68,000 acres. The balance of the land was either transferred back to Rayonier or put in a — in other companies that managed timber or whatever.

Q Okay. When was the DRI I guess applied for, I guess, on the 68,000 acres?

A I don't — I don't remember when it was started. It took several years to do it. I also don't remember exactly when it was approved.

Q It would have been after the 1985 Growth Management Act?

A 1985 Growth Management Act.

Q Let me put it this way: It's my understanding it was one of the — it was multiphased and it was one of the first DRIs after some amendment to the Florida Statutes in that regard. Is that a better question? Or if that doesn't help you, I'll try it again.

A Well, what happened, there was a — what occurred, and it occurred earlier than that as it relates to that, is in the early '70s, right after they passed Chapter 380, the company went back and got into this real extensive planning process that really was not completed until about 1980.

**Page 11**

At that point, the document that was put together was called a comprehensive land use plan or club, is what they referred to it as. It had provisions that many of the different departments of the State of Florida had gone over it and helped to put the thing together. And as a result of that, it was something that was considered approved by the state. It had land use and various types of plans for the development, the roads, the water, sewer, the drainage. The whole thing was part of that plan.

The DRI on — on Hammock Dunes was started later, and to my knowledge, didn't have anything to do with the Growth Management Act.

Q Okay.

A It was something that was done in such a way that it was not a problem.

Q But it was multiphased, and it was quite complex, wasn't it?

A The DRI —

Q DRI?

A — on Hammock Dunes, yes.

Q By then, you were the president — do you want me to call it ITT, or what should I call the development company?

A ITT Community Development Corporation, yeah.

**Page 12**

Q Give me a, again, a general explanation of — of the — of the complexity of the DRI and what ITT needed to do to comply with it.

A Well, as you said, it is a — was a very complex thing. I can probably just give you some of the high points —

Q Yeah, just high points.

A — that I remember at this point in time. One is that it needed access to get over to it from the mainland. Building the bridge was one of the major things, which a CDD was created to do that. Other items was water, sewer, storm drainage, working out dune preservation, a lot of things like that.

Q Fire safety facilities?

A Yes.

Q Roadways?

A Yes.

Q Community parks?

A Yes.

Q In your opinion, was this a unique project?

A Well, it wasn't the only beachfront property that had ever been developed, but it was probably unique in that it was in an area that didn't have much development around it. Flagler County.

Q There were some contingent obligations,

Page 13

also, were there not, as far as ITT's continued involvement in the project, should it sell it, such as that bridge?

A    I'm not sure I understand your question.

Q    Okay.

MR. GERLACH:  Excuse me a second.  Off the record.

(Whereupon, an off-the-record discussion was held.)

MR. GERLACH:  Go ahead.

(Whereupon, Mr. Gerlach leaves the room.)

BY MR. ORCUTT:

Q    By contingent obligations that ITT would be responsible for upon the sale of the project.

A    Oh, absolutely, yes.

Q    And they included the bridge?

A    That was one of them, yeah.  What had occurred was that the developer, quote, the company, ITT Community Development Corporation, the subsidiary company was several that were involved, and it was ITT Land and a number of others.  But the bridge bond payments, half of the payments were to be made by the developer.  The other half was to be funded by tolls.  Studies indicated that the tolls by themselves wouldn't do it.  The developer picked up half of it.

(Whereupon, Mr. Gerlach enters the room.)

Page 14

THE WITNESS:  Selling it included selling that obligation.  The other part had to do with the club operating the equity club and of course building a second golf course.

BY MR. ORCUTT:

Q    Those were also contingent liabilities.

A    Yes.

Q    Any other big contingent liabilities that were present?

A    Well, as part of the DRI, four-laning A1A was a portion of it.  There was also some four-laning of some roads over in Palm Coast that were extractions that the county made.  There were other extractions in there, too, some big, some small.

Q    When was the decision made to sell the project?

A    Well, my -- my recollection of how that occurred, it was not a decision that was made to sell the project.  What happened was that the stockholders in ITT was looking at ITT as, you know, such things as return on total capital and return on equity and cash-flow characteristics and what have you.

ITT responding to what I think was a stockholder pressure put hurdle rates into the agenda for the different companies.  Those hurdle rates

Page 15

required us to go back and look at -- we were not -- we had a tremendous investment and we didn't have a lot of sales to go with it.  As a result of that, our return on equity or total capital was -- was very low.

So, what we did was we put together a plan that would divest a lot of the -- of the developed property or even some of the undeveloped property.  We were pursuing a course of doing that when ITT came to the conclusion that they wanted to spin off a bunch of the companies.  They had by that time spun off Rayonier, and they were getting ready to spin off Hartford, Sheraton Hotels, the industrial ITT Industries, as it's owned today.

The advent of that, ITT Community Development Corporation really didn't fit with any of the subs that they had.  As a result of that, the decision was made to sell it.  Exactly when that occurred and what date, I don't remember.

Q    What -- what year, approximately?

A    Probably '90.

Q    Okay.  Was that a difficult assignment for you, to liquidate the interests here at Hammock Dunes for ITT?

A    Well, emotionally, I guess you would say it was, but, no, not really.  It was a -- you know,

Page 16

accomplish the task, just like everything else that you do in your day-to-day work.

Q    Based upon the complexity of the project and the contingent obligations, was it -- was it important in your opinion to find the -- I'll call the right buyer for this -- for this project?

A    Yes.

Q    Were you concerned at all about who that ultimate buyer would be or the ultimate fate of the project, depending on who it was sold to?

A    Well, I -- you were talking about the divestiture of the Palm Coast-ITT holdings, and you're talking now I believe about just Hammock Dunes, right?

Q    Yes.  And again, am I -- I'm missing -- I was -- and let's make sure we're -- we're saying the same thing.  I thought you were talking about ITT divesting itself of its real estate generally, its real estate holdings generally, including the Hammock Dunes project.  What were you -- what were you talking about?

A    Well, I mean, if you're asking the question specifically about Hammock Dunes, then I'd answer it a little different than I would have broached the sale of all of Palm Coast.

In other words, we -- we sold blocks of land

JAMES GARDNER

**Page 17**

to people. The concern about the financial and expertise of the guy that buys raw land is different than what you would consider for something like Hammock Dunes.

Hammock Dunes was a project that had been put together. The value of the land and homes of the people that had bought in there depended upon the continuation of the plan we had or one that, you know, was similar to it to be able to retain the values to the buyers in there.

Q That's what I took your answer to be.

A Okay.

Q You were -- the concern was for Hammock Dunes --

A Yes, Hammock Dunes was more of a concern. You wanted to be sure that whoever you sold that to had the expertise and the financial ability to carry the thing on through to completion. That was important, yes.

Q Was there a concern -- and again I'm really -- I'll just be limiting myself to Hammock Dunes. Was there a concern that a buyer would perhaps carve up the project and sell it off in pieces?

A I don't -- no, I don't -- I don't think that that was ever an issue with regard to Hammock Dunes.

**Page 18**

And the reason that it wasn't is that Hammock Dunes, being an equity project, the ownership of the club and the property and that sort of thing at that point in time was scattered among enough people that it would -- that was not likely something that could be done.

There was no objection, for instance, from our point of view -- as a matter of fact, we considered it, in selling pieces of it to qualified developers, a multifamily developer, you might sell off a piece.

Q But the buyer or developer's expertise would have been a factor in deciding who ITT entered into negotiations with for the sale of Hammock Dunes?

A Yes.

Q Were the services of Cushman-Wakefield engaged for purposes of selling Hammock Dunes?

A Yes.

Q How did that -- how did that occur? Again, just generally. I mean --

A Well, we first of all was interested in having a -- an assessment of the value by a company with expertise in that area, and Cushman-Wakefield had such expertise.

Q Is that the offering memorandum that they

**Page 19**

ultimately prepared?

A It was a part of it, yes.

Q Okay. What was -- what were the other parts of the offering memorandum?

A Probably was added by our staff and our legal department, what have you.

Q I assume there was a listing agreement with Cushman-Wakefield?

A There was, yes.

Q Was there a list of -- a list of potential purchasers developed?

A Yes.

Q How many prospective purchasers received the offering memorandum, again, generally?

A I have no idea.

Q Do you know how many potential purchasers visited the site?

A No, I don't remember. There was a number of them.

Q And again, did this start, when, in -- what --

A A while ago you asked me when did ITT --

Q Make the decision?

A -- make the decision to sell it. The '90s -- I would say in the '90s, probably the late

**Page 20**

'90s, somewhere. You said '90, and I didn't disagree with it. I want to correct that.

Q Okay. I thought you had said --

A I really do not know myself what year that occurred. I -- it was -- I was part of the decision, probably most of the time on the receiving end of the word from New York. So, I don't remember exactly when that occurred.

Q But again, generally, with -- with the engagement of Cushman-Wakefield, approximately when would that have been?

A I don't remember that, either. I'm sure that we have in our records --

Q Probably '96, '97?

A Somewhere in that area, yes.

Q Do you recall how many offers were ultimately received by ITT for the purchase of the Hammock Dunes project?

A No.

Q Was it five, ten?

A Well, I think that it probably -- if you're talking about bona fide offers that you could take and go forward, probably four or five, something like that.

Q The Lane group, together with Farallon, had

**Page 21**

actually entered into a contract for the purchase of Hammock Dunes in August of 1998; is that -- that correct?

A   We worked with David Lane and a group, a financial group. I don't remember the exact dates.

Q   Okay. Is that the first contract that had ever been fully executed by both parties for the purchase of the Hammock Dunes project?

A   I don't remember the answer to that. It's possible we could have got that far with somebody else.

Q   And again, I'm jumping forward again --

A   We had --

Q   Yes, sir.

A   We had one group out of South Florida, and I do not remember their name, that got pretty far along prior to the David Lane involvement. I don't think it got to the point of signing contracts, but --

Q   Would that have been the J.E. Roberts Company?

A   Could have been, yes.

Q   Okay. I assume -- and jumping forward, I assume Cushman-Wakefield was -- was paid for their services, both in preparation of this offering memorandum and then ultimately upon the sale of the --

**Page 22**

of the project?

A   Yes.

Q   There was a -- I'm going to hand -- and I'm not going to try to dwell on these documents. And for a moment --

MR. ORCUTT:  Off the record.

(Whereupon, an off-the-record discussion was held.)

MR. ORCUTT:  Let me hand you that which I'll mark as Exhibit 1 to your deposition (tendered).

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 1.)

MR. ORCUTT:  And I hope I -- I hope I brought enough copies.

BY MR. ORCUTT:

Q   Were Hillman Properties one of the prospective purchasers of the Hammock Dunes project? Reference is in that first paragraph to Hillman Properties. This was actually a broker's agreement sent to an Alan P. Dickinson.

A   I don't remember anything about it. The name is something that I've heard before, but --

Q   Do you remember anything about the negotiations, why they weren't successful or if --

A   No. No, I don't.

**Page 23**

Q   And this was a -- actually occurring in April of 1999, at least from the date of the letter to the broker, which would have been --

A   Well --

Q   Go ahead, sir.

A   I don't recollect any negotiations with them. We had other people in our -- on our staff that worked with them. If this one didn't rise to the level of being serious negotiations, then I might not have got involved in it. That's possible.

Q   Okay. That's fine.

A   I remember the name Hillman, but I don't remember anything else about it.

Q   But your general recollection would be that if it didn't rise to the level of -- of serious consideration, you may not have gotten involved.

A   That's true.

Q   I think I'll skip the next one, then. How about Cobb Partners Limited? Let me hand you that which I'll mark as Exhibit 2 to your deposition (tendered).

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 2.)

THE WITNESS:  That one gentleman, Chuck

**Page 24**

Cobb, called me up, and he was actually talking to me about the project for another gentleman that was heading up one of the paper company tracts down in this area. What's the guy's name?

MR. MIDDLETON:  Rummell and St. Joe?

THE WITNESS:  Peter Rummell, right. His discussion with me, as far as my recollection on it, was he was talking about getting Peter and us together, and it never happened.

BY MR. ORCUTT:

Q   Okay. Were you aware or are you aware of any of these potential purchasers, other than the Lane contract that they referenced, that executed purchase agreements for Hammock Dunes?

A   As I told you a while ago, it's possible that it could have happened, but I don't think so. I don't remember.

Q   So, to your knowledge, it was the Lane contract in August of 1998 and then the -- what I'll call the HD Associates contract at the end of July 1999, which are the two -- I guess Starwood would be there right before -- before the HD Associates contract in -- at the end of July of 1999 as having been executed by somebody; is that correct? If I went too fast, I'll --

JAMES GARDNER

Page 25

MR. GERLACH: I'm going to object to the question.

BY MR. ORCUTT:

Q    Let me -- let me take that apart. You've got the Lane contract that was executed by both Lane and by ITT in August of '98, correct?

A    Yeah. I mean --

Q    And then --

A    -- I -- I don't absolutely remember that, but I think that's correct, yes.

Q    Then you have the -- then you have a contract executed by Starwood, or an entity, a Starwood entity that was not signed by ITT. And then you have the HD Associates contract that was executed by both HD and ITT, which ultimately resulted in the sale. Any others that you can think of?

A    No, not -- not right off. I -- the conversation that you just went through, I actually was, at the time the Starwood contract was brought in, was under the impression that we had a hard contract with Eiger and that group at that time.

Q    Okay. And we'll get to that later, but I just wanted to -- I was getting through some background. And just for the record, what was your understanding of why the Lane contract did not go

Page 26

forward to closing?

A    Financing.

MS. FARQUHAR: Objection, ambiguous.

BY MR. ORCUTT:

Q    What did you say?

A    Financing.

Q    Okay. How did you first -- how did you first meet David Lane?

A    He was introduced to me by -- I can't remember who now. Probably one of the brokers that were involved in the deal.

Q    Could it have been David Rohn (phonetic) or a Penn Hodge? That's P-e-n-n, H-o-d-g-e? Do those names ring a bell?

A    No.

Q    What did you know about him and his background?

A    Well, it was our -- it was our practice to, when we got involved with somebody like that, was to develop information about them and their background and their expertise and what have you. At the same time, we would go for the standard nondisclosure forms that we ask them to sign. The information that I got about him came from that investigation.

Q    What -- what information did you receive

Page 27

about Mr. Lane?

A    About his company, you know, some information about him, his wife and his daughters, and business things that he had been involved with, and in this case, I guess his partner.

Q    Mr. Evans?

A    No.

Q    Or Mr. Barnett?

A    No, I think the financial group, Farallon or something like that --

Q    Farallon?

A    -- may have been involved in it. I'm not sure that's the name at this point. I haven't read those files, so I don't know. That information would be in the files, though.

Q    Did Mr. Lane have any experience in Florida real estate development, to your recollection?

A    I -- I don't remember seeing projects that he had done in Florida, no.

Q    Any experience as -- in golf course construction?

A    I don't -- I don't know the answer to that.

Q    Do you -- how about reclaimed irrigation systems?

A    (Witness shakes head.)

Page 28

Q    Is it your general recollection that Mr. Lane was a developer himself or not?

A    It's my opinion that David Lane, with the partnership group that he brought in there, had the expertise to do the project. That was my conclusion at that time, yes.

Q    All right. And Farallon, or whatever that entity was, would have been the financing. Evans would have been the development part of that team? Is that an accurate assessment?

A    I don't remember it being put together that way.

Q    How do you remember it being put together?

A    I remember that normally when we got involved with, especially out-of-state people, they hired technical experts to assist them in putting the project together and, you know, that this was no different.

Q    Well, let's -- let me ask it this way: When did you first meet Mr. Evans? And again, remember -- I'm asking you to accept or assume that the Lane contract was executed in August of 1998.

A    I don't -- I don't remember when I first met him, but I know that David Lane brought him and, as we had done with others, he was given the information and

JAMES GARDNER

Page 29

we worked with him in developing it.

Q   Did you meet with Mr. Evans -- and Evans believes it was in about March of 1998.

A   That's reasonable.

Q   Did you meet with Mr. Evans as well as your staff on various occasions to --

A   Yes.

Q   -- discuss the project?

A   Yes.

Q   Did Evans meet with Jack Kelly in your company?

A   Yes.

Q   And Chuck Callea, C-a-l-l- --

A   Callea.

Q   Callea?

A   Yes.

Q   C-a-l-l-i-a? And Vicky -- I'll pronounce it "Delaughter." How do you --

A   Delaughter (phonetic).

MR. MIDDLETON: Greg, I don't know if it's i-a or e-a.

MR. GERLACH: I think it's e-a, isn't it?

MR. ORCUTT: Callea, e-a? Okay. Thank you.

BY MR. ORCUTT:

Q   Did they discuss with you and/or these

Page 30

people -- did he discuss golf course construction? Let me go through a laundry list.

A   They discussed the project. Golf course construction was certainly one of them.

Q   Reclaimed irrigation systems?

A   Yes.

Q   Water and sewer capabilities -- or capacities, excuse me?

A   Yes.

Q   Community development district obligations?

A   Yes.

Q   Master community developments in general?

A   Yes.

Q   I'll -- let me just go through the rest of them. Marina permitting; coastal construction line impact to oceanfront property; wetland jurisdictional lines on the second golf course site; protected wildlife species on the second golf course site; DRIs in general; development orders for DRIs; maintenance costs of existing -- of the existing golf course. Were those issues discussed?

A   Everything you covered was things that would have normally been discussed with the technical experts working on the project, yeah.

Q   And it's your testimony that Bob Evans was

Page 31

one of these technical experts, or what -- what is your understanding of his role?

A   He was --

MS. FARQUHAR: Objection, compound.

THE WITNESS: He was the expert in Florida developments, the way he was introduced to me.

BY MR. ORCUTT:

Q   Okay. Did -- in your opinion, did Mr. Evans have a high level of knowledge on these issues?

A   He did.

Q   Did Mr. Evans -- I assume you had a pretty good relationship with Mr. Evans.

A   Absolutely. As far as I know, still do.

Q   I -- he feels that way. Did he at one instance estimate to you within several thousand dollars of what your -- of what ITT's actual maintenance budget was for the golf course?

A   I don't remember that, but it would have been something I'm sure he was capable of doing, yes.

Q   Did you believe that Evans had the capability to participate or oversee the continued development of Hammock Dunes?

A   Participate, oversee the continued development...

Q   Well, if he had been the person -- if he'd

Page 32

been the person that was going to be the development member of the team for the Lane -- for instance, for the Lane contract, do you believe that he was capable of doing that?

MS. FARQUHAR: Objection, ambiguous.

MR. GERLACH: Object to the form of the question. Calls for speculation.

BY MR. ORCUTT:

Q   You get to -- get to answer anyway.

A   I -- I think that he was very knowledgeable in the development field. Whether that would qualify him to run it or not, I never bothered to even consider that.

Q   Well, what do you define as "running it"? I mean, are you saying "running it" like you ran it, or "run it" from the sense of the -- the actual development of the infrastructure and -- let's -- let me -- let me stop.

What do you mean by "running it" when I use that expression?

A   Well, in -- in our business, when we worked with people that were interested in it, they always had a staff of experts and a lot of times in different areas that would probably wind up being cleared through one or two that would feed the information to

Page 33

what I would consider the management that was making the decisions as to whether they do or don't do it. He — he certainly was in that role and was very capable of it.

Could he have played the role of one of the owners? I would imagine he could have. I don't see any reason why he couldn't, but that's not the way I looked at him. I didn't get final answers from him. I got final answers from David Lane and later on Paul Rowsey and other people, not necessarily him.

Q    Okay. I understand. And I think you — you equated "running it" with more as the chief executive officer —

A    Yeah, yeah.

Q    — position than I was categorizing it as the on-site developer who's running the day-to-day, perhaps like Mr. Pendleton is — is doing now.

MR. GERLACH:  Object to the form of the question, leading.

MS. FARQUHAR:  Join the objection.

THE WITNESS:  I — I really was more thinking about the process that we were involved in at that time, which didn't involve running it, but it involved making the decisions on whether they buy it or whether they don't buy it.

Page 34

BY MR. ORCUTT:

Q    And then back to Mr. Lane, is it your experience — or is it your understanding that he had the Florida real estate development experience to — in the areas, the same areas that I mentioned, the reclaimed irrigation system, water and service capacities, and all those others I listed? Was it your understanding that was a field of his expertise?

A    I don't — I'm not sure I understand your question, but David Lane organization had the capability of doing that.

Q    Right. But was it your understanding that David Lane individually had those —

MR. GERLACH:  Object to the form of the question.

BY MR. ORCUTT:

Q    You don't know?

A    Well, I mean, I don't think any one person has all of those technical competencies without having experts close at hand to help him with it.

Q    I understand.

A    That's really all I'm saying. I think when we were looking at whether or not this was an organization that could purchase Hammock Dunes and continue on with the development and something that

Page 35

would be acceptable to the people we had sold to, he together with all of his organization appeared to be capable of doing that, yes.

Q    All right. We're on the same page. I understand what you're saying. The — we've already established that there were various meetings and discussions about the — about these various technical issues relating to the project, the DRIs, et cetera.

Is it accurate to say that — that — how would you — how would you describe the transition from the Lane-Farallon contract not going forward and then the Eiger-HD Associates contract, that at least — that also included Lane and Evans going forward?

MS. FARQUHAR:  Objection, ambiguous.

MR. GERLACH:  Join in the objection.

BY MR. ORCUTT:

Q    What I'm trying to establish is we — you've got Lane and Evans with Farallon. That goes away, and then Eiger, in about March of 1999, essentially replaces Farallon, is the way I — the way I'm categorizing it.

A    I guess if I could describe, you know, the change or the difference is, is that — and I'll be nice; I won't say anything ugly about lawyers. But

Page 36

the lawyers didn't change. So, the contract essentially went on. There was modifications to it, and some of the major terms of it were modified, but it really was never — it was not like it ended; it just developed some new players and kept going. I think that's what I would say.

Q    And would it be accurate to say that — that due diligence continued for a lengthy period of time from the purchase — from the purchaser?

A    Yes.

MS. FARQUHAR:  Objection, ambiguous.

BY MR. ORCUTT:

Q    The — Mr. Evans, as well as the lawyers and others, were requesting substantial documentation from ITT on various issues during that time?

A    You know, the — the project itself was, as I'm sure having read it, was very complex, and there was a lot of different issues that required dealing with. The manner in which they were dealt with, generally speaking, when it was just the David Lane, was not greatly different than the way they wound up being dealt with and the contract that was finally closed on.

Q    This was — was this not an evolutionary process?

JAMES GARDNER

Page 37

A    Yes.

Q    I mean, it --

A    Yes. It had to be.

Q    And due to the complexity of the -- of the project generally, would it be your opinion that the due diligence required was more I guess enhanced or greater than it might have been for some other type of real estate project?

MS. FARQUHAR: Objection. Calls for speculation.

MR. GERLACH: I'm going to join that objection.

THE WITNESS: Do I answer that?

BY MR. ORCUTT:

Q    Yeah, you get to answer. You get to answer anyway.

A    Okay. This particular project was, in my opinion, very complex, and it was complex for several reasons. One is, the project was multiphase, and there were more than one buyer involved in it.

Most of the commitments that existed between ITT and the various governmental agencies involved, involved the whole thing being able to work those problems out, was one of the complexities. There was a lot of different commitments that had to be made

Page 38

that, again, applied to the whole thing. How it was divided up was a -- was very complex discussions.

Issues involving them assuming liabilities that ITT Community Development Corporation had was very complex in that ITT wanted guarantees that these things would be done, because we had guaranteed them to the buyers and to the various governmental entities. It was very complex to put all of that together.

Surprisingly, it seems to have worked pretty well at this point, but it was very complex. There was lots of times in there when I couldn't figure out exactly how it was going to work, but we did -- we did finally get it all done. But --

Q    Did -- did the complexity of all those issues you just mentioned, in your opinion, dissuade some potential purchasers from either spending the effort to answer those questions or solve those problems?

A    I imagine it would, yeah. Did it? I don't know.

Q    You didn't have people knocking your door down to buy the project. And, again, I'm not trying to be facetious; I'm just saying you didn't have a multitude of potential purchasers for the project, did

Page 39

you?

A    I think we recognized when we started in to sell that project that there weren't a lot of people available with the resources and the expertise to -- to carry it forward to completion.

Q    And this process, at least with Lane and his team, leading up to the ultimate contract with HD Associates, took a good year, 15 months, 18 months or so, did it not?

A    Yes.

Q    In your opinion, could a team such as HD Associates have started this process, this due diligence process, the solving of the problems, et cetera, that we've talked about, had they had to start that process say on June 15th, 1999, and completed it by July 30th, 1999?

MS. FARQUHAR: Objection. Calls for speculation.

MR. GERLACH: Same objection.

THE WITNESS: I don't -- I don't know the answer to that. I would suggest that we learned as we went along from ITT's point of view, you know, of the nuances of how you approach the different problems that were in there.

I think that finding that out helped us in

Page 40

being able to sell it to somebody else maybe at a faster pace. A lot of the early time was spent working on discovery of how the problem was and how it could best be solved. I don't -- I don't know if that answers your question. I really don't know.

BY MR. ORCUTT:

Q    Well, if -- if you had been a purchaser, could you have answered all of those questions in 45 days?

MS. FARQUHAR: Objection. Calls for speculation.

BY MR. ORCUTT:

Q    To the point where you were willing to put down a nonrefundable $3 million deposit on a contract?

MS. FARQUHAR: Objection. Calls for speculation.

THE WITNESS: I'm not sure that I understand what you're asking me. If you're asking me if I would come in cold and take a look at the documents on that and be able to get to an end of a due diligence period in 35 or 40 days, probably no. I don't know.

BY MR. ORCUTT:

Q    And put down a $3 million nonrefundable

JAMES GARDNER

Page 41

deposit. Same answer?

A   I -- I believe that it probably was more complicated than could be done in that period of time. I don't know that for sure.

Q   But from your perspective it was; and again, it's just your opinion, and I'm just --

A   That's all.

Q   And as they say, everybody has opinions. There's also something else that goes with that saying, but I'll get back to business.

Let me digress for just one minute. Do you remember anything more? You had mentioned this South Florida prospect? I referenced the J.E. Roberts Company. Do you remember anything more about them or how close that got to a contract or who were the principals for that company?

MS. FARQUHAR: Objection, compound.

THE WITNESS: The -- the particular project down there was brought on by two gentlemen that were interested in the golf course end of the thing. They introduced us to this guy that -- I don't remember if J.E. Roberts -- I guess that was the guy's name. I'm not positive of even that. But we went down and visited with him and had lengthy conversations with him. The project

Page 42

never really got going beyond that point. It was supposed to, but it never did.

BY MR. ORCUTT:

Q   Are these folks associated with the Jack Nicklaus golf development company?

A   I don't remember. I'm not sure of that.

Q   Does the name Bob Whitley or Tucker Frederickson --

A   Tucker Frederickson and Bob Whitley were the two guys that I was referring to.

Q   Tucker's the former football player?

A   Yeah.

Q   Okay. Okay. But you don't remember anything more specific?

A   Well, I mean, we -- we had a conversation with him. We talked about it. They seemed interested, but it never -- nothing ever happened on it.

Q   I'm going to direct you to a meeting that occurred between you and Mr. Evans in Palm Coast on or about July 8th, 1999, where Mr. Evans informed you that he would not be working with Eiger. Do you remember such a meeting?

A   Yes.

Q   Did he advise you that they had agreed to

Page 43

disagree on fundamental issues involving the development of Hammock Dunes?

A   I remember him stating that they had a disagreement and that, you know, he was going in different directions, yes.

Q   Did he say anything negative about Mr. Rowsey or Mr. Lane?

A   Not to my recollection.

Q   Did he tell you that Mr. Rowsey had told him that Eiger would not be going forward with the acquisition of Hammock Dunes, or words to that effect?

A   I'm trying to remember exactly what he said. He indicated as how they were not going to do the deal. I remember that. But --

Q   The specific words you don't recall?

A   -- whether he was told by Rowsey that he wasn't going to do it or not --

Q   What was your reaction to the -- at least the -- the statement that Eiger was not going to continue to pursue the -- the project?

A   Well, at that point in time, I was having conversations with Mr. Rowsey and other members of his staff out there, and I thought the deal was going through. And I --

Q   Even -- even though Evans had told you he

Page 44

didn't think it was?

A   Yes.

Q   Did Mr. Evans tell you or ask you -- I guess tell you that if the property was still for sale, that he would approach Starwood as a potential purchaser?

A   I had two meetings with him, as you I'm sure are going to carry me through in a minute, and I can't remember which meeting he mentioned it, but the answer is yes.

Q   Let me digress just one moment. I'll get back to this. Let me show you that which I'll mark as Exhibit 3.

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 3.)

BY MR. ORCUTT:

Q   And ask if you can identify that (tendered). Do you know who Gale Wentsworth & Dillon are?

A   I don't remember, no.

Q   Okay.

A   I remember the name, but I don't remember who they were.

Q   So, that's just another -- were they potential purchasers?

A   I don't remember.

Page 45

Q Okay. Didn't rise to that level where it got to your front burner of recall.

A Well, I remember these names vaguely, but I don't -- I hadn't connected them with anything else yet.

Q Okay.

A Obviously, I signed the letter.

Q Let me hand you that which I'll mark as 4.

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 4.)

BY MR. ORCUTT:

Q A letter from you to Mr. Lane dated May 3rd, 1999 (tendered).

(Whereupon, there was a short pause.)

BY MR. ORCUTT:

Q Okay?

A Yeah.

Q Do you remember that letter?

A Yeah.

Q What was happening during that time? And I guess I should have asked you a little earlier when we were talking about the entrance into the picture of Eiger. Tell me in your own words what -- what's happening in the negotiations at this point in time.

Page 46

A Well, as -- as you could see, we had some continuing conversation going on with ITT relative to this sale. They were looking over our shoulder as we went forward with the thing.

The method that the price was based on had a lot to do with when property was sold and how fast it was sold and that sort of thing, and in the pro forma, is how they arrived at that. And they were making changes in it that produced total numbers that was below what was our minimum that we would work towards. This conversation had to do with that and had to do with trying to correct it.

There were some things in there that we didn't like, and there were some things they didn't like. And I didn't read it real close.

Q I understand.

A But it was clear that we were just trying to work out some of the details.

Q Had -- we had talked earlier about the Cushman-Wakefield's offering memorandum.

A Uh-huh.

Q Would it be accurate to say that that memorandum had valued the property as a going concern or --

A Yeah. It was a going concern.

Page 47

Q But not just selling or purchasing the land --

A That's right.

Q -- as distinguished from just purchasing the land.

A Yeah.

Q Was there a Price Waterhouse study that evaluated the Hammock Dunes project just as a real estate purchase?

A I remember -- maybe it was the David Lane group that put together an approach that was -- involved Price Waterhouse, I believe. I'm not sure of that. Those, I guess, wound up being two different numbers, their side and our side, and this letter was handling negotiations, I guess, of --

Q Those are related issues.

A Yes.

Q And again, as a general statement, is it not correct that ultimately, the -- the purchase price, which was in the low $20 million range versus the mid-$30 million range, was successfully negotiated based upon a premise that only real estate was being purchased versus the purchase of a going concern?

A I don't --

MS. FARQUHAR: Objection, ambiguous. Calls

Page 48

for speculation.

THE WITNESS: I don't remember any numbers that I could say what you said's correct or not correct. I don't --

BY MR. ORCUTT:

Q Without the numbers, is the general premise -- or put in your own words what happened to reduce the price to the ultimate number that was purchased -- it was purchased for by HD Associates.

A I -- I don't know the answer to that question. I -- you know, as we worked our way through it, there was give-and-take all the way through it. When we got to the final end, the number that we went with was a result of that. It was probably not one thing; it was -- if it did go down.

There was -- as you know, if you read the information in it, this involved not only the sale of the property, but the assumption of quite a bit of debt associated with the bridge and with the future golf courses and things like that. And the ultimate price was a combination of those two things.

Q But did -- was one of the factors that went into that ultimate purchase price the fact that the issue I raised of just purchasing the real estate rather than the contracting company, the going

JAMES GARDNER

Page 49

concern -- the operating business aspects that perhaps Cushman-Wakefield had originally envisioned in its offering memorandum?

MS. FARQUHAR: Objection, ambiguous. Calls for speculation.

THE WITNESS: I don't think that's true. What we eventually sold them was what we started out to do.

BY MR. ORCUTT:

Q   Okay. In this May 3rd letter, it does reference, does it not, at the second-to-the-last paragraph on page 2, that -- that your corporation was continuing to talk with several potential purchasers and intends to continue marketing the property so long as there's no binding contract in place for its sale?

A   Yeah.

Q   And again, although we've spoken about some potential purchasers, was this done to encourage HD Associates or Eiger or Lane, for that matter, to get on with it, submit an offer if they were going to or contract if they were going to?

A   Obviously, in negotiations of this type, pressures are an important thing. However, I do think that -- that what we were saying at that point in time was that, you know, we would entertain another buyer,

Page 50

if one came along. And we had several people that we were constantly talking to that had not developed into being ready to take over the due diligence and run with it.

But yes, I think that it was a combination of using that as -- which was not an untrue statement. We did have other people that were constantly talking to you about it.

Q   Okay. Now I can go back. I had digressed, and I'm sorry and I'll try not to do that again. Let me show you what I've marked as 5.

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 5.)

BY MR. ORCUTT:

Q   Which is Mr. Rowsey's letter to you of July 13, 1999. Please take a look at that, if you'd be so kind (tendered).

(Whereupon, there was a short pause.)

BY MR. ORCUTT:

Q   Okay?

A   Okay.

Q   The second-to-the-bottom paragraph on page 1 of that letter references that they are reluctant to go forward with the matter, with the Evans matter

Page 51

outstanding, in paraphrasing, "...until we are able to contact Mr. Evans and ascertain his intentions, we are unable to finalize the contract negotiations." Is that -- that correct?

A   That's the way I remember it, yes.

Q   Did you -- had you talked to Mr. Rowsey telephonically before or after receipt of this letter about any of the issues that were discussed in this letter?

A   No.

Q   You didn't talk to him after receipt of this letter?

A   Well, I mean, the only discussion I had with him concerning this was that, you know, it was holding up the deal, and he was concerned, as he says in the letter, about getting sued.

Q   Had you ever referred to Evans as, quote, or words -- well, quote, the horse that everyone at ITT was betting on to help them win the race, close quote, or words to that effect?

A   Not to my knowledge, no.

Q   Let me get to the next exhibit.

A   Can I take a quick break?

Q   Yeah. Let's do that. You want to take five?

Page 52

A   Yeah, that'd be fine.

Q   All right. Thank you.

(Whereupon, a recess was had.)

BY MR. ORCUTT:

Q   We were talking about this -- what telephone conversations you may have had with Mr. Rowsey at or about this time. And maybe I'll just jump forward to this exhibit, which I'll mark as Number 6.

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 6.)

BY MR. ORCUTT:

Q   Which is a letter from you to Mr. Rowsey dated July 23rd. Let me give you a second one (tendered).

(Whereupon, there was a short pause.)

BY MR. ORCUTT:

Q   Okay. This appears to be in response to the previous letter. I think you had told me earlier that you had thought that the HD Associates contract was already signed by the time that the Starwood contract was presented to you. Does this letter refresh your memory as to --

A   Yes.

Q   -- the series of events?

JAMES GARDNER

Page 53

A   Yeah.

MS. FARQUHAR:  Objection.  Misstates his testimony.

MR. GERLACH:  I join in that objection.

BY MR. ORCUTT:

Q   Tell me, was it your earlier statement that you thought that the HD Associates contract was already in effect by the time Starwood submitted a contract?

A   I would answer that by saying that what I said to you was that the contract had been signed before I think it had been, and I think it went beyond the dates.  They didn't follow through with it and they no longer -- the contract no longer had an effect.

What I was thinking about in regard to this was that my conversations with him, and they were referred to in that letter, led me to believe that they were going to close the deal.

Q   Okay.  So, are you telling me that HD Associates had already signed a contract to purchase the property prior to this time, but that the time limits within which to close had expired?

A   Yes, something like that.

Q   Do you know --

Page 54

A   That's what I remember.

Q   -- approximately when?

A   No, I don't remember the details of it.

Q   And so, what are you referencing in this letter, that they need to sign another contract before July 30th?

A   Yes.  I mean, that's what the letter says.

Q   It would have been a different -- a new contract.

A   Yes.

Q   Okay.  Let me just -- again, I said I wasn't going to do this, but I'll digress one more time and mark as 7 a fax from Eiger to you, dated June 21st, 1999 (tendered).

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 7.)

BY MR. ORCUTT:

Q   And ask if you can identify that.

MR. GERLACH:  Okay.  Is this -- is this P-7?

MR. ORCUTT:  This is 7.

(Whereupon, there was a short pause.)

THE WITNESS:  Okay.

BY MR. ORCUTT:

Q   This appears to be a first amendment to an

Page 55

Agreement For Sale And Purchase, does it not?

A   Yeah.

Q   What is this document purporting to amend, if you know?

MS. FARQUHAR:  Objection.  Calls for a legal conclusion, and best evidence.

BY MR. ORCUTT:

Q   Do you know?

A   No.  What I -- I think it probably had something to do with the carrying expenses with regard to the day-to-day cost of the operation and credit for sales.  I remember something about that, but not -- not enough to really explain it.

Q   Seems to reference on page 2 extending the closing date from July 21st to July 30th, with a $10,000 per day payment for any day extending the closing date beyond July 30th.  Do you recall anything about that?

A   Yeah.  I think that's what I just said to you, is that it had to do with the carry cost of the assets, the salary of the people, and a whole bunch of things.  There was a -- the contract had always anticipated, you know, cost and sales and how you treated the sales you made and how you treated the carry costs, and that related to the price.  I think

Page 56

that's what was going on there.

MR. ORCUTT:  Has that contract been produced, or do you know?

MR. MIDDLETON:  I don't know.  If it's -- it could be considered part of the closing documents, and I just assumed that y'all had all the contracts or closing documents out there.  So, that --

MR. ORCUTT:  You have them if we need those.

MR. MIDDLETON:  I would suspect, but I mean, we're talking a fair number of documents.

BY MR. ORCUTT:

Q   And again, just so I'm perfectly clear, this -- this first amendment appears to reference a contract dated in June of 1999.  And it's your recollection that such a contract was executed or was being negotiated?

A   I don't know.  Again, you're digging back into my memory.  I guess I'm reasonably sure that we had signed a contract with David Lane and it did not close.

The other guys came in -- I'm assuming that we were working off of language that evolved over time that we're going against and it was called for the thing being signed by a certain date, or maybe we had

JAMES GARDNER

Page 57

signed it and it was called for being closed by a certain date. I don't remember the answer to that.

Q Okay. But you do reference in Exhibit 8 (sic), on the second page, "If you still intend to sign the contract described above...by July 30, 1999 --"

A That would indicate that the contract was not valid at that point in time, if it ever was.

Q Okay. That's fine.

A I don't -- I don't know the answer to that.

Q Let me hand you one other exhibit. And there's a -- I'm getting there. I don't think these folks have a lot of questions for you.

MR. MIDDLETON: And by the way, if you want to look at those closing documents, Greg, that were in the room earlier to see if that contract may be in there, I'd be delighted for you to look.

MR. ORCUTT: Thank you. Let me -- I may have stated Exhibit 8 before. I meant to say 6. This is 8 (tendered).

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 8.)

BY MR. ORCUTT:

Page 58

Q You probably never saw that document. It's a fax from Lane to Rowsey, but it references --

MR. GERLACH: Well, I'm going to object to the form of the question. Okay.

BY MR. ORCUTT:

Q Well, I'll ask it. Have you seen that document before?

A No.

Q I assume you haven't.

MR. ORCUTT: All right. Thank you, Mr. --

BY MR. ORCUTT:

Q It says -- this is Lane again. "I just spoke with Jim Gardner and he said that it is his understanding that the Hammock Dunes contract will be signed by the first of August. If this is not the case, Jim says" that "he will be in a complete nondefensible position with New York."

Do you remember having such a conversation with David Lane on or about July 21st, 1999?

A I don't remember the specific conversation, no.

Q Is this --

A I don't doubt that it's true, though.

Q I understand. And -- and if Lane is saying that you expect a contract to be signed by the 1st of

Page 59

August, is that just consistent with your feeling that --

A Yes.

Q -- that Eiger or HD was going to --

A Yes.

Q And why -- why would your position be nondefensible with New York if -- if such a contract is not signed?

A I had the project essentially off the market at that point in time, and it was not something ITT got real happy about, me having it off market, having it committed.

Q Even though you didn't have a contract with HD Associates or anyone else?

A In dealing with sales like this, if you told a guy that you were going to hold it off the market, that was something that you honored. And, you know, that's what had happened there.

Q So, you had told HD Associates that you were holding it off the market.

A Well, I think what I had said was that if he would get it done by a certain date, that we would sell it to him, which in effect I think was covered in that other letter, right. That's what I recollect.

Q I don't recall anything in that letter

Page 60

saying you were going to hold it off the market until July 30th. Is that just implicit, or could that have occurred in a phone conversation between you and Mr. Rowsey or Mr. Lane?

MR. MIDDLETON: Just for clarification, I think when the witness spoke, he was referring to Plaintiffs' 6 --

MR. ORCUTT: Right.

MR. MIDDLETON: -- as the letter --

MR. ORCUTT: Right. And I was, too.

(Whereupon, there was a short pause.)

THE WITNESS: I -- you know, that's what I --

BY MR. ORCUTT:

Q That's your recollection.

A -- my recollection is, that if he would proceed forward with it, I -- well...

Q And that's also consistent, is it not, with a -- with a statement by Evans and the -- in a letter from Rowsey that says they're not sure if they're willing to go forward in light of the events involving Evans.

A (Witness nods head.)

Q So then going back to Exhibit 8, the last paragraph, or sentence of that fact says, "Jim asked

JAMES GARDNER

Page 61

whether I could get you to turn the lawyers back on today so that the contract will be ready for execution by August 1st." Is that again consistent with your desire to get this contract executed by July 30th?

A   Yes.

Q   Okay. Did you talk at all to Mr. Rowsey about the Starwood offer or Mr. Evans's call to you on July 15th, telling you about a new contract that he proposed to send to us from Starwood?

A   I'm -- I'm sure that I did, but do I remember the conversation? No. We were talking fairly frequently at that point in time.

Q   Was it as a result of those telephone conversations with Mr. Rowsey that you decided not to consider a contract from Starwood and to hold the property off the market until July 30th?

A   No.

Q   What was the reason why you decided not to consider a contract from Starwood and to hold the property off the market until July 30th?

A   At that particular point in time, I did not believe that it was possible for a company to come in and make an offer like that, not having done any due diligence at all.

Q   Even though Evans had been one of the

Page 62

technical experts, as you called him --

A   Yes.

Q   -- that had participated at a very significant level in the due diligence?

MR. GERLACH:  Object to the form of the question.

THE WITNESS:  You know, bottom line, I did not believe --

MS. FARQUHAR:  Objection. Misstates his testimony.

THE WITNESS:  -- it was a valid offer.

(Whereupon, an off-the-record discussion was had.)

MR. GERLACH:  Also, I just would observe that a lot of times, you're answering before he finishes his question. I imagine that's difficult for the reporter, too.

THE WITNESS:  Okay.

BY MR. ORCUTT:

Q   What were you going to say?

A   What I was going to say was that I -- somebody walks in the door and says, "I want to buy the project," when it's obvious the reason they're doing it is because the other people are about to buy it.

But the reason -- you know, I didn't feel

Page 63

like it was a valid offer because it -- I just didn't think you could do that in that amount of time. There was too many things that could screw it up. It was not -- I didn't think it would happen.

Q   Even though Evans had been intimately involved in -- in this process for over 15 months with both Lane and with HD Associates?

MR. GERLACH:  Object to the form of the question.

MS. FARQUHAR:  Join in the objection.

THE WITNESS:  I -- you know, what I said is my position. I did not consider it to be a serious offer.

BY MR. ORCUTT:

Q   Wasn't the due diligence process almost completed by that time?

MR. MIDDLETON:  As to whom?

BY MR. ORCUTT:

Q   As to -- as to the due diligence being performed by Ev- -- anyone.

MS. FARQUHAR:  Objection.

MR. MIDDLETON:  Including Starwood?

MS. FARQUHAR:  Objection, ambiguous, and calls for speculation.

MR. GERLACH:  Join the objection.

Page 64

BY MR. ORCUTT:

Q   Including Lane, including Eiger. You can always tell when --

A   What -- what I would say in reply is that there were things involved in the contract that were specific to the buyer as well as the seller, and to go through that process and understand it on a commitment, you know, that was made before any of that started and it would probably take longer than that to just get, like for instance, guarantees from the buyer related to bank letters of credit or bonds and what have you, and it -- it was just -- it's not possible, I think, to go through that very quick. Not in 30 days or even two months.

Q   Is that one of the things that you referenced to Mr. Lane when he said to get the lawyers back on, one of the things the lawyers were doing, as far as preparing for the -- a contract?

MS. FARQUHAR:  Objection. Calls for speculation.

MR. GERLACH:  Join the objection.

THE WITNESS:  To sign the contract, the contract language had to be completed before that date, and the amount of time that it took to do that had to be done fairly soon if it was going

JAMES GARDNER

Page 65

to reach closing by that date, and that was my objective, to get the deal closed.

BY MR. ORCUTT:

Q   And I'm not — I'm just, you know —

A   I understand.

Q   I'm not second guessing you; I'm just asking the questions. When did the — when did the HD Associates contract close? Wasn't it the —

A   I don't remember the date.

Q   — very end of 1999?

A   I don't — I don't remember.

Q   Was it December? January of 2000?

A   I already — I just don't remember —

Q   Okay.

A   — the exact date that it closed.

Q   But it wasn't within 30 or 60 days of the HD Associates contract, was it?

MR. MIDDLETON: Object to form. I think he's mentioned more than one contract, so —

BY MR. ORCUTT:

Q   Well, we're talking — and again, I'm going to reference the contract I know, which is the — the July —

MR. MIDDLETON: '99.

BY MR. ORCUTT:

Page 66

Q   — July '99 contract, which was submitted after Exhibit 6, extending that deadline. To your knowledge, did the — did the transaction close within 30 or 60 days of July 30th, 1999?

A   I don't know the answer to that.

Q   Was there — again, I asked this at least in one way before. Was there anything discussed in your telephone conversations with Mr. Rowsey to the effect of you agreeing to keep the property off the market until July 30th or not consider a contract from Starwood? Did you have any discussions with him about those two issues?

MR. MIDDLETON: Talking oral?

BY MR. ORCUTT:

Q   Telephone conversations.

A   I'm sure that as the letter indicated, that I made him aware that that had been done and that we were willing to continue with the deal with him if he could do it by certain dates.

Q   Did he ask you to keep it off the market until a certain date?

A   I don't remember the answer to that.

Q   Did he ask you to not consider the Starwood contract?

A   No, not to my recollection.

Page 67

Q   Did he tell you that he was suing Mr. Evans in Texas and in fact filed that lawsuit on July 23rd, 1999, the same date as your letter to Mr. Rowsey?

A   I don't remember.

Q   Okay. Let me hand you that which I'll mark as Exhibit 9 (tendered).

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 9.)

BY MR. ORCUTT:

Q   Which is a July 22nd letter from Starwood.

(Whereupon, there was a short pause.)

BY MR. ORCUTT:

Q   Do you remember that letter?

A   Yes.

Q   Are you familiar with Starwood?

A   Yes.

Q   Are they big enough and capable enough to be one of those buyers you described as being capable of purchasing this project?

A   Yes.

Q   And Mr. Evans presented this letter with the Starwood contract I believe on or about July 23rd, 1999. Do you recall that?

A   I don't remember the exact date, but that he

Page 68

presented me with this letter, yes.

Q   Did you write the letter to Mr. Rowsey, the July 23rd letter to Mr. Rowsey, after you had met with Mr. Evans and had him present this letter and the Starwood contract?

A   Obviously.

Q   Yes, sir?

A   Yes.

Q   I'm sorry. I didn't hear you.

A   Yes.

Q   There's a reference in that letter to a telephone conversation. And, again, I've asked you this generally about telephone conversations between you and Mr. Rowsey at or about this time, but did you specifically call Mr. Rowsey after the presentation of the Starwood contract and have a telephone conversation with him?

A   I probably did. I don't remember.

Q   And you don't remember what you talked about?

A   Oh, I'm sure it was about this.

Q   Did you give Mr. Rowsey any specifics of the Starwood contract, how much they were offering and the like?

A   No, I don't think so.

**JAMES GARDNER**

Page 69

Q   Would you remember that if you had?

A   Probably, yeah.

Q   So if -- you would remember if you had given Mr. Rowsey the -- either the gross or the net purchase price on the -- in the Starwood contract?

A   Oh, I'm sure that I didn't do that. That was a piece of information that I don't think I had available at that particular moment, since it was a number that was changing.

MR. ORCUTT: Let me mark this as 10.

(Whereupon, the document referred to was received and marked for Identification as Plaintiffs' Exhibit No. 10.)

BY MR. ORCUTT:

Q   This is the Starwood contract, if you'd take a quick look at that. My notes tell me that offer was for $26,500,000. Do you recall that?

A   No. I recall getting the contract. I don't recall reading it. I don't recall --

Q   Do you recall that it was -- do you recall generally that it was more -- more money than the HD Associates offer?

A   (Witness shakes head.)

Q   No?

A   No.

Page 70

Q   When did you find out that Eiger had sued Mr. Evans and his companies?

A   I don't remember.

Q   Would it have been after -- it would have been after this time. It only -- the lawsuit was only filed on the same July 23rd date.

A   I don't remember when I found out about it, no.

Q   And I know I couldn't tie you down on when the actual closing occurred with HD Associates, but do you know why there was a delay or if -- if there was a delay, do you know why that delay was caused?

A   No.

MS. FARQUHAR: Objection. Assumes facts not in evidence.

MR. ORCUTT: All right. I think I'm done. Thank you, Mr. Gardner.

MS. FARQUHAR: I have some questions. I think it would be better if we switched places.

CROSS-EXAMINATION

BY MS. FARQUHAR:

Q   Mr. Gardner, my name's Carol Farquhar, and I represent the Defendants in this case, with the exception of David Lane and his two companies, JTL Capital and Barnett Lane Investments. We appreciate

Page 71

you taking the time to be here today.

You testified this morning earlier that ITT had put what you termed a hurdle rate on the various ITT companies. What is a hurdle rate?

A   The -- ITT's objective for the stockholders might be a return on total capital or something like that of 11 or 12 percent. They would turn around and expect their companies to be able to hit that same rate.

Q   I believe you said that the first time you had met Mr. Evans was when he was introduced to you by Mr. Lane; is that correct?

A   I think so, yes.

Q   Prior to that time, had you ever heard of Robert Evans?

A   No.

Q   Had you ever heard of either of his companies, being Lochmere Development Group, Inc. or Lochmere Realty?

A   I don't think so.

Q   When was the first time you were aware that Mr. Evans was working with Mr. Lane towards the potential purchase of Hammock Dunes?

A   I don't remember the date, but it was after we got involved with David Lane and he brought him in

Page 72

and introduced him as an -- expertise in Florida development.

Q   And at that time, did you have an understanding of what Mr. Evans' role was within Mr. Lane's group of people?

A   Other than providing the expertise for the development in Florida, I mean, he was -- his credentials seemed to be in that area.

Q   Fortunately, Mr. Orcutt's questions have covered a lot of what I had, so mine will be shorter.

MR. ORCUTT: Likely story.

MS. FARQUHAR: I said shorter, not short.

BY MS. FARQUHAR:

Q   This morning, you stated that ITT had a standard nondisclosure form that you asked Mr. Lane to sign; is that correct?

A   Yes. We did that routinely with anybody that we provided the package of information about the project to.

Q   Do you know whether or not ITT still has a copy of any nondisclosure agreement Mr. Lane signed?

A   I don't know the answer to that. It would be in I guess some of the information that --

MR. MIDDLETON: I don't know, as we have discussed, Mr. Orcutt and I, there is significant

Page 73

documentation stored in a warehouse in Pennsylvania, and none of that documentation has been accessed to determine the extent it would be responsive to either of the two subpoenas.

BY MS. FARQUHAR:

Q   Do you know if Mr. Evans was asked to sign a nondisclosure agreement by ITT?

A   I don't have any knowledge of that.

Q   What information did ITT give to Mr. Evans or Mr. Lane regarding the Hammock Dunes project?

A   I think that we, in the standard package, obviously included a word picture of the project itself, some of the history of it, kind of what had been done as far as the DRI was concerned at that point. And probably the real important one was the work that had been done by the firm out of Orlando. Anyway, a pro forma on the project that was prepared by them.

Q   Do you know if ITT gave Mr. Evans or Mr. Lane any documentation or information other than what you've said was in the standard package?

A   Well, I am sure we did as we got into it, but your question I thought was just what we gave them in response to their interest in it, yes.

Q   Then over time, did ITT provide more

Page 74

information to Mr. Evans or Mr. Lane?

A   Yes.

Q   In what -- do you know what that information consisted of?

A   All kind of things.

Q   Can you give me some examples?

A   Well, we had developed a lot of information about the land that the second golf course was going to be built on, a lot of additional information relating to operating numbers of the club, information -- additional information relative to the bridge, commitments to the county, to the state, things like that that may not have been totally explained in the original package.

Q   Do you think ITT was responsive to the information requested by Evans or Lane?

A   I would have heard about it if we weren't. The answer is yes.

Q   Did you hear that ITT was not being responsive?

A   No.

Q   So, in your opinion, you believe that ITT was being responsive in providing the information within a reasonable amount of time?

A   Yes.

Page 75

Q   Did Mr. Evans ever tell you that ITT was difficult to get information from?

A   No.

Q   Did you have any objection to the information that had been provided by ITT to Mr. Evans and Mr. Lane being provided to Farallon, which I believe is Farallon Capital Management, Inc.?

A   It was my opinion at the time that Barnett Lane and Farallon were working on the deal together and the agreement included them.

Q   Did you have any objections to the information that ITT provided to Mr. Evans and Mr. Lane being provided to any of the Eiger companies or to HD Associates?

A   Any of the Eiger companies or HD Associates? I would say no.

Q   Did you have any objections to any of the Eiger companies or HD Associates using the information that ITT had provided to Mr. Evans or Mr. Lane?

A   No.

Q   Did you ever ask Mr. Evans to return any of the information that ITT had provided to him?

A   Not to my knowledge.

Q   Did you ever charge anyone connected with the prospective purchaser for the information that ITT

Page 76

provided to them?

A   Not to my knowledge.

Q   Do you know if Mr. Evans ever paid ITT any money for the information regarding Hammock Dunes that he received from ITT?

A   Not to my knowledge.

Q   Do you believe it's appropriate for Lochmere Development Group or Lochmere Realty to sue the Eiger companies in part for use by the Eiger companies of the information provided by ITT?

MR. ORCUTT:  Object to the form of the question.

BY MS. FARQUHAR:

Q   You may answer.

A   This is not an area that ITT's involved in. I don't have a position on that.

Q   Okay.  If the Eiger companies had requested the same information from ITT that had been requested by Mr. Evans, would ITT have provided it to them?

A   I'm sure they would.  Yes.

(Whereupon, the document referred to was received and marked for Identification as Defendant's Exhibit No. 11.)

BY MS. FARQUHAR:

Q   Mr. Gardner, let me hand you what's been

Page 77

marked as Exhibit 11.

MS. FARQUHAR: And Mr. Middleton, I'm sorry, they didn't send me with enough copies. If I could impose and ask you to share with the witness.

BY MS. FARQUHAR:

Q Have you ever seen Exhibit 11 before?

A This is Exhibit 11 (indicating)?

Q Yes.

A Yes.

Q What is it, please?

A Just a letter that we wrote to the Hammock Dunes homeowners telling them of our beginning discussion with David Lane or Barnett Lane and Farallon.

Q Is there any reason, when you wrote this letter, why you did not include Mr. Evans' name in this as someone with whom ITT had executed an agreement?

A The investigation that we did into Barnett Lane and Farallon Capital was what we were talking about at that point in time. We didn't get any further.

(Whereupon, the document referred to was received and marked for Identification as Defendant's Exhibit

Page 78

No. 12.)

BY MS. FARQUHAR:

Q Let me hand you what's been marked as Exhibit 12 to your deposition.

(Whereupon, there was a short pause.)

BY MS. FARQUHAR:

Q Can you identify it, please?

A Yes.

Q What is it?

A It's an extension to the contract, Barnett Lane, that was mailed to me.

Q And did you execute it on behalf -- this extension agreement on behalf of, looks like three separate entities, ITT Community Development Corporation, Admiral Corporation, and ITT Land Corporation?

A Yes.

Q Why was the Farallon-Barnett Lane contract extended, if you know?

A I don't remember.

Q Did this contract ever close?

A No.

Q Do you know why it didn't close?

A I discussed it already, but I think it had to do with the financing.

Page 79

Q How did you come to that conclusion, that it had to do with financing?

A Farallon, I believe, was the group that was providing a lot of the financing, and they did not go along with it for whatever reason. I don't know.

(Whereupon, the document referred to was received and marked for Identification as Defendant's Exhibit No. 13.)

BY MS. FARQUHAR:

Q Let me hand you what's been marked as Exhibit 13 (tendered).

MR. GERLACH: I'm going to have to take a break, and I would appreciate it if you didn't ask questions while I'm gone. It will only be a minute, I hope.

(Whereupon, there was a short pause.)

MR. GERLACH: Go ahead.

BY MS. FARQUHAR:

Q Can you identify Exhibit 13, please?

A Yes. It was a letter from me back to David, talking about the deposit, the $250,000 deposit, and talking about, you know, working with them to resurrect the agreement.

Q Why did you write the letter?

A December the 22nd, 1998.

Page 80

Q No, sir. Why did you write it?

A Oh, why. Obviously, we were wanting to continue to work on it. The time had run out on it. We wanted to continue to work on trying to sell it to them. They had done a lot of work on it. It was easier to take that and go forward than it was to go out and start with somebody totally new, and he seemed to want to do it.

Q At the time you wrote this letter, was it your understanding that the agreement with Barnett Lane and Farallon was no longer in effect?

A I think that's the case, yes.

Q At the time you wrote this letter, was it your understanding that Farallon was still interested, or had by this time Farallon -- it been communicated to you Farallon was no longer interested?

A I think the latter was the case, that Farallon was not interested.

Q At the time of this letter, were you aware of whether or not David Lane had any other sources of capital for the purchase of Hammock Dunes?

A Yes.

Q And what were those?

A He just had indicated to us that he was exploring or working with other sources.

Page 81

Q   Did he give you any names of who those sources might be?

A   At -- by this point, I don't remember. I don't remember.

Q   So, would it be fair to say that by March 1 of 1999, David Lane had not been able to close on any contract of sale for the purchase of Hammock Dunes?

A   That's correct.

Q   Were you ever present at any meetings at which Paul Rowsey was present with -- with Robert Evans?

A   I'm sorry, I do not remember. I would guess that I probably was when the meeting was of the nature where they were discussing the nuances of the deal, but I do not remember it, no.

Q   After the Eiger entities became involved with the potential purchase of Hammock Dunes, did you ever come to learn of what Robert Evans or Lochmere Development Group, Inc. or Lochmere Realty's roles were within the potential purchase group?

A   No.

Q   Did anyone ever discuss with you what Robert Evans or Lochmere Realty or Lochmere Development potential compensation was from the -- from within the Eiger potential purchase group?

Page 82

A   No.

Q   Did anyone ever discuss with you a dollar figure for the value of any work done by Robert Evans or Lochmere Development Group or Robert -- or Lochmere Realty?

A   No.

Q   Was there supposed to be a July 14 meeting with Paul Rowsey wherein you thought the contract with HD Associates was going to be signed?

A   I don't remember.

(Whereupon, the document referred to was received and marked for Identification as Defendant's Exhibit No. 14.)

BY MS. FARQUHAR:

Q   Let me hand you what's been marked as Exhibit 14 (tendered) and ask you if you've ever seen that.

A   I -- you know, am not -- again, I don't remember.

Q   Does that letter refresh your recollection as to whether or not there was supposed to be a meeting with Mr. Rowsey on July 14th of 1999 to sign the contract?

MR. MIDDLETON:   You're referring to an e-mail marked as Defendant's 14?

Page 83

MS. FARQUHAR: Yes.

THE WITNESS: I don't remember it, no.

BY MS. FARQUHAR:

Q   Okay. Let me turn you to Exhibit Number 5. What was your reaction when you received this letter from Mr. Rowsey?

A   At that stage of the game, my reaction was it's just another problem that has to be solved to get it to closing.

Q   Did you or anyone at ITT have any part in resolving this problem? I take it back. Strike that.

Do you know if this problem was ever resolved?

A   No.

Q   Did you or anyone associated with ITT ever propose any resolution?

A   No.

Q   I believe you testified this morning, when Mr. Orcutt represented that there was a meeting between yourself and Mr. Evans in Palm Coast on July 8th, that at that meeting Mr. Evans said he would not be working with Eiger. Do you remember such a meeting occurring on that date?

A   I -- I believe that's correct. I'm not sure of the date, but I believe we did have a meeting where

Page 84

he explained to me that he was unhappy with the situation.

Q   Do you believe that that meeting occurred prior to the time you received this letter from Mr. Rowsey that's Exhibit 5 to your deposition?

A   That's what I would recollect, yes.

Q   Then would it be correct to say that the first you learned there was a problem between Mr. Evans and the Eiger group was from Mr. Evans himself?

A   That's my recollection of it, yes.

Q   I believe you testified that you had two meetings with Mr. Evans. There was this one on July 8th. When was the second one?

A   I don't remember the date. It wasn't long after that, though.

Q   What happened at that meeting, the second meeting?

A   I believe that that was the meeting where he made us aware of the offer by Starwood to get involved in the project.

Q   Was that when he brought to you the Starwood contract that's been marked as Exhibit 10 to your deposition?

A   I believe it was. I'm not sure of that. It

**JAMES GARDNER**

Page 85

could have been that that was done at a later meeting, but I think that's correct, yes.

Q  Do you remember anything else about that particular second meeting?

A  No.

Q  Who all was present?

A  Just Bob and myself.

Q  And do you remember where the meeting occurred?

A  In my office.

Q  Is that also where this first meeting on July 8th occurred?

A  Yes.

Q  Prior to July 8th of '99, have you heard of the Starwood Group?

A  Yes.

Q  How had you come to be aware of — of that entity?

A  They bought the Sheraton Hotel chain from ITT.

Q  Prior to July of 1999, had anyone affiliated with Starwood expressed an interest in purchasing the Hammock Dunes project?

A  I — I am not certain.  I believe Starwood may have been somebody that called in and asked for

Page 86

information.  I don't know how we responded to it or if we responded to it, but seems to me I remember maybe they had shown some interest in it earlier.

Q  Did anything ever come of that show of interest by Starwood?

A  No.

MR. ORCUTT:  Object to the form of that question, for the record, the previous question.

BY MS. FARQUHAR:

Q  Has anything Paul Rowsey ever said to you negatively affected your opinion of Lochmere Development Group, Inc.?

A  No.

Q  Has anything Mr. Rowsey ever said to you negatively affected your opinion of Lochmere Realty?

A  No.

Q  Has anything Mr. Rowsey ever said to you negatively affected your opinion of Robert Evans?

A  No.

Q  Has anything ever communicated to you by anyone affiliated with any of the Eiger companies or HD Associates ever negatively affected your opinion of Lochmere Development Group, Inc., Lochmere Realty, or Mr. Evans?

A  No.

Page 87

Q  If you could turn to Exhibit 2 to your deposition, the May 13 letter with Mr. Cobb?  Is this the type of confidentiality agreement that ITT required of Mr. Lane?

A  My opinion is yes.  Early on the — these things with our legal department and ITT legal department evolved somewhat.  May not be exactly the same, but...

Q  Did you have an opinion as to whether or not Barnett Lane or Mr. Evans by themselves had the financial ability to carry out the development of Hammock Dunes, had they been the purchasers?

A  I — I don't think that issue ever came up.

MR. ORCUTT:  I object to the form of the question.

BY MS. FARQUHAR:

Q  Did Mr. Lane or Mr. Evans either ever present a contract for the purchase of Hammock Dunes to ITT that did not include someone else serving as a partner?

A  Not to my recollection.

MS. FARQUHAR:  Mr. Gardner, thank you very much.  Those are all the questions I have at this time.

MR. GERLACH:  I have some questions for you.

Page 88

CROSS-EXAMINATION

BY MR. GERLACH:

Q  I'm Alan Gerlach, Florida counsel for David Lane and his companies.  Mr. Lane never described Mr. Evans as his partner to you, did he?

A  Not in my recollection, no.

Q  Did Mr. Lane ever describe the terms of any deal or arrangement between himself or his companies and Mr. Evans or Mr. Evans' companies?

A  No.

Q  Did Mr. Lane ever say anything about Mr. Evans or about Lochmere that negatively affected your opinion of Mr. Evans or Lochmere?

A  No.

Q  You testified that you met with Mr. Evans on two occasions, I believe you said in July of '99.  Did Mr. Evans describe for you during those — either of those meetings the terms of a deal that he said he thought he had with Mr. Lane?

A  No, I don't — as to getting into percentages or amount of money, no.

Q  What did he say about the deal that he thought he had, if anything, with respect to Mr. Lane?

A  If I'm not mistaken, most of the conversation of those two meetings that you're talking

JAMES GARDNER

Page 89

about was discussing the Eiger handling of it, not David Lane.

Q    Was he specific about the deal he thought he had with Eiger?

A    I -- I don't believe he got into specifics with me. That just wasn't the way he wanted it.

Q    How many -- Mr. Gardner, can you estimate for me how many times you met -- you had face-to-face meetings with Mr. Lane regarding the sale of the Hammock Dunes development?

A    Over the whole period of time?

Q    Yes, sir.

A    A couple of dozen times, probably.  I don't -- I didn't keep up with it.  I probably could dig it out of my calendars, but it was dinner or lunch or meeting with lawyers or whatever.

Q    And could you tell me what cities these meetings occurred in?

A    Generally speaking, in Palm Coast.

Q    Okay.  Were there any meetings in Dallas or Atlanta or anyplace else?

A    No.

Q    Jacksonville?

A    Not that I attended.

Q    Yes, sir.

Page 90

A    No.

MR. GERLACH:  No further questions.

MR. ORCUTT:  Just one more and then you can go.

REDIRECT EXAMINATION

BY MR. ORCUTT:

Q    Do you have any association with the project today?

A    I live in it.

Q    You're not acting as a consultant or otherwise participating in its development or sale.

A    I'm -- I'm involved in a way of being the chairman of the CDD board, which actually doesn't have very much to do with the development, the developer, really.

MR. ORCUTT:  Thank you very much.

MR. MIDDLETON:  Off the record.

(Whereupon, an off-the-record discussion was had.)

MR. MIDDLETON:  We'll read.

(Thereupon, the deposition concluded.)

Page 91

REPORTER'S DEPOSITION CERTIFICATE

STATE OF FLORIDA    )

COUNTY OF ST. JOHNS )

I, JANET M. BEASON, RPR-CP, RMR, certify that I was authorized to and did stenographically report the deposition of JAMES E. GARDNER, that a review of the transcript was requested; and that the transcript is a true and complete record of my stenographic notes.

I further certify that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

Dated this 1st day of July, 2001.

_____
JANET M. BEASON, RPR-CP, RMR, CRR
Notary Public - State of Florida
My Commission No.:  CC 705710
Expires:  April 30, 2002

Page 92

CERTIFICATE OF OATH

STATE OF FLORIDA    )
COUNTY OF ST. JOHNS )

I, the undersigned authority, certify that JAMES E. GARDNER, personally appeared before me and was duly sworn.

WITNESS my hand and official seal this 1st day of July, 2001.

_____
Janet M. Beason
Notary Public - State of Florida
My Commission No.:  CC 705710
Expires:  April 30, 2002

Page 93

STATE OF FLORIDA   )

COUNTY OF ST. JOHNS )

I, JAMES E. GARDNER, personally appeared before the undersigned authority and, being first duly sworn, depose and say that I have read the testimony in the foregoing deposition given by me, constituting pages 4 through 90, and subject to the corrections listed below, if any, it is true and correct.

PAGE    LINE    CORRECTIONS AND REASONS THEREFORE

_____
JAMES E. GARDNER

JAMES GARDNER

**$**

$10,000  55/16
$20  47/20
$250,000  79/21
$26,500,000  69/17
$3  40/15, 40/25

**&**

&  1/17, 2/2, 2/5, 2/11, 2/15, 44/18

**'**

'60s  8/5, 8/18
'65  7/19
'70s  10/22
'71  8/20
'78  7/23
'85  7/19, 7/21, 7/22, 7/23
'90  15/20, 20/1
'90s  19/25, 20/1
'96  20/14
'97
'98  25/6
'99  65/24, 66/1, 85/14, 88/16

**\***

*  1/13, 1/20

**1**

1  3/11, 22/9, 22/12, 50/23, 81/5
10  3/16, 69/10, 69/13, 84/23
11  3/17, 71/7, 76/23, 77/1, 77/7, 77/8
110  2/6
1100  2/12
12  3/17, 71/7, 78/1, 78/4
12:19  1/16
13  3/18, 50/17, 79/8, 79/11, 79/19, 87/2
14  3/18, 82/7, 82/13, 82/16, 82/25
14th  82/22
15  39/8, 63/6
1510  1/22
15th  39/15, 61/8
170  1/17, 2/15
18  39/8
18383  2/6
19  1/15
1965  7/15
1970  8/19
1972  8/22
1978  7/15
1980  10/25
1985  10/11, 10/13
1998  21/2, 24/19, 28/22, 29/3, 79/25
1999  23/2, 24/21, 24/23, 35/20, 39/15, 39/16, 42/21, 45/14, 50/17, 54/14, 56/15, 57/6, 58/19, 65/10, 66/4, 67/3, 67/24, 81/6, 82/22, 85/21
1st  58/25, 61/3, 91/16, 92/5

**2**

2  3/12, 23/20, 23/24, 49/12, 55/14, 87/1
200  2/3
2000  65/12
2001  1/15, 91/16, 92/5
2002  91/20, 92/8
21st  54/13, 55/15, 58/19
22  3/11
225,000  8/25
22nd  67/11, 79/25
23  3/12
23rd  52/14, 67/2, 67/23, 68/3, 70/6
2M  1/7, 2/8

**3**

3  3/12, 44/12, 44/15
30  57/5, 64/13, 65/16, 66/4, 91/20, 92/8
30th  39/16, 54/6, 55/15, 55/17, 60/2, 61/4, 61/16, 61/20, 66/4, 66/10
32084  1/18, 1/22, 2/16
32801  2/12
33602  2/3
35  40/22

**4**

4  3/4, 3/13, 45/8, 45/11
40  40/22
44  3/12
45  3/13, 40/9

**5**

5  3/13, 50/11, 50/14, 83/4, 84/5
50  3/13
500  2/3
52  3/14
54
57  3/15

**6**

6  3/14, 52/8, 52/11, 57/20, 60/7, 66/2
60  65/16, 66/4
67  3/15
68,000  9/12, 9/18, 9/24, 10/3, 10/7
68,000-acre  8/24, 9/6, 9/15
69  3/16

**7**

7  3/14, 54/13, 54/17, 54/21
70  3/4
705710  91/19, 92/8
75252  2/6
76  3/17
77
79  3/18

**8**

8  3/15, 57/3, 57/20, 57/21, 57/24, 60/24
82  3/18
825-0570  1/23
87  3/5
8th  42/21, 83/21, 84/14, 85/12, 85/14

**9**

9  3/15, 67/6, 67/9
90  3/5
904  1/23
91  3/7
92  3/8
93
9:39  1/16

**A**

A.M
A1A  14/10
ability  17/17, 87/11
above...by  57/5
accept  28/21
acceptable  35/1
access  12/9
accessed  73/3
accomplish  16/1
accurate  28/10, 35/9, 36/7, 46/22
acquisition  43/11
acreage  9/11
acres  9/12, 9/19, 9/20, 9/24, 10/3, 10/7
Act  10/12, 10/13, 11/13
acting  90/10
action  91/14, 91/15
added  19/5
Admiral  78/15
advent  15/14
advise  42/25
affected  86/11, 86/15, 86/18, 86/22, 88/12
affiliated  85/21, 86/21
agencies  37/22
agenda  14/24
agree  5/14
agreed  3/21, 42/25
agreeing  66/9
agreement  19/7, 22/19, 55/1, 72/21, 73/7, 75/10,
77/19, 78/13, 79/23, 80/10, 87/3
agreements  24/14
Air  7/2, 7/3
Alabama  6/14
ALAN  2/10, 22/20, 88/3
ambiguous  26/3, 32/5, 35/15, 36/11, 47/25, 49/4, 63/23
amend  55/3
amendment  10/16, 54/25, 56/14
amount  8/12, 63/2, 64/24, 74/24, 88/21
answer  16/22, 17/11, 21/9, 27/22, 32/9, 37/13, 37/15, 38/18, 39/21, 41/1, 44/8, 48/10, 53/10, 57/2, 57/10, 66/5, 66/22, 72/22, 74/18, 76/14
answered  40/9
answering  62/14
answers  33/8, 33/9, 40/5
anticipated  55/23
APPEARANCES  2/1
applied  10/6, 38/1
appreciate  70/25, 79/13
approach  39/23, 44/5, 47/11
appropriate  76/7
approved  10/10, 11/7
April  23/2, 91/20, 92/8
area  8/22, 8/25, 9/25, 12/23, 18/23, 20/15, 24/4, 72/8, 76/15
areas  32/24, 34/5
arrangement  88/8
arrived  46/8
ascertain  51/2
aspects  49/1
assessment  18/22, 28/10
assets  55/21
assignment  15/21
assist  28/16
assistant  7/4
associate's  6/13
associated  42/4, 48/19, 83/15
ASSOCIATES  1/6, 2/7, 4/22, 24/20, 24/22, 25/14, 35/12, 39/8, 39/12, 48/9, 49/19, 52/20, 53/7, 53/21, 59/14, 59/19, 63/7, 65/8, 65/17, 69/22, 70/10, 75/14, 75/15, 75/18, 82/9, 86/22
association  1/9, 90/7
assumption  48/18
Atlanta  89/21
attended  6/12, 89/24
attention  5/10
Attorney  2/16, 91/12
Attorneys  2/4, 2/7, 2/13, 91/13
August  21/2, 24/19, 25/6, 28/22, 58/15, 59/1, 61/3
Augustine  1/18, 1/21, 1/22, 2/16
authority  92/3, 93/5
authorized  91/7
available  39/4, 69/8
Avenue  2/11

**B**

Bachelor  6/2
background  4/11, 5/25, 6/23, 7/25, 25/24, 26/17, 26/20
Bailey  1/17, 2/15
balance  10/3
BANK  1/9, 2/9, 64/11
BankBoston  2/9, 4/24, 4/25
banking  1/9
BARNETT  1/8, 2/13, 70/25, 75/8, 77/14, 77/20, 78/10, 80/10, 87/10
Based  16/3, 46/5, 47/22
beachfront  12/21
BEASON  1/19, 91/6, 91/18, 92/7
bell  26/14
betting  51/19
big  14/8, 14/14, 67/18
binding  49/15
bit  8/17, 9/9, 48/18
blocks  16/25
Blvd  1/22
board  90/13
Bob  4/18, 30/25, 42/7, 42/9, 85/7
Bolves  2/2
bona  20/22
bond  13/20
bonds  64/11
bothered  32/12
bottom  62/7
bought  8/17, 17/7, 85/19
Boulevard  2/3
break  51/23, 79/13

JAMES GARDNER

Bricklemyer 2/2
bridge 12/10, 13/3, 13/15, 13/20, 48/19, 74/12
brief 5/25, 6/23, 7/25
bring 5/9
broached 16/23
Broad 2/11
broker 23/3
broker's 22/19
brokers 26/10
brought 9/21, 22/14, 25/19, 28/4, 28/24, 41/19, 71/25, 84/22
BUCHANAN 1/11, 2/9
budget 31/17
building 8/19, 12/10, 14/4
built 74/9
bunch 15/9, 55/21
burner 45/2
business 27/4, 32/21, 41/10, 49/1
buy 33/25, 38/23, 62/21, 62/23
buyer 16/6, 16/9, 17/22, 18/12, 37/20, 49/25, 64/6, 64/10
buyers 17/10, 38/7, 67/19
buys 17/2

## C

C-a-l-l 29/13
C-a-l-l-i-a 29/17
calendars 89/15
call 8/3, 11/23, 16/5, 24/20, 61/7, 68/15
Callea 29/13, 29/14, 29/15, 29/23
Calls 32/7, 37/9, 39/17, 40/11, 40/16, 47/25, 49/4, 55/5, 63/24, 64/19
came 7/3, 7/12, 15/8, 26/24, 50/1, 56/22, 87/13
campus 6/7
capabilities 30/7
capability 31/21, 34/11
capacities 30/8, 34/7
CAPITAL 1/9, 2/13, 14/21, 15/4, 70/25, 71/6, 75/7, 77/21, 80/21
CAROL 2/5, 70/22
carry 17/17, 39/5, 44/7, 55/20, 55/25, 87/11
carrying 55/10
carve 17/23
case 27/5, 58/16, 70/23, 80/12, 80/17
cash-flow 14/22
Cassel 2/11
categorizing 33/15, 35/22
caused 70/12
CC 91/19, 92/8
CDD 12/11, 90/13
Central 6/12
CEO 7/16
Certificate 3/7, 3/8, 91/1, 92/1
certify 91/6, 91/11, 92/3
chain 85/19
chairman 90/13
change 35/24, 36/1
changes 46/9
changing 69/9
Chapter 8/22, 10/23
characteristics 14/22
charge 75/24
chief 33/12
Chris 2/18, 5/6
Chuck 23/25, 29/13
cities 89/17
city 7/4, 7/7, 7/8
Civil 6/18
clarification 60/5
clear 46/17, 56/13
cleared 32/24
Clerk 2/18, 5/6
close 34/20, 41/15, 46/15, 51/19, 53/19, 53/23, 56/21, 65/8, 66/3, 78/21, 78/23, 81/6
closed 36/23, 57/1, 65/2, 65/15
closing 26/1, 55/15, 55/17, 56/5, 56/7, 57/15, 65/1, 70/10, 83/9
club 11/3, 14/3, 18/2, 74/10
Coast 7/12, 14/12, 16/24, 42/20, 83/20, 89/19
Coast-ITT 16/12
coastal 30/15
Cobb 23/19, 24/1
coin 4/23
cold 40/20
college 6/12, 6/13, 7/1
combination 48/21, 50/5
Commission 91/19, 92/8
commitment 64/8

commitments 37/21, 37/25, 74/12
committed 59/12
communicated 86/15, 86/20
community 6/12, 7/16, 8/8, 8/24, 9/2, 9/22, 11/25, 12/18, 13/18, 15/14, 30/10, 30/12, 30/4, 78/14
companies 4/18, 4/20, 4/23, 8/6, 8/7, 8/9, 10/5, 14/25, 15/10, 70/2, 70/24, 71/4, 71/8, 71/18, 75/13, 75/15, 75/18, 76/9, 76/17, 86/21, 88/4, 88/8, 88/9
COMPANY 1/7, 1/8, 1/9, 2/7, 10/23, 11/24, 13/17, 13/19, 18/22, 21/20, 24/3, 27/2, 29/11, 41/14, 41/16, 42/5, 48/25, 61/22
compensation 81/24
competencies 34/19
complete 58/16, 91/9
completed 10/25, 39/15, 63/16, 64/23
completion 17/18, 39/5
complex 11/18, 12/5, 36/17, 37/18, 38/2, 38/5, 38/8, 38/11
complexities 37/24
complexity 12/2, 16/3, 37/4, 38/15
complicated 41/3
comply 12/3
compound 31/4, 41/17
comprehensive 11/2
concern 9/7, 17/1, 17/13, 17/15, 17/20, 17/22, 46/23, 46/25, 47/23, 49/1
concerned 16/8, 51/15, 73/14
concluded 90/20
conclusion 15/9, 28/5, 55/6, 79/1
confidentiality 87/3
connected 45/4, 75/24, 91/14
consideration 23/16
consistent 59/1, 60/18, 61/3
construction 27/21, 30/1, 30/4, 30/15
consultant 90/10
contact 51/2
contingent 12/25, 13/12, 14/6, 14/8, 16/4
continuation 17/8
continue 34/25, 43/20, 49/14, 66/18, 88/3, 88/4
continued 13/1, 31/21, 31/23, 36/8
continuing 46/2, 49/13
contract 21/1, 21/6, 24/13, 24/19, 24/20, 24/23, 25/5, 25/12, 25/14, 25/19, 25/20, 25/25, 28/22, 32/3, 35/11, 35/12, 36/1, 36/22, 39/7, 40/15, 41/15, 49/15, 49/21, 51/3, 52/20, 52/21, 53/7, 53/9, 53/11, 53/14, 53/21, 54/5, 54/9, 55/22, 56/2, 56/15, 56/16, 56/20, 57/5, 57/7, 57/16, 58/14, 58/25, 59/7, 59/13, 61/2, 61/4, 61/8, 61/15, 61/19, 64/5, 64/18, 64/22, 64/23, 65/8, 65/17, 65/19, 65/22, 66/1, 66/10, 66/24, 67/23, 68/5, 68/16, 68/23, 69/5, 69/15, 69/18, 78/10, 78/18, 78/21, 81/7, 82/8, 82/23, 84/23, 87/18
contracting 48/25
contracts 21/18, 56/7
conversation 25/18, 42/15, 46/2, 46/11, 58/18, 58/20, 60/3, 61/11, 68/12, 68/17, 88/25
conversations 5/10, 41/25, 43/22, 52/6, 53/17, 61/14, 66/8, 66/15, 68/13
copies 22/14, 77/3
copy 72/21
corporation 1/7, 1/8, 7/10, 7/17, 9/3, 11/25, 13/18, 15/15, 38/4, 49/12, 78/15, 78/16
correct 8/4, 20/2, 21/3, 24/24, 25/6, 25/10, 46/12, 47/19, 48/3, 48/4, 51/4, 71/12, 72/16, 81/8, 83/24, 84/7, 85/2
cost 55/11, 55/20, 55/23
costs 30/20, 55/25
counsel 3/22, 5/5, 88/3, 91/12, 91/14
County 8/14, 12/24, 14/13, 74/12, 91/4, 92/2, 93/2
couple 89/13
course 9/1, 14/3, 14/4, 15/8, 27/20, 30/1, 30/3, 30/17, 30/18, 30/20, 31/17, 41/20, 74/8
courses 48/20
COURT 1/1, 1/21
covered 30/22, 59/23, 72/10
created 12/11
credentials 72/8
credit 55/11, 64/11
Cross-Examination 3/4, 3/5, 70/20, 88/1
cross-noticed 5/4
CRR 1/19, 91/18
Cushman-Wakefield 18/16, 18/23, 19/8, 20/10, 21/23, 49/2
Cushman-Wakefield's 46/20

## D

Dallas 2/6, 89/20
DATE 1/15, 15/18, 23/2, 55/15, 55/17, 56/25, 57/2, 59/22, 64/24, 65/1, 65/9, 65/15, 66/21, 67/3, 67/25, 70/6, 71/24, 83/23, 83/25, 84/15
dated 45/13, 52/14, 54/13, 56/15, 91/16
dates 21/5, 53/13, 66/19
daughters 27/3
DAVID 1/8, 1/10, 2/8, 2/13, 4/20, 21/4, 21/17, 26/8, 26/12, 28/3, 28/24, 33/9, 34/10, 34/13, 36/20, 47/10, 56/20, 58/19, 70/24, 71/25, 77/14, 79/20, 80/20, 81/6, 88/3, 89/2
day 55/16, 91/16, 92/5
days 40/10, 40/22, 64/14, 65/16, 66/4
de 1/22
deadline 66/2
deal 26/11, 43/14, 43/23, 51/15, 53/19, 65/2, 66/18, 75/9, 81/14, 88/8, 88/18, 88/22, 89/3
dealing 36/18, 59/15
dealt 36/19, 36/22
debt 48/19
December 65/12, 79/25
decided 8/15, 61/14, 61/18
deciding 18/13
decision 14/15, 14/18, 15/17, 19/23, 19/24, 20/5
decisions 33/2, 33/24
Defendant's 3/17, 3/18, 76/22, 77/25, 79/7, 82/12, 82/25
Defendants 1/12, 4/21, 70/23
define 32/14
degree 6/2, 6/13
degrees 6/10
Delaughter 29/18, 29/19
Delaware 1/6, 1/7
delay 70/11, 70/12
delighted 57/17
department 19/6, 87/6, 87/7
departments 11/4
depended 17/7
Deponent 3/8, 3/24
depose 93/5
deposit 40/15, 41/1, 79/21
DEPOSITION 1/14, 4/12, 22/9, 23/20, 78/4, 84/5, 84/24, 87/2, 90/20, 91/1, 91/7
describe 35/10, 35/23, 88/7, 88/17
described 57/5, 67/19, 88/4
desire 61/4
details 46/18, 54/3
determine 73/3
develop 8/8, 26/20
developed 12/22, 15/6, 19/11, 36/5, 50/2, 74/7
developer 13/17, 13/22, 13/24, 18/10, 28/2, 33/16, 90/14
developer's 18/12
developers 18/10
developing 29/1
DEVELOPMENT 1/2, 4/19, 7/17, 8/16, 8/25, 9/1, 9/2, 9/6, 9/14, 9/15, 9/25, 11/9, 11/24, 11/25, 12/24, 13/18, 15/15, 27/17, 28/9, 30/10, 30/19, 31/22, 31/24, 32/1, 32/11, 32/17, 34/4, 34/25, 38/4, 42/5, 43/2, 71/18, 72/2, 72/7, 76/8, 78/14, 81/19, 81/23, 82/4, 86/12, 86/23, 87/11, 89/10, 90/11, 90/14
developments 8/11, 30/12, 31/6
Dickinson 22/20
difference 35/24
difficult 15/21, 62/16, 75/2
dig 89/15
digging 56/18
digress 41/11, 44/10, 54/12
digressed 50/9
diligence 36/8, 37/6, 39/13, 40/22, 50/3, 61/24, 62/4, 63/15, 63/19
Dillon 44/18
dinner 89/15
Direct 3/4, 4/5, 42/19
directions 43/5
director 7/8, 7/13
disagree 20/1, 43/1
disagreement 43/4
discovery 40/3
discuss 29/8, 29/25, 30/1, 81/22, 82/2
discussed 30/3, 30/21, 30/23, 51/8, 66/7, 72/25, 78/24
discussing 81/14, 89/1
discussion 13/8, 22/7, 24/7, 51/13, 62/12, 77/14, 90/18
discussions 35/7, 38/2, 66/11
dissuade 38/16

JAMES GARDNER

distinguished 47/4
DISTRICT 1/1, 30/10
diversifying 8/6
divest 15/6
divesting 16/17
divestiture 16/12
divided 38/2
division 8/2
document 11/1, 22/10, 23/22, 44/13, 45/9, 50/12, 52/9, 54/15, 55/3, 57/22, 58/1, 58/7, 67/7, 69/11, 76/21, 77/24, 79/6, 82/11
documentation 36/14, 73/1, 73/2, 73/20
documents 22/4, 40/21, 56/6, 56/7, 56/11, 57/15
doesn't 10/18, 90/13
dollar 82/2
dollars 31/16
door 38/22, 62/21
doubt 58/23
dozen 89/13
drainage 11/10, 12/12
DRI 10/6, 11/11, 11/19, 11/20, 12/2, 14/10, 73/14
DRIs 10/16, 30/18, 30/19, 35/8
dune 12/13
DUNES 1/6, 1/7, 2/7, 2/8, 8/2, 8/3, 11/11, 11/21, 15/22, 16/13, 16/19, 16/22, 17/4, 17/5, 17/14, 17/15, 17/22, 17/25, 18/1, 18/14, 18/17, 20/18, 21/2, 21/8, 22/17, 24/14, 31/22, 34/24, 43/2, 43/11, 47/8, 58/14, 71/23, 73/10, 76/4, 77/13, 80/21, 81/7, 81/17, 85/23, 87/12, 87/18, 89/10
during 36/15, 45/21, 88/17
dwell 22/4

## E

e-a 29/21, 29/22, 29/23
e-mail 82/25
easier 80/6
East 2/3, 6/12
eastern 8/13
education 6/1
educational 4/11, 6/10
effect 43/11, 51/20, 53/8, 53/15, 59/23, 66/8, 80/11
effort 38/18
EIGER 1/7, 2/7, 2/8, 4/21, 25/21, 35/20, 42/22, 43/10, 43/19, 45/24, 49/19, 54/13, 59/4, 64/2, 70/1, 75/13, 75/15, 75/18, 76/8, 76/9, 76/17, 81/16, 81/25, 83/22, 84/9, 86/21, 89/1, 89/4
Eiger-HD 35/12
emotionally 15/24
employee 91/11, 91/13
employment 6/25
encourage 49/18
end 20/6, 24/20, 24/23, 40/21, 41/20, 48/13, 65/10
ended 36/4
engaged 18/17
engagement 20/10
engineer 6/15, 6/17, 6/18, 7/4, 7/8
engineering 4/11
enhanced 37/6
enjoyed 6/7
entered 18/13, 21/1
enters 13/25
entertain 49/25
entities 38/8, 78/14, 81/16
entity 25/12, 25/13, 28/8, 85/18
entrance 45/23
envisioned 49/2
equated 33/12
equity 14/3, 14/21, 15/4, 18/2
Esquire 2/2, 2/5, 2/10, 2/14
establish 35/18
established 35/6
estate 8/1, 16/17, 16/18, 27/17, 34/4, 37/8, 47/9, 47/22, 48/24
estimate 31/15, 89/7
Ev 63/20
evaluated 47/8
Evans 4/18, 28/8, 29/2, 29/10, 30/25, 31/20, 35/13, 35/19, 43/25, 50/25, 51/17, 60/19, 60/22, 61/25, 63/5, 71/15, 74/16, 81/11, 81/18, 81/23, 82/3, 86/18
events 52/25, 60/21
evidence 55/6, 70/15
evolutionary 36/24
evolved 9/6, 9/12, 56/23, 87/7
Examination 3/4, 3/5, 4/5, 90/5
examined 4/3
exception 70/24
Excuse 13/6, 30/8

execute 78/12
executed 21/7, 24/13, 24/24, 25/5, 25/12, 25/14, 28/22, 56/16, 61/4, 77/18
execution 61/2
executive 33/12
Exhibit 3/11, 3/12, 3/13, 3/14, 3/15, 3/16, 3/17, 3/18, 22/9, 22/11, 23/20, 23/23, 44/12, 44/14, 45/10, 50/13, 51/22, 52/8, 52/10, 54/16, 57/3, 57/11, 57/20, 57/23, 60/24, 66/2, 67/6, 67/8, 69/12, 76/22, 77/1, 77/7, 77/8, 77/25, 78/4, 79/7, 79/11, 79/19, 82/12, 82/16, 83/4, 84/5, 84/23, 87/1
existed 37/21
existing 30/20
expect 58/25, 71/8
expenses 55/10
experience 27/16, 27/20, 34/3, 34/4
expert 31/5
expertise 17/2, 17/17, 18/12, 18/23, 18/24, 26/21, 28/5, 34/8, 39/4, 72/1, 72/6
experts 28/16, 30/24, 31/1, 32/23, 34/20, 62/1
expired 53/23
Expires 91/20, 92/8
explanation 12/1
exploring 80/25
expressed 85/22
expression 32/20
extended 78/19
extending 55/14, 55/16, 66/2
extension 78/10, 78/13
extractions 14/12, 14/13

## F

f/k/a 2/9
face-to-face 89/8
facetious 38/24
facilities 12/14
fact 5/12, 18/8, 48/23, 60/25, 67/2
factor 18/13
factors 48/22
facts 70/14
fair 56/11, 81/5
Farallon 20/25, 27/9, 27/11, 28/7, 35/19, 35/21, 75/6, 75/7, 75/9, 77/15, 77/21, 79/3, 80/11, 80/14, 80/15, 80/16, 80/18
Farallon-Barnett 78/18
FARQUHAR 2/5, 70/22
fast 24/25, 46/6
faster 40/2
fate 16/9
fax 54/13, 58/2
feed 32/25
fide 20/22
field 32/11, 34/8
figure 38/12, 82/3
filed 67/2, 70/6
files 27/14, 27/15
finalize 51/3
financial 17/1, 17/17, 21/5, 27/9, 87/11
financially 91/14
Financing 26/2, 26/6, 28/8, 78/25, 79/2, 79/4
find 16/5, 70/1
finding 39/25
fine 5/21, 5/22, 23/11, 52/1, 57/9
finishes 62/15
finishing 7/1
Fire 12/14
firm 5/7, 73/16
fit 15/15
five 20/20, 20/23, 51/25
FL 1/18, 1/22
Flagler 8/14, 12/24
FLEET 1/9, 2/9
Flew 7/5
Florida 1/1, 2/3, 2/12, 2/16, 5/8, 5/13, 6/20, 10/17, 11/5, 21/15, 27/16, 27/19, 31/5, 34/4, 41/13, 72/1, 72/7, 88/3, 91/3, 91/19, 92/2, 92/7, 93/1
Florida-Mississippi 6/5
folks 42/4, 57/13
follow 53/13
follows 4/4
football 42/11
Force 7/3
form 32/6, 33/18, 34/14, 58/4, 62/5, 63/8, 65/18, 72/15, 76/11, 86/7, 87/14
forma 46/7, 73/17
forms 26/22
Fort 7/7
Fortunately 72/9

found 70/7
four 7/6, 7/9, 7/11, 20/23
four-laning 14/10, 14/11
Frederickson 42/8, 42/9
frequently 61/12
front 45/2
Fund 2/8
fundamental 43/1
funded 13/22
future 48/19

## G

Gale 44/18
game 6/6, 83/7
GARDNER 1/14, 2/16, 3/3, 4/2, 4/8, 58/13, 91/8, 92/4, 93/4
Gay 1/17, 2/15
Geanine 8/5
gentleman 23/25, 24/2
gentlemen 41/19
GERLACH 2/10, 88/3
give-and-take 48/12
golf 14/4, 27/20, 30/1, 30/3, 30/17, 30/18, 30/20, 31/17, 41/20, 42/5, 48/20, 74/8
governmental 37/22, 38/7
greater 37/7
Greg 29/20, 57/15
GREGORY 2/2
gross 69/4
GROUP 1/2, 5/11, 9/21, 20/25, 21/4, 21/5, 21/15, 25/21, 27/9, 28/4, 47/11, 71/18, 72/5, 76/8, 79/3, 81/19, 81/20, 81/25, 82/4, 84/9, 85/15, 86/12, 86/23
Growth 10/11, 10/13, 11/13
guaranteed 38/6
guarantees 38/5, 64/10
Guard 7/3, 7/5
guess 10/6, 10/7, 15/24, 24/21, 27/5, 35/23, 37/6, 41/22, 44/3, 45/22, 47/13, 47/15, 56/19, 72/23, 81/12
guy 17/2, 41/21, 59/16
guy's 24/4, 41/23
guys 42/10, 56/22

## H

H-o-d-g-e 26/13
H.D 1/6
half 7/11, 13/21, 13/22, 13/24
Hammock 8/2, 8/3, 11/11, 11/21, 15/22, 16/13, 16/18, 16/22, 17/4, 17/5, 17/13, 17/15, 17/21, 17/25, 18/1, 18/14, 18/17, 20/18, 21/2, 21/8, 22/17, 24/14, 31/22, 34/24, 43/2, 43/11, 47/8, 58/14, 71/23, 73/10, 76/4, 77/12, 80/21, 81/7, 81/17, 85/23, 87/12, 87/18, 89/10
Hand 2/18, 5/6, 22/3, 22/8, 23/19, 34/20, 45/8, 57/11, 67/5, 76/25, 78/3, 79/10, 82/15, 92/5
handling 47/15, 89/1
happy 59/11
hard 25/20
Harold 8/5
Hartford 15/12
HD 2/7, 4/22, 24/20, 24/22, 25/14, 25/15, 39/7, 39/11, 48/9, 49/18, 52/20, 53/7, 53/20, 59/4, 59/14, 59/19, 63/7, 65/7, 65/16, 69/21, 70/10, 75/14, 75/15, 75/18, 82/9, 86/22
head 27/25, 60/23, 69/23
heading 24/3
held 13/8, 22/7
help 10/18, 34/20, 51/19
helped 11/5, 39/25
high 6/14, 12/6, 12/7, 31/9
Hillman 22/16, 22/18, 23/12
hired 28/16
history 6/24, 73/13
hit 71/8
Hodge 26/13
hold 6/19, 59/16, 60/1, 61/15, 61/19
holding 51/14, 59/20
holdings 16/12, 16/18
homeowners 77/13
homes 17/6
honored 59/17
hope 22/13, 79/15
horse 51/18
Hotel 85/19
Hotels 15/12
houses 8/19
housing 10/2
hundred 9/20

hurdle 14/24, 14/25, 71/3, 71/4     knowledgeable 32/10

## I

i-a 29/21
idea 8/8, 9/11, 19/15
Identification 3/11, 3/12, 3/13, 3/14, 3/15, 3/16, 3/17, 3/18, 22/11, 23/23, 44/14, 45/10, 50/13, 52/10, 54/16, 57/23, 67/8, 69/12, 76/22, 77/25, 79/7, 82/12
identify 44/17, 54/19, 78/7, 79/19
III 1/10, 2/8
imagine 33/6, 38/20, 62/15
impact 30/16
implicit 60/2
impose 77/4
impression 25/20
indicate 57/7
indicated 13/23, 43/13, 66/16, 80/24
indicating 77/8
industrial 15/12
Industries 15/13
information 26/20, 26/23, 26/25, 27/3, 27/14, 28/25, 32/25, 48/17, 69/7, 72/18, 72/23, 73/9, 73/20, 74/1, 74/3, 74/7, 74/9, 74/11, 74/16, 74/23, 75/2, 75/5, 75/12, 75/18, 75/22, 75/25, 76/4, 76/10, 76/18, 86/1
informed 42/21
infrastructure 32/17
Institute 6/14
intentions 51/2
interest 73/24, 85/22, 86/3, 86/5
intimately 63/5
introduced 26/9, 31/6, 41/21, 71/11, 72/1
investigation 26/24, 77/20
investment 15/2
INVESTMENTS 1/8, 2/13, 70/25
involvement 13/2, 21/17
irrigation 27/23, 30/5, 34/6
issue 17/25, 48/24, 87/13
issues 30/21, 31/9, 35/8, 36/15, 36/18, 38/3, 38/16, 43/1, 47/16, 51/8, 66/12
items 12/12
ITT 6/25, 7/12, 7/16, 8/1, 8/4, 9/2, 9/18, 11/23, 11/25, 12/3, 13/12, 13/18, 13/19, 14/20, 14/23, 15/8, 15/12, 15/14, 15/23, 16/16, 18/13, 19/22, 20/17, 25/6, 25/13, 25/15, 36/15, 37/22, 38/4, 38/5, 46/2, 51/18, 59/10, 71/2, 71/4, 72/14, 72/20, 73/7, 73/9, 73/19, 73/25, 74/15, 74/19, 74/22, 75/1, 75/5, 75/12, 75/19, 75/22, 75/25, 76/3, 76/5, 76/10, 76/18, 76/19, 77/18, 78/14, 78/15, 83/10, 83/15, 85/20, 87/3, 87/6, 87/19
ITT's 13/1, 31/16, 39/22, 71/5, 76/15

## J

J.E 21/19, 41/13, 41/22
Jack 29/10, 42/4
Jacksonville 89/23
JACOBS 1/10, 2/9
JAMES 1/14, 2/14, 2/16, 3/3, 4/2, 4/8, 91/8, 92/3, 93/4
JANET 1/19, 91/6, 91/18, 92/7
January 65/12
Jim 58/13, 58/16, 60/25
job 6/21, 7/6
Joe 24/5
JOHNS 91/4, 92/2, 93/2
Join 33/20, 35/16, 37/11, 53/4, 63/10, 63/25, 64/21
joined 9/16
Jones 1/17, 2/15
JTL 1/8, 2/13, 70/24
July 24/20, 24/23, 39/16, 42/21, 50/16, 52/14, 54/6, 55/15, 55/17, 57/5, 58/19, 60/2, 61/4, 61/8, 61/16, 61/20, 65/23, 66/1, 66/4, 66/10, 67/2, 67/11, 67/23, 68/3, 70/6, 82/7, 82/22, 83/20, 84/13, 85/12, 85/14, 85/21, 88/16, 91/16, 92/5
jump 52/7
jumping 21/12, 21/22
June 1/15, 39/15, 54/13, 56/15
Junior 6/13
jurisdictional 30/16

## K

Kelly 29/10
Kennedy 2/3
knocking 38/22
knowledge 11/12, 24/18, 31/9, 51/21, 66/3, 73/8, 75/23, 76/2, 76/6

## L

L.L.C 1/7, 1/9
L.L.P 2/5
L.P 1/6, 1/7
land 8/13, 8/14, 8/17, 9/9, 9/10, 9/13, 9/23, 10/2, 10/3, 11/2, 11/8, 13/20, 16/25, 17/2, 17/6, 47/2, 47/5, 74/8, 78/15
landholdings 9/18
LANE 1/8, 2/13, 4/20, 20/25, 21/4, 21/17, 24/12, 24/18, 25/5, 25/25, 26/8, 28/3, 28/21, 28/24, 32/2, 32/3, 33/9, 34/10, 34/13, 35/13, 35/19, 35/20, 39/6, 47/10, 49/19, 56/20, 58/2, 58/12, 58/19, 58/24, 63/7, 64/2, 70/24, 70/25, 71/25, 74/16, 75/9, 77/14, 77/21, 78/11, 78/18, 80/11, 80/20, 81/6, 87/10, 88/4, 89/2
Lane-Farallon 35/11
language 56/23, 64/23
larger 9/18
later 11/12, 25/22, 33/9, 85/1
laundry 30/2
law 5/7, 5/8
lawsuit 67/2, 70/5
lawyers 35/25, 36/1, 36/13, 61/1, 64/16, 64/17, 89/16
leading 6/24, 33/19, 39/7
learn 81/18
learned 39/21, 84/8
leaves 13/10
led 53/18
legal 19/6, 55/5, 87/6
Lehigh 7/9
lengthy 36/8, 41/25
Leon 1/22
letter 23/2, 45/7, 45/13, 45/19, 47/14, 49/10, 50/16, 50/24, 51/7, 51/9, 51/12, 51/16, 52/13, 52/19, 52/22, 53/18, 54/5, 54/7, 59/24, 59/25, 60/9, 60/19, 66/16, 67/3, 67/11, 67/14, 67/22, 68/1, 68/2, 68/3, 68/4, 68/11, 77/12, 77/17, 79/20, 79/24, 80/9, 80/13, 80/19, 82/20, 83/5, 84/4, 87/2
letters 64/11
level 23/9, 23/15, 31/9, 45/1, 62/4
liabilities 14/6, 14/8, 38/3
liability 1/8, 1/9
licensed 6/20, 6/21
licenses 6/19
light 60/21
Limited 1/6, 1/7, 1/8, 1/9, 23/19
limiting 17/21
limits 53/23
line 30/15, 62/7
lines 30/17
liquidate 15/22
list 19/10, 30/2
listed 34/7
listing 19/7
litigation 5/12, 5/13, 5/17
little 16/23, 45/22
live 90/9
living 9/1
location 10/1
LOCHMERE 1/2, 1/3, 4/19, 71/18, 71/19, 76/7, 76/8, 81/18, 81/19, 81/23, 82/4, 86/11, 86/15, 86/23, 88/12, 88/13
Loewinsohn 2/5
low 15/4, 47/20
lunch 89/15

## M

mailed 78/11
mainland 12/10
maintenance 30/19, 31/17
major 12/11, 36/3
Malaga 1/17, 2/15
managed 10/5
management 4/10, 10/12, 10/13, 11/13, 33/1, 75/7
manner 36/19
March 29/3, 35/20, 81/5
Marina 30/15
Marion 6/14
mark 22/9, 23/20, 44/11, 45/8, 52/8, 54/13, 67/5, 69/10
marked 22/11, 23/23, 44/14, 45/10, 50/11, 50/13, 52/10, 54/16, 57/23, 67/8, 69/12, 76/22, 77/1, 77/25, 78/3, 79/7, 79/10, 82/12, 82/15, 82/25, 84/23
market 59/9, 59/11, 59/16, 59/20, 60/1, 61/16, 61/20, 66/9, 66/20

marketing 49/14
Master 30/12
matter 18/8, 49/19, 50/25
meet 26/8, 28/20, 29/2, 29/5, 29/10
meeting 42/19, 42/23, 44/8, 81/13, 82/7, 82/22, 83/19, 83/21, 83/22, 83/25, 84/3, 84/17, 84/18, 84/19, 85/1, 85/4, 85/8, 85/11, 89/16
meetings 35/6, 44/6, 81/9, 84/13, 88/18, 88/25, 89/9, 89/18, 89/20
member 32/2
members 43/22
memorandum 18/25, 19/4, 19/14, 21/25, 46/20, 46/23, 49/3
memory 52/23, 56/19
mentioned 34/5, 38/16, 41/12, 44/8, 65/19
Meridian 7/4
met 28/23, 68/3, 71/11, 88/15, 89/8
method 46/5
mid-$30 47/21
Middle 1/1
MIDDLETON 2/14
MILLER 1/10, 2/8
million 40/15, 40/25, 47/20, 47/21
minimum 46/10
minute 41/11, 44/7, 79/15
misheard 7/24
missing 16/14
Mississippi 6/3, 6/11, 6/21, 7/2, 7/5
Misstates 53/2, 62/9
mistaken 88/24
modifications 36/2
modified 36/3
moment 22/5, 44/10, 69/8
money 69/21, 76/4, 88/21
months 39/8, 63/6, 64/14
morning 71/2, 72/14, 83/18
Moved 7/7
Mr. 58/10
Mr. Barnett 27/8
Mr. Cobb 87/2
Mr. Evans 27/6, 28/20, 29/2, 29/5, 31/8, 31/11, 31/12, 36/13, 42/20, 42/21, 44/3, 51/2, 67/1, 67/22, 68/4, 70/2, 71/11, 71/22, 73/6, 73/9, 73/19, 74/1, 75/1, 75/5, 75/12, 75/19, 75/21, 76/3, 76/19, 83/20, 83/21, 84/9, 84/13, 86/24, 87/10, 87/17, 88/5, 88/9, 88/12, 88/13, 88/15, 88/17
Mr. Evans' 72/4, 77/17, 88/9
Mr. Evans's 61/7
Mr. Gardner 4/9, 70/17, 70/22, 76/25, 87/22, 89/7
Mr. Gerlach 3/5, 4/19, 13/6, 13/9, 13/10, 13/25, 25/1, 29/22, 32/6, 33/18, 34/14, 35/16, 37/11, 39/19, 53/4, 54/20, 58/3, 62/5, 62/13, 63/8, 63/25, 64/21, 79/12, 79/17, 87/25, 88/2, 90/2
Mr. Lane 27/1, 27/16, 28/2, 34/2, 43/7, 45/13, 60/4, 64/16, 71/12, 71/22, 72/15, 72/21, 73/10, 73/20, 74/1, 75/6, 75/13, 75/19, 87/4, 87/17, 88/4, 88/7, 88/11, 88/19, 88/23, 89/9
Mr. Lane's 72/5
MR. MIDDLETON 5/2, 5/23, 24/5, 29/20, 56/4, 56/10, 57/14, 60/5, 60/9, 63/17, 63/22, 65/18, 65/24, 66/13, 72/24, 77/2, 82/24, 90/17, 90/19
Mr. Orcutt 3/4, 3/5, 4/6, 4/25, 5/21, 5/24, 13/11, 14/5, 22/6, 22/8, 22/13, 22/15, 24/10, 25/3, 26/4, 29/23, 29/24, 31/7, 32/8, 34/1, 34/16, 35/17, 36/12, 37/14, 40/7, 40/13, 40/24, 42/3, 44/16, 45/12, 45/16, 48/5, 49/9, 50/15, 50/20, 52/4, 52/12, 52/17, 53/5, 54/18, 54/21, 54/24, 55/7, 56/2, 56/9, 56/12, 57/19, 57/25, 58/5, 58/10, 58/11, 60/8, 60/10, 60/14, 62/18, 63/14, 63/18, 64/1, 65/3, 65/20, 65/25, 66/14, 67/10, 67/13, 69/10, 69/14, 70/16, 72/11, 72/25, 76/11, 83/19, 86/7, 87/14, 90/3, 90/6, 90/16
Mr. Orcutt's 72/9
Mr. Pendleton 33/17
Mr. Rowsey 4/22, 43/7, 43/9, 43/22, 51/6, 52/6, 52/13, 60/4, 61/6, 61/14, 66/8, 67/3, 68/2, 68/3, 68/14, 68/15, 68/22, 69/4, 82/22, 83/6, 84/5, 86/14, 86/17
Mr. Rowsey's 50/16
Ms. Farquhar 3/4, 4/21, 4/24, 5/22, 26/3, 31/4, 32/5, 33/20, 35/15, 36/11, 37/9, 39/17, 40/11, 40/16, 41/17, 47/25, 49/4, 53/2, 55/5, 62/9, 63/10, 63/21, 63/23, 64/19, 70/14, 70/18, 70/21, 72/12, 72/13, 73/5, 76/13, 76/24, 77/2, 77/6, 78/2, 78/6, 79/9, 79/18, 82/14, 83/1, 83/3, 86/9, 87/16, 87/22
multifamily 18/10
multiphase 37/19
multiphased 10/15, 11/17
multitude 38/25

JAMES GARDNER

Myers  7/7

## N

N.A  1/9, 2/9
name  4/7, 21/16, 22/22, 23/12, 24/4, 27/13, 41/23, 42/7, 44/21, 77/17
name's  70/22
names  26/14, 45/3, 81/1
NATIONAL  1/9, 2/9, 7/2
nature  81/13
need  4/15, 5/15, 54/5, 56/9
needed  12/3, 12/9
negative  43/6
negatively  86/11, 86/15, 86/18, 86/22, 88/12
negotiated  47/21, 56/17
negotiations  18/14, 22/24, 23/6, 23/9, 45/25, 47/15, 49/22, 51/3
neighborhood  9/19
net  69/4
New  20/7, 36/5, 54/8, 58/17, 59/7, 61/8, 80/7
nice  35/25
Nicklaus  42/5
nods  60/23
nondefensible  58/17, 59/7
nondisclosure  26/22, 72/15, 72/21, 73/7
nonrefundable  40/15, 40/25
normally  28/14, 30/23
North  2/11
Notary  1/19, 91/19, 92/7
notes  69/16, 91/10
nuances  39/23, 81/14
number  4/10, 9/10, 13/20, 19/18, 48/8, 48/13, 52/8, 56/11, 69/9, 83/4
numbers  46/9, 47/14, 48/2, 48/6, 74/10

## O

Oath  3/8, 4/4, 92/1
object  25/1, 32/6, 33/18, 34/14, 58/3, 62/5, 63/8, 65/18, 76/11, 86/7, 87/14
objection  18/7, 26/3, 31/4, 32/5, 33/20, 35/15, 35/16, 36/11, 37/9, 37/12, 39/17, 39/19, 40/11, 40/16, 41/17, 47/25, 49/4, 53/2, 53/4, 55/5, 62/9, 63/10, 63/21, 63/23, 63/25, 64/19, 64/21, 70/14, 75/4
objections  75/11, 75/17
objective  65/2, 71/5
obligation  14/2
obligations  12/25, 13/12, 16/4, 30/10
observe  62/13
occasions  29/6, 88/16
occupation  4/9
occupational  6/24
occurring  23/1, 83/23
oceanfront  30/16
off-the-record  13/8, 22/7, 62/12, 90/18
offer  49/20, 61/7, 61/23, 62/11, 63/1, 63/13, 69/16, 69/22, 84/20
offering  18/25, 19/4, 19/14, 21/24, 46/20, 49/3, 68/23
offers  20/16, 20/22
office  85/10
officer  33/13
official  92/5
on-site  33/16
OPERATING  1/6, 2/7, 14/3, 49/1, 74/10
operation  55/11
operations  7/11, 7/13
opinion  12/20, 16/5, 28/3, 31/8, 37/5, 37/18, 38/16, 39/11, 41/6, 74/22, 75/8, 86/11, 86/15, 86/18, 86/22, 87/5, 87/9, 88/13
opinions  41/8
oral  66/13
Orange  2/11
ORCUTT  2/2
orders  30/19
organization  34/10, 34/24, 35/2
original  74/14
originally  49/2
Orlando  2/12, 73/16
out-of-state  28/15
outstanding  51/1
oversee  31/21, 31/23
owned  8/12, 8/17, 15/13
owners  33/6
ownership  8/2, 18/2
owning  9/8

## P

P-7  54/20
P-e-n-n  26/13
P.A  2/2
P.M  1/16
pace  40/2
package  72/18, 73/11, 73/21, 74/14
paid  21/23, 76/3
Palm  7/12, 14/12, 16/12, 16/24, 42/20, 83/20, 89/19
paper  24/3
paragraph  22/18, 49/12, 50/23, 60/25
paraphrasing  51/1
parks  12/18
part  9/14, 11/10, 14/2, 14/10, 19/2, 20/5, 28/9, 56/5, 76/9, 83/10
participate  31/21, 31/23
participated  62/3
participating  90/11
parties  3/22, 5/5, 21/7, 91/12
parties'  91/13
partner  27/5, 87/20, 88/5
partners  1/6, 2/8, 23/19
Partnership  1/6, 1/7, 28/4
parts  19/3
party's  5/16
passed  8/22, 10/23
PAUL  1/9, 2/8, 33/9, 81/10, 82/8, 86/10
pause  45/15, 50/19, 52/16, 54/22, 60/11, 67/12, 78/5, 79/16
payment  55/16
payments  13/21
Penn  26/13
Pennsylvania  73/2
percentages  88/21
performed  63/20
period  36/8, 40/22, 41/3, 89/11
permitting  30/15
personally  92/4, 93/4
perspective  41/5
Peter  24/6, 24/8
Pezzulli  2/5
phone  60/3
phonetic  7/10, 8/5, 26/12, 29/19
picked  13/24
picture  45/23, 73/12
piece  18/11, 69/7
pieces  17/23, 18/9
pilot  7/2
PLACE  1/17, 49/15
places  70/19
Plaintiffs  1/4, 2/4
Plaintiffs'  3/11, 3/12, 3/13, 3/14, 3/15, 3/16, 22/11, 23/23, 44/14, 45/10, 50/13, 52/10, 54/16, 57/12, 60/7, 67/8, 69/12
plan  8/24, 9/24, 11/2, 11/10, 15/5, 17/8
planners  9/22
planning  10/24
plans  11/8
played  33/5
player  42/11
players  36/5
point  11/1, 12/8, 18/3, 18/8, 21/18, 27/13, 38/11, 39/22, 40/14, 42/1, 43/21, 45/25, 49/24, 57/8, 59/10, 61/12, 61/21, 73/15, 77/22, 81/3
points  12/6, 12/7
Ponce  1/22
portion  14/11
position  7/17, 33/15, 58/17, 59/6, 63/12, 76/16
positive  5/19, 41/23
possible  21/10, 23/10, 24/15, 61/22, 64/12
potential  19/10, 19/16, 24/12, 38/17, 38/25, 44/5, 44/24, 49/13, 49/18, 71/23, 81/17, 81/20, 81/24, 81/25
practice  26/18
prejudice  5/16
premise  47/22, 48/7
preparation  21/24
prepared  19/1, 73/17
preparing  64/18
presentation  68/15
presented  52/22, 67/22, 68/1
preservation  12/13
president  7/16, 11/22
pressure  14/24
pressures  49/23
Preston  2/6
pretty  21/16, 31/11, 38/10

## Q

price  46/5, 47/7, 47/12, 47/19, 48/8, 48/21, 48/23, 55/25, 69/5
principals  4/22, 41/16
pro  46/7, 73/17
problem  11/16, 40/3, 83/8, 83/11, 83/12, 84/8
problems  8/21, 37/24, 38/19, 39/13, 39/24
proceed  60/17
process  10/24, 33/22, 36/25, 39/6, 39/12, 39/13, 39/15, 63/6, 63/15, 64/7
produced  8/24, 46/9, 56/3
project  8/3, 9/12, 9/17, 12/20, 13/2, 13/13, 14/16, 14/19, 16/3, 16/6, 16/10, 16/19, 17/5, 17/23, 18/2, 20/18, 21/8, 22/1, 22/17, 24/2, 28/5, 28/17, 29/8, 30/3, 30/24, 35/8, 36/16, 37/5, 37/8, 37/17, 37/19, 38/23, 38/25, 39/3, 41/18, 41/25, 43/20, 47/8, 59/9, 62/22, 67/20, 72/19, 73/10, 73/12, 73/17, 84/21, 85/23, 90/7
projects  27/18
promoted  7/16
pronounce  29/17
Properties  22/16, 22/19
property  12/21, 15/7, 18/3, 30/16, 44/4, 46/6, 46/23, 48/18, 49/14, 53/22, 61/16, 61/20, 66/9
propose  83/16
proposed  61/9
prospect  41/13
protected  30/17
provide  73/25
provisions  11/4
Public  1/19, 7/8, 91/19, 92/7
purchase  20/17, 21/1, 21/8, 24/13, 34/24, 36/9, 47/9, 47/19, 47/23, 48/23, 53/21, 55/1, 69/4, 71/23, 80/21, 81/7, 81/17, 81/20, 81/25, 87/18
purchased  9/4, 9/5, 9/9, 47/23, 48/9
purchaser  36/9, 40/8, 44/5, 75/25
purchasers  19/11, 19/13, 19/16, 22/17, 24/12, 38/17, 38/25, 44/24, 49/13, 49/18, 87/12
purchasing  8/7, 47/1, 47/4, 48/24, 67/20, 85/22
purposes  18/17
pursue  43/20
pursuing  15/8
put  8/15, 10/4, 10/14, 11/1, 11/6, 14/24, 15/5, 17/6, 28/11, 28/13, 38/8, 40/14, 40/25, 47/11, 48/7, 71/3
putting  28/16

## Q

qualified  18/9
qualify  32/11
question  10/18, 13/4, 16/21, 25/2, 32/7, 33/19, 34/15, 40/5, 48/11, 58/4, 62/6, 62/15, 63/9, 73/23, 76/12, 86/8, 87/15
questions  5/15, 38/18, 40/9, 57/13, 65/7, 70/18, 72/9, 79/14, 87/23, 87/25, 90/2
quick  51/23, 64/13, 69/16
quote  13/17, 51/17, 51/18, 51/19

## R

race
raised  48/24
ran  8/21, 32/15
range  47/20, 47/21
rate  71/3, 71/4, 71/9
rates  14/24, 14/25
raw  17/2
Rayonier  8/12, 8/17, 9/8, 10/4, 15/11
reach  65/1
reaction  43/18, 83/5, 83/7
read  27/13, 36/17, 46/15, 48/16, 90/19
reading  3/23, 69/19
REALTY  1/3, 4/19, 71/19, 76/8, 81/23, 82/5, 86/15, 86/23
Realty's  81/19
reason  18/1, 33/7, 61/18, 62/22, 62/25, 77/16, 79/5
reasonable  29/4, 74/24
reasons  37/19
recall  20/16, 43/15, 45/2, 55/17, 59/25, 67/24, 69/17, 69/18, 69/19, 69/20
receipt  51/7, 51/11
receive  26/25
received  5/18, 19/13, 20/17, 22/10, 23/22, 44/13, 45/9, 50/12, 52/9, 54/15, 57/22, 67/7, 69/11, 76/5, 76/21, 77/24, 79/6, 82/11, 83/5, 84/4
receiving  20/6
recess  52/3
reclaimed  27/23, 30/5, 34/6
recollection  14/17, 23/14, 24/7, 27/17, 28/1, 43/8,

JAMES GARDNER

56/16, 60/15, 60/16, 66/25, 82/20, 84/11, 87/21, 88/6
record 4/7, 13/7, 22/6, 25/24, 86/8, 90/17, 91/10
records 20/13
Redirect 3/5, 90/5
reduce 48/8
Reference 22/18, 49/11, 55/14, 56/14, 57/3, 65/22, 68/11
referenced 24/13, 41/13, 64/16
references 50/24, 58/2
referencing 54/4
refresh 52/22, 82/20
related 47/16, 55/25, 64/11
relates 10/22
relationship 31/12
relative 46/2, 74/11, 91/11, 91/13
reluctant 50/24
remember 10/8, 10/10, 12/8, 15/18, 19/18, 20/7, 20/12, 21/5, 21/9, 21/16, 22/21, 22/23, 23/12, 23/13, 24/17, 25/9, 26/10, 27/18, 28/11, 28/13, 28/14, 28/20, 28/23, 31/18, 41/12, 41/14, 41/22, 42/6, 42/13, 42/23, 43/3, 43/12, 43/14, 44/8, 44/19, 44/21, 44/25, 45/3, 45/19, 47/10, 48/2, 51/5, 54/1, 54/3, 55/12, 57/2, 58/18, 58/20, 61/11, 65/9, 65/11, 65/13, 66/22, 67/2, 67/14, 67/25, 68/18, 68/19, 69/1, 69/3, 70/3, 70/7, 71/24, 78/20, 81/3, 81/4, 81/12, 81/15, 82/10, 82/19, 83/2, 83/22, 84/15, 85/3, 85/8, 86/2
replaces 35/21
replan 8/23
reply 64/4
report 91/7
REPORTED 1/19
Reporter 3/7, 62/16
REPORTER'S 91/1
REPORTERS 1/21
represent 4/18, 5/2, 70/23
representatives 5/11
represented 83/19
represents 4/20, 4/21
request 5/20
requested 74/16, 76/17, 76/18, 91/9
requesting 36/14
require 6/22
required 15/1, 36/18, 37/6, 87/4
reserved 3/24
resolution 83/16
resolved 83/13
resolving 83/11
resources 39/4
respect 88/23
responded 86/1, 86/2
responding 14/23
response 5/19, 52/18, 73/24
responses 5/19
responsible 13/13
responsive 73/4, 74/15, 74/20, 74/23
rest 30/14
restart 8/23
result 11/6, 15/3, 15/16, 48/14, 61/13
resurrect 79/23
retain 17/9
retired 7/18
return 14/21, 15/4, 71/6, 75/21
review 91/8
rights 5/16
ring 26/14
rise 23/8, 23/15, 45/1
RMR 1/19, 91/6, 91/18
Road 2/6
roads 11/9, 14/12
Roadways 12/16
Robert 71/15, 81/10, 81/18, 81/22, 82/3, 82/4, 86/18
Roberts 21/19, 41/13, 41/22
Rogers 1/17, 2/15, 2/18
Rohn 26/12
role 31/2, 33/3, 33/5, 72/4
roles 81/19
room 13/10, 13/25, 57/16
routinely 72/17
ROWSEY 1/10, 2/8, 33/10, 43/16, 58/2, 60/20, 81/10, 82/8, 86/10
RPR-CP 1/19, 91/6, 91/18
Rummell 24/5, 24/6
run 32/12, 32/16, 50/3, 80/3
running 32/14, 32/15, 32/19, 33/12, 33/16, 33/23

## S

safety 12/14
said's 48/3
salary 55/21
sale 13/13, 16/23, 18/14, 21/25, 25/16, 44/4, 46/3, 48/17, 49/15, 55/1, 81/7, 89/9, 90/11
sales 15/3, 55/12, 55/23, 55/24, 59/15
saw 58/1
scattered 10/2, 18/4
school 5/8, 6/14
Science 6/2
screw 63/3
seaboard 8/13
seal 92/5
second 13/6, 14/4, 30/17, 30/18, 52/14, 87/4, 65/6, 74/8, 84/14, 84/17, 85/4
second-to-the-bottom 50/23
second-to-the-last 49/11
sell 13/2, 14/15, 14/18, 15/17, 17/23, 18/10, 19/24, 39/3, 40/1, 59/23, 80/4
seller 64/6
Selling 14/1, 18/9, 18/17, 47/1
send 61/9, 77/3
sense 32/16
sent 22/20
sentence 60/25
separate 78/14
series 52/25
serious 23/9, 23/15, 63/13
service 34/6
services 18/16, 21/24
serving 87/19
sewer 11/9, 12/12, 30/7
shakes 27/25, 69/23
share 77/4
Sheraton 15/12, 85/19
short 45/15, 50/19, 52/16, 54/22, 60/11, 67/12, 72/12, 78/5, 79/16
shorter 72/10, 72/12
shoulder 46/3
show 44/11, 50/11, 86/4
side 4/23, 47/14
sign 26/23, 54/5, 57/5, 64/22, 72/16, 73/6, 82/22
signed 25/13, 45/7, 52/21, 53/11, 53/21, 56/20, 56/25, 57/1, 58/15, 58/25, 59/8, 72/21, 82/9
signing 3/23, 21/18
site 19/17, 30/17, 30/18
situation 84/2
skip 23/18
small 14/14
Smolker 2/2
sold 16/10, 16/25, 17/16, 35/1, 46/6, 46/7, 49/7
solve 38/18
solved 40/4, 83/8
solving 39/13
sort 18/3, 46/7
sources 80/20, 80/25, 81/2
South 21/15, 41/12
southern 8/15
species 30/18
speculation 32/7, 37/10, 39/18, 40/12, 40/17, 48/1, 49/5, 63/24, 64/20
spending 38/17
spent 7/1, 40/2
spin 15/9, 15/11
spun 15/10
staff 19/5, 23/7, 29/6, 32/23, 43/23
stage 83/7
standard 26/22, 72/15, 73/11, 73/21
start 19/20, 39/14, 80/7
started 8/19, 9/8, 9/17, 10/9, 11/11, 39/2, 39/12, 49/7, 64/9
Starwood 24/21, 25/12, 25/13, 25/19, 44/8, 52/21, 53/8, 61/7, 61/9, 61/15, 61/19, 63/22, 66/11, 66/23, 67/11, 67/16, 67/23, 68/5, 68/16, 68/23, 68/8, 69/15, 84/20, 84/22, 85/15, 85/22, 85/24, 86/5
state 4/7, 6/3, 6/5, 8/22, 11/5, 11/8, 74/12, 91/3, 91/19, 92/2, 92/7, 93/1
statement 43/19, 47/18, 50/6, 53/6, 68/19
STATES 1/1
Statutes 10/17
stenographic 91/10
stenographically 91/7
stipulate 5/14
stipulated 3/21
stockholder 14/24
stockholders 14/19, 71/5
stop 32/18

## T

stored 73/1
storm 12/12
story 72/11
Street 1/17, 2/15
Strike 83/11
Studies 13/23
study 47/7
submit 49/20
submitted 53/8, 66/1
subpoenaed 5/4
subpoenas 73/4
subs 15/16
Subscription 3/8
subsidiary 13/18
subs 15/16
successful 22/24
successfully 47/21
sue 76/8
sued 51/16, 70/1
Suite 1/17, 1/22, 2/3, 2/6, 2/12
summer 5/6
support 9/23
suspect 56/10
switched 70/19
sworn 4/3, 92/4, 93/5
system 34/6
systems 27/24, 30/5

## T

talk 49/13, 51/11, 61/6
talked 39/14, 42/16, 46/19, 51/6, 68/19
talking 16/11, 16/13, 16/16, 16/19, 20/22, 24/1, 24/8, 45/23, 50/2, 50/7, 52/5, 56/11, 61/11, 65/21, 66/13, 77/21, 79/21, 79/22, 88/25
Tampa 2/3
task 16/1
team 28/9, 32/2, 39/7, 39/11
technical 28/16, 30/23, 31/1, 34/19, 35/7, 62/1
telephone 52/5, 61/13, 66/8, 66/15, 68/12, 68/13, 68/16
telephonically 51/7
ten 20/20
tendered 22/9, 23/21, 44/17, 45/14, 50/18, 52/15, 54/14, 57/21, 67/6, 79/11, 82/16
termed 71/3
terminus 8/15
terms 36/3, 88/7, 88/18
testified 4/3, 71/2, 83/18, 84/12, 88/15
testify 5/18
testimony 30/25, 53/3, 62/10
Texas 1/7, 1/8, 1/9, 2/6, 5/13, 67/2
Thank 4/25, 29/23, 52/2, 57/19, 58/10, 70/17, 87/22, 90/16
Thanks 5/23
THEREUPON 4/1, 90/20
third-party 5/3
thousand 9/20, 31/15
three 78/13
tie 70/9
timber 10/5
TIME 1/16, 5/18, 6/8, 8/12, 9/5, 12/8, 15/10, 18/4, 20/6, 25/19, 25/21, 26/22, 28/6, 33/23, 36/8, 36/15, 40/2, 41/3, 43/21, 45/21, 45/25, 49/24, 52/7, 52/21, 53/8, 53/22, 54/12, 56/23, 57/8, 59/10, 61/12, 61/21, 63/2, 63/16, 64/24, 68/14, 70/5, 71/1, 71/10, 71/14, 71/21, 72/3, 73/25, 74/24, 75/8, 77/22, 80/3, 80/9, 80/13, 80/15, 80/19, 84/4, 87/24, 89/11
times 32/23, 38/12, 62/14, 89/8, 89/13
TODD 1/10, 2/8
tolls 13/22, 13/23
Towers 1/17, 2/15, 2/18
tracts 9/9, 24/4
training 7/2
transaction 66/3
transcript 3/23, 91/8, 91/9
transferred 10/4
transition 35/10
treated 55/24
true 23/17, 49/6, 58/23, 91/9
Tucker 42/7, 42/9
Tucker's 42/11
Tuesday 1/15
turn 61/1, 71/7, 83/4, 87/1
two 5/5, 24/21, 32/25, 41/19, 42/10, 44/6, 47/13, 48/21, 64/14, 66/12, 70/24, 73/4, 84/12, 88/16, 88/25
type 6/17, 37/7, 49/22, 87/3
types 8/6, 8/7, 10/1, 11/8

JAMES GARDNER

## U

U.S 8/7
ugly 35/25
undersigned 92/3, 93/5
undeveloped 15/7
unhappy 84/1
UNITED 1/1
University 5/7, 6/3
untrue 50/6

## V

valid 57/8, 62/11, 63/1
value 17/6, 18/22, 82/3
valued 46/23
values 17/9
vice-president 7/10, 7/13
Vicky 29/17
view 18/8, 39/22
visited 19/17, 41/24
visiting 5/7

## W

waiver 5/16
walks 62/21
warehouse 73/1
water 11/9, 12/12, 30/7, 34/6
Waterhouse 47/7, 47/12
Wentsworth 44/18
wetland 30/16
Whitley 42/7, 42/9
wife 27/3
wildlife 30/18
WILLIAM 1/10, 2/9
willing 40/14, 60/21, 66/18
win 51/19
wind 32/24
WITNESS 3/2, 5/3, 14/1, 23/25, 24/6, 27/25, 31/5, 33/21, 37/13, 39/20, 40/18, 41/18, 48/2, 49/6, 54/23, 60/6, 60/12, 60/23, 62/7, 62/11, 62/17, 63/11, 64/22, 69/23, 77/5, 83/2, 92/5
word 20/7, 73/12
words 16/25, 43/11, 43/15, 45/24, 48/7, 51/18, 51/20
work 7/9, 7/12, 16/2, 37/23, 38/13, 46/10, 46/18, 73/16, 80/3, 80/4, 80/5, 82/3
worked 7/5, 21/4, 23/8, 29/1, 32/21, 38/10, 48/11
working 12/12, 30/24, 40/3, 42/22, 56/23, 71/22, 75/9, 79/22, 80/25, 83/22
works 7/8
wound 8/23, 9/24, 36/21, 47/13
write 68/2, 79/24, 80/1
wrote 77/12, 77/16, 80/9, 80/13

## X

X 3/1, 3/10

## Y

year 6/4, 7/1, 7/14, 15/19, 20/4, 39/8
years 4/11, 7/6, 7/9, 7/12, 10/9
York 20/7, 58/17, 59/7

93

STATE OF FLORIDA     )

COUNTY OF ST. JOHNS )

I, JAMES E. GARDNER, personally appeared before the undersigned authority and, being first duly sworn, depose and say that I have read the testimony in the foregoing deposition given by me, constituting pages 4 through 90, and subject to the corrections listed below, if any, it is true and correct.

PAGE    LINE        CORRECTIONS AND REASONS THEREFORE

JAMES E. GARDNER

ORIGINAL TRANSCRIPT