

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

LOCHMERE DEVELOPMENT §
GROUP, INC., and LOCHMERE §
REALTY, INC., §
§
Plaintiffs §
§
v. § CASE NO.
§ 8:00-CV-1026-T-27B
H.D. ASSOCIATES, L.P., a Delaware §
Limited Partnership by and through § STATE COURT NO.
its general partners DUNES § 00-02525/Div. 1
OPERATING COMPANY, L.P., a §
Delaware Limited Partnership and §
EIGER, INC., a Delaware Corporation §
2M DUNES, L.L.C., a Texas Limited §
Liability Company, DAVID LANE, an §
Individual; BARNETT LANE §
INVESTMENTS, INC., a Texas §
Corporation; JTL CAPITAL, L.L.C., §
A Texas Limited Liability Company; §
FLEET NATIONAL BANK, N.A., a §
National Banking Association; PAUL E. §
ROWSEY, III, an Individual; C. TODD §
MILLER, an Individual; DAVID M. §
JACOBS, an Individual; and, WILLIAM §
S. BUCHANAN, an Individual, §
§
Defendants §

## MOTION OF DEFENDANTS DAVID LANE, INDIVIDUALLY, BARNETT LANE INVESTMENTS, INC. AND JTL CAPITAL, L.L.C., FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM OF LAW AND SUPPORT THEREOF

A. INTRODUCTION

1.      Defendants David Lane, individually, Barnett Lane Investments, Inc. and JTL Capital, L. L. C., (collectively, for purposes of this motion, "the Lane Defendants"), hereby move the Court for an award of attorney's fees incurred by the Lane Defendants in defense of claims asserted against the Lane Defendants by Lochmere Development Group, Inc. and Lochmere Realty, Inc.

(collectively, for purposes of this motion, referred to as "Plaintiffs"). The Lane Defendants assert that Lochmere failed to present even a scintilla of evidence to support Plaintiffs claims and, in fact, the evidence clearly established that there was no reasonable basis for the bringing of such claims against the Defendants by Plaintiffs.

## B. ARGUMENT

2.      As the Court will recall, at the conclusion of the trial, four (4) questions were submitted to the Jury. A true and correct copy of the Verdict Form for this case is attached hereto as Exhibit "A." The two operative liability questions in the verdict form provided to the Jury were as follows:

> 2.      **Do you find that any of the following Defendants misappropriated a trade secret possessed by Lochmere Development Group, Inc.?**
> **David Lane**                              **Yes/No**
> **Barnett Lane Investments, Inc.**          **Yes/No**
> **JTL Capital, L.L.C.**                     **Yes/No....;**
>
> 3.      **Do you find that any of the following Defendants engaged in a civil conspiracy to misappropriate Lochmere Development Group, Inc.'s trade secrets?**
> **David Lane**                              **Yes/No**
> **Barnett Lane Investments, Inc.**          **Yes/No**
> **JTL Capital, L.L.C.**                     **Yes/No....;**

3.      The basis of Plaintiffs' claims against the Lane Defendants at the time of submission to the jury, all other claims of Plaintiffs having been dismissed as a matter of law by the Court prior to submission, was whether or not the Lane Defendants "misappropriated" a trade secret of Plaintiffs.

4.      Robert Evans, the representative of both Plaintiffs, testified that the Master Development Budget was the only trade secret which Plaintiffs' claim was misappropriated:

MOTION OF DEFENDANTS DAVID LANE, INDIVIDUALLY, BARNETT LANE INVESTMENTS, INC. AND JTL CAPITAL, L.L.C., FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM OF LAW AND SUPPORT THEREOF

Page 2

Q.     So, not withstanding the fact that you're not claiming all this information is a trade secret, on July 12th, you demand that Eiger return all of it to you, don't you, Sir?

A.     Sir, what I demanded was to be - for the return of my trade secrets, proprietary information and anything that I had sent them. I wanted it back. And it's my budget. It is the conclusions of that budget that are trade secrets, Sir. Page 183, trial testimony of Robert Evans (Attached as Exhibit "B").

Q.     And that budget is a revision of what previously had been five versions of the Master Development Budget. The same five documents that you are claiming are trade secrets, correct?

A.     Yes, Sir. Page 134, trial testimony of Robert Evans (Attached hereto as Exhibit "C").

5.     Inasmuch as the Plaintiffs' only claim against the Lane Defendants related to misappropriation of trade secrets, it is clear that there is no legitimate basis for Plaintiffs to assert such a cause of action against the Lane Defendants. The testimony of the representative of the Plaintiffs on this issue is unequivocal:

Q.     ...Mr. Lane didn't give any version of this Master Development Budget to anybody that you didn't intend to have it, did he?

A.     Not that I'm aware

Q.     Okay. You had no knowledge that he ever gave it to anyone that either you didn't give it to or you consented to; Is that right?

A.     To the best of my knowledge....

Q.     In fact, the only person...the only entity that you are aware of that he did give it to, if anyone, was Eiger, and you also gave it to Eiger, Right?

MOTION OF DEFENDANTS DAVID LANE, INDIVIDUALLY, BARNETT LANE INVESTMENTS, INC. AND JTL CAPITAL, L.L.C., FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM OF LAW AND SUPPORT THEREOF

Page 3

**A.**      **Yes, sir. That's correct.** Page 124, trial testimony of Robert Evans (Attached hereto as Exhibit "D").

6.      In order for there to be a finding of misappropriation of trade secrets under Florida Law, the complaining party must establish either;

> A.)      Acquisition of a trade secret of another by a person who knows or has reason to know that that trade secret was acquired by improper means; or

> B.)      Disclosure or use of a trade secret of another without express or implied consent by a person.....

7.      Clearly, there was absolutely no evidence to support the Plaintiffs' allegations with regard to the Lane Defendants.   Robert Evans, the representative of the Plaintiffs, testified without qualification that the alleged trade secret (the Master Development Budget) was given to David Lane by Robert Evans, and Robert Evans consented to David Lane's delivery of the Master Development Budget to Eiger.   In fact, that delivery was done at the direction of Robert Evans.

8.      It is clear that the Plaintiffs' claim of misappropriation of trade secrets by the Lane Defendants is wholly without merit and brought in bad faith.   For the purposes of awarding attorney's fees under the Uniform Trade Secrets Act, bad faith can be established by circumstantial evidence. *Russo v. Baxter Healthcare Corp.*, 51 F Supp. 2d. 70 (d.r.i. 1999).   A claim or defense is groundless, for purposes of awarding attorney fees under the Uniform Trade Secrets Act, if the allegations end in complaint, while sufficient to survive a motion to dismiss for failure to stay to claim, are not supported by any credible evidence at trial. *Colorado Supply Company, Inc. v. Stewart*, 797 P 2d. 1303 (Colo. App.1990).   While in common usage "bad faith" may be an element of "maliciousness," a strict legalistic concept of maliciousness is not an element of bad faith in an action based on interference with a perspective contractual

MOTION OF DEFENDANTS DAVID LANE, INDIVIDUALLY, BARNETT LANE INVESTMENTS, INC. AND JTL CAPITAL, L.L.C., FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM OF LAW AND SUPPORT THEREOF

Page 4

relationship. *Frank Coulson, Inc./Buick v. General Motors Corp.*, 488 F2d. 202 (Fifth Circuit 1971) (applying Florida Law).

9.   A simple comparison of the sworn trial testimony of Robert Evans to the requirements of establishing misappropriation of trade secrets demonstrates that there was not even a scintilla of evidence to support Plaintiffs' allegations. Plaintiffs were required to establish or at least have some basis for claiming that the Lane Defendants obtained the trade secret improperly and disclosed those trade secrets without consent. In fact, Plaintiffs knew from the very beginning that the alleged trade secret had not been obtained by the Lane Defendants improperly. Indeed, the Master Development Budget had been willingly given by Plaintiffs to the Lane Defendants. Moreover, the Plaintiffs knew at all times that the Lane Defendants had not disclosed those trade secrets without consent. In fact, to the extent those trade secrets were disclosed by the Lane Defendants, such disclosure took place not only with the consent of, but at the direction of, Plaintiffs. Therefore, the only possible conclusion is that such allegations, the only allegations sufficiently strong to avoid dismissal as a matter of law, were wholly without merit. Therefore, Plaintiffs' claim must have been brought in bad faith.

10.   The Florida Uniform Trade Secrets Act, Chapter 688 of Title XXXIX "Commercial Relations", states the following:

> If a claim of misappropriation is made in bad faith, a motion to terminate an injunction is made or resisted in bad faith, or willful and malicious misappropriation exist, the court may award reasonable attorney's fees to the prevailing party. Section 688.005

11.   In this case, it is clear that Plaintiff's claim of misappropriation was made in bad faith. Therefore, it is within the court's discretion to award reasonable attorney's fees.

## C. ATTORNEY'S FEES

MOTION OF DEFENDANTS DAVID LANE, INDIVIDUALLY, BARNETT LANE INVESTMENTS, INC. AND JTL CAPITAL, L.L.C., FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM OF LAW AND SUPPORT THEREOF

Page 5

12.    As is evidenced by the Affidavit attached hereto as Exhibit "E," the Lane Defendants incurred $ 131,235.82 in reasonable and necessary attorney's fees and $21,614.04 in costs for the defense of this case.  The Lane Defendants would show that of the myriad causes of action originally alleged by Plaintiffs, those causes of action were so inextricably intertwined that it is impossible to segregate the attorney's fees incurred in the defense of the respective claims.  As the Court will recall, Plaintiffs alleged at various times that a partnership existed, that a joint venture existed, that there was a fiduciary relationship between Plaintiffs and the Lane Defendants, that the Lane Defendants converted the trade secrets, that the Lane Defendants engaged in fraud to obtain the trade secrets, that the Lane Defendants conspired to obtain the trade secrets, that the Lane Defendants used the trade secrets to usurp a business opportunity, and many more.  The essence of all those causes of action was that the Lane Defendants (as well as the other Defendants) had wrongfully obtained the trade secrets.  Plaintiffs should be held accountable for such "shotgun" allegations in that the Lane Defendants should be awarded their attorney's fees in total because the defense of one of those claims could not be differentiated or segregated from the preparation of the defense of all of the claims.

13.    The Lane Defendants would respectfully submit that they should be awarded $152,849.86 amount as attorney's fees under the provision of Section 688.005 of the Florida Uniform Trade Secrets Act.

MOTION OF DEFENDANTS DAVID LANE, INDIVIDUALLY, BARNETT LANE INVESTMENTS, INC. AND JTL CAPITAL, L.L.C., FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM OF LAW AND SUPPORT THEREOF

Page 6

Respectfully submitted,

HILL GILSTRAP

By:_____
    John W. Greene
    State Bar No. 08391520

1400 West Abram
Arlington, Texas 76013
(817) 261-2222
(817) 277-3249 FAX

and

Alan M. Gerlach
State Bar No. 199184
BROAD AND CASSEL
390 N. Orange Avenue
Suite 1100
Orlando, FL 32801
Phone: 407/ 839-4200
Via Facsimile: 407/425-8377

ATTORNEYS FOR DEFENDANTS
DAVID LANE, BARNETT LANE
INVESTMENTS, INC. and
JTL CAPITAL, L.L.C.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been sent via regular mail on _____APRIL 30_____, 2002, to all counsel of record.

_____
John W. Greene

MOTION OF DEFENDANTS DAVID LANE, INDIVIDUALLY, BARNETT LANE INVESTMENTS, INC. AND JTL CAPITAL, L.L.C., FOR ATTORNEY'S FEES AND INCORPORATED MEMORANDUM OF LAW AND SUPPORT THEREOF

Page 7

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

LOCHMERE DEVELOPMENT
GROUP, INC. and
LOCHMERE REALTY, INC.,

        Plaintiffs,

                                      Case No.: 8:00-cv-1026-T-27B

v.

H.D. ASSOCIATES, L.P. a Delaware limited
partnership by and through its general partner
DUNES OPERATING COMPANY, L.P., a
Delaware limited partnership by and through
its general partners, EIGER, INC., a Delaware
corporation and 2M DUNES, L.L.C.,
a Texas limited liability company; DAVID LANE,
an individual; BARNETT LANE INVESTMENTS, INC.,
a Texas corporation; JTL CAPITAL, L.L.C., a
Texas limited liability company; FLEET NATIONAL
BANK, N.A., a national banking association;
PAUL E. ROWSEY, III, an individual,

        Defendants.

_____/

## VERDICT

**We the Jury,** find as follows:

1. On the claim of misappropriation of trade secrets, did Lochmere Development Group, Inc. possess a "trade secret" as defined by Florida law, namely, the master development budget?

                              Yes ___  No ___

*[If you answered NO to Question #1, your verdict is for the Defendants and you should not proceed further except to sign and date the verdict and return it to the courtroom. If you answered YES to Question #1, proceed to Question #2.]*



2. Do you find that any of the following Defendants misappropriated a trade secret possessed by Lochmere Development Group, Inc.?

David Lane                          Yes _____ No _____

Barnett Lane Investments, Inc.      Yes _____ No _____

JTL Capital, L.L.C.                 Yes _____ No _____

H.D. Associates, L.P. (a Delaware limited partnership by and through its general partner, Dunes Operating Company L.P., a Delaware limited partnership, by and through its general partners, Eiger, Inc., and 2M Dunes, L.L.C., a Texas limited liability company)

                                    Yes _____ No _____

Paul E. Rowsey III                  Yes_____ No _____

Fleet National Bank, N.A.           Yes_____ No_____

*[If you answered No for all Defendants in Question #2, your verdict is for the Defendants and you should proceed no further except to sign and date the verdict and return it to the courtroom. If you answered yes as to any Defendant, proceed to Question #3.]*

3. Do you find that any of the following Defendants engaged in a civil conspiracy to misappropriate Lochmere Development Group, Inc.'s trade secrets ?

David Lane                          Yes _____ No _____

Barnett Lane Investments, Inc.      Yes _____ No _____

JTL Capital, L.L.C.                 Yes _____ No _____

H.D. Associates ( a Delaware limited partnership by and through its general partner, Dunes Operating Company L.P., a Delaware limited partnership, by and through its general partners, Eiger, Inc. and 2M Dunes, L.L.C., a Texas limited partnership)

                                    Yes _____ No _____

Paul E. Rowsey, III                 Yes_____ No_____

Fleet National Bank, N.A.           Yes_____ No_____

*[Proceed to Question #4.]*

4.    For each Defendant for whom you answered YES to Question 2, state what amount of damages, if any, sustained by Lochmere Development Group, Inc. and caused by that Defendant's misappropriation:

David Lane                            $ _____

Barnett Lane Investments, Inc.        $ _____

JTL Capital, L.L.C.                  $ _____

H.D. Associates ( a Delaware limited partnership by and through its general partner Dunes Operating Company, a Dealaware limited partnership, by and through its general partners, Eiger, Inc. and 2M Dunes, L.L.C., a Texas limited partnership)

                                     $ _____

Paul E. Rowsey, III                 $ _____

Fleet National Bank, N.A.        $ _____

**SO SAY WE ALL** this ____ day of December, 2001.

_____
Foreperson

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| LOCHMERE DEVELOPMENT GROUP, INC., and LOCHMERE REALTY, INC., | § § § § | |
| Plaintiffs | § § § | |
| v. | § § | CASE NO. 8:00-CV-1026-T-27B |
| H.D. ASSOCIATES, L.P., a Delaware Limited Partnership by and through its general partners DUNES OPERATING COMPANY, L.P., a Delaware Limited Partnership and EIGER, INC., a Delaware Corporation 2M DUNES, L.L.C., a Texas Limited Liability Company, DAVID LANE, an Individual; BARNETT LANE INVESTMENTS, INC., a Texas Corporation; JTL CAPITAL, L.L.C., A Texas Limited Liability Company; FLEET NATIONAL BANK, N.A., a National Banking Association; PAUL E. ROWSEY, III, an Individual; C. TODD MILLER, an Individual; DAVID M. JACOBS, an Individual; and, WILLIAM S. BUCHANAN, an Individual, | § § § § § § § § § § § § § § § § § § § | STATE COURT NO. 00-02525/Div. 1 |
| Defendants | § | |

## AFFIDAVIT OF JOHN W. GREENE

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TARRANT | § |

Before me, the undersigned notary public, appeared JOHN W. GREENE, personally

known to me, who, after being sworn stated and deposed as follows:

1.     My name is John W. Greene. I am a resident of Johnson County, Texas. I am over the age of eighteen years. I have never been convicted of a felony or a crime involving moral turpitude. I am not disqualified in any respect from giving the testimony contained herein and have personal knowledge of same.

**AFFIDAVIT OF JOHN W. GREENE**                                                        **PAGE 1**

2.    I was present at the trial of this case and have reviewed the daily transcripts of trail testimony prepared by the court reporter during the trial. Exhibit's B, C and D attached hereto are true and correct copies of the daily trial transcript obtained from the court reporter.

FURTHER, AFFIANT SAYETH NOT,

_____
John W. Greene

SUBSCRIBED AND SWORN to before me on this ___30th___ day of _April_ 2002.

_____
Notary Public in and for the State of Texas

M. CARMEN BANNISTER
MY COMMISSION EXPIRES
JUNE 8, 2002

**AFFIDAVIT OF JOHN W. GREENE**                                    **PAGE 2**

Lockmere, are you?

A.   No sir.  That is raw data.  I said that from the beginning, and that's been my interpretation.  To make it clear, is I worked with all these consultants and their end product or raw data, was directly related to my input or my involvement.  That's how you end up getting the raw data.

Q.   Are you done?

A.   Go ahead.

Q.   So, notwithstanding the fact you're not claiming all this information is a trade secret.  On July 12th, you demand that that Eiger return all of it to you, don't you sir?

A.   Sir, what I demanded was to be -- for the return of my trade secrets, proprietary information and anything that I had sent them.  I wanted it back.  And it's my budget.  It is the conclusions of that budget that are trade secrets, sir.

Q.   Sir, you didn't just ask for your budgets back on July 12th.  You said --

A.   I wanted everything back.

Q   Yes sir

A.   That I provided to them.

Q.   Yes sir.

A.   Pack it up and send it back.

Q.   Yes sir.

---

Lochmere he.   demands that you return all information related to Hammock Dunes that Lochmere has provided to you.  You wanted back not only these budgets, you wanted the Pricewaterhouse report back, you wanted the Cushman & Wakefield report back, you wanted the CED report back, didn't you?

A.   I wanted anything back that I had actually sent that would be construed as trade secrets or any other data.  If they can have these information readily available to them, then they can got it.

Q.   Your letter doesn't say that.  It says you want all information back, doesn't it, sir?

A.   Well, sir.  I had this in cooperation with counsel, in the preparation of my demand letter, I related the information as I knew to my counsel, because they are the best ones I know to speak legal ease to another attorney.  So, I had them assist me in the preparation of the language that went into this letter.

Q.   This isn't legal ease to another attorney.  You just told the jury, sir, that you wanted all of the information back.  We just heard that, didn't we?  Yes sir?

A.   Yes sir.

Q.   And you made this demand on July 12th at a time that you're getting ready to put together a contract with Starwood, which is finally done on July 23rd, correct?

---

A.   Yes sir.  I wanted my information back.

Q.   You made this demand at a time when you're trying to buy the Hammock Dunes property without Eiger and without David Lane, correct?

A.   Yes sir.  The timing was the same.  I wanted whatever information that I had forwarded to them.  And if they want to find it wherever, they can go find it.  But anything that I had sent to them, I merely asked that they send it back.

Q.   Even though Mr. Lane had paid for it, and you now view Lane and Eiger as one in the same, correct?

A   Sir, they were working hand-in-hand throughout this project along with myself up until that point.

Q.   Let me ask you a question.

If you truly thought on July 2nd, as you told Starwood on July 6th that Eiger was dead on the deal, why did you wait until July 12th to demand all this information back, sir?

A.   Sir, after that, I went and I spoke with my attorneys and I was telling them what I was working on.  And their advice, they said, Bob you should probably go ahead and try to get your information back.  You don't know these people, and this is proprietary.  I talked to them about my budgets.  I talked to them about my agreement.  There is the same law firm that I had gone over with the first agreement that I drafted from Starwood, and was very cognisant of the

---

magnitude of involvement that I had with this project, and how upset I was when this whole thing started to fall apart or when it did fall apart.  So, I was talking to them at various times.  And at the advice of counsel, sir, that's why we sent this letter.

Q.   Isn't it the truth, Mr. Evans, you knew Eiger was still interested in this deal at least as of July 12th and prior there to, and you wanted this information back to increase the chance that you would win the competition with Starwood and without Eiger, without David Lane; isn't that the truth, sir?

A.   No sir.  Because I am not so sure if I even knew that Eiger was back in the race about then.  I was pretty sure that they weren't in the race about then, about that time.

Q.   You also provided to Starwood a copy of the Cushman & Wakefield report, didn't you?

A.   I may have.  If I had an extra copy of it I probably would have.

Q.   At a minimum, you know you gave Cushman -- Starwood in July, some of the pages from that report, don't we?

A.   From the Cushman Wakefield?

Q.   Yes?

A.   Yes sir  And if I had the whole report that had been published that had all the pretty pictures in it.

Q.   Yes sir?

EXHIBIT

B

you and without Eiger and without David Lai    orrect?

A.   Yes sir.

Q.   And then on July 8th, thereabouts, you meet with the seller, Mr. Gardner at ITT, and you tell him that Eiger is out of the picture, correct?

A.   I told him it was my understanding that Eiger may not be pursuing this venture, but Eiger could speak for themselves, and -- I wasn't trying to make any representation on behalf of Eiger, or Mr. Lane, or Mr. Rowsey, and it was up to them to decide what they wanted to do   And I made it very clear that I was not going to get into discussing dirty laundry with them.  And Mr. Gardner said, along the lines of, I appreciate that.  I'm sorry to hear it, was one of the conversations   This was probably 20, 30-minute meeting that I had with him there.

Q.   Okay

Then on July 23rd, you and Starwood are able to submit a written contract to buy this property for 26 million dollars, correct?

A.   Yes sir.  I hand-delivered that morning.

Q.   So, in less than three weeks, you are able to take Starwood, who didn't know anything about this project, to the point that they are able to sign this contract and submit it for 26 million, accurate?

A.   Well, I wouldn't say they didn't know anything about

it.  They had a ma   ole in Amelia Island just north.  So they were very familiar with the geographic area, the market conditions, the construction.  They had a lot of local knowledge in that area.  But, yes sir.  I met with them and discussed what I knew about the project.  And in that time frame, they made a decision to pursue it.

Q.   And yesterday in direct examination, you told the jury that in this one four-hour meeting, Starwood was ready to sign a check for 26 million dollars because they trusted you, and since you were involved, that was good enough for them?

A.   No sir.  I didn't say that   What I said was, they were ready to pursue this   I went up there and said we need to raise 50 million dollars.  I don't recall that being the exact words.  But they were ready, they had the 26 million dollars   They could write a check with it, and they wanted to pursue it because, you know, to pursuit.  They were in the capability to write a check for 26 million dollars.  They are a multi billion dollar real estate company, and they are not stupid money

Q.   Well, speaking of not stupid money, the day before on direct examination, you told the jury that Starwood is the type of investor who would require very detailed analyses like these master development budgets before they would get involved in a project like this.  Do you remember that?

A.   Oh, yes sir.

Q.   What you didn't tell the jury, during your direct examination, sir, is that one of the reasons that you and Starwood were able to work so quickly, is that you gave Starwood a new version of the master development budget that you had been working on with Eiger and Mr. Lane; isn't that true, sir?

A   Yes sir.  I went through, reviewed my master development budget   I modified some of my assumptions and I carried it with me when I met with them.

Q   Would you get Lochmere Exhibit 104, sir, that's in evidence?

MR  LOEWINSOHN:  And may publish that to the jury, Your Honor?

THE COURT   Yes   Going to take a break at 2 15 everybody

MR. LOEWINSOHN:  Okay   Your Honor, I'll get it identified and then we'll be at a breaking point.

BY MR. LOEWINSOHN:

Q.   Do you have it sir?

A.   The agreement again, sir?

Q.   Lochmere 104?

A   Yes sir.

Q   That's another version of the master development budget for Hammock Dunes, correct?

A.   Yes sir.

Q.   Lochmere Development according to you, prepared it, correct?

A.   Yes sir.

Q.   That budget was prepared for use of Starwood Capital, correct?

A   It was prepared for the benefit of Lochmere that I carried with me to meet with Starwood

Q   It was prepared for possible use by Starwood Capital, correct?

A   Yes sir   In the pursuit of this project

Q.   And that budget is a revision of what previously had been five versions of the master development budget.  The same five documents that you're claiming are trade secrets, correct?

A.   Yes sir

Q.   And you used one of the versions of these prior versions to prepare in whole or in part that budget, correct?

A.   Yes sir.  I went from one of my other budgets, and I made some modifications to it, and that was the -- my work product that I took to Connecticut.

Q.   And do you agree, sir, that you could not have prepared this version of the master development budget, which you gave to Starwood, without all the information you amassed

**EXHIBIT**

C

Page 122

Q. All right.
A. From their accounting department.
Q. Anybody else that you can recall?
A. Mr. Rowsey and Mr. Lane, Mr. Kennedy, Suarez and myself. I believe that was it.
Q. Would it be fair to say that some time not too long after this April 28th meeting, that Mr. Lane began to take a more passive role in this -- in the pursuit of this project?
A. I would say so, sir, because we were dealing more with the numbers and the complexities of how this deal worked from a development standpoint. And David had not been actively involved to a great degree in understanding the development issues. He relied upon me to explain the development issues. So, during that meeting of the 28th, again, I went over a whole array of development issues, and then we got into the actual budget itself.
Q. And you've seen the letter that's already been introduced into evidence from Mr. Rowsey to you, that references the fact that while David Lane, while Eiger initially wanted Mr. Lane to play a significant role in the management of the project, Mr. Lane's business and personal commitments in Dallas prevented him from doing that; is that correct?
A. Well, I think that is the June 8th letter you're referring to, sir?

Page 123

Q. I believe so. Yes sir?
A. So, it was a couple months later.
Q. Uh-hum?
A. It did in that letter.
Q. Right.
And Mr. Lane's involvement in review process and budget review and analysis, he began to become less and less in the picture after about April 28th; isn't that a fact?
A. I think that would be a fair statement. Because a lot of my involvement was starting -- it was focused on the financial aspects of it, which was something David was not familiar with, or the development aspects and how this whole thing worked.
Q. Okay.
A. So, I was spending more and more time with the -- directly with the Eiger representatives.
Q. All right.
And Mr. Lane was not involved in any of these negotiations, to your knowledge? Was not involved in any of these negotiations with Bank Boston; is that right?
A. I don't believe so at all. But David still was very active in the negotiations with the seller.
Q. Sure. Sure.
A. But as far as the involvement with the actual cash flows and my interaction with Eiger, other than reviewing

Page 124

the terms and conditions of the purchase agreement, David was very active in that aspect as well, though.
Q. With regard to Bank Boston?
A. No sir, in regards to the purchase agreement with the seller. I don't know that Mr. Lane had any involvement. I mean, I had no personal knowledge of Mr. Lane having involvement with Bank Boston.
Q. In that -- that was my question about Bank Boston. Mr. Lane didn't give any version of this master development budget to anybody that you didn't intend to have it, did he?
A. Not that I'm aware.
Q. Okay.
You had no knowledge that he ever gave it to anyone that either you didn't give it to or you consented to; is that right?
A. To the best of my knowledge.
Q. Okay.
He didn't give it to Bank Boston, to your knowledge?
A. No sir.
Q. In fact, the only person, the only entity that you're aware of that he did give it to, if anyone, was Eiger, and you also gave it to Eiger, right?
A. Yes sir. That's correct.
Q. Now, let me ask you, eventually you redrafted what we had marked, as or what had been marked as Plaintiff's

Page 125

Exhibit Number 9, I believe, which was the -- I'm sorry, Defendant's Exhibit Number 9, which was the -- this management development and marketing agreement dated April planning of '99. You redrafted that to reflect H. D. Associates; is that correct?
A. Yes sir.
Q. Okay.
And was this based on your understanding that H. D. Associates was going to become the eventual owner?
A. Yes sir. So, I just made that modification.
Q. Okay.
And who was going to pay Lochmere? It was going to be the owner of the property, right?
A. It would be the -- yes sir. It would be the owner of the property.
Q. If there was an agreement, if Lochmere was the developer, if Lochmere was performing services, those monies for compensation were to be paid out of the revenue of the project, right?
A. That is correct. It wasn't a matter of if, it was just a matter of when.
Q. And the owner is the one that would receive the revenue of the project, right?
A. Yes sir. The actual entity that would be created would be the entity that would be paying Lochmere.

**EXHIBIT**

D

32 (Pages 122 to 125)

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | | |
|---|---|---|
| LOCHMERE DEVELOPMENT GROUP, INC., and LOCHMERE REALTY, INC., | § § § § | |
| Plaintiffs | § § § | |
| v. | § § | CASE NO. 8:00-CV-1026-T-27B |
| H.D. ASSOCIATES, L.P., a Delaware Limited Partnership by and through its general partners DUNES OPERATING COMPANY, L.P., a Delaware Limited Partnership and EIGER, INC., a Delaware Corporation 2M DUNES, L.L.C., a Texas Limited Liability Company, DAVID LANE, an Individual; BARNETT LANE INVESTMENTS, INC., a Texas Corporation; JTL CAPITAL, L.L.C., A Texas Limited Liability Company; FLEET NATIONAL BANK, N.A., a National Banking Association; PAUL E. ROWSEY, III, an Individual; C. TODD MILLER, an Individual; DAVID M. JACOBS, an Individual; and, WILLIAM S. BUCHANAN, an Individual, | § § § § § § § § § § § § § § § § § § § § § § | STATE COURT NO. 00-02525/Div. 1 |
| Defendants | § | |

AFFIDAVIT OF JOHN W. GREENE

| | |
|---|---|
| STATE OF TEXAS | § § |
| COUNTY OF TARRANT | § |

Before me, the undersigned notary public, appeared JOHN W. GREENE, personally known to me, who, after being sworn stated and deposed as follows:

1.    My name is John W. Greene. I am a resident of Johnson County, Texas. I am over the age of eighteen years. I have never been convicted of a felony or a crime involving moral turpitude. I am not disqualified in any respect from giving the testimony contained herein and have personal knowledge of same.

**AFFIDAVIT OF JOHN W. GREENE**

EXHIBIT
E

**PAGE 1**

2.      I am licensed to practice law in the state of Texas. I am admitted to practice in the Eastern and Northern Districts of Texas. I have practicing law since 1985, primarily in the Fort Worth/Dallas area of Texas. I am familiar with hourly rates customarily charged by attorneys in Texas. I am Board Certified in Personal Injury Trial and Civil Trial Law and am familiar with the work required to prepare and try a case of this type.

3.      I am an attorney of record in the above-styled matter. Jennifer N. Cook is an associate with the firm and is also an attorney of record in this matter. Our time is billed in 1/10 of an hour increments. My time is billed at the rate of $200.00 an hour on this matter. Jennifer Cook's time is billed at the rate of $150.00 per hour in this matter.

4.      The fees billed in this matter have been $131,235.82.

5.      It is my opinion based upon my experience and practice involving matters of this type that (a) the services were all reasonably necessary taking into account the circumstances in question; (b) the charges for said services were all for reasonable amounts; and that (c) the hourly rates at which the attorneys' time was billed are in line with those customarily charged by attorneys in Texas.

6.      The above statements are all true and correct and of my own personal knowledge or as to paragraph 4 above, were taken from records of regularly conducted business activity, made at or near the time by, or from information transmitted by, a person with knowledge of the facts contained therein. It is in the regular practice of Hill Gilstrap to maintain such records of attorney' time, as shown by the attached billing summary.

_____

John W. Greene

SUBSCRIBED AND SWORN to before me on this _____30th_____ day of _April_, 2002.

_____

Notary Public in and for the State of Texas

M. CARMEN BANNISTER
MY COMMISSION EXPIRES
JUNE 8, 2002

**AFFIDAVIT OF JOHN W. GREENE**                                     **PAGE 2**

04:23 PM  Apr 29, 2002

HILL GILSTRAP
Billed Fees and Costs in Client I.D. Order
From 01-01-96 through 04-29-02

Page No. 1

Client(s):  Select,1110

| I.D. Invoice # | Client Name/Matter Bill Date | Total Billed | Fees Billed | Atty | Hours | Amount | Costs Billed | Code | Amount |
|---|---|---|---|---|---|---|---|---|---|
| 1110 | David A. Lane | | | | | | | | |
| | -000026 General Matters - II | | | | | | | | |
| # 792735-1 | 08-31-99 | 600.00 | 600.00 | MAP | 3.00 | 600.00 | 0.00 | | |
| # 793196-1 | 09-30-99 | 60.73 | 60.00 | MAP | 0.30 | 60.00 | 0.73 | SC | 0.40 |
| | | | | | | | | SPOST | 0.33 |
| * Matter Total * | | 660.73 | 660.00 | MAP | 3.30 | 660.00 | 0.73 | SC | 0.40 |
| | | | | | | | | SPOST | 0.33 |
| | -000027 Eiger, Inc. & H.D. Associates, | | | | | | | | |
| # 792735-2 | 08-31-99 | 936.84 | 930.00 | FH | 3.10 | 930.00 | 6.84 | SPOST | 6.84 |
| # 793196-2 | 09-30-99 | 120.77 | 120.00 | FH | 0.40 | 120.00 | 0.77 | SPOST | 0.77 |
| # 793891-1 | 10-31-99 | 362.31 | 360.00 | FH | 1.20 | 360.00 | 2.31 | SPOST | 2.31 |
| # 794275-1 | 11-30-99 | 395.58 | 392.50 | FH | 1.20 | 360.00 | 3.08 | SPOST | 3.08 |
| | | | | LJL | 0.50 | 32.50 | | | |
| # 794898-1 | 12-31-99 | 180.33 | 180.00 | FH | 0.60 | 180.00 | 0.33 | SPOST | 0.33 |
| # 795518-1 | 01-31-00 | 245.23 | 240.00 | JWG | 1.20 | 240.00 | 5.23 | SC | 3.80 |
| | | | | | | | | SPOST | 1.43 |
| # 796082-1 | 02-29-00 | 450.00 | 450.00 | FH | 1.10 | 330.00 | 0.00 | | |
| | | | | JWG | 0.60 | 120.00 | | | |
| # 796607-1 | 03-31-00 | 6422.03 | 6040.00 | FH | 3.00 | 900.00 | 382.03 | HMISC | 375.72 |
| | | | | JWG | 25.70 | 5140.00 | | SC | 4.00 |
| | | | | | | | | SPOST | 2.31 |
| # 797092-1 | 04-30-00 | 1571.85 | 640.00 | JWG | 3.20 | 640.00 | 931.85 | HMISC | 925.31 |
| | | | | | | | | SC | 5.00 |
| | | | | | | | | SPOST | 1.54 |
| # 797461-1 | 05-31-00 | 4243.79 | 4060.00 | JWG | 20.30 | 4060.00 | 183.79 | HMISC | 20.00 |
| | | | | | | | | SFAX | 162.00 |
| | | | | | | | | SLDC | 1.46 |
| | | | | | | | | SPOST | 0.33 |
| # 797991-1 | 06-28-00 | 2521.70 | 2428.00 | JWG | 10.10 | 2020.00 | 93.70 | HMISC | 31.06 |
| | | | | TAF | 3.40 | 408.00 | | SFAX | 60.00 |
| | | | | | | | | SPOST | 2.64 |
| # 798666-1 | 07-31-00 | 3230.54 | 3229.00 | CAT | 0.20 | 33.00 | 1.54 | SPOST | 1.54 |
| | | | | JWG | 5.90 | 1180.00 | | | |
| | | | | TAF | 16.80 | 2016.00 | | | |
| # 800684-1 | 08-31-00 | 3670.90 | 3512.00 | JWG | 7.00 | 1400.00 | 158.90 | HMISC | 60.00 |
| | | | | TAF | 17.60 | 2112.00 | | SC | 15.00 |
| | | | | | | | | SFAX | 72.00 |
| | | | | | | | | SLDC | 0.65 |
| | | | | | | | | SPOST | 11.25 |
| # 800896-1 | 09-30-00 | 2626.67 | 2613.00 | JNC | 0.70 | 105.00 | 13.67 | SFOST | 13.67 |
| | | | | JWG | 12.30 | 2460.00 | | | |
| | | | | TAF | 0.40 | 48.00 | | | |
| # 801722-1 | 10-31-00 | 1172.02 | 1100.00 | JWG | 5.50 | 1100.00 | 72.02 | HMISC | 56.03 |
| | | | | | | | | SM | 15.00 |
| | | | | | | | | SPOST | 0.99 |
| # 802141-1 | 11-30-00 | 844.99 | 824.00 | JWG | 3.70 | 740.00 | 20.99 | HMISC | 19.19 |
| | | | | TAF | 0.70 | 84.00 | | SLDC | 0.37 |
| | | | | | | | | SPOST | 1.43 |
| # 802789-1 | 12-31-00 | 4399.49 | 4394.50 | CAT | 0.50 | 82.50 | 4.99 | SFAX | 4.00 |

04:23 PM  Apr 29, 2002                              HILL GILSTRAP                                          Page No. 2
                                      Billed Fees and Costs in Client I.D. Order
                                          From 01-01-96 through 04-29-02

Client(s):  Select,1110

| I.D. Invoice # | Client Name/Matter Bill Date | Total Billed | Fees Billed | Atty | Hours | Amount | Costs Billed | Code | Amount |
|---|---|---|---|---|---|---|---|---|---|
| | | | | JWG | 7.40 | 1480.00 | | SPOST | 0.99 |
| | | | | TAF | 23.60 | 2832.00 | | | |
| # 803151-1 | 01-31-01 | 1625.33 | 1556.00 | JWG | 3.30 | 660.00 | 69.33 | SC | 44.20 |
| | | | | TAF | 8.50 | 896.00 | | SCR | 4.01 |
| | | | | | | | | SPOST | 21.12 |
| # 803552-1 | 02-28-01 | 604.86 | 584.00 | JWG | 2.50 | 500.00 | 20.86 | SFAX | 4.00 |
| | | | | TAF | 0.60 | 84.00 | | SM | 15.00 |
| | | | | | | | | SPOST | 1.86 |
| # 804097-1 | 03-31-01 | 441.70 | 440.00 | JWG | 2.20 | 440.00 | 1.70 | SPOST | 1.70 |
| | | | | TAF | 1.20 | 0.00 | | | |
| # 804886-1 | 04-30-01 | 5342.37 | 5100.00 | JWG | 27.50 | 5100.00 | 242.37 | HMISC | 235.40 |
| | | | | | | | | SFAX | 6.00 |
| | | | | | | | | SPOST | 0.97 |
| # 805128-1 | 05-31-01 | 3868.98 | 2080.00 | JWG | 12.40 | 2080.00 | 1788.98 | HMISC | 1696.98 |
| | | | | | | | | SFAX | 92.00 |
| # 805787-1 | 06-30-01 | 18115.98 | 17162.00 | JNC | 9.80 | 1568.00 | 953.98 | HMISC | 835.98 |
| | | | | JWG | 65.40 | 12680.00 | | SFAX | 118.00 |
| | | | | NEW | 7.50 | 1500.00 | | | |
| | | | | TAF | 13.90 | 1414.00 | | | |
| # 806491-1 | 07-31-01 | 13261.72 | 9258.00 | JWG | 44.20 | 8600.00 | 4003.72 | HMISC | 3702.42 |
| | | | | TAF | 4.70 | 658.00 | | SCR | 247.30 |
| | | | | | | | | SFAX | 54.00 |
| # 806677-1 | 08-31-01 | 8243.38 | 6880.00 | JWG | 35.90 | 6880.00 | 1363.38 | HMISC | 984.97 |
| | | | | | | | | SCR | 352.41 |
| | | | | | | | | SFAX | 26.00 |
| # 807180-1 | 09-30-01 | 3554.25 | 1140.00 | JWG | 5.70 | 1140.00 | 2414.25 | HMISC | 2406.25 |
| | | | | | | | | SFAX | 8.00 |
| # 807767-1 | 10-31-01 | 9965.21 | 10340.00 | JWG | 55.50 | 10340.00 | -374.79 | HMISC | -471.58 |
| | | | | | | | | SC | 10.00 |
| | | | | | | | | SFAX | 72.00 |
| | | | | | | | | SLDC | 13.09 |
| | | | | | | | | SPOST | 1.70 |
| # 807767-1R | 10-31-01 | -9965.21 | -10340.00 | JWG | -55.50 | -10340.00 | 374.79 | HMISC | 471.58 |
| | | | | | | | | SC | -10.00 |
| | | | | | | | | SFAX | -72.00 |
| | | | | | | | | SLDC | -13.09 |
| | | | | | | | | SPOST | -1.70 |
| # 807958-1 | 10-31-01 | 8931.21 | 9306.00 | JWG | 55.50 | 9306.00 | -374.79 | HMISC | -471.58 |
| | | | | | | | | SC | 10.00 |
| | | | | | | | | SFAX | 72.00 |
| | | | | | | | | SLDC | 13.09 |
| | | | | | | | | SPOST | 1.70 |
| # 808661-1 | 12-31-01 | 107603.07 | 99361.00 | FH | 2.00 | 700.00 | 8242.07 | HMISC | 7040.69 |
| | | | | JNC | 223.60 | 35776.00 | | SC | 119.80 |
| | | | | JWG | 314.10 | 62820.00 | | SCR | 625.39 |
| | | | | SAS | 1.00 | 65.00 | | SFAX | 426.00 |
| | | | | | | | | SLDC | 27.67 |
| | | | | | | | | SPOST | 2.52 |
| # 808661-1R | 01-31-02 | -107603.07 | -99361.00 | FH | -2.00 | -700.00 | -8242.07 | HMISC | -7040.69 |
| | | | | JNC | -223.60 | -35776.00 | | SC | -119.80 |
| | | | | JWG | -314.10 | -62820.00 | | SCR | -625.39 |
| | | | | SAS | -1.00 | -65.00 | | SFAX | -426.00 |
| | | | | | | | | SLDC | -27.67 |
| | | | | | | | | SPOST | -2.52 |

04:23 PM  Apr 29, 2002                          HILL GILSTRAP                                    Page No. 3
                                    Billed Fees and Costs in Client I.D. Order
                                         From 01-01-96 through 04-29-02

Client(s):  Select,1110

| I.D. Invoice # | Client Name/Matter Bill Date | Total Billed | Fees Billed | Atty | Hours | Amount | Costs Billed | Code | Amount |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Fees by Working Attorney | | --- Costs by Type --- | |
| # 809105-1 | 01-31-02 | 1273.01 | 280.00 | JWG | 1.40 | 280.00 | 993.01 | HMISC | 783.50 |
| | | | | | | | | SCR | 209.14 |
| | | | | | | | | SLDC | 0.37 |
| # 809105-1R | 01-31-02 | -1273.01 | -280.00 | JWG | -1.40 | -280.00 | -993.01 | HMISC | -783.50 |
| | | | | | | | | SCR | -209.14 |
| | | | | | | | | SLDC | -0.37 |
| # 810315-1 | 01-31-02 | 50936.11 | 45252.82 | FH | 2.00 | 319.19 | 5683.29 | HMISC | 5107.67 |
| | | | | JNC | 223.90 | 16313.48 | | SC | 119.80 |
| | | | | JWG | 313.50 | 28590.52 | | SFAX | 426.00 |
| | | | | SAS | 1.00 | 29.63 | | SLDC | 27.30 |
| | | | | | | | | SPOST | 2.52 |
| # 810316-1 | 03-31-02 | 4528.93 | 964.00 | JNC | 0.90 | 144.00 | 3564.93 | HMISC | 2716.52 |
| | | | | JWG | 4.10 | 820.00 | | SC | 0.80 |
| | | | | | | | | SCR | 834.53 |
| | | | | | | | | SFAX | 12.00 |
| | | | | | | | | SLDC | 0.74 |
| | | | | | | | | SPOST | 0.34 |
| * Matter Total * | | 152849.86 | 131235.82 | CAT | 0.70 | 115.50 | 21614.04 | HMISC | 18701.92 |
| | | | | FH | 12.60 | 3499.19 | | SC | 202.60 |
| | | | | JNC | 235.30 | 18130.48 | | SCR | 1438.25 |
| | | | | JWG | 675.10 | 97376.52 | | SFAX | 1116.00 |
| | | | | LJL | 0.50 | 32.50 | | SLDC | 43.61 |
| | | | | NEW | 7.50 | 1500.00 | | SM | 30.00 |
| | | | | SAS | 1.00 | 29.63 | | SPOST | 81.66 |
| | | | | TAF | 91.40 | 10552.00 | | | |
| -000028 Lubbock - DOT | | | | | | | | | |
| # 810316-2 | 03-31-02 | 4081.15 | 4030.00 | FH | 0.40 | 150.00 | 51.15 | SC | 42.00 |
| | | | | JWG | 9.20 | 1840.00 | | SPOST | 9.15 |
| | | | | NEW | 10.20 | 2040.00 | | | |
| ** Client Total ** | | 157591.74 | 135925.82 | CAT | 0.70 | 115.50 | 21665.92 | HMISC | 18701.92 |
| | | | | FH | 13.00 | 3649.19 | | SC | 245.00 |
| | | | | JNC | 235.30 | 18130.48 | | SCR | 1438.25 |
| | | | | JWG | 684.30 | 99216.52 | | SFAX | 1116.00 |
| | | | | LJL | 0.50 | 32.50 | | SLDC | 43.61 |
| | | | | MAP | 3.30 | 660.00 | | SM | 30.00 |
| | | | | NEW | 17.70 | 3540.00 | | SPOST | 91.14 |
| | | | | SAS | 1.00 | 29.63 | | | |
| | | | | TAF | 91.40 | 10552.00 | | | |
| *** Report Total *** | | 157591.74 | 135925.82 | | | | 21665.92 | | |